United States Court of Appeals
for the Fourth Circuit
No. 19-4392

_____

United States,
Appellee,
v.

Eric Grinder,
Appellant.

_____

Appeal from the United States District Court
for the District of Maryland
_____

**Joint Appendix – Volume I**

James Wyda
Federal Public Defender

Cullen Macbeth
Assistant Federal Public Defender
100 S. Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
(410) 962-3962

Robert K. Hur
United States Attorney

Paul E. Budlow
Assistant U.S. Attorney
Office of the U.S. Attorney
36 S. Charles Street, 4th Floor
Baltimore, MD 21201
(410) 209-4917

Counsel for Appellant

Counsel for Appellee

# Table of Contents

## Volume I

**Page**

Docket Sheet ................................................................................1

Indictment ..............................................................................13

Superseding Indictment ...............................................................19

Second Superseding Indictment .......................................................28

Third Superseding Indictment ........................................................38

Motion to Suppress ...................................................................48

Reply to Motion to Suppress .........................................................61

Government Notice of Additional Legal Authority .....................................85

Response to Notice of Additional Legal Authority ....................................87

Reply to Notice of Additional Legal Authority .......................................90

Transcript of Hearing on Motion to Suppress .........................................92

Memorandum and Order Denying Motion to Suppress ....................................180

Defense Correspondence Regarding Acceptance of Responsibility ......................193

Motion to Reconsider Denial of Motion to Suppress ..................................196

Response to Motion to Reconsider ...................................................219

i

Reply to Motion to Reconsider ......................................................... 235

Transcript of Jury Trial, Day One ................................................... 239

Transcript of Jury Trial, Day Two .................................................. 328

## Volume II

**Page**

Transcript of Jury Trial, Day Three ................................................ 490

Trial Exhibits ................................................................................. 579

Verdict ........................................................................................... 759

Sentencing Transcript ................................................................... 761

Judgment ........................................................................................ 820

Notice of Appeal ........................................................................... 828

Amended Judgment ...................................................................... 829

## Volume III

**Page**

Exhibit 13A, Audio Recording, Admitted at Trial ......................... 837

Exhibit 18A, Audio Recording, Admitted at Trial ......................... 838

Exhibit 32A, Video Recording, Admitted at Trial ......................... 839

Exhibit 32B, Video Recording, Admitted at Trial ......................... 840

Exhibit 49B, Video Recording, Admitted at Trial ..........................................841

# U.S. District Court
## District of Maryland (Baltimore)
## CRIMINAL DOCKET FOR CASE #: 1:17-cr-00226-CCB-1

Case title: USA v. Grinder

Date Filed: 04/26/2017
Date Terminated: 05/28/2019

---

Assigned to: Judge Catherine C. Blake

Appeals court case number: 19-4392 Fourth
Circuit Court of Appeals

**Defendant (1)**

**Eric Wayne Grinder**
*TERMINATED: 05/28/2019*

represented by **Elizabeth Genevieve Oyer**
Office of the Federal Public Defender
100 S Charles St Ste 900 Tower II
Baltimore, MD 21201
14109623962
Fax: 14109620872
Email: liz_oyer@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community
Defender Appointment*

**Kirstin Maguire Hopkins**
Office of the Federal Public Defender
100 S Charles St
Tower II, 9th Fl
Baltimore, MD 21201
14109623962
Fax: 14109620872
Email: kirstin_hopkins@fd.org
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community
Defender Appointment*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:2251(a) PRODUCTION OF CHILD PORNOGRAPHY; 18:2 AIDING & ABETTING (1-3) | DISMISSED |
| 18:2251(a) PRODUCTION OF CHILD PORNOGRAPHY; 18:2 AIDING AND ABETTING (1s-3s) | DISMISSED |
| 18:2251(a) PRODUCTION OF CHILD PORNOGRAPHY; 18:2 AIDING & | DISMISSED |

ABETTING
(1ss-6ss)

18:2251(a) PRODUCTION OF CHILD
PORNOGRAPHY; 18:2 AIDING &
ABETTING
(1sss)

IMPRISONMENT for 360 months as to
Counts 1sss - 6sss, concurrent, and 240 months
as to Counts 7sss - 9sss, concurrent, for a total
term of 360 months w/credit for time served
from 11/29/16; SUPERVISED RELEASE for
LIFE as to Counts 1sss - 9sss, concurrent;
ASSESSMENT $900; RESTITUTION
$36,000.00

18:2251(a),(e) ATTEMPTED PRODUCTION
OF CHILD PORNOGRAPHY; 18:2 AIDING
& ABETTING
(2sss)

IMPRISONMENT for 360 months as to
Counts 1sss - 6sss, concurrent, and 240 months
as to Counts 7sss - 9sss, concurrent, for a total
term of 360 months w/credit for time served
from 11/29/16; SUPERVISED RELEASE for
LIFE as to Counts 1sss - 9sss, concurrent;
ASSESSMENT $900; RESTITUTION
$36,000.00

18:2251(a) PRODUCTION OF CHILD
PORNOGRAPHY; 18:2 AIDING &
ABETTING
(3sss-6sss)

IMPRISONMENT for 360 months as to
Counts 1sss - 6sss, concurrent, and 240 months
as to Counts 7sss - 9sss, concurrent, for a total
term of 360 months w/credit for time served
from 11/29/16; SUPERVISED RELEASE for
LIFE as to Counts 1sss - 9sss, concurrent;
ASSESSMENT $900; RESTITUTION
$36,000.00

18:2252(a)(4)(B) POSSESSION OF CHILD
PORNOGRAPHY; 18:2 AIDING &
ABETTING
(4-5)

DISMISSED

18:2252(a)(4)(B) & 2256 POSSESSION OF
CHILD PORNOGRAPHY; 18:2 AIDING
AND ABETTING
(4s-5s)

DISMISSED

18:2251(a) PRODUCTION OF CHILD
PORNOGRAPHY; 18:2 AIDING AND
ABETTING
(6s-7s)

DISMISSED

18:2252A(a)(5)(B) POSSESSION OF CHILD
PORNOGRAPHY; 18:2 AIDING &
ABETTING
(7ss-8ss)

DISMISSED

18:2252A(a)(5)(B) & 2256 POSSESSION OF
CHILD PORNOGRAPHY; 18:2 AIDING &
ABETTING
(7sss-8sss)

IMPRISONMENT for 360 months as to
Counts 1sss - 6sss, concurrent, and 240 months
as to Counts 7sss - 9sss, concurrent, for a total
term of 360 months w/credit for time served
from 11/29/16; SUPERVISED RELEASE for
LIFE as to Counts 1sss - 9sss, concurrent;
ASSESSMENT $900; RESTITUTION
$36,000.00

DISMISSED

09/16/2019

18:1512(b)(1) WITNESS TAMPERING; 18:2
AIDING AND ABETTING
(8s)

18:1512(b)(1) WITNESS TAMPERING;
AIDING & ABETTING                                   DISMISSED
(9ss)

18:1512(b)(1) WITNESS TAMPERING; 18:2
AIDING & ABETTING
(9sss)

IMPRISONMENT for 360 months as to
Counts 1sss - 6sss, concurrent, and 240 months
as to Counts 7sss - 9sss, concurrent, for a total
term of 360 months w/credit for time served
from 11/29/16; SUPERVISED RELEASE for
LIFE as to Counts 1sss - 9sss, concurrent;
ASSESSMENT $900; RESTITUTION
$36,000.00

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                               **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                      **Disposition**

None

---

**Plaintiff**

**USA**                        represented by   **Paul Anthony Riley**
                                                United States Attorney s Office, District of
                                                Maryland
                                                36 S. Charles St., 4th Floor
                                                Baltimore, MD 21201
                                                (410) 209-4800
                                                Email: paul.riley@usdoj.gov
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*
                                                *Designation: Assistant US Attorney*

                                                **Paul E Budlow**
                                                Office of the United States Attorney
                                                36 S Charles St Fourth Fl
                                                Baltimore, MD 21202
                                                14102094917
                                                Fax: 14109620716
                                                Email: Paul.Budlow@usdoj.gov
                                                *ATTORNEY TO BE NOTICED*
                                                *Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/26/2017 | 1 | INDICTMENT as to Eric Wayne Grinder (1) count(s) 1-3, 4-5. (hmls, Deputy Clerk) (Entered: 04/26/2017) |
| 04/27/2017 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Eric Wayne Grinder. PLEASE NOTE: Defendant is in custody. A writ was requested on 4/27/2017. A come up was requested on 4/27/2017. An interpreter will not be needed. Initial Appearance set for 5/4/2017 11:00 AM in Courtroom 7B, 101 West Lombard Street, Baltimore, Maryland 21201, before Magistrate Judge Beth P. Gesner.(Riley, Paul) (Entered: 04/27/2017) |
| 04/27/2017 | | Corrected PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Eric Wayne Grinder. PLEASE NOTE: Defendant is in custody. A writ was requested on 4/27/2017. A come up was requested on 4/27/2017. An interpreter will not be needed. Initial Appearance set for 5/4/2017 10:00 AM in Courtroom 7B, 101 West Lombard Street, Baltimore, Maryland 21201, before Magistrate Judge Beth P. Gesner.(Riley, Paul) (Entered: 04/27/2017) |
| 05/04/2017 | 7 | Initial Appearance as to Eric Wayne Grinder (Defendant informed of Rights.) held on 5/4/2017 before Magistrate Judge Beth P. Gesner.(FTR Waryu-7B) (jws, Deputy Clerk) (Entered: 05/04/2017) |
| 05/04/2017 | 8 | Arraignment as to Eric Wayne Grinder (1) Counts 1-3,4-5 held on 5/4/2017. Plea entered by Eric Wayne Grinder Not Guilty as to Counts 1-3, 4-5 before Magistrate Judge Beth P. Gesner.(FTR - Waryu-7B) (jws, Deputy Clerk) (Entered: 05/04/2017) |
| 05/04/2017 | 9 | CJA 23 Financial Affidavit by Eric Wayne Grinder. (hmls, Deputy Clerk) (Entered: 05/05/2017) |
| 05/04/2017 | 10 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Eric Wayne Grinder. Signed by Magistrate Judge Beth P. Gesner on 5/4/2017. (hmls, Deputy Clerk) (Entered: 05/05/2017) |
| 05/04/2017 | 11 | ORDER OF DETENTION by Agreement as to Eric Wayne Grinder. Signed by Magistrate Judge Beth P. Gesner on 5/4/2017. (hmls, Deputy Clerk) (Entered: 05/05/2017) |
| 05/05/2017 | 12 | NOTICE OF ATTORNEY APPEARANCE: Elizabeth Genevieve Oyer as Public Defender appearing for Eric Wayne Grinder(Oyer, Elizabeth) (Entered: 05/05/2017) |
| 05/17/2017 | 13 | STATUS REPORT by USA as to Eric Wayne Grinder (Riley, Paul) (Entered: 05/17/2017) |
| 05/17/2017 | 14 | Marginal ORDER APPROVING 13 Status Report filed by USA as to Eric Wayne Grinder. Signed by Chief Judge Catherine C. Blake on 5/17/2017. (hmls, Deputy Clerk) (Entered: 05/17/2017) |
| 06/16/2017 | 15 | STATUS REPORT by USA as to Eric Wayne Grinder (Riley, Paul) (Entered: 06/16/2017) |
| 06/16/2017 | 16 | PAPERLESS ORDER APPROVING 15 Status Report filed by USA. An updated Status Report is requested by August 15, 2017. Signed by Chief Judge Catherine C. Blake on 6/16/2017. (Blake, Catherine) (Entered: 06/16/2017) |
| 06/21/2017 | 17 | MOTION to Exclude *Time pursuant to the Speedy Trial Act* by USA as to Eric Wayne Grinder. (Attachments: # 1 Text of Proposed Order)(Riley, Paul) (Entered: 06/21/2017) |
| 06/22/2017 | 18 | ORDER GRANTING 17 Motion to Exclude Time pursuant to the Speedy Trial Act as to Eric Wayne Grinder (1). Signed by Chief Judge Catherine C. Blake on 6/22/2017. (hmls, Deputy Clerk) (Entered: 06/22/2017) |
| 07/12/2017 | 19 | NOTICE OF ATTORNEY APPEARANCE: Kirstin Maguire as Public Defender appearing for Eric Wayne Grinder(Maguire, Kirstin) (Entered: 07/12/2017) |
| 08/09/2017 | 20 | SUPERSEDING INDICTMENT as to Eric Wayne Grinder (1) count(s) 1s-3s, 4s-5s, 6s-7s, 8s. (cags, Deputy Clerk) (Entered: 08/09/2017) |

| 08/09/2017 | 22 | Redlined Superseding Indictment filed by USA on 8/9/2017as to Eric Wayne Grinder. (cags, Deputy Clerk) (Entered: 08/09/2017) |
| --- | --- | --- |
| 08/15/2017 | 23 | STATUS REPORT by USA as to Eric Wayne Grinder (Riley, Paul) (Entered: 08/15/2017) |
| 08/22/2017 | 24 | PAPERLESS ORDER APPROVING 23 Status Report filed by USA. Signed by Chief Judge Catherine C. Blake on 8/22/2017. (Blake, Catherine) (Entered: 08/22/2017) |
| 09/15/2017 | 25 | STATUS REPORT by USA as to Eric Wayne Grinder (Riley, Paul) (Entered: 09/15/2017) |
| 09/15/2017 | 26 | PAPERLESS ORDER APPROVING 25 Status Report filed by USA. Signed by Chief Judge Catherine C. Blake on 9/15/2017. (Blake, Catherine) (Entered: 09/15/2017) |
| 09/15/2017 | 27 | MOTION to Exclude *Time Pursuant to the Speedy Trial Act* by USA as to Eric Wayne Grinder. (Attachments: # 1 Text of Proposed Order)(Riley, Paul) (Entered: 09/15/2017) |
| 09/15/2017 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Eric Wayne Grinder. PLEASE NOTE: Defendant is in custody. A writ was requested on 9/15/2017. A come up was requested on 9/15/2017. An interpreter will not be needed. Initial Appearance set for 9/29/2017 11:00 AM in Courtroom 3A, 101 West Lombard Street, Baltimore, Maryland 21201, before Magistrate Judge A. David Copperthite.(Riley, Paul) (Entered: 09/15/2017) |
| 09/19/2017 | 28 | ORDER GRANTING 27 Motion to Exclude Time Pursuant to the Speedy Trial Act as to Eric Wayne Grinder (1). Signed by Judge Richard D. Bennett on 9/18/2017. (hmls, Deputy Clerk) (Entered: 09/19/2017) |
| 09/29/2017 | 31 | Initial Appearance as to Eric Wayne Grinder (Defendant informed of Rights.) held on 9/29/2017 before Magistrate Judge A. David Copperthite.(FTR Waryu-3A) (jws, Deputy Clerk) (Entered: 09/29/2017) |
| 09/29/2017 | 32 | Arraignment as to Eric Wayne Grinder (1) Counts 1s-3s,4s-5s,6s-7s,8s held on 9/29/2017. Plea entered by Eric Wayne Grinder Not Guilty as to Counts 1s-3s, 4s-5s, 6s-7s and 8s before Magistrate Judge A. David Copperthite.(FTR Waryu-3A) (jws, Deputy Clerk) (Entered: 09/29/2017) |
| 10/30/2017 | 33 | MOTION to Suppress *Cell Phone and Laptop Computer Evidence* by Eric Wayne Grinder. (Oyer, Elizabeth) (Entered: 10/30/2017) |
| 10/30/2017 | 34 | -SEALED- MOTION to Seal by Eric Wayne Grinder. (Attachments: # 1 Text of Proposed Order)(Oyer, Elizabeth) (Entered: 10/30/2017) |
| 10/30/2017 | 35 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 5)(Oyer, Elizabeth) (Entered: 10/30/2017) |
| 10/30/2017 | 36 | Consent MOTION for Extension of Time to File Response/Reply by Eric Wayne Grinder. (Hopkins, Kirstin) (Entered: 10/30/2017) |
| 10/31/2017 | 37 | PAPERLESS ORDER Granting 36 Motion for Extension of Time. Signed by Judge Catherine C. Blake on 10/31/2017. (Blake, Catherine) (Entered: 10/31/2017) |
| 11/15/2017 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Eric Wayne Grinder. PLEASE NOTE: Defendant is in custody. A writ was requested on 11/15/2017. A come up was requested on 11/15/2017. An interpreter will not be needed. Pretrial Hearing on Motions set for 1/26/2018 02:00 PM in Courtroom 7D, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge Catherine C. Blake.(Riley, Paul) (Entered: 11/15/2017) |
| 11/15/2017 | 38 | ORDER confirming results of the telephone conference and setting schedule as to Eric Wayne Grinder. Signed by Judge Catherine C. Blake on 11/15/2017. (hmls, Deputy Clerk) (Entered: 11/15/2017) |
| 11/15/2017 | | |

|  |  | Telephone Conference as to Eric Wayne Grinder held on 11/15/2017 before Judge Catherine C. Blake. (kams, Deputy Clerk) (Entered: 12/04/2017) |
|---|---|---|
| 11/16/2017 | 41 | Correspondence re: Deadline Extension (Riley, Paul) (Entered: 11/16/2017) |
| 11/16/2017 | 42 | ORDER re: Revisions to Schedule as to Eric Wayne Grinder. Signed by Judge Catherine C. Blake on 11/16/2017. (hmls, Deputy Clerk) (Entered: 11/16/2017) |
| 11/16/2017 |  | Telephone Conference as to Eric Wayne Grinder held on 11/16/2017 before Judge Catherine C. Blake. (kams, Deputy Clerk) (Entered: 12/04/2017) |
| 11/27/2017 | 43 | -SEALED- MOTION to Seal by USA as to Eric Wayne Grinder. (Attachments: # 1 Text of Proposed Order)(Riley, Paul) (Entered: 11/27/2017) |
| 11/27/2017 | 44 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Riley, Paul) (Entered: 11/27/2017) |
| 12/04/2017 | 45 | Correspondence re: Revised Filing (Riley, Paul) (Entered: 12/04/2017) |
| 12/04/2017 | 46 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Riley, Paul) (Entered: 12/04/2017) |
| 12/18/2017 | 47 | RESPONSE in Support by Eric Wayne Grinder re 33 MOTION to Suppress *Cell Phone and Laptop Computer Evidence* (Oyer, Elizabeth) (Entered: 12/18/2017) |
| 01/24/2018 | 48 | Correspondence re: Additional Legal Authority In Connection With Motions Hearing Set For January 26, 2018 at 2:00 pm. (Riley, Paul) (Entered: 01/24/2018) |
| 01/24/2018 | 49 | RESPONSE re 48 Miscellaneous Correspondence. *re Motion to Suppress Evidence* (Oyer, Elizabeth) (Entered: 01/24/2018) |
| 01/25/2018 | 50 | RESPONSE re 49 Response filed by USA. *Gov't response to Defendant's correspondence dated January 24, 2018 which contained new legal authority and argument* (Riley, Paul) (Entered: 01/25/2018) |
| 01/26/2018 | 51 | EXHIBIT LIST by USA as to Eric Wayne Grinder. (hmls, Deputy Clerk) (Entered: 01/29/2018) |
| 01/26/2018 | 52 | Motion Hearing as to Eric Wayne Grinder held on 1/26/2018 re 33 MOTION to Suppress *Cell Phone and Laptop Computer Evidence* filed by Eric Wayne Grinder before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kams, Deputy Clerk) (Entered: 01/29/2018) |
| 06/07/2018 | 53 | Request for Scheduling (Riley, Paul) (Entered: 06/07/2018) |
| 06/12/2018 | 54 | MEMORANDUM as to Eric Wayne Grinder. Signed by Judge Catherine C. Blake on 6/12/2018. (hmls, Deputy Clerk) (Entered: 06/12/2018) |
| 06/12/2018 | 55 | ORDER DENYING 33 Motion to Suppress Cell Phone and Laptop Computer Evidence as to Eric Wayne Grinder (1). Signed by Judge Catherine C. Blake on 6/12/2018. (hmls, Deputy Clerk) (Entered: 06/12/2018) |
| 06/12/2018 |  | Telephone Conference as to Eric Wayne Grinder held on 6/12/2018 before Judge Catherine C. Blake. (kam, Deputy Clerk) (Entered: 06/12/2018) |
| 06/13/2018 | 56 | PAPERLESS Correspondence to all counsel: A telephone conference is set for JULY 10, 2018 at 9:00 a.m. The government will be initiating the call. (Blake, Catherine) (Entered: 06/13/2018) |
| 07/10/2018 | 57 | ORDER SCHEDULING Trial as to Eric Wayne Grinder. Signed by Judge Catherine C. Blake on 7/10/2018. (hmls, Deputy Clerk) (Entered: 07/10/2018) |
| 07/10/2018 |  | Telephone Conference as to Eric Wayne Grinder held on 7/10/2018 before Judge Catherine C. Blake. (kam, Deputy Clerk) (Entered: 07/23/2018) |
| 07/12/2018 | 58 |  |

| | | |
|---|---|---|
| | | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Eric Wayne Grinder held on 5/4/2017, before Judge Gesner. Court Reporter/Transcriber Er'd. Total number of pages filed: 12. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 8/2/2018. Redacted Transcript Deadline set for 8/13/2018. Release of Transcript Restriction set for 10/10/2018. (slss, Deputy Clerk) (Entered: 07/12/2018) |
| 07/30/2018 | 59 | Consent MOTION to Exclude *Time Pursuant To The Speedy Trial Act* by USA as to Eric Wayne Grinder. (Attachments: # 1 Text of Proposed Order)(Riley, Paul) (Entered: 07/30/2018) |
| 07/31/2018 | 60 | ORDER granting 59 Motion to Exclude Time Pursuant to the Speedy Trial Act as to Eric Wayne Grinder (1). Signed by Judge Catherine C. Blake on 7/31/18. (krs, Deputy Clerk) (Entered: 07/31/2018) |
| 12/12/2018 | 61 | Second Superseding INDICTMENT as to Eric Wayne Grinder (1) count(s) 1ss-6ss, 7ss-8ss, 9ss. (hmls, Deputy Clerk) (Entered: 12/13/2018) |
| 12/12/2018 | 63 | Redlined Second Superseding Indictment filed by USA on 12/12/2018as to Eric Wayne Grinder. (hmls, Deputy Clerk) (Entered: 12/13/2018) |
| 01/02/2019 | 64 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Eric Wayne Grinder held on 1/26/18, before Judge Blake. Court Reporter/Transcriber Douglas J. Zweizig, Telephone number 410-962-4474. Total number of pages filed: 88. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 1/23/2019. Redacted Transcript Deadline set for 2/4/2019. Release of Transcript Restriction set for 4/2/2019. (dz, Court Reporter) (Entered: 01/02/2019) |
| 01/04/2019 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Eric Wayne Grinder. PLEASE NOTE: Defendant is in custody. A writ was requested on 1/3/2019. A come up was requested on 1/3/2019. An interpreter will not be needed. Arraignment set for 1/11/2019 11:00 AM in Courtroom 7B, 101 West Lombard Street, Baltimore, Maryland 21201, before Magistrate Judge J. Mark Coulson. Initial Appearance set for 1/11/2019 11:00 AM in Courtroom 7B, 101 West Lombard Street, Baltimore, Maryland 21201, before Magistrate Judge J. Mark Coulson. (Riley, Paul) (Entered: 01/04/2019) |
| 01/11/2019 | 69 | Initial Appearance as to Eric Wayne Grinder (Defendant informed of Rights.) held on 1/11/2019 before Magistrate Judge J. Mark Coulson.(FTR KLEIN -7B.) (jks, Deputy Clerk) (Entered: 01/14/2019) |
| 01/11/2019 | 70 | Arraignment as to Eric Wayne Grinder (1) Counts 1ss-6ss,7ss-8ss,9ss held on 1/11/2019, Plea entered by Eric Wayne Grinder of Not Guilty as to counts 1ss-6ss,7ss-8ss,9ss before Magistrate Judge J. Mark Coulson.(FTR KLEIN -7B.) (jks, Deputy Clerk) (Entered: 01/14/2019) |
| 01/15/2019 | 71 | Correspondence re: Acceptance of Responsibility (Oyer, Elizabeth) (Entered: 01/15/2019) |
| 01/16/2019 | 74 | MOTION in Limine *to Exclude Evidence Regarding the Removal of Items from the Home* by Eric Wayne Grinder. (Hopkins, Kirstin) (Entered: 01/16/2019) |
| 01/16/2019 | 75 | MOTION in Limine *to Exclude SAFE Exam Evidence* by Eric Wayne Grinder. (Hopkins, Kirstin) (Entered: 01/16/2019) |
| 01/16/2019 | 76 | MOTION in Limine *to Exclude Drug-Related Evidence* by Eric Wayne Grinder. (Hopkins, Kirstin) (Entered: 01/16/2019) |
| 01/16/2019 | 77 | MOTION in Limine *to Exclude Image Comparison Analysis Testimony* by Eric Wayne Grinder. (Hopkins, Kirstin) (Entered: 01/16/2019) |

| | | |
|---|---|---|
| 01/16/2019 | 78 | Proposed Jury Instructions by USA as to Eric Wayne Grinder (Riley, Paul) (Entered: 01/16/2019) |
| 01/16/2019 | 79 | Proposed Voir Dire by USA as to Eric Wayne Grinder (Riley, Paul) (Entered: 01/16/2019) |
| 01/16/2019 | 80 | -SEALED- MOTION to Seal by USA as to Eric Wayne Grinder. (Attachments: # 1 Text of Proposed Order)(Riley, Paul) (Entered: 01/16/2019) |
| 01/16/2019 | 81 | **PROPOSED SEALED DOCUMENT** (Riley, Paul) (Entered: 01/16/2019) |
| 01/16/2019 | | Pretrial Conference as to Eric Wayne Grinder held on 1/16/2019 before Judge Catherine C. Blake. (kam, Deputy Clerk) (Entered: 02/01/2019) |
| 01/18/2019 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Eric Wayne Grinder. PLEASE NOTE: Defendant is in custody. A writ was requested on 1/15/2019. A come up was requested on 1/18/2019. An interpreter will not be needed. Jury Trial set for 2/19/2019 10:00 AM in Courtroom 7D, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge Catherine C. Blake.(Riley, Paul) (Entered: 01/18/2019) |
| 01/23/2019 | 82 | Third Superseding INDICTMENT as to Eric Wayne Grinder (1) count(s) 1sss, 2sss, 3sss-6sss, 7sss-8sss, 9sss. (hmls, Deputy Clerk) (Entered: 01/24/2019) |
| 01/23/2019 | 84 | Redlined Third Superseding Indictment filed by USA on 1/23/2019as to Eric Wayne Grinder. (hmls, Deputy Clerk) (Entered: 01/24/2019) |
| 01/24/2019 | 85 | Correspondence re: third superseding indictment and stipulations (Riley, Paul) (Entered: 01/24/2019) |
| 01/25/2019 | 86 | RESPONSE. *to Government's Motions in Limine* (Hopkins, Kirstin) (Entered: 01/25/2019) |
| 01/25/2019 | 87 | RESPONSE re 76 MOTION in Limine *to Exclude Drug-Related Evidence*, 74 MOTION in Limine *to Exclude Evidence Regarding the Removal of Items from the Home*, 75 MOTION in Limine *to Exclude SAFE Exam Evidence*, 77 MOTION in Limine *to Exclude Image Comparison Analysis Testimony* filed by USA. (Riley, Paul) (Entered: 01/25/2019) |
| 02/01/2019 | 88 | -SEALED- MOTION to Seal by USA as to Eric Wayne Grinder. (Attachments: # 1 Text of Proposed Order)(Riley, Paul) (Entered: 02/01/2019) |
| 02/01/2019 | 89 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11)(Riley, Paul) (Entered: 02/01/2019) |
| 02/04/2019 | 90 | Correspondence re: request for Order of Reference (Riley, Paul) (Entered: 02/04/2019) |
| 02/06/2019 | 91 | Correspondence re: Opposition to Request for Magistrate Judge Referral (Oyer, Elizabeth) (Entered: 02/06/2019) |
| 02/07/2019 | 92 | Correspondence re: request for order of reference (Riley, Paul) (Entered: 02/07/2019) |
| 02/11/2019 | 93 | Correspondence re: evidentiary dispute (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Riley, Paul) (Entered: 02/11/2019) |
| 02/12/2019 | 94 | MOTION for Reconsideration *of Motion to Suppress* by Eric Wayne Grinder. (Attachments: # 1 Exhibit A)(Oyer, Elizabeth) (Entered: 02/12/2019) |
| 02/13/2019 | 95 | MOTION in Limine *to Exclude Evidence Related to the Internet History of the Seized Electronic Devices* by Eric Wayne Grinder. (Hopkins, Kirstin) (Entered: 02/13/2019) |
| 02/13/2019 | 98 | RESPONSE in Opposition by USA as to Eric Wayne Grinder re 94 MOTION for Reconsideration *of Motion to Suppress* (Attachments: # 1 Exhibit 1)(Riley, Paul) (Entered: 02/13/2019) |
| 02/14/2019 | 99 | |

| | | |
|---|---|---|
| | | REPLY TO RESPONSE to Motion by Eric Wayne Grinder re 94 MOTION for Reconsideration *of Motion to Suppress* (Oyer, Elizabeth) (Entered: 02/14/2019) |
| 02/15/2019 | | Telephone Conference as to Eric Wayne Grinder held on 2/15/2019 before Judge Catherine C. Blake. (kams, Deputy Clerk) (Entered: 02/26/2019) |
| 02/17/2019 | 100 | Correspondence re: publication of images/videos to the jury and response to motion in limine re: internet history (ECF No. 95) (Attachments: # 1 Exhibit 30A, # 2 Exhibit 30B, # 3 Exhibit 30C, # 4 Exhibit 30D, # 5 Exhibit 30E, # 6 Exhibit 30F, # 7 Exhibit 30G, # 8 Exhibit 33G, # 9 Exhibit 33H, # 10 Exhibit 33F)(Riley, Paul) (Entered: 02/17/2019) |
| 02/18/2019 | 101 | Correspondence re: Victim's Right Not to Be Excluded Under the Crime Victims Rights Act (Budlow, Paul) (Entered: 02/18/2019) |
| 02/19/2019 | 102 | Arraignment as to Eric Wayne Grinder (1) Count 1sss,2sss,3sss-6sss,7sss-8sss,9sss held on 2/19/2019. Defendant plead "NOT GUILTY" as to Counts 1sss - 9sss of the 3rd Superseding Indictment before Judge Catherine C. Blake.(Court Reporter: Mary Zajac) (kam, Deputy Clerk) (Entered: 02/19/2019) |
| 02/19/2019 | 104 | Jury Trial (Day 1) as to Eric Wayne Grinder held on 2/19/2019 before Judge Catherine C. Blake. (Court Reporter: Mary Zajac) (kam, Deputy Clerk) (Entered: 02/21/2019) |
| 02/20/2019 | 103 | Correspondence re: proposed jury instructions (Riley, Paul) (Entered: 02/20/2019) |
| 02/21/2019 | 106 | Jury Trial (Day 2) as to Eric Wayne Grinder held on 2/21/2019 before Judge Catherine C. Blake. (Court Reporter: Mary Zajac) (kams, Deputy Clerk) (Entered: 02/22/2019) |
| 02/22/2019 | 107 | Jury Trial (Day 3) as to Eric Wayne Grinder held on 2/22/2019 before Judge Catherine C. Blake. (Court Reporter: Mary Zajac) (kams, Deputy Clerk) (Additional attachment(s) added on 2/25/2019: # 1 Supplement Corrected minutes) (kams, Deputy Clerk). (Entered: 02/22/2019) |
| 02/25/2019 | 108 | EXHIBIT LIST by USA as to Eric Wayne Grinder (hmls, Deputy Clerk) (Entered: 02/26/2019) |
| 02/25/2019 | 109 | Stipulation re: Certification of Exhibits Submitted to the Jury (hmls, Deputy Clerk) (Entered: 02/26/2019) |
| 02/25/2019 | 110 | Jury Note (hmls, Deputy Clerk) (Entered: 02/26/2019) |
| 02/25/2019 | 111 | JURY VERDICT as to Eric Wayne Grinder (1) Guilty on Count 1sss, 2sss, 3sss-6sss, 7sss-8sss, 9sss. (hmls, Deputy Clerk) (Entered: 02/26/2019) |
| 02/25/2019 | 112 | -SEALED- JURY VERDICT Signed (hmls, Deputy Clerk) (Entered: 02/26/2019) |
| 02/25/2019 | 113 | Stipulation re: Return of Exhibits to Counsel (hmls, Deputy Clerk) (Entered: 02/26/2019) |
| 02/25/2019 | 114 | Sentencing Order as to Eric Wayne Grinder. Signed by Judge Catherine C. Blake on 2/22/2019. (hmls, Deputy Clerk) (Entered: 02/26/2019) |
| 05/09/2019 | 117 | Correspondence re: request for extension of sentencing memorandum filing deadline from May 10, 2019 to May 13, 2019 (Riley, Paul) (Entered: 05/09/2019) |
| 05/09/2019 | 118 | Marginal ORDER APPROVING 117 Correspondence re request for extension of sentencing memorandum filing deadline from May 10, 2019 to May 13, 2019 as to Eric Wayne Grinder. Signed by Judge Catherine C. Blake on 5/9/2019. (hmls, Deputy Clerk) (Entered: 05/09/2019) |
| 05/10/2019 | 119 | MOTION to Seal by Eric Wayne Grinder. (Attachments: # 1 Text of Proposed Order)(Hopkins, Kirstin) (Entered: 05/10/2019) |
| 05/10/2019 | 120 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit)(Hopkins, Kirstin) (Entered: 05/10/2019) |
| 05/13/2019 | 121 | |

| | | |
|---|---|---|
| | | -SEALED- MOTION to Seal by USA as to Eric Wayne Grinder. (Attachments: # 1 Text of Proposed Order)(Riley, Paul) (Entered: 05/13/2019) |
| 05/13/2019 | 122 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14)(Riley, Paul) (Entered: 05/13/2019) |
| 05/17/2019 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Eric Wayne Grinder. PLEASE NOTE: Defendant is in custody. A writ was requested on 5/17/2019. A come up was requested on 5/20/2019. An interpreter will not be needed. Sentencing set for 5/24/2019 09:30 AM in Courtroom 7D, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge Catherine C. Blake.(Riley, Paul) (Entered: 05/17/2019) |
| 05/17/2019 | 123 | -SEALED- MOTION to Seal by USA as to Eric Wayne Grinder. (Attachments: # 1 Text of Proposed Order)(Riley, Paul) (Entered: 05/17/2019) |
| 05/17/2019 | 124 | **SEALED DOCUMENT** (Riley, Paul) Modified on 5/24/2019 (bmhs, Deputy Clerk). (Entered: 05/17/2019) |
| 05/20/2019 | 127 | Correspondence re: Supplemental Authority with Regard to Acceptance of Responsibility (Hopkins, Kirstin) (Entered: 05/20/2019) |
| 05/21/2019 | 128 | Correspondence re: government's response to defendant's letter dated May 20, 2019 (ECF No. 127) (Riley, Paul) (Entered: 05/21/2019) |
| 05/23/2019 | 131 | Correspondence re: victim restitution request (Attachments: # 1 Exhibit A)(Riley, Paul) (Entered: 05/23/2019) |
| 05/24/2019 | 132 | -SEALED- ORDER granting 123 Motion to Seal as to Eric Wayne Grinder (1). Signed by Judge Catherine C. Blake on 5/24/2019. (c/d 5/24/19 bmhs, Deputy Clerk) (Entered: 05/24/2019) |
| 05/24/2019 | 133 | Sentencing as to Eric Wayne Grinder held on 5/24/2019 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kams, Deputy Clerk) (Additional attachment(s) added on 6/7/2019: # 1 Supplement Corrected Minutes) (kam, Deputy Clerk). (Entered: 05/24/2019) |
| 05/28/2019 | 135 | ORDER of Forfeiture as to Eric Wayne Grinder. Signed by Judge Catherine C. Blake on 5/24/2019. (hmls, Deputy Clerk) (Entered: 05/28/2019) |
| 05/28/2019 | 136 | JUDGMENT as to Eric Wayne Grinder (1), Count(s) 1-3, 1s-3s, 1ss-6ss, 4-5, 4s-5s, 6s-7s, 7ss-8ss, 8s, 9ss, DISMISSED; Count(s) 1sss, 2sss, 3sss-6sss, 7sss-8sss, 9sss, IMPRISONMENT for 360 months as to Counts 1sss - 6sss, concurrent, and 240 months as to Counts 7sss - 9sss, current, for a total term of 360 months w/credit for time served from 11/29/16; SUPERVISED RELEASE for LIFE as to Counts 1sss - 9sss, concurrent; ASSESSMENT $900; RESTITUTION Deferred for 90 days. Signed by Judge Catherine C. Blake on 5/28/2019. (hmls, Deputy Clerk) Modified on 5/29/2019 (hmls, Deputy Clerk). (Entered: 05/29/2019) |
| 05/31/2019 | 138 | NOTICE OF APPEAL by Eric Wayne Grinder re 136 Judgment,, Fee Status: Federal Public Defender. (Oyer, Elizabeth) (Entered: 05/31/2019) |
| 05/31/2019 | 139 | Transmission of Notice of Appeal and Docket Sheet as to Eric Wayne Grinder to US Court of Appeals re 138 Notice of Appeal - Final Judgment (jb5, Deputy Clerk) (Entered: 05/31/2019) |
| 05/31/2019 | | Assembled Electronic Record Transmitted to Fourth Circuit -- Initial (jb5, Deputy Clerk) (Entered: 05/31/2019) |
| 06/04/2019 | 140 | USCA Case Number 19-4392 as to Eric Wayne Grinder for 138 Notice of Appeal - Final Judgment filed by Eric Wayne Grinder - Case Manager - Cathi Bennett. (slss, Deputy Clerk) (Entered: 06/04/2019) |
| 06/04/2019 | 141 | |

|  |  | ORDER of USCA (certified copy) "Appointing" Federal Public Defender as to Eric Wayne Grinder re 138 Notice of Appeal - Final Judgment. (slss, Deputy Clerk) (Entered: 06/04/2019) |
|---|---|---|
| 06/18/2019 | 142 | TRANSCRIPT ORDER ACKNOWLEDGMENT by Eric Wayne Grinder for proceedings held on Arraignment of 2/19/2019, Trial of 2/19/2019, 2/21/2019 and 2/22/2019 before Judge Blake, re 138 Notice of Appeal - Final Judgment - Transcript due by 7/25/2019. (Court Reporter: Mary Zajac)(slss, Deputy Clerk) (Entered: 06/18/2019) |
| 06/18/2019 | 143 | TRANSCRIPT ORDER ACKNOWLEDGMENT by Eric Wayne Grinder for proceedings held on Initial Appearance and Arraignment of 9/29/2017 and 1/11/2019 before Judge Blake, re 138 Notice of Appeal - Final Judgment - Transcript due by 7/25/2019. (Court Reporter: Er'd) (slss, Deputy Clerk) (Entered: 06/18/2019) |
| 06/26/2019 | 144 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Eric Wayne Grinder for dates of 2/19/2019 before Judge Catherine C. Blake, re 138 Notice of Appeal - Final Judgment Court Reporter/Transcriber Mary M. Zajac, Telephone number 410-962-4544. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 7/17/2019. Redacted Transcript Deadline set for 7/29/2019. Release of Transcript Restriction set for 9/24/2019. (mmz, Court Reporter) (Entered: 06/26/2019) |
| 06/26/2019 | 145 | Sealed Document (mmz, Court Reporter) (Entered: 06/26/2019) |
| 06/26/2019 | 146 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Eric Wayne Grinder for dates of 2/21/2019 before Judge Catherine C. Blake, re 138 Notice of Appeal - Final Judgment Court Reporter/Transcriber Mary M. Zajac, Telephone number 410-962-4544. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 7/17/2019. Redacted Transcript Deadline set for 7/29/2019. Release of Transcript Restriction set for 9/24/2019. (mmz, Court Reporter) (Entered: 06/26/2019) |
| 06/26/2019 | 147 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Eric Wayne Grinder for dates of 2/22/2019 before Judge Catherine C. Blake, re 138 Notice of Appeal - Final Judgment Court Reporter/Transcriber Mary M. Zajac, Telephone number 410-962-4544. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 7/17/2019. Redacted Transcript Deadline set for 7/29/2019. Release of Transcript Restriction set for 9/24/2019. (mmz, Court Reporter) (Entered: 06/26/2019) |
| 07/12/2019 | 148 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Eric Wayne Grinder for dates of 9/29/17 before Judge A. David Copperthite, re 138 Notice of Appeal - Final Judgment Court Reporter/Transcriber CompuScribe, Telephone number 301-577-5882. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 8/2/2019. Redacted Transcript Deadline set for 8/12/2019. Release of Transcript Restriction set for 10/10/2019. (bmhs, Deputy Clerk) (Entered: 07/15/2019) |
| 07/12/2019 | 149 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Eric Wayne Grinder for dates of 1/11/19 before Judge J. Mark Coulson, re 138 Notice of Appeal - Final Judgment Court Reporter/Transcriber CompuScribe, Telephone number 301-577-5882. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. |

11

| | | |
|---|---|---|
| | | Redaction Request due 8/2/2019. Redacted Transcript Deadline set for 8/12/2019. Release of Transcript Restriction set for 10/10/2019. (bmhs, Deputy Clerk) (Entered: 07/15/2019) |
| 07/16/2019 | 150 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Eric Wayne Grinder for dates of 9/29/2017 before Magistrate Judge Cooperthite, re 138 Notice of Appeal - Final Judgment Court Reporter/Transcriber Er'd. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 8/6/2019. Redacted Transcript Deadline set for 8/16/2019. Release of Transcript Restriction set for 10/15/2019. (slss, Deputy Clerk) (Entered: 07/16/2019) |
| 07/16/2019 | 151 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Eric Wayne Grinder for dates of 1/11/2019 before Magistrate Judge Coulson, re 138 Notice of Appeal - Final Judgment Court Reporter/Transcriber Er'd. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 8/6/2019. Redacted Transcript Deadline set for 8/16/2019. Release of Transcript Restriction set for 10/15/2019. (slss, Deputy Clerk) (Entered: 07/16/2019) |
| 07/23/2019 | 152 | Joint MOTION To Include Restitution In The Judgment by USA as to Eric Wayne Grinder. (Riley, Paul) (Entered: 07/23/2019) |
| 07/25/2019 | 153 | AMENDED JUDGMENT as to Eric Wayne Grinder (1), Count(s) 1-3, 1s-3s, 1ss-6ss, 4-5, 4s-5s, 6s-7s, 7ss-8ss, 8s, 9ss, DISMISSED; Count(s) 1sss, 2sss, 3sss-6sss, 7sss-8sss, 9sss, IMPRISONMENT for 360 months as to Counts 1sss - 6sss, concurrent, and 240 months as to Counts 7sss - 9sss, concurrent, for a total term of 360 months w/credit for time served from 11/29/16; SUPERVISED RELEASE for LIFE as to Counts 1sss - 9sss, concurrent; ASSESSMENT $900; RESTITUTION $36,000.00. Signed by Judge Catherine C. Blake on 7/25/2019. (hmls, Deputy Clerk) (Entered: 07/25/2019) |
| 08/09/2019 | 155 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Eric Wayne Grinder for dates of 5/24/19 (Sentencing) before Judge Blake, re 138 Notice of Appeal - Final Judgment Court Reporter/Transcriber Douglas J. Zweizig, Telephone number 410-962-4474. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 8/30/2019. Redacted Transcript Deadline set for 9/9/2019. Release of Transcript Restriction set for 11/7/2019. (dz, Court Reporter) (Entered: 08/09/2019) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/16/2019 13:17:01 | | |
| **PACER Login:** | fpdmddef:2550628:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:17-cr-00226-CCB |
| **Billable Pages:** | 14 | **Cost:** | 1.40 |

Case 1:17-cr-00226-CCB   Document 1   Filed 04/26/17   Page 1 of 6

PEB: USAO 2017R000222

FILED

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

2017 APR 26 PM 3: 37

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ERIC WAYNE GRINDER,<br><br>Defendant. | CRIMINAL NO. CCB-17-0226<br><br>(Production of Child Pornography,<br>18 U.S.C. § 2251(a); Possession of Child<br>Pornography, 18 U.S.C. §2252(a)(4)(B);<br>Aiding and Abetting, 18 U.S.C. § 2;<br>Forfeiture, 18 U.S.C. § 2253) |

## INDICTMENT

### COUNT ONE
(Production of Child Pornography)

The Grand Jury for the District of Maryland charges that:

On a date unknown to the Grand Jury but on or about June 15, 2013 through no later than June 25, 2016, in the District of Maryland, the defendant,

**ERIC WAYNE GRINDER,**

did knowingly employ, use, persuade, induce, entice and coerce a minor female to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), for the purpose of producing visual depictions of such conduct, and said visual depictions were produced using materials that were mailed, shipped, and transported in interstate and foreign commerce by any means, including by computer, that is, a series of 9 image files, including, but not limited to (1) an image file that depicts Jane Doe, a prepubescent female, performing fellatio on an adult male's penis, and (2) image files that depict Jane Doe, a prepubescent female, using her hand to touch an adult male's penis, said image files having been stored on a Toshiba Satellite Model Laptop computer, S/N 1A112898Q.

18 U.S.C. § 2251(a)
18 U.S.C. § 2

1

## COUNT TWO
(Production of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about July 10, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly employ, use, persuade, induce, entice and coerce a minor female to engage in

sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), for the

purpose of producing visual depictions of such conduct, and said visual depictions were produced

using materials that were mailed, shipped, and transported in interstate and foreign commerce by

any means, including by smartphone, that is, an image that depicts Jane Doe's legs spread with her

genitals exposed and displayed in a lascivious manner, said image file having been stored on a

Samsung SM-G900V smartphone, IMEI:  990004495000428.


18 U.S.C. § 2251(a)
18 U.S.C. § 2

2

## COUNT THREE
(Production of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about August 27, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly employ, use, persuade, induce, entice and coerce a minor female to engage in

sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), for the

purpose of producing visual depictions of such conduct, and said visual depictions were produced

using materials that were mailed, shipped, and transported in interstate and foreign commerce by

any means, including by smartphone, that is, two images that each depict Jane Doe's legs spread

with her genitals exposed and displayed in a lascivious manner, said image files having been stored

on a Samsung SM-G900V smartphone, IMEI: 990004495000428.

18 U.S.C. § 2251(a)
18 U.S.C. § 2

3

## COUNT FOUR
(Possession of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about November 29, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly possess and knowingly access with intent to view one or more matters which contained any visual depiction that had been mailed, shipped and transported using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce, and which was produced using materials which had been mailed, shipped and transported by any means, including by computer, the production of which involved the use of a minor engaging in sexually explicit conduct, that is, the defendant possessed a Toshiba Satellite Model Laptop computer, S/N 1A112898Q, which contained one or more visual depictions of prepubescent minors engaged in sexually explicit conduct.

18 U.S.C. §§ 2252(a)(4)(B) & 2256
18 U.S.C. § 2

4

16

## COUNT FIVE
(Possession of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about November 29, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly possess and knowingly access with intent to view one or more matters which contained any visual depiction that had been mailed, shipped and transported using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce, and which was produced using materials which had been mailed, shipped and transported by any means, including by computer, the production of which involved the use of a minor engaging in sexually explicit conduct, that is, the defendant possessed a Samsung SM-G900V smartphone, IMEI: 990004495000428, which contained one or more visual depictions of prepubescent minors engaged in sexually explicit conduct.

18 U.S.C. §§ 2252(a)(4)(B) & 2256
18 U.S.C. § 2

5

Case 1:17-cr-00226-CCB   Document 1   Filed 04/26/17   Page 6 of 6

## FORFEITURE

The Grand Jury for the District of Maryland further charges that:

1.     The allegations of Counts One through Five of this Indictment are incorporated here.

2.     As a result of the offenses set forth in Counts One through Five of the Indictment in this case, the defendant,

### ERIC WAYNE GRINDER,

shall forfeit to the United States all property that was used and intended to be used to commit and to promote the commission of offenses in Counts One through Five, and any property traceable to such property, including but not limited to the following:

a.     Toshiba Satellite Model Laptop computer, S/N 1A112898Q; and

b.     Samsung SM-G900V smartphone, IMEI: 990004495000428.

18 U.S.C. § 2253

Rod J. Rosenstein /pm
Rod J. Rosenstein
United States Attorney

**SIGNATURE REDACTED**

Foreperson

Date: April _26_, 2017

6

PEB: USAO 2017R000222

FILED
UNITED STATES DISTRICT COURT U.S. DISTRICT COURT
FOR THE DISTRICT OF MARYLAND DISTRICT OF MARYLAND

2017 AUG -9  PM 12: 53

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. CCB-17-226 |
| v. | (Production of Child Pornography, 18 U.S.C. § 2251(a); Possession of Child Pornography, 18 U.S.C. § 2252(a)(4)(B); |
| ERIC WAYNE GRINDER, | Witness Tampering, 18 U.S.C. § 1512(b)(1); Aiding and Abetting, 18 U.S.C. § 2; |
| Defendant. | Forfeiture, 18 U.S.C. § 2253) |

## SUPERSEDING INDICTMENT

### COUNT ONE
(Production of Child Pornography)

The Grand Jury for the District of Maryland charges that:

On a date unknown to the Grand Jury but on or about June 15, 2013 through no later than June 25, 2016, in the District of Maryland, the defendant,

**ERIC WAYNE GRINDER,**

did knowingly employ, use, persuade, induce, entice and coerce a minor female to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), for the purpose of producing visual depictions of such conduct, and said visual depictions were produced using materials that were mailed, shipped, and transported in interstate and foreign commerce by any means, including by computer, that is, a series of 9 image files, including, but not limited to (1) an image file that depicts Jane Doe, a prepubescent female, performing fellatio on an adult male's penis, and (2) image files that depict Jane Doe, a prepubescent female, using her hand to touch an adult male's penis, said image files having been stored on a Toshiba Satellite Model Laptop computer, S/N 1A112898Q.

18 U.S.C. § 2251(a)
18 U.S.C. § 2

1

## COUNT TWO
(Production of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about July 10, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly employ, use, persuade, induce, entice and coerce a minor female to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), for the purpose of producing visual depictions of such conduct, and said visual depictions were produced using materials that were mailed, shipped, and transported in interstate and foreign commerce by any means, including by smartphone, that is, an image that depicts Jane Doe's legs spread with her genitals exposed and displayed in a lascivious manner, said image file having been stored on a Samsung SM-G900V smartphone, IMEI: 990004495000428.

18 U.S.C. § 2251(a)
18 U.S.C. § 2

2

## COUNT THREE
(Production of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about August 27, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly employ, use, persuade, induce, entice and coerce a minor female to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), for the purpose of producing visual depictions of such conduct, and said visual depictions were produced using materials that were mailed, shipped, and transported in interstate and foreign commerce by any means, including by smartphone, that is, two images that each depict Jane Doe's legs spread with her genitals exposed and displayed in a lascivious manner, said image files having been stored on a Samsung SM-G900V smartphone, IMEI: 990004495000428.

18 U.S.C. § 2251(a)
18 U.S.C. § 2

3

## COUNT FOUR
(Possession of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about November 29, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly possess and knowingly access with intent to view one or more matters which contained any visual depiction that had been mailed, shipped and transported using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce, and which was produced using materials which had been mailed, shipped and transported by any means, including by computer, the production of which involved the use of a minor engaging in sexually explicit conduct, that is, the defendant possessed a Toshiba Satellite Model Laptop computer, S/N 1A112898Q, which contained one or more visual depictions of prepubescent minors engaged in sexually explicit conduct.

18 U.S.C. §§ 2252(a)(4)(B) & 2256
18 U.S.C. § 2

4

22

## COUNT FIVE
(Possession of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about November 29, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly possess and knowingly access with intent to view one or more matters which contained any visual depiction that had been mailed, shipped and transported using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce, and which was produced using materials which had been mailed, shipped and transported by any means, including by computer, the production of which involved the use of a minor engaging in sexually explicit conduct, that is, the defendant possessed a Samsung SM-G900V smartphone, IMEI: 990004495000428, which contained one or more visual depictions of prepubescent minors engaged in sexually explicit conduct.

18 U.S.C. §§ 2252(a)(4)(B) & 2256
18 U.S.C. § 2

5

23

## COUNT SIX
(Production of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about May 29, 2016, in the District of Maryland, the defendant,

**ERIC WAYNE GRINDER,**

did knowingly employ, use, persuade, induce, entice and coerce a minor female to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), for the purpose of producing a visual depiction of such conduct, and said visual depiction was produced using materials that were mailed, shipped, and transported in interstate and foreign commerce by any means, including by SD card, that is, a video that depicts Jane Doe's exposed vagina being touched by a vibrator, said video file having been stored on a SanDisk SD card, S/N: 100090348DUU.

18 U.S.C. § 2251(a)
18 U.S.C. § 2

6

24

## COUNT SEVEN
(Production of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about June 19, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly employ, use, persuade, induce, entice and coerce a minor female to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), for the purpose of producing a visual depiction of such conduct, and said visual depiction was produced using materials that were mailed, shipped, and transported in interstate and foreign commerce by any means, including by SD card, that is, a video that depicts Jane Doe's exposed vagina being penetrated by an adult finger, said video file having been stored on a SanDisk SD card, S/N: 100090348DUU.

18 U.S.C. § 2251(a)
18 U.S.C. § 2

7

## COUNT EIGHT
(Witness Tampering)

The Grand Jury for the District of Maryland further charges that:

At all times relevant:

1.      A federal grand jury for the District of Maryland, empaneled as the Wednesday Special Grand Jury, January Term 2017, was an official proceeding investigating violations of federal criminal laws related to the conduct and offenses set forth in Counts One through Seven of this Superseding Indictment.

2.      The federal grand jury returned a federal indictment assigned Criminal Case Number CCB-17-226, and the case was an official proceeding pending in the District of Maryland.

3.      Jane Doe was a witness in the official proceedings described in Paragraphs 1 and 2 of this Count.

4.      In or about July 2017, in the District of Maryland, the defendant,

**ERIC WAYNE GRINDER,**

attempted to knowingly corruptly persuade, and engage in misleading conduct towards Jane Doe, with the intent to influence, delay, and prevent the testimony of Jane Doe in an official proceeding.

18 U.S.C. §§ 1512(b)(1)
18 U.S.C. § 2

8

## FORFEITURE

The Grand Jury for the District of Maryland further charges that:

1.     The allegations of Counts One through Eight of this Superseding Indictment are incorporated here.

2.     As a result of the offenses set forth in Counts One through Eight of the Superseding Indictment in this case, the defendant,

### ERIC WAYNE GRINDER,

shall forfeit to the United States all property that was used and intended to be used to commit and to promote the commission of offenses in Counts One through Eight, and any property traceable to such property, including but not limited to the following:

    a.     Toshiba Satellite Model Laptop computer, S/N 1A112898Q; and

    b.     Samsung SM-G900V smartphone, IMEI: 990004495000428.

18 U.S.C. § 2253

Stephen M. Schenning
Acting United States Attorney

A TRUE BILL

**SIGNATURE REDACTED**

Foreperson

Date: August   9  , 2017

9

27

Case 1:17-cr-00226-CCB　Document 61　Filed 12/12/18　Page 1 of 10

PAR/PEB: USAO 2017R000222

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

2018 DEC 12　AM 5: 43

CLERK'S OFFICE
AT BALTIMORE

BY _____ K _____ DEPUTY

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO.  CCB-17-226** |
| **v.** | (Production of Child Pornography, 18 U.S.C. § 2251(a); Possession of Child Pornography, 18 U.S.C. § 2252A(a)(5)(B); Witness Tampering, 18 U.S.C. § 1512(b)(1); Aiding and Abetting, 18 U.S.C. § 2; Forfeiture,  18 U.S.C. § 2253) |
| **ERIC WAYNE GRINDER,** | |
| **Defendant.** | |

## SECOND SUPERSEDING INDICTMENT

### COUNT ONE
(Production of Child Pornography)

The Grand Jury for the District of Maryland charges that:

On a date unknown to the Grand Jury but on or about June 15, 2013 through no later than June 25, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly employ, use, persuade, induce, entice and coerce a minor female to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), for the purpose of producing visual depictions of such conduct, and said visual depictions were produced using materials that were mailed, shipped, and transported in interstate and foreign commerce by any means, including by computer, that is, a series of 9 image files, including, but not limited to (1) an image file that depicts Jane Doe, a prepubescent female, performing fellatio on an adult male's penis, and (2) image files that depict Jane Doe, a prepubescent female, using her hand to touch an adult male's penis, said image files having been stored on a Toshiba Satellite Model Laptop computer, S/N 1A112898Q.

18 U.S.C. § 2251(a)
18 U.S.C. § 2

1

## COUNT TWO
(Attempted Production of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about April 30, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

knowingly attempted to and did employ, use, persuade, induce, entice and coerce a minor female

to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2),

for the purpose of producing a visual depiction of such conduct, and said visual depiction was

produced using materials that were mailed, shipped, and transported in interstate and foreign

commerce by any means, including by SD card, that is, a video file having been stored on a

SanDisk SD card, S/N:  100090348DUU.

18 U.S.C. §§ 2251(a), (e)
18 U.S.C. § 2

2

## COUNT THREE
(Production of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about May 29, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly employ, use, persuade, induce, entice and coerce a minor female to engage in

sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), for the

purpose of producing a visual depiction of such conduct, and said visual depiction was produced

using materials that were mailed, shipped, and transported in interstate and foreign commerce by

any means, including by SD card, that is, a video that depicts Jane Doe's exposed vagina being

touched by a vibrator, said video file having been stored on a SanDisk SD card, S/N:

100090348DUU.

18 U.S.C. § 2251(a)
18 U.S.C. § 2

3

## COUNT FOUR
(Production of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about June 19, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly employ, use, persuade, induce, entice and coerce a minor female to engage in

sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), for the

purpose of producing a visual depiction of such conduct, and said visual depiction was produced

using materials that were mailed, shipped, and transported in interstate and foreign commerce by

any means, including by SD card, that is, a video that depicts Jane Doe's exposed vagina being

penetrated by an adult finger, said video file having been stored on a SanDisk SD card, S/N:

100090348DUU.


18 U.S.C. § 2251(a)
18 U.S.C. § 2

4

## COUNT FIVE
(Production of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about July 10, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly employ, use, persuade, induce, entice and coerce a minor female to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), for the purpose of producing visual depictions of such conduct, and said visual depictions were produced using materials that were mailed, shipped, and transported in interstate and foreign commerce by any means, including by smartphone, that is, an image that depicts Jane Doe's legs spread with her genitals exposed and displayed in a lascivious manner, said image file having been stored on a Samsung SM-G900V smartphone, IMEI: 990004495000428.

18 U.S.C. § 2251(a)
18 U.S.C. § 2

5

## COUNT SIX
(Production of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about August 27, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly employ, use, persuade, induce, entice and coerce a minor female to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), for the purpose of producing visual depictions of such conduct, and said visual depictions were produced using materials that were mailed, shipped, and transported in interstate and foreign commerce by any means, including by smartphone, that is, two images that each depict Jane Doe's legs spread with her genitals exposed and displayed in a lascivious manner, said image files having been stored on a Samsung SM-G900V smartphone, IMEI: 990004495000428.

18 U.S.C. § 2251(a)
18 U.S.C. § 2

6

## COUNT SEVEN
(Possession of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about November 29, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly possess and knowingly access with intent to view any book, magazine, periodical, film, videotape, computer disk, and any other material that contained an image of child pornography, as defined in Title 18 United States Code, Section 2256(8)(A), that had been mailed, shipped and transported using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce by any means, including by computer, and that was produced using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by computer, that is, the defendant possessed a Toshiba Satellite Model Laptop computer, S/N 1A112898Q, which contained one or more visual depictions of prepubescent minors engaged in sexually explicit conduct.

18 U.S.C. §§ 2252A(a)(5)(B) & 2256
18 U.S.C. § 2

7

34

## COUNT EIGHT
(Possession of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about November 29, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly possess and knowingly access with intent to view any book, magazine, periodical, film, videotape, computer disk, and any other material that contained an image of child pornography, as defined in Title 18 United States Code, Section 2256(8)(A), that had been mailed, shipped and transported using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce by any means, including by computer, and that was produced using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by computer, that is, the defendant possessed a Samsung SM-G900V smartphone, IMEI: 990004495000428, which contained one or more visual depictions of prepubescent minors engaged in sexually explicit conduct.

18 U.S.C. §§ 2252A(a)(5)(B) & 2256
18 U.S.C. § 2

8

## COUNT NINE
(Witness Tampering)

The Grand Jury for the District of Maryland further charges that:

At all times relevant:

1.    A federal grand jury for the District of Maryland, empaneled as the Wednesday Special Grand Jury, January Term 2017, was an official proceeding investigating violations of federal criminal laws related to the conduct and offenses set forth in Counts One through Eight of this Second Superseding Indictment.

2.    The federal grand jury returned a federal indictment assigned Criminal Case Number CCB-17-226, and the case was an official proceeding pending in the District of Maryland.

3.    Jane Doe was a witness in the official proceedings described in Paragraphs 1 and 2 of this Count.

4.    In or about July 2017, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

attempted to knowingly corruptly persuade, and engage in misleading conduct towards Jane Doe, with the intent to influence, delay, and prevent the testimony of Jane Doe in an official proceeding.

18 U.S.C. § 1512(b)(1)
18 U.S.C. § 2

9

36

## FORFEITURE

The Grand Jury for the District of Maryland further charges that:

1.    The allegations of Counts One through Nine of this Second Superseding Indictment are incorporated here.

2.    As a result of the offenses set forth in Counts One through Nine of the Second Superseding Indictment in this case, the defendant,

### ERIC WAYNE GRINDER,

shall forfeit to the United States all property that was used and intended to be used to commit and to promote the commission of offenses in Counts One through Nine, and any property traceable to such property, including but not limited to the following:

a.    Toshiba Satellite Model Laptop computer, S/N 1A112898Q; and

b.    Samsung SM-G900V smartphone, IMEI: 990004495000428.

18 U.S.C. § 2253

Robert K. Hur
United States Attorney

SIGNATURE REDACTED

Foreperson

Date: December /2, 2018

10

37

PAR/PEB: USAO 2017R000222

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

2019 JAN 23  PM 4: 31

CLERK'S OFFICE
AT BALTIMORE

BY_____ DEPUTY

UNITED STATES OF AMERICA

v.

ERIC WAYNE GRINDER,

Defendant.

CRIMINAL NO.  CCB-17-226

(Production of Child Pornography,
18 U.S.C. § 2251(a); Possession of Child
Pornography, 18 U.S.C. § 2252A(a)(5)(B);
Witness Tampering, 18 U.S.C. § 1512(b)(1);
Aiding and Abetting, 18 U.S.C. § 2;
Forfeiture,  18 U.S.C. § 2253)

## THIRD SUPERSEDING INDICTMENT

### COUNT ONE
(Production of Child Pornography)

The Grand Jury for the District of Maryland charges that:

On a date unknown to the Grand Jury but on or about June 15, 2013 through no later than June 25, 2016, in the District of Maryland, the defendant,

**ERIC WAYNE GRINDER,**

did knowingly employ, use, persuade, induce, entice and coerce a minor female to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), for the purpose of producing visual depictions of such conduct, and said visual depictions were produced using materials that were mailed, shipped, and transported in interstate and foreign commerce by any means, including by computer, that is, a series of 9 image files, including, but not limited to (1) an image file that depicts Jane Doe, a prepubescent female, performing fellatio on an adult male's penis, and (2) image files that depict Jane Doe, a prepubescent female, using her hand to touch an adult male's penis, said image files having been stored on a Toshiba Satellite Model Laptop computer, S/N 1A112898Q.

18 U.S.C. § 2251(a)
18 U.S.C. § 2

1

## COUNT TWO
### (Attempted Production of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about April 30, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

knowingly attempted to and did employ, use, persuade, induce, entice and coerce a minor female

to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2),

for the purpose of producing a visual depiction of such conduct, and said visual depiction was

produced using materials that were mailed, shipped, and transported in interstate and foreign

commerce by any means, including by SD card, that is, a video file having been stored on a

SanDisk SD card, S/N: 1000903482DUU.

18 U.S.C. §§ 2251(a), (e)
18 U.S.C. § 2

2

Case 1:17-cr-00226-CCB   Document 82   Filed 01/23/19   Page 3 of 10

## COUNT THREE
(Production of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about May 29, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly employ, use, persuade, induce, entice and coerce a minor female to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), for the purpose of producing a visual depiction of such conduct, and said visual depiction was produced using materials that were mailed, shipped, and transported in interstate and foreign commerce by any means, including by SD card, that is, a video that depicts Jane Doe's exposed vagina being touched by a vibrator, said video file having been stored on a SanDisk SD card, S/N: 1000903482DUU.

18 U.S.C. § 2251(a)
18 U.S.C. § 2

3

40

## COUNT FOUR
(Production of Child Pornography.)

The Grand Jury for the District of Maryland further charges that:

On or about June 19, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly employ, use, persuade, induce, entice and coerce a minor female to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), for the purpose of producing a visual depiction of such conduct, and said visual depiction was produced using materials that were mailed, shipped, and transported in interstate and foreign commerce by any means, including by SD card, that is, a video that depicts Jane Doe's exposed vagina being penetrated by an adult finger, said video file having been stored on a SanDisk SD card, S/N: 1000903482DUU.

18 U.S.C. § 2251(a)
18 U.S.C. § 2

4

41

USCA4 Appeal: 19-4392      Doc: 18      Filed: 09/19/2019      Pg: 46 of 493

## COUNT FIVE
(Production of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about July 10, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly employ, use, persuade, induce, entice and coerce a minor female to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), for the purpose of producing visual depictions of such conduct, and said visual depictions were produced using materials that were mailed, shipped, and transported in interstate and foreign commerce by any means, including by smartphone, that is, an image that depicts Jane Doe's legs spread with her genitals exposed and displayed in a lascivious manner, said image file having been stored on a Samsung SM-G900V smartphone, IMEI:  990004495000428.

18 U.S.C. § 2251(a)
18 U.S.C. § 2

5

## COUNT SIX
(Production of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about August 27, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly employ, use, persuade, induce, entice and coerce a minor female to engage in

sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), for the

purpose of producing visual depictions of such conduct, and said visual depictions were produced

using materials that were mailed, shipped, and transported in interstate and foreign commerce by

any means, including by smartphone, that is, two images that each depict Jane Doe's legs spread

with her genitals exposed and displayed in a lascivious manner, said image files having been stored

on a Samsung SM-G900V smartphone, IMEI: 990004495000428.


18 U.S.C. § 2251(a)
18 U.S.C. § 2

6

43

## COUNT SEVEN
(Possession of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about November 29, 2016, in the District of Maryland, the defendant,

## ERIC WAYNE GRINDER,

did knowingly possess and knowingly access with intent to view any book, magazine, periodical, film, videotape, computer disk, and any other material that contained an image of child pornography, as defined in Title 18 United States Code, Section 2256(8)(A), that had been mailed, shipped and transported using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce by any means, including by computer, and that was produced using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by computer, that is, the defendant possessed a Toshiba Satellite Model Laptop computer, S/N 1A112898Q, which contained one or more visual depictions of prepubescent minors engaged in sexually explicit conduct.

18 U.S.C. §§ 2252A(a)(5)(B) & 2256
18 U.S.C. § 2

7

44

Case 1:17-cr-00226-CCB    Document 82    Filed 01/23/19    Page 8 of 10

## COUNT EIGHT
(Possession of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about November 29, 2016, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

did knowingly possess and knowingly access with intent to view any book, magazine, periodical, film, videotape, computer disk, and any other material that contained an image of child pornography, as defined in Title 18 United States Code, Section 2256(8)(A), that had been mailed, shipped and transported using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce by any means, including by computer, and that was produced using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by computer, that is, the defendant possessed a Samsung SM-G900V smartphone, IMEI: 990004495000428, which contained one or more visual depictions of prepubescent minors engaged in sexually explicit conduct.

18 U.S.C. §§ 2252A(a)(5)(B) & 2256
18 U.S.C. § 2

8

## COUNT NINE
### (Witness Tampering)

The Grand Jury for the District of Maryland further charges that:

At all times relevant:

1.    A federal grand jury for the District of Maryland, empaneled as the Wednesday Special Grand Jury, January Term 2017, was an official proceeding investigating violations of federal criminal laws related to the conduct and offenses set forth in Counts One through Eight of this Third Superseding Indictment.

2.    The federal grand jury returned a federal indictment assigned Criminal Case Number CCB-17-226, and the case was an official proceeding pending in the District of Maryland.

3.    Jane Doe was a witness in the official proceedings described in Paragraphs 1 and 2 of this Count.

4.    In or about July 2017, in the District of Maryland, the defendant,

### ERIC WAYNE GRINDER,

attempted to knowingly corruptly persuade, and engage in misleading conduct towards Jane Doe, with the intent to influence, delay, and prevent the testimony of Jane Doe in an official proceeding.

18 U.S.C. § 1512(b)(1)
18 U.S.C. § 2

9

## FORFEITURE

The Grand Jury for the District of Maryland further charges that:

1.     The allegations of Counts One through Nine of this Third Superseding Indictment are incorporated here.

2.     As a result of the offenses set forth in Counts One through Nine of the Third Superseding Indictment in this case, the defendant,

### ERIC WAYNE GRINDER,

shall forfeit to the United States all property that was used and intended to be used to commit and to promote the commission of offenses in Counts One through Nine, and any property traceable to such property, including but not limited to the following:

a.     Toshiba Satellite Model Laptop computer, S/N 1A112898Q; and

b.     Samsung SM-G900V smartphone, IMEI: 990004495000428.

18 U.S.C. § 2253

_Robert K. Hur_
Robert K. Hur
United States Attorney

SIGNATURE REDACTED

Foreperson

Date: January 23 , 2019

10

47

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

|  |  |  |
|---|---|---|
| | * | |
| UNITED STATES OF AMERICA | * | |
| v. | * | Criminal No. CCB-17-0226 |
| ERIC WAYNE GRINDER | * | |

\* \* \* \* \* \* \* \* \* \* \*

## MOTION TO SUPPRESS CELL PHONE AND LAPTOP COMPUTER EVIDENCE

The defendant, Eric Wayne Grinder, by and through his undersigned counsel, hereby moves this Honorable Court to suppress evidence seized without a valid search warrant, including: (1) a cell phone seized pursuant to an unlawful warrantless search of Mr. Grinder's person on November 29, 2016; (2) digital evidence obtained from an unlawful warrantless search of a laptop computer seized from Mr. Grinder's residence on the same date; and (3) all derivative evidence. The grounds for this motion are set forth below.

## BACKGROUND

On November 29, 2016, Detective John Emminizer of the Westminster City Police Department and Master Trooper Danielle Barry of the Maryland State Police applied for a search and seizure warrant for 261 Montpelier Court, Westminster, Maryland – the residence of Eric Grinder and family. The search warrant application, attached as **Exhibit 1**, asserted there was probable cause to believe that the residence contained evidence related to the crimes of child abuse of a minor, second-degree rape, second- and third-degree sexual offenses, and sexual abuse of a minor. The search and seizure warrant, signed that same day by Judge Thomas F. Stansfield of the Circuit Court for Carroll County, found probable cause to search the residence for evidence of the referenced crimes, and authorized the police to:

48

A. Enter and search the residence as completely described above for evidence of the aforementioned crimes to include the curtilage;

B. Seize articles of personal property tending to establish the identity of the person(s) in control of the premises to be searched;

C. Seize all evidence found in or upon said premises and its curtilage;

D. Conduct crime scene processing in the residence to include but not limited to photographs, measurements/drawings of the residence, DNA/Biological collection of evidence, etc;

E. Seize all evidence tending to identify any other victims and or suspects of the aforementioned crimes;

F. Seize and have forensically analyzed by a qualified person or persons any cellular telephones seized;

G. Seize and have forensically analyzed by a qualified person or persons any computers, hard drives, media storage devices[.]

**Exhibit 2** (Nov. 29, 2016, Search and Seizure Warrant).

State and local police officers proceeded to the residence to execute the search warrant the same day, November 29, 2016.  Outside the residence, officers detained Mr. Grinder and seized from his person his Samsung cellular phone.[1]  Officers proceeded to enter the residence, where they seized numerous items, including a Toshiba laptop computer found in the basement.  The Samsung phone and the Toshiba laptop are the subjects of the instant motion to suppress.

On December 19, 2016, Trooper Barry sought the assistance of federal law enforcement in conducting forensic examinations of the seized electronic devices.  She turned over the seized Samsung phone and Toshiba laptop to the custody of Homeland Security Investigations (HSI) for analysis.  A computer forensic analyst with HSI proceeded to conduct a forensic examination of the Toshiba laptop computer seized from the Grinder residence.

---

[1] Mr. Grinder was not arrested or charged with a crime on this day.  He was arrested nearly four months later, on March 20, 2017, pursuant to a state arrest warrant.

While conducting a forensic examination, the analyst found images of alleged child pornography on the laptop. The analyst stopped searching the laptop after finding the images of suspected child pornography, "pending investigators obtaining a search warrant specifically authorizing a search of the devices for evidence relating to the production and possession of child pornography, and related offenses." **Exhibit 3** ¶ 25 (Mar. 17, 2017, Search Warrant Affidavit).

On March 17, 2017, Special Agent Richard Federico of HSI applied for additional search warrants, including warrants to forensically search the Toshiba laptop and the Samsung phone, as well as a warrant to conduct another search of the premises of 261 Montpelier Court. **Exhibit 3**. These warrants were issued the same day by U.S. Magistrate Judge A. David Copperthite. **Exhibit 4** (Mar. 17, 2017, Laptop Search and Seizure Warrant); **Exhibit 5** (Mar. 17, 2017, Cell Phone Search and Seizure Warrant). Images of alleged child pornography were recovered from both devices, and from an SD card (*i.e.*, a removable memory card) located inside the Samsung phone.

## ARGUMENT

The warrantless seizure of the Samsung cell phone and the warrantless search of the Toshiba laptop violated the Fourth Amendment, requiring suppression of all evidence found on both devices. As to the cell phone, police exceeded the scope of their warrant – which covered only the Grinder residence – by seizing the cell phone from Mr. Grinder's person, when he was outside the residence. Accordingly, all evidence discovered on the cell phone, including the SD card located inside the phone, must be suppressed. With respect to the laptop computer, police failed to obtain a warrant prior to forensically searching its contents. The warrant that was eventually obtained in March 2017 – after the initial search of the laptop – is invalid because it expressly relied on the fruits of the prior unlawful warrantless search to establish probable cause. Accordingly, all evidence seized from the cell phone and laptop must be suppressed.

I.    **Evidence Seized from Mr. Grinder's Cell Phone Must Be Suppressed.**

    A.    **The Warrant Did Not Authorize the Seizure of Mr. Grinder's Cell Phone from His Person.**

On November 29, 2016, police had only one search warrant in hand, which authorized them to search the premises of 261 Montpelier Court in Westminster. Police did <u>not</u> have a warrant authorizing them to search Mr. Grinder's person. Nevertheless, they seized his Samsung cell phone from his person, outside 261 Montpelier Court, on that date. Because the seizure of the Samsung cell phone was not authorized by any valid warrant, the phone and its contents must be suppressed. "It is axiomatic that a 'search conducted pursuant to a warrant is limited in scope by the terms of the warrant's authorization.'" *United States v. Kimble*, 855 F.3d 604, 610 (4th Cir. 2017) (quoting *United States v. Phillips*, 588 F.3d 218, 223 (4th Cir. 2009)). When officers executing a search warrant exceed the scope of that warrant, improperly seized evidence must be suppressed. *United States v. Squillacote*, 221 F.3d 542, 556 (4th Cir. 2000); *see also Horton v. California*, 496 U.S. 128, 140 (1990) (holding that where "the scope of the search exceeds that permitted by the terms of a validly issued warrant . . . the subsequent seizure is unconstitutional without more" and the evidence seized outside the scope of the authorized search "will be excluded").

In this case, the warrant was clearly limited to a search of 261 Montpelier Court and the seizure of certain items within it. *See* **Exhibit 2**. The warrant lacked any reference to searching Mr. Grinder or seizing property from his person. Yet an officer approached Mr. Grinder outside 261 Montpelier Court and took the cell phone from his person at the time of the execution of the search and seizure warrant for the residence. Officers did not obtain a warrant to search or arrest Mr. Grinder, did not arrest him during the execution of the search and seizure warrant, and did not recover the phone from him during a search incident to an arrest. Thus, the seizure of Mr. Grinder's

cell phone from his person outside 261 Montpelier Court during the execution of the search and seizure warrant for the residence exceeded the scope of the warrant. Accordingly, any evidence discovered on the cell phone must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 484–485 (1963) (concluding that evidence derived in violation of the Fourth Amendment is deemed fruit of the poisonous tree and is inadmissible).

### B.   The Good Faith Exception Does Not Apply Because the Seizure of the Cell Phone Exceeded the Scope of the Warrant.

The good faith exception to the exclusionary rule does not apply when officers act outside the scope of the warrant, as they did here. Under the good faith exception to the exclusionary rule, evidence should not be excluded "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and *acted within its scope*." *United States v. Leon*, 468 U.S. 897, 920 (1984) (emphasis added). In crafting the good faith exception, the *Leon* Court "le[ft] untouched the probable-cause standard and the various requirements for a valid warrant." *Id.* at 923. The Court explained that its holding was based on the assumption "that the officers properly executed the warrant and searched only those places and for those objects that it was reasonable to believe were covered by the warrant." *Id.* at 918 n.19. This language makes clear that the good faith exception does not apply when officers improperly execute a warrant by seizing evidence outside the scope of the warrant. *See, e.g.*, *United States v. Bershchansky*, 788 F.3d 102, 113–14 (2d Cir. 2015) (holding that the good faith exception was inapplicable where the officers exceeded the scope of the warrant); *United States v. Angelos*, 433 F.3d 738, 746 (10th Cir. 2006) ("[T]he *Leon* good faith exception will not save an improperly executed warrant."); *United States v. King*, 227 F.3d 732, 753–54 (6th Cir. 2000) (holding that the search outside the scope of the search warrant did not come within *Leon*'s good faith exception); *United States v. Fuccillo*, 808 F.2d 173, 177 (1st Cir. 1987) (determining that the good faith exception "will not be applied unless the

officers executing search warrants, at the very minimum, act within the scope of the warrants and abide by their terms"); *United States v. Strand*, 761 F.2d 449, 456–57 (8th Cir. 1985) (finding that *Leon* does not apply to cases in which officers seize items not included in the warrant).

Here, the good faith exception does not apply to the seizure of Mr. Grinder's cell phone because police acted outside the scope of the warrant by seizing it.  The warrant authorized only a search and seizure of various items within the residence.  It did not permit officers to search or seize items from Mr. Grinder's person while he was outside the home.  Because the officers improperly executed the warrant by exceeding its scope, the good faith exception does not apply.  Accordingly, the evidence from the cell phone must be suppressed.

## II.    **Evidence Seized from Mr. Grinder's Laptop Computer Must Be Suppressed.**

### A.    **The Warrant Did Not Establish Probable Cause to Seize the Laptop.**

Evidence obtained from Mr. Grinder's laptop computer must be suppressed because the warrant that purported to authorize the seizure of the computer was not supported by probable cause.  When assessing whether a search warrant is supported by probable cause, the question is whether the issuing judge had a "substantial basis" for concluding that "a search would uncover evidence of wrongdoing." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).  A search warrant must demonstrate cause to believe that "evidence is likely to be found at the place to be searched." *Groh v. Ramirez*, 540 U.S. 551, 568 (2004).  Furthermore, "[t]here must, of course, be a nexus . . . between the item to be seized and criminal behavior." *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967).

An open-ended search warrant for a residence permitting officers to seize any and all electronic devices found there lacks probable cause and is unconstitutionally overbroad. *United States v. Griffith*, 867 F.3d 1265, 1275 (D.C. Cir. 2017).  For a warrant to authorize the seizure of an electronic device, police need to present particularized information demonstrating that (1) the

suspect possessed the specific electronic device to be seized, (2) the electronic device would be found in the residence, and (3) the electronic device would contain incriminating evidence about the suspected offense. *Id.* at 1273.

None of these requirements are satisfied here. Nothing in the search warrant application indicates that Mr. Grinder may have owned a laptop, that he stored the laptop at 261 Montpelier Court, or that any evidence of the suspected crimes would be found on the laptop. Without providing that information, officers had no lawful authority to seize the laptop.

**B.    Police Failed to Obtain a Valid Warrant Prior to Searching the Laptop.**

Any evidence obtained from Mr. Grinder's Toshiba laptop computer must be suppressed because that evidence was the product of an unlawful warrantless search. Even if the laptop computer may have been lawfully <u>seized</u> from 261 Montpelier Court, police did not obtain a valid warrant to <u>search its contents</u> prior to conducting a forensic examination of the device.

The law is indisputably clear that police must obtain a warrant establishing probable cause to search the <u>contents</u> of a computer or cell phone, even after the device has been lawfully seized. *See, e.g.*, *Riley v. California*, 134 S. Ct. 2473, 2484–85 (2014) (holding that officers generally must obtain a warrant before searching data on cell phones because doing so does not risk harm to officers or destruction of evidence, and cell phones "place vast quantities of personal information literally in the hands of individuals"); *see also United States v. Lara*, 815 F.3d 605, 612–614 (9th Cir. 2016) (concluding that warrantless search of probationer's cell phone data violated Fourth Amendment and required exclusion of evidence, even though probationer agreed to submit his person and property to search and seizure, because his privacy interest in his cell phone was "substantial in light of the broad amount of data contained in, or accessible though, his cell phone"); *United States v. Sparks*, 806 F.3d 1323, 1336 (11th Cir. 2015) (finding that warrantless

54

search of cell phone for child pornography violated Fourth Amendment because police officer's search exceeded scope of a private search by a store employee who found the phone).

In this case, state police sent the laptop computer seized from the Grinder residence to HSI for forensic analysis without ever obtaining a warrant to search its contents. An HSI analyst then went ahead and conducted a forensic examination of the laptop's contents without first obtaining a warrant authorizing such a search. Only <u>after</u> allegedly incriminating evidence was located on the computer did officers apply for the necessary search warrant. This was too little, too late, for reasons discussed in Section E, below.

### C.   A Forensic Search of the Contents of the Laptop Was Not Authorized by the Search Warrant for 261 Montpelier Court.

The government may argue that the forensic search of the contents of the Toshiba laptop was within the scope of the search warrant for 261 Montpelier Court, issued by the Carroll County Circuit Court on November 29, 2016. **Exhibit 2**. That is wrong. We acknowledge that the state search warrant authorizes police, among other things, to "[s]eize and have forensically analyzed by a qualified person or persons any computers, hard drives, media storage devices," as well as "any cellular telephones seized." *Id*. at 2. However, this sweeping and generic authorization is plainly legally insufficient to authorize a search of the contents of a specific seized computer, such as the Toshiba laptop.

It is a foundational requirement of the Fourth Amendment that a search warrant describe <u>with particularity</u> the location to be searched. *See, e.g.*, *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) ("The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one particularly describing the place to be searched and the persons or things to be seized." (internal quotation marks omitted)). "This particularity requirement protects against 'a general, exploratory rummaging in a person's belongings.'" *United States v. Uzenski*, 434 F.3d

690, 706 (4th Cir. 2006) (quoting *United States v. Robinson*, 275 F.3d 371, 381 (4th Cir. 2001)). For a warrant to be sufficiently particular, it must "describe[] the items to be seized in such a manner that it leaves nothing to the discretion of the officer executing the warrant." *Robinson*, 275 F.3d at 381.

The particularity requirement is even more important for a personal computer than for other items traditionally found in the home, because a computer has the "ability to store and intermingle a huge array of one's personal papers in a single place," thereby "increas[ing] law enforcement's ability to conduct a wide-ranging search into a person's private affairs." *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009); *see also Riley*, 134 S. Ct. at 2489–91 (noting that "minicomputers," such as cell phones, differ from physical records both quantitatively and qualitatively, due to their "immense storage capacity" and ability to convey more information than previously possible, including "a broad array of private information never found in a home in any form").

The only location described with particularity in the state search warrant is 261 Montpelier Court. The warrant application contains a detailed, paragraph-long description of the property. **Exhibit 1** at 1. The warrant itself identifies the location to be searched as: "***The property known as 261 Montpelier Court Westminster, Maryland, Carroll County, Maryland 21157***." **Exhibit 2** at 1 (emphasis in original). The warrant does <u>not</u> find probable cause to search any other location, nor does it identify with particularity any other location to be searched.

A sweeping authorization to search "any" computers, cell phones, or other electronic devices does not state with any level of particularity the specific items to be searched or the type of evidence to be sought from those devices. By purportedly authorizing an unlimited forensic analysis of all digital files contained on any electronic devices, the warrant is unconstitutionally

overbroad, in violation of the Fourth Amendment's prohibition against general searches. *See Griffith*, 867 F.3d at 1277 (reasoning that a search warrant authorizing police to search any electronic device in the residence would be impermissibly overbroad because any restraint shown by officers executing the search would be "imposed by the agents themselves, not a judicial officer" (quoting *Groh*, 540 U.S. at 561)); *United States v. Galpin*, 720 F.3d 436, 447–48 (2d Cir. 2013) (holding that a warrant authorizing a search of electronic equipment for evidence of violations of state and federal law was overbroad where the forensic analysis led to the discovery of child pornography and the only crime specified in the warrant was a registration offense); *United States v. Rosa*, 626 F.3d 56, 62 (2d Cir. 2010) (determining that the warrant authorizing a search and seizure of electronic devices amounted to a general warrant by failing to link the items sought to the suspected criminal activity and providing officers "no guidance as to the type of evidence sought"); *Otero*, 563 F.3d at 1132–33 (concluding that a warrant permitting a computer search of "any and all information and/or data" was invalid because the warrant contained no limiting principle for the search).

> ### D.    The Good Faith Exception Does Not Apply Because the Warrant Was Facially Overbroad.

Under the good faith exception to the exclusionary rule, "evidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be excluded if the officer's reliance on the warrant was 'objectively reasonable.'" *United States v. Perez*, 393 F.3d 457, 461 (4th Cir. 2004) (quoting *Leon*, 468 U.S. at 922). However, the good faith exception does not apply where a warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S at 923; *see also Griffith*, 867 F.3d at 1278–79 (holding that the good faith exception did not apply to an overbroad warrant that granted authorization to search for and seize every

electronic device in the home); *United States v. George*, 975 F.2d 72, 78 (2d Cir. 1992) (determining that no reasonably well-trained officer could have relied in good faith on the unconstitutionally overbroad search warrant, and therefore evidence seized pursuant to the warrant was not admissible under the good faith exception); *United States v. Crozier*, 777 F.2d 1376, 1381–82 (9th Cir. 1985) (holding that the agent could not reasonably rely on the overbroad warrant that authorized a search for evidence of violation of two statutes and did not describe any particular items to be seized).

The good faith exception does not apply here because the warrant was so facially deficient that no reasonable officer could have presumed it to be valid.  As explained *supra*, the warrant for 261 Montpelier Court was so broad that it qualifies as a general warrant.  It failed to specify any specific devices to be searched, to limit the search of those devices to particular files, or even to tie the search and seizure of the electronic equipment to particular crimes.  The warrant effectively granted the executing officers complete discretion to seize any electronic device and conduct a limitless search of all of its digital data.  No officer could have reasonably presumed such a warrant to be valid, and therefore the good faith exception does not apply.

> **E.** **The Evidence Obtained from the Laptop Must Be Excluded, Notwithstanding the Search Warrant Obtained After the Fact.**

The fact that federal agents belatedly sought and obtained a search warrant – only <u>after</u> discovering allegedly incriminating information within the laptop – does not save the unlawfully discovered evidence from exclusion.  "The exclusionary rule generally renders inadmissible evidence recovered during an unlawful search." *United States v. Hill*, 776 F.3d 243, 250 (4th Cir. 2015).  Because the images of suspected child pornography found on the Toshiba laptop were recovered during an unlawful warrantless search of that device, they must be excluded.

The government may argue that the illegality is "cured" by the later-obtained search warrant, invoking the so-called "independent source" doctrine. The Fourth Circuit has explained that independent source doctrine

> applies when a "search pursuant to [a] warrant was in fact a genuinely independent source of the information and tangible evidence" that would otherwise be subject to exclusion because they were found during an earlier unlawful search. To find the search with a warrant "genuinely independent," the unlawful search must not have affected (1) the officer's "decision to seek the warrant" or (2) the magistrate judge's "decision to issue [it]."

*Hill*, 776 F.3d at 251 (quoting *Murray v. United States*, 487 U.S. 533, 542 (1988)).

The independent source doctrine is not applicable here, because the belatedly issued search warrant expressly relied upon and resulted from the original illegal search. Here, the stated reason that Special Agent Federico sought a warrant to search the Toshiba laptop was the discovery of suspected images of child pornography on that computer during the initial, warrantless search. **Exhibit 3 ¶¶** 23–28. Moreover, the allegations pertaining to the discovery of suspected child pornography on the computer were central to the Magistrate Judge's finding of probable cause to support a search warrant. *See id.* Accordingly, neither prong of the independent source test is satisfied. Any and all evidence obtained from the laptop computer must be suppressed.

<u>**CONCLUSION**</u>

For the reasons stated herein, Mr. Grinder requests that the Court suppress all evidence obtained from the Samsung cell phone and the Toshiba laptop computer seized from his person and his residence, respectively.

Respectfully submitted,

JAMES WYDA
Federal Public Defender
for the District of Maryland

/s/

_____
ELIZABETH G. OYER, #95458
KIRSTIN MAGUIRE HOPKINS, #19629
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Telephone: (410) 962-3962
Facsimile: (410) 962-0872
Email: liz_oyer@fd.org
       kirstin_hopkins@fd.org

## **REQUEST FOR HEARING**

Pursuant to Rule 105.6 of the Local Rules of the United States District Court for the

District of Maryland, the defendant requests a hearing on this motion.

/s/

_____
ELIZABETH G. OYER
Assistant Federal Public Defender

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | Crim. No. CCB-17-0226 |
| ERIC WAYNE GRINDER | * | |
| | * | |

\* \* \* \* \*

## REPLY BRIEF IN SUPPORT OF MOTION TO SUPPRESS

As Mr. Grinder argued in his Motion to Suppress (ECF 33), the government seized Mr. Grinder's cell phone in violation of the Fourth Amendment's warrant clause, and the search of his laptop computer was unreasonable under the Fourth Amendment, as it was the result of an overly broad, general warrant. The government's attempts to excuse these Constitutional violations do not actually address the issues Mr. Grinder raised. (ECF 44 & 46.)

The government argues that the warrantless seizure of the phone from Mr. Grinder's person was permissible because the police were in the process of obtaining a warrant for his home. But, as discussed in detail below, that warrant had no impact on the seizure from his person; the police simply never got a warrant that would have authorized the seizure that occurred.

The government tries to justify the search of the laptop by claiming that the warrant to search for evidence of assault from Mr. Grinder's home was sufficient. But it was not sufficient to search the laptop. The forensic search authorized by the

61

warrant so far exceeded the stated probable cause that it was the equivalent of a warrantless search or a search pursuant to a general warrant.

None of the government's post hoc justifications for the warrantless searches and seizures saves these constitutional violations. This Court must suppress the illegally obtained evidence. Moreover, even though the police obtained federal warrants several months after the initial constitutional violations, these late warrants likewise fail to prevent exclusion of the evidence. Since these warrants were the direct result of the initial constitutional violations, the federal warrants themselves were fruit of the poisonous tree.

<u>Argument</u>

I.  **All evidence seized from Mr. Grinder's person, and all evidence derived from that illegal seizure, must be suppressed.**

The government characterizes its warrantless seizure of Mr. Grinder's cell phone as a temporary seizure based on probable cause to secure the property while the police acquired a valid search warrant. (Gov. Opp. at 8.) This characterization is misleading at best. No warrant ever authorized the search or seizure of this particular phone. The government never sought a warrant to search Mr. Grinder's person. The search and seizure were wholly warrantless and therefore unreasonable under the Fourth Amendment. This Court must suppress the cell phone and all evidence obtained and derived from this unreasonable warrantless search.

A.  **The government's argument that it could temporarily detain Mr. Grinder's property while it obtained a warrant is inapplicable because it never obtained a warrant to seize any property from Mr. Grinder's person.**

The government begins its argument with the statement that the police may

restrict the movement of a person whose home is subject to a pending search warrant. (Gov. Opp. at 8.) This may well be true, but has no relevance here.

The government concedes that it never restricted Mr. Grinder's movements. The police clearly had no arrest warrant. And Corporal Michael Lare from the Carroll County Sheriff's Office, who interacted with Mr. Grinder the evening of the search, apparently had no reason to believe Mr. Grinder was armed and dangerous. He did not even conduct a *Terry* pat down. Yet he did demand that Mr. Grinder deliver his phone. After seizing Mr. Grinder's property, Corporal Lare told Mr. Grinder that he was free to leave. The government's reliance on *Illinois v. McArthur*, 531 U.S. 326 (2001), simply does not advance any justification for the warrantless seizure of property from Mr. Grinder's person.

The government next argues that it may temporarily detain property "when needed to preserve evidence until police could obtain a warrant." *Id.* This theory also fails to justify the warrantless seizure of Mr. Grinder's phone and the subsequent search of the property. The government never obtained a warrant to search any property seized from Mr. Grinder.

The government obtained a warrant to search Mr. Grinder's residence, not his person. The warrant identifies the specific property that the magistrate authorized the police to search: "The property known as 261 Montpelier Court Westminster, Maryland, Carroll County, Maryland, 21147." This statement within the warrant is necessary to satisfy the Fourth Amendment's particularity clause, but also strictly limits where the police have authority to search for and seize evidence. Warrants

63

must "particularly describe[e] the place to be searched" and must particularly describe the "person or things to be seized." U.S. Const. amend. IV. *See also Groh v. Ramirez*, 540 U.S. 551, 557, 559-64 (2004).

The police presented an affidavit to the magistrate seeking permission to search a specific building—no other property and no person. The magistrate considered the proffered probable cause and determined that the intrusion into the *residence* was justified. The police never sought authorization, nor did the magistrate gratuitously grant permission, to search any person, including Mr. Grinder.

The fact that the warrant specified cell phones in its list of items to be seized *from the home* does not alter this analysis. The warrant also authorized the police to collect DNA or biological evidence *from the residence*, but there is no question about whether this warrant would have allowed Corporal Lare to swab Mr. Grinder's cheek. Clearly not. The warrant did not authorize any search of or seizure of evidence from any person. The warrant also permitted the seizure of "personal property tending to establish the identity of persons in control of the premises," but there is no question that Corporal Lare could not demand that Mr. Grinder deliver his wallet from his pocket or a hypothetical electricity bill that he may have been carrying as a reminder to pay it. If those items had been found and seized from inside the home, the seizure would have been pursuant to the warrant. But if they had been seized in the manner that Corporal Lare demanded Mr. Grinder's phone, the seizure would be warrantless and unreasonable.

The government's insistence that it was entitled to temporarily secure movable

property while it obtained a warrant for that property simply fails to address what happened here. The police did obtain a warrant, but for someplace else. The police may, in retrospect, wish they had asked for permission to search Mr. Grinder. But no warrant exception exists for a reviewing court to rewrite a warrant to include new objects or people within the scope of an otherwise particularly drafted warrant.

### B.    Reasonable suspicion is insufficient to justify the warrantless seizure of Mr. Grinder's cell phone.

The government next turns to a different attempt to justify the warrantless seizure—that it was entitled to detain Mr. Grinder's cell phone based on reasonable suspicion. (Gov. Opp. 9-10.) It cites a line of inapposite cases that address whether containers suspected of holding drugs may be temporarily detained while a drug-detecting canine conducts its non-search sniff.[1] *See United States v. Place*, 462 U.S. 696 (1983) (detention of luggage at airport pending drug sniff); *United States v. Kent*, 652 Fed. Appx. 161 (4th Cir. 2016) (detention of package in the mail pending canine sniff); *United States v. Branch*, 537 F.3d 328 (4th Cir. 2008) (traffic stop where officers developed reasonable suspicion of drug activity then called a drug sniffing canine). Mr. Grinder has no disagreement for purposes of this motion that, when the police have reasonable suspicion that luggage, a package in the mail, or a car driving on the public roads contains drugs, the police may call a drug sniffing dog to either confirm

---

[1] The Supreme Court has clearly established that the police do not conduct a search, and the police do not intrude upon a constitutionally recognized privacy interest, when a specially trained dog sniffs the exterior of packages or a car for the presence of narcotics. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). This is a wholly different situation from, and the intrusion into constitutionally protected privacy interests is monumentally different, when the police seize property *from a person*.

or dispel the reasonable suspicion.

These cases have no bearing on the warrantless seizure of Mr. Grinder's phone from his person. They address a situation where the police had reasonable suspicion, briefly seized the containers, then conducted the least intrusive additional investigation possible. That of course is not what happened here. There is no "reasonable suspicion" exception to the Fourth Amendment's warrant requirement for seizing property out of a person's pockets.

Reasonable suspicion can support certain stops and seizures because the stop or seizure is brief and highly circumscribed. *United States v. Sharpe*, 470 U.S. 675, 68-87 (1985). The unlimited duration of this seizure and search establishes that the search requires a warrant based upon probable cause, not just reasonable suspicion. Brief detentions based on reasonable suspicion "cannot continue indefinitely." *United States v. Leo*, 792 F.3d 742, 750 (7th Cir. 2015).

Corporal Lare did not conduct a *Terry* stop and seize Mr. Grinder's phone based on reasonable suspicion, nor could he have. But even if he had, seizing a cell phone during a *Terry* stop would be unreasonable. Even before *Riley v. California* foreclosed such an absurd result, there was no question that reasonable suspicion could not justify such a search. The Second Circuit had "little difficulty concluding" that an "extensive" search of a cell phone "went well beyond what was permissible under a *Terry* stop." *Carter v. City of Yonkers*, 345 Fed. Appx. 605, 606 (2d Cir. 2009). Similarly in the Fifth Circuit, searching a cell phone exceeds the "scope of a lawful protective search" under *Terry*. *United States v. Zavala*, 541 F.3d 562, 576 (5th Cir.

2008). Reasonable suspicion can support brief, limited intrusions, but not the exhaustive search for evidence and seizure from the person that occurred here.

To the extent that the government is asking the Court to treat cell phones as having the same diminished expectation of privacy as cars travelling on public roads or luggage in airports, the Supreme Court has already rejected this notion. "That is like saying a ride on horseback is materially indistinguishable from a flight to the moon." *Riley v. California*, 134 S. Ct. 2473, 2488 (2014.) "Cell phones differ in both a quantitative and qualitative sense from other objects that might be kept" in a pocket. *Id.* Accordingly, this Court cannot simply apply cases that discuss run-of-the-mill containers to warrantless searches and seizures involving cell phones without accounting for the increased need to protect an individual's constitutionally recognized privacy interest in cell phones. *Id.* at 2484 (rejecting a mechanical application of warrant exceptions to warrantless searches of cell phones, and rejecting that cell phones are no different from wallets or other small containers carried in pockets or purses).

### C.   Preservation of evidence does not supply a warrant exception to render reasonable the warrantless seizure here.

Finally, the government argues that it could seize Mr. Grinder's phone without a warrant in order to preserve evidence. (Gov. Opp. at 11-12.) This is in fact a reiteration of its initial argument that it could seize the property while it obtained a warrant. It argues, "They seized Defendant's phone without a warrant to prevent evidence tampering or destruction, then obtained a warrant to search the device." (Gov. Opp. at 11 (citing *McArthur*, 531 U.S. at 331)).

The government appears to be arguing that digital media may always be seized due to the exigent circumstances warrant exception because it can be easily deleted. (Gov. Opp. at 11-12.) Not so. There is no "digital media" warrant exception. *Compare Mincey v. Arizona*, 437 U.S. 385, 390-91 (1978) (rejecting the notion of a "murder scene exception" to the Fourth Amendment). Just because the police perceive a need to conduct a warrantless search, and even if they think the search would be very important and productive, they cannot avoid the Fourth Amendment's warrant requirement. *See id.* Regardless, as discussed above, the Supreme Court's recognition and protection of citizens' immense privacy interests in their cell phones eliminates the possibility of any blanket digital media warrant exception. *See Riley*, 134 S. Ct. at 2487-89.

The government has not cited one precedential case where a court held that an exigent circumstance justified a warrantless seizure of an item *from a suspect's person*. The officers in Riley had access to the defendants' cell phones pursuant to the search incident to arrest exception, which is not at issue here. 124 S. Ct. at 2486. But even in *Riley*, where the cell phones were properly seized pursuant to a different warrant exception, the government's interest in preventing the destruction of evidence did not justify dispensing with the search warrant requirement. *Id.* Likewise, *McArthur* did not involve the warrantless seizure of anything from the defendant's body due to exigent circumstances. Instead, that case only involved the defendant's temporary restraint, which the Court described as a minimal intrusion, as opposed to the substantial intrusion of seizing property from a person. 531 U.S. at

68

329.

The cases the government cites when it suggests that digital media may generally be seized under the exigent circumstances warrant exception actually do not support any such broad authorization. (Gov. Opp. at 12.) In *United States v. Clutter*, the police seized a computer during a search incident to arrest, not under the exigent circumstances exception. 674 F.3d 908, (8th Cir. 2012). In *United States v. Bradley*, 488 Fed. Appx. 99 (6th Cir. 2012), the defendant consented to the police searching his computer, even providing passwords. In *United States v. Blood*, 429 Fed. Appx. 670 (9th Cir. 2011), the police seized the computer while their application for a warrant that would have covered the laptop was pending. In *United States v. Diaz*, 435 Fed. Appx. 329 (5th Cir. 2011), the defendant admitted to the police that his laptop contained child pornography, then tried to hide the computer. The police therefore had specific reason to believe that the specific evidence was in danger, rather than a general, unspecified concern regarding digital evidence in every case. In *United States v. Vallimont*, 378 Fed. Appx. 972 (11th Cir. 2011), a co-owner of the computer consented to its search. The opinion also describes the computer as if it were any container, a characterization that cannot survive *Riley*. Finally, in *United States v. Walser*, 275 F.3d 981 (10th Cir. 2001), the computer was seized from a hotel room pursuant to a warrant for that hotel room.

Although these cases may mention exigent circumstances, none of them turns on a warrantless seizure of a device because of the generic perceived ephemeral character of electronic evidence. A different basis for seizure existed in each case.

None of these cases supports the warrantless seizure of Mr. Grinder's phone from his person.

The government cites *United States v. Brown*, 701 F.3d 120 (4th Cir. 2012), but this case also fails to justify the warrantless seizure here since its facts and the circumstances of the search and seizure are so factually distinguishable. In that case, the police were investigating internet crimes against children, and traced certain criminal activity to a particular "Internet Protocol" address. The police obtained a search warrant for the address associated with that IP address, which happened to be a private ambulance service. The police had identified specific images of child pornography that had been downloaded at specific times—times when only two people worked at the dispatch service. When they executed the warrant, the two people were out on a call, but when they returned, the police stopped the search they were already conducting and asked if there were any laptops in the ambulance. When one of the two people said yes, the police asked "Can you get those for us?" and he complied. 701 F.3d at 123. The police then interrogated both individuals, one of whom admitted to having child pornography on his computer. *Id.* The Fourth Circuit concluded that the police were entitled to ask for the computers to preserve evidence. *Id.* at 126.

*Brown*, however, does not control what happened here. In *Brown*, the police were investigating an offense where the computer was the instrumentality of the offense and the police had substantial evidence that the specific computer in the particular individual's possession would contain the fruits of the particular offense.

Here, on the other hand, the cell phone was not the instrumentality. The police were investigating allegations of child abuse, not computer crimes against a child. Nor did they have any specific information about any specific cell phones. *See United States v. Doyle*, 650 F.3d 460, 472 (4th Cir. 2011) ("Evidence of child molestation alone does not support probable cause to search for child pornography."); *Virgin Islands v. John*, 654 F.3d 412, 418-19 (3d Cir. 2011) (probable cause of assaulting a child is not probable cause of possessing child pornography). In *Brown*, the police were actively executing an extant warrant at a business when one of the business's vehicles drove up to the door of the business. They asked for specific property covered by the warrant from the vehicle. They did not search the person of either employee.

*Riley* discussed searching cell phones subject to the exigent circumstances exception. But this exception, contrary to the position taken by the government, is to allow for "fact-specific threats." *Riley*, 134 S. Ct. at 2494. "The critical point is that . . . the exigent circumstances exception requires a court to examine whether an emergency justified a warrantless search in each particular case." *Id.* No "fact-specific threat" occurred here. The government, whose burden it is to establish an exigent circumstance, offers no fact other than that Mr. Grinder knew the police were about to execute a search warrant at his home. Allowing this justification for the exigent circumstances *exception* would allow the exception to swallow the warrant requirement.

No exigency justified the warrantless seizure. An exigency may justify a warrantless search or seizure "when officers must enter to fight an on-going fire,

prevent the destruction of evidence, or continue in 'hot pursuit' of a fleeing suspect."
*United States v. Yengel*, 711 F.3d 392, 396 (4th Cir. 2013). This is an "exceptional
situation." *United States v. Dart*, 747 F.2d 263, 267 (4th Cir. 1984).

The government claims that the police did what *Riley* instructed. (Gov. Opp.
at 12.) But they did not. *Riley's* instructions were clear: "Get a warrant." 134 S. Ct.
2495.

## II. This Court must suppress all evidence seized from Mr. Grinder's laptop because the search was the product of an unreasonable, overbroad general warrant.

The government defends its search of Mr. Grinder's laptop with the general
proposition that, since the warrant identified a particular crime under investigation,
the warrant satisfied all requirements of the Fourth Amendment. (Gov. Opp. at 15-
16.) While it is true that a warrant must identify with particularity the offense under
investigation, that is only one of four required elements of a valid warrant. *See Groh*,
540 U.S. at 557.

The government overlooks the other aspect of the particularity clause—that
the warrant must particularly identify the persons or things to be seized. *Id.* This
requirement "provides written assurance that the magistrate actually found probable
cause to search for, and to seize, every item mentioned in the affidavit." *Id.* at 560.
The existence of probable cause to search for certain items in a home, as established
by a warrant, does not mean that probable cause necessarily exists to seize *all*
contents of the home. Yet that is essentially what the warrant did here.

"The chief evil that prompted the framing and adoption of the Fourth
Amendment was the 'indiscriminate searches and seizures' conducted by the British

under the authority of 'general warrants.'" *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013). The "distinct objective" of the warrant requirement—and the Fourth Amendment's particularity requirement specifically—"is that those searches deemed necessary should be as limited as possible. Here, the specific evil is the 'general warrant' abhorred by the colonists, and the problem is not that of intrusion *per se*, but of a general exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (citations omitted). The Fourth Amendment's textual "particularity requirement prevents general searches and strictly limits the discretion of the officer executing the warrant." *Cassady v. Goering*, 567 F.3d 628, 635 (10th Cir. 2009).

To determine whether a warrant is sufficiently specific in order to avoid the pitfalls of a general warrant, courts examine both the warrant's particularity and its breadth. *United States v. Kow*, 58 F.3d 423, 426 (9th Cir. 1996). Warrants can constitute general warrants if they are insufficiently particular or if they authorize an overbroad seizure of an individual's papers and effects. "Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *In re Grand Jury Subpoenas*, 926 F.2d at 856-57.

These potential flaws are closely related, and are often considered together—and both are present here. The affidavit in support of the warrant establishes probable cause to search for evidence of sexual abuse and assault, but includes no fact giving rise to probable cause to search for child pornography. Yet the search that

the police conducted pursuant to this warrant was for all files, including photographs and other images that would have nothing to do with the described probable cause. The warrant provided no limit to forensic search of the laptop's files, meaning that every single byte of data was available to be examined. The affidavit, however, fails to establish probable cause to search every file. The affidavit therefore does not justify the scope of the search that the warrant purported to authorize. As such, the warrant is a general warrant, and the search that followed was unreasonable under the Fourth Amendment.

A. **The warrant established probable cause for sexual abuse of a minor, not for any offense relating to child pornography. Any search that exceeded this limit fell outside the scope of the warrant.**

The government focuses its response to Mr. Grinder's motion to suppress by arguing that the affidavit in support of the warrant to search Mr. Grinder's home, seize his laptop, and conduct a forensic examination of that laptop, was supported by probable cause of sexual abuse of a minor. (Gov. Opp. at 15-17.) What the affidavit does *not* establish is probable cause to search for evidence relating to child pornography.

The affidavit mentions use of a computer with respect to one aspect of the offense: it includes allegations from Mr. Grinder's wife that he used a computer to buy drugs over the internet. This is the *only* mention of a computer in the affidavit. There is no mention of Mr. Grinder taking photographs or videos, or the minor victim or her mother ever observing any pornography of any sort on any computer or digital media, or of any internet searches or digital storage of anything other than purchasing Clonazelam.

74

The Fourth Circuit has unambiguously held, in striking down a warrant under similar circumstances, that "evidence of child molestation alone does not support probable cause to search for child pornography." *Doyle*, 650 F.3d at 472; *see also John*, 654 F.3d at 418-20. Without some fact giving rise to a suspicion that images of the abuse exist—or some other link between the offenses—which must be stated explicitly in the affidavit, probable cause of one offense does not establish probable cause of the other offense.

Here, the warrant was limited by its own terms to searching for evidence of sexual abuse of a minor. This would include, with respect to the laptop, a search for evidence of buying drugs. The warrant did not, however, authorize a broad search of everything on the laptop. But that is what the police did. The search therefore fell outside the scope of the warrant. The search, as it was conducted, exceeded the probable cause. The police thus performed an unreasonable warrantless search.

### B. The warrant was overbroad because it permitted the search and seizure of information that fell beyond the scope of the alleged probable cause.

Not only did the police conduct a search beyond the scope of the probable cause, but the warrant itself authorized a search for digital files that exceeded the probable cause identified in the affidavit, and was therefore overly broad. The government does not address this aspect of the warrant's failure to comply with the particularity clause.

An overly broad warrant allows for the search and seizure of items that are not supported by probable cause. *United States v. Leary*, 846 F.2d 592, 605 (10th Cir. 1988). "A warrant with an 'indiscriminate sweep' is 'constitutionally intolerable.'"

*United States v. Griffith*, 867 F.3d 1265, 1275 (D.C. Cir. 2017) (quoting *Stanford v. Texas*, 379 US 476, 486 (1965)).

This aspect of the particularity requirement "ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Griffith*, 867 F.3d at 1275 (quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)). *See also United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986) (protecting against overly broad warrants "ensures that the magistrate issuing the warrant is fully apprised of the scope of the search and can thus accurately determine whether the entire search is supported by probable cause"). "'An otherwise unobjectionable description of the objects to be seized is defective if it is broader than can be justified by the probable cause upon which the warrant is based.'" *Galpin*, 720 F3d at 446 (quoting 2 W. LaFave, *Search and Seizure* § 4.6(a) (5th ed. 2012)). "There [must] be probable cause to seize the particular thing named in the warrant." *In re Grand Jury Subpoenas*, 926 F.2d 847, 857 (9th Cir. 1991).

Here, the warrant had an indiscriminate sweep that "far outstripped the police's proffered justification" for the search. *Griffith*, 867 F.3d at 1275. The court order authorized "wholesale seizures of entire categories of [data] not generally evidence of criminal activity, and provide[d] no guidelines to distinguish items used lawfully from those the government had probable cause to seize." *Spilotro*, 800 F.3d at 964.

The warrant purported to authorize the police to seize and have forensically analyzed any computers or digital media found in the home. This Court has described

what a forensic exam of a computer entails, since the nature of that type of search is an important aspect of the Fourth Amendment analysis:

> First, "the computer forensics process always begins with the creation of a perfect 'bitstream' copy or 'image' of the original storage device saved as a 'read only' file." Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L.Rev. 531, 540 (2005). Then, a computer forensics expert will use specialized software to comb through the data, often over the course of days, weeks, or even months, *id.* at 537–38, searching the full contents of the imaged hard drive, examining the properties of individual files, and probing the drive's unallocated "slack space" to reveal deleted files, *id.* at 542–43. Although directed by a forensic examiner, an integral part of a forensic examination is the use of technology-assisted search methodology, where the computer searches vast amounts of data that would exceed the capacity of a human reviewer to examine in any reasonable amount of time.

*United States v. Saboonchi*, 990 F. Supp. 2d 536, 547 (D. Md. 2014).

This type of search "using sophisticated technology-assisted search methodologies can exceed vastly the capacity of a human searching and viewing files." *Id.* Forensic searches also reveal "a class of data that raise novel privacy concerns," including exposure of deleted files, location data, and other metadata. *Id.* at 547-58. A forensic search therefore differs from a traditional, conventional search "not merely in degree, but in kind." *Id.* at 548.

By authorizing a forensic search, the warrant here thus authorized the police to review *all* data stored on the device, whether related to sexual abuse of a minor or not. The authorization to conduct a forensic search included no limit by file type, type of data sought, or date restriction. The authorization was for a general rummaging through Mr. Grinder's data and thus exceeded the probable cause established in the warrant.

This warrant is analogous to invalid, overly broad general warrants that permit the seizure of all of a business's files. Multiple courts find such warrants to violate the Fourth Amendment. For example, in *Kow*, "The warrant authorized the seizure of virtually every document and computer file. . . . To the extent it provided any guidance to the officers executing the warrant, the warrant apparently sought to describe every document on the premises and direct that everything be seized." 58 F.3d at 427. But the court held, "The warrant contained no limitations on which documents within each category could be seized or suggested how they related to specific criminal activity. By failing to describe with any particularity the items to be seized, the warrant is indistinguishable from the general warrants repeatedly held by this court to be unconstitutional." *Id. See also Voss v. Bergsgaard*, 774 F.2d 402, 405 (10th Cir. 1985) (holding that a warrant that purported to establish probable cause of tax fraud, but allowed for the general rummaging through all of a business's customer files, employment files, marketing and promotional materials, and more was impermissibly overbroad).

Allowing the government to gather as much data about Mr. Grinder as the warrant here authorized is precisely the "wide-ranging exploratory" search and "general rummaging" that "the Framers intended to prohibit." *Griffith*, 867 F.3d at 1275. This was an impermissibly overbroad general warrant.

### C. Since the warrant was impermissibly overbroad and failed to satisfy the particularity requirement, the search was the equivalent of an unreasonable warrantless search.

Since the warrant here failed to satisfy the Fourth Amendment's particularity requirement (by failing to particularly identify the files to be seized and ensure that

probable cause existed to seize everything the warrant authorized), the search was an unreasonable search based on a general warrant. The Supreme Court has explained that this type of search is the equivalent of an unreasonable warrantless search: "We have clearly stated that the presumptive rule against warrantless searches applies with equal force to searches whose only defect is a lack of particularity in the warrant." *Groh*, 540 U.S. at 559.

Moreover, the police cannot reasonably rely on general warrants. "Given that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly does not comply with the requirement was valid." *Groh*, 540 U.S. at 563. And this is a longstanding constitutional rule. "As we noted 20 years ago in *Sheppard*: 'The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional.'" *Groh*, 540 U.S. at 564 (quoting *Massachusetts v. Sheppard*, 468 U.S. 981, 988 n.5 (1984)).

Warrants that fail the particularity requirement are overbroad on their face. *Leary*, 846 F.2d at 602. Police cannot reasonably rely on facially overbroad warrants. *United States v. Leon*, 468 U.S. 897, 914-15 (1984).

Here, the warrant failed to particularly identify the items to be searched for and seized from the computer. Instead, the warrant authorized a wide ranging rummaging through all files with no limit. This is a facially overbroad warrant. The search that the government initially conducted was unreasonable and the equivalent

of a warrantless search. As the Supreme Court held in *Groh*, the police were not entitled to rely on the warrant. Suppression is required.

### III.    The illegal warrantless seizure of Mr. Grinder's phone and the warrantless search of Mr. Grinder's laptop poisoned the subsequent federal search warrants.

The government argues that the federal search warrants are supported by independent probable cause. In fact, the search warrants issued by the federal court several months later for a forensic search of Mr. Grinder's computer and phone were the fruit of the first illegal, warrantless seizure and searches of his cell phone and laptop. Accordingly, all evidence seized as a result of the subsequent search warrants should be suppressed. Moreover, the police cannot reasonably rely in good faith on a warrant that is based on unconstitutionally obtained evidence.

The government's first argument that the federal search warrant was supported by probable cause relates to the discovery of evidence on the laptop during the initial search pursuant to an unreasonable, general warrant. (Gov. Opp. at 19.) This alone establishes that the impetus for the federal warrant was the initial search.

When a search warrant is based on information that the police obtain illegally, the search warrant itself is invalid as fruit of the unconstitutional seizure. *United States v. Mowatt*, 513 F.3d 395, 403-04 (4th Cir. 2008). "The evidence recovered in a later search is not admissible unless the government establishes that 'no information gained from the illegal [search] affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it.'" *Id.* at 404 (quoting *Murray v. United States*, 487 U.S. 533, 540 (1988)); *see also United States v. Dawkins*, 17 F.3d 399, 408 (D.C. Cir. 1994) (excluding evidence seized during a search warrant

that was based on facts learned during an earlier warrantless entry into a residence

that was unsupported by any exception to the Fourth Amendment's warrant

requirement). "A magistrate's consideration does not protect from exclusion evidence

seized during a search under a warrant if that warrant was based on evidence seized

in an unconstitutional search." *United States v. Vasey*, 834 F.2d 782, 789-90 (9th Cir.

1987).

Indeed, the agent's stated reason for obtaining the later warrant to search the

laptop was the earlier discovery of suspected child pornography during the first

search. Thus the federal warrant is dependent upon, rather than entirely

independent from, the first unconstitutional search. *See United States v. Hill*, 776

F.3d 243, 251 (4th Cir. 2015). *See also Murray*, 487 U.S. at 542 ("The ultimate

question, therefore, is whether the search pursuant to the warrant was in fact a

genuinely independent source of the information and tangible evidence at issue here.

This would not have been the case if the agents' decision to seek the warrant was

prompted by what they had seen during the [illegal entry], or if information obtained

during that entry was presented to the Magistrate and affected his decision to issue

the warrant.").

Moreover, the Fourth Circuit as well as others have squarely held that the good

faith exception described in *United States v. Leon*, 468 U.S. 897 (1984), cannot save

a tainted search warrant predicated on the fruits of a prior illegal search. *See Mowatt*,

513 F.3d at 405 (good faith exception does not apply where search warrant was

prompted by previous warrantless illegal search); *United States v. McGough*, 412

F.3d 1232,1240 (11th Cir. 2005) (*Leon* exception does not apply when it was "the officers' unlawful entry . . . that led to [the] request for a search warrant;" ); *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996) (declining to apply good faith exception when the "issuance of the warrant was itself premised on material obtained in a prior search that today's holding makes clear was illegal"); *United States v. Scales*, 903 F.2d 765 (10th Cir. 1990) (same); *United States v. Wanless*, 882 F.2d 1459, 1466 (9th Cir. 1989) (noting that "good faith exception does not apply where a search warrant is issued on the basis of evidence obtained as a result of an illegal search"); *United States v. Villard*, 678 F. Supp. 483, 490 (D. N.J. 1988) (good faith exception does not apply to "evidence seized under a warrant that was based on information obtained in a prior illegal search").

The government asks the Court to rely on *United States v. Gillenwaters*, 890 F.2d 679 (4th Cir. 1989), and excise the illegally obtained evidence from the affidavit in support of the federal warrants. That case deals with illegally obtained evidence presented to a magistrate as if the warrant is challenged under *Franks v. Delaware*, 438 U.S. 154 (1978). The reasoning of *Mowatt*, and the similar cases cited above, which follow more closely to *Murray*, is more apt under the circumstances here. Mr. Grinder is not alleging that the federal agents deliberately or recklessly lied or hid information from the federal magistrate. This motion does not challenge the veracity of the federal affidavit. Instead, the argument, which was addressed in *Mowatt* and the cases cited above, is that the federal warrant is the fruit of an earlier illegal search, and thus must be suppressed under *Wong Sun v. United States*, 371 U.S. 471

82

(1963). The most recent and better reasoned Fourth Circuit authority mandates that the entire federal warrant is tainted by the search conducted pursuant to the illegal warrantless seizure of the cell phone and the unreasonable general warrant for the laptop.

"The exclusionary rule is the sole means of ensuring that the police refrain from engaging in the unwarranted harassment or unlawful seizure of anyone." *United States v. Foster*, 634 F.3d, 243, 249 (4th Cir. 2011); *see also Mowatt*, 513 F.3d at 403. "'Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions.'" *Foster*, 634 F.3d at 249 (quoting *Terry v. Ohio*, 392 U.S. 1, 12-13 (1968)).


## Conclusion

For these reasons and those stated in Mr. Grinder's initial motion to suppress, as well as those that will be developed further at the hearing on this matter, this Court should enter an order suppressing all evidence derived from the illegal searches and seizures of the cell phone and laptop computer.

Respectfully submitted,

JAMES WYDA
Federal Public Defender
for the District of Maryland

/s/
_____
ELIZABETH G. OYER, #95458
KIRSTIN MAGUIRE HOPKINS, #19629
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Telephone: (410) 962-3962
Facsimile: (410) 962-0872
Email: liz_oyer@fd.org
        kirstin_hopkins@fd.org



January 24, 2018

**BY ECF**

The Honorable Catherine C. Blake
United States District Judge
United States District Court
for the District of Maryland
101 West Lombard Street
Baltimore, MD 21201

Re:     *United States v. Eric Wayne Grinder*, No. CCB-17-0226

Dear Judge Blake:

    We write on behalf of the Government in the above-referenced matter to notify the Court that the Government has located additional, controlling authority that it intends to rely on at the motions hearing currently scheduled for January 26, 2018 at 2:00 p.m.

    That authority, *Cupp v. Murphy*, 412 U.S. 291 (1973), broadly stands for the proposition that where, as here, law enforcement has probable cause to arrest a suspect but does not do so, law enforcement may still nevertheless conduct a warrantless search of the suspect if the search is supported by probable cause and exigent circumstances exist.  412 U.S. at 295-96 (upholding warrantless police seizure of fingernail scrapings from suspect—not arrested until one month later—because it was necessary to prevent the destruction of evidence); *see also United States v. Rizzo*, 583 F.2d 907, 910 (7th Cir. 1978) (unpublished) (where defendant emerged from building carrying tape cassette agents reasonably believed he had been using in unlawful wiretapping, seizure of cassette without any arrest lawful because if "they had deferred seizing it until they had obtained a warrant for its seizure, it would surely have been erased or secreted") (citing *Cupp*, 412 U.S. at 295-96); Wayne R. LaFave, *Search and Seizure:  A Treatise on the Fourth Amendment* § 5.4(b) ("At a minimum, *Cupp* should be applied so as to permit, when there are grounds upon which a formal arrest could have been made, a more extensive search for any evidence reasonably believed to be in the possession of the suspect which might be unavailable later, either because of future conduct of the suspect or by other means.").

    Here, as set forth in the Government's response brief at 10-11, the seizure of the Defendant's cellphone was amply supported by probable cause and was necessary given the exigencies of the situation:  If law enforcement did not immediately seize the phone, it could have been moved, destroyed or its contents deleted by Defendant who was (1) told that a search warrant was about to be executed at his home; (2) well-aware of the Minor Victim's allegations against him; (3) and was likewise undoubtedly aware of the existence inculpatory evidence on his phone—images of him sexually abusing the Minor Victim.

Case 1:17-cr-00226-CCB   Document 48   Filed 01/24/18   Page 2 of 2

Respectfully submitted,

Stephen M. Schenning
Acting United States Attorney

By:     ___/s/_____

Paul A. Riley
Paul E. Budlow
Assistant United States Attorneys

CC:  All counsel (by ECF)

86

**OFFICE OF THE FEDERAL PUBLIC DEFENDER**
**DISTRICT OF MARYLAND**
NORTHERN DIVISION
TOWER II, NINTH FLOOR
100 SOUTH CHARLES STREET
BALTIMORE, MARYLAND  21201-2705
TEL: (410) 962-3962
FAX: (410) 962-0872
TOLL FREE: (855) 213-8450
EMAIL: Liz_Oyer@fd.org

JAMES WYDA                                                                ELIZABETH G. OYER
FEDERAL PUBLIC DEFENDER                                    ASSISTANT FEDERAL PUBLIC DEFENDER

January 24, 2018

**BY CM/ECF**
The Honorable Catherine C. Blake
United States District Court
101 West Lombard Street
Baltimore, MD 21201

> Re:  *United States v. Eric Wayne Grinder*
>       Criminal Case No. CCB-17-0226

Dear Judge Blake:

We write on behalf of the defendant, Eric Wayne Grinder, to address the government's most recent filing, Dkt. No. 48, and to bring to the Court's attention further authority that supports Mr. Grinder's argument that the evidence from his cell phone must be suppressed.

The government cites *Cupp v. Murphy*, 412 U.S. 291 (1973), in support of its argument that the warrantless seizure of Mr. Grinder's cell phone was authorized. *Cupp* is a narrow and highly fact-specific decision that has no application here.  In *Cupp*, the Supreme Court upheld the warrantless taking of fingernail scrapings from a murder suspect – in the presence of his attorney – upon observing what appeared to be a spot of dried blood on his finger.  The taking of fingernail scrapings was a "very limited search" that the Court deemed "necessary to preserve the highly evanescent evidence" – *i.e.*, biological material – found under the defendant's fingernails.  *Id.* at 296.  The Court underscored the narrowness of its holding: "On the facts of this case, considering the existence of probable cause, the very limited intrusion undertaken incident to the station house detention, and the ready destructibility of the evidence, we cannot say that this search violated the Fourth and Fourteenth Amendment."  *Id.*

The warrantless seizure of Mr. Grinder's cell phone presents wholly different considerations.  To begin, a cell phone is not the sort of "highly evanescent evidence" that could be readily washed away, like blood on one's fingers.  Moreover, cell phones implicate a special category of possessory and privacy interest, in light of the vast quantities of personal data that they hold and in light of their pervasive use in all aspects of life.  *See, e.g.*, *Riley v. California*, 134 S.

Ct. 2473, 2489 (2014).[1]  In addition, and perhaps most importantly, the extended deprivation of Mr. Grinder's cell phone – for months before police obtained a warrant – represents a much more substantial and prolonged intrusion on Mr. Grinder's Fourth Amendment rights than a quick scraping of the fingernails.

Indeed, even if the initial seizure of Mr. Grinder's cell phone could be justified by some exception to the warrant requirement, there is no lawful justification for law enforcement's decision to deprive him of his phone for nearly four months before obtaining a warrant to search it.  As the Supreme Court has repeatedly held, "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'"  *United States v. Jacobsen*, 466 U.S. 109, 124 (1984) (citing *United States v. Place*, 462 U.S. 696 (1983)). In *Place*, the Court held that while a brief investigative detention of an individual's luggage might be justified, seizing the luggage for 90 minutes was not.  *Place*, 462 U.S. at 710.  And this constitutional violation was "exacerbated" by the indefinite nature of the seizure: the agents failed to accurately inform respondent of the place to which they were transporting his luggage, of the length of time he might be dispossessed, and of what arrangements would be made for return of the luggage of the investigation dispelled the suspicion."  *Id.*

Here, as in *Place*, the extended warrantless seizure of Mr. Grinder's cell phone exceeded any "narrow authority" that police arguably might have had "to detain briefly" his property.  *Id.* Police seized his phone and kept it for nearly four months – from November 29, 2016 through March 17, 2017 – before obtaining a warrant to search it.  This sort of lengthy, indefinite warrantless seizure of a key piece of personal property is not reasonable under any Fourth Amendment doctrine.

The Eleventh Circuit's opinion in *United States v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009), is instructive here.  In *Mitchell*, the court held that police lawfully seized the defendant's computer hard drive – which he admitted would contain evidence of child pornography – without a warrant, based on probable cause.  *Id.* at 1350.  However, the court further held that the 21-day delay in obtaining a search warrant for the hard drive was unreasonable, and therefore the motion to suppress should have been granted.  *Id.* at 1353.  Citing *Jacobsen*, the Court reasoned that "the detention of the hard drive for over three weeks before a warrant was sought constitutes a significant interference with Mitchell's possessory interest."  *Id.* at 1351.  The court characterized the defendant's possessory interest in his computer as "substantial," explaining: "Computers are relied upon heavily for personal and business use. Individuals may store personal letters, e-mails, financial information, passwords, family photos, and countless other items of a personal nature in electronic form on their computer hard drives."  *Id.*  Because no countervailing compelling government interest justified the delay, the court held that the seizure was unreasonable.  *Id.*

Here, as in *Mitchell*, the extended warrantless seizure of Mr. Grinder's cell phone unreasonably deprived him of his substantial possessory interest in that device.  As the Supreme Court underscored in *Riley*, cell phones, like computers, store vast quantities of personal information and therefore "differ in both a quantitative and a qualitative sense from other objects

---

[1] We note that *Cupp* was decided in 1973, decades before the advent of modern cell phone technology and their pervasive incorporation into everyday life.

USCA4 Appeal: 19-4392    Doc: 18    Filed: 09/19/2019    Pg: 93 of 493

that might be kept on an arrestee's person."  134 S. Ct. at 2489.  Depriving Mr. Grinder of his phone for nearly four months was unreasonable, regardless of whether the initial seizure was valid.


Respectfully,

/s/

Elizabeth G. Oyer
Kirstin Maguire Hopkins
Office of the Federal Public Defender


cc:    Paul A. Riley, AUSA
       Paul E. Budlow, AUSA

Case 1:17-cr-00226-CCB   Document 50   Filed 01/25/18   Page 1 of 2



January 25, 2018

**BY ECF**

The Honorable Catherine C. Blake
United States District Judge
United States District Court
for the District of Maryland
101 West Lombard Street
Baltimore, MD 21201

Re:    *United States v. Eric Wayne Grinder*, No. CCB-17-0226

Dear Judge Blake:

We write on behalf of the Government in the above-referenced matter to respond the legal authority and argument raised for the first time in Defendant's letter dated January 24, 2018.  Relying on *United States v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009) (per curiam), Defendant now claims that the depriving the Defendant "of his phone for nearly four months was unreasonable, regardless of whether the initial seizure was valid."  Letter at 3.  Defendant's claim is meritless.

Defendant was not deprived of his phone for four months before a warrant was obtained; he was deprived of his phone for mere minutes.  Corporal Lare seized the Defendant's phone on the driveway of 261 Montpelier Court, just feet from the front door of Defendant's home—*i.e.*, within the home's curtilage—at 5:56 p.m. on November 29, 2016.  And the search and seizure warrant, which explicitly included the curtilage and which explicitly provided for the seizure of cellular telephones, was signed at 6:15 p.m.  *See* Gov't Opp'n Ex. 1 (Warrant).  In other words, law enforcement obtained a warrant to seize and search Defendant's phone just 19 minutes after they temporarily detained it.  *See id.*  And this detention was warranted to preserve the evidence until that warrant could be obtained.  *See* Gov't Opp'n at 9-12.

This is hardly the "substantial and prolonged intrusion" claimed by Defendant.  Nor does it come close to the factual scenario present in *Mitchell*.  *See* 565 F.3d at 1351 (21-day delay between a valid warrantless seizure of a computer and the application for a search warrant was unreasonable). In any event, the Eleventh Circuit was careful to note that that no bright-line rule for unreasonableness exists, but rather any delay is evaluated on a case-by-case basis.  *See Mitchell*, 565 F.3d at 1352 ("[W]e emphasize again that we are applying a rule of reasonableness that is dependent on all the circumstances.") (citation omitted).  And, in distinguishing *Mitchell*, that court has repeatedly confirmed as much.  *See, e.g.*, *United States v. Laist*, 702 F.3d 608, 614 (11th Cir. 2012) (noting that "in some contexts, a delay as short as 90 minutes may be unreasonable, while in others, a delay of *over three months may be reasonable*") (citations omitted) (emphasis added).

90

Case 1:17-cr-00226-CCB   Document 50   Filed 01/25/18   Page 2 of 2

Even if Defendant were correct that a warrant to seize the phone was not obtained for a period of months—and he is not—he can hardly complain.  Defendant has never requested return of the phone from law enforcement.  *See United States v. Johns*, 469 U.S. 478, 487 (1985) (defendants who "never sought return of the property" have thus "not even alleged, much less proved, that the delay in the search . . . adversely affected legitimate interests protected by the Fourth Amendment"); *United States v. Stabile*, 633 F.3d 219, 236 (3d Cir. 2011) (concluding that three month delay in obtaining warrant justified where, among other things defendant did not ask for the return of his property for over 18 months); *United States v. Brown*, No. 10 Cr. 16, 2013 WL 6858408, at *10 (W.D. Va. Dec. 30, 2013) ("Defendant's failure to follow up on Detective Rudman's offer that he might be able to recover and convey to Defendant legitimate files from the computer—much less to inquire about getting the computer back—shows that his Fourth Amendment possessory interests were not unconstitutionally affected.").

Respectfully submitted,

Stephen M. Schenning
Acting United States Attorney

     /s/

By:    Paul A. Riley
       Paul E. Budlow
       Assistant United States Attorneys

CC:  All counsel (by ECF)

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
 2                      NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,    )
          Plaintiff,              )
 4                                )
          vs.                     ) CRIMINAL CASE NO. CCB-17-226
 5                                )
     ERIC WAYNE GRINDER,          )
 6        Defendant.              )
     _____ )
 7

 8

 9                  Friday, January 26, 2018
                        Courtroom 7D
10                   Baltimore, Maryland

11

          BEFORE:  THE HONORABLE CATHERINE C. BLAKE, JUDGE
12

13                      MOTIONS HEARING

14   For the Plaintiff:

15   Paul Riley, Esquire
     Paul Budlow, Esquire
16   Assistant United States Attorneys

17   For the Defendant:

18   Elizabeth Oyer, Esquire
     Kirstin Hopkins, Esquire
19   Assistant Federal Public Defenders

20   Also Present:

21   Special Agent Rick Federico, HSI

22   _____
                        Reported by:
23
                  Douglas J. Zweizig, RDR, CRR, FCRR
24                Federal Official Court Reporter
                  101 W. Lombard Street, 4th Floor
25                   Baltimore, Maryland  21201
```

```
 1              P R O C E E D I N G S

 2         (2:05 p.m.)

 3              THE COURT:  Good afternoon, everyone.  Be seated,

 4    please.

 5              Be seated.  Do you want to call the case, Mr. Riley.

 6              MR. RILEY:  Yes, Your Honor.  This case is

 7    United States of America versus Eric Wayne Grinder,

 8    Criminal No. CCB-17-226.  Assistant U.S. Attorneys Paul Riley

 9    and Paul Budlow on behalf of the Government.

10              With us at counsel table is Special Agent

11    Rick Federico of the Department of Homeland Security,

12    Homeland Security Investigations.

13              We're here for a motions hearing, Your Honor.

14              THE COURT:  All right.  Thank you.

15              MS. OYER:  Good afternoon, Your Honor.

16              THE COURT:  Good afternoon.

17              MS. OYER:  Liz Oyer and Kirstin Hopkins for

18    Mr. Grinder, who is present to my right.

19              THE COURT:  All right.  Well, we are here for a

20    motions hearing, motion to suppress various evidence, I

21    believe.

22              Are the parties planning on presenting evidence?

23              MR. RILEY:  Yes, Your Honor.  The Government's

24    planning on presenting just one witness, Corporal Michael Lare.

25    This is the gentleman who seized the defendant's cell phone
```

```
1   minutes before the search warrant at Mr. Grinder's house was
2   signed.
3           THE COURT:  All right.  Then let's see, unless there's
4   anything preliminary, I'll go ahead and --
5           MR. RILEY:  No, Your Honor.  We're ready.
6           THE COURT:  You may call the witness.
7           MR. RILEY:  The Government calls Corporal Lare,
8   Your Honor.
9           May I use the podium, Your Honor?
10          THE COURT:  Yes.  Sure.
11          THE CLERK:  Please raise your right hand.
12      CORPORAL MICHAEL W. LARE, JR., GOVERNMENT'S WITNESS,
13  SWORN.
14          THE CLERK:  Please be seated.
15          THE WITNESS:  Good morning, Your Honor.
16          THE COURT:  Good morning.
17          THE CLERK:  Please speak directly into the microphone.
18  State your full name for the record and spell your last name,
19  please.
20          THE WITNESS:  Yes, ma'am.  Corporal Michael William
21  Lare, Jr., L-A-R-E.
22          THE CLERK:  Thank you.
23                       DIRECT EXAMINATION
24  BY MR. RILEY:
25  Q.   Good afternoon, Corporal Lare.
```

1    **A.**    Good afternoon.

2    **Q.**    Sir, are you employed?

3    **A.**    Yes.

4    **Q.**    Where do you work?

5    **A.**    Carroll County Sheriff's Office.

6    **Q.**    You're currently on suspended status; right?

7    **A.**    I am.

8    **Q.**    That's a result of having a protective order issued

9    against you; right?

10   **A.**    That's correct.

11   **Q.**    And that protective order concerned a domestic dispute

12   between you and your wife?

13   **A.**    Correct.

14   **Q.**    How long have you worked at the Carroll County

15   Sheriff's Office?

16   **A.**    Just over 12 years.

17   **Q.**    And before you entered suspended status, what was your

18   role at the Carroll County Sheriff's Office?

19   **A.**    I was a patrol supervisor.

20   **Q.**    And very generally speaking, what are the duties and

21   responsibilities of a patrol supervisor?

22   **A.**    I supervise deputies assigned under my area, maintain

23   their standards of work, assist them as needed when responding

24   to calls, check their reports.  I also would respond to calls

25   for service myself, enforce traffic.

1   Q.   When you're using the term "responding to calls," what

2   does that mean, briefly?

3   A.   Respond to calls if somebody has an animal complaint or

4   neighbor complaint, you know, minor calls.  I responded to

5   unattended deaths and homicides.

6   Q.   Does it include assisting in connection with

7   search warrants?

8   A.   That's correct.

9   Q.   During your time at Carroll County Sheriff's Office, have

10  you had any other duties besides being a patrol supervisor?

11  A.   I have formerly been assigned to the Carroll County

12  Advocacy and Investigation Center.  I've also been assigned as

13  a detective to our Major Crimes Unit.

14  Q.   Okay.  And what type of work does the Carroll County

15  Advocacy and Investigation Center do?

16  A.   They investigate allegations of child abuse, physical and

17  sexual abuse, as well as adult sexual abuse or sexual assault

18  crimes.

19  Q.   And how long were you an investigator with the Advocacy

20  and Investigation Center?

21  A.   About two years.

22  Q.   And do you have any specialized training and expertise

23  with respect to child exploitation investigations?

24  A.   Yes, sir.  I attended the -- it's called the Child First

25  Finding Words, which is specific to interviewing children.  And

USCA4 Appeal: 19-4392    Doc: 18    Filed: 09/19/2019    Pg: 101 of 493

```
 1   I've attended the Mid-Atlantic Conference of Child Abuse and
 2   Neglect on two different occasions, which is a conference that
 3   covers a wide range of child abuse topics.
 4   Q.   And during your two years at the advocacy -- detective at
 5   the Advocacy and Investigation Center, approximately how many
 6   child exploitation investigations were you involved with?
 7   A.   Well over a hundred.
 8   Q.   And in your role as an investigator with the CCAIC, did
 9   you have occasion to examine cell phones or other
10   digital media?
11   A.   I did.  I maintained our Cellebrite system, which was a
12   system that we used to read information on cell phones,
13   download information on cell phones.
14   Q.   And did you have any specialized training with respect to
15   digital evidence such as cell phones?
16   A.   I do.  I've attended numerous trainings with the National
17   White Collar Crime Center on handling electronic evidence and
18   obtaining electronic evidence, as needed, for investigations.
19   Q.   And based on your knowledge, training, and experience, was
20   it common to find images of sexual abuse and other evidence on
21   cell phones?
22   A.   Yes, sir.
23        MS. OYER:  Your Honor, I'd object on relevance
24   grounds.
25        THE COURT:  All right.  Well, we'll see if it becomes
```

```
 1    relevant.
 2    BY MR. RILEY:
 3    Q.    And --
 4           THE COURT:  Overruled for now.
 5    BY MR. RILEY:
 6    Q.    In addition to potential images, Corporal Lare, what sort
 7    of evidence -- or what sort of items of evidentiary value might
 8    you -- might one find on a cell phone in connection with
 9    child exploitation investigation?
10    A.    Phone contacts, text messages, notes kept on a --
11    different apps, Web searches, and many numerous other different
12    applications.
13    Q.    Based on your work with respect to digital evidence and
14    your work in connection with child exploitation investigations,
15    did you find that it was common to see attempts to delete
16    electronic evidence from cell phones and other media?
17    A.    Yes, sir.
18    Q.    And how exactly would that be done by a suspect?
19    A.    Very easily.  You navigate to wherever the file is or
20    where the app is on the screen or in the file system of the
21    phone and you -- either swipes of your finger or button presses
22    and the information is very quickly deleted.
23    Q.    And could you give us a time estimate of just generally
24    speaking how long it could take.
25    A.    A matter of one or two seconds.
```

**GARB - DIRECT**

1    **Q.**   I want to shift gears a little bit and ask you some

2    questions about your involvement in connection with this case.

3         Did there come a point in time when you learned about

4    the -- an advocacy center, Carroll County Advocacy Center

5    investigation concerning the defendant, Eric Grinder?

6    **A.**   Yes, sir.  On November 28th, I received a call from

7    Deputy Reuben Gill, who's one of the deputies that I supervise,

8    advised me of a case that -- a call that he had responded to

9    where there were allegations that Mr. Grinder had allegedly

10   sexually abused his 10-year-old stepdaughter.

11        Deputy Gill briefed me on the case of what the allegations

12   were and I advised him to contact the detectives at the

13   Child Advocacy Center.

14   **Q.**   Did he provide any additional information besides what you

15   just told Your Honor?

16   **A.**   There were allegations of -- with digital penetration and

17   that some type of a drug was used to subdue the child.

18   **Q.**   Did there come a point in time when you were asked to

19   assist in connection with the investigation, after speaking

20   with Deputy Gill?

21   **A.**   The following evening, on November 29th, I received a call

22   from Sergeant Glen Day.  He's the supervisor for the

23   Child Advocacy Center.

24        He asked that I have two deputies respond out to

25   Mr. Grinder's address at 261 Montpelier Court to secure the

PARK - DIRECT

```
 1  residence for a search warrant.
 2  Q.   And what does it mean to secure the residence for a
 3  search warrant?
 4  A.   Respond out to the residence.  If anybody's home, make
 5  sure that they're all in one location of the house, that way
 6  they cannot -- roaming about the house, potentially destroying
 7  evidence.
 8  Q.   Okay.  And did Sergeant Day, your supervisor, tell you to
 9  do anything else in connection with responding to
10  261 Montpelier Court?
11  A.   He advised that if Mr. Grinder was home, to make sure we
12  got his cell phone so that way no potential evidence could be
13  deleted on there.  And he also advised that Mr. Grinder was not
14  going to be under arrest.
15  Q.   And what happened after you received those instructions
16  from Sergeant Day?
17  A.   I responded out to the residence, along with Deputy Gill.
18  I was parked on the street in front of the residence.  The
19  residence appeared to be mostly dark.  I believe there was a
20  light on, either in the kitchen or dining room towards the rear
21  of the house.  No cars in the driveway and the doors were
22  secured.
23  Q.   Okay.  And approximately what time did you arrive at
24  261 Montpelier Court?
25  A.   Approximately 5:06 p.m.
```

*Douglas J. Zweizig, RDR, CRR - Federal Official Court Reporter*

1   Q.   And you mentioned that you were with Deputy Gill, one of

2   your colleagues when you arrived.

3        Did there come a point in time when Deputy Gill left the

4   scene and another deputy came?

5   A.   Yes, sir.  I don't recall what time it was.  It was maybe

6   half an hour to 45 minutes after we arrived.  It was the end of

7   our shift, mine and Deputy Gill's, and Deputy McGuinness

8   arrived on-scene and I sent Deputy Gill home.

9   Q.   When you arrived at the residence with Deputy Gill, what

10  was the status of the search-and-seizure warrant?

11  A.   My understanding was that they were in the process of

12  getting it signed.

13  Q.   And did you have a general understanding of what that

14  warrant authorized a search and seizure of?

15  A.   Yes.  Throughout my training, knowledge, and experience as

16  a Deputy Sheriff at the Sheriff's Office, I've written numerous

17  search warrants of this type, and they cover the home,

18  outbuilding, grounds, anything within the curtilage of the

19  residence.

20  Q.   And did you have an understanding of what specific items

21  were authorized by the search-and-seizure warrant?

22  A.   In these types of cases, the detectives will go in and

23  they'll look for bedding, electronic devices, meaning

24  cell phones, laptops, computers, desktop computers, anything

25  where evidence could potentially be stored.

```
 1              MR. RILEY:  May I approach the witness, Your Honor?
 2              THE COURT:  Sure.
 3              MR. RILEY:  The ELMO is not working, so I might just
 4   work on paper.
 5              THE COURT:  Okay.
 6   BY MR. RILEY:
 7   Q.   Showing you what's been marked as Government Exhibit 1
 8   (handing).
 9        Do you recognize that picture, sir?
10   A.   Yes, sir.
11   Q.   And what is it?
12   A.   That is the residence of Mr. Grinder at
13   261 Montpelier Court, Westminster, Maryland.
14   Q.   And does this picture fairly and accurately portray the
15   house as it existed on November 29th --
16   A.   Yes.
17   Q.   -- of 2016?
18   A.   Yes, sir.
19   Q.   So after you arrived at 261 Montpelier Court, what did you
20   do?
21   A.   I approached the residence, knocked on the door, didn't
22   receive an answer.  So, you know, I checked the doors.  The
23   doors were all secured and locked.  And just -- we waited on
24   the porch for the detectives and the crime scene technicians to
25   show up.
```

LARE - DIRECT

1  **Q.**   Okay.  And you're referencing a porch there.  Is there --

2  there's a front door right in the picture and there appears to

3  be an awning.  Is that the porch you're referring to?

4  **A.**   Correct.  It's only about 4 by 8 feet, so very, very small

5  porch.

6  **Q.**   And did there come a point in time when anyone arrived at

7  the house while you were waiting at the porch?

8  **A.**   Mr. Grinder arrived home at approximately 5:56 p.m. and

9  parked on the driveway about two-thirds, three-quarters of the

10 way up.

11 **Q.**   Was he in a vehicle?

12 **A.**   Yes.  He was driving a dark-colored sedan.  I don't recall

13 the exact make and model.

14 **Q.**   And what did you do?  What steps did you take after

15 Mr. Grinder pulled his vehicle into the driveway?

16 **A.**   I stepped off the porch and walked across, around the

17 front of the vehicle, standing at approximately the left front

18 side of the fender.  Mr. Grinder exited the vehicle.  I advised

19 who I was, explained I was Corporal Lare of the Carroll County

20 Sheriff's Office.  We were there securing the residence for a

21 search warrant.

22     I asked him if I could have his house keys so we didn't

23 have to damage the house when we went in.  And I also asked for

24 his cell phone, advised that that was going to be subject to

25 search warrant as well.

LARUE - DIRECT

1   Q.   And why did you ask for the cell phone?

2   A.   Because it was on the curtilage of the residence at the

3   time, and we didn't want any evidence, potential evidence, to

4   be deleted off the phone.

5   Q.   Did you believe that you were legally justified in asking

6   for the phone?

7   A.   Yes, sir.

8   Q.   And why so?

9   A.   Because the car was parked on the driveway, which is

10  within the curtilage.

11  Q.   Did Mr. Grinder comply with your requests to hand over the

12  cell phone and the keys to his house?

13  A.   He did.  He handed me the keys to the car and -- or to the

14  house and reached back into the car, I believe from the center

15  console, and got his cell phone and handed it to me.

16  Q.   What -- in addition to asking for the cell phone and the

17  keys from the defendant, did you say anything else to the

18  defendant?

19  A.   I advised him that he was not under arrest, that he was

20  free to leave, but he could not go into the house.

21  Q.   What, if anything, did the defendant say to you after he

22  handed over his keys and his cell phone?

23  A.   He decided that he was going to just wait in his car and

24  stated that he didn't know what he would do because he would

25  typically play games on his cell phone.

USCA4 Appeal: 19-4392    Doc: 18    Filed: 09/19/2019    Pg: 109 of 493

1  **Q.**   What was his demeanor when he handed over his keys and

2  cell phone?

3  **A.**   Very calm and cooperative.

4  **Q.**   Did Mr. Grinder leave after you told him that he could

5  leave?

6  **A.**   No, sir.

7  **Q.**   Where did he go?

8  **A.**   He sat in the driver's seat of his car.

9  **Q.**   Approximately how far were you from the garage door of

10  Mr. Grinder's house when Mr. Grinder handed over his keys and

11  cell phone?

12  **A.**   Approximately 6 to 10 feet.

13  **Q.**   And approximately how far were you from the house's front

14  door when Mr. Grinder handed over his keys and cell phone?

15  **A.**   I'd say approximately 18 to 20 feet.

16  **Q.**   After you secured the keys and cell phone and after the

17  defendant was waiting in his car, what did you do?

18  **A.**   I contacted Sergeant Day, advised him that Mr. Grinder was

19  home, that I had the keys to the residence and the cell phone,

20  and he advised that one of the detectives was almost there at

21  the residence.

22  **Q.**   And approximately at what time did you leave the

23  residence?

24  **A.**   At approximately 6:05 p.m., Detective Royce (ph) arrived

25  on-scene.  I handed the keys and cell phone over to him and I

```
 1  left.
 2  Q.   And at the time you left 261 Montpelier Court, had the
 3  execution of the search warrant began?
 4  A.   No, sir.
 5          MR. RILEY:  May I have just one moment, Your Honor?
 6          THE COURT:  Yes.
 7          MR. RILEY:  No further questions right now,
 8  Your Honor.
 9          THE COURT:  All right.  Thank you.
10          Ms. Oyer.
11          MS. OYER:  Thank you, Your Honor.
12                      CROSS-EXAMINATION
13  BY MS. OYER:
14  Q.   Good afternoon, Corporal Lare.
15  A.   Good afternoon, ma'am.
16  Q.   So Mr. Grinder handed you his cell phone from his person
17  when you seized it from him outside his residence; correct?
18  A.   No, ma'am.  As I stated, I believe he grabbed it from the
19  center console of his car.
20  Q.   Okay.  The cell phone was inside the car and he grabbed it
21  out of the car and he gave it to you; correct?
22  A.   Yes, ma'am.
23  Q.   Okay.  The reason that you took his phone was because you
24  said Sergeant Day instructed you to do so; correct?
25  A.   Yes.
```

DAY - CROSS

1   Q.   And you were following Sergeant Day's orders; correct?

2   A.   Yes.

3   Q.   Now, was Sergeant Day present at the scene when you took

4   the phone?

5   A.   No, ma'am, he was not.

6   Q.   Was Sergeant Day present at the scene at any time when you

7   were there?

8   A.   No, ma'am, not while I was there.

9   Q.   Did you know for sure that Mr. Grinder would have a

10  cell phone on him when you encountered him?

11  A.   No, ma'am, I did not.

12  Q.   Did you have any specific information about what make or

13  model of cell phone Mr. Grinder used?

14  A.   No, ma'am.

15  Q.   Did you have any information about whether he even had a

16  cell phone -- used a cell phone at all?

17  A.   No, ma'am.

18  Q.   Now, you also took house keys from Mr. Grinder; correct?

19  A.   Yes, ma'am.

20  Q.   And those were on his person when you took them; correct?

21  A.   I believe, yes, ma'am.

22  Q.   Did you take any other items from Mr. Grinder's person?

23  A.   No, ma'am.

24  Q.   Did you take any other items from Mr. Grinder's vehicle?

25  A.   No, ma'am.

1  **Q.**  All right.  And the vehicle was parked in the driveway at

2  the time that Mr. Grinder went in there and retrieved the phone

3  at your request; correct?

4  **A.**  Yes, ma'am.

5  **Q.**  Now, during your encounter with Mr. Grinder, he was

6  compliant with all of your instructions; correct?

7  **A.**  Yes, ma'am.

8  **Q.**  And I believe that you described him as very cooperative;

9  correct?

10  **A.**  Yes, ma'am.

11  **Q.**  Now, he waited outside the residence when you instructed

12  him to do so; correct?

13  **A.**  Yes, ma'am.

14  **Q.**  And he did not attempt to enter the home against your

15  instructions; correct?

16  **A.**  No, ma'am.

17  **Q.**  And he waited nearby in his car while you were on the

18  scene; correct?

19  **A.**  Yes, ma'am.

20  **Q.**  And at no point while you were there did he attempt to

21  flee or leave the scene; correct?

22  **A.**  No, ma'am.

23  **Q.**  Now, Corporal Lare, you testified that you're currently

24  suspended from your job with the Carroll County

25  Sheriff's Office; correct?

**LARE - CROSS**

1    **A.**   Yes, ma'am.

2    **Q.**   And that's as a result of the fact that you are currently

3    the subject of a criminal investigation by the Carroll County

4    State's Attorney; correct?

5    **A.**   No, ma'am, I'm not aware of any criminal investigation.

6    **Q.**   You are aware that there is an investigation that relates

7    to allegations of physical abuse of your wife; correct?

8    **A.**   No, ma'am.

9    **Q.**   You were present in court recently for a proceeding that

10   involved your wife's allegations that you assaulted her with a

11   firearm; correct?

12   **A.**   It was a civil proceeding, a protective order hearing.

13   **Q.**   Okay.  And a District Court Judge in Carroll County

14   granted your wife a protective order based on her testimony

15   that you assaulted her with a firearm; correct?

16   **A.**   Yes, ma'am.

17   **Q.**   And a Circuit Court Judge also granted her a protective

18   order based on her testimony that you assaulted her with a

19   firearm; correct?

20   **A.**   Yes, ma'am.

21   **Q.**   And you also testified at both of those proceedings under

22   oath; correct?

23   **A.**   Yes, ma'am.

24   **Q.**   Corporal Lare, you met with the Assistant United States

25   Attorneys who are present here in the courtroom prior to your

*Douglas J. Zweizig, RDR, CRR - Federal Official Court Reporter*

109

DAKE - CROSS

```
 1   testimony today; correct?
 2   A.   Yes, ma'am.
 3   Q.   How many times have you met with them or discussed with
 4   them your testimony today?
 5   A.   I met with them one time and I spoke with them over the
 6   phone one time.
 7   Q.   Okay.  And did you meet with them earlier this week?
 8   A.   Yes, ma'am, two days ago.
 9   Q.   Okay.  And when you met with them two days ago, did you
10   disclose that you were suspended from your police duties?
11   A.   Yes, ma'am.
12        MS. OYER:  No further questions.  Thank you, sir.
13        THE COURT:  Anything else?
14        MR. RILEY:  No, Your Honor.
15        THE COURT:  Okay.  Thank you, sir.  You are excused.
16        THE WITNESS:  Thank you.
17    (Witness excused.)
18        THE COURT:  Okay.  No other additional evidence at
19   this point from the Government?
20        MR. RILEY:  No, Your Honor.  Thank you.
21        THE COURT:  Any evidence on the defense side?
22        MS. OYER:  No, Your Honor.
23        THE COURT:  Okay.  Then I guess we'll turn to
24   argument.
25        I guess that's your motion.
```

*Douglas J. Zweizig, RDR, CRR - Federal Official Court Reporter*

1    **MS. OYER:**  Well, Your Honor, I think that because the

2    cell phone search was not pursuant to a warrant, the Government

3    has the burden, so maybe it would make sense for them to . . .

4    **THE COURT:**  Sure.

5    **MR. RILEY:**  I'm happy to go first, Your Honor.

6    **THE COURT:**  Okay.

7    **MR. RILEY:**  Your Honor, perhaps it makes sense to

8    address the seizure of the phone and hear from both sides and

9    then turn to the computer, if that's all right with Your Honor.

10    Your Honor, with respect to the seizure of the phone,

11    this is -- what happened, Corporal Lare's seizure of the phone

12    is precisely the type of temporary detention, before a warrant

13    is signed, permitted by the well-established Supreme Court

14    precedent.

15    Given the exigencies of the situation, seizure of the

16    phone by Corporal Lare was necessary to preserve the valuable

17    evidence on that phone; i.e., images of the defendant

18    sexually abusing his minor daughter.

19    Indeed, the images recovered from the phone and the

20    disc -- and the memory card within the phone are charged in

21    Counts 2, 3, 6, and 7 of the superseding indictment.

22    Had Corporal Lare not seized the phone, had he not

23    done his job, there was a serious risk that the defendant would

24    have destroyed the phone, hidden the phone, deleted its

25    contents.

```
 1              This is so for a couple reasons.
 2              The defendant knew that law enforcement was in the
 3    process of attaining a search warrant for his house.
 4              He knew that his daughter, his 8-year-old daughter,
 5    had made allegations of sexual abuse to his wife, his
 6    daughter's mother, and that his wife had reported those
 7    allegations to police.
 8              Third, he knew the phone contained inculpatory
 9    evidence, the images of him abusing his daughter.
10              Law enforcement also knew about those allegations by
11    the minor, Your Honor, that -- the allegations by the minor to
12    her mother.
13              Furthermore, they knew that during a forensic
14    interview on November 28th, 2016, that she said that the minor
15    told the interviewers that her adopted father had penetrated
16    her with his penis, as well as pushed her mouth onto his penis,
17    and that the abuse had been occurring for two years.
18              Law enforcement also knew that the defendant had
19    bought controlled substances off of the Internet, using
20    presumably an Internet-enabled device like a phone or a
21    computer.
22              And they knew that on November 27th, 2016, the minor
23    victim was extremely tired, barely responsive, which caused her
24    mother to believe that the young woman had been drugged.
25              And, as Corporal Lare testified, law enforcement knew
```

```
 1   that individuals with a sexual interest in children frequently
 2   store images of their abuse on phones and that those -- that
 3   it -- and it's very easy to delete those images.
 4         Based on these facts, Your Honor, there was certainly
 5   probable cause to arrest the defendant, even though that didn't
 6   happen.  And there was also exigency, the risk of the
 7   destruction of that very valuable evidence.
 8         Now, the Supreme Court's made clear in the McArthur
 9   case that law enforcement can temporarily detain -- can seize
10   and temporarily detain a piece of property, quote, where needed
11   to preserve evidence until police could obtain a warrant.
12         The Supreme Court confirmed as much just recently in
13   the Riley case.  And that's exactly what happened here,
14   Your Honor.  We had a temporary detention of property and then
15   19 minutes later, a warrant authorizing seizure and a search of
16   that phone was authorized.  Corporal Lare --
17         THE COURT:  Was it 19 minutes later approximately that
18   the warrant actually arrived or it was signed?
19         MR. RILEY:  The warrant was signed at 6:15,
20   Your Honor.
21         THE COURT:  6:15.  Okay.
22         MR. RILEY:  And as I understand from the reports,
23   the -- I think the search began at 6:30, somewhere -- it wasn't
24   one of those warrants where there's a phone call and then the
25   search warrant is executed.  It was later.
```

1            But the warrant was signed by the judge in

2    Carroll County at 6:15 p.m.  As Corporal Lare testified, the

3    phone was handed over at approximately 5:56 p.m.  So just about

4    20 minutes.

5            **THE COURT:**  Okay.

6            **MR. RILEY:**  So Corporal Lare temporarily detains the

7    phone.  When the defendant hands over the phone, they are on

8    the driveway of the defendant's house.  They are within the

9    premises known as 261 Montpelier Court, clearly within the

10   curtilage of the house.

11           Now, that warrant signed by the judge at 6:15

12   necessarily covered the defendant.  The affidavit in connection

13   with that state warrant, Your Honor, says on Page 2 that people

14   who perpetrate the crimes listed in the warrant; i.e.,

15   sex abuse crimes, quote, often attempt to conceal property,

16   evidence, contraband, or fruits of the crime on their person,

17   in their vehicles, and their place of residence.

18           **THE COURT:**  I'm sorry.  Hold on.  This is?

19           **MR. RILEY:**  This is Exhibit 2 of the Government's

20   opposition brief, Your Honor.  Exhibit 2, Page 2.

21           It's the fourth paragraph from the bottom, Your Honor.

22   I'm sorry, the fifth paragraph.  I apologize.

23           **THE COURT:**  Fifth.  I've found it.  Okay.

24           **MR. RILEY:**  I apologize, Your Honor.

25           Furthermore, Your Honor, it's not as if the defendant

1    was just a bystander who happened to approach and happened to

2    be in the curtilage of the home on the driveway.  This was the

3    owner of the premises.  This was the subject of the

4    investigation of whom investigators believed had -- whom

5    investigators had probable cause to believe was participating

6    in criminal activity.  He was within the curtilage and he was

7    holding in his hand one of the items specifically covered by

8    the search warrant, Your Honor.

9            In addition to -- well, let me back up and say all of

10   this is to say that law enforcement did, in fact, obtain a

11   warrant that authorized them to seize the defendant's phone.

12   And it wasn't obtained months later.  It was obtained 19 -- 19

13   later after they had temporarily detained that property.  And

14   that temporary detention, again, was permissible given the

15   exigencies of the situation.

16           I'd note too, Your Honor -- and this is a related

17   argument -- that seizure was also permissible under the

18   Supreme Court's decision in the Cupp case, which the Government

19   alerted Your Honor to just a couple of days ago, and I

20   apologize for not doing so earlier.

21           And that case essentially stands for the proposition

22   that where law enforcement has probable cause to arrest but

23   doesn't do so, as here, they can still search a person if

24   probable cause exists and there are exigent circumstances.

25           And everything I said with respect to the seizure

1   under the McArthur case, the temporary detention, is equally

2   applicable here.  There is both probable cause and there are

3   exigent circumstances.

4        As Corporal Lare testified, digital media can be

5   erased in a matter of seconds.  And it's quite easy to stomp on

6   a cell phone, throw it in a river, throw it in a lake, run it

7   over with your car, and it's potentially gone forever.

8        Just to address some of the briefing by the defendant,

9   they rely heavily on the Riley case in their papers, but that

10  case actually supports the Government's position, Your Honor.

11  And there the Supreme Court endorsed the notion that seizure is

12  permissible to preserve evidence where exigencies are present,

13  and they cited the McArthur case approving them.

14       I'd note too that there is sort of conflating of the

15  holding of Riley in those papers.  Riley simply stands for the

16  proposition that when a phone is searched incident to arrest,

17  you need to get a warrant to search it.

18       Here, after the phone was seized, 19 minutes later

19  there was a warrant to seize it and search it and there was a

20  federal warrant four months later too.  So there were not just

21  one warrant --

22       **THE COURT:**  So part of your position is that the

23  warrant, the initial warrant, authorized both a seizure of the

24  phone and a search of the phone?

25       **MR. RILEY:**  Yes, Your Honor.  Unless Your Honor has

```
 1   any questions . . .
 2           THE COURT:  Let me see if my timeline agrees with you.
 3   And obviously I'll ask the same of defense counsel.
 4           But what I'm gathering from the papers -- and I think
 5   consistent with the testimony -- November 27th, 2016, I'll just
 6   say the minor tells her mother of the alleged abuse.
 7           The next day the mother tells the Sheriff's
 8   Department.
 9           And then on the 29th, both the minor and the mother
10   are interviewed, and that's when the information about the
11   suspected drug use on the minor and the purchasing of drugs
12   over the Internet and some, I think, text exchanges between
13   herself and Mr. Grinder are provided to law enforcement
14   November 28th.  I'm sorry, they were messages that occurred on
15   November 28th.  It was provided on November 29th.  So this is
16   the same day that the -- as the testimony says that the
17   search warrant application was made.
18           The testimony obviously was consistent that
19   Corporal Lare arrived at the residence at about 5:05 p.m.
20           5:56, I think we've said, Mr. Grinder arrived, parked
21   in the driveway.  I won't repeat all the testimony that we just
22   heard.
23           And then the one thing you've got at 6:15 you think is
24   when the -- it's probably on there and I just didn't see it --
25   but 6:15 is when the warrant was signed and then the
```

1   investigators actually arrive around 6:31 and take both the

2   laptop and the cell phone, among other items.

3          **MR. RILEY:**  Among other things, yes, Your Honor,

4   that's all correct.

5          **THE COURT:**  Okay.

6          **MR. RILEY:**  And, Your Honor, as Mr. Budlow was just

7   noting to me, Exhibit 1, Page 2 of the Government's opposition

8   brief has the 6:15 time on the search warrant.

9          **THE COURT:**  Exhibit 1.

10         **MR. RILEY:**  Of the opposition papers.

11         **THE COURT:**  Yes.  Okay.  Exhibit 1, Page 2 is the

12  6:15 p.m.

13         **MR. RILEY:**  And I'd note too -- and this is clear in

14  the briefing, Your Honor -- that Paragraph F of the warrant

15  specifically authorized the seizure and the forensic analysis

16  of any cellular telephone seized.

17         **THE COURT:**  Where again?

18         **MR. RILEY:**  That's the same page as where it says

19  6:15, Your Honor.  F covers this search and seizure of

20  cell phones and G covers the search and seizure of computers,

21  hard drives, and media storage devices.

22         **THE COURT:**  Oh, yes.  Sure.  The list of entering and

23  searching the residence and the curtilage and the DNA and the

24  forensic analysis of the cell phones and the computers, right.

25  Okay.

1        **MR. RILEY:**  Thank you, Your Honor.

2        **THE COURT:**  All right.  Ms. Oyer.

3        **MS. OYER:**  Your Honor, I disagree with the way the

4    Government has framed the issue in a couple of respects.

5        The Government appears to be arguing both that the

6    seizure of the phone from Mr. Grinder's person was contemplated

7    by the original search warrant that was issued and also that

8    the seizure of the phone was contemplated by the subsequent

9    search warrant that was issued by the federal authorities

10   before they did a forensic search of it, and I don't think

11   that -- I think there's a couple of problems with both of those

12   arguments.

13       The first is that the search warrant that was issued

14   on November the 29th was a search warrant for the residence,

15   which, I grant, includes the curtilage of the residence, but it

16   does not include Mr. Grinder's person and it does not include

17   his vehicle.

18       And we frequently see cases where the Government, in

19   fact, gets a separate search warrant for a vehicle that's known

20   to be driven by a particular suspect.  That's something that

21   they can easily do.  They had ready access to information about

22   what vehicle Mr. Grinder might have been driving that evening,

23   and they did not get a warrant to search his vehicle.

24       Your Honor, the cases that the Government cites for

25   the proposition that a cell phone can be temporarily detained

*Douglas J. Zweizig, RDR, CRR - Federal Official Court Reporter*

1  pending the issuance of a warrant apply to cases where they're

2  actually getting a warrant for the relevant place.

3       But in this case the Government was -- or the police

4  in Carroll County -- were seeking a warrant for the residence.

5  They were not seeking a warrant for Mr. Grinder's person or his

6  vehicle, and, therefore, it's not really a relevant warrant in

7  consideration of the -- as you consider whether this was a

8  brief or a lengthy detention of his cell phone without a

9  warrant.

10      **THE COURT:**  I think this is a pretty critical

11  question, and I'm not sure I've seen it particularly addressed.

12  I mean, this is a different situation in some ways, for

13  example, from the Mitchell case.

14      But let me suppose this:  Suppose that when they got

15  to the house to execute the search warrant, Mr. Grinder was

16  inside the house, sitting on the couch.  Let's suppose he --

17  first of all, what I assume will be an easy one, he had taken

18  the cell phone out of his pocket and it was sitting on the

19  coffee table.  Would the warrant authorize taking it?

20      **MS. OYER:**  Your Honor, I do think the warrant would

21  have been authorized taking it if it had been sitting on the

22  table.

23      Although I do want to address the overbreadth of the

24  warrant separately.

25      **THE COURT:**  That's a separate --

1      **MS. OYER:**  But setting aside the issue of the breadth

2   of the warrant, if the warrant had authorized seizure of that

3   specific phone and that phone had been sitting on a coffee

4   table inside the residence next to Mr. Grinder or something

5   like that, then I do agree that it would be covered by --

6      **THE COURT:**  Why would it have to be a specific phone?

7   Why would they have to know when they went in -- I mean, I

8   don't necessarily see that.  If you go into someone's home

9   who's allegedly dealing drugs or whatever it is and it's known

10   that people might use a cell phone in the commission of a

11   crime, they can go in and look for cell phones.  I don't think

12   they need to know that it's a Samsung Model 29.

13      **MS. OYER:**  Your Honor, I think that a warrant could

14   reasonably authorize seizure of phones that were believed to

15   have been used by the suspect in a crime.

16      So if the warrant had said something to the effect

17   that the police were authorized to seize any phone that was

18   believed to have been used by Mr. Grinder in commission of the

19   stated offenses, that would be a different situation.

20      But this warrant sweepingly authorizes the seizure of

21   any and all cell phones that are found in the residence, and in

22   that respect it's very similar to the D.C. Circuit case, the

23   <u>Griffith</u> case that's cited in our briefs, where the case deals

24   with an apartment that's occupied by the suspect as well as his

25   girlfriend, and the warrant broadly authorizes the seizure of

1    any device without respect even to who might own or use the

2    device.

3            And in this case there's nothing that limits the

4    seizure of cell phones to devices that are believed to have

5    been used by Mr. Grinder.

6            And moreover, Your Honor, this search warrant, to the

7    extent that it applies to the seizure of the phone, it does not

8    establish probable cause for a sweeping forensic search of

9    Mr. Grinder's phone.

10           One of the most important points that I think we can

11   all agree on about the Riley case is that it noted that

12   cell phones are both qualitatively and quantitatively different

13   from most pieces of personal property in the amount and array

14   of data that they store.

15           And in this case the only link between the cell phones

16   and the offense is the fact that it's alleged in the

17   search warrant affidavit that Mr. Grinder and his wife

18   exchanged some text messages about the allegations of the

19   minor victim.

20           Now, perhaps that could justify a warrant authorizing

21   a search of a phone believed to belong to Mr. Grinder, which is

22   not a limitation present here, and of the text messages in that

23   phone.  But there is no probable cause for a complete forensic

24   search of every area of data on the phone.  And this is

25   something --

1    **THE COURT:** Well, backing up just a minute, though,

2    distinguish between the forensic, the scope of the forensic

3    search, and the residence. You don't think that given

4    everything that was in the application as well that it would be

5    reasonable to believe that a cell phone in Mr. Grinder's

6    personal residence might have evidence of a crime allegedly

7    committed? I mean, certainly have probable cause to believe to

8    have been committed?

9    **MS. OYER:** Well, Your Honor, I think the Government

10   has established probable cause that might -- in the

11   search warrant application that might justify the search of his

12   text messages, but they have not -- there are no allegations

13   that establish probable cause that there would be photos or

14   videos or depictions of child abuse on the phone.

15       And there is a couple of cases that are cited in our

16   brief. There's the Virgin Islands v. John case. And then

17   there's the Fourth Circuit case which I believe is

18   U.S. v. Doyle which explain that allegations related to

19   child abuse are not, in and of themselves, sufficient to

20   establish probable cause to search for evidence of

21   child pornography.

22       And I think the reasoning that applies there is that

23   child abuse can be committed in different forms and there's no

24   necessity that photos or videos are taken. And given the

25   highly intrusive nature of a search of a cell phone, I think

1    that given that the only link to the cell phone is the

2    text messages, only a search of the text messages could even

3    arguably have been justified by this search warrant.

4          And then the further problem is that any phone in the

5    residence could have been seized and searched without regard to

6    whether it was the phone that Mr. Grinder had been using.

7          **THE COURT:**  And what about a search of the phone to

8    find evidence of ordering drugs on the Internet?

9          **MS. OYER:**  Well, Your Honor, the Government seems to

10   want to suggest that that is the justification for searching

11   the laptop, for the warrant to search the laptop.

12         And they seem to be adopting in their papers the idea

13   that Mr. Grinder probably used a laptop computer to purchase

14   the drugs on the Internet.

15         There's no allegation in the search warrant

16   application that indicates that he used a phone or a computer

17   really by what means he accessed the Internet to search -- to

18   shop for drugs online.

19         And I think that in this case it was incumbent on

20   law enforcement to get that basic piece of information from

21   Mr. Grinder's wife, who reported the information in the first

22   place, before undertaking an extremely intrusive search of any

23   and all electronic devices that were in his possession.

24         But also, Your Honor, even had there been probable

25   cause to search for those -- evidence of the Internet drug

*Douglas J. Zweizig, RDR, CRR - Federal Official Court Reporter*

1    purchases on his cell phone, again, that might have justified a

2    limited search of perhaps his Internet search history, but to

3    go through and search all video files and photo files and other

4    areas of the phone is not justified by anything that's in the

5    statement of probable cause that accompanies this

6    search warrant application.

7           Your Honor, I want to address also the Government's

8    argument that exigent circumstances justified this, what they

9    described as a temporary seizure of the phone.

10          Now, in our view, this was a seizure for nearly four

11   months until federal authorities got a warrant in March of

12   2017, because this cell phone is not within the scope of the

13   initial warrant.

14          But setting that aside, there also were not

15   exigent circumstances that justified the seizure of this phone.

16   The Government is advocating for a general rule that whenever a

17   suspect in a crime has a cell phone on him, the police can

18   seize it because it might contain evidence.

19          Now, the problem with that is that the case law in the

20   Fourth Circuit and from the Supreme Court could not be clearer

21   that exigent circumstances is a fact-specific determination

22   that needs to be made by the seizing officer, as well as by the

23   Court, based on facts that are present at the time.

24          Now, Corporal Lare testified that he seized the

25   cell phone because his supervisor told him so.  He did not make

1    an independent determination that there were

2    exigent circumstances that applied.

3         **THE COURT:**  Well, I believe that he testified that it

4    was to avoid the deletion of evidence of child abuse, which was

5    common to find on cell phones and could be easily deleted

6    within one to two seconds.

7         It was consistent with -- and, sure, he had an order

8    from his supervisor, which he presumably would have followed

9    anyway.  But in the course of his direct examination, I believe

10   that he gave a reason.

11        **MS. OYER:**  Well, Your Honor, I think the primary

12   reason and the initial reason that he stated was that his

13   supervisor instructed him to do this, and it appears that he

14   would have done it no matter what the circumstances at the

15   scene.

16        So I don't think that the Government can reasonably

17   rely on a finding of exigent circumstances when it appears that

18   he was just going to take the cell phone one way or another if

19   he could get it.

20        But moreover, Your Honor, this -- Corporal Lare said

21   that he did not have any information or any knowledge that

22   Mr. Grinder even had a cell phone or used a cell phone.  So the

23   notion that he jumps to the conclusion that there must be

24   evidence on the cell phone that could be readily destroyed when

25   he said that he didn't even know if Mr. Grinder used a

Case 1:17-cr-00226-CCB   Document 64   Filed 01/02/19   Page 36 of 88

1    cell phone is really a huge leap.

2           And given the protections that are afforded the

3    privacy of cell phones under Riley and other recent cases, I

4    don't think that that logic holds.

5           But also, Your Honor, the Fourth Circuit's case in the

6    Yengel case cited in our brief --

7           **THE COURT:**  I'm sorry, which one?

8           **MS. OYER:**  Yengel -- it's Y-E-N-G-E-L -- says that a

9    finding of exigent circumstances must be based on specific

10   articulable facts.  And I don't think that Corporal Lare

11   articulated any specific facts that would have justified a

12   finding of exigent circumstances or a belief that evidence was

13   about to readily be destroyed.

14          And on the contrary, he described Mr. Grinder's

15   behavior as very cooperative, compliant with all of his

16   instructions, and he said that he made no attempt to leave the

17   scene, he stayed there and complied for the entire duration of

18   the entire time Corporal Lare was there.

19          **THE COURT:**  But that's after he had turned over the

20   cell phone.

21          **MS. OYER:**  Your Honor, I simply think that's a factor

22   that weighs against a finding that there were any

23   exigent circumstances present related to the possibility that

24   evidence would be destroyed.

25          And moreover, Your Honor, the fact that the Government

---

*Douglas J. Zweizig, RDR, CRR - Federal Official Court Reporter*

1    then essentially put this phone in evidence storage for three

2    and a half or four months before they got a warrant really

3    calls into question the sincerity of anyone's belief that there

4    was actually some key piece of evidence on the phone.  And by

5    the time the phone was searched, many months had already

6    passed.

7          Your Honor, I also want to note the Government argues

8    that the Riley case supports their position here, but the Riley

9    case supports the notion that a temporary detention of a

10   cell phone while a warrant is being detained [sic] may be

11   justified in some circumstances.

12         This is a case where Mr. Grinder's phone was held by

13   police for many months before it was ever searched.  He was

14   deprived of his possessory interest in that phone.  And there

15   is, in our view, no search warrant that justified that.

16         **THE COURT:**  Okay.  Would you -- I mean, I think the

17   Mitchell situation is different.  I think -- certainly a

18   stronger case would be if they had taken the phone in his

19   driveway and kept it, just based on probable cause, which I

20   think was maybe the Mitchell situation, and didn't have a

21   warrant to seize it or search it or anything with it for four

22   months.

23         But assume for sake of argument that they held onto

24   the phone for 19 minutes until there was a warrant which

25   authorized seizing the cell phone, how do you argue that --

1    you're quite right, they didn't go in and apparently didn't

2    forensically search the phone for some time afterwards, but

3    that's a little different from the Mitchell or situation --

4         **MS. OYER:**  Well, Your Honor, I think that there are a

5    lot of fundamental flaws with the search warrant.  And I don't

6    think that in this day and age a search warrant can be

7    reasonably considered valid that gives a sweeping authorization

8    to seize any cell phones in a residence that's known to be

9    occupied by multiple different inhabitants, as well as any

10   computers and other electronic devices.

11        So I think that to the extent there was a warrant that

12   was issued, it was not valid because of the breadth of the

13   warrant, it was not valid because the scope of the search that

14   was authorized was not tailored to relate to the evidence that

15   was believed to exist on the phone, and it was also not valid

16   because the links between the alleged criminal conduct and the

17   allegations in the search warrant application are very, very

18   slim and certainly insufficient to justify a very intrusive

19   search of that cell phone as well as any others that might be

20   seized from the residence.

21        **THE COURT:**  Okay.

22        **MS. OYER:**  Thank you, Your Honor.

23        **THE COURT:**  Mr. Riley.

24        **MR. RILEY:**  Just briefly regarding a couple of the

25   points made by counsel.

```
 1              Counsel suggests -- I think that the only link between
 2    the cell phone and the affidavit is the existence of
 3    text messages on the phone.
 4              Notably, the affidavit points to text messages
 5    regarding narcotics, and these are the same narcotics that the
 6    defendant used to -- or that the defendant -- that the mother
 7    of the victim believed the defendant used to drug her child.
 8    That's the connection, Your Honor.  It's the defendant's MO to
 9    buy drugs on the Internet, to drug his daughter, and to
10    sexually abuse her and take pictures of her.
11              And the other link -- and this is sort of implicit,
12    and Your Honor picked up on this point -- is what is the
13    defendant going to use to purchase items on the Internet?  It
14    has to be something that's Internet-enabled.  He's not using,
15    you know, the mail.  You can't get -- you need an electronic
16    device, like a phone, you need a computer to get on the
17    Internet.
18              Okay.  So both the computer that were seized and the
19    phone that was seized are sort of encompassed by that piece of
20    information in the affidavit.
21              I want to address briefly the Doyle case that counsel
22    mentioned.
23              Doyle stands for the proposition that allegations of
24    sex abuse in an affidavit are insufficient to search for
25    child pornography.
```

1    Here the search warrant was for child -- it was

2  sex abuse, rape, child sex abuse, so the allegations for

3  child -- the allegations in the affidavit were for child --

4  related to child sex abuse.  The crimes at issue were not

5  child pornography.  They were child sex abuse crimes.  That's a

6  distinguishing -- a very important distinguishing factor,

7  Your Honor.

8    And I note -- and this is in the Government's

9  papers -- the best evidence that there is of child sex abuse

10  and rape are exactly what the examiner found on the defendant's

11  cell phone and his computer; i.e., pictures of him sexually

12  abusing his 8-, 10-year-old daughter.

13    I'd like to make one final point, Your Honor, then

14  I'll sit down.

15    It's simply not the case that the Government seized

16  the phone -- and Your Honor, I think, noted this.  The

17  Government seized the phone without a warrant and did nothing

18  with it for four months.  They seized the phone.  19 minutes

19  later they had a warrant which authorized both its search and

20  seizure.

21    They did not search that phone, Your Honor, until

22  March, and that's because the forensic examiner at HSI was

23  examining the Toshiba laptop pursuant to the state

24  search warrant, and he came across an image of the minor being

25  abused by her adopted father.  And he suspended his

```
 1   examination.
 2            Could he have kept going?  Yes.  But he suspended that
 3   examination, out of an abundance of caution, and
 4   law enforcement then sought a warrant to search both the phone
 5   and the computer for evidence of child pornography.
 6            That's what happened.  There was no delay for four
 7   months.
 8            And I know I said one final point.  Here's my last
 9   point, Your Honor, and this is in the Government's papers.  And
10   it goes to exigent circumstances.
11            There's a collective knowledge that law enforcement
12   can rely upon in finding probable cause and in finding
13   exigent circumstances.
14            So Corporal Lare was not the primary investigator of
15   the defendant's case.  His knowledge of the case comes from
16   what Sergeant Day and Deputy Gill told him about the case.
17            But what was in his head doesn't really matter 'cause
18   we can rely on all of the folks from law enforcement, all of
19   that collective knowledge in establishing probable cause and
20   the exigency.
21            Unless Your Honor has questions . . .
22            THE COURT:  Sure.  As I say, I see the -- I don't know
23   if this is in the particular cases or not or just common sense
24   or if you want to address it any further.  Defense has several
25   arguments that they're making.  I appreciate that.  One of them
```

1  appears to be that the warrant was not sufficient to cover a
2  cell phone on Mr. Grinder's person --
3       **MR. RILEY:**  Right.
4       **THE COURT:**  -- even if he was within the curtilage.
5       **MR. RILEY:**  Right.
6       **THE COURT:**  Do you want to address that.
7       **MR. RILEY:**  I would disagree, Your Honor.  And I
8  note -- I point to the same language that I referenced earlier.
9  In -- sorry, if I could just have a moment to shuffle my papers
10 here.
11      **THE COURT:**  Page 2 of the affidavit that relates to
12 concealing property on their person is what you pointed me to
13 before.
14      **MR. RILEY:**  Yes, Your Honor.  I would --
15      **THE COURT:**  Okay.  It is -- I guess the point --
16      **MR. RILEY:**  I'd direct your attention to that,
17 Your Honor.  But I would also note that this is not -- as I
18 said earlier, there is not a circumstance -- this is not a
19 circumstance where the defendant is a third party.  He's
20 implicitly covered by the scope of this warrant.  All of the
21 allegation -- all of the allegations, all of the facts in this
22 affidavit are about him.  It's an investigation about him and
23 his abuse of his daughter.  It's his house.  He owned the
24 house.
25          And I think -- and I don't have it in a case, but I

1   think it's the law that an occupant of a house or a premises

2   can be searched for objects if there is probable cause to

3   believe that those objects are -- have contraband or are

4   associated with the crime.

5          And we do have those links here, Your Honor.  We have

6   the ordering of the drugs on the Internet.  We have the

7   text messages regarding the drugs.  So there is all that to say

8   there is a link here, Your Honor.

9          Is that responsive to your question, at least a little

10  bit?

11          THE COURT:  Sure.  That's fine.

12          Ms. Oyer.

13          MS. OYER:  Your Honor, could I just briefly respond on

14  that last issue?

15          THE COURT:  Yes.

16          MS. OYER:  Mr. Riley's argument is that any occupant

17  of the residence is implicitly covered by a search warrant for

18  the residence.

19          THE COURT:  He said Mr. Grinder, who was clearly the

20  subject of this application and the warrant is covered, not a

21  third party.

22          MS. OYER:  Yes.  His argument seems to be that, in

23  general, a suspect in a residence is implicitly covered, their

24  person, by a search warrant.  I don't agree with that,

25  Your Honor, at all, that an individual's person can be searched

1    pursuant to a warrant that is specifically for the residence.

2            And the law is clear.  I believe the Groh v. Ramirez

3    case cited in our brief discusses the fact that what's in the

4    warrant, not the warrant application, is what's critical and

5    needs to be sufficient.

6            And in this case the warrant itself makes no mention

7    of Mr. Grinder.  I don't see one single mention of him by name

8    in the search warrant itself.  And the warrant is very clear

9    that it's for the property known as 261 Montpelier Court in

10   Westminster, Maryland.  That's the only location that is

11   designated as authorized to search under the search warrant.

12           And, Your Honor, the logical implications of the

13   Government's argument would be tremendous under their theory

14   the police could go and take a DNA swab from Mr. Grinder's

15   cheek while he's sitting inside his residence if he happens to

16   be home when they execute the search warrant.

17           It simply cannot be that the individual's person and

18   anything that might be on their body is subject to search

19   pursuant to a warrant that specifically identifies the

20   residence and does not even mention that person.

21           And, Your Honor, it's very easy for the police to list

22   the suspect as well as the premises in a search warrant

23   application and in the warrant itself.  They did not do so

24   here.  And I think that given that this two-page warrant, this

25   one-and-a-half-page warrant makes no mention of Mr. Grinder's

1    person whatsoever, it cannot reasonably be argued that he is

2    somehow implicitly covered by this warrant.

3         I think the other possible illogical result that could

4    lead to is they could take the position that regardless of

5    where Mr. Grinder is, he's somehow implicitly covered by a

6    warrant because he's the suspect in the investigation.

7         Maybe, you know, they could take the position that if

8    he's in Baltimore when they show up at his residence in

9    Carroll County, he could still be searched and his cell phone

10   seized pursuant to this warrant simply because he's the

11   suspect.

12        It's not about who's the suspect.  It's about what's

13   spelled out in the warrant, because the police are not supposed

14   to have any discretion in executing the warrant.

15        And the argument that the Government's making leads to

16   tremendous amounts of discretion that police are not supposed

17   to have in this context.

18        **THE COURT:**  Sure.

19        **MS. OYER:**  Thank you, Your Honor.

20        **THE COURT:**  I will say, I don't see their argument

21   leading quite as far as you take it, because I understood them

22   to be relying on the fact that he was within the curtilage.  I

23   didn't hear any suggestion that they -- and I'm certainly not

24   suggesting that this could, you know, lead them to go someplace

25   else outside the curtilage.

```
 1          I guess it gets back to I have a hard time seeing this
 2   distinction -- and I'll look at this Groh v. Ramirez case --
 3   between if you happen to be on the inside the house and put a
 4   cell phone on the table as compared to being within the
 5   curtilage and having a cell phone in his pocket, or wasn't even
 6   in his pocket, it was, you know, in his car.  But once they're
 7   there on the property, that they have a right to search.
 8          That's why I'm having trouble seeing why it wouldn't
 9   authorize taking the cell phone when that is something, for
10   sake of argument, that is specifically authorized under the
11   warrant.
12          But I'll look at that case.
13          MS. OYER:  Well, Your Honor, I think the point is
14   there's an additional level of invasiveness to searching one's
15   body or one's vehicle in addition to one's residence, and I
16   think that that's the reason that a warrant is required for
17   every place that law enforcement wants to search.
18          THE COURT:  Okay.  Thank you.
19          MR. RILEY:  Your Honor, may I address the Groh case
20   just briefly?
21          THE COURT:  Go ahead.
22          MR. RILEY:  That case wasn't about whether a person
23   was named in the warrant.  That case addressed the
24   particularity -- the particularity requirement of the
25   Fourth Amendment and specifically what was supposed to be
```

*Douglas J. Zweizig, RDR, CRR - Federal Official Court Reporter*

```
 1   seized.
 2          The problem with the warrant in that case is that the
 3   place to be searched was a house.  The crime at issue, there
 4   was believed to be a bunch of guns in this house.  The place to
 5   be searched was the address of the house and the curtilage.
 6          And the items to be seized was -- there was a mistake
 7   in the warrant and it listed the house.  It didn't list any
 8   firearms or any other sort of contraband that you would see
 9   typically in a case like that.
10          So I'm not sure at all what Groh has to do with the
11   specific circumstance that we have here.
12          THE COURT:  Okay.  All right.  Well, I'm not going to
13   rule this minute.  I appreciate the evidence that was
14   presented.  You've done a lot of briefing that I want to look
15   at more carefully.
16          But I will also say that if -- this is important, I
17   think a fairly critical issue here, if the defense is correct
18   and that there was not a basis to seize the cell phone under
19   the warrant, if all -- the only basis was, assuming for the
20   moment there was a basis to take it on a probable cause theory,
21   which is sort of the Government's fallback of probable cause
22   exigency, but there was no warrant issued to cover that phone.
23   If the defense is correct about that for somewhere between
24   three and four months afterwards, I think we're in a different
25   position than if there was a warrant which authorized search --
```

1    well, search -- actually, seizure and search of the phone

2    virtually at the same time that it was taken into custody,

3    there's still a delay, and we would all prefer that there had

4    not been a delay in searching the phone, I'm sure.

5         But it's different if at least the Government was

6    lawfully in possession pursuant to a warrant than if it was

7    just holding the phone.

8         But I know you have a number of other -- do you want

9    to address anything further?  Ms. Oyer, I don't mean to cut you

10   off.  I know you have arguments about the breadth and scope.  I

11   mean, you've pretty thoroughly briefed them, but I'm happy to

12   hear anything else.

13        **MS. OYER:**  On the cell phone, Your Honor?

14        **THE COURT:**  I guess -- well, actually, that's right,

15   we haven't gotten onto the computer yet, so perhaps we

16   should -- we have a computer here too, yes.

17        **MS. OYER:**  Would Your Honor like me to begin or the

18   Government to begin?

19        **THE COURT:**  I think you might as well begin.

20        **MS. OYER:**  Okay.  Your Honor, the laptop computer that

21   was seized in this case was again authorized by this same

22   search warrant in a very sweeping statement that authorized

23   law enforcement to seize and have forensically analyzed by a

24   qualified person or persons any computers, hard drives, and

25   media storage devices.

1           So, again, that is an extremely broad authorization to

2   search any devices that are found in this specific residence

3   without reference to what they may have been used for or by

4   whom they may have been used.

5           Now, there's a couple of --

6           **THE COURT:**  Wait a minute.  You say that, but that's

7   within the context of the application.  We know we're

8   talking -- I mean, this is a home.  It's only a couple of

9   people.  This is not, you know, like an office with a lot of

10  folks in it.  We're talking about a limited number of people

11  that would have been using a computer or a cell phone.

12          **MS. OYER:**  Well, Your Honor, there are three residents

13  of the home, two adults and a child.  I am slightly embarrassed

14  to admit that my 8-year-old son has two iPads.  How that

15  happened, I don't know.

16          **THE COURT:**  You don't want to confess that.

17          **MS. OYER:**  There are -- in any single residence, there

18  are often many different electronic devices.  You know, my

19  husband's got a cache of old cell phones and computers that he

20  keeps in our house that are from decades ago.

21          So the amount of data that's stored on the amount of

22  devices that are found in any one residence is often huge.  And

23  it wouldn't be unusual for police to enter a residence and

24  recover dozens of electronic devices belonging to different

25  residents from different periods of time.

1           And this often happens in our cases.  You know, we

2   sometimes get the results of searches of a dozen or two dozen

3   different electronic devices in the course of one single case,

4   and sometimes all those devices can be tied to the offenses.

5           But in this case the search warrant application makes

6   no effort to tie the devices that are authorized to be seized

7   to any specific criminal offense.

8           The only allegation in the search warrant application

9   that would even possibly justify the seizure of an

10  electronic device is the allegation that Mr. Grinder was

11  purchasing some sort of illegal drugs on the Internet.  So that

12  would potentially bring an Internet-capable device within the

13  scope of the search warrant.

14          But this warrant is not even limiting the

15  electronic devices that can be seized to ones that are capable

16  of having an Internet connection, so that's an initial problem

17  there.

18          And moreover, Your Honor, there's no allegation in the

19  search warrant application that Mr. Grinder was using a laptop

20  computer to purchase the drugs over the Internet or that he was

21  even doing it from his residence.

22          He had a job.  His wife was well aware of his job.  He

23  worked in a setting where he's surrounded by computers all day

24  long.  And many people do their illicit business from their

25  work computer because they don't want it to be uncovered at

1    home.  It's very common.

2          So to suggest that any laptop in his residence has

3    been sufficiently linked to the alleged criminal conduct in the

4    application for a search warrant is just wrong here.  There's

5    no allegations that tie that specific laptop or any specific

6    device, or even any laptop computer at all, to the purchase of

7    these drugs on the Internet.

8          But, Your Honor -- and, Your Honor, I want to note

9    also that establishing that evidence is likely to be found in a

10   place to be searched is one of the foundational requirements of

11   the Fourth Amendment.

12         The Government has to be able to search a particular

13   place, so in this case a particular electronic device.  They

14   have to show that evidence is likely to be found on that

15   electronic device.  And here that basic requirement is not

16   remotely satisfied at all.

17         But, Your Honor, let's just assume that the police had

18   probable cause to believe that this specific Toshiba laptop at

19   issue here was the laptop that was used to purchase the drugs

20   on the Internet -- and they haven't shown that, but let's

21   assume that they had -- then the search warrant would still

22   need to be tailored to authorize a search that's calculated to

23   find that evidence that's not just a sweeping, general search.

24         And the case of Maryland v. Garrison cited in our

25   briefs is a Supreme Court case, explains that a search warrant

1    must be carefully tailored to its justification and not a

2    wide-ranging exploratory search.

3            What they did here was a wide-ranging exploratory

4    search of all the electronic devices that were found in the

5    residence.  There was no effort to tailor the search to the

6    justifications; namely, that there was some drugs being

7    purchased on the Internet.

8            If that were really the basis for searching the

9    laptop, they could have gotten the warrant that limited the

10   search to the Internet history on that computer and to receipts

11   or invoices or other like documents that would have shown

12   purchases on the Internet.

13           But there's certainly no basis for police to be going

14   into the video files and photo files and other areas of the

15   computer to be able to search for that type of information, the

16   type of information that's in the search warrant application.

17           And these are very sophisticated searches that can be

18   limited in many ways.  And I think it's informative to look in

19   contrast at the federal search warrant which has been submitted

20   as an exhibit here and see all of the steps that are laid out

21   by the federal law enforcement agency to explain how they're

22   going to minimize the likelihood of viewing irrelevant data in

23   their search.

24           There are ways to do that by using search terms and by

25   searching specific areas of the computer.  And federal

1    authorities routinely do that, but there was no attempts to

2    craft this search warrant in a way that tailored the

3    justifications for the search to the evidence that was likely

4    to be found on the computer.

5         So I guess the legal doctrine that applies here is

6    overbreadth.  The warrant is substantially overbroad in order

7    to achieve the intended purposes, assuming that the warrant has

8    even sufficiently laid out that connection to this specific

9    laptop, which we believe that it hasn't.

10        Your Honor, I think another problem with the

11   search warrant is that it's not sufficiently particular.  And

12   it's a basic Fourth Amendment requirement that the warrant must

13   particularly describe both the place to be searched and the

14   things to be seized.

15        Now, focusing on the things-to-be-seized aspect of it,

16   they say the things to be seized includes all

17   electronic devices.  But then once police are on those

18   electronic devices searching their contents, anything is fair

19   game under this warrant.  And there is no effort to tailor the

20   search again to the particular types of files that might likely

21   have the types of evidence that the Government has said are

22   relevant here.

23        Many Courts of Appeals have started to recognize that

24   in light of the vast quantities of data and the different types

25   of data that computers as well as cell phones can store, these

1   searches are highly intrusive and extremely broad and need to

2   be carefully tailored.

3        And I don't think that there's a Fourth Circuit case

4   that's post-Riley that -- since the Supreme Court recognized

5   that in 2014.  So I think a lot of the older Fourth Circuit

6   cases that predate Riley may fail to give sufficient weight to

7   the qualitative and quantitative differences between

8   electronic devices and the information they store versus

9   routine items of personal property like a suitcase or a wallet,

10  that sort of thing.

11       But I think in the post-Riley era, this warrant is

12  plainly insufficient to justify an expansive, unlimited

13  forensic search of that laptop, as well as any other

14  electronic device or cell phone found in that residence in

15  Westminster.

16       And I think maybe the most instructive case here is

17  the D.C. Circuit's case in Griffith, which was decided

18  post-Riley.  And in that case, which was decided in 2017, the

19  Court found that there was a lack of probable cause to search

20  electronic devices based on the warrant under circumstances

21  similar to this.

22       And one of the arguments that they made was that there

23  was no showing in the statement of probable cause that the

24  defendant even owned any of the -- any device along the lines

25  specified in the warrant.

1          And similarly here, in the search warrant affidavit,

2     there's no allegation that Mr. Grinder even owns a laptop

3     computer.

4          And another problem that the D.C. Circuit found was

5     overbreadth because the search warrant authorized police to

6     seize any and all electronic devices in the residence, which

7     the defendant in that case shared with his girlfriend, same as

8     Mr. Grinder shared his residence with his wife and child.  And

9     the Court emphasized the fact that these are otherwise lawful

10    devices.  These are not contraband.  So it's not analogous to

11    saying police can go in and seize any drugs or any firearms.

12    These are devices that have many lawful applications.

13         And, Your Honor, the Government cites this

14    Fourth Circuit case that I want to address briefly, which is

15    U.S. v. Williams.  It was decided in 2010.

16         And the Government relies on this in support of their

17    argument, but there's some key language in Williams that I

18    think shows exactly the problem here.

19         The Williams case says that the particularity

20    requirement is fulfilled when the warrant identifies the items

21    to be seized by their relation to the designated crimes and

22    when the description of the items leaves nothing to the

23    discretion of the officer executing the warrant.

24         Now, that is absolutely lacking here.  The

25    search warrant in the Williams case authorized police to seize

1    certain devices that were indicative of a connection with

2    specified offenses.

3            Now, that allows for a lot of discretion, and I'm not

4    sure that that would be sufficient in the post-Riley world.

5    But even if that were sufficient, that's a critical difference

6    in this case.

7            This does not limit, in any way, the devices that can

8    be seized.  It opens up any device in the residence as fair

9    game, and that is simply overbroad under the current state of

10   the law.

11           And that's all I have, Your Honor.

12           **THE COURT:**  Okay.  Thank you.

13           Do you want to respond on that?

14           **MR. RILEY:**  Yes, Your Honor.

15           I'd like to note at the outset, Your Honor, that if

16   the defendant's argument were accepted, every search warrant in

17   this courthouse would be invalid.  There is not a requirement

18   to identify the specific device to be seized.  The only

19   requirement is probable cause that evidence of a crime is going

20   to be found on that device.

21           You see all the time where -- particularly in

22   child exploitation cases where there is a wife, there is a

23   girlfriend, and the defendant is using the wife and

24   girlfriend's phone.  It's for that reason why all the

25   electronic devices in the house are seized during the execution

1    of a search warrant.

2         And there's no way, Your Honor, when police are

3    executing that search warrant, to know whose computer or phone

4    is whose.

5         There might be some indicia in the bedroom.  But if

6    there's ten computers in the bedroom, two iPads or whatever,

7    how is law enforcement executing that warrant in a reasonable

8    fashion trying to -- how are they supposed to know whose is

9    whose?

10        I think what's happening here is the defense is asking

11   the Court to interpret the affidavit here in the same

12   hypertechnical manner that the Supreme Court has said the Court

13   shouldn't do.

14        With respect to the argument that there's no probable

15   cause to search because there's no connection between the

16   laptop and the offenses at issue, I think I addressed that

17   earlier in connection with the phone.

18        There is a connection, Your Honor.  The defendant used

19   an Internet-enabled device.  It could be a laptop.  It could be

20   a phone.  And he used that device to purchase drugs off of the

21   Internet, drugs that the victim's mother believed were used to

22   drug the minor victim, make her extremely responsive [sic] and

23   fairly tired, and drugs that facilitated the defendant's abuse

24   of that victim.  I think that's very clear in the affidavit.

25        With respect to Defendant's argument that the search

1    of the warrant [sic] exceeded the scope of the state

2    search warrant, this argument doesn't really hold muster

3    either.

4            As I said earlier, there's no better evidence of child

5    sex abuse than pictures on a phone, on a computer of a child

6    being --

7            **THE COURT:**  But wait.  I'm not sure I'm following that

8    exactly.  We've got -- I mean, the first question is just the

9    probable cause to seize the computer and the phone.

10           **MR. RILEY:**  Yes, Your Honor.

11           **THE COURT:**  And I understand you're relying on --

12           **MR. RILEY:**  Yes.

13           **THE COURT:**  -- certainly the fact that he presumably

14   has used some sort of Internet-enabled device to order things

15   online --

16           **MR. RILEY:**  Yes, Your Honor.

17           **THE COURT:**  Generally speaking, you order online with

18   a phone or a computer.  We sort of know he had a phone because

19   the wife -- I've already talked about text messages back and

20   forth.

21           **MR. RILEY:**  Yes, Your Honor.

22           **THE COURT:**  And, of course, as Riley -- one of the

23   foundations of Riley is that everybody has a cell phone these

24   days.

25           **MR. RILEY:**  Right, Your Honor.

---

*Douglas J. Zweizig, RDR, CRR - Federal Official Court Reporter*

1      **THE COURT:**  But that's your point that gets as far as

2   looking for drugs.

3      Now, I'm missing a little bit your point about looking

4   for images because that's a further step.

5      **MR. RILEY:**  Right.  I think I'll address Your Honor's

6   concern in the context of the <u>Williams</u> case which counsel

7   referred to here.

8      <u>Williams</u> is Fourth Circuit.  It's controlling --

9   controlling authority.  And I think <u>Williams</u> makes clear that

10  where the search warrant outlines the particular offenses

11  where -- that are being searched for and where it outlines what

12  specifically is to be seized, the warrant passes muster.  It's

13  sufficiently particular.

14      And I'd like to point to the specific language in that

15  decision that -- or particular warrant in that decision.

16      The Court in that case upheld the warrant that allowed

17  the search of, quote, any and all computer systems and digital

18  storage media, end quote.

19      And the Court concluded that, quote, the particularity

20  requirement is fulfilled when the warrant identifies the items

21  to be seized by their relation to designated crimes.

22      And that's -- and what does that mean?  It means that

23  crimes are listed.  Just like the warrant here, our warrant

24  describes the offenses at issue, child abuse, minor, rape,

25  second degree, sex offense, et cetera.

1          And it also describes the places to be searched,

2     including the defendant's home and any computers, drives, media

3     storage, et cetera, there.  Everything contained within the

4     home.

5          And it also describes what's to be seized from those

6     items, quote, evidence relating to these crimes to -- that's --

7     that's what's -- those are the items to be seized, Your Honor.

8          So this is plainly sufficient under the

9     Fourth Circuit's decision in Williams.

10          And I'd note that the Williams court, Your Honor, made

11     clear that when conducting a search of a piece of -- a computer

12     or a piece of media, the examiner, law enforcement is justified

13     in opening up every single file on that machine to see if it

14     relates to the specific crime, to see if it relates to the

15     child abuse, the child sex abuse, and that's exactly what the

16     examiner did here, Your Honor.  He was opening up the files and

17     he encountered the image of the defendant abusing his minor

18     daughter.

19          It's not just looking for evidence of potentially drug

20     invoices, et cetera.  It's opening up all of the files and

21     seeing if those relate to the crimes that are enumerated in the

22     warrant.

23          **THE COURT:**  Then what was the need for the federal

24     search warrant down the road?

25          **MR. RILEY:**  Your Honor, we could have -- it's the

1    Government's position that we could have proceeded under the

2    state search warrant.  We could have continued our -- we could

3    have continued the search under the state search warrant.

4         As I'm sure Your Honor knows, we often don't do that.

5    We often obtain a federal search warrant even if we believe the

6    state search warrant is fine, because the federal warrants are,

7    to put it mildly, extremely robust.

8         And I'd note too that the warrant from -- that

9    Agent Federico swore out included additional information that

10   was the result of additional investigation.

11        And as Mr. Budlow is noting to me, we didn't -- the

12   federal government, we didn't learn about this case until

13   March.  And we swore out a warrant four days after we learned

14   about this case.  Agent Federico did that.

15        And as I was saying, the federal warrant also included

16   additional information concerning the case, such as the fact

17   that the minor victim told her mother that the defendant used

18   his phone to take pictures of -- essentially to take pictures

19   of her performing fellatio on him and he, quote, put it on the

20   TV.

21        Note too --

22        **THE COURT:**  What's your position -- I think it's

23   addressed in the papers -- understanding your argument is that

24   the state search warrant was enough to have searched every -- I

25   think I hear you saying searched every file and looked for any

1    image having to do with child sex abuse or child pornography, I

2    suppose.

3         But that's not, in fact, what happened; am I right?

4    Did the state search stop at a certain point?

5         **MR. RILEY:**  Yes, Your Honor.  Yes, Your Honor.  When

6    the examiner -- when he encountered -- and this is someone who

7    has experience in child exploitation investigations.

8         When he encountered what he believed to be

9    child pornography, and specifically the image of the

10   minor victim, the person who he believed to be the

11   minor victim, based on descriptions given to him by

12   law enforcement, he stopped his examination, and he did so out

13   of basically an abundance of caution.

14        And he said, okay, well, here's what we need to do.

15   We need to get a warrant to search for child pornography

16   specifically, out of an abundance of caution.

17        **MR. BUDLOW:**  Can I interrupt?  One moment, Your Honor.

18        (Government counsel conferred.)

19        **MR. RILEY:**  Apologies, Your Honor.

20        As Mr. Budlow was noting to me, we feel like the

21   examiner could have continued his search, as I noted earlier,

22   looking for evidence of child sex abuse, just like what he

23   found.

24        But when he encountered that image, it occurred to him

25   that there might be, besides produced images, memorializations

1   of abuse and rape.  There might be other child pornography on

2   the machine.  That also was the impetus for him to cease, out

3   of an abundance of caution and, again, get a warrant

4   specifically to search for child pornography.

5          And I'll note too that initially the state got a

6   warrant which was never -- it was signed, but it was never

7   executed, to search for child pornography.  And it wasn't

8   executed because the U.S. Attorney's Office got involved and

9   got a federal warrant to search for child pornography.

10         I want to address good faith here, Your Honor.

11         Even if the defense is correct that the warrant was

12  insufficiently particular, the officers reasonably -- they were

13  able to rely on the good-faith exception here.  The warrant

14  identified the evidence to be seized; i.e., computers and other

15  digital media.

16         And as I noted earlier, the defense relies on this

17  Groh case, but the warrant here is a far cry from the warrant

18  at issue in the Groh case, where there is nothing, nothing at

19  all named in the place to be seized.  It was the premises

20  essentially named twice.

21         Unless Your Honor has any other questions,

22  that's . . .

23         **THE COURT:**  Okay.  No.  Thank you.

24         **MR. RILEY:**  Thank you.

25         **MS. OYER:**  Your Honor, may I respond briefly?

1          **THE COURT:**  Yes.

2          **MS. OYER:**  Your Honor, I think that what should have

3   happened here -- the Government is making this argument that a

4   residence might be full of different electronic devices and

5   there's no way of knowing which one belongs to who or who might

6   have been using another person's electronic device.

7          What we typically see in federal cases is that the

8   Government may get a warrant that authorizes them to seize

9   electronic devices, but then they will get a subsequent warrant

10  that authorizes them to search a specific electronic device on

11  a showing that that specific device is likely to have some

12  evidence of a crime, and this is that foundational

13  Fourth Amendment requirement that we were talking about is that

14  the Government must make a showing that evidence is likely to

15  be found in the place to be searched.

16         So they're essentially trying to accomplish two steps

17  with this one federal -- with this one state search warrant.

18  One is to get access to the devices and two is to get inside

19  the devices.

20         And this warrant does not justify both of those

21  things.  If they want to get into a specific electronic device,

22  they need to make a showing that that device likely has some

23  evidence of a crime, and no such showing has been made in this

24  case.

25         **THE COURT:**  What about -- the federal search warrant

1    doesn't make that showing as to the cell phone?

2            **MS. OYER:**  Well, Your Honor, our argument regarding

3    the federal search warrant is that it's tainted.  It makes a

4    showing that the laptop's likely to contain evidence of a crime

5    because that laptop has been examined forensically without a

6    valid warrant.

7            And I think that the conduct of the forensic examiner

8    in the state just underscores the fact that this warrant gave

9    law enforcement too much discretion, the type of discretion

10   that they are not supposed to have under a search warrant,

11   because this examiner was finding stuff that made him or her

12   uncomfortable that he or she was exceeding the scope of the

13   warrant in the search that was being conducted, and that's

14   because the warrant included no parameters or limitations on

15   what type of search could be conducted on this computer.

16           This also relates to the timing argument that the

17   Government made.  The Court asked a question earlier about how

18   long the devices were detained.

19           And in this case that forensic examination of the

20   laptop computer took place I believe in mid December of 2016,

21   and no one got a warrant until March of 2017 to actually do a

22   proper search of that computer.

23           The Government talks about the Williams case, which I

24   cited in my argument as well.  And I want to note that, first

25   of all, I don't think the warrant there would survive the Riley

1    decision.

2           But apart from that, Mr. Riley read a portion of what

3    the warrant authorized in that case, but he didn't read all of

4    it, and what he didn't read is sort of the most important part.

5    The warrant in that case authorized a search of any and all

6    computer systems and digital storage media, videotapes, video

7    recorders, documents, photographs, and instrumentalities

8    indicative of the offense of harassment by computer and threats

9    of death or bodily injury to a person, citing certain sections

10   of the Virginia Code.

11          And that case is very clear that the search warrant,

12   at minimum, needs to be limited by referencing the items to be

13   seized to particular statutes or particular criminal

14   violations.

15          And in this case the language is incredibly stark in

16   terms of what the search warrant authorizes.  Without anything

17   further, it says that the police can seize and have

18   forensically analyzed any computers, hard drives, media storage

19   devices, and that's just not sufficient.

20          **THE COURT:**  I think Mr. Riley's argument was that you

21   have to read that in relation to the paragraph -- I agree, it's

22   a little bit above that.  It doesn't directly link with the

23   words that you just read, but there's a paragraph just a little

24   but further up the page, basically, that says it's evidence

25   relating to the crimes of sex abuse of a minor, second-degree

1    sexual offense and so forth.

2          Wouldn't you think that modifies the rest of it?

3          **MS. OYER:**  Well, maybe it could be read that way, but

4    I don't think that that's sufficient.

5          And I think this is the Groh v. Ramirez case that I'm

6    thinking of, but I may be confusing it with another case that's

7    cited in our brief.

8          But it is very possible that the officers executing

9    this warrant looked only at the list of items that they're

10   authorized to seize without reading anything else.

11         And I would be willing to bet that if you put under

12   oath any member of this search warrant execution team and asked

13   did you make a decision about whether the devices you seized

14   were likely to have evidence of these specified crimes, they

15   would say no, we just went in there and seized all of the

16   electronic devices.

17         But, you know, what they would say doesn't really

18   matter because they're not supposed to have that discretion.

19   The warrant is supposed to specifically outline the items

20   they're allowed to seize.  And here there are no modifiers.

21   Just says any and all computers or other electronic devices,

22   and I think that that is insufficient.

23         And I also think the lack of any directions or

24   limitations as to how the forensic examinations are to be

25   conducted is a separate and maybe even more problematic aspect

1    of this particular warrant, because as we saw happen here, the

2    forensic examiner can just get in there, look at everything,

3    and problems can arise.

4         THE COURT:  Let me go back to the cell phone for a

5    minute.  You said that the subsequent search, the federal

6    search of the laptop, was tainted because previously the

7    examiner had gone in and looked at more than you believe that

8    he should have.

9         But my understanding is the cell phone contents were

10   not searched until the federal search warrant was obtained?

11        MS. OYER:  Your Honor, there's nothing that I'm aware

12   of that indicates that the cell phone was searched prior to

13   obtaining the federal warrant, so in all candor, I don't think

14   that that same argument applies to the cell phone as applies to

15   the laptop computer.

16        THE COURT:  Okay.  Obviously, you have the preliminary

17   argument that the warrant didn't cover the cell phone to begin

18   with; but if that is not the case, then they seized it and did

19   not, so far as we know in the evidence, they did not search the

20   contents until they had the federal search warrant.

21        MS. OYER:  That's right.  I mean, Your Honor, I would

22   make the argument that because the initial warrant, it's our

23   argument, was invalid, that holding his cell phone for four

24   months to obtain a valid warrant invalidates the entire search,

25   regardless of whether the federal warrant is invalid.

1        But I don't have the same argument that the cell phone

2   was improperly previewed by -- not pursuant to a valid warrant

3   as I am making with the laptop.

4        **THE COURT:**  All right.

5        **MS. OYER:**  And, Your Honor, I just want to briefly

6   address the good-faith argument that the Government made as

7   well.

8        I think that this is a case where the search warrant

9   is so clearly facially deficient that the good-faith exception

10  does not apply.

11       And as Your Honor is well aware, if a search warrant

12  application is so lacking in indicia of probable cause that

13  reliance on that search warrant is unreasonable, the good-faith

14  exception does not apply.

15       Also, if the warrant is so facially deficient that

16  reliance is unreasonable, good-faith doesn't apply.  And I

17  think that both of those are reasons that the good-faith

18  exception does not apply in this case.

19       It's very similar, again, to the D.C. Circuit's

20  decision in Griffith in which the Court found that this type of

21  massively overbroad authorization to seize electronic devices

22  did not survive the good-faith exception.

23       It's also similar to the Fourth Circuit's decision in

24  U.S. v. Doyle, which is an earlier case in which the Court

25  found that facial deficiencies in the affidavit that failed to

1    establish probable cause to search the defendant's residence

2    made reliance on the search warrant unreasonable.

3         And I think that in the post-Riley universe, there is

4    no way that a law enforcement officer with appropriate training

5    to execute search warrants could have reasonably relied on this

6    particular search warrant to conduct a forensic examination of

7    the laptop computer.

8         **THE COURT:**  Okay.  Thank you.

9         Mr. Riley, anything else?

10        **MR. RILEY:**  If I could just address the Griffith case.

11   I neglected to address it earlier, Your Honor.

12        I think that case is distinguishable simply on the

13   basis that in that case, there was no indication that the

14   defendant's cell phone which was searched -- that the defendant

15   had a cell phone or that that phone was involved in any

16   criminal activity whatsoever.

17        By contrast here, as I noted earlier, we know that an

18   Internet-enabled device -- i.e., a phone or a computer -- was

19   used to purchase drugs.  Those drugs were then used to drug the

20   minor, or at least that is believed to be the case by the

21   minor's mother, and she was subsequently abused.

22        I'm happy to address the federal warrant if Your Honor

23   would like, but I'm also happy to address it in my brief as

24   well.

25        **THE COURT:**  Okay.  Why don't you go ahead --

```
1          MR. RILEY:  It's up to Your Honor if you have specific
2    questions as to the sufficiency of the federal warrant.  The
3    Government would submit that --
4          THE COURT:  I don't think it's a sufficiency argument
5    being made as a taint argument in regard to the laptop.
6          MR. RILEY:  Yes.  Understood, Your Honor.  And it's
7    our position that the warrant -- that even if the warrant is
8    tainted, even if the Court were to excise from that federal
9    warrant everything regarding the discovery -- the examiner's
10   discovery of the images of the minor being abused by her
11   father, the warrant would -- there would still be sufficient
12   probable cause to -- the warrant would not be tainted and there
13   would be sufficient probable cause to survive.
14         And I noted one of the new additions to the federal
15   warrant that helped to provide that probable cause earlier;
16   i.e., the minor victim's statement that her father used a
17   cell phone to take pictures of her performing fellatio on him
18   and putting it on the TV.
19         Another addition to the federal warrant, which is not
20   the state warrant, is that there was a pediatric sexual assault
21   forensic examination conducted on the child, and that
22   examination revealed that the child lacked a hymen on her
23   vagina and that it was diagnostic of prior penetrating trauma;
24   i.e., someone was having sex with that child.
25         So, again, Your Honor, it stands to reason that even
```

```
 1   if we get rid of everything from the prior search, there's
 2   still probable cause to search that computer for evidence of
 3   child pornography.
 4           MR. RILEY:  Thank you.
 5           MS. OYER:  Could I just very briefly respond to that
 6   last point, Your Honor?
 7           It's our view -- and this is laid out in our brief, so
 8   I won't belabor it here -- that that Franks-type analysis where
 9   you excise the bad information is not what applies in this
10   context.
11           And we've cited the case of U.S. v. Hill, which is a
12   2015 Fourth Circuit decision that explains that the correct
13   test is whether the prior unlawful search influenced either the
14   officer's decision to seek a new warrant or the
15   Magistrate Judge's decision to issue the new warrant.
16           I think it's plain that in this case, the new warrant
17   was sought because of information that was found in the old
18   warrant.  So I don't think that the new search warrant, the
19   federal search warrant, can survive the taint of the prior
20   unlawful search of the laptop computer.
21           MR. RILEY:  Your Honor, I just want to address that
22   last point.  I apologize, Your Honor.  The Gillenwater case
23   cited to by the Government does not involve a Franks issue.
24   It's true that the Franks case is cited there, but that case
25   involved an illegal search and the issue of taint.  And, in
```

```
1  fact, it cites the Murray case relied upon by the defense in
2  their own brief.
3          THE COURT:  Okay.  That was a very thorough briefing
4  on both sides.  Thank you very much.
5          And this argument is helpful.  And I need to reflect
6  on it and look back through some of the briefing and the cases
7  that you all have relied on.  And I will get you an opinion
8  reasonably soon.
9          MS. OYER:  Thank you, Your Honor.
10         MR. RILEY:  Thank you, Your Honor.
11         THE COURT:  Okay.  Thank you.
12     (Court adjourned at 3:40 p.m.)
13                          INDEX
14                   PLAINTIFF'S EVIDENCE
15
   WITNESS                 DR     CR     RDR     RCR
16 CPL. MICHAEL W. LARE, JR.      3     15      --      --
17
18     I, Douglas J. Zweizig, RDR, CRR, FCRR, do hereby certify
19 that the foregoing is a correct transcript from the
20 stenographic record of proceedings in the above-entitled
21 matter.
22           _____/s/_____
23            Douglas J. Zweizig, RDR, CRR
                Registered Diplomate Reporter
24              Certified Realtime Reporter
                Federal Official Court Reporter
25               DATE:  January 2, 2019
```

*Douglas J. Zweizig, RDR, CRR - Federal Official Court Reporter*

Case 1:17-cr-00226-CCB Document 54-9 Filed 01/02/18 Page 74 of 88

74

**'**
'cause [1]  41/17

**/**
/s [1]  73/22

**1**
10 [1]  14/12
10-year-old [2]  8/10 40/12
101 [1]  1/24
12 [1]  4/16
15 [1]  73/16
18 [1]  14/15
19 [7]  22/15 22/17 24/12 24/12
 25/18 37/24 40/18

**2**
20 [2]  14/15 23/4
2010 [1]  55/15
2014 [1]  54/5
2015 [1]  72/12
2016 [5]  11/17 21/14 21/22 26/5
 65/20
2017 [3]  34/12 54/18 65/21
2018 [1]  1/9
2019 [1]  73/25
21201 [1]  1/25
226 [2]  1/4 2/8
26 [1]  1/9
261 Montpelier Court [8]  8/25
 9/10 9/24 11/13 11/19 15/2 23/9
 44/9
27th [2]  21/22 26/5
28th [4]  8/6 21/14 26/14 26/15
29 [1]  30/12
29th [5]  8/21 11/15 26/9 26/15
 28/14
2:05 p.m [1]  2/2

**3**
3:40 p.m [1]  73/12

**4**
45 [1]  10/6
4th [1]  1/24

**5**
5:05 p.m [1]  26/19
5:06 p.m [1]  9/25
5:56 [1]  26/20
5:56 p.m [2]  12/8 23/3

**6**
6:05 p.m [1]  14/24
6:15 [7]  22/19 22/21 23/11
 26/23 26/25 27/8 27/19
6:15 p.m [2]  23/2 27/12
6:30 [1]  22/23
6:31 [1]  27/1

**7**
7D [1]  1/9

**8**
8-year-old [2]  21/4 49/14

**A**
able [3]  51/12 52/15 63/13
about [35]  5/21 8/2 8/3 9/6
 12/4 12/9 16/12 16/15 21/10
 23/3 26/10 26/19 28/21 31/11
 31/18 33/7 36/13 41/16 42/22

42/22 45/12 45/12 46/22 47/23
48/10 49/10 58/15 59/2 60/11
61/14 64/13 64/25 65/17 65/23
67/13
above [2]  66/22 73/20
above-entitled [1]  73/20
absolutely [1]  55/24
abundance [4]  41/3 62/13 62/16
 63/3
abuse [33]  5/16 5/17 5/17 6/1
 6/3 6/20 18/7 21/5 21/17 22/2
 23/15 26/6 32/14 32/19 32/23
 35/4 39/10 39/24 40/2 40/2 40/4
 40/5 40/9 42/23 57/23 58/5
 59/24 60/15 60/15 62/1 62/22
 63/1 66/25
abused [4]  8/10 40/25 70/21
 71/10
abusing [4]  20/18 21/9 40/12
 60/17
accepted [1]  56/16
access [2]  28/21 64/18
accessed [1]  33/17
accompanies [1]  34/5
accomplish [1]  64/16
accurately [1]  11/14
achieve [1]  53/7
across [2]  12/16 40/24
activity [2]  24/6 70/16
actually [8]  22/18 25/10 27/1
 29/2 37/4 48/1 48/14 65/21
addition [5]  7/6 13/16 24/9
 46/15 71/19
additional [6]  8/14 19/18 46/14
 61/9 61/10 61/16
additions [1]  71/14
address [20]  8/25 20/8 25/8
 29/23 34/7 39/21 41/24 42/6
 46/19 47/5 48/9 55/14 59/5
 63/10 69/6 70/10 70/11 70/22
 70/23 72/21
addressed [4]  29/11 46/23 57/16
 61/23
adjourned [1]  73/12
admit [1]  49/14
adopted [2]  21/15 40/25
adopting [1]  33/12
adult [1]  5/17
adults [1]  49/13
advised [9]  8/8 8/12 9/11 9/13
 12/18 12/24 13/19 14/18 14/20
advocacy [9]  5/12 5/15 5/19 6/4
 6/5 8/4 8/4 8/13 8/23
advocating [1]  34/16
affidavit [13]  23/12 31/17 39/2
 39/4 39/20 39/24 40/3 42/11
 42/22 55/1 57/11 57/24 69/25
afforded [1]  36/2
after [13]  8/19 9/15 10/6 11/19
 12/14 13/21 14/4 14/16 14/16
 24/13 25/18 36/19 61/13
afternoon [7]  2/3 2/15 2/16
 3/25 4/1 15/14 15/15
afterwards [2]  38/2 47/24
again [9]  24/14 27/17 34/1
 48/21 49/1 53/20 63/3 69/19
 71/19
against [3]  4/9 17/14 36/22
age [1]  38/6
agency [1]  52/21
Agent [4]  1/21 2/10 61/9 61/14
Agent Federico [2]  61/9 61/14

ago [4]  19/8 19/9 24/19 49/20
agree [4]  28/5 31/11 43/24
 66/21
agrees [1]  26/2
ahead [3]  3/4 46/21 70/25
alerted [1]  24/19
all [54]  2/14 2/19 3/3 6/25 9/5
 11/23 15/9 16/16 17/1 17/6 20/9
 24/9 26/21 27/4 28/2 29/17
 30/21 31/11 33/23 34/3 36/15
 41/18 41/18 42/20 42/21 42/21
 43/7 43/25 47/10 47/12 47/19
 48/3 50/4 50/23 51/6 51/16 52/4
 52/20 53/16 55/6 56/11 56/21
 56/24 59/17 60/20 63/19 65/25
 66/3 66/5 67/15 67/21 68/13
 69/4 73/7
allegation [6]  33/15 42/21 50/8
 50/10 50/18 55/2
allegations [19]  5/16 8/9 8/11
 8/16 18/7 18/10 21/5 21/7 21/10
 21/11 31/18 32/12 32/18 38/17
 39/23 40/2 40/3 42/21 51/5
alleged [4]  26/6 31/16 38/16
 51/3
allegedly [3]  8/9 30/9 32/6
allowed [2]  59/16 67/20
allows [1]  56/3
almost [1]  14/20
along [2]  9/17 54/24
already [2]  37/5 58/19
also [31]  1/20 4/24 5/12 9/13
 12/23 16/18 18/17 18/21 21/10
 21/18 22/6 24/17 28/7 33/24
 34/7 34/14 36/5 37/7 38/15
 42/17 47/16 51/9 60/1 60/5
 61/15 63/2 65/16 67/23 69/15
 69/23 70/23
Although [1]  29/23
am [4]  4/7 49/13 62/3 69/3
Amendment [4]  46/25 51/11 53/12
 64/13
AMERICA [2]  1/3 2/7
among [2]  27/2 27/3
amount [3]  31/13 49/21 49/21
amounts [1]  45/16
analogous [1]  55/10
analysis [3]  27/15 27/24 72/8
analyzed [2]  48/23 66/18
animal [1]  5/3
another [7]  10/4 35/18 53/10
 55/4 64/6 67/6 71/19
answer [1]  11/22
any [58]  5/10 5/22 6/14 8/14
 13/3 16/6 16/12 16/15 16/22
 16/24 18/5 19/21 26/1 27/16
 30/17 30/21 31/1 33/4 33/22
 35/21 35/21 36/11 36/22 38/8
 38/9 38/19 41/24 43/16 45/14
 45/23 47/7 47/8 48/24 49/2
 49/17 49/22 50/7 51/2 51/5 51/6
 54/13 54/24 54/24 55/6 55/11
 55/11 56/7 56/8 59/17 60/2
 61/25 63/21 66/5 66/18 67/12
 67/21 67/23 70/15
anybody's [1]  9/4
anyone [1]  12/6
anyone's [1]  37/3
anything [16]  3/4 9/9 10/18
 10/24 13/17 13/21 19/13 34/4
 37/21 44/18 48/9 48/12 53/18
 66/16 67/10 70/9

165

Case 1:17-cr-00226-CCB Document 54 Filed 01/02/18 Page 176 of 188

**A**

anyway [1]   3579
apart [1]   66/2
apartment [1]   30/24
Apologies [1]   62/19
apologize [4]   23/22 23/24 24/20 72/22
app [1]   7/20
apparently [1]   38/1
Appeals [1]   53/23
appeared [1]   9/19
appears [5]   12/2 28/5 35/13 35/17 42/1
applicable [1]   25/2
application [16]   26/17 32/4 32/11 33/16 34/6 38/17 43/20 44/4 44/23 49/7 50/5 50/8 50/19 51/4 52/16 69/12
applications [2]   7/12 55/12
applied [1]   35/2
applies [6]   31/7 32/22 53/5 68/14 68/14 72/9
apply [5]   29/1 69/10 69/14 69/16 69/18
appreciate [2]   41/25 47/13
approach [2]   11/1 24/1
approached [1]   11/21
appropriate [1]   70/4
approving [1]   25/13
approximately [13]   6/5 9/23 9/25 12/8 12/17 14/9 14/12 14/13 14/15 14/22 14/24 22/17 23/3
apps [1]   7/11
are [65]   2/19 2/22 4/2 4/20 18/2 18/6 18/25 19/15 20/20 23/7 23/8 24/24 25/2 25/12 26/10 26/13 30/21 31/4 31/12 32/12 32/15 32/19 32/24 34/23 36/2 38/4 38/17 39/5 39/19 39/24 40/10 42/22 43/3 43/3 45/13 45/16 49/2 49/12 49/17 49/18 49/20 49/22 50/6 50/15 52/17 52/20 52/24 53/17 53/21 54/1 55/9 55/10 55/12 56/25 57/2 57/8 59/11 59/23 60/7 60/21 61/6 65/10 67/20 67/24 69/17
area [2]   4/22 31/24
areas [3]   34/4 52/14 52/25
arguably [1]   33/3
argue [1]   37/25
argued [1]   45/1
argues [1]   37/7
arguing [1]   28/5
argument [30]   19/24 24/17 34/8 37/23 43/16 43/22 44/13 45/15 45/20 46/10 55/17 56/16 57/14 57/25 58/2 61/23 64/3 65/2 65/16 65/24 66/20 68/14 68/17 68/22 68/23 69/1 69/6 71/4 71/5 73/5
arguments [4]   28/12 41/25 48/10 54/22
arise [1]   68/3
around [2]   12/16 27/1
array [1]   31/13
arrest [5]   9/14 13/19 22/5 24/22 25/16
arrive [2]   9/23 27/1
arrived [11]   10/2 10/6 10/8

10/9 11/19 12/6 12/8 14/24 26/18 36/11 26/254
articulable [1]   36/10
articulated [1]   36/11
as [80]
aside [2]   30/1 34/14
ask [3]   8/1 13/1 26/3
asked [6]   8/18 8/24 12/22 12/23 65/17 67/12
asking [3]   13/5 13/16 57/10
aspect [2]   53/15 67/25
assault [2]   5/17 71/20
assaulted [3]   18/10 18/15 18/18
assigned [3]   4/22 5/11 5/12
assist [2]   4/23 8/19
Assistant [4]   1/16 1/19 2/8 18/24
assisting [1]   5/6
associated [1]   43/4
assume [4]   29/17 37/23 51/17 51/21
assuming [2]   47/19 53/7
Atlantic [1]   6/1
attaining [1]   21/3
attempt [4]   17/14 17/20 23/15 36/16
attempts [2]   7/15 53/1
attended [3]   5/24 6/1 6/16
attention [1]   42/16
Attorney [1]   18/4
Attorney's [1]   63/8
Attorneys [3]   1/16 2/8 18/25
authorities [3]   28/9 34/11 53/1
authority [1]   59/9
authorization [3]   38/7 49/1 69/21
authorize [4]   29/19 30/14 46/9 51/22
authorized [23]   10/14 10/21 22/16 24/11 25/23 27/15 29/21 30/2 30/17 37/25 38/14 40/19 44/11 46/10 47/25 48/21 48/22 50/6 55/5 55/25 66/3 66/5 67/10
authorizes [5]   30/20 30/25 64/8 64/10 66/16
authorizing [2]   22/15 31/20
avoid [1]   35/4
aware [5]   18/5 18/6 50/22 68/11 69/11
awning [1]   12/3

**B**

back [6]   13/14 24/9 46/1 58/19 68/4 73/6
backing [1]   32/1
bad [1]   72/9
Baltimore [3]   1/10 1/25 45/8
barely [1]   21/23
based [6]   6/19 7/13 18/14 18/18 22/4 34/23 36/9 37/19 54/20 62/11
basic [1]   33/20 51/15 53/12
basically [2]   62/13 66/24
basis [6]   18/18 47/19 47/20 52/8 52/13 70/13
be [110]
because [31]   13/2 13/9 13/24 15/23 20/1 34/12 34/18 34/25 38/12 38/13 38/16 40/22 45/6 45/10 45/13 45/21 50/25 55/5 57/15 58/18 59/4 61/6 63/8 65/5 65/11 65/14 67/18 68/1 68/6

68/22 72/17
becomes [1]   17/5
bedding [1]   10/23
bedroom [2]   57/5 57/6
been [26]   5/11 5/12 11/7 21/17 21/24 28/22 29/21 29/21 30/3 30/15 30/18 31/5 32/8 33/3 33/5 33/6 33/24 48/4 49/3 49/4 49/11 51/3 52/19 64/6 64/23 65/5
before [9]   1/11 3/1 4/17 20/12 28/10 33/22 37/2 37/13 42/13
began [2]   15/3 22/23
begin [4]   48/17 48/18 48/19 68/17
behalf [1]   2/9
behavior [1]   36/15
being [10]   5/10 37/10 40/24 46/4 52/6 58/6 59/11 65/13 71/5 71/10
belabor [1]   72/8
belief [2]   36/12 37/3
believe [21]   2/21 9/19 13/5 13/14 15/18 16/21 17/8 21/24 24/5 32/5 32/7 32/17 35/3 35/9 43/3 44/2 51/18 53/9 61/5 65/20 68/7
believed [12]   24/4 30/14 30/18 31/4 31/21 38/15 39/7 47/4 57/21 62/8 62/10 70/20
belong [1]   31/21
belonging [1]   49/24
belongs [1]   64/5
besides [3]   5/10 8/14 62/25
best [1]   40/9
bet [1]   67/11
better [1]   58/4
between [10]   4/12 26/12 31/15 32/2 38/16 39/1 46/3 47/23 54/7 57/15
bit [4]   8/1 43/10 59/3 66/22
BLAKE [1]   1/11
bodily [1]   66/9
body [2]   44/18 46/15
both [16]   18/21 20/8 25/2 25/23 26/9 27/1 28/5 28/11 31/12 39/18 40/19 41/4 53/13 64/20 69/17 73/4
bottom [1]   23/21
bought [1]   21/19
breadth [3]   30/1 38/12 48/10
brief [10]   23/20 27/8 29/8 32/16 36/6 44/3 67/7 70/23 72/7 73/2
briefed [2]   8/11 48/11
briefing [5]   25/8 27/14 47/14 73/3 73/6
briefly [9]   5/2 38/24 39/21 43/13 46/20 55/14 63/25 69/5 72/5
briefs [2]   30/23 51/25
bring [1]   50/12
broad [2]   49/1 54/1
broadly [1]   30/25
Budlow [5]   1/15 2/9 27/6 61/11 62/20
bunch [1]   47/4
burden [1]   20/3
business [1]   50/24
button [1]   7/21
buy [1]   39/9
bystander [1]   24/1

Case 1:17-cr-00226-Center Document 1 165 Filed 01/02/18 Page 333 of 849

**C**

calculated [1]   51/22
call [6]   2/5 3/6 8/6 8/8 8/21 22/24
called [1]   5/24
calls [7]   3/7 4/24 4/24 5/1 5/3 5/4 37/3
calm [1]   14/3
came [2]   10/4 40/24
can [27]   22/9 22/9 24/23 25/4 28/21 28/25 30/11 31/10 32/23 34/17 35/16 38/6 41/12 41/18 43/2 43/25 50/4 50/15 52/17 53/25 55/11 56/7 62/17 66/17 68/2 68/3 72/19
can't [1]   39/15
candor [1]   68/13
cannot [3]   9/6 44/17 45/1
capable [2]   50/12 50/15
car [12]   13/9 13/13 13/14 13/23 14/8 14/17 15/19 15/20 15/21 17/17 25/7 46/6
card [1]   20/20
carefully [3]   47/15 52/1 54/2
Carroll [14]   4/5 4/14 4/18 5/9 5/11 5/14 8/4 12/19 17/24 18/3 18/13 23/2 29/4 45/9
Carroll County [14]   4/5 4/14 4/18 5/9 5/11 5/14 8/4 12/19 17/24 18/3 18/13 23/2 29/4 45/9
cars [1]   9/21
case [92]
cases [12]   10/22 28/18 28/24 29/1 32/15 36/3 41/23 50/1 54/6 56/22 64/7 73/6
CATHERINE [1]   1/11
cause [31]   22/5 24/5 24/22 24/24 25/2 31/8 31/23 32/7 32/10 32/13 32/20 33/25 34/5 37/19 41/12 41/19 43/2 47/20 47/21 51/18 54/19 54/23 56/19 57/15 58/9 69/12 70/1 71/12 71/13 71/15 72/2
caused [1]   21/23
caution [4]   41/3 62/13 62/16 63/3
CCAIC [1]   6/8
CCB [2]   1/4 2/8
CCB-17-226 [1]   1/4
cease [1]   63/2
cell [87]
cell phone [68]   2/25 7/8 9/12 12/24 13/1 13/12 13/15 13/16 13/22 13/25 14/2 14/11 14/14 14/16 14/19 14/25 15/16 15/20 16/10 16/13 16/16 16/16 20/2 25/6 27/2 28/25 29/8 29/18 30/10 32/5 32/25 33/1 34/1 34/12 34/17 34/25 35/18 35/22 35/22 35/24 36/1 36/20 37/10 37/25 38/19 39/2 40/11 42/2 45/9 46/4 46/5 46/9 47/18 48/13 49/11 54/14 58/23 65/1 68/4 68/9 68/12 68/14 68/17 68/23 69/1 70/14 70/15 71/17
cell phones [19]   6/9 6/12 6/13 6/15 6/21 7/16 10/24 27/20 27/24 30/11 30/21 31/4 31/12 31/15 35/5 36/3 38/8 49/19 53/25
Cellebrite [1]   6/11

cellular [1]   27/16
center [10]   5/12 5/15 6/20 6/7 6/17 8/4 8/4 8/23 13/14 15/19
certain [3]   56/1 62/4 66/9
certainly [7]   22/4 32/7 37/17 38/18 45/23 52/13 58/13
Certified [1]   73/24
certify [1]   73/18
cetera [3]   59/25 60/3 60/20
charged [2]   20/20
check [1]   4/24
checked [1]   11/22
cheek [1]   44/15
child [49]   5/16 5/23 5/24 6/1 6/3 6/6 7/9 7/14 8/13 8/17 8/23 32/14 32/19 32/21 32/23 35/4 39/7 39/25 40/1 40/2 40/3 40/3 40/4 40/5 40/5 40/9 41/5 49/13 55/8 56/22 58/4 58/5 59/24 60/15 60/15 62/1 62/1 62/7 62/9 62/15 62/22 63/1 63/4 63/7 63/9 71/21 71/22 71/24 72/3
child abuse [7]   6/3 32/14 32/19 32/23 35/4 59/24 60/15
Child Advocacy Center [2]   8/13 8/23
child exploitation [6]   5/23 6/6 7/9 7/14 56/22 62/7
child pornography [12]   32/21 39/25 40/5 41/5 62/1 62/9 62/15 63/1 63/4 63/7 63/9 72/3
children [2]   5/25 22/1
Circuit [10]   18/17 30/22 32/17 34/20 54/3 54/5 54/5 55/14 59/8 72/12
Circuit's [5]   36/5 54/17 60/9 69/19 69/23
circumstance [3]   42/18 42/19 47/11
circumstances [15]   24/24 25/3 34/8 34/15 34/21 35/2 35/14 35/17 36/9 36/12 36/23 37/11 41/10 41/13 54/20
cited [11]   25/13 30/23 32/15 36/6 44/3 51/24 65/24 67/7 72/11 72/23 72/24
cites [3]   28/24 55/13 73/1
citing [1]   66/9
civil [1]   18/12
clear [8]   22/8 27/13 44/2 44/8 57/24 59/9 60/11 66/11
clearer [1]   34/20
clearly [3]   23/9 43/19 69/9
Code [1]   66/10
coffee [2]   29/19 30/3
Collar [1]   6/17
colleagues [1]   10/2
collective [2]   41/11 41/19
colored [1]   12/12
come [4]   8/3 8/18 10/3 12/6
comes [1]   41/15
commission [2]   30/10 30/18
committed [3]   32/7 32/8 32/23
common [5]   6/20 7/15 35/5 41/23 51/1
common sense [1]   41/23
compared [1]   46/4
complaint [2]   5/3 5/4
complete [1]   31/23
compliant [2]   17/6 36/15
complied [1]   36/17

comply [1]   13/11
computer [49]   21/21 33/13 33/16 39/16 39/18 40/11 41/5 48/15 48/16 48/20 49/11 50/20 50/25 51/6 52/10 52/15 52/25 53/4 55/3 57/3 58/5 58/9 58/18 59/17 60/11 65/15 65/20 65/22 66/6 66/8 68/15 70/7 70/18 72/2 72/20
computers [14]   10/24 10/24 27/20 27/24 38/10 48/24 49/19 50/23 53/25 57/6 60/2 63/14 66/18 67/21
conceal [1]   23/15
concealing [1]   42/12
concern [1]   59/6
concerned [1]   4/11
concerning [2]   8/5 61/16
concluded [1]   59/19
conclusion [1]   35/23
conduct [4]   38/16 51/3 65/7 70/6
conducted [4]   65/13 65/15 67/25 71/21
conducting [1]   60/11
conference [2]   6/1 6/2
conferred [1]   62/18
confess [1]   49/16
confirmed [1]   22/12
conflating [1]   25/14
confusing [1]   67/6
connection [14]   5/6 7/8 7/14 8/2 8/19 9/9 23/12 39/8 50/16 53/8 56/1 57/15 57/17 57/18
consider [1]   29/7
consideration [1]   29/7
considered [1]   38/7
consistent [3]   26/5 26/18 35/7
console [2]   13/15 15/19
contact [1]   8/12
contacted [1]   14/18
contacts [1]   7/10
contain [2]   34/18 65/4
contained [2]   21/8 60/3
contemplated [2]   28/6 28/8
contents [4]   20/25 53/18 68/9 68/20
context [4]   45/17 49/7 59/6 72/10
continued [3]   61/2 61/3 62/21
contraband [4]   23/16 43/3 47/8 55/10
contrary [1]   36/14
contrast [2]   52/19 70/17
controlled [1]   21/19
controlling [2]   59/8 59/9
cooperative [3]   14/3 17/8 36/15
Corporal [24]   2/24 3/7 3/12 3/20 3/25 7/6 12/19 15/14 17/23 18/24 20/11 20/16 20/22 21/25 22/16 23/2 23/6 25/4 26/19 34/24 35/20 36/10 36/18 41/14
Corporal Lare [20]   3/7 3/25 7/6 12/19 15/14 17/23 18/24 20/16 20/22 21/25 22/16 23/2 23/6 25/4 26/19 34/24 35/20 36/10 36/18 41/14
Corporal Lare's [1]   20/11
Corporal Michael [1]   3/20
Corporal Michael Lare [1]   2/24
correct [31]   4/10 4/13 5/8 12/4 15/17 15/21 15/24 16/1 16/18

167

**C**

correct... [22]   16/20   17/5   17/8
17/9   17/12   17/15   17/18   17/21
17/25   18/4   18/7   18/11   18/15
18/19   18/22   19/1   27/4   47/17
47/23   63/11   72/12   73/19
couch [1]   29/16
could [38]   7/23   7/24   9/12   10/25
12/22   13/20   14/4   22/11   30/13
31/20   33/2   33/5   34/20   35/5
35/19   35/24   41/2   42/9   43/13
44/14   45/3   45/4   45/7   45/9   45/24
52/9   57/19   57/19   60/25   61/1
61/2   61/2   62/21   65/15   67/3   70/5
70/10   72/5
counsel [7]   2/10   26/3   38/25
39/1   39/21   59/6   62/18
Counts [1]   20/21
County [14]   4/5   4/14   4/18   5/9
5/11   5/14   8/4   12/19   17/24   18/3
18/13   23/2   29/4   45/9
couple [8]   21/1   24/19   28/4
28/11   32/15   38/24   49/5   49/8
course [3]   35/9   50/3   58/22
court [34]   1/1   1/24   8/25   9/10
9/24   11/13   11/19   15/2   18/9
18/13   18/17   20/13   22/12   23/9
25/11   34/20   34/23   44/9   51/25
54/4   54/19   55/9   57/11   57/12
57/12   59/16   59/19   60/10   65/17
69/20   69/24   71/8   73/12   73/24
Court's [2]   22/8   24/18
courthouse [1]   56/17
courtroom [2]   1/9   18/25
Courts [1]   53/23
cover [4]   10/17   42/1   47/22
68/17
covered [9]   23/12   24/7   30/5
42/20   43/17   43/20   43/23   45/2
45/5
covers [3]   6/3   27/19   27/20
CPL [1]   73/16
CR [1]   73/15
craft [1]   53/2
crime [14]   6/17   11/24   23/16
30/11   30/15   32/6   34/17   43/4
47/3   56/19   60/14   64/12   64/23
65/4
crimes [13]   5/13   5/18   23/14
23/15   40/4   40/5   55/21   59/21
59/23   60/6   60/21   66/25   67/14
criminal [10]   1/4   2/8   18/3   18/5
24/6   38/16   50/7   51/3   66/13
70/16
Criminal No. CCB-17-226 [1]   2/8
critical [4]   29/10   44/4   47/17
56/5
CROSS [1]   15/12
CROSS-EXAMINATION [1]   15/12
CRR [3]   1/23   73/18   73/23
cry [1]   63/17
Cupp [1]   24/18
current [1]   56/9
currently [3]   4/6   17/23   18/2
curtilage [13]   10/18   13/2   13/10
23/10   24/2   24/6   27/23   28/15
42/4   45/22   45/25   46/5   47/5
custody [1]   48/2
cut [1]   48/9

**D**

D.C. [4]   30/22   54/17   55/4   69/19

D.C. Circuit [2]   30/22   55/4
damage [1]   12/25
dark [2]   9/19   12/12
dark-colored [1]   12/12
data [6]   31/14   31/24   49/21
52/22   53/24   53/25
DATE [1]   73/25
daughter [8]   20/18   21/4   21/4
21/9   39/9   40/12   42/23   60/18
daughter's [1]   21/6
day [12]   8/22   9/8   9/16   14/18
15/24   16/3   16/6   26/7   26/16   38/6
41/16   50/23
Day's [1]   16/1
days [5]   19/8   19/9   24/19   58/24
61/13
dealing [1]   30/9
deals [1]   30/23
death [1]   66/9
deaths [1]   5/5
decades [1]   49/20
December [1]   65/20
decided [4]   13/23   54/17   54/18
55/15
decision [11]   24/18   59/15   59/15
60/9   66/1   67/13   69/20   69/23
72/12   72/14   72/15
defendant [28]   1/6   1/17   8/5
13/17   13/18   13/21   14/17   20/17
20/23   21/2   21/18   22/5   23/7
23/12   23/25   25/8   39/6   39/6   39/7
39/13   42/19   54/24   55/7   56/23
57/18   60/17   61/17   70/14
defendant's [12]   2/25   23/8
24/11   39/8   40/10   41/15   56/16
57/23   57/25   60/2   70/1   70/14
Defenders [1]   1/19
defense [9]   19/21   26/3   41/24
47/17   47/23   57/10   63/11   63/16
73/1
deficiencies [1]   69/25
deficient [2]   69/9   69/15
degree [2]   59/25   66/25
delay [3]   41/6   48/3   48/4
delete [2]   7/15   22/3
deleted [5]   7/22   9/13   13/4
20/24   35/5
deletion [1]   35/4
demeanor [1]   14/1
Department [2]   2/11   26/8
depictions [1]   32/14
deprived [1]   37/14
deputies [3]   4/22   8/7   8/24
deputy [13]   8/7   8/11   8/20   9/17
10/1   10/3   10/4   10/7   10/7   10/8
10/9   10/16   41/16
Deputy Gill [8]   8/11   8/20   9/17
10/1   10/3   10/8   10/9   41/16
Deputy Gill's [1]   10/7
Deputy McGuinness [1]   10/7
Deputy Reuben Gill [1]   8/7
Deputy Sheriff [1]   10/16
describe [1]   53/13
described [3]   17/8   34/9   36/14
describes [3]   59/24   60/1   60/5
description [1]   55/22
descriptions [1]   62/11
designated [3]   44/11   55/21
59/21
desktop [1]   10/24
destroyed [4]   20/24   35/24   36/13

36/24
destruction [1]   22/7
detain [2]   22/9   22/10
detained [4]   24/13   28/25   37/10
65/18
detains [1]   23/6
detective [3]   5/13   6/4   14/24
Detective Royce [1]   14/24
detectives [4]   8/12   10/22   11/24
14/20
detention [6]   20/12   22/14   24/14
25/1   29/8   37/9
determination [2]   34/21   35/1
device [23]   21/20   31/1   31/2
39/16   50/10   50/12   51/6   51/13
51/15   54/14   54/24   56/8   56/18
56/20   57/19   57/20   58/14   64/6
64/10   64/11   64/21   64/22   70/18
devices [35]   10/23   27/21   31/4
33/23   38/10   48/25   49/2   49/18
49/22   49/24   50/3   50/4   50/6
50/15   52/4   53/17   53/18   54/8
54/20   55/6   55/10   55/12   56/1
56/7   56/25   64/4   64/9   64/18
64/19   65/18   66/19   67/13   67/16
67/21   69/21
diagnostic [1]   71/23
did [53]   6/8   6/11   6/14   7/15   8/3
8/14   8/18   9/8   9/23   10/3   10/13
10/20   11/19   12/6   12/14   12/14
13/1   13/5   13/11   13/13   13/17
13/21   14/4   14/7   14/17   14/22
16/9   16/11   16/12   16/15   16/22
16/24   17/14   17/20   19/7   19/9
24/10   28/10   28/23   34/25   35/21
40/17   40/21   44/23   52/3   60/16
61/14   62/4   62/12   67/13   68/18
68/19   69/22
didn't [17]   11/21   12/22   13/3
13/24   22/5   26/24   35/25   37/20
38/1   38/1   45/23   47/7   61/11
61/12   66/3   66/4   68/17
difference [1]   56/5
differences [1]   54/7
different [18]   6/2   7/11   7/11
29/12   30/19   31/12   32/23   37/17
38/3   38/9   47/24   48/5   49/18
49/24   49/25   50/3   53/24   64/4
digital [8]   6/10   6/15   7/13   8/16
25/4   59/17   63/15   66/6
digital evidence [2]   6/15   7/13
digital media [3]   6/10   25/4
63/15
digital penetration [1]   8/16
dining [1]   9/20
Diplomate [1]   73/23
direct [3]   3/23   35/9   42/16
directions [1]   67/23
directly [2]   3/17   66/22
disagree [2]   28/3   42/7
disc [1]   20/20
disclose [1]   19/10
discovery [2]   71/9   71/10
discretion [7]   45/14   45/16
55/23   56/3   65/9   65/9   67/18
discussed [1]   19/3
discusses [1]   44/3
dispute [1]   4/11
distinction [1]   46/2
distinguish [1]   32/2
distinguishable [1]   70/12

78

**D**

distinguishing [2]  40/6 40/7
DISTRICT [3]  1/1 1/1 18/13
District Court [1]  18/13
DIVISION [1]  1/2
DNA [2]  27/23 44/14
do [35]  2/5 4/4 5/15 5/22 6/16
 9/9 11/9 11/20 12/14 13/24
 14/17 15/24 17/12 24/23 28/21
 29/20 29/23 30/5 35/13 37/25
 42/6 43/5 44/23 47/10 48/8
 50/24 52/24 53/1 56/13 57/13
 61/4 62/1 62/14 65/21 73/18
doctrine [1]  53/5
documents [2]  52/11 66/7
does [16]  5/2 5/6 5/14 9/2
 11/14 28/16 28/16 31/7 44/20
 56/7 59/22 64/20 69/10 69/14
 69/18 72/23
doesn't [7]  24/23 41/17 58/2
 65/1 66/22 67/17 69/16
doing [2]  24/20 50/21
domestic [1]  4/11
don't [28]  10/5 12/12 28/10
 30/8 30/11 32/3 35/16 36/4
 36/10 38/5 41/22 42/25 43/24
 44/7 45/20 48/9 49/15 49/16
 50/25 54/3 61/4 65/25 67/4
 68/13 69/1 70/25 71/4 72/18
done [4]  7/18 20/23 35/14 47/14
door [4]  11/21 12/2 14/9 14/14
doors [3]  9/21 11/22 11/23
Douglas [3]  1/23 73/18 73/23
down [2]  40/14 60/24
download [1]  6/13
Doyle [4]  32/18 39/21 39/23
 69/24
dozen [2]  50/2 50/2
dozens [1]  49/24
DR [1]  73/15
driven [1]  28/20
driver's [1]  14/8
drives [4]  27/21 48/24 60/2
 66/18
driveway [9]  9/21 12/9 12/15
 13/9 17/1 23/8 24/2 26/21 37/19
driving [2]  12/12 28/22
drug [8]  8/17 26/11 33/25 39/7
 39/9 57/22 60/19 70/19
drugged [1]  21/24
drugs [20]  26/11 30/9 33/8
 33/14 33/18 39/9 43/6 43/7
 50/11 50/20 51/7 51/19 52/6
 55/11 57/20 57/21 57/23 59/2
 70/19 70/19
duration [1]  36/17
during [5]  5/9 6/4 17/5 21/13
 56/25
duties [3]  4/20 5/10 19/10

**E**

earlier [13]  19/7 24/20 42/8
 42/18 57/17 58/4 62/21 63/16
 65/17 69/24 70/11 70/17 71/15
easily [3]  7/19 28/21 35/5
easy [4]  22/3 25/5 29/17 44/21
effect [1]  30/16
effort [3]  50/6 52/5 53/19
either [4]  7/21 9/20 58/3 72/13
electronic [30]  6/17 6/18 7/16
 10/23 33/23 38/10 39/15 49/18

49/24 50/3 50/10 50/15 51/13
51/15 52/4 53/17 53/18 54/8
54/14 54/20 55/6 56/25 64/4
64/6 64/9 64/10 64/21 67/16
67/21 69/21
electronic device [7]  50/10
 51/13 51/15 54/14 64/6 64/10
 64/21
electronic devices [18]  10/23
 33/23 38/10 49/24 50/3 50/15
 52/4 53/17 53/18 54/8 54/20
 55/6 56/25 64/4 64/9 67/16
 67/21 69/21
electronic evidence [3]  6/17
 6/18 7/16
Elizabeth [1]  1/18
Elizabeth Oyer [1]  1/18
ELMO [1]  11/3
else [17]  9/9 13/17 19/13 45/25
 48/12 67/10 70/9
embarrassed [1]  49/13
emphasized [1]  55/9
employed [1]  4/2
enabled [5]  21/20 39/14 57/19
 58/14 70/18
encompassed [1]  39/19
encounter [1]  17/5
encountered [5]  16/10 60/17
 62/6 62/8 62/24
end [2]  10/6 59/18
endorsed [1]  25/11
enforce [1]  4/25
enforcement [20]  21/2 21/10
 21/18 21/25 22/9 24/10 24/22
 26/13 33/20 41/4 41/11 41/18
 46/17 48/23 52/21 57/7 60/12
 62/12 65/9 70/4
enough [1]  61/24
enter [2]  17/14 49/23
entered [1]  4/17
entering [1]  27/22
entire [3]  36/17 36/18 68/24
entitled [1]  73/20
enumerated [1]  60/21
equally [1]  25/1
era [1]  54/11
erased [1]  5/11
ERIC [3]  1/5 2/7 8/5
Eric Grinder [1]  8/5
Esquire [4]  1/15 1/15 1/18 1/18
essentially [5]  24/21 37/1
 61/18 63/20 64/16
establish [4]  31/8 32/13 32/20
 70/1
established [2]  20/13 32/10
establishing [2]  41/19 51/9
estimate [1]  36/23
et [3]  59/25 60/3 60/20
et cetera [3]  59/25 60/3 60/20
even [24]  16/15 22/5 31/1 33/2
 33/24 35/22 35/25 42/4 44/20
 46/5 50/9 50/14 50/21 51/6 53/8
 54/24 55/2 56/5 61/5 63/11
 67/25 71/7 71/8 71/25
evening [2]  8/21 28/22
ever [1]  37/13
every [6]  31/24 46/17 56/16
 60/13 61/24 61/25
everybody [1]  58/23
everyone [1]  2/3
everything [6]  24/25 32/4 60/3
 68/2 71/9 72/1

evidence [57]  2/20 2/22 6/15
 6/25 7/7 7/23 7/23 7/25 7/13 7/16
 9/7 9/12 10/25 13/3 13/3 19/18
 19/21 20/17 21/9 22/7 22/11
 23/16 25/12 32/6 32/20 33/8
 33/25 34/18 35/4 35/24 36/12
 36/24 37/1 37/4 38/14 40/9 41/5
 47/13 51/9 51/14 51/23 53/3
 53/21 56/19 58/4 60/6 60/19
 62/22 63/14 64/12 64/14 64/23
 65/4 66/24 67/14 68/19 72/2
 73/14
evidentiary [1]  7/7
exact [1]  12/13
exactly [6]  7/18 22/13 40/10
 55/18 58/8 60/15
examination [10]  3/23 15/12
 35/9 41/1 41/3 62/12 65/19 70/6
 71/21 71/22
examinations [1]  67/24
examine [1]  6/9
examined [1]  65/5
examiner [10]  40/10 40/22 60/12
 60/16 62/6 62/21 65/7 65/11
 68/2 68/7
examiner's [1]  71/9
examining [1]  40/23
example [2]  29/13
exceeded [1]  58/1
exceeding [1]  65/12
exception [5]  63/13 69/9 69/14
 69/18 69/22
exchanged [1]  31/18
exchanges [1]  26/12
excise [2]  71/8 72/9
excused [3]  19/15 19/17
execute [3]  29/15 44/16 70/5
executed [3]  22/25 63/7 63/8
executing [5]  45/14 55/23 57/3
 57/7 67/8
execution [3]  15/3 56/25 67/12
exhibit [7]  11/7 23/19 23/20
 27/7 27/9 27/11 52/20
Exhibit 1 [3]  27/7 27/9 27/11
Exhibit 2 [2]  23/19 23/20
exigencies [3]  20/15 24/15
 25/12
exigency [3]  22/6 41/20 47/22
exigent [12]  24/24 25/3 34/8
 34/15 34/21 35/2 35/17 36/9
 36/12 36/23 41/10 41/13
exigent circumstances [11]
 24/24 25/3 34/8 34/15 34/21
 35/2 35/17 36/12 36/23 41/10
 41/13
exist [1]  38/15
existed [1]  11/15
existence [1]  39/2
exists [1]  24/24
exited [1]  12/18
expansive [1]  54/12
experience [3]  6/19 10/15 62/7
expertise [1]  5/22
explain [2]  32/18 52/21
explained [1]  12/19
explains [2]  51/25 72/12
exploitation [6]  5/23 6/6 7/9
 7/14 56/22 62/7
exploratory [2]  52/2 52/3
extent [2]  31/7 38/11
extremely [6]  21/23 33/22 49/1
 54/1 57/22 61/7

**F**

facial [1]   69/25
facially [2]   69/9 69/15
facilitated [1]   57/23
fact [14]   18/2 24/10 28/19
  31/16 34/21 36/25 44/3 45/22
  55/9 58/13 61/16 62/3 65/8 73/1
fact-specific [1]   34/21
factor [2]   36/21 40/6
facts [5]   22/4 34/23 36/10
  36/11 42/21
fail [1]   54/6
failed [1]   69/25
fair [2]   53/18 56/8
fairly [3]   11/14 47/17 57/23
faith [8]   63/10 63/13 69/6 69/9
  69/13 69/16 69/17 69/22
fallback [1]   47/21
far [6]   14/9 14/13 45/21 59/1
  63/17 68/19
fashion [1]   57/8
father [4]   21/15 40/25 71/11
  71/16
FCRR [2]   1/23 73/18
federal [30]   1/19 1/24 25/20
  28/9 34/11 52/19 52/21 52/25
  60/23 61/5 61/6 61/12 61/15
  63/9 64/7 64/14 64/25 65/3 68/5
  68/10 68/13 68/20 68/25 70/22
  71/2 71/8 71/14 71/19 72/19
  73/24
federal government [1]   61/12
federal warrant [2]   61/15 68/13
federal warrants [1]   61/6
Federico [4]   1/21 2/11 61/9
  61/14
feel [1]   62/20
feet [3]   12/4 14/12 14/15
fellatio [2]   61/19 71/17
fender [1]   12/18
fifth [2]   23/22 23/23
file [4]   7/19 7/20 60/13 61/25
file system [1]   7/20
files [7]   34/3 34/3 52/14 52/14
  53/20 60/16 60/20
final [2]   40/13 41/8
find [6]   6/20 7/8 7/15 33/8
  35/5 51/23
finding [8]   5/25 35/17 36/9
  36/12 36/22 41/12 41/12 65/11
fine [2]   43/11 61/6
finger [1]   7/21
firearm [3]   18/11 18/15 18/19
firearms [2]   47/8 55/11
first [7]   5/24 20/5 28/13 29/17
  33/21 58/8 65/24
flaws [1]   38/5
flee [1]   17/21
Floor [1]   1/24
focusing [1]   53/15
folks [2]   41/18 49/10
followed [1]   35/8
following [3]   8/21 16/1 58/7
foregoing [1]   73/19
forensic [16]   21/13 27/15 27/24
  28/10 31/8 31/23 32/2 32/2
  40/22 54/13 65/7 65/19 67/24
  68/2 70/6 71/21
forensically [4]   38/2 48/23
  65/5 66/18
forever [1]   25/7

formerly [1]   5/11
forms [3]   32/3 32/21
forth [2]   58/20 67/1
found [18]   23/23 30/21 40/10
  49/2 49/22 51/9 51/14 52/4 53/4
  54/14 54/19 55/4 56/20 62/23
  64/15 69/20 69/25 72/17
foundational [1]   51/10 64/12
foundations [1]   58/23
four [9]   25/20 34/10 37/2 37/21
  40/18 41/6 47/24 61/13 68/23
fourth [15]   23/21 32/17 34/20
  36/5 46/25 51/11 53/12 54/3
  54/5 55/14 59/8 60/9 64/13
  69/23 72/12
Fourth Amendment [4]   46/25
  51/11 53/12 64/13
Fourth Circuit [7]   32/17 34/20
  54/3 54/5 55/14 59/8 72/12
Fourth Circuit's [3]   36/5 60/9
  69/23
framed [1]   28/4
Franks [3]   72/8 72/23 72/24
Franks-type [1]   72/8
free [1]   13/20
frequently [2]   22/1 28/18
Friday [1]   1/9
front [5]   9/18 12/2 12/17 12/17
  14/13
fruits [1]   23/16
fulfilled [2]   55/20 59/20
full [2]   3/18 64/4
fundamental [1]   38/5
further [8]   15/7 19/12 33/4
  41/24 48/9 59/4 66/17 66/24
Furthermore [2]   21/13 23/25

**G**

game [2]   53/19 56/9
games [1]   13/25
garage [1]   14/9
Garrison [1]   51/24
gathering [1]   26/4
gave [3]   15/21 35/10 65/8
gears [1]   8/1
general [4]   10/13 34/16 43/23
  51/23
generally [3]   4/20 7/23 58/17
gentleman [1]   2/25
get [17]   25/17 28/23 33/20
  35/19 39/15 39/16 50/2 62/15
  63/3 64/8 64/9 64/18 64/18
  64/21 68/2 72/1 73/7
gets [3]   28/19 46/1 59/1
getting [2]   10/12 29/2
Gill [9]   8/7 8/11 8/20 9/17
  10/1 10/3 10/8 10/9 41/16
Gill's [1]   10/7
Gillenwater [1]   72/22
girlfriend [3]   30/25 55/7 56/23
girlfriend's [1]   56/24
give [2]   7/23 54/6
given [8]   20/15 24/14 32/3
  32/24 33/1 36/2 44/24 62/11
gives [1]   38/7
Glen [1]   8/22
go [15]   3/4 10/22 13/20 14/7
  20/5 30/8 30/11 34/3 38/1 44/14
  45/24 46/21 55/11 68/4 70/25
goes [1]   41/10
going [10]   9/14 12/24 13/23
  35/18 39/13 41/2 47/12 52/13

52/22 56/19
some P2 2507 6/67
good [17]   2/3 2/15 2/16 3/15
  3/16 3/25 4/1 15/14 15/15 63/10
  63/13 69/6 69/9 69/13 69/16
  69/17 69/22
good-faith [7]   63/13 69/6 69/9
  69/13 69/16 69/17 69/22
got [12]   9/12 13/15 26/23 29/14
  34/11 37/2 49/19 58/8 63/5 63/8
  63/9 65/21
gotten [2]   48/15 52/9
government [35]   2/9 3/7 11/7
  19/19 20/2 24/18 28/4 28/5
  28/18 28/24 29/3 32/9 33/9
  34/16 35/16 36/25 37/7 40/15
  40/17 48/5 48/18 51/12 53/21
  55/13 55/16 61/12 62/18 64/3
  64/8 64/14 65/17 65/23 69/6
  71/3 72/23
Government Exhibit [1]   11/7
Government's [12]   2/23 3/12
  23/19 25/10 27/7 34/7 40/8 41/9
  44/13 45/15 47/21 61/1
grabbed [2]   15/18 15/20
grant [1]   28/15
granted [2]   18/14 18/17
Griffith [4]   30/23 54/17 69/20
  70/10
GRINDER [42]   1/5 2/7 2/18 8/5
  8/9 9/11 9/13 11/12 12/8 12/15
  12/18 13/11 14/4 14/10 14/14
  14/18 15/16 16/9 16/13 16/18
  17/2 17/5 26/13 26/20 28/22
  29/15 30/4 30/18 31/5 31/17
  31/21 33/6 33/13 35/22 35/25
  43/19 44/7 45/5 50/10 50/19
  55/2 55/8
Grinder's [16]   3/1 8/25 14/10
  16/22 16/24 28/6 28/16 29/5
  31/9 32/5 33/21 36/14 37/12
  42/2 44/14 44/25
Groh [7]   44/2 46/2 46/19 47/10
  63/17 63/18 67/5
Groh v. Ramirez [3]   44/2 46/2
  67/5
grounds [2]   6/24 10/18
guess [6]   19/23 19/25 42/15
  46/1 48/14 53/5
guns [1]   47/4

**H**

had [40]   5/10 8/8 8/9 14/19
  15/2 16/15 20/22 20/22 21/5
  21/6 21/15 21/17 21/18 21/24
  22/14 24/4 24/5 24/13 28/21
  29/17 29/21 30/2 30/3 30/16
  33/6 33/24 35/7 35/22 36/19
  37/5 37/18 40/19 48/3 50/22
  51/17 51/21 58/18 68/7 68/20
  70/15
half [3]   10/6 37/2 44/25
hand [3]   3/11 13/11 24/7
handed [9]   13/13 13/15 13/22
  14/1 14/10 14/14 14/25 15/16
  23/3
handing [1]   11/8
handling [1]   6/17
hands [1]   23/7
happen [1]   22/6 46/3 68/1
happened [9]   9/15 20/11 22/13
  24/1 24/1 41/6 49/15 62/3 64/3

**H**

happening [1]   57/10
happens [2]   44/15 50/1
happy [4]   20/5 48/11 70/22
  70/23
harassment [1]   66/8
hard [4]   27/21 46/1 48/24 66/18
hard drives [3]   27/21 48/24
  66/18
has [26]   5/3 20/3 24/22 25/25
  27/8 28/4 32/10 34/17 39/14
  41/21 41/24 47/10 49/14 51/2
  51/12 52/19 53/7 53/21 57/12
  58/14 58/23 62/7 63/21 64/22
  64/23 65/5
hasn't [1]   53/9
have [82]
haven't [1]   48/15 51/20
having [6]   4/8 46/5 46/8 50/16
  62/1 71/24
he [96]
he's [9]   8/22 39/14 42/19 44/15
  45/5 45/6 45/8 45/10 50/23
head [1]   41/17
hear [4]   20/8 45/23 48/12 61/25
heard [1]   26/22
hearing [4]   1/13 2/13 2/20
  18/12
heavily [1]   25/9
held [2]   37/12 37/23
helped [1]   71/15
helpful [1]   73/5
her [24]   18/10 18/14 18/15
  18/17 18/18 18/18 21/12 21/15
  21/16 21/16 21/23 26/6 39/7
  39/10 39/10 40/25 57/22 61/17
  61/19 65/11 71/10 71/16 71/17
  71/22
here [41]   2/13 2/19 18/25 22/13
  24/23 25/2 25/18 31/22 37/8
  40/1 42/10 43/5 43/8 44/24
  47/11 47/17 48/16 51/4 51/15
  51/19 52/3 52/20 53/5 53/22
  54/16 55/1 55/18 55/24 57/10
  57/11 59/7 59/23 60/16 63/10
  63/13 63/17 64/3 67/20 68/1
  70/17 72/8
here's [2]   41/8 62/14
hereby [1]   73/18
herself [1]   26/13
hidden [1]   20/24
highly [2]   32/25 54/1
Hill [1]   72/11
him [26]   8/12 12/22 13/19 14/4
  14/18 14/25 15/17 16/10 16/10
  17/8 17/12 21/9 34/17 34/25
  35/13 40/11 41/16 42/22 42/22
  44/7 61/19 62/11 62/24 63/2
  65/11 71/17
his [82]
history [2]   34/2 52/10
hold [2]   23/18 58/2
holding [4]   24/7 25/15 48/7
  68/23
holds [1]   36/4
home [15]   9/4 9/11 10/8 10/17
  12/8 14/19 17/14 24/2 30/8
  44/16 49/8 49/13 51/1 60/2 60/4
Homeland [2]   2/11 2/12
Homeland Security [1]   2/12
homicides [1]   5/5

Honor [126]
Honor's [1]   18/6
HONORABLE [1]   1/11
Hopkins [2]   1/18 2/17
hour [1]   10/6
house [28]   3/1 9/5 9/6 9/21
  11/15 12/7 12/22 12/23 13/12
  13/14 13/20 14/10 16/18 21/3
  23/8 23/10 29/15 29/16 42/23
  42/24 43/1 46/3 47/3 47/4 47/5
  47/7 49/20 56/25
house's [1]   14/13
how [15]   4/14 5/19 6/5 7/18
  7/24 14/9 14/13 19/3 37/25
  49/14 52/21 57/7 57/8 65/17
  67/24
HSI [1]   1/21 40/22
huge [2]   36/1 49/22
hundred [1]   6/7
husband's [1]   49/19
hymen [1]   71/22
hypertechnical [1]   57/12

**I**

I'd [11]   6/23 14/15 24/16 25/14
  27/13 40/13 42/16 56/15 59/14
  60/10 61/8
I'll [8]   3/4 26/3 26/5 40/14
  46/2 46/12 59/5 63/5
I'm [23]   18/5 20/5 23/18 23/22
  26/4 26/14 29/11 36/7 45/23
  46/8 47/10 47/12 48/4 48/11
  56/3 58/7 58/7 59/3 61/4 67/5
  68/11 70/22 70/23
I've [7]   5/12 6/1 6/16 10/16
  23/23 29/11 58/19
i.e [7]   20/17 23/14 40/11 63/14
  70/18 71/16 71/24
idea [1]   33/12
identified [1]   63/14
identifies [3]   44/19 55/20
  59/20
identify [1]   56/18
illegal [2]   50/11 72/25
illicit [1]   50/12
illogical [1]   45/3
image [5]   40/24 60/17 62/1 62/9
  62/24
images [10]   6/20 7/6 20/17
  20/19 21/9 22/2 22/3 59/4 62/25
  71/10
impetus [1]   63/2
implications [1]   44/12
implicit [1]   39/11
implicitly [5]   42/20 43/17
  43/23 45/2 45/5
important [4]   31/10 40/6 47/16
  66/4
improperly [1]   69/2
incident [1]   25/16
include [3]   5/6 28/16 28/16
included [3]   61/9 61/15 65/14
includes [2]   28/15 53/16
including [1]   60/2
incredibly [1]   66/15
inculpatory [1]   21/8
incumbent [1]   33/19
Indeed [1]   20/19
independent [1]   35/1
INDEX [1]   73/13
indicates [2]   33/16 68/12
indication [1]   70/13

indicative [2]   56/1 66/8
indispensable [1]   69/12
indictment [1]   20/21
individual's [2]   43/25 44/17
individuals [1]   22/1
influenced [1]   72/13
information [19]   6/12 6/13 7/22
  8/14 16/12 16/15 26/10 28/21
  33/20 33/21 35/21 39/20 52/15
  52/16 54/8 61/9 61/16 72/9
  72/17
informative [1]   52/18
inhabitants [1]   38/9
initial [5]   25/23 34/13 35/12
  50/16 68/22
initially [1]   63/5
injury [1]   66/9
inside [6]   15/20 29/16 30/4
  44/15 46/3 64/18
instructed [3]   15/24 17/11
  35/13
instructions [4]   9/15 17/6
  17/15 36/16
instructive [1]   54/16
instrumentalities [1]   66/7
insufficient [4]   38/18 39/24
  54/12 67/22
insufficiently [1]   63/12
intended [1]   53/7
interest [2]   22/1 37/14
Internet [26]   21/19 21/20 26/12
  33/8 33/14 33/17 33/25 34/2
  39/9 39/13 39/14 39/17 43/6
  50/11 50/12 50/16 50/20 51/7
  51/20 52/7 52/10 52/12 57/19
  57/21 58/14 70/18
Internet-capable [1]   50/12
Internet-enabled [5]   21/20
  39/14 57/19 58/14 70/18
interpret [1]   57/11
interrupt [1]   62/17
interview [1]   21/14
interviewed [1]   26/10
interviewers [1]   21/15
interviewing [1]   5/25
intrusive [4]   32/25 33/22 38/18
  54/1
invalid [3]   56/17 68/23 68/25
invalidates [1]   68/24
invasiveness [1]   46/14
investigate [1]   5/16
investigation [14]   5/12 5/15
  5/20 6/5 7/9 8/5 8/19 18/3 18/5
  18/6 24/4 24/22 45/6 61/10
investigations [6]   2/12 5/23
  6/6 6/18 7/14 62/7
investigator [3]   5/19 6/8 41/14
investigators [3]   24/4 24/5
  27/1
invoices [2]   52/11 60/20
involve [1]   72/23
involved [5]   6/6 18/10 63/8
  70/15 72/25
involvement [1]   8/2
iPads [2]   49/14 57/6
irrelevant [1]   52/22
is [191]
Islands [1]   32/16
issuance [1]   29/1
issue [13]   28/4 30/1 40/4 43/14
  47/3 47/17 51/19 57/16 59/24
  63/18 72/15 72/23 72/25

81

**I**

issued [6]    4/8 28/7 28/9 28/15
 38/12 47/22
it [129]
it's [49]    5/24 12/4 22/3 23/21
 23/25 25/5 25/7 26/24 29/6 30/9
 30/12 30/22 31/16 36/8 39/8
 40/15 42/22 42/23 43/1 44/9
 44/21 45/12 45/12 48/5 49/8
 51/1 52/18 53/11 53/12 55/10
 56/24 59/8 59/12 60/19 60/20
 60/25 61/22 65/3 66/21 66/24
 68/22 69/19 69/23 71/1 71/4
 71/6 72/7 72/16 72/24
items [17]    7/7 10/20 16/22
 16/24 24/7 27/2 39/13 47/6 54/9
 55/20 55/22 59/20 60/6 60/7
 66/12 67/9 67/19
its [3]    20/24 40/19 52/1
itself [3]    44/6 44/8 44/23

**J**

January [2]    1/9 73/25
job [4]    17/24 20/23 50/22 50/22
John [1]    32/16
JR [3]    3/12 3/21 73/16
judge [5]    1/11 18/13 18/17 23/1
 23/11
Judge's [1]    72/15
jumps [1]    35/23
just [45]    2/24 4/16 7/23 8/15
 11/3 11/23 13/23 15/5 22/12
 22/3 24/1 24/19 25/8 25/20 26/5
 26/21 26/24 27/6 32/1 35/18
 37/19 38/24 41/23 42/9 43/13
 46/20 48/7 51/4 51/17 51/23
 58/8 59/23 60/19 62/22 65/8
 66/19 66/23 66/23 67/15 67/21
 68/2 69/5 70/10 72/5 72/21
justification [2]    33/10 52/1
justifications [2]    52/6 53/3
justified [10]    13/5 33/3 34/1
 34/4 34/8 34/15 36/11 37/11
 37/15 60/12
justify [6]    31/20 32/11 38/18
 50/9 54/12 64/20

**K**

keeps [1]    49/20
kept [3]    7/10 37/19 41/2
key [2]    37/4 55/17
keys [12]    12/22 13/12 13/13
 13/17 13/22 14/1 14/10 14/14
 14/16 14/19 14/25 16/18
Kirstin [2]    1/18 2/17
Kirstin Hopkins [1]    1/18 2/17
kitchen [1]    9/20
knew [8]    21/2 21/4 21/8 21/10
 21/13 21/18 21/22 21/25
knocked [1]    11/21
know [26]    5/4 11/22 13/24 16/9
 30/7 30/12 35/25 39/15 41/8
 41/22 45/7 45/24 46/6 48/8
 48/10 49/7 49/9 49/15 49/18
 50/1 57/3 57/8 58/18 67/17
 68/19 70/17
knowing [1]    64/5
knowledge [6]    6/19 10/15 35/21
 41/11 41/15 41/19
known [5]    23/9 28/19 30/9 38/8
 44/9

**L**

knows [1]    61/4
L-A-R-E [1]    3/21
lack [2]    54/19 67/23
lacked [1]    71/22
lacking [2]    55/24 69/12
laid [3]    52/20 53/8 72/7
lake [1]    25/6
language [4]    42/8 55/17 59/14
 66/15
laptop [26]    27/2 33/11 33/11
 33/13 40/23 48/20 50/19 51/2
 51/5 51/6 51/18 51/19 52/9 53/9
 54/13 55/2 57/16 57/19 65/5
 65/20 68/6 68/15 69/3 70/7 71/5
 72/20
laptop's [1]    65/4
laptops [1]    10/24
Lare [24]    2/24 3/7 3/12 3/21
 3/25 7/6 12/19 15/14 17/23
 18/24 20/16 20/22 21/25 22/16
 23/2 23/6 25/4 26/19 34/24
 35/20 36/10 36/18 41/14 73/16
Lare's [1]    20/11
last [5]    3/18 41/8 43/14 72/6
 72/22
later [8]    22/15 22/17 22/25
 24/12 24/13 25/18 25/20 40/19
law [24]    21/2 21/10 21/18 21/25
 22/9 24/10 24/22 26/13 33/20
 34/19 41/4 41/11 41/18 43/1
 44/2 46/17 48/23 52/21 56/10
 57/7 60/12 62/12 65/9 70/4
law enforcement [20]    21/2 21/10
 21/18 21/25 22/9 24/10 24/22
 26/13 33/20 41/4 41/11 41/18
 46/17 48/23 52/21 57/7 60/12
 62/12 65/9 70/4
lawful [2]    55/9 55/12
lawfully [1]    48/6
lead [2]    45/4 45/24
leading [1]    45/21
leads [1]    45/15
leap [1]    36/1
learn [1]    61/12
learned [2]    8/3 61/13
least [3]    43/9 48/5 70/20
leave [16]    13/20 14/4 14/5 14/22
 17/21 36/16
leaves [1]    55/22
left [4]    10/3 12/17 15/1 15/2
legal [1]    53/5
legally [1]    13/5
lengthy [1]    29/8
let [4]    24/9 26/2 29/14 68/4
let's [4]    3/3 29/16 51/17 51/20
level [1]    46/14
light [2]    9/20 53/24
like [15]    21/20 30/5 39/16
 40/13 47/9 48/17 49/9 52/11
 54/9 56/15 59/14 59/23 62/20
 62/22 70/23
likelihood [1]    52/22
likely [9]    51/9 51/14 53/3
 53/20 64/11 64/14 64/22 65/4
 67/14
limit [1]    56/7
limitation [1]    31/22
limitations [2]    65/14 67/24
limited [5]    34/2 49/10 52/9
 52/18 66/12

**Mid column 3**

limiting [1]    50/14
limits [1]    54/24
line [1]    31/15 33/1 39/1 39/11
 43/8 66/22
linked [1]    51/3
links [2]    38/16 43/5
list [4]    27/22 44/21 47/7 67/9
listed [3]    23/14 47/7 59/23
little [6]    8/1 38/3 43/9 59/3
 66/22 66/23
Liz [1]    2/17
Liz Oyer [1]    2/17
location [2]    9/5 44/10
locked [1]    11/23
logic [1]    36/4
logical [1]    44/12
Lombard [1]    1/24
long [5]    4/14 5/19 7/24 50/24
 65/18
look [8]    10/23 30/11 46/2 46/12
 47/14 52/18 68/2 73/6
looked [3]    61/25 67/9 68/7
looking [4]    59/2 59/3 60/19
 62/22
lot [5]    38/5 47/14 49/9 54/5
 56/3

**M**

ma'am [29]    3/20 15/15 15/18
 15/22 16/5 16/8 16/11 16/14
 16/17 16/19 16/21 16/23 16/25
 17/4 17/7 17/10 17/13 17/16
 17/19 17/22 18/1 18/5 18/8
 18/16 18/20 18/23 19/2 19/8
 19/11
machine [2]    60/13 63/2
made [14]    21/5 22/8 26/17 34/22
 36/16 38/25 54/22 60/10 64/23
 65/11 65/17 69/6 70/2 71/5
Magistrate [1]    72/15
Magistrate Judge's [1]    72/15
mail [1]    39/15
maintain [1]    4/22
maintained [1]    6/11
Major [1]    5/13
make [13]    9/4 9/11 12/13 16/12
 20/3 34/25 40/13 57/22 64/14
 64/22 65/1 67/13 68/22
makes [6]    20/7 44/6 44/25 50/5
 59/9 65/3
making [4]    41/25 45/15 64/3
 69/3
manner [1]    57/12
many [10]    6/5 7/11 19/3 37/5
 37/13 49/18 50/24 52/18 53/23
 55/12
March [4]    34/11 40/22 61/13
 65/21
marked [1]    11/7
MARYLAND [6]    1/1 1/10 1/25
 11/13 44/10 51/24
Maryland v. Garrison [1]    51/24
massively [1]    69/21
matter [6]    7/25 25/5 35/14
 41/17 67/18 73/21
may [12]    3/6 3/9 11/1 15/5
 37/10 46/19 49/3 49/4 54/6
 63/25 64/8 67/6
maybe [7]    10/5 20/3 37/20 45/7
 54/16 67/3 67/25
McArthur [3]    22/8 25/1 25/13

Case 1:17-cr-00226-CCB   Document 64   Filed 01/02/18   Page 177 of 493

**M**

McGuinness [1]  1/7
me [13]  8/8 8/11 13/13 13/15
 24/9 26/2 27/7 29/14 42/12
 48/17 61/11 62/20 68/4
mean [12]  5/2 9/2 29/12 30/7
 32/7 37/16 48/9 48/11 49/8 58/8
 59/22 68/21
meaning [1]  10/23
means [2]  33/17 59/22
media [11]  6/10 7/16 25/4 27/21
 48/25 59/18 60/2 60/12 63/15
 66/6 66/18
meet [1]  19/7
member [1]  67/12
memorializations [1]  62/25
memory [1]  20/20
memory card [1]  20/20
mention [4]  44/6 44/7 44/20
 44/25
mentioned [2]  10/1 39/22
messages [11]  7/10 26/14 31/18
 31/22 32/12 33/2 33/2 39/3 39/4
 43/7 58/19
met [4]  18/24 19/3 19/5 19/9
Michael [4]  2/24 3/12 3/20
 73/16
microphone [1]  3/17
mid [2]  6/1 65/20
Mid-Atlantic [1]  6/1
might [20]  7/7 7/8 11/3 28/22
 30/10 31/1 32/6 32/10 32/11
 34/1 34/18 38/19 44/18 48/19
 53/20 57/5 62/25 63/1 64/4 64/5
mildly [1]  61/7
mine [1]  10/7
minimize [1]  52/22
minimum [1]  66/12
minor [21]  5/4 20/18 21/11
 21/11 21/14 21/22 26/6 26/9
 26/11 31/19 40/24 57/22 59/24
 60/17 61/17 62/10 62/11 66/25
 70/20 71/10 71/16
minor victim [5]  31/19 57/22
 61/17 62/10 62/11
minor victim's [1]  71/16
minor's [1]  70/21
minute [4]  32/1 47/13 49/6 68/5
minutes [8]  3/1 10/6 22/15
 22/17 23/4 25/18 37/24 40/18
missing [1]  59/3
mistake [1]  47/6
Mitchell [4]  29/13 37/17 37/20
 38/3
MO [1]  39/8
model [3]  12/13 16/13 30/12
modifiers [1]  67/20
modifies [1]  67/2
moment [4]  15/5 42/9 47/20
 62/17
months [11]  24/12 25/20 34/11
 37/2 37/5 37/13 37/22 40/18
 41/7 47/24 68/24
Montpelier [8]  8/25 9/10 9/24
 11/13 11/19 15/2 23/9 44/9
more [3]  47/15 67/25 68/7
moreover [4]  31/6 35/20 36/25
 50/18
morning [2]  3/15 3/16
most [4]  31/10 31/13 54/16 66/4
mostly [1]  9/19

mother [10]  21/6 21/12 21/24
 25/6 25/24 26/2 38/4 57/21 61/14
 70/21
motion [2]  2/20 19/25
motions [3]  1/13 2/13 2/20
mouth [1]  21/16
Mr. [64]  2/5 2/18 3/1 8/9 8/25
 9/11 9/13 11/12 12/8 12/15
 12/18 13/11 14/4 14/10 14/10
 14/14 14/18 15/16 16/9 16/13
 16/18 16/22 16/24 17/2 17/5
 26/13 26/20 27/6 28/6 28/16
 28/22 29/5 29/15 30/4 30/18
 31/5 31/9 31/17 31/21 32/5 33/6
 33/13 33/17 35/22 35/25 36/14
 37/12 38/23 42/2 43/16 43/19
 44/7 44/14 44/25 45/5 50/10
 50/19 55/2 55/8 61/11 62/20
 66/2 66/20 70/9
Mr. Budlow [3]  27/6 61/11 62/20
Mr. Grinder [39]  2/18 8/9 9/11
 9/13 11/12 12/8 12/15 12/18
 13/11 14/4 14/10 14/14 14/18
 15/16 16/9 16/13 16/18 17/2
 17/5 26/13 26/20 28/22 29/15
 30/4 30/18 31/5 31/17 31/21
 33/6 33/13 35/22 35/25 43/19
 44/7 45/5 50/10 50/19 55/2 55/8
Mr. Grinder's [16]  3/1 8/25
 14/10 16/22 16/24 28/6 28/16
 29/5 31/9 32/5 33/21 36/14
 37/12 42/2 44/14 44/25
Mr. Riley [4]  2/5 38/23 66/2
 70/9
Mr. Riley's [2]  43/16 66/20
Ms. [4]  15/10 28/2 43/12 48/9
Ms. Oyer [4]  15/10 28/2 43/12
 48/9
much [3]  22/12 65/9 73/4
multiple [1]  38/9
Murray [1]  73/1
must [5]  35/23 36/9 52/1 53/12
 64/14
muster [2]  58/2 59/12
my [12]  2/18 4/22 10/11 10/15
 26/2 41/8 42/9 49/14 49/18
 65/24 68/9 70/23
myself [1]  4/25

**N**

name [3]  3/18 3/18 44/7
named [3]  46/23 63/19 63/20
namely [1]  52/6
narcotics [2]  39/5 39/5
National [1]  6/16
nature [1]  32/25
navigate [1]  7/19
nearby [1]  17/17
nearly [1]  34/10
necessarily [2]  23/12 30/8
necessary [1]  20/16
necessity [1]  32/24
need [11]  25/17 30/12 39/15
 39/16 51/22 54/1 60/23 62/14
 62/15 64/22 73/5
needed [3]  4/23 6/18 22/10
needs [3]  34/22 44/5 66/12
Neglect [1]  6/2
neglected [1]  70/11
neighbor [1]  5/4
never [2]  63/6 63/6
new [5]  71/14 72/14 72/15 72/16

72/18
no [58]  5/4 5/5 9/12 9/21 14/6
 15/4 15/7 15/18 16/5 16/8 16/11
 16/14 16/17 16/23 16/25 17/16
 17/20 17/22 18/5 18/8 19/12
 19/14 19/18 19/20 19/22 31/23
 32/12 32/23 33/15 35/14 36/16
 37/15 41/6 44/6 44/25 47/22
 50/6 50/18 51/5 52/5 52/13 53/1
 53/19 54/23 55/2 57/2 57/14
 57/15 58/4 63/23 64/5 64/23
 65/14 65/21 67/15 67/20 70/4
 70/13
No. [1]  2/8
NORTHERN [1]  1/2
not [88]
Notably [1]  39/4
note [14]  24/16 25/14 27/13
 37/7 40/8 42/8 42/17 51/8 56/15
 60/10 61/8 61/21 63/5 65/24
noted [6]  31/11 40/16 62/21
 63/16 70/17 71/14
notes [1]  7/10
nothing [6]  31/3 40/17 55/22
 63/18 63/18 68/11
noting [3]  27/7 61/11 62/20
notion [3]  25/11 35/23 37/9
November [10]  8/6 8/21 11/15
 21/14 21/22 26/5 26/14 26/15
 26/15 28/14
November 27th [2]  21/22 26/5
November 28th [4]  8/6 21/14
 26/14 26/15
November 29th [3]  8/21 11/15
 26/15
now [18]  7/4 15/7 16/3 16/18
 17/5 17/11 17/23 22/8 23/11
 31/20 34/10 34/19 34/24 49/5
 53/15 55/24 56/3 59/3
number [2]  48/8 49/10
numerous [3]  6/16 7/11 10/16

**O**

oath [2]  18/22 67/12
object [1]  6/23
objects [2]  43/2 43/3
obtain [4]  22/11 24/10 61/5
 68/24
obtained [3]  24/12 24/12 68/10
obtaining [2]  6/18 68/13
obviously [3]  26/3 26/18 68/16
occasion [1]  6/9
occasions [1]  6/2
occupant [2]  43/1 43/16
occupied [2]  30/24 38/9
occurred [2]  26/14 62/24
occurring [1]  21/17
off [5]  12/16 13/4 21/19 48/10
 57/20
offense [5]  31/16 50/7 59/25
 66/8 67/1
offenses [6]  30/19 50/4 56/2
 57/16 59/10 59/24
office [9]  4/5 4/15 4/18 5/9
 10/16 12/20 17/25 49/9 63/8
officer [3]  34/22 55/23 70/4
officer's [1]  72/14
officers [2]  63/12 67/8
Official [2]  1/24 73/24
often [6]  23/15 49/18 49/22
 50/1 61/4 61/5

Case 1:17-cr-00226-CCB   Document 64   Filed 01/02/18   Page 31 of 81

**O**

Oh [1]   27/22
okay [35]   5/14 9/8 9/23 11/5
 12/1 15/20 15/23 18/13 19/7
 19/9 19/15 19/18 19/23 20/6
 22/21 23/5 23/23 27/5 27/11
 27/25 37/16 38/21 39/18 42/15
 46/18 47/12 48/20 56/12 62/14
 63/23 68/16 70/8 70/25 73/3
 73/11
old [6]   8/10 21/4 40/12 49/14
 49/19 72/17
older [1]   54/5
on-scene [2]   10/8 14/25
once [2]   46/6 53/17
one [36]   2/24 7/8 7/25 8/7 9/5
 10/1 14/20 15/5 19/5 19/6 22/24
 24/7 25/21 26/23 29/17 31/10
 35/6 35/18 36/7 40/13 41/8
 41/25 44/7 44/25 49/22 50/3
 51/10 54/22 58/22 62/17 64/5
 64/17 64/17 64/18 65/21 71/14
one's [3]   46/14 46/15 46/15
one-and-a-half-page [1]   44/25
ones [1]   50/15
online [3]   33/18 58/15 58/17
only [11]   12/4 31/15 33/1 33/2
 39/1 44/10 47/19 49/8 50/8
 56/18 67/9
opening [3]   60/13 60/16 60/20
opens [1]   56/8
opinion [1]   73/7
opposition [3]   23/20 27/7 27/10
order [9]   4/8 4/11 18/12 18/14
 18/18 35/7 53/6 58/14 58/17
ordering [2]   33/8 43/6
orders [1]   16/1
original [1]   28/7
other [24]   5/10 6/9 6/20 7/11
 7/16 16/22 16/24 19/18 27/2
 27/3 34/3 36/3 38/10 39/11 45/3
 47/8 48/8 52/11 52/14 54/13
 63/1 63/14 63/21 67/21
others [1]   38/19
otherwise [1]   55/9
our [20]   5/13 6/11 10/7 30/23
 32/15 34/10 36/6 37/15 44/3
 49/20 50/1 51/24 59/23 61/2
 65/2 67/7 68/22 71/7 72/7 72/7
out [15]   8/24 9/4 9/17 15/21
 29/18 41/3 45/13 52/20 53/8
 61/9 61/13 62/12 62/16 63/2
 72/7
outbuilding [1]   10/18
outline [1]   67/19
outlines [2]   59/10 59/11
outset [1]   56/15
outside [3]   15/17 17/11 45/25
over [15]   4/16 6/7 13/11 13/22
 14/1 14/10 14/14 14/25 19/5
 23/3 23/7 25/7 26/12 36/19
 50/20
overbreadth [3]   29/23 53/6 55/5
overbroad [3]   53/6 56/9 69/21
Overruled [1]   7/4
own [2]   31/1 73/2
owned [2]   42/23 54/24
owner [1]   24/3
owns [1]   55/2
Oyer [6]   1/18 2/17 15/10 28/2
 43/12 48/9

**P**

p.m [9]   2/2 9/25 12/8 14/24
 23/2 23/3 26/19 27/12 73/12
page [9]   23/13 23/20 27/7 27/11
 27/18 42/11 44/24 44/25 66/24
Page 2 [5]   23/13 23/20 27/7
 27/11 42/11
paper [1]   11/4
papers [9]   25/9 25/15 26/4
 27/10 33/12 40/9 41/9 42/9
 61/23
paragraph [5]   23/21 23/22 27/14
 66/21 66/23
Paragraph F [1]   27/14
parameters [1]   65/14
parked [5]   9/18 12/9 13/9 17/1
 26/20
part [2]   25/22 66/4
participating [1]   24/5
particular [14]   28/20 41/23
 51/12 51/13 53/11 53/20 59/10
 59/13 59/15 63/12 66/13 66/13
 68/1 70/6
particularity [4]   46/24 46/24
 55/19 59/19
particularly [3]   29/11 53/13
 56/21
parties [1]   2/22
party [2]   42/19 43/21
passed [1]   37/6
passes [1]   56/8
patrol [3]   4/19 4/21 5/10
Paul [4]   1/15 1/15 2/8 2/9
Paul Budlow [2]   1/15 2/9
Paul Riley [2]   1/15 2/8
pediatric [1]   71/20
pending [1]   29/1
penetrated [1]   21/15
penetrating [1]   71/23
penetration [1]   8/16
penis [2]   21/16 21/16
people [5]   23/13 30/10 49/9
 49/10 50/24
performing [2]   61/19 71/17
perhaps [4]   20/7 31/20 34/2
 48/15
periods [1]   49/25
permissible [3]   24/14 24/17
 25/12
permitted [1]   20/13
perpetrate [1]   23/14
person [19]   15/16 16/20 16/22
 23/16 24/23 28/6 28/16 29/5
 42/2 42/12 43/24 43/25 44/17
 44/20 45/1 46/22 48/24 62/10
 66/9
person's [1]   64/6
personal [3]   31/13 32/6 54/9
persons [1]   48/24
ph [1]   14/24
phone [149]
phones [21]   6/9 6/12 6/13 6/15
 6/21 7/16 10/24 22/2 27/20
 27/24 30/11 30/14 30/21 31/4
 31/12 31/15 35/5 36/3 38/8
 49/19 53/25
photo [1]   34/3 52/14
photographs [1]   66/7
photos [2]   32/13 32/24
physical [2]   5/16 18/7
physical abuse [1]   18/7

**picked** [1]   39/12

picked [1]   39/12
pictures [6]   39/10 40/11 58/5
 61/18 61/18 71/17
piece [6]   22/10 33/20 37/4
 39/19 60/11 60/12
pieces [1]   31/13
place [12]   23/17 29/2 33/22
 46/17 47/3 47/4 51/10 51/13
 53/13 63/19 64/15 65/20
places [1]   60/1
plain [1]   72/16
plainly [2]   54/12 60/8
Plaintiff [2]   1/3 1/14
PLAINTIFF'S [1]   73/14
planning [2]   2/22 2/24
play [1]   13/25
please [5]   2/4 3/11 3/14 3/17
 3/19
pocket [3]   29/18 46/5 46/6
podium [1]   3/9
point [19]   8/3 8/18 10/3 12/6
 17/20 19/19 39/12 40/13 41/8
 41/9 42/8 42/15 46/13 59/1 59/3
 59/14 62/4 72/6 72/22
pointed [1]   42/12
points [3]   31/10 38/25 39/4
police [20]   19/10 21/7 22/11
 29/3 30/17 34/17 37/13 44/14
 44/21 45/13 45/16 49/23 51/17
 52/13 53/17 55/5 55/11 55/25
 57/2 66/17
porch [6]   11/24 12/1 12/3 12/5
 12/7 12/16
pornography [12]   32/21 39/25
 40/5 41/5 62/1 62/9 62/15 63/1
 63/4 63/7 63/9 72/3
portion [1]   66/2
portray [1]   11/14
position [9]   25/10 25/22 37/8
 45/4 45/7 47/25 61/1 61/22 71/7
possession [2]   33/23 48/6
possessory [1]   37/14
possibility [1]   36/23
possible [2]   45/3 67/8
possibly [1]   50/9
post [5]   54/4 54/11 54/18 56/4
 70/3
post-Riley [5]   54/4 54/11 54/18
 56/4 70/3
potential [3]   7/6 9/12 13/3
potentially [5]   9/6 10/25 25/7
 50/12 60/19
precedent [1]   20/14
precisely [1]   20/12
predate [1]   54/6
prefer [1]   48/3
preliminary [2]   3/4 68/16
premises [3]   23/9 24/3 43/1
 44/22 63/19
present [10]   1/20 2/18 16/3
 16/6 18/9 18/25 25/12 31/22
 34/23 36/23
presented [1]   47/14
presenting [2]   2/22 2/24
preserve [3]   20/16 22/11 25/12
presses [1]   7/21
presumably [3]   21/20 35/8 58/13
pretty [2]   29/10 48/11
previewed [1]   69/2
previously [1]   68/6
primary [2]   35/11 41/14

Case 1:17-cr-00226-CCB   Document 154   Filed 01/02/19   Page 179 of 493

## P

prior [6]   18/25 68/12 71/23
  72/1 72/13 72/19
privacy [1]   36/3
probable [31]   22/5 24/5 24/22
  24/24 25/2 31/8 31/23 32/7
  32/10 32/13 32/20 33/24 34/5
  37/19 41/12 41/19 43/2 47/20
  47/21 51/18 54/19 54/23 56/19
  57/14 58/9 69/12 70/1 71/12
  71/13 71/15 72/2
probably [2]   26/24 33/13
problem [7]   33/4 34/19 47/2
  50/16 53/10 55/4 55/18
problematic [1]   67/25
problems [2]   28/11 68/3
proceeded [1]   61/1
proceeding [2]   18/9 18/12
proceedings [2]   18/21 73/20
process [2]   10/11 21/3
produced [1]   62/25
proper [1]   65/22
property [9]   22/10 22/14 23/15
  24/13 31/13 42/12 44/9 46/7
  54/9
proposition [4]   24/21 25/16
  28/25 39/23
protections [1]   36/2
protective [5]   4/8 4/11 18/12
  18/14 18/17
provide [2]   8/14 71/15
provided [2]   26/13 26/15
Public [1]   1/19
pulled [1]   12/15
purchase [7]   33/13 39/13 50/20
  51/6 51/19 57/20 70/19
purchased [1]   52/7
purchases [2]   34/1 52/12
purchasing [2]   26/11 50/11
purposes [1]   53/7
pursuant [7]   20/2 40/23 44/1
  44/19 45/10 48/6 69/2
pushed [1]   21/16
put [5]   37/1 46/3 61/7 61/19
  67/11
putting [1]   71/18

## Q

qualified [1]   48/24
qualitative [1]   54/7
qualitatively [1]   31/12
quantitative [1]   54/7
quantitatively [1]   31/12
quantities [1]   53/24
quarters [1]   12/9
question [5]   29/11 37/3 43/9
  58/8 65/17
questions [7]   8/2 15/7 19/12
  26/1 41/21 63/21 72/1
quickly [1]   7/22
quite [3]   25/5 38/1 45/21
quote [7]   22/10 23/15 59/17
  59/18 59/19 60/6 61/19

## R

raise [1]   3/11
Ramirez [3]   44/2 46/2 67/5
range [1]   6/3
ranging [2]   52/2 52/3
rape [4]   40/2 40/10 59/24 63/1
RCR [1]   73/15

RDR [4]   1/23 73/15 73/18 73/23
read [7]   6/12 66/2 66/5 66/4
  66/21 66/23 67/3
readily [2]   35/24 36/13
reading [1]   67/10
ready [2]   3/5 28/21
really [8]   29/6 33/17 36/1 37/2
  41/17 52/8 58/2 67/17
Realtime [1]   73/24
rear [1]   9/20
reason [7]   15/23 35/10 35/12
  35/12 46/16 56/24 71/25
reasonable [2]   32/5 57/7
reasonably [7]   30/14 35/16 38/7
  45/1 63/12 70/5 73/8
reasoning [1]   32/22
reasons [2]   21/1 69/17
recall [2]   10/5 12/12
receipts [1]   52/10
receive [1]   11/22
received [3]   8/6 8/21 9/15
recent [1]   36/3
recently [2]   18/9 22/12
recognize [2]   11/9 53/23
recognized [1]   54/4
record [2]   3/18 73/20
recorders [1]   66/7
recover [1]   49/24
recovered [1]   20/19
reference [1]   49/3
referenced [1]   42/8
referencing [2]   12/1 66/12
referred [1]   59/7
referring [1]   12/3
reflect [1]   73/5
regard [2]   33/5 71/5
regarding [5]   38/24 39/5 43/7
  65/2 71/9
regardless [2]   45/4 68/25
Registered [1]   73/23
relate [2]   38/14 60/21
related [4]   24/16 32/18 36/23
  40/4
relates [5]   18/6 42/11 60/14
  60/14 65/16
relating [1]   60/6 66/25
relation [3]   55/21 59/21 66/21
relevance [1]   6/23
relevant [4]   7/1 29/2 29/6
  53/22
reliance [3]   69/13 69/16 70/2
relied [3]   70/5 73/1 73/7
relies [2]   55/16 63/16
rely [5]   25/9 35/17 41/12 41/18
  63/13
relying [2]   45/22 58/11
remotely [1]   51/16
repeat [1]   26/21
reported [3]   1/22 21/6 33/21
Reporter [4]   1/24 73/23 73/24
  73/24
reports [2]   4/24 22/22
request [1]   17/3
requests [1]   13/11
required [1]   46/16
requirement [8]   46/24 51/15
  53/12 55/20 56/17 56/19 59/20
  64/13
requirements [1]   51/10
residence [51]   9/1 9/2 9/4 9/17
  9/18 9/19 10/9 10/19 11/12

11/21 12/20 13/2 14/19 14/21
  15/23 16/9 16/12 16/17 26/19
  27/23 28/14 28/15 29/4 30/4
  30/21 32/3 32/6 33/5 38/8 38/20
  43/17 43/18 43/23 44/1 44/15
  44/20 45/8 46/15 49/2 49/17
  49/22 49/23 50/21 51/2 52/5
  54/14 55/6 55/8 56/8 64/4 70/1
residents [2]   49/12 49/25
respect [9]   5/23 6/14 7/13
  20/10 24/25 30/22 31/1 57/14
  57/25
respects [1]   28/4
respond [8]   4/24 5/3 8/24 9/4
  43/13 56/13 63/25 72/5
responded [5]   5/4 8/8 9/17
responding [3]   4/23 5/1 9/9
responsibilities [1]   4/21
responsive [3]   21/23 43/9 57/22
rest [1]   67/2
result [4]   4/8 18/2 45/3 61/10
results [1]   50/2
retrieved [1]   17/2
Reuben [1]   8/7
revealed [1]   71/22
Rick [2]   1/21 2/11
Rick Federico [2]   1/21 2/11
rid [1]   72/1
right [26]   2/14 2/18 2/19 3/3
  3/11 4/6 4/9 6/25 12/2 15/7
  15/9 17/1 20/9 27/24 28/2 38/1
  42/3 42/5 46/7 47/12 48/14
  58/25 59/5 62/3 68/21 69/4
Riley [23]   1/15 2/5 2/8 22/13
  25/9 25/15 25/15 31/11 36/3
  37/8 37/8 38/23 54/4 54/6 54/11
  54/18 56/4 58/22 58/23 65/25
  66/2 70/3 70/9
Riley's [2]   43/16 66/20
risk [2]   20/23 22/6
river [1]   25/6
road [1]   60/24
roaming [1]   9/6
robust [1]   61/7
role [2]   4/18 6/8
room [1]   9/20
routine [1]   54/9
routinely [1]   53/1
Royce [1]   14/24
rule [2]   34/16 47/13
run [1]   25/6

## S

said [16]   15/24 21/14 24/25
  26/20 30/16 35/20 35/25 36/16
  41/8 42/18 43/19 53/21 57/12
  58/4 62/14 68/5
sake [2]   37/23 46/10
same [11]   26/3 26/16 27/18 39/5
  42/8 48/2 48/21 55/7 57/11
  68/14 69/1
Samsung [1]   30/12
sat [1]   14/8
satisfied [1]   51/16
saw [1]   68/1
say [14]   13/17 13/21 14/15 24/9
  24/10 26/6 41/22 43/7 45/20
  47/16 49/6 53/16 67/15 67/17
saying [3]   55/11 61/15 61/25
says [8]   23/13 26/16 27/18 36/8
  55/19 66/17 66/24 67/21
scene [10]   10/4 10/8 11/24

**S**

scene... [7]   14/25 16/3 16/6
17/18 17/21 35/15 36/17
scope [8]   32/2 34/12 38/13
42/20 48/10 50/13 58/1 65/12
screen [1]   7/20
search [166]
search warrant [77]
search warrants [3]   5/7 10/17
70/5
search-and-seizure [2]   10/10
10/21
searched [19]   25/16 33/5 37/5
37/13 43/2 43/25 45/9 47/3 47/5
51/10 53/13 59/11 60/1 61/24
61/25 64/15 68/10 68/12 70/14
searches [4]   7/11 50/2 52/17
54/1
searching [7]   27/23 33/10 46/14
48/4 52/8 52/25 53/18
seat [1]   14/8
seated [3]   2/3 2/5 3/14
second [2]   59/25 66/25
second-degree [1]   66/25
seconds [3]   7/25 25/5 35/6
sections [1]   66/9
secure [2]   8/25 9/2
secured [3]   9/22 11/23 14/16
securing [1]   12/20
Security [2]   2/11 2/12
sedan [1]   12/12
see [16]   3/3 6/25 7/15 26/2
26/24 28/18 30/8 41/22 44/7
45/20 47/8 52/20 56/21 60/13
60/14 64/7
seeing [3]   46/1 46/8 60/21
seek [1]   72/14
seeking [2]   29/4 29/5
seem [1]   33/12
seems [2]   33/9 43/22
seen [1]   29/11
seize [18]   22/9 24/11 25/19
30/17 34/18 37/21 38/8 47/18
48/23 55/6 55/11 55/25 58/9
64/8 66/17 67/10 67/20 69/21
seized [36]   2/25 15/17 20/22
25/18 27/16 33/5 34/24 38/20
39/18 39/19 40/15 40/17 40/18
45/10 47/1 47/6 48/21 50/6
50/15 53/14 53/15 53/16 55/21
56/8 56/18 56/25 59/12 59/21
60/5 60/7 63/14 63/19 66/13
67/13 67/15 68/18
seizing [2]   34/22 37/25
seizure [29]   10/10 10/14 10/21
20/8 20/10 20/11 20/15 22/15
24/17 24/25 25/11 25/23 27/15
27/19 27/20 28/6 28/8 30/2
30/14 30/20 30/25 31/4 31/7
34/9 34/10 34/15 40/20 48/1
50/9
sense [3]   20/3 20/7 41/23
sent [1]   10/8
separate [3]   28/19 29/25 67/25
separately [1]   29/24
Sergeant [9]   8/22 9/8 9/16
14/18 15/24 16/1 16/3 16/6
41/16
Sergeant Day [7]   9/8 9/16 14/18
15/24 16/3 16/6 41/16
Sergeant Day's [1]   16/1

Sergeant Glen Day [1]   8/22
service [1]   4/25
setting [3]   30/1 34/14 50/23
several [1]   41/24
sex [14]   23/15 39/24 40/2 40/2
40/4 40/5 40/9 58/5 59/25 60/15
62/1 62/22 66/25 71/24
sex abuse [12]   23/15 39/24 40/2
40/2 40/4 40/5 40/9 58/5 60/15
62/1 62/22 66/25
sexual [8]   5/17 5/17 5/17 6/20
21/5 22/1 67/1 71/20
sexual abuse [4]   5/17 5/17 6/20
21/5
sexual assault [2]   5/17 71/20
sexually [4]   8/10 20/18 39/10
40/11
sexually abused [1]   8/10
sexually abusing [1]   20/18
shared [1]   57/5 55/8
she [3]   21/14 65/12 70/21
Sheriff [1]   10/16
Sheriff's [8]   4/5 4/15 4/18 5/9
10/16 12/20 17/25 26/7
Sheriff's Office [7]   4/5 4/15
4/18 5/9 10/16 12/20 17/25
shift [2]   8/1 10/7
shop [1]   33/18
should [3]   48/16 64/2 68/8
shouldn't [1]   57/13
show [3]   11/25 45/8 51/14
showing [8]   11/7 54/23 64/11
64/14 64/22 64/23 65/1 65/4
shown [2]   51/20 52/11
shows [1]   55/18
shuffle [1]   42/9
sic [3]   37/10 57/22 58/1
side [2]   12/18 19/21
sides [2]   20/8 73/4
signed [9]   3/2 10/12 20/13
22/18 22/19 23/1 23/11 26/25
63/6
similar [4]   30/22 54/21 69/19
69/23
similarly [1]   55/1
simply [7]   25/15 36/21 40/15
44/17 45/10 56/9 70/12
since [1]   54/4
sincerity [1]   37/3
single [4]   44/7 49/17 50/3
60/13
sir [14]   4/2 5/24 6/22 7/17 8/6
10/5 11/9 11/10 11/18 13/7 14/6
15/4 19/12 19/15
sit [1]   40/14
sitting [5]   29/16 29/18 29/21
30/3 44/15
situation [7]   20/15 24/15 29/12
30/19 37/17 37/20 38/3
slightly [1]   49/13
slim [1]   38/18
small [1]   12/4
so [52]   9/12 11/3 11/19 11/22
12/4 12/22 13/8 15/16 15/24
17/12 20/3 21/1 23/3 23/6 24/20
24/23 25/20 25/22 26/15 30/16
34/25 35/16 35/22 38/11 39/18
40/2 41/14 43/7 44/23 47/10
48/15 49/1 49/21 50/11 50/16
51/2 51/13 53/5 54/5 55/10 60/8
62/12 64/16 67/1 68/13 68/19

69/9 69/12 69/15 71/25 72/7
73/14
some [17]   8/1 8/17 25/8 26/12
29/12 31/18 37/4 37/11 38/2
50/11 52/6 55/17 57/5 58/14
64/11 64/22 73/6
somebody [5]   5/3
somehow [2]   45/2 45/5
someone [2]   62/6 71/24
someone's [1]   30/8
someplace [1]   45/24
something [6]   28/20 30/4 30/16
31/25 39/14 46/9
sometimes [2]   50/2 50/4
somewhere [2]   22/23 47/23
son [1]   49/14
soon [1]   73/8
sophisticated [1]   52/17
sorry [5]   23/18 23/22 26/14
36/7 42/9
sort [12]   7/6 7/7 25/14 39/11
39/19 47/8 47/21 50/11 54/10
58/14 58/18 66/4
sought [2]   41/4 72/17
speak [1]   3/17
speaking [4]   4/20 7/24 8/19
58/17
Special [2]   1/21 2/10
Special Agent [1]   2/10
specialized [2]   5/22 6/14
specific [23]   5/25 10/20 16/12
30/3 30/6 34/21 36/9 36/11
47/11 49/2 50/7 51/5 51/5 51/18
52/25 53/8 56/18 59/14 60/14
64/10 64/11 64/21 71/1
specifically [11]   24/7 27/15
44/1 44/19 46/10 46/25 59/12
62/9 62/16 63/4 67/19
specified [3]   54/25 56/2 67/14
spell [1]   3/18
spelled [1]   45/13
spoke [1]   19/5
standards [1]   4/23
standing [1]   12/17
stands [4]   24/21 25/15 39/23
71/25
stark [1]   66/15
started [1]   53/23
state [14]   3/18 23/13 40/23
56/9 58/1 61/2 61/3 61/6 61/24
62/4 63/5 64/17 65/8 71/20
State's [1]   18/4
stated [4]   13/24 15/18 30/19
35/12
statement [4]   34/5 48/22 54/23
71/16
STATES [5]   1/1 1/3 1/16 2/7
18/24
status [3]   4/6 4/17 10/10
statutes [1]   66/13
stayed [1]   36/17
stenographic [1]   73/20
step [1]   59/4
stepdaughter [1]   8/10
stepped [1]   12/16
steps [3]   12/14 52/20 64/16
still [6]   24/23 45/9 48/3 51/21
71/11 72/2
stomp [1]   25/5
stop [1]   62/4
stopped [1]   62/12
storage [7]   27/21 37/1 48/25

Case 1:17-cr-00226-CCB    Document 64    Filed 01/02/18    Page 181 of 493

**S**

storage... [4]   59/18 60/3 66/6
66/18
store [4]   22/2 31/14 53/25 54/8
stored [2]   10/25 49/21
street [2]   1/24 9/18
stronger [1]   37/18
stuff [1]   65/11
subdue [1]   8/17
subject [5]   12/24 18/3 24/3
43/20 44/18
submit [1]   71/3
submitted [1]   52/19
subsequent [3]   28/8 64/9 68/5
subsequently [1]   70/21
substances [1]   21/19
substantially [1]   53/6
such [3]   6/15 61/16 64/23
sufficiency [2]   71/2 71/4
sufficient [11]   32/19 42/1 44/5
54/6 56/4 56/5 60/8 66/19 67/4
71/11 71/13
sufficiently [4]   51/3 53/8
53/11 59/13
suggest [2]   33/10 51/2
suggesting [1]   45/24
suggestion [1]   45/23
suggests [1]   39/1
suitcase [1]   54/9
superseding [1]   20/21
superseding indictment [1]
20/21
supervise [2]   4/22 8/7
supervisor [8]   4/19 4/21 5/10
8/22 9/8 34/25 35/8 35/13
support [1]   55/16
supports [3]   25/10 37/8 37/9
suppose [4]   29/14 29/14 29/16
62/2
supposed [7]   45/13 45/16 46/25
57/8 65/10 67/18 67/19
suppress [1]   2/20
Supreme [9]   20/13 22/8 22/12
24/18 25/11 34/20 51/25 54/4
57/12
Supreme Court [7]   20/13 22/12
25/11 34/20 51/25 54/4 57/12
Supreme Court's [2]   22/8 24/18
sure [17]   3/10 9/5 9/11 11/2
16/9 20/4 27/22 29/11 35/7
41/22 43/11 45/18 47/10 48/4
56/4 58/7 61/4
surrounded [1]   50/23
survive [4]   65/25 69/22 71/13
72/19
suspect [10]   7/18 28/20 30/15
30/24 34/17 43/23 44/22 45/6
45/11 45/12
suspected [1]   26/11
suspended [6]   4/6 4/17 17/24
19/10 40/25 41/2
swab [1]   44/14
sweeping [4]   31/8 38/7 48/22
51/23
sweepingly [1]   30/20
swipes [1]   7/21
swore [2]   61/9 61/13
SWORN [1]   3/13
system [3]   6/11 6/12 7/20
systems [2]   59/17 66/6

**T**

table [3]   2/10 29/19 29/22 30/4
46/4
tailor [2]   52/5 53/19
tailored [5]   38/14 51/22 52/1
53/2 54/2
taint [3]   71/5 72/19 72/25
tainted [4]   65/3 68/6 71/8
71/12
take [15]   7/24 12/14 16/22
16/24 27/1 35/18 39/10 44/14
45/4 45/7 45/21 47/20 61/18
61/18 71/17
taken [4]   29/17 32/24 37/18
48/2
taking [3]   29/19 29/21 46/9
talked [1]   58/19
talking [3]   49/8 49/10 64/13
talks [1]   65/23
team [1]   67/12
technicians [1]   11/24
telephone [1]   27/16
tell [1]   9/8
tells [2]   26/6 26/7
temporarily [5]   22/9 22/10 23/6
24/13 28/25
temporary [6]   20/12 22/14 24/14
25/1 34/9 37/9
ten [1]   57/6
term [1]   5/1
terms [2]   52/24 66/16
test [1]   72/13
testified [7]   17/23 18/21 21/25
23/2 25/4 34/24 35/3
testimony [8]   18/14 18/18 19/1
19/4 26/5 26/16 26/18 26/21
text [11]   7/10 26/12 31/18
31/22 32/12 33/2 33/2 39/3 39/4
43/7 58/19
text messages [10]   7/10 31/18
31/22 32/12 33/2 33/2 39/3 39/4
43/7 58/19
than [4]   47/25 48/6 58/5 68/7
Thank [21]   2/14 3/22 15/9 15/11
19/12 19/15 19/16 19/20 28/1
38/22 45/19 46/18 56/12 63/23
63/24 70/8 72/4 73/4 73/9 73/10
73/11
that [526]
that's [53]   4/8 4/10 5/8 18/2
19/25 20/9 22/13 26/10 27/4
27/18 28/19 28/20 29/25 30/23
30/24 34/4 36/19 36/21 38/3
38/8 39/8 39/14 40/5 40/22 41/6
43/11 44/10 46/8 46/16 48/14
49/6 49/21 50/16 51/22 51/23
52/16 54/4 56/5 56/11 57/24
59/1 59/4 59/22 60/6 60/7 60/15
62/3 63/22 65/13 66/19 67/4
67/6 68/21
their [22]   4/23 4/24 22/2 23/16
23/17 23/17 25/9 33/12 37/8
42/12 43/23 44/13 44/18 45/20
50/24 50/24 52/23 53/18 55/16
55/21 59/21 73/2
them [17]   4/23 16/20 19/3 19/4
19/5 19/5 19/7 19/9 20/3 24/11
25/13 41/25 45/21 45/24 48/11
64/8 64/10
themselves [1]   32/19
then [20]   3/3 19/23 20/9 22/14

**T... continued**

22/24 26/9 26/23 26/25 30/5
35/16 35/17 38/24 49/13 41/4
51/21 55/17 60/23 64/9 68/18
70/19
theory [2]   44/13 47/20
there [9]
there's [28]   3/3 12/2 22/24
28/11 31/3 32/16 32/17 32/23
33/15 41/11 46/14 48/3 49/5
50/18 51/4 52/13 54/3 55/2
55/17 57/2 57/6 57/14 57/15
58/4 64/5 66/23 68/11 72/1
therefore [1]   29/6
these [12]   10/22 22/4 39/5 51/7
52/17 53/25 55/9 55/10 55/12
58/23 60/6 67/14
they [64]   5/16 9/6 10/11 10/17
21/13 21/22 23/7 23/8 24/13
24/23 25/9 25/13 26/14 28/10
28/21 28/21 28/23 29/5 29/14
30/7 30/7 30/11 30/12 31/14
32/12 33/12 34/8 37/2 37/18
37/23 38/1 40/5 40/18 40/19
40/21 44/16 44/23 45/4 45/7
45/8 45/23 46/7 49/3 49/4 50/25
51/13 51/20 51/21 52/3 52/9
53/16 54/8 54/22 57/8 63/12
64/9 64/21 64/22 65/10 67/14
67/17 68/18 68/19 68/20
they'll [1]   10/23
they're [9]   9/5 29/1 41/25 46/6
52/21 64/16 67/9 67/18 67/20
thing [2]   26/23 54/10
things [6]   27/3 53/14 53/15
53/16 58/14 64/21
things-to-be-seized [1]   53/15
think [71]   20/1 22/23 26/4
26/12 26/20 26/23 28/10 28/11
29/10 29/20 30/11 30/13 31/10
32/3 32/9 32/22 32/25 33/19
35/11 35/16 36/4 36/10 36/21
37/16 37/17 37/20 38/4 38/6
38/11 39/1 40/16 42/25 43/1
44/24 45/3 46/13 46/16 47/17
47/24 48/19 52/18 53/10 54/3
54/5 54/11 54/16 55/18 57/10
57/16 57/24 59/5 59/9 61/22
61/25 64/2 65/7 65/25 66/20
67/2 67/4 67/5 67/22 67/23
68/13 69/8 69/17 70/3 70/12
71/4 72/16 72/18
thinking [1]   67/6
third [3]   21/8 42/19 43/21
thirds [1]   12/9
this [113]
thorough [1]   73/3
thoroughly [1]   48/11
those [21]   9/15 16/20 18/21
21/6 21/10 22/2 22/3 22/24
25/15 28/11 33/25 43/3 43/5
50/4 53/17 60/5 60/7 60/21
64/20 69/17 70/19
though [2]   22/5 32/1
threats [1]   66/8
three [4]   12/9 37/1 47/24 49/12
three-quarters [1]   12/9
through [2]   34/3 73/6
Throughout [1]   10/15
throw [2]   25/6 25/6
tie [2]   50/6 51/5
tied [1]   50/4
time [24]   5/9 7/23 8/3 8/18

Case 1:17-cr-00226-CCB Document 24-2 Filed 01/02/18 Page 72 of 88

**T**

time... [20]   9/23 10/3 10/5
  12/6 13/3 14/22 15/2 16/6 17/2
  19/5 19/6 27/8 34/23 36/18 37/5
  38/2 46/1 48/2 49/25 56/21
timeline [1]   26/2
times [1]   19/3
timing [1]   65/16
tired [2]   21/23 57/23
today [2]   19/1 19/4
told [6]   8/15 14/4 21/15 34/25
  41/16 61/17
too [9]   24/16 25/14 25/20 27/13
  48/16 61/8 61/21 63/5 65/9
took [5]   15/23 16/3 16/18 16/20
  65/20
topics [1]   6/3
Toshiba [2]   40/23 51/18
towards [1]   9/20
traffic [1]   4/25
training [5]   5/22 6/14 6/19
  10/15 70/4
trainings [1]   6/16
transcript [1]   73/19
trauma [1]   71/23
tremendous [2]   44/13 45/16
trouble [1]   46/8
true [1]   72/24
trying [2]   57/8 64/16
turn [2]   19/23 20/9
turned [1]   36/19
TV [2]   61/20 71/18
twice [1]   63/20
two [17]   5/21 6/2 6/4 7/25 8/24
  12/9 19/8 19/9 21/17 35/6 44/24
  49/13 49/14 50/2 57/6 64/16
  64/18
two-page [1]   44/24
two-thirds [1]   12/9
type [10]   5/14 8/17 10/17 20/12
  52/15 52/16 65/9 65/15 69/20
  72/8
types [4]   10/22 53/20 53/21
  53/24
typically [3]   13/25 47/9 64/7

**U**

U.S. [6]   2/8 32/18 55/15 63/8
  69/24 72/11
U.S. Attorney's [1]   63/8
U.S. Attorneys [1]   2/8
U.S. v. Doyle [2]   32/18 69/24
U.S. v. Hill [1]   72/11
U.S. v. Williams [1]   55/15
unattended [1]   5/5
uncomfortable [1]   65/12
uncovered [1]   50/25
under [19]   4/22 9/14 13/19
  18/21 24/17 25/1 36/3 44/11
  44/13 46/10 47/18 53/19 54/20
  56/9 60/8 61/1 61/3 65/10 67/11
underscores [1]   65/8
understand [2]   22/22 58/11
understanding [5]   10/11 10/13
  10/20 61/23 68/9
understood [2]   45/21 71/6
undertaking [1]   33/22
Unit [1]   5/13
UNITED [5]   1/1 1/3 1/16 2/7
  18/24
United States [2]   2/7 18/24

universe [1]   70/3
CRB "ft...
unless [4]   3/3 25/25 41/21
  63/21
unlimited [1]   54/12
unreasonable [3]   69/13 69/16
  70/2
until [8]   22/11 34/11 37/24
  40/21 61/12 65/21 68/10 68/20
unusual [1]   49/23
up [12]   11/25 12/10 24/9 32/1
  39/12 45/8 56/8 60/13 60/16
  60/20 66/24 71/1
upheld [1]   59/16
upon [2]   41/12 73/1
us [2]   2/10 7/23
use [5]   3/9 26/11 30/10 31/1
  39/13
used [24]   6/12 8/17 16/13 16/16
  30/15 30/18 31/5 33/13 33/16
  35/22 35/25 39/6 39/7 49/3 49/4
  51/19 57/18 57/20 57/21 58/14
  61/17 70/19 70/19 71/16
using [9]   5/1 21/19 33/6 39/14
  49/11 50/19 52/24 56/23 64/6

**V**

v. [9]   32/16 32/18 44/2 46/2
  51/24 55/15 67/5 69/24 72/11
vagina [1]   71/23
valid [7]   38/7 38/12 38/13
  38/15 65/6 68/24 69/2
valuable [2]   20/16 22/7
value [1]   7/7
various [1]   2/20
vast [1]   53/24
vehicle [12]   12/11 12/15 12/17
  12/18 16/24 17/1 28/17 28/19
  28/22 28/23 29/6 46/15
vehicles [1]   23/17
versus [2]   2/7 54/8
very [27]   4/20 7/19 7/22 12/4
  12/4 14/3 17/8 22/3 22/7 30/22
  36/15 38/17 38/17 38/18 40/6
  44/8 44/21 48/22 51/1 52/17
  57/24 66/11 67/8 69/19 72/5
  73/3 73/4
victim [8]   21/23 31/19 39/7
  57/22 57/24 61/17 62/10 62/11
victim's [2]   57/21 71/16
video [3]   34/3 52/14 66/6
videos [2]   32/14 32/24
videotapes [1]   66/6
view [3]   34/10 37/15 72/7
viewing [1]   52/22
violations [1]   66/14
Virgin [1]   32/16
Virgin Islands v. John [1]
  32/16
Virginia [1]   66/10
Virginia Code [1]   66/10
virtually [1]   48/2

**W**

wait [3]   13/23 49/6 58/7
waited [3]   11/23 17/11 17/17
waiting [2]   12/7 14/17
walked [1]   12/16
wallet [1]   54/9
want [22]   2/5 8/1 13/3 29/23
  33/10 34/7 37/7 39/21 41/24
  42/6 47/14 48/8 49/16 50/25

51/8 55/14 56/13 63/10 64/21
wants [1]   46/17
warrant [220]
warrants [5]   5/7 10/17 22/24
  61/6 70/5
was [187]
wasn't [5]   22/23 24/12 46/5
  46/22 63/7
way [11]   9/5 9/12 12/10 28/3
  35/18 53/2 56/7 57/2 64/5 67/3
  70/4
WAYNE [1]   1/5 2/7
ways [3]   29/12 52/18 52/24
we [47]   2/19 6/12 9/11 10/6
  11/23 12/20 12/22 12/23 13/3
  22/14 26/21 28/18 31/10 41/18
  43/5 43/5 43/6 47/11 48/3 48/15
  48/15 48/16 49/7 50/1 53/9
  58/18 60/25 61/1 61/2 61/2 61/4
  61/5 61/5 61/11 61/12 61/13
  61/13 62/14 62/15 62/20 64/7
  64/13 67/15 68/1 68/19 70/17
  72/1
we'll [2]   6/25 19/23
we're [5]   2/13 3/5 47/24 49/7
  49/10
we've [3]   26/20 58/8 72/11
Web [1]   7/11
week [1]   19/7
weighs [1]   36/22
weight [1]   54/6
well [37]   2/19 5/17 6/7 6/25
  12/25 20/1 20/13 21/16 24/9
  30/24 32/1 32/4 32/9 33/9 34/22
  35/3 35/11 38/4 38/9 38/19
  44/22 46/13 47/12 48/1 48/14
  48/19 49/12 50/22 53/25 54/13
  62/14 65/2 65/24 67/3 69/7
  69/11 70/24
well-established [1]   20/13
went [4]   12/23 17/2 30/7 67/15
were [50]   5/19 6/6 8/9 8/12
  8/16 8/18 9/21 10/1 10/11 10/21
  11/23 12/7 12/20 13/5 14/9
  14/13 16/1 16/7 16/20 17/17
  17/20 18/9 19/10 25/20 26/14
  29/4 29/5 30/14 30/17 33/23
  34/14 35/1 36/22 39/18 40/3
  40/4 40/5 52/4 52/8 56/1 56/5
  56/16 57/21 63/12 64/13 65/18
  67/14 68/9 70/19 71/8
Westminster [3]   11/13 44/10
  54/15
what [62]   4/17 4/20 5/1 5/14
  7/6 7/7 8/11 8/14 9/2 9/15 9/23
  10/5 10/9 10/13 10/20 11/11
  11/19 12/14 12/14 13/16 13/21
  13/24 14/1 14/17 14/22 16/12
  20/11 22/13 26/4 28/22 29/17
  33/7 33/17 34/8 35/14 39/12
  40/10 41/6 41/16 41/17 42/12
  46/25 47/10 49/3 52/3 59/11
  59/22 60/15 60/23 62/3 62/8
  62/14 62/22 64/2 64/7 64/25
  65/15 66/2 66/4 66/16 67/17
  72/9
what's [8]   11/7 44/3 44/4 45/12
  57/10 60/5 60/7 61/22
whatever [2]   30/9 57/6
whatsoever [2]   45/1 70/16
when [40]   4/23 5/1 8/3 8/18

**W**

when... [36]   10/2 10/3 10/9
12/6 12/23 14/1 14/10 14/14
15/17 16/3 16/6 16/10 16/20
17/11 19/9 23/7 25/16 26/10
26/24 26/25 29/14 30/7 35/17
35/24 44/16 45/8 46/9 55/20
55/22 57/2 59/20 60/11 62/5
62/6 62/8 62/24
whenever [1]   34/16
where [26]   4/4 7/20 8/9 10/25
14/7 22/10 22/24 24/22 25/12
27/17 27/18 28/18 29/1 30/23
37/12 42/19 45/5 50/23 56/21
56/22 59/10 59/11 59/11 63/19
69/8 72/8
wherever [1]   7/19
whether [7]   16/15 29/7 33/6
46/22 67/13 68/25 72/13
which [34]   5/25 6/2 6/11 13/9
21/23 24/18 28/15 31/21 32/17
32/18 35/4 35/8 36/7 37/19
37/24 40/19 47/21 47/25 52/19
53/9 54/17 54/18 55/6 55/14
59/6 63/6 64/5 65/23 69/20
69/24 69/24 70/14 71/19 72/11
while [6]   12/7 16/8 17/17 17/20
37/10 44/15
White [1]   6/17
who [13]   2/18 2/25 12/19 18/25
23/14 24/1 31/1 33/21 43/19
62/6 62/10 64/5 64/5
who's [3]   8/7 30/9 45/12
whom [3]   24/4 24/4 49/4
whose [4]   57/3 57/4 57/8 57/9
why [8]   13/1 13/8 30/6 30/7
46/8 46/8 56/24 70/25
wide [3]   6/3 52/2 52/3
wide-ranging [2]   52/2 52/3
wife [12]   4/12 18/7 18/14 21/5
21/6 31/17 33/21 50/22 55/8
56/22 56/23 58/19
wife's [1]   18/10
will [6]   10/22 29/17 45/20
47/16 64/9 73/7
William [1]   3/20
Williams [10]   55/15 55/17 55/19
55/25 59/6 59/8 59/9 60/9 60/10
65/23
willing [1]   67/11
within [14]   10/18 13/10 20/20
23/8 23/9 24/6 34/12 35/6 42/4
45/22 46/4 49/7 50/12 60/3
without [8]   29/8 31/1 33/5
40/17 49/3 65/5 66/16 67/10
witness [6]   2/24 3/6 3/12 11/1
19/17 73/15
woman [1]   21/24
won't [2]   26/21 72/8
words [2]   5/25 66/23
work [7]   4/4 4/23 5/14 7/13
7/14 11/4 50/25
worked [2]   4/14 50/23
working [1]   11/3
world [1]   56/4
would [46]   4/24 7/18 13/24
13/24 16/9 20/3 20/23 29/19
29/20 30/5 30/6 30/7 30/19 32/4
32/13 35/8 35/14 36/11 36/24
37/16 37/18 42/7 42/14 42/17
44/13 47/8 48/3 48/17 49/11

50/9 50/12 51/21 52/11 56/4
56/17 56/21 67/11 67/18 67/17
68/21 70/23 71/5 71/11 71/11
71/12 71/13
wouldn't [3]   46/8 49/23 67/2
written [1]   10/16
wrong [1]   51/4

**Y**

Y-E-N-G-E-L [1]   36/8
year [4]   8/10 21/4 40/12 49/14
years [4]   4/16 5/21 6/4 21/17
Yengel [2]   36/6 36/8
yes [52]   2/6 2/23 3/10 3/20 4/3
5/24 6/22 7/17 8/6 10/5 10/15
11/10 11/16 11/18 12/12 13/7
15/6 15/22 15/25 16/2 16/19
16/21 17/4 17/7 17/10 17/13
17/19 18/1 18/16 18/20 18/23
19/2 19/8 19/11 25/25 27/3
27/11 27/22 41/2 42/2 42/14 43/15
43/22 48/16 56/14 58/10 58/12
58/16 58/21 62/5 62/5 64/1 71/6
yet [1]   48/15
you [160]
you're [7]   4/6 5/1 12/1 12/3
17/23 38/1 58/11
you've [3]   26/23 47/14 48/11
young [1]   21/24
your [163]
Your Honor [124]
Your Honor's [1]   59/5

**Z**

Zweizig [3]   1/23 73/18 73/23

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| United States of America | * | |
| | * | |
| v. | * | Criminal No. CCB-17-226 |
| | * | |
| Eric Wayne Grinder | * | |
| | * | |
| | *** | |

### Memorandum

The defendant, Eric Wayne Grinder, ("Grinder"), has been indicted by the United States on eight counts: (1) five counts of production of child pornography; (2) two counts of possession of child pornography; and (3) one count of witness tampering. (ECF No. 20). Grinder has now moved to suppress evidence obtained from a laptop and cell phone searched and seized under state and federal warrants. (ECF No. 33). For the reasons stated below, Grinder's motion will be denied.

### Background

The following facts are based on the testimony and exhibits presented in connection with an evidentiary hearing held January 26, 2018. On November 27, 2016, a 10-year-old girl, referred to as Minor Victim by the government, told her mother, Alisha Grinder, that she had been sexually abused by her adopted father, Eric Wayne Grinder. (Warrant Affidavit, ECF No. 44, Ex. 2 at 2). On November 29, 2016, after Alisha Grinder reported what the Minor Victim had told her, the police learned from a forensic interview of the Minor Victim that she claimed Grinder had sexually abused her for years, at both the family's prior residence and their current residence at 261 Montpelier Court in Westminster, Maryland. (*Id.* at 3). Alisha Grinder also told

1

the police that she suspected Grinder of drugging the Minor Victim with Clonazepam, a drug in

the benzodiazepine class purchased by Grinder over the Internet to treat Alisha's insomnia. (*Id.*).

By evening on the 29th, the police sought a state search and seizure warrant for Grinder's

current residence. While the warrant application was pending, Corporal Michael Lare of the

Carroll County Sheriff's Office secured Grinder's residence at around 5:06 pm. The residence

was empty until Grinder pulled up the driveway in a car around 5:56 pm, and began walking

toward Corporal Lare who was standing at the front door to the residence. Corporal Lare met

Grinder near the car and told him that a warrant was being sought to search his home. He asked,

as his supervisor told him to, for a key to the residence and for Grinder's cell phone, which was

in his car.[1] Grinder complied, and afterward chose to remain waiting in his car.

At 6:15 pm a state court judge approved the warrant application. (Warrant, ECF No. 44,

Ex. 1). The warrant found probable cause to believe that several crimes had been committed and

authorized law enforcement to search the property known as 261 Montpelier Court, Westminster

Maryland, and seize:

> evidence relating to the crimes of Sex Abuse of a Minor, 2nd Degree Sexual
> Offense, 3rd Degree Sexual Offense, Rape 2nd Degree, Sex Abuse of a Minor-
> Continuing Course of Conduct, to include but not limited to crime scene
> processing; to include photographs, drawings/measurements, DNA/Biological
> evidence collection; bedding, prescription and non-prescription medication to
> include but not limited to [Clonazepam] and U-771, home drug testing kits,
> invoices/receipts for mail order medications, cell phones, computers, hard drives,
> media storage devices, etc.

(*Id*).

The warrant also authorized the police to, among other things: (1) "[e]nter and search the

residence as completely described above for evidence of the aforementioned crimes to include

---

[1] In addition to his supervisor's instruction, Corporal Lare testified that it is likely evidence of child abuse may be found on a cell phone and that such evidence may be quickly deleted by a suspect left in possession of a cell phone.

the curtilage;" (2) "[s]eize all evidence found in or upon said premises and its curtilage;" (3)

"[s]eize and have forensically analyzed by a qualified person or persons any cellular telephones

seized;" and (4) "[s]eize and have forensically analyzed by a qualified person or persons any

computers, hard drives, [and] media devices." *Id.*

The Carroll County Sheriff's Office executed the warrant at 6:31 pm and, in the course of

the search, seized a Toshiba laptop computer. (Opp. to Mot. to Suppress, ECF No. 44, p. 4). The

laptop eventually was sent to the Department of Homeland Security for forensic analysis. (*Id.*)

Analysis of the laptop began on December 19, 2016, and turned up what an analyst believed

were images of the Minor Victim being sexually abused by an adult male and two photos of

child pornography. (*Id.*) After discovering the images, the analyst promptly suspended his search

pending a federal warrant specifically authorizing a search for evidence related to child

pornography. (*Id.*) The government asserts that the analyst acted out of "an abundance of

caution" and could have lawfully continued searching the laptop under the original state warrant.

In any case, a federal warrant was signed on March 17, 2017, authorizing law enforcement to

search the cell phone and laptop computer for evidence of child pornography. (Opp. to Mot. to

Suppress, ECF No. 44, Exs. 3, 4).

The federal warrant was based on several assertions in a supporting affidavit, in addition

to those in the state affidavit, including that: (1) the images of sexual abuse believed to feature

the Minor Victim did feature the Minor Victim; (2) a medical examination performed on the

Minor Victim discovered signs of sexual abuse; and (3) the Minor Victim told her mother, Alisha

Grinder, that the defendant videotaped her sexual abuse and played it back on the television.

(Opp. to Mot. to Suppress, ECF No. 44, Ex. 5).

3

Resuming his search of the laptop, and this time including Grinder's cell phone, the

analyst found additional evidence that Grinder sexually abused the Minor Victim, images of

child pornography, and Google search terms related to child pornography. (Opp. to Mot. to

Suppress, ECF No. 44, pp. 5-6)

<div align="center">***</div>

Grinder now moves to suppress the evidence found on the laptop and cell phone claiming

that their search and seizure violated his rights under the Fourth Amendment. (ECF No. 33). The

government has opposed the defendant's motion. (ECF No. 44).

### Analysis

Grinder argues that the evidence law enforcement obtained from his cell phone and the

Toshiba laptop should be suppressed because the state warrant is insufficiently supported by

probable cause and lacks particularity, and because the seizure of the cell phone outside the

residence and the forensic search of both the laptop and cell phone exceeded the scope of the

warrant.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. IV amen.

"As the text makes clear, the ultimate touchstone of the Fourth Amendment is 'reasonableness,'"

and "reasonableness generally requires the obtaining of a judicial warrant." *Riley v. California*,

134 S. Ct. 2473, 2482 (2014).

A warrant shall only issue "upon probable cause, supported by oath or affirmation, and

particularly describing the place to be searched, and the persons or things to be seized." U.S.

Const. IV amen. Whether a warrant is supported by probable cause is determined by the issuing

magistrate judge whose judgment on the matter is accorded "great deference." *U.S. v. Leon*, 468

<div align="center">4</div>

U.S. 897, 914 (1984). The last part of the warrant clause, referred to as the 'particularity requirement,' "is fulfilled when the warrant identifies the items to be seized by their relation to designated crimes and when the description of the items leaves nothing to the discretion of the officer executing the warrant." *U.S. v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010). This requirement in turn limits the scope of law enforcement's authority under the warrant to search and seize items. *Id.* Still, the warrant's limitations should not be read in a "hypertechnical manner" but should be approached with "commonsense." *Id.*

With these principles in mind, Grinder's motion must be denied. The original warrant obtained by law enforcement: (1) particularly described the place to be searched—Grinder's residence and its curtilage—and the things to be seized—among other things, cell phones and laptops related to identified crimes; (2) was supported by probable cause to believe Grinder's residence and its curtilage, and the cell phones and laptops discovered therein, would contain evidence of the crimes identified in the warrant; and (3) authorized the search and seizure of the laptop and cell phone.

I.    Adequacy of the Warrant

A.

Grinder first argues that the warrant lacked probable cause to authorize the seizure of the laptop and cell phone. Probable cause exists where a magistrate has reason to believe "evidence is located in a particular place." *Illinois v. Gates*, 462 U.S. 213, 230 (1983). It "does not deal with hard certainties" but is instead "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 231-32. Here, a state court judge, having reviewed an affidavit describing Grinder's alleged sexual abuse of the Minor Victim and online purchase of drugs, determined there was probable

5

cause to search and seize electronic devices in Grinder's home that might contain evidence of certain listed crimes. The affidavit supports this determination.

The affidavit supporting the state warrant application contained, among other things: (1) portions of a statement from the Minor Victim summarizing Grinder's alleged sexual abuse; (2) portions of a statement from Alisha Grinder in which she explained that Grinder orders Clonazepam from the Internet; (3) reason to believe Grinder had given the Minor Victim Clonazepam to sedate her; and (4) text messages between Grinder and Alisha obtained from Alisha's phone in which Grinder referred to possessing illegal drugs and denied abusing the Minor Victim. (Opp. to Mot. to Suppress, ECF No. 44, Ex. 2). By sworn testimony then it was at least probable that Grinder used an Internet connected device to illegally purchase drugs in furtherance of the abuse of the Minor Victim, (justifying the search and seizure of the computer and cell phone), and that Grinder used a cell phone to discuss both the purchase of those drugs and his alleged abuse of the Minor Victim, (justifying the search and seizure of the cell phone). In sum, the court finds no reason to second-guess the judge's determination, which is entitled to great deference. The warrant was supported by probable cause.

B.

But the warrant, if valid, must still be sufficiently particular and Grinder presents two reasons for why it is not. He claims first that the warrant gave law enforcement unbounded discretion to search and seize items within Grinder's home in violation of the Fourth Amendment, and second that the serious privacy concerns implicated by searches of laptops and cell phones demand a heightened particularity requirement.

6

Starting with his first point, Grinder argues that the warrant is insufficiently particular because it did not: (1) identify the electronic devices to be seized; (2) limit law enforcement's authority to seize only those items owned by the defendant; or (3) direct how, once seized, electronic devices were to be searched. But the warrant authorized the search and seizure of cell phones and laptops found within the residence and its curtilage for "evidence of the aforementioned crimes." (Opp. to Mot. to Suppress, ECF No. 44, Ex. 1). Thus, a common sense reading—and indeed the only reasonable reading—of the warrant constrained the executing officers to: (1) the specified set of crimes supported by probable cause; and (2) searching and seizing particular items in particular places for evidence of those crimes.[2] Accordingly, this warrant presents a different situation from one that provides unconditional authority to seize or search any and all cell phones found in the residence without relation to any particular crime.

Grinder claims that this warrant is like the one in *Groh v. Ramirez*, 540 U.S. 551 (2004), where the Supreme Court held a warrant invalid because it failed to "describe the items to be seized *at all*." *Groh*, 540 U.S. at 558 (emphasis in original). In light of the preceding discussion, it suffices to say that the warrant here bears little resemblance to the one at issue in *Groh*, and although *Groh* indicates that items to be seized should be described, *Williams* instructs that the item's description can rely in part on its relationship to specific crimes detailed in the complaint.[3]

---

[2] This reading of the warrant is further bolstered by the fact that only Grinder, his wife, and the Minor Victim lived in the residence identified in the affidavit and warrant. Thus, Grinder had access to all evidence likely on his, and also on his wife's, laptop and cell phone. The receipt of text messages is one example of this.

[3] Grinder also relies on three out-of-circuit cases for the proposition that a warrant must identify the specific electronic devices to be seized and how those devices may be searched to satisfy the particularity requirement of the Fourth Amendment. Those cases are distinguishable from the factual circumstances involved here. *See U.S. v. Griffith*, 867 F.3d 1265, 1271-77 (D.C. Cir. 2017) (holding a warrant to search for electronic devices invalid because it was not based on probable cause to believe evidence of a crime would be found on the devices or that the defendant used or owned an electronic device); *U.S. v. Galpin*, 720 F.3d 436, 447-48 (2d Cir. 2013) (holding a warrant invalid because it broadly authorized a search for crimes under "NYS Penal Law and or Federal Statutes"); *U.S. v. Rosa*, 626 F.3d 56, 61-62 (2d Cir. 2010) (holding a warrant invalid because it failed to specify a single crime supported by probable cause and therefore failed to give any "guidance as to the type of evidence sought"). In this

7

Demanding more, such as that the warrant specifically name each item to be seized under the warrant, "would require officers possessed of incomplete knowledge to identify *ex ante* every item of evidence that will be relevant and the precise form that it will take—a plainly unrealistic expectation." *U.S. v. Dargan*, 738 F.3d 643, 648 (4th Cir. 2013).

Grinder further argues that, even so, the nature of the information sought in this case requires a more robust particularity requirement. The information found on cell phones and laptops "is distinguished from physical records by quantity alone," to be sure, but it also is qualitatively different. *Riley*, 134 S.Ct. at 2490.  For example, "Internet search and browsing history . . . could reveal an individual's private interests or concerns—perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD"—information undiscoverable in physical records. *Id.* All of this is to say that searching such devices may precipitate privacy violations not before possible through physical means alone. And because of the seriousness of those privacy concerns, traditional Fourth Amendment doctrines that consider privacy when weighing the reasonableness of a warrantless search have been applied differently to digital devices. *Id.* at 2494.

This case, however, does not involve a warrantless search. And as *Riley* made explicit, the Court's "holding, of course, is not that the information on a cell phone is immune from search; it is instead that a warrant is generally required before such a search." *Id.* at 2493. Far from ignoring *Riley*, law enforcement here did what the Court said it should do—they "[got] a warrant." *Id.* at 2495. As a result, Grinder's arguments fail to alter the court's analysis.

---

case, the warrant clearly identified crimes supported by probable cause, the places and things to be searched, and the kind of evidence sought.

As the state warrant here limits the types of items to be searched and seized and identifies specific crimes alleged to have been committed—and with the considerable deference due to the magistrate judge's determination in mind—the court is convinced that the state warrant was sufficiently particular under the Fourth Amendment.

## C.

But even if the warrant were not justified by probable cause, and even if it were not sufficiently particular, suppression still would not be an appropriate remedy. Evidence discovered by an officer who reasonably relied "on a warrant issued by a detached and neutral magistrate," should not be excluded even if the warrant is subsequently invalidated. *Leon*, 468 U.S. at 913. This standard, commonly referred to as the 'good faith exception', "does not apply in four situations, [however]: first, when the warrant is based on an affidavit containing knowing or reckless falsity; second, when the magistrate has simply acted as a rubber stamp for the police; third, when the affidavit does not provide the magistrate with a substantial basis for determining the existence of probable cause; and finally, when the warrant is so facially deficient that an officer could not reasonably rely on it." *U.S. v. Wilhelm*, 80 F.3d 116, 121 (4th Cir. 1996) (internal quotation marks omitted).

In light of the preceding discussion of the warrant—that it was issued based on testimony from the Minor Victim and her mother, and that it identified particular crimes, places, and items to be searched—law enforcement's reliance on the state warrant as validly issued was objectively reasonable. *See, e.g.*, *U.S. v. Qazah*, 810 F.3d 879, 886-87 (4th Cir. 2015). Grinder's motion to suppress would thus be denied on this ground as well.

9

II.    Seizure of Cell phone

Moving away from the validity of the warrant to the warrant's scope, Grinder argues that Corporal Lare's seizing of his cell phone was unlawful because the cell phone was taken from Grinder's person outside the residence. And that is a problem according to Grinder because the warrant only covered the residence.[4] But the warrant authorized law enforcement to search and seize items that might contain evidence of sex crimes or illegal drug purchases from the curtilage of the home, not just the home itself, and the cell phone was not taken from Grinder's person but rather was seized from Grinder's car while it was sitting in the driveway of his home.

Even so, Grinder argues, the seizure was unlawful because the warrant did not authorize law enforcement to search his automobile even if the automobile happened to be within the curtilage. But this argument has been rejected by the Fourth Circuit. Indeed, "the fact that the [car] was not itself listed in the search warrant does not require exclusion" of evidence seized from the car because a warrant that authorizes the search of a residence and its curtilage also authorizes the search of "automobiles on the property or premises that are owned by or are under the dominion and control of the premises owner or which reasonably appear to be so controlled." *U.S. v. Patterson*, 278 F.3d 315, 318 (4th Cir. 2002). As neither party disputes that the driveway constituted the curtilage of the residence, or that Grinder at least appeared to control the car from which the cell phone was seized, law enforcement was squarely within the scope of the state warrant when it seized the cell phone.[5]

---

[4] To the extent the defendant argues that law enforcement's seizing of his phone pending prompt execution of a warrant was unconstitutional, that argument is foreclosed under well-settled precedent. *See, e.g., Illinois v. McArthur*, 531 U.S. 326, 331-33 (2001).

[5] Grinder also takes issue with the length of his phone's seizure, relying on *U.S. v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009) in which the Eleventh Circuit found that seizing a phone for 21 days before a warrant was obtained was unreasonable under the Fourth Amendment. 565 F.3d at 1351-52. But here the cell phone was warrantlessly held by law enforcement for no more than twenty minutes.

10

III.    Search of Cell phone and Laptop

Finally, Grinder argues that the search of the laptop was invalid because the warrant only authorized a limited search for evidence of a drug crime, not the indiscriminate search for child pornography that he alleges occurred. And he argues that the second search of the laptop was unlawful because the federal warrant that authorized it was based on evidence illegally obtained from the first laptop search. The scope of the warrant and precedent foreclose Grinder's argument.

The Fourth Circuit has previously held that a forensic search of a laptop, authorized by a warrant, includes "the authority to open and cursorily view each file." *Williams*, 592 F.3d at 523. Applying this reasoning here, the images of child pornography found in the course of analyzing the laptop need not be suppressed. Law enforcement was justified in forensically searching the laptop because the warrant authorized such a search, and because evidence of a drug crime, or the Minor Victim's sexual abuse, could have been located anywhere on the laptop. In other words, "the observation of child pornography within several of [the laptop's] files did not involve an intrusion on [Grinder's] protected privacy interests beyond that already authorized by the warrant." *Williams*, 592 F.3d at 523.[6] And it was truly just an observation. Once the images were discovered, the search was immediately suspended pending a federal warrant specifically authorizing a search for child pornography.[7] More still, if the images were lawfully observed, it was lawful for the magistrate judge to consider them when issuing the federal warrant, making the federal warrant valid, and so too the cell phone search it authorized.

---

[6] For this reason, this case does not present the same issue as in *U.S. v. Doyle*, 650 F.3d 460 (4th Cir. 2011) where the Fourth Circuit rejected the government's argument that evidence of child molestation justified a search for child pornography. 650 F.3d at 472. Here, the government did not set out to find child pornography but discovered it during a lawful search.

[7] The government argues that it could have continued the search after finding the photos without seeking an additional warrant. Because an additional warrant was sought, however, the court need not address the merits of the government's argument.

11

Case 1:17-cr-00226-CCB   Document 54   Filed 06/12/18   Page 12 of 12

*Riley* does not change this conclusion. For one thing, *Riley* considered only whether a

warrantless search of a cell phone incident to arrest was lawful, a distinct question from whether

an investigator, with warrant in hand, may forensically search a laptop. For another, the Fourth

Circuit has not yet provided any reason to think *Riley*'s recognition of the qualitative and

quantitative difference of digital evidence will alter its holding in *Williams*. Indeed, the *Williams*

opinion itself recognized "the sheer amount of information contained in a computer." 592 F.3d at

523. In short, the scope of the initial search did not exceed what was permitted by the state

warrant.

<div align="center">

**Conclusion**

</div>

For the reasons stated above, Grinder's motion to suppress will be denied. A separate

order follows.

_6/12/18_
Date

_CCB_
Catherine C. Blake
United States District Judge

Case 1:17-cr-00226-CCB   Document 55   Filed 06/12/18   Page 1 of 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

United States of America                    *

v.                                          *           Criminal No. CCB-17-226

Eric Wayne Grinder                          *

                                            *
                                           ***

### Order

For the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that:

1. The defendant's motion to suppress (ECF No. 33) is **DENIED**;

2. The Clerk shall **SEND** a copy of this Order and the accompanying Memorandum to counsel of record.

$\frac{6/12/18}{\text{Date}}$

Catherine C. Blake
United States District Judge

## OFFICE OF THE FEDERAL PUBLIC DEFENDER
### DISTRICT OF MARYLAND
NORTHERN DIVISION
TOWER II, 9TH FLOOR
100 SOUTH CHARLES STREET
BALTIMORE, MARYLAND 21201-2705
TEL: (410) 962-3962
FAX: (410) 962-0872
TOLL FREE: (855) 213-8450

JAMES WYDA
FEDERAL PUBLIC DEFENDER

ELIZABETH G. OYER
ASSISTANT FEDERAL PUBLIC DEFENDER

January 15, 2019

**VIA ECF FILING**
Hon. Catherine C. Blake
U.S. District Judge
101 W. Lombard St.
Baltimore, Maryland  21201

Re: *United States v. Eric Wayne Grinder*, Crim. No. CCB-17-0226

Dear Judge Blake:

We are writing on behalf of our client Eric Grinder, the defendant in this case.  Mr. Grinder is charged in a second superseding indictment with multiple offenses related to child pornography.  A pretrial conference is scheduled for January 16, and trial is scheduled to begin February 19.

In advance of those proceedings, we are writing to advise the Court that Mr. Grinder accepts responsibility for his criminal conduct and does not intend to present a defense at trial. Mr. Grinder is proceeding to trial for the sole purpose of preserving his right to appeal the denial of his earlier-litigated motion to suppress evidence.[1]

It is necessary to put Mr. Grinder's position on the record at this juncture in order to preserve his ability to seek credit for acceptance of responsibility at sentencing under U.S.S.G. § 3E1.1.  The application notes to § 3E1.1 provide, in pertinent part:

---

[1] Specifically, on October 30, 2017, Mr. Grinder filed a motion to suppress evidence seized from his cell phone and laptop computer on Fourth Amendment grounds (Dkt. No. 33).  On January 26, 2018, a hearing was held on that motion (Dkt. No. 52).  On June 12, 2018, the Court issued a Memorandum and Order denying Mr. Grinder's motion (Dkt. Nos. 54, 55).  It is that ruling that Mr. Grinder is seeking to appeal.

This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. ***Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction.*** In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. ***This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt*** (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, ***a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct***.

USSG § 3E1.1 n.2 (emphasis added); *see also, e.g.*, *United States v. Castner*, 50 F.3d 1267, 1279 (4th Cir. 1995) ("Although a defendant may exercise his right to trial and still receive an adjustment for acceptance of responsibility, such situations are rare and the determination of acceptance must be based primarily upon pre-trial statements and conduct.") (citation and internal quotation marks omitted); *United States v. Muldoon*, 931 F.2d 282, 289 (4th Cir. 1991) (affirming application of § 3E1.1 reduction where defendant "offered to plead guilty" before trial, reserving his right to appeal constitutional and statutory challenges to wiretaps, but government "rejected this condition").

Because the application of § 3E1.1 turns on the defendant's "pre-trial statements and conduct," it is necessary to create a record of Mr. Grinder's pretrial statements and conduct demonstrating his acceptance of responsibility. Without getting into all of the details, we highlight the following.

Mr. Grinder has repeatedly sought to resolve this case by way of a conditional guilty plea that would preserve his right to appeal the denial of his suppression motion; however, the government has rejected such a resolution. In light of the government's refusal to accept a conditional guilty plea, Mr. Grinder has no way of preserving his appellate right other than to proceed to trial.

Accordingly, Mr. Grinder has proposed several ways in which to substantially streamline the trial in this matter. Through counsel, Mr. Grinder has advised the government that he waives his right to a jury trial and consents to a Court trial, in order to conserve the resources of all parties. However, the government has refused to consent to a Court trial.

In addition, Mr. Grinder has advised the government that he will stipulate to all of the facts that the government would need to prove in order to establish his guilt beyond a reasonable doubt on all counts of the indictment. This would minimize the burden on witnesses in addition to saving substantial time and resources of the Court and the parties. However, the government has rejected this proposal and has indicated that it will proceed with an evidentiary presentation, including calling numerous lay and expert witnesses. The parties are working on a series of

limited stipulations that may save some time.  However, the record should reflect that Mr. Grinder has offered to stipulate to <u>all</u> pertinent facts, including but not limited to the fact that he produced the images of child pornography charged in the indictment.  Mr. Grinder does not intend to dispute the evidence that the government will present at trial.

Under these circumstances, we believe that Mr. Grinder's pretrial conduct demonstrates acceptance of responsibility, and we anticipate asking this Court at sentencing to give him credit accordingly.

Sincerely

/s/

Elizabeth G. Oyer
Kirstin Maguire Hopkins
Assistant Federal Public Defenders

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **Crim. No. CCB-17-0226** |
| **ERIC WAYNE GRINDER** | * | |

## MOTION FOR RECONSIDERATION OF MOTION TO SUPPRESS

The defendant, Eric Wayne Grinder, by and through undersigned counsel, hereby moves this Honorable Court for reconsideration of its prior ruling denying his motion to suppress evidence seized from his cell phone and computer, in light of the Fourth Circuit's recent ruling in *United States v. Pratt*, No. 17-4489 (4th Cir. Feb. 8, 2019) (slip opinion attached as Exhibit A). In *Pratt*, the Fourth Circuit held that an unreasonable delay (of 31 days) in obtaining a warrant to search the defendant's cell phone rendered the search unlawful, even though the initial seizure of the phone was lawful. The same reasoning applies here, where law enforcement waited four months to obtain the federal search warrants that ultimately authorized the forensic examinations of Mr. Grinder's cell phone and laptop computer.

### Procedural History

Mr. Grinder is charged in a Third Superseding Indictment with eight counts related to production and possession of child pornography and one count of witness tampering. The child pornography charges are based on images discovered on a cell phone and laptop computer seized from Mr. Grinder. Through counsel, Mr. Grinder previously moved to suppress all evidence obtained from the cell phone and laptop computer on Fourth Amendment grounds. *See* Dkt. No. 33. Responsive and supplemental briefing was submitted by both parties. *See* Dkt. Nos. 43 – 50. An evidentiary hearing was held on January 26, 2018. Dkt. No. 52. On June 12, 2018, this Court

issued an Order and Memorandum Opinion denying Mr. Grinder's motion to suppress.  Dkt. Nos.
54, 55.  Trial is scheduled to begin on February 19, 2019.

<div align="center">

**The Fourth Circuit's Ruling in *United States v. Pratt***

</div>

On February 8, 2019, the Fourth Circuit issued its opinion in *United States v. Pratt*,
reversing the district court's denial of a motion to suppress evidence (specifically, images of child
pornography) seized from the defendant's cell phone.  FBI agents had seized defendant Pratt's cell
phone after he admitted that it contained nude photos of a minor.  After the initial seizure of the
phone (the lawfulness of which was not disputed), the FBI waited 31 days to obtain a warrant to
search the phone.  When they finally conducted the search, it revealed nude photos of the minor
victim as well as other incriminating evidence.  Pratt was charged with offenses related to sex-
trafficking of a minor and child pornography.  Pratt moved to suppress the evidence obtained from
his phone, pointing to the FBI's delay in obtaining a warrant and searching the contents.  The
district court denied his motion, and the evidence was later admitted at a jury trial.  Pratt appealed
after he was convicted at trial.

The Fourth Circuit reversed the district court's denial of Pratt's suppression motion.  The
Court explained that the FBI's failure to act diligently in obtaining a warrant and searching the
contents of the phone unreasonably deprived Pratt of his possessory interest in his cell phone.  The
Court framed the constitutional question as "whether the extended seizure of Pratt's phone was
reasonable."  Slip op. at 6.  The Court emphasized that "a seizure that is 'lawful at its inception
can nevertheless violate the Fourth Amendment because its manner of execution unreasonably
infringes possessory interests.'"  *Id*. (quoting *United States v. Jacobsen*, 466 U.S. 109, 124 (1984)
(citing *United States v. Place*, 462 U.S. 696 (1983))).  The Court concluded that the extended
seizure of Pratt's phone, for 31 days, was unreasonable, given that the government offered no
persuasive reason for the delay.  The government's proffered explanation was difficulty deciding

<div align="center">

2

</div>

in which jurisdiction to obtain a warrant.  The Court was unpersuaded, finding that "the agents here failed to exercise diligence by spending a whole month debating where to get a warrant." *Id.* at 8.

The Court also rejected the government's alternative argument that it could retain the phone indefinitely, because it had independent evidentiary value.  The Court emphasized that it was the files on the phone – not the phone itself – that had evidentiary value.  *Id.* at 9.  Accordingly, "[t]he agents could have removed or copied incriminating files and returned the phone," but they did not. *Id.*  Their decision to retain Pratt's cell phone for 31 days was unreasonable.  The Court further concluded that the district court's error in denying Pratt's motion to suppress was not harmless and vacated Pratt's convictions on the child pornography counts.  *Id.* at 12.

## Argument

This case presents a similar question of whether the extended seizure of Mr. Grinder's cell phone and laptop was reasonable.  We submit that it was not, under the logic of *Pratt*.  In this case, as set forth in earlier briefing, Mr. Grinder's cell phone and laptop computer were seized by the Carroll County Sheriff's Office (CCSO) pursuant to a warrant authorizing a search of his residence.  This occurred on November 29, 2016.  CCSO apparently did nothing with the phone or computer for three weeks, when they sent the devices to federal agents with Homeland Security Investigations (HSI) for forensic analysis.  On December 19, 2016, a forensic analyst with HSI began to conduct a forensic examination of the laptop computer.  Upon discovering images of suspected child pornography on the laptop, the examiner terminated the examination until a new search warrant could be obtained, authorizing a search for evidence related to child pornography offenses – which was beyond the scope of the original search warrants obtained by CCSO.

New search warrants were not sought until March 17, 2017 – four months later – when HSI Special Agent Ricardo Federico applied to a U.S. Magistrate Judge for a warrant to forensically

search Mr. Grinder's cell phone and laptop computer.  The government has offered no explanation for the extended delay in seeking a warrant to search those two devices, which had been seized and in the custody of HSI for several months.

Even if the initial seizure of Mr. Grinder's devices was lawful, the extended delay in obtaining the federal warrants that ultimately authorized the searches renders the searches unlawful.[1]  As the Fourth Circuit stated in *Pratt*, a seizure that is "lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests."  Slip op. at 6 (citations and internal quotation marks omitted).  This is precisely what happened here.  The "manner of execution" of the search of Mr. Grinder's devices apparently involved several steps: (1) the seizure of the devices on November 29, 2016; (2) an initial delay of three weeks (until December 19, 2016) before conducting any forensic examination of the seized devices; (3) an abbreviated examination of the laptop only, on December 19, 2016; (4) a determination that a new search warrant was required before further examination of either device could occur; and (4) a delay of four more months (until March 17, 2017) before new search warrants were obtained, authorizing the forensic examinations of the cell phone and laptop that ultimately yielded the evidence at issue here.

This manner of execution unreasonably infringed upon Mr. Grinder's possessory interests in his cell phone and his computer.  These are devices that contain tremendous amounts of sensitive personal data relating to all aspects of life.  Moreover, they are devices that are used on a daily basis and instrumental to carrying out all manner of essential tasks.  A deprivation of one's personal cell phone and laptop computer is a substantial hardship as well as a substantial intrusion

---

[1] We submit that the initial seizures of the cell phone and computer were unlawful, for the reasons set forth in our earlier briefing, but we recognize that this Court has already rejected our arguments on that point, and we are not seeking reconsideration of that aspect of the Court's ruling here.  Our argument, based on *Pratt*, is that the extended delay *after* the initial seizure renders the searches unlawful.  We are asking for reconsideration on that ground only.

on privacy interests.  Accordingly, as *Pratt* recognizes, law enforcement had an obligation to act with diligence in carrying out their investigation.  They were not entitled simply to hold Mr. Grinder's devices in a drawer for four months before obtaining the necessary warrants.

In denying our motion to suppress initially, this Court relied on the fact that, after images of suspected child pornography were discovered on the laptop, "the search was immediately suspended pending a federal warrant specifically authorizing a search for child pornography." Memorandum Opinion (Dkt. No. 54), at 11.  We respectfully submit that the Fourth Circuit's opinion in *Pratt* makes clear that the four-month delay in obtaining that federal warrant was unreasonable.  Once law enforcement determined that new warrants were needed to carry out forensic searches of the laptop and cell phone, they had an obligation to act expeditiously in doing so; a delay of four months (far longer than in *Pratt*) was unjustified and unreasonable.  The eventual searches were therefore unlawful and the seized evidence should be suppressed.

## Conclusion

For the foregoing reasons, together with the reasons set forth in his prior briefing and argument, Mr. Grinder hereby moves this Honorable Court to reconsider its prior decision denying his motion to suppress, and to enter an order suppressing all evidence seized from his cell phone and laptop computer.  Mr. Grinder requests a hearing on this motion.

Respectfully submitted,

JAMES WYDA
Federal Public Defender
for the District of Maryland

/s/

_____
ELIZABETH G. OYER (#95458)
KIRSTIN MAGUIRE HOPKINS (#19629)
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: (410) 962-3962
Fax: (410) 962-0872
Email: liz_oyer@fd.org
        kirstin_hopkins@fd.org

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 17-4489**

———————————

UNITED STATES OF AMERICA,

                Plaintiff − Appellee,

      v.

SAMUEL PRATT, a/k/a Promise,

              Defendant – Appellant.

———————————

Appeal from the United States District Court for the District of South Carolina, at Columbia.  Terry L. Wooten, Chief District Judge.  (3:16-cr-00207-TLW-1)

———————————

Argued:  September 28, 2018                     Decided:  February 8, 2019

———————————

Before MOTZ, AGEE, and DIAZ, Circuit Judges.

———————————

Affirmed in part, vacated in part, and remanded by published opinion. Judge Diaz wrote the opinion, in which Judge Motz and Judge Agee joined.

———————————

**ARGUED:** David Bruce Betts, LAW OFFICES OF DAVID B. BETTS, Columbia, South Carolina, for Appellant.  James Hunter May, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.  **ON BRIEF:** Beth Drake, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

———————————

DIAZ, Circuit Judge:

Samuel Pratt was convicted of eight counts related to sex trafficking and child pornography.  He appeals on two grounds.  On the first ground, we hold that the district court should have suppressed evidence from Pratt's cellphone.  That error was not harmless because the remaining evidence does not satisfy the elements of the two child pornography counts.  On the second ground, we hold that the district court did not err in admitting hearsay statements.  Accordingly, we vacate Pratt's convictions on the two child pornography counts, affirm his other six convictions, vacate his sentence, and remand to the district court.

I.

FBI agents in the Carolinas investigated Samuel Pratt for running a prostitution ring that included juveniles.  The agents found a post on Backpage.com in which Pratt advertised the sexual services of seventeen-year-old "RM"[1] at a hotel in Columbia, South Carolina.  An agent scheduled a "date" with RM at the hotel for February 3, 2016.  When the agent entered the hotel room, he identified himself to RM as law enforcement.  She agreed to speak with several agents.  RM told them she was seventeen and working as a prostitute at the hotel.  She said her "boyfriend" Pratt brought her across state lines from North Carolina.  J.A. 66.  Responding to an agent's question, she said she had texted

_____

[1] We refer to minor victims solely by their initials.

2

nude photographs of herself to Pratt's phone.   RM allowed FBI agents to take her cellphone.

At the same time, two FBI agents spoke to Pratt in the hotel parking lot.   Agent Stansbury, who had spoken with RM, joined them.   Stansbury confronted Pratt, who was holding an iPhone.   Pratt told Stansbury the phone was his.   Stansbury asked if Pratt had nude photos of RM on the phone.   Pratt responded "yes, I've got pictures of her on the phone."   J.A. 67.

Stansbury then seized the phone, telling Pratt the FBI would get a search warrant. Pratt refused to consent to the seizure or disclose the phone's passcode.   And the FBI didn't get a warrant to search the phone until March 4, 2016—a full 31 days after seizing it.   When agents finally searched the phone, they found nude images of RM and incriminating text conversations with RM and others.

Soon after, a federal grand jury indicted Pratt.[2]   At Pratt's initial appearance, the magistrate judge ordered him to have no contact with anyone "who is a witness, or may be a witness, or a victim."   J.A. 524.   Despite that order, Pratt repeatedly called his mother from prison to coordinate continued prostitution operations.   In several calls, he had his mother put RM on the phone.   He repeatedly told RM not to testify or cooperate.

---

[2] The nine counts were: (1) conspiracy to commit sex trafficking, (2) producing child pornography, (3) sex trafficking of a minor, (4) attempt to commit sex trafficking, (5) possession of child pornography, (6) coercion or enticement of a minor, (7) felon in possession of a firearm, (8) obstruction of justice, and (9) interstate travel to carry on an unlawful activity.   The government dismissed count nine before trial.

Before trial, Pratt moved to suppress evidence from his phone.  In his written pleadings, Pratt only contended that the seizure of the phone was unconstitutional.  But at the suppression hearing, he also argued that the delay between the seizure and obtaining the search warrant was unconstitutional.  The government explained that the delay came from the need to decide whether to seek a warrant in North Carolina or South Carolina.  Ruling from the bench, the district court denied the suppression motion, finding the seizure justified and the delay reasonable.

The government tried to get RM to testify.  Several months after Pratt's calls from jail, the FBI served her with a subpoena.  When agents later spoke to her, she refused to testify.  The FBI obtained a material witness warrant for her, but the U.S. Marshals couldn't find her.  Several other women would testify at trial that Pratt would beat any prostitute—including RM—whom he considered disobedient.

With RM unavailable, the government sought to introduce her statements to FBI agents about the prostitution ring and about the nude images she sent Pratt.  The district court overruled Pratt's hearsay and confrontation objections, ruling that Pratt forfeited those objections by intimidating RM into refusing to testify.  An agent then recounted RM's statements.

In addition, the government introduced evidence from Pratt's cellphone.  That evidence included 28 images alleged to be child pornography, metadata for the images, text message conversations, and advertisements Pratt placed for prostitution.  The

4

government also introduced an "extraction report" on data from RM's phone.  It included

text messages but didn't include photos or videos.[3]

The jury convicted Pratt on all eight counts.  The district court imposed life

sentences on four counts and concurrent time on the other four.  Pratt appeals the denial

of his suppression motion and the admission of RM's prior statements.


II.

Pratt contends that the district court should have suppressed information from his

cellphone because the FBI unreasonably delayed getting a search warrant.  He does not

contend that the seizure of the phone itself was unconstitutional.  To justify the delay, the

government points to the difficulty of coordinating the various law enforcement agencies

involved in the Pratt investigation and deciding where to seek a search warrant for the

phone.  In the alternative, the government argues that it could keep the phone indefinitely

because it was an instrumentality of Pratt's crimes.

We review the factual findings in a suppression motion for clear error and the

legal conclusions de novo.[4]  *See United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir.

---

[3] An agent testified that the extraction report is "just like the call logs, the text messages . . . I don't think this has the videos, or any videos or pictures." J.A. 187.  The prosecutor asked, "So, just to be clear, Exhibit 21, forensic download, absent videos and photographs?"  *Id.*  The agent responded, "Correct."  *Id.*

[4] The government contends that we should apply plain error review because Pratt didn't mention unreasonable delay in his motion papers.  We disagree.  Pratt pressed the argument at the suppression hearing and the district court expressly ruled from the bench on the claim of delay in obtaining the search warrant.  *See United States v. Williams*, 504 (Continued)

2018).  If the district court erred, we must assess whether any such error was harmless.
*See* Fed. R. Crim. P. 52(a); *United States v. Abu Ali*, 528 F.3d 210, 231 (4th Cir. 2008).

We hold that the district court erred by denying the suppression motion and that
the error was not harmless regarding the child pornography counts.

A.

The constitutional question is whether the extended seizure of Pratt's phone was
reasonable.  A seizure that is "lawful at its inception can nevertheless violate the Fourth
Amendment because its manner of execution unreasonably infringes possessory
interests."  *United States v. Jacobsen*, 466 U.S. 109, 124 (1984) (citing *United States v.
Place*, 462 U.S. 696 (1983)).  To determine if an extended seizure violates the Fourth
Amendment, we balance the government's interest in the seizure against the individual's
possessory interest in the object seized.  *See Place*, 462 U.S. at 703; *United States v. Van
Leeuwen*, 397 U.S. 249, 252–53 (1970).

A strong government interest can justify an extended seizure.  *See, e.g.*, *Illinois v.
McArthur*, 531 U.S. 326, 332–33 (2001) (suspect prevented from entering home for two
hours while officers obtained a warrant); *United States v. Montoya de Hernandez*, 473
U.S. 531, 541–44 (1985) (suspected alimentary canal smuggler detained for 16 hours);
*Van Leeuwen*, 397 U.S. at 252–53 (package detained for 29 hours while seeking a
warrant).  But if the individual's interest outweighs the government's, an extended

U.S. 36, 41 (1992) (argument is preserved if pressed or passed upon).  Pratt therefore
preserved this argument and the plain error standard does not apply.

6

207

seizure may be unreasonable.  *See Rodriguez v. United States*, 135 S. Ct. 1609, 1615–16 (2015) (traffic stop extended for dog sniff without reasonable suspicion); *Place*, 462 U.S. at 698–99 (traveler's luggage detained at airport for 90 minutes to conduct dog sniff).  An individual diminishes his interest if he consents to the seizure or voluntarily shares the seized object's contents.  *See, e.g.*, *United States v. Christie*, 717 F.3d 1156, 1162–63 (10th Cir. 2013).

Here, Pratt didn't diminish his possessory interest in the phone.  He didn't consent to its seizure or voluntarily share the phone's contents.  The government's only explanation for the 31-day delay in obtaining a warrant was that Pratt committed crimes in both North Carolina and South Carolina and agents had to decide where to seek a warrant.  We find this explanation insufficient to justify the extended seizure of Pratt's phone.

Pratt's case parallels *United States v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009). There, an agent seized a computer but failed to obtain a search warrant for 21 days.  *Id.* at 1351.  The agent explained that he left town for a lengthy training and didn't think the warrant was urgent.  *Id.*  The Eleventh Circuit considered the seizure unreasonable because the agent could have applied for a warrant before he left or passed the case to someone else.  *Id.* at 1351–52.  But the court cautioned that overwhelmed police resources or other "overriding circumstances" could justify extended delays.  *Id.* at 1353.

The Eleventh Circuit has applied this standard in two later cases.  In *United States v. Vallimont*, 378 F. App'x 972, 975–76 (11th Cir. 2010), it upheld a 45-day delay in getting a search warrant for a seized computer.  The delay was reasonable because the

7

208

investigator was diverted to other cases, the county's resources were overwhelmed, and the defendant diminished his privacy interest by giving another person access to the computer. *Id.* And in *United States v. Laist*, 702 F.3d 608, 616–17 (11th Cir. 2012), the court upheld a 25-day delay in getting a search warrant for a seized computer. The delay was reasonable because the agents worked diligently on the affidavit; they were responsible for investigations in ten counties; and the defendant consented to the seizure and had been allowed to keep certain files, diminishing his privacy interest. *Id.* Other circuits have upheld equivalent delays where the government could justify them.[5]

Pratt's case is closest to *Mitchell* because the government has no persuasive justification for the delay in obtaining a search warrant for Pratt's phone. Unlike the agencies in *Vallimont* and *Laist*, the FBI's resources were not overwhelmed. Simply put, the agents here failed to exercise diligence by spending a whole month debating where to get a warrant. *See United States v. Burgard*, 675 F.3d 1029, 1033–34 (7th Cir. 2012) (describing diligence as an important factor). That decision shouldn't have taken a month. It is unlikely that the forum for a warrant would affect a later prosecution: a point the government conceded at oral argument.[6] And unlike in *Vallimont* and *Laist*, Pratt had

---

[5] *See, e.g.*, *United States v. Gill*, 280 F.3d 923, 929 (9th Cir. 2002) (magistrate unavailable); *United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998) (delay fell over weekends and Christmas); *United States v. Aldaz*, 921 F.2d 227, 230–31 (9th Cir. 1990) (delay to transport package for dog sniff); *United States v. Mayomi*, 873 F.2d 1049, 1050, 1054 (7th Cir. 1989) (delay over weekend to corroborate tip and procure drug-sniffing dog).

[6] The Seventh Circuit did accept a six-day delay for an officer to seek a warrant for a cellphone where he needed to consult with prosecutors and with the officer who (Continued)

an undiminished possessory interest in the cellphone—he didn't consent to the seizure and he wasn't allowed to retain any of the phone's files. *Cf. Riley v. California*, 134 S. Ct. 2473, 2494–95 (2014) (describing the strong privacy interest in a cellphone). Given Pratt's undiminished interest, a 31-day delay violates the Fourth Amendment where the government neither proceeds diligently nor presents an overriding reason for the delay.

We decline to affirm on the government's alternative argument that it could retain the phone indefinitely because it had independent evidentiary value, like a murder weapon. Only the phone's files had evidentiary value. The agents could have removed or copied incriminating files and returned the phone. Pratt's phone is thus distinct from the suitcase in *United States v. Carter*, 139 F.3d 424, 426 (4th Cir. 1998) (en banc). In *Carter*, the police arrested a man at an airport for stealing another traveler's bag. *Id.* We affirmed that the police could retain the man's own suitcase as evidence he didn't take the other bag by mistake. *Id.* But here, the phone itself is evidence of nothing. We hold that the delay in obtaining a search warrant was unreasonable. The district court therefore erred in denying Pratt's motion to suppress.

B.

---

seized the phone. *See Burgard*, 675 F.3d at 1033–34. But the Seventh Circuit criticized that delay, and Pratt's delay was more than five times as long. *See id.*

But even though the district court should have suppressed evidence from Pratt's cellphone, we must examine whether the error was harmless.[7]  *See Abu Ali*, 528 F.3d at 231.  On appeal, "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."  Fed. R. Crim. P. 52(a).  The essential question is whether "it [is] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error."  *United States v. Garcia-Lagunas*, 835 F.3d 479, 488 (4th Cir. 2016) (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)).

To answer that question, we look to the strength of the government's remaining evidence, the centrality of the issue, steps taken to mitigate any error, and the closeness of the case.  *See United States v. Recio*, 884 F.3d 230, 238 (4th Cir. 2018); *United States v. Ince*, 21 F.3d 576, 583 (4th Cir. 1994).  The government bears the burden of establishing harmlessness.  *See Ince*, 21 F.3d at 582.

After examining the trial evidence, we are not satisfied that the government met its burden for counts two and five.  Count two charges Pratt with producing images containing child pornography, 18 U.S.C. § 2251(a); count five charges him with possessing images containing child pornography, *id.* § 2252A(a)(5)(B).  Both charges

---

[7] The following harmless error discussion only applies to count two (producing child pornography) and count five (possessing child pornography).  Pratt's phone is irrelevant to counts seven (felon in possession) and eight (obstruction of justice).  The error does affect the sex trafficking and enticement charges (counts one, three, four, and six), for which text messages from Pratt's phone were evidence.  But the error was harmless for those four counts because the government introduced duplicates of many of those text messages from RM's phone and elicited extensive testimony about the prostitution operation.

require the government to prove that the images depict a minor engaging in "sexually explicit conduct." *See id.* §§ 2251(a), 2252A(a)(5)(B). The two offenses include slightly different categories of conduct. *See id.* §§ 2251(a), 2256(2)(A) (count two); *id.* §§ 2252A(a)(5)(B), 2256(2)(B), 2256(8)(B) (count five). But under both definitions, the only relevant category is "lascivious exhibition of the genitals or pubic area."[8] *Id.* § 2256(2)(A), (2)(B). Thus, if the trial evidence that did not come from Pratt's phone is insufficient to find that the images fit into this category, the error cannot be harmless.

Beyond Pratt's phone, the government introduced insufficient evidence that the images meet the statutory requirements. As evidence for the child pornography counts, the government introduced Agent Stansbury's recollection of statements RM and Pratt made at the hotel. Those statements were admissible under the hearsay exception for forfeiture by wrongdoing, as discussed in Part III below. Stansbury recounted RM's statements about the photos twice. First, he recounted her saying "he did have naked photos of her, that they sent each other naked photos . . . . [H]e's got naked photos of me on his cell phone." J.A. 66. Second, he recounted her saying she "sent him nude photographs of herself and that he had nude photographs of her on his phone . . . . [H]e has naked pictures of me on his cell phone." J.A. 66–67.[9] And Stansbury said he asked

---

[8] From the trial testimony, we can't infer that the images contained any of the other categories of conduct—sexual intercourse, masturbation, bestiality, or sadistic or masochistic abuse. *See* 18 U.S.C. § 2256(2)(A), (2)(B).

[9] Another agent said RM suggested that "there was child pornography" on Pratt's phone. J.A. 57. But the agent appears to have used "child pornography" colloquially, not (Continued)

Pratt "[D]o you have naked pictures of [RM] . . . on the phone?" to which he says Pratt responded "yes, I've got pictures of her on the phone." J.A. 67.[10]

In each statement, the photos are described solely with the generic terms "naked" or "nude." Some "naked" or "nude" photos are lascivious and display the genitals or pubic area. But many photos an ordinary viewer would describe as "naked" or "nude" are not lascivious or do not depict the genitals or pubic area. Thus, without more, we can't infer that the photos contain sexually explicit conduct as defined by statute.

Considering all the trial testimony, there was insufficient evidence for a "rational trier of fact" to find the "essential element[]" that the photos contained sexually explicit conduct. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Given this failure of proof, the error was not harmless regarding counts two and five. We therefore vacate Pratt's convictions for the two child pornography offenses.[11]

C.

---

as a legal conclusion. No witness testified that the photos depicted the genitals or pubic area.

[10] At trial, FBI agents described the images from Pratt's phone as "nude" photos of RM. J.A. 174, 359. At least one of those descriptions derived from viewing the photos. J.A. 174. That description should have been suppressed. *See Wong Sun v. United States,* 371 U.S. 471, 485 (1963) ("[T]estimony as to matters observed during an unlawful invasion" is also subject to exclusion.). In any event, the agents' generic description of the photos adds nothing new.

[11] When the government addressed harmless error at oral argument, it incorrectly stated that it had introduced copies of pornographic images from RM's phone. In a post-argument submission, the government conceded that no such images had been introduced.

12

We must also decide whether to vacate Pratt's entire sentence in light of this error. "[A]n appellate court when reversing one part of a defendant's sentence 'may vacate the entire sentence . . . so that, on remand the trial court can reconfigure the sentencing plan.'" *Pepper v. United States*, 562 U.S. 476, 507 (2011) (quoting *Greenlaw v. United States*, 554 U.S. 237, 253 (2008)). This court has recognized that district courts consider all counts when crafting sentencing packages. *See United States v. Smith*, 115 F.3d 241, 246 (4th Cir. 1997). We do have discretion to vacate only the sentences for vacated convictions. *See, e.g.*, *United States v. Hurwitz*, 459 F.3d 463, 482–83 (4th Cir. 2006); *United States v. Berry*, 369 F. App'x 500, 502–03 (4th Cir. 2010). But because sentences are often interconnected, a full resentencing is typically appropriate when we vacate one or more convictions. *See United States v. Ventura*, 864 F.3d 301, 309 (4th Cir. 2017).

Here, the district court likely crafted a sentencing package with all eight convictions in mind. A resentencing might not change how long Pratt stays in prison, given that the district court imposed multiple life sentences. But "there may be some chance that other parts of [Pratt's] sentence may be affected by" vacating the child pornography counts. *United States v. Jones*, No. 95-5370, 1998 WL 19620, at *7 (4th Cir. Apr. 22, 1998). The district court is in the best position to make that judgment. We therefore vacate Pratt's entire sentence. On remand, the government may retry Pratt for the child pornography counts. Once the government has retried him or declined to do so, the district court shall resentence Pratt and "make any correction to his sentence it deems appropriate." *Id.* We express no opinion on whether the district court should modify his sentence.

13

214

III.

In addition to his Fourth Amendment argument, Pratt contends that the district court erred by admitting an FBI agent's recollection of RM's statements about the prostitution business and the nude images she sent him.  Unlike most evidentiary issues, we review this ruling de novo because it implicates the Confrontation Clause.  *See United States v. Summers*, 666 F.3d 192, 197 (4th Cir. 2011).  We see no error.

The district court admitted RM's statements under the "forfeiture by wrongdoing" exception to the hearsay rule.  Under this exception, a district court may admit hearsay statements "offered against a party that wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result." Fed. R. Evid. 804(b)(6).  The elements are (1) wrongful conduct, (2) intended to cause the witness's unavailability, and (3) actually causing the witness's unavailability.  *See United States v. Jackson*, 706 F.3d 264, 267–69 (4th Cir. 2013).   The Constitution normally forbids testimonial statements from an unavailable witness whom the defendant had no previous chance to cross-examine.  *See* U.S. Const. amend. VI; *Crawford v. Washington*, 541 U.S. 36, 68–69 (2004).  But the Supreme Court has recognized that wrongfully and intentionally causing a witness's unavailability estops a defendant from asserting confrontation rights.  *See Giles v. California*, 554 U.S. 353, 359 (2008); *Crawford*, 541 U.S. at 62.

Several times, Pratt called his mother from jail and had her put RM on the phone. The government contends that Pratt threatened RM in these calls.  Those calls plus Pratt's

14

215

history of violence against women caused RM not to testify, in the government's view. Pratt denies that he intended to threaten RM and that his calls caused her unavailability.

There is no question Pratt engaged in wrongful conduct when he violated the magistrate judge's order and contacted a potential witness (and victim) from jail. *See United States v. Montague*, 421 F.3d 1099, 1103–04 (10th Cir. 2005) (violating order not to contact witness is wrongful). Thus, the only questions are intent and causation.

In his phone conversations with RM from jail, Pratt's intent to make RM unavailable is plain. As an ineffective ruse, Pratt would pretend to be talking to someone other than RM. In the first call he said, speaking of RM, "[f]or some reason they saying that she's a witness . . like she cooperating or something . . . I'm saying don't even try and speak to her or nothing because even if . . . anybody tries to speak to her I'm gone get in trouble understand." J.A. 676. He followed up with, "I hope you don't think she's cooperating right." *Id.* RM said she was not cooperating. *Id.* Pratt then said, "I hope if [RM] is talking to ["AM" (another minor victim)] . . . I hope she can find out if [AM is] cooperating too." *Id.* "I just hope neither one of them is cooperating," he continued. *Id.* Over and over, Pratt tried to dissuade RM from testifying.

In a second call, he told her "[RM] and [AM] need to speak cause . . . that's the two pieces to the puzzle that . . . get me out of here *don't you talk to them*." J.A. 677 (emphasis added). In a third call, he urged her to deny that he used the alias "Promise," with which some witnesses would identify him at trial. J.A. 679. Pretending that he was speaking to RM's cousin, he told her the government was calling RM a "witness" and

15

would question her.  *Id.*  He urged her to deny any knowledge.  J.A. 680.  In all three

calls, Pratt tried to get RM not to testify or not to testify honestly.

Those calls caused RM's unavailability.  Standing alone, the calls sound like

veiled threats.  But the threats become obvious against the backdrop of the graphic

testimony of several women at trial who detailed how Pratt would beat prostitutes—

including RM—whom he considered disobedient.  *See Montague*, 421 F.3d at 1102–04

(recognizing forfeiture from wrongdoing through threatening phone calls and history of

abuse); *State v. Maestas*, 412 P.3d 79, 90–91 (N.M. 2018) (same).  RM would have

received the message that Pratt would hurt her in the future if she disobeyed Pratt and

testified against him.

Pratt contends that the time lapse between the phone calls and the trial reduced the

salience of any threat.  But given Pratt's history of abusing RM, we think it unlikely that

time eroded the sense of threat.  That threat caused RM not to testify.  Her personal

feelings for Pratt—whom she considered her boyfriend—may have played a role too.

But those feelings were tied up in the same abusive relationship.

The district court did not err by admitting an agent's recollection of RM's

statements.

IV.

In sum, the district court erred by refusing to suppress information from Pratt's

cellphone.  The error was not harmless because the government's other evidence could

not establish the statutory elements of counts two and five.  On the evidentiary issue, the

16

district court did not err by admitting RM's hearsay statements under Federal Rule of

Evidence 804(b)(6).  Accordingly, we vacate Pratt's convictions for counts two and five

and affirm the remaining convictions.  We also vacate Pratt's sentence and remand to the

district court for further proceedings consistent with this opinion.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CASE NO:  CCB-17-0226** |
| **ERIC WAYNE GRINDER,** | |
| **Defendant.** | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR RECONSIDERATION

The United States of America submits this Response in Opposition to the Motion of Defendant Eric Wayne Grinder for Reconsideration of the Court's Memorandum and Order dated June 12, 2018 (the "Order") in which the Court denied Defendant's Motion to Suppress Cell Phone and Laptop Computer Evidence (ECF No. 94).

Defendant claims that the Court should reconsider the Order in light of the Fourth Circuit's recent decision in *United States v. Pratt*, No. 17-4489, -- F. 3d --,  2019 WL 489053 (4th Cir. Feb. 8, 2019).  Because *Pratt* is inapplicable, and for all of the other reasons that follow, the Court should summarily deny Defendant's Motion.

## BACKGROUND

### A.  Procedural History

On January 23, 2019, a federal Grand Jury sitting in the District of Maryland returned a Third Superseding Indictment charging the defendant with five counts of Production of Child Pornography, pursuant to 18 U.S.C. § 2251(a), one count of Attempted Production of Child Pornography, pursuant to 18 U.S.C. § 2251(a), two counts of Possession of Child Pornography, pursuant to 18 U.S.C. § 2252A(a)(5)(B), and one count of Witness Tampering pursuant to 18 U.S.C. § 1512(b)(1).  The child pornography charges arise out of Defendant's filming of his sexual abuse of a minor (the "Minor Victim") in his care from approximately June 2013 through

August 2016.  The witness tampering charges arise out of Defendant's attempt, after his arrest and detention, to have his sister contact the Minor Victim and coach the child to recant her earlier statements to law enforcement.

The depictions of the sexual abuse of the Minor Victim and other child pornography were located on the Defendant's Samsung Model Galaxy S5 cell phone (and the SD card within it) (the "Phone") and a Toshiba laptop computer (the "Laptop") (together, the "Devices") which were seized by local law enforcement on November 29, 2016 pursuant to a state search and seizure warrant (the "State Warrant").

On October 30, 2017, Defendant moved to suppress the evidence contained on the Devices, ECF No. 33, the parties submitted responsive and supplemental briefing, ECF Nos. 43-50, and the Court held a hearing on January 26, 2018.

On June 12, 2018, the Court denied Defendant's motion to suppress in its entirety.  ECF No. 54; *United States v. Grinder*, No. CR CCB-17-226, 2018 WL 2943235 (D. Md. June 12, 2018).  In that ruling, the Court explicitly considered Defendant's argument that the Devices were held pursuant to an "extended warrantless seizure."  ECF No. 49 at 2.  The Court rejected this argument, noting that "Grinder also takes issue with the length of his phone's seizure, relying on *U.S. v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009)" and concluding that "here the cell phone was warrantlessly held by law enforcement for no more than twenty minutes"—the period of time when the Devices were detained by law enforcement pending authorization of the State Warrant.  It is this argument that Defendant would have the Court revisit at this late juncture— just a week before trial.

**B.  Factual Background**

On November 29, 2016, the State Warrant was authorized for Defendant's residence at 261 Montpelier Court in Westminster, Maryland for evidence relating to the following crimes: Child Abuse Minor, Rape 2d Degree, Sexual Offense 2d Degree, Sexual Offense 3d Degree, and

Sex Abuse Minor—Continuing Course of Conduct. *See Grinder*, 2018 WL 2943235, at *1. The

State Warrant specifically provided for the search and seizure of evidence of relating to such

crimes, including phones and computers. *Id.* at *2. The State Warrant was authorized by a state

court judge at 6:15 p.m. *Id.*

On November 29, 2016 at approximately 5:06 p.m., Corporal Michael Lare of the Carroll

County Sheriff's Office, responded to 261 Montpelier Court to secure the residence in light of

the pending search warrant. *Id.* at *1.

At approximately 5:56 p.m., Defendant arrived in his car and parked in the driveway of

his residence. *Id.* Corporal Lare approached Defendant, told him that a search warrant for the

residence was being obtained and, asked for Defendant's phone, which, as he told Defendant,

was subject to the State Warrant. Motions Hearing Tr. at 12. Defendant complied and provided

Cpl. Lare with his phone. *Id.* at 13.

At 6:31 p.m., investigators from the Carroll County Sheriff's Office responded to

Defendant's residence to execute the warrant for it. Among the items seized during the search

was the Laptop, which was on December 19, 2016 provided by state law enforcement to a

Department of Homeland Security, Homeland Security Investigations (HSI) forensic analyst for

review.[1] While the analyst received the Devices on December 19, 2016, his bench notes—

obtained by the government yesterday evening—reflect, among other things, that: (1) On

February 7, 2017, he imaged the laptop; (2) On February 16, 2017, he "found CP" and a

"potential victim," notified the investigator[2] and suspended his search of the Laptop; (3) On

March 8 and March 9, 2017, he tried to reach the investigator by phone and email; and (4) On

---

[1] In its response to Defendant's Motion to Suppress, the Government wrote, "On December 19, 2016, the HSI forensic analyst began an examination of the Toshiba laptop computer." ECF No. 44 at 4. Though the analyst received the Laptop on December 19, 2016, he did not begin examining it that day. The Government regrets this error.

[2] The primary investigator at this time was a state investigator. Federal law enforcement learned of this matter shortly before the Federal Warrant was obtained.

March 17, 2017, he "printed off" images and video—*i.e.*, the suspected child pornography and suspected images of the Minor victim—for "Case Agent SW."  Ex. 1.

On March 17, 2017, Special Agent Richard Federico obtained warrants to search Defendant's residence, as well as the Devices (the "Federal Warrants").

Thereafter, the analyst's search of Defendant's Laptop continued—this time searching for evidence concerning child pornography rather than rape of the Minor Victim—and he executed the federal warrant as to Defendant's phone as well.  After the Federal Warrants for the Laptop and the Phone were obtained, the analyst located numerous images of suspected produced child pornography, as well as numerous forensic artifacts indicative of Defendant's sexual interest in children.  It is all of this evidence that Defendant once again asks the Court to suppress.

## ARGUMENT

In his supplemental briefing dated January 24, 2018, Defendant ignored the existence of the State Warrant altogether, arguing that "the extended deprivation of Mr. Grinder's cell phone – for *months before police obtained a warrant* – represents a . . .  substantial and prolonged intrusion on Mr. Grinder's Fourth Amendment rights."  ECF No. 92 at 2 (emphasis added).  The Court considered this argument and rejected it:

> Grinder also takes issue with the length of his phone's seizure, relying on *U.S. v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009) in which the Eleventh Circuit found that seizing a phone for 21 days before a warrant was obtained was unreasonable under the Fourth Amendment. 565 F.3d at 1351-52. *But here the cell phone was warrantlessly held by law enforcement for no more than twenty minutes.*

*United States v. Grinder*, No. CR CCB-17-226, 2018 WL 2943235, at *6 (D. Md. June 12, 2018) (emphasis added).

Once again ignoring the existence of the State Warrant authorizing seizure and search of the Devices, Defendant now has repackaged the same argument he made previously—this time relying upon the Fourth Circuit's recent decision in *Pratt*, which amounted to nothing more than an application of *Mitchell*.  *Compare* ECF No. 94 at 5 ("*Pratt* makes clear that the four-month

delay in obtaining the federal warrant was unreasonable."), with *Pratt*, No. 17-4489, 2019 WL

489053, at *3 ("Pratt's case parallels *United States v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009)")

and *id.* at *4 ("Pratt's case is closest to *Mitchell*.").

For the following reasons, Defendant's argument fares no better now than it did

previously, and the Court should summarily reject it without a hearing.

### A.  Pratt Involved A Warrantless Seizure.  This Case Does Not.

*First*, *Pratt* is inapposite, and its facts bear little resemblance to those here.  *Pratt*

involved a warrantless seizure of a phone based on a probable cause arrest—and then a 31 day

delay before law enforcement obtained a warrant to search the phone.  *See Pratt*, 2019 WL

489053, at *1.  In other words, the case concerned the effect a *warrantless seizure* had on the

defendant there's possessory interests in his property.  Not so here.

Indeed, every case cited by the Fourth Circuit in the relevant portion of *Pratt*'s analysis

concerned seizures *without warrants*.  *See Riley v. California*, 134 S. Ct. 2473, 2486 (2014)

(warrantless seizure incident to arrest); *United States v. Jacobsen*, 466 U.S. 109, 125 (1984)

(warrantless seizure and field test of white powder permissible); *United States v. Place*, 462 U.S.

696, 706 (1983) (warrantless detention of luggage unreasonable under circumstances); *United*

*States v. Van Leeuwen*, 397 U.S. 249, 252–53 (1970) (warrantless detention of package for 29

hours reasonable under circumstances); *Illinois v. McArthur*, 531 U.S. 326, 332–33 (2001)

(warrantless detention of suspect preventing him from entering home for two hours permissible);

*United States v. Montoya de Hernandez*, 473 U.S. 531, 541–44 (1985) (warrantless detention of

suspected drug smuggler for 16 hours permissible); *Rodriguez v. United States*, ––– U.S. ––––,

135 S. Ct. 1609, 1615–16 (2015) (extension of warrantless traffic stop for dog sniff

impermissible without reasonable suspicion); *United States v. Mitchell*, 565 F.3d 1347 (11th Cir.

2009) (per curiam) (21-day delay between a valid warrantless seizure of a computer and the

application for a search warrant unreasonable); *United States v. Vallimont*, 378 F. App'x 972, 975–76

(11th Cir. 2010) (after warrantless seizure, 45-day delay in obtaining warrant permissible); *United States v. Laist*, 702 F.3d 608, 616–17 (11th Cir. 2012) (after warrantless seizure, 25-delay in obtaining warrant was permissible).

Here, by contrast, law enforcement obtained a warrant—the State Warrant—that authorized law enforcement to seize and search the Devices.  *See Grinder*, 2018 WL 2943235, at *2 (noting that the State Warrant authorized law enforcement to "[s]eize and have forensically analyzed by a qualified person or persons any cellular telephones seized" and "[s]eize and have forensically analyzed by a qualified person or persons any computers, hard drives, media storage devices.").  The State Warrant thus granted law enforcement the right to impede Defendant's possessory interests in the Devices.  The fact that federal law enforcement ultimately obtained the Federal Warrants to search for evidence related to child pornography offenses on the Devices is irrelevant.

Defendant cites no authority that endorses the proposition—illogical on its face—that evidence seized pursuant to a valid warrant may be suppressed based on the delay in obtaining a second warrant.  As *Pratt's* discussion and cited-authority makes clear, a warrantless seizure is a necessary predicate to any "unreasonable-delay" argument, such as the one Defendant advances yet again now.

**B.  Defendant Conflates Search And Seizure Interests.**

*Second*, Defendant improperly conflates the separate search and seizure interests. "Different interests are implicated by a seizure than by a search." *Segura v. United States*, 468 U.S. 796, 806 (1984) (Burger & O'Connor, JJ.); *accord United States v. Jacobsen*, 466 U.S. 109, 113 (1984). "A seizure affects only the person's possessory interests; a search affects a person's privacy interests." *Segura*, 468 U.S. at 806.  And although a seizure is, by nature, "generally less

intrusive" than a search, *Segura*, 468 U.S. at 806, a warrant is ordinarily required to safeguard the defendant's "possessory interest" in seized property.

Thus, again, the fact that the government later obtained the Federal Warrants is irrelevant for the purposes here. What matters was that the State Warrant permitted the Devices' seizure—as the Court as already ruled. Because the State Warrant conferred the authority to seize and retain the Devices, there was no violation of Defendant's possessory interest in them.

The Eighth Circuit's decision in *United States v. Gregoire*, 638 F.3d 962 (8th Cir. 2011), is instructive. There, local police seized the defendant's laptop pursuant to a warrant that permitted a search of the defendant's home for evidence, including computers, based on probable cause to believe he was reselling stolen merchandise. *Id.* at 966. The laptop was turned over to the United States Postal Service and searched, over a year after its seizure, without first obtaining another warrant. *Id.* The Eighth Circuit summarily rejected the defendant's argument that the year-long delay warranted suppression: "Gregoire's contention that the delay in searching the laptop was unreasonable, requiring suppression of evidence obtained by the search, is without merit." *Id.* at 968. Because the seizure was permitted by the initial warrant, there was no Fourth Amendment violation. *Id.* at 967-68. So too here—where the government sought a second warrant before searching defendant's Devices and obtained that second warrant just a few months after the initial seizure.

Cases in which defendants consented to searches and seizures are also instructive. Consent is an exception to the Fourth Amendment's warrant requirement. *See Soldal v. Cook Cnty.*, 506 U.S. 56, 65-66 (1992). Both warrants and consent protect (or vitiate) Fourth Amendment rights. *See McArthur*, 531 U.S. at 330; *Leon*, 468 U.S. at 913-14. Thus, the warrant

to seize Defendant's Devices safeguarded defendant's possessory interest in the same manner as consent does in other cases.

In *United States v. Murinko*, No. CR-09-027-JLQ, 2009 WL 2487042 (E.D. Wash. Aug. 12, 2009), for example, the defendant contested a 72-day delay between the FBI's seizure of his computer and application for a search warrant. *Id.* at \*1-2, 4. However, because the defendant had given agents his consent, the Ninth Circuit held that his reliance on unreasonable-delay precedents—*Mitchell* and *Dass*—was "misplaced." *United States v. Murinko*, 410 F. App'x 2, 4 (9th Cir. 2010) (summary order); *accord United States v. Stabile*, 633 F.3d 219, 235 (3d Cir. 2011). Those cases, the Court observed, "both involved warrantless seizures based on probable cause, not consent." *Murinko*, 410 F. App'x at 4. "This distinction matters." *Stabile*, 633 F.3d at 235. When property is seized with the owner's consent, "no possessory interest has been infringed." *Stabile*, 633 F.3d at 235). Thus, because the seizure in *Murinko* was accomplished by means of consent, the length of the pre-search delay was not proscribed by the Fourth Amendment. Likewise, here, because Defendant's Devices were seized pursuant to a valid warrant, the length of any delay before the federal warrant was obtained did not violate his constitutional rights.

The Eleventh Circuit's analysis in *Laist*—cited by the Fourth Circuit in *Pratt*—is in accord. There, the defendant initially consented to the FBI's seizure of his computer but revoked his consent eight days later. 702 F.3d at 610-11. The FBI then waited an additional 25 days before seeking a warrant. *Id.* at 612-13, 614 n.2. The Eleventh Circuit analyzed whether the FBI violated the defendant's Fourth Amendment rights by retaining the computer for the 25 days after consent was revoked. *Id.* The court specifically did not include the eight-day period during which the computer had been held with the defendant's consent. *See id.* at 613 n.1. During those eight days, there was no infringement of the defendant's possessory interest. *See also United States v. Emanuel*, 440 F. App'x 881, 883, 885-86 (11th Cir. 2011) (per curiam) (holding

that 34-day delay before obtaining a warrant to search the defendant's computer "did not violate [his] constitutional possessory rights" where he had consented to the computer's seizure; "[b]ecause [the defendant] gave his voluntary consent to the seizure, *Mitchell* is inapposite").

At bottom, there is no constitutional basis to distinguish between cases in which a defendant's possessory interest is vitiated by consent and cases in which that same interest is protected by a warrant. If anything, a warrant confers law enforcement with greater rights and benefits; unlike consent, a warrant requires a showing of probable cause, is obtained with the blessing of a neutral judge, and cannot be revoked at the will of the property owner. Neither precedent nor principle supports the conclusion that the government has a greater interest in retaining the property of consenting parties than in retaining property seized on the basis of judicially affirmed probable cause.

### C. Defendant Could Have Sought The Return Of The Devices. But He Did Not.

*Third*, Defendant's argument also fails because Defendant never sought return of the Devices. An individual who is lawfully dispossessed of his property pursuant to a valid seizure warrant is not without a remedy in the event of a prolonged detention. "A person aggrieved . . . by the deprivation of property may move for the property's return." Fed. R. Crim. P. 41(g). If the motion is granted, the property must be returned. *Id.* As the advisory committee explained, under the amended rule, "a person whose property has been lawfully seized may seek return of property when aggrieved by the government's continued possession of it." Fed. R. Crim. P. 41 adv. comm. n. (1989). Thus, the Eighth Circuit's conclusion in *Gregoire* is equally applicable here: "To the extent [defendant] complains of interference with his possessory interest in the laptop, Rule 41(g) of the Federal Rules of Criminal Procedure provided a remedy he did not invoke." 638 F.3d at 968. The Defendant had ample opportunity to seek the return of the Devices seized on November 29, 2016—particularly because he was not arrested until March 21,

2017—but nevertheless did not do so. Defendant has never requested return of the Devices from

law enforcement under Rule 41(g) or any other authority. He can hardly complain.

Further, to the extent Defendant is arguing that even if a computer is seized pursuant to a

valid warrant, "at some point" its continued retention must ripen into a Fourth Amendment

violation warranting suppression, this argument is meritless. "The Fourth Amendment" does not

place "expiration dates" on warrants, *United States v. Burgess*, 576 F.3d 1078, 1097 (10th Cir.

2009), and there is no constitutional limitation on "the duration" for which validly seized

property may be retained, *see United States v. Syphers*, 426 F.3d 461, 469 (1st Cir. 2005).

In *United States v. Jacobsen*, agents operating without a warrant seized suspected powder

cocaine and conducted a field test, which "by *destroying* a quantity of the powder . . . converted

what had been only a temporary deprivation of possessory interests into a permanent one." 466

U.S. at 124-25 (emphasis added). But the "permanent" warrantless seizure did not violate the

Fourth Amendment. Because the defendants' property had been "lawfully detained" pursuant to

a valid exception to the warrant requirement, "the 'seizure' could, at most, have only a *de

minimis* impact on any protected property interest." *Jacobsen*, 466 U.S. at 125; *see also United

States v. Johns*, 469 U.S. 478, 487 (1985) (recognizing, in the context of a warrantless seizure,

that defendants "who do not challenge the legitimacy of the seizure" and who "never sought

return of the property" cannot "even allege[], much less prove[], that the delay in the search of

[the property] adversely affected legitimate interests protected by the Fourth Amendment");

*United States v. Mulder*, 889 F.2d 239, 241 & n.1 (9th Cir. 1989) (two-year delay following

warrantless seizure of pills was not unreasonable where, inter alia, the defendant's "possessory

interest in the [contraband] pills was minimal," and he "never made a motion for the return of the

pills or asserted any legal challenge to the government's right to retain them").

If, as the Supreme Court reasoned in *Jacobsen*, a permanent and permissible warrantless

seizure works only a *de minimis* intrusion on property interests, it follows that the permanent

228

seizure of property with a valid warrant, works no intrusion on property interests. The State

Warrant satisfies Fourth Amendment concerns, and suppression is unjustified. To the extent any

property interest remains, the remedy is statutory: An individual aggrieved by the prolonged

retention of property may move for its return under Rule 41(g). Defendant did not pursue that

remedy.

But even assuming that some outer constitutional limit proscribes the time within which

the government must obtain a search warrant after seizing a computer pursuant to a valid state

warrant, that limit must be well beyond the approximately four-month period at issue in this

case. In *Christie*, where a computer was held for five months with the consent of one of the

computer's co-owners, then-Judge Gorsuch explained that the delay was "inside the bounds of

constitutionally reasonable conduct, if not by a very great margin." 717 F.3d at 1163-64. In

*Gregoire*, where a computer was seized pursuant to a warrant and held for an entire year before it

was searched, the Eighth Circuit rejected unreasonable-delay arguments as utterly meritless. 638

F.3d at 968.

Those cases teach that when a seizure is effected with a warrant or without the need for

one, any constitutional time limit within which a search must be completed is far beyond the

limit applicable to cases involving exigent warrantless seizures—as in *Pratt*. Because

Defendant's Devices were seized pursuant to a valid warrant, four months comes nowhere near

any outer constitutional bound.

**D. The State Warrant Authorized Both the Seizure *And The Search* Of The Devices.**

*Fourth*, Defendant's complaint about time between the warrant-authorized seizure and

the Federal Warrants ignores the fact that the State Warrant authorized not only seizure of the

Devices, but also their search (albeit for evidence of sex abuse of a minor, rather than child

pornography offenses)—and it did so on November 29, 2016. Thus, other than the 20 minutes

that the phone was held by law enforcement while the State Warrant was being authorized, there

229

was no wait, no delay, no elapsed time. The warrant to search was simultaneous with the warrant to seize. That the Federal Warrant were later obtained expressly to search for child pornography—which arguably was not necessary as the existence of child pornography on the computer of suspect accused of child rape is within scope of the State Warrant ("evidence relating to the crimes of Sex Abuse of a Minor …")—is immaterial.

### E.  The Laptop Contained Contraband.

*Fifth*, even if Defendant had requested the Devices back—and he did not—law enforcement could not have given the Laptop back, as it contained contraband. Indeed, the forensic analyst observed images of a prepubescent child engaged in sexually explicit conduct on it. Just as the government would not return cocaine to the dealer because it is contraband, so too would it not return the Laptop to the Defendant because the device now contained contraband. Further, the Laptop is subject to forfeiture upon conviction under 18 U.S.C. § 2253. *See also United States v. Wernick*, 673 F. App'x 21 (2d Cir. 2016) (per curiam) (laptop and all data associated with child pornography laden laptop subject to forfeiture because contraband commingled with legitimate materials); *United States v. Mooney*, 581 F. App'x 831 (11th Cir. 2014) (per curiam) (affirming denial of 41(g) motion for return of laptop which contained CP). Moreover, from a practical standpoint, even if the government could have, for example, removed the contraband—*i.e.*, the hard drive—from the Laptop and returned it, that would serve little purpose, as Defendant would then only have an inoperable plastic shell.

### F.  The Laptop And Phone Have Independent Evidentiary Value.

*Sixth*, and relatedly, both the Laptop and the Phone have independent evidentiary—yet another reason the government permissibly retained the Devices pursuant to the State Warrant. Unlike in *Pratt*, where the Circuit concluded that "only the phone's files had evidentiary value," *Pratt*, 2019 WL 489053, at *4, the Devices themselves constitute evidence of Defendant's production of child pornography. For instance, the way in which the videos found on the SD

card contained within the Phone were shot—*i.e.*, the angle and the way in which the filming device is handled in the videos—is consistent with the Government's theory that Defendant used a phone to produce the videos of production of child pornography and, in one of the videos, the case covering Defendant's Phone itself is visible.  The Laptop too has independent evidentiary value as it contains a non-pornographic file that appears to depict Defendant and the Minor Victim watching a pornographic video[3] that is being displayed *on a laptop*—in other words, it shows Defendant using a laptop to groom the Minor Victim for the purpose of filming his later sexual abuse of her.

**G.  The Good Faith Exception Applies.**

*Finally*, though he argues for suppression of the Devices, Defendant fails to address whether the good faith exception applies—and it does.  This is yet another reason the Court should summarily deny Defendant's Motion.

"Exclusion exacts a heavy toll on both the judicial system and society at large. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Davis v. United States*, 564 U.S. 229, 237 (2011) (internal citations omitted).  Accordingly, suppression is a remedy of "last resort." *Id.* It is appropriate only when necessary to deter police misconduct. *Id.* at 237-40, 246; *Leon*, 468 U.S. at 916. Courts should not "suppress evidence obtained as a result of nonculpable, innocent police conduct." *Davis*, 564 U.S. at 240. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that

---

[3] Although the screen of the laptop is not visible while it films, the defendant and the Minor Victim is seen pointing as she asks the defendant, "Does it come out of here?  Does it?  Does it?  Does it?  Does it?" Defendant tells her, "No, it comes up and then she fucks someone."

such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009).

Here, there was no such misconduct by law enforcement.  To the contrary, law enforcement retained Defendant's Devices because they had authority to do so pursuant to the State Warrant.  And even if a court were to conclude *post hoc* that the seizure warrant at some point expired—contrary to its terms—or that a search of the Devices was required to be conducted within a certain time period, law enforcement's failure to anticipate such a ruling was not objectively unreasonable.  Thus, assuming a Fourth Amendment violation, the good-faith exception applies. *See Leon*, 468 U.S. at 920-22.

Again, the fact that law enforcement eventually obtained the Federal Warrants is irrelevant to the question of whether law enforcement impermissibly retained the Devices.  By obtaining approval from a federal magistrate after a state judge had already authorized the seizure search of defendant's laptop, law enforcement demonstrated prudent caution.  That belt-and-suspenders approach—which entailed the review of not one but two neutral judicial arbiters—safeguarded Defendant's rights.  Not only would suppression in this case fail to deter culpable conduct, it would discourage law-enforcement officers from taking time to guarantee that they have authority to conduct a federal search.  Deterring good policing is exactly the opposite of what the exclusionary rule was designed to accomplish. *Davis*, 564 U.S. at 246. Because the good faith exception applies, the Court should deny Defendant's Motion.

## CONCLUSION

For all of the foregoing reasons, the Government respectfully requests that the Court deny Defendant's motion without hearing.[4]

---

[4] To the extent the Court does not deny the Motion on these grounds, the government respectfully requests the right to demonstrate the reasonableness of the purported delay at an evidentiary hearing limited to this issue.

Respectfully submitted,

Robert K. Hur
United States Attorney

/s/

By: _____
Paul A. Riley
Paul E. Budlow
Assistant United States Attorneys

Case 1:17-cr-00226-CCB   Document 98-1   Filed 02/13/19   Page 1 of 1

DEPARTMENT OF HOMELAND SECURITY
U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT

CASE NUMBER
CCSO 16-48227

GRINDER

**CASE CHRONOLOGY & REVIEW FORM**

| DATE | TIME | DESCRIPTION OF ACTIVITY |
|------|------|-------------------------|
| 2/7/17 | 1 | Opened Case - IMAGED C FTK IMAGER / PROCESSED C ENCASE & IEF. |
| 2/16/17 | | Found CP & Potential VICTIM - NOTIFIED CASE AGENT - (WAS ASKED TO WAIT ON FURTHER INVESTIGATION) BY CASE AGENT BASED ON NEW SEARCH WARRANT |
| 3/8/17 | | Called and left message for return call |
| 3/9/17 | | Emailed request to case agent for her to call me |
| 3/9/17 | | Called Carroll Child Advocacy Center and spoke c Detective that stated he would attempt to call her and have her contact me. |
| 3/17/17 | | VIDEO · 4:30 I UKEM WE |
| 3/17/17 | | PRINTED OFF IMAGES/VIDEO'S FOR CASE AGENT, SU |
| 3/24/17 | | COPIED INTERVIEW/VIDEO DISKS FROM MSP TO HSI FOR AGENT FEDERICO. |
| 3/24/17 | | IMAGED CELL PHONE FROM WESTMINSTER PD- 2nd SEARCH/DUMP OF PHONE- (SW EXECUTION) - IMAGED SD CARD FROM PHONE (POTENTIALLY FOUND VICTIM VAGINAL IMAGES. |
| 5/5/17 | | NORTHRUP/GRUNEN LAPTOP DESKTOP EO1 CREATED |
| 11/8/18 | | RAN MICRO SECURITY ESSENTIALS - NO VIRUS. & A1/6. No VIRUS. |
| 11/26/18 | | CREATED EXPORT OF EMULE & GOOGLE SEARCHES SENT B) EMAIL TO PROSECUTION |

LAST WRITE TIME

eMule - 12/12/14 17:44 UTC   C: USER\home\DeskTop\eMule

ICE Form 73-004 (10/07)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | Crim. No. CCB-17-0226 |
| ERIC WAYNE GRINDER | * | |

**REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION
OF MOTION TO SUPPRESS**

The defendant, Eric Wayne Grinder, by and through undersigned counsel, hereby submits this reply memorandum in order to briefly address certain points raised in the government's response in opposition to his motion for reconsideration (Dkt. No. 98).

First, in responding to Mr. Grinder's motion for reconsideration, the government relies on a host of factual assertions that are not in the evidentiary record before this Court. *See* Dkt. No. 98, at 3-4 & nn. 1-2. Among other things, the government makes factual representations that are directly contrary to facts that the case agent swore to under oath in the search warrant affidavit submitted to a federal magistrate judge. This includes the government's recent assertion that Mr. Grinder's laptop computer was in fact forensically searched in February 2017, not in December 2016, as represented in the federal search warrant application. In ruling on Mr. Grinder's motion for reconsideration, this Court should not consider or credit factual proffers that are not supported by the evidentiary record established in connection with the hearing on Mr. Grinder's motion to suppress.

Second, the government's entire legal argument rests on the flawed premise that so long as the initial seizure is made pursuant to a valid warrant, the subsequent actions of law enforcement are insulated from Fourth Amendment scrutiny. The Fourth Circuit's recent decision in *Pratt* stands for the opposite principle: that "a seizure that is 'lawful at its inception **can** nevertheless

violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests.'" *United States v. Pratt*, No. 17-4489 (4th Cir. Feb. 8, 2019), slip op. at 6 (emphasis added) (quoting *United States v. Jacobsen*, 466 U.S. 109, 124 (1984) (citing *United States v. Place*, 462 U.S. 696 (1983))). Nothing in the Fourth Circuit's analysis limits this principle to lawful seizures *pursuant to a search warrant*; rather, the analysis on its face applies broadly to any seizure that is initially made pursuant to some lawful authority. *Pratt* stands for the proposition that law enforcement have an obligation to act with diligence in carrying out the legitimate objectives of the seizure, particularly when the seized item is a cell phone holding a vast quantity of an individual's most vital personal data. The device must be promptly searched or imaged and returned to the owner; it cannot be held indefinitely, without examination, for future review. Here, as in *Pratt*, the "manner of execution" of the searches of Mr. Grinder's cell phone and computer were unreasonable in their lack of urgency, which violates the Fourth Amendment.

Third, the government argues for the first time that it was incumbent upon Mr. Grinder to seek the return of his devices pursuant to Federal Rule of Criminal Procedure 41(g). However, nothing in *Pratt* suggests that a defendant must first pursue relief under Rule 41(g) as a prerequisite to moving for suppression on Fourth Amendment grounds. Moreover, the government has offered no authority indicating that Federal Rule 41(g) is even a remedy available to a defendant whose property is seized by state law enforcement authorities pursuant to a state court warrant.

Fourth, the government's arguments that the seized devices have independent evidentiary value is frivolous. All of the evidence of value that the government points to derives from the *contents* of the devices, not from the physical devices themselves. This is a case, like *Pratt*, in which "[t]he agents could have removed or copied incriminating files and returned the phone," but did not. Slip op. at 9.

Fifth, the government incorrectly relies on the good faith exception here.  Good faith cannot apply where the very law enforcement officer tasked with conducting the forensic searches himself aborted the searches and ceased to conduct further examination because it was apparent that the scope of the initial search warrants had been exceeded.  It is what happened next – an unexplained period of lengthy delay between when law enforcement decided that new warrants were needed and when they actually sought such warrants – that triggered the Fourth Amendment violations under *Pratt* and that cannot be salvaged by the good faith exception.

Sixth, it is necessary to distinguish between the treatment of the cell phone and the laptop. In the case of the laptop, the forensic examiner conducted an initial examination, which revealed evidence that plainly exceeded the scope of the search warrant, prompting him to discontinue the search until a further warrant was obtained.  Once it was decided that a new search warrant was needed, a lengthy delay ensued before such warrant was even sought.  In the case of the cell phone, it was *never* searched pursuant to the initial warrant.  Law enforcement simply sat on the phone, without ever searching it, for months until a second search warrant was obtained.  Both periods of unexplained delay trigger a Fourth Amendment violation that is not subject to good faith analysis.

## **Conclusion**

For these reasons, together with the reasons set forth in his motion to reconsider and earlier briefing and argument, Mr. Grinder hereby moves this Honorable Court to reconsider its prior decision denying his motion to suppress, and to enter an order suppressing all evidence seized from his cell phone and laptop computer.  Mr. Grinder requests a hearing on this motion.

Respectfully submitted,

JAMES WYDA
Federal Public Defender
for the District of Maryland

     /s/

_____
ELIZABETH G. OYER (#95458)
KIRSTIN MAGUIRE HOPKINS (#19629)
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: (410) 962-3962
Fax: (410) 962-0872
Email: liz_oyer@fd.org
       kirstin_hopkins@fd.org

1

1           IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MARYLAND
2                   NORTHERN DIVISION


3


4
   UNITED STATES OF AMERICA
5
          v.                      CRIMINAL CASE NO.
6                                 CCB-17-226
   ERIC WAYNE GRINDER,
7
          Defendant
8   _____/

9

10                  VOLUME I
               Tuesday, February 19, 2019
11             Baltimore, Maryland

12
   Before:  Honorable Catherine C. Blake, Judge
13                  And a Jury

14


15  Appearances:

16       On Behalf of the Government:
          Paul A. Riley, Esquire
17        Paul E. Budlow, Esquire

18       On Behalf of the Defendant:
          Elizabeth G. Oyer, Esquire
19        Kirstin M. Hopkins, Esquire

20

21

22  ----------------------------------------------------------------

23            Mary M. Zajac, RPR, FCRR
           Fourth Floor, U.S. Courthouse
24          101 West Lombard Street
           Baltimore, Maryland 21201

25

2

1                    (Voir Dire filed in different transcript.)

2                    (Afternoon Session commences at 2:00 p.m.)

3                    THE COURT:  Okay.  So we have a few issues.  We're

4      going to see how much we can get on the record at the moment.

5      But to start with, I think perhaps we should do the arraignment

6      on the third superseding.

7                    THE CLERK:  Please stand.  Please state your name for

8      the record.

9                    THE DEFENDANT:  Eric Grinder.

10                   THE CLERK:  What is your age?

11                   THE DEFENDANT:  37.

12                   THE CLERK:  What year were you born?

13                   THE DEFENDANT:  1981.

14                   THE CLERK:  Mr. Grinder, how do you wish to plead to

15     Counts One through Nine of the third superseding indictment?

16                   THE DEFENDANT:  Not guilty.

17                   THE CLERK:  Thank you.

18                   THE COURT:  Thank you.  You can be seated.  There was

19     an issue -- and you can tell me where things stand at the

20     moment -- with the presence of the victim's mother, under the

21     Crime Victims' Rights Act, which we discussed, and the government

22     has given me a letter about it.  Where does that stand?

23                   MR. BUDLOW:  Your Honor, no change from the

24     government's perspective.  And Ms. Grinder's present in the

25     courtroom, as she was during the jury selection this morning.

3

1          THE COURT:  Okay.  Anything else that the defense wants

2    to say?

3          MS. OYER:  Your Honor, I want the record to be clear

4    that we are objecting to the presence of Mrs. Grinder because we

5    understand her to be a key witness in the government's case.  We

6    therefore think that it's appropriate to invoke Rule 615 of the

7    Federal Rules of Evidence and exclude her based on the likelihood

8    that her testimony could be influenced by the testimony of

9    witnesses who precede her.  It's our understanding that she is

10   essentially expected to connect the dots set forth by the

11   testimony of witnesses who will precede her.  And based on the

12   nature of her testimony, it would be prejudicial to have her

13   present in the courtroom during the testimony of other witnesses.

14         We believe that the victims, the Crime Victims' Rights

15   Act, which the government has invoked, is a basis for the victim,

16   the minor victim herself, to be present if she chose to, perhaps

17   even under these circumstances.  But we think that another

18   representative could equally represent her interests in the

19   courtroom.  It does not have to be Mrs. Grinder, who's a key

20   government witness.  And we are moving to exclude her, prior to

21   her trial testimony, on that basis.

22         THE COURT:  Okay.  All right.  Thank you.

23         Having looked at the statute and the cases that the

24   government provided in its letter dated February 18th of 2019, I

25   will overrule the objection to Ms. Grinder being here.  I think

4

1    that she, as the mother of the minor victim, is the one that has

2    and should assume the rights of the minor child.  While the

3    statute provides that there might be other people appointed to do

4    that function, that is if and when necessary, here, clearly, we

5    have the mother, the most logical guardian, who I think succeeds

6    to the victim's rights under the statute and therefore is

7    entitled to be here unless the defense has presented clear and

8    convincing evidence that the testimony she will give would be

9    materially altered if she hears other testimony.

10           I certainly understand the defense objection, but I

11   don't think it prevails in light of the clear language of the

12   statute.

13           Do you -- the government had requested to put certain

14   things on the record regarding a case, two cases, Lafler and

15   Frye.  And while I did not think it appropriate to refer this for

16   some sort of hearing, I will permit the government to put on the

17   evidence, on the record what it would like to regarding plea

18   discussions.

19           MR. RILEY:  Yes, Your Honor.  There were, there was no

20   formal plea offer made in this case.  The parties had informal

21   plea discussions very early on in the case.  The government

22   extended an informal plea offer.  That informal plea offer was

23   rejected.

24           Not long ago, Your Honor, the parties, after the

25   pretrial conference before the Court, the parties discussed a

5

1    potential resolution of this case again.  Again, informal

2    discussions, Your Honor.  And that, that proposed disposition

3    included both the federal case, as well as the state case.  It's

4    the government's understanding that that offer has not been

5    accepted, either.

6         THE COURT:  Well, to be clear, there was not any actual

7    offer.

8         MR. RILEY:  Thank you, Your Honor.  Yes, there was

9    never a formal offer.

10        THE COURT:  Okay.  Anything that, Ms. Oyer, that you

11   think is incorrect or that you want to discuss further?

12        MS. OYER:  Well, Your Honor, I think that in light of

13   the record, the government has made the record, should also

14   reflect that Mr. Grinder has repeatedly offered to plead guilty

15   pursuant to a conditional plea that would allow him to reserve

16   his appellate rights under the Fourth Amendment issue that we've

17   already litigated.

18        THE COURT:  All right.  And the government chose not to

19   accept that.

20        MR. RILEY:  Yes, Your Honor.

21        THE COURT:  Here we are.  All right.  Is there -- well,

22   let me turn to the issue of publishing the child pornography to

23   the jury in a limited fashion.  And again, counsel can correct me

24   if I'm stating anything wrong about what we might have discussed

25   in chambers.

6

1           My concern throughout the conversations that we've had

2   leading up to today is that the jury not unnecessarily be exposed

3   to the child pornography pictures in this case in light of the

4   defense stipulations.  It is my understanding that other than

5   offering the stipulations, the defense is essentially taking no

6   position on the publication of the images.

7           The government has agreed to substantially limit what

8   it publishes to the jury.  Of course, the jury would also have

9   the right to come back and ask to look at images or videos again

10  if they felt it necessary.  But at least in the course of

11  offering the evidence, the government will publish as little as

12  it thinks absolutely necessary.

13          I have reviewed the cases that the government cited in

14  its letter of February 17 of 2019.  And it certainly is correct

15  that, in general terms, the government has the right to prove its

16  case in the manner that it finds appropriate other, of course,

17  than the stipulation in Old Chief to a prior felony.

18          Having also been able to excuse from the jury at least

19  everyone that came forward and affirmatively indicated that they

20  would have some problems looking at the, at the images, subject

21  to anything else anybody wants to say, I would be allowing the

22  government to publish the images and the photographs in the most

23  limited way possible.  The public monitor will not be turned on.

24          Anything anybody needs to add to that?

25          MR. RILEY:  No, Your Honor.

7

1          THE COURT:  Okay.  There was an issue about the

2     defendant's use of the search terms.  The defendant had a motion

3     in limine about the various search terms, which is also laid out

4     in the February 17th government's letter.  Does the defense want

5     to be heard on that any further?

6          MS. HOPKINS:  Your Honor, I just want to make it clear

7     for the record which of the government's exhibits we're objecting

8     to.  And those are 30-A, 30-B, 30-C, 30-D, 30-E, 30-F, 30-G,

9     33-F, 33-G, and 33-H.  And we're objecting to those for all the

10     reasons in our motions in limine.  We're also objecting to any

11     related testimony.

12          THE COURT:  Okay.  All right.  And that objection

13     obviously is preserved.  Having looked at what the language is

14     and the government's argument for why it wants to present this, I

15     think that, well, I'm going to permit the government to put that

16     evidence in.  I think that it is their burden, as we are here,

17     going to trial, to prove all the elements of the offense,

18     including that, for example, the defendant knew that the images

19     were on his computer, in terms of the ones that are not produced,

20     and also it would, the fact that he was searching for these kinds

21     of sites would add to the circumstantial evidence that he, in

22     fact, produced these videos and images.

23              I don't see how there's any unfair or undue prejudice.

24     Obviously, it's the very subject of the case.  Can't exactly get

25     around it.  And it's not anything different or more prejudicial

245

8

1    than the pornography itself.

2              So I would deny that motion in limine.

3              We have the reconsideration of the motion to suppress.

4    Is there anything else?  In terms of motions in limine, I can say

5    tentatively, unless something changes in the course of the

6    evidence, that I'm letting in, and I'm sure it was objected to,

7    the coded letter that forms the basis of the witness tampering

8    charge in Count 9.  I am not at this point admitting the second

9    coded letter, which is not the subject of Count 9, on the

10   assumption that essentially it would be undisputed that the

11   defendant is responsible for the letter that is the subject of

12   Count 9.  We'll see how that, see how that goes.  And I therefore

13   would not admit any jail calls about that letter.

14             I am admitting the recorded jail call involving Mr.

15   Grinder's mother that discusses the first letter and includes a

16   conversation about whether he did this, and also a conversation

17   about the search warrant and why, from Mr. Grinder's point of

18   view, why his mother took them to the garage that, in fact, had

19   Mr. Grinder's sweatpants in it.

20             But I am excluding the additional call from an

21   unrelated person with no other particular connection to the case,

22   a conversation with, I believe, that occurred during the lacrosse

23   game, but another individual to whom Mr. Grinder made a

24   statement, which was not a clear admission.

25             What have I left out?  Anything we need to address

9

1    right now?

2         MS. HOPKINS:  Your Honor, I just want to, again, just

3    make it clear for the record which exhibits we are objecting to.

4    The discussion of the first letter, that's Exhibit Number 5 in

5    ECF Number 89.  And then we're also objecting to Exhibit 1 with

6    ECF Number 93, which is the call that Mr. Grinder had with his

7    mother.  And we're objecting to these for the same reasons in our

8    motions in limine.  Essentially, relevance, prejudice, cumulative

9    evidence, and a waste of time.

10         THE COURT:  Okay.

11         MR. RILEY:  Nothing further from the government's

12   perspective, Your Honor.

13         THE COURT:  Okay.  All right.  So the next step here

14   would be to bring in the jury, have them sworn.  I have some

15   brief preliminary instructions for them, including an extremely

16   brief recitation of the elements of the offense, the government's

17   Jury Instruction Number 46, and perhaps 49, the definition of

18   sexually explicit conduct -- I didn't see that either of those

19   had any objection to them -- Number 51, which is the attempt, and

20   Number 60, the elements of witness tampering, obviously, with the

21   usual instruction to the jury that if there's anything different

22   at the end of the case, they'll follow what they hear at the end

23   of the case.  But it would be fairly, fairly brief.

24         And about how long does the government expect to need

25   in opening?

247

10

1          MR. RILEY:  Sorry, Your Honor?

2          THE COURT:  How long do you think you need in opening?

3          MR. RILEY:  Twenty minutes, Your Honor.

4          THE COURT:  Ms. Oyer or Ms. Hopkins?

5          MS. OYER:  Your Honor, less than five minutes.

6          THE COURT:  Okay.  All right.  Then we'll bring in the

7    jury, have them sworn.  Let me also ask, will you be ready to go

8    right into opening, Mr. Riley?

9          MR. RILEY:  Yes, Your Honor.

10         THE COURT:  Okay.

11         MR. RILEY:  Your Honor, the only thing that I may need

12   is the microphone from Ms. Moye.

13         THE COURT:  Sure.

14         (Jury enters the courtroom at 2:20 p.m.)

15         THE COURT:  All right.  Welcome back.  And you can all

16   be seated for a moment.  Waiting for Ms. Moye because the first

17   thing we need to do is to have you all sworn in.

18         THE CLERK:  Members of the jury panel selected in the

19   present case, please stand and raise your right hand.

20         (Jury sworn.)

21         THE CLERK:  Thank you.  You may be seated.  Jury sworn.

22         THE COURT:  All right.  Thank you, ladies and

23   gentlemen.  As I said, I'm going to give you some brief

24   preliminary instructions, and then we'll get started with the

25   case.

11

1        As many of you have probably already realized, it's

2  going to be your job to decide, based on the evidence, what the

3  facts in this case are.  You are the only judges of the facts.

4  You do have to apply the law as I will give it to you to those

5  facts.  You have to follow the law, whether you agree with it or

6  not.  But nothing that I may say or do during the course of the

7  trial is intended to indicate what I think your verdict ought to

8  be.  That is up to you.

9        The evidence that you're going to have to decide the

10  facts will be testimony of witnesses sworn in, testified to you

11  under oath right there.  There will be documents, other things

12  that are admitted into the record as exhibits.  And there may be

13  some stipulations.  There will be things that the parties agree

14  to or stipulate to that you may also consider as evidence.

15        There are certain things that are not evidence.  That

16  includes the statements and the arguments and the questions of

17  the lawyers, as well as objections to questions, if there are

18  any.

19        Lawyers do have an obligation to their clients to make

20  objections when they believe evidence that's being offered is

21  improper for some reason under the rules of evidence.  You should

22  not be influenced by the objection or by my ruling on it.

23        If an objection is sustained, just ignore the question.

24  If it's overruled, treat the answer like any other part of the

25  testimony.

12

1          Obviously, if I tell you that some item of evidence is

2     being admitted for a limited purpose only, you must follow that

3     instruction.  Or if I tell you that certain testimony is stricken

4     or should be disregarded, please follow that instruction.

5          Ordinarily, the witnesses who, who testify in court

6     don't express their opinions.  Rather, they come in and tell you

7     what they heard or saw.  There are exceptions to that where there

8     is a witness who, because of their background, training,

9     experience, has some special expertise in a particular field, and

10    they may be permitted to express opinions if it would be helpful

11    to the jury in reaching their conclusion.

12         Expert testimony, however, like any other testimony, it

13    is up to you to decide whether to accept it or reject it or how

14    much of it to consider.  You should think about the reasons that

15    the expert is offered and their training and experience, and then

16    you give the testimony the weight you think it deserves.

17         Anything that you may have seen or heard outside the

18    courtroom or that you may see or hear outside the courtroom, as I

19    tried to make clear already, it's not evidence.  It must be

20    disregarded.

21         Another way of looking at the evidence is to say that

22    it can be direct or circumstantial.  By direct evidence, we mean

23    something like the testimony of an eyewitness, a person who was

24    present at an event, comes in and tells you what they saw or

25    heard.

13

1          By circumstantial evidence, we mean that you've got

2     proof of certain facts and, based on those facts, you may infer,

3     you may conclude, you may decide that other facts exist.  And the

4     simple example that I generally give is you go off to work in the

5     morning and it's a bright, sunny day.  You happen to work in an

6     office where there's no windows.  A couple hours later one of

7     your coworkers comes in and they're holding up a dripping wet

8     umbrella, taking off a dripping wet raincoat.  You didn't see it

9     rain because you couldn't see out the window, but based on what

10    you do see it would be reasonable for you to conclude that it

11    must have been raining outside.

12          That's all we mean by circumstantial evidence.  You

13    have proof of certain facts that lead you to conclude that other

14    facts exist.  And you may consider both direct and circumstantial

15    evidence in this case.

16          As I indicated in regard to experts, it's going to be

17    up to you to decide which witness to believe, which witness not

18    to believe, or how much of any particular witness's testimony to

19    accept or reject.  I may give you some guidelines on witness

20    credibility at the end of the case.  But essentially, it's a

21    matter of listening to them and applying your common sense.

22          As you know, this is a criminal case, and I will just

23    repeat a few things that I did say this morning.  But there are

24    some basic rules you have to keep in mind.

25          The defendant is presumed innocent unless and until

14

1    proven guilty.  The indictment, the charges brought by the

2    government against the defendant, are only an accusation, nothing

3    more, not proof of guilt or anything else.

4         And the burden of proof is on the government through

5    the very end of the case.  A defendant never has to prove that he

6    or she is innocent or present any evidence or testify.

7         The defendant has the right to remain silent.  So you

8    may not consider that in any way in arriving at your verdict, if

9    that is his choice.

10        And as I've indicated, the government does have to

11   prove the defendant's guilt beyond a reasonable doubt.

12        Now, the charges in this case, which I will just refer

13   to briefly, and I'm sure you will hear more about from counsel,

14   and substantially more at the end of the case, the counts, there

15   are several counts, nine counts, nine different charges, that is,

16   in the indictment.  Counts 1, 3, 4, 5, and 6 -- so the first six,

17   except for Count 2 -- charge production of child pornography.

18   And as to that, the government will have to prove beyond a

19   reasonable doubt, first of all, that the person referred to as

20   Jane Doe, the victim, was under the age of 18; second, that the

21   defendant used or employed or persuaded or induced or enticed or

22   coerced the victim, Jane Doe, to take part in sexually explicit

23   conduct for the purpose of producing or transmitting a visual

24   depiction, an image, a picture, a video, of that conduct; and

25   third, that this visual depiction, this image or picture, was

15

1    produced using materials that had been mailed or transported in

2    interstate or foreign commerce.

3         Essentially, sexually explicit conduct -- and I'll be

4    giving you a more full description of this at the end.  I should

5    also say, at the end you will have written jury instructions as

6    well to take back in the jury room with you.  But sexually

7    explicit conduct includes actual or simulated sexual intercourse

8    of various kinds, whether between adults, children, any person.

9    It also includes something called lascivious exhibition, which is

10   meaning a picture or depiction that displays or brings to view to

11   attract notice to the genitals or pubic area of children in order

12   to excite lustfulness or sexual stimulation in the viewer.  Not

13   every exposure of a child's genitals or pubic area constitutes

14   lascivious exhibition.  There will be various things for you to

15   consider in whether the government has met that particular part

16   of its proof.  That is a general definition.

17        Count 2 is attempt to commit production of child

18   pornography.  As to the attempt, the government would have to

19   prove, first, that the defendant did intend to commit the crime

20   of production of child pornography, as I've just described it to

21   you; and second, that the defendant did some act that was a

22   substantial step in an effort to bring about or accomplish the

23   crime, some substantial step towards trying to accomplish that

24   crime.  That is attempt in Count 2.

25        Counts 7 and 8, they are possession, as opposed to

16

1    production, possession of child pornography.  As to possession of

2    child pornography, the government would have to prove that the

3    defendant knowingly possessed or accessed a visual depiction,

4    picture; that this visual depiction was transported in or

5    affecting interstate or foreign commerce, or that it was produced

6    using materials that had been transported in or affecting

7    interstate or foreign commerce; third, they would have to prove

8    that that visual depiction was child pornography, which will be

9    further defined later; and fourth, that the defendant knew about

10   the sexually explicit nature of the material, and that this

11   visual depiction, this picture, was of an actual minor engaged in

12   that sexually explicit conduct.

13          And, finally, as to Count 9, Count 9 is a witness

14   tampering count.  For Count 9, the government would have to

15   prove, first, that on or about the date that's charged, which

16   you'll hear, the defendant knowingly, it says corruptly,

17   persuaded the Jane Doe, that's the victim, or attempted to do so,

18   that the defendant acted knowingly and with the intent to

19   influence the testimony of Jane Doe in an official federal

20   proceeding.

21          That is a very basic outline of the elements, as I've

22   said.  I'm sure you will hear more from counsel and also from me

23   at the conclusion of the case.

24          To be clear, if I didn't say this already, if there's

25   any difference between what I say now and what I say to you at

254

1    the end of the case, the instructions at the end of the case will

2    control.

3          In terms of your conduct as jurors, as I've already

4    told you, you need to decide the case just based on the evidence

5    here in the courtroom.  No independent research, please.  And as

6    I've said, please don't discuss the case with anyone, even among

7    yourselves.  And again, the reason is just that it's important to

8    keep an open mind until you've heard all the evidence.  Please,

9    so please don't form any opinion until all the evidence is in.

10          I think you'll find that the counsel ask questions that

11    need to be asked.  But as you're sitting there, if any of you has

12    a question that you would like to ask, don't discuss it with your

13    fellow jurors, but just write it down on a piece of paper, get my

14    attention or perhaps, more likely, Ms. Moye's attention, and I

15    will talk with counsel.  If it's a question that can be answered,

16    we'll try to answer if for you.

17          If you want to take notes during the course of the

18    trial, you may do that.  If some of you take notes and the others

19    don't, the notes will not control when you are deliberating.

20    Everybody's individual recollection is to be considered when you

21    deliberate in the jury room.  And if you take notes, they need to

22    stay here.  Don't take them out of the courthouse.  They need to

23    be in the courtroom or in the jury room.

24          One other thing.  When you go out to deliberate in a

25    couple days, we will ask you to elect a foreperson.  It can be

any one of you. We put you in the box in the order that you were on the list. The foreperson doesn't get an extra vote. We just need somebody to preside over your deliberations and be your spokesperson in court.

I also need to tell you that even though we have an excellent court reporter, we do not have instantaneous transcripts. I won't be able to give you a transcript of everything to read back at the end. Obviously, it's important to pay attention, takes notes if you want to.

The trial will begin in just a minute. The government has the right to make an opening statement, as does defense counsel. It's not evidence. It's just supposed to tell you a little bit about the case and what perhaps they expect to prove or expect the evidence to be, or not. It's just, as I say, it's not evidence. It's not an argument.

The government will then call witnesses. Defense counsel has the right to, may or may not choose to cross examine them. Once the government's case is done, the defendant has the right, again, but no obligation whatsoever, to call witnesses or present evidence.

Once the evidence is all in, the attorneys have the chance to speak with you again, summarize and interpret the evidence. And then you will go out to deliberate on your verdict.

So with that, I will turn to counsel. Mr. Riley, would

19

1    you like to make an opening statement?

2         MR. RILEY:  Yes, Your Honor.  Thank you.  Good

3    afternoon.

4         In March 2012, the defendant, Eric Grinder, started

5    dating a woman named Alisha O'Neil.  Alisha has a daughter, her

6    name is MG.  She was five years old at the time.  Alisha and the

7    defendant's relationship progressed and, in November 2013, they

8    were married.  One month later, in December 2013, the defendant

9    legally adopted MG and she became his daughter.

10        And shortly before they were married, the family moved

11   into a townhouse at 122 Laurel Valley Court in Abingdon,

12   Maryland.  Alisha didn't know, and MG couldn't have known, that

13   that house, that house would become a house of horrors.  In that

14   house, the defendant sexually abused MG, and he filmed it.  In

15   that house, the defendant put his penis inside MG's mouth, and he

16   filmed it.  In that house, the defendant put his finger in MG,

17   and he filmed it.  In that house, the defendant put a vibrator on

18   MG, and he filmed it.

19        Three years later, the defendant, Alisha and MG moved

20   to a new house, 261 Montpelier Court in Westminster, Maryland.

21   And this house, like the house at 122 Laurel Valley Court, became

22   a house of horrors, too.  The defendant once again used MG for

23   his own purposes, for his own sexual gratification, and he filmed

24   it.

25        The abuse didn't stop until November 28, 2016.  That's

20

1    the day Alisha and MG moved out of 261 Montpelier Court.

2            Ladies and gentlemen, this is a case about a man who

3    sexually abused his adopted daughter and filmed that abuse.  It's

4    a case about those pictures, those videos, those memorializations

5    of abuse that he created.

6            No question, child sex abuse, child pornography, a

7    tough topic.  It's tough to talk about.  It's tough to look at.

8    It's tough to think about.  Child pornography, as you just heard

9    from Judge Blake, and you will hear again at the end of this

10   case, is minors engaged in sexually explicit conduct.

11           Here's what it's not.  It's not kids in sexy poses.

12   It's not kiddie porn, whatever that means.  It's not family

13   photos in the bathroom.  It's not child modeling.

14           MS. OYER:  Objection, Your Honor.  I think this is

15   beyond the scope of offering an overview of the evidence.

16           THE COURT:  Overruled.  I don't -- I disagree.

17   Overruled.

18           MR. RILEY:  Child pornography is videos and images of

19   children being sexually abused, molested, raped, or being used

20   for purposes of sexual stimulation, and the viewing.

21           You're going to be hearing some -- you're going to be

22   seeing some of those images and videos during this case.  And

23   when you see those images, you will evaluate the evidence against

24   this defendant dispassionately.  Not based on emotion, but based

25   on the evidence, your logic, and common sense.  That's why you're

21

1    here.

2        Now, a day after MG and Alisha left 261 Montpelier

3    Court, on November 29, 2016, law enforcement executed a search

4    and seizure warrant at that address.  Among other things, a

5    Toshiba laptop was seized, a Samsung phone was seized, and MG's

6    bedding, some of MG's bedding was seized, including a purple

7    polka dot comforter.

8        The Toshiba laptop was examined by a computer forensic

9    examiner and the examiner discovered photographs of a minor being

10   abused.  He would eventually go on to examine the Samsung phone

11   and the SD memory card within it.  And he located additional

12   images and videos there, too.  And in one of those videos there

13   was a wedding ring.

14       After learning about the images of abuse on the laptop,

15   Homeland Security joined the investigation.  Now, with respect to

16   the images on the laptop, not surprisingly, the abuser's face was

17   not visible.  It was a man and he was wearing clothing, and the

18   closing was distinct.  He was wearing an orange shirt with at

19   least one hole at the bottom of his shirt, and he was wearing

20   dark blue pajama pants with an orange or red drawstring.

21       The images also included a distinct background.  There

22   was a unique marbling effect in the wall of the room where the

23   abuse took place.

24       So the investigation was focused on two things:  First,

25   who's the victim; second, who's the man.

22

1          Investigators quickly figured out that the victim was

2     MG.  Her face is visible in some of the images.  And her bedding,

3     a purple polka dot blanket, comforter, as well as a yellow

4     blanket, are visible in others.

5          So to figure out the identity of the abuser, law

6     enforcement needed to find that orange shirt, find those blue

7     pants with that red or orange drawstring, and figure out where

8     the abuse took place.  What was the room with that distinct

9     marbling effect on the wall?

10         So Agent Federico got a search warrant for the

11    defendant's house at 261 Montpelier Court.  He noticed there

12    weren't a lot of clothes in the house.  The dressers were looking

13    pretty bare.  But he did find one thing there:  Orange shirt,

14    holes at the bottom of it, identical to the ones he'd seen in the

15    images of abuse.

16         Later that day he executed a search warrant for the

17    defendant's mother's garage in Union Bridge, Maryland.  What did

18    he find there?  Blue pants with an orange or red drawstring.

19         Now, as, as the investigation continued, Agent Federico

20    was also able to identify the background where the abuse took

21    place.  He visited 122 Laurel Valley Court, walked upstairs to

22    the master bedroom, flicked on the light, and saw the distinct

23    marbling effect that he had seen previously in those images.  It

24    was created by an overhead fan with glass housing around the

25    light bulb.

23

1          Agent Federico would go on to obtain a search warrant

2     for the defendant's mother's apartment.  And during the execution

3     of that warrant, he seized the defendant's wedding band.  And it

4     was identical to the ones he had seen in the video.

5          As Judge Blake just told you, there are nine charges

6     you're being asked to consider in this case:  Five counts of

7     production of child pornography; one count of attempted

8     production of child pornography; two counts of possession of

9     child pornography; and one count of witness tampering.  The

10    evidence you will hear during this trial will establish each of

11    the elements for these charges beyond a reasonable doubt.

12         Now, as to production of child pornography, the judge

13    has just told you what the elements of that charge are.  Ladies

14    and gentlemen, the evidence will show that MG was a little girl

15    around nine years old when the defendant took pictures and videos

16    of her.  You'll be able to see the pictures for yourself and you

17    will hear from MG's mother that MG was born in October of 2006.

18         The evidence will show that the defendant not only

19    engaged in sex acts with MG, but he also repeatedly and carefully

20    filmed her.  Similarly, the evidence will show the defendant

21    repeatedly and carefully took close-up picture of the defendant's

22    genitals.  And finally, the evidence will show that the photos

23    and videos were produced using materials that were manufactured

24    outside the District of Maryland.  Toshiba laptop, made in China.

25    Samsung phone, made in China.  SD card within the phone, made in

24

1    China.

2              As to attempted production of child pornography, Judge

3    Blake just gave you a brief instruction with respect to that

4    charge as well.  First, the defendant intended to commit the

5    crime of production of child pornography and, second, the

6    defendant did some act that was a substantial step in an effort

7    to bring about or accomplish that crime.

8              The evidence will show the defendant intended to film

9    himself touching MG's vagina, but that he failed.  He failed to

10   capture her genitals on film.  You will see that the camera is

11   framed on MG's inner thigh, but her genitals are just out of

12   sight.  And you will see the defendant's hand moving in and out

13   of the frame, with his wedding band visible.

14             As to possession of child pornography charged in Counts

15   7 and 8, the elements are straightforward.  The judge just went

16   through them with you.  Count 7 pertains to at least one

17   depiction of child pornography knowingly possessed, knowingly

18   accessed, from the defendant's Toshiba laptop computer.

19             Count 8 pertains to at least one depiction of child

20   pornography knowingly possessed or knowingly accessed on the

21   Samsung phone.

22             And you will hear not only that the defendant possessed

23   images of MG, but you will see that he had other child

24   pornography on his laptop, too.  He tried to delete it but it was

25   still there.  And you will see it is of the exact same nature as

262

25

1    what he did to MG:  Adult males sexually abusing little girls.

2    And you will also hear and see that the defendant sought out

3    these files of child pornography by explicitly searching for

4    them.

5              As to Count 9, witness tampering, you will hear that in

6    July 2017, after the defendant had been charged federally, after

7    he'd been brought to court for his first appearance in this

8    courthouse, and during the period of time when he was detained

9    pretrial, he wrote a coded letter to his sister, Kayla Martin.

10   The evidence will show that in the coded letter he asked his

11   sister to talk to MG, to talk to MG and try to get MG to say that

12   he didn't do anything and, regarding pictures, quote, "she used

13   my phone while I was asleep."

14             Now, in terms of witnesses, you're going to be hearing

15   from just four witnesses:  Agent Federico of Homeland Security

16   investigations; Detective John Emminizer from the Westminster

17   City Police Department; Computer Forensic Analyst Steven Gibson;

18   and Alisha Grinder, the defendant's ex-wife, the mother of MG.

19             Agent Federico will tell you about the steps he took in

20   connection with the investigation, the seizure of that orange

21   shirt with the holes in the bottom, the seizure of those blue

22   pants with the orange or red drawstring, his discovery of the

23   distinct marbling effect on the master bedroom wall at 122 Laurel

24   Valley Court, the seizure of the defendant's wedding ring, and

25   the coded letter I referred to just a moment ago.

26

1          Detective Emminizer's testimony will be relatively

2    brief.  He will tell you about the seizure of various pieces of

3    evidence on November 29th, 2016, seizure of the defendant's

4    laptop, seizure of the Samsung phone, as well as the seizure of

5    MG's bedding, the purple polka dot blanket I referred to earlier,

6    and that you will see in some of the images and videos of child

7    pornography.

8          You'll next hear from Steven Gibson of Homeland

9    Security Investigations.  He's a computer forensic analyst.  He

10   will tell you about his forensic examination of the devices:

11   Phone, laptop, SD card.  And he will tell you about his discovery

12   of the child pornography photographs and videos in this case.

13   And not only the images and videos of MG, but other child

14   pornography, too.  He will also provide the information he

15   located as to the dates, images, and videos that were created.

16   And you will see during his testimony some of those images and

17   videos.

18          Finally, you'll hear that the defendant used a

19   peer-to-peer file-sharing program to search for child

20   pornography, that he visited numerous child pornography websites,

21   with a particular focus on incest and father/daughter sex.  You

22   will also hear that he entered search terms into various internet

23   search engines that were specifically focused on child

24   exploitation.

25          Finally, you'll hear from his Alisha Grinder, MG's

27

1    mother.  She will tell you about her marriage to the defendant,

2    defendant's adoption of MG. She will tell you about the move to

3    122 Laurel Valley Court.  She will tell you about the distinct

4    background in the master bedroom of that house.  She will tell

5    you about the occasions in which the defendant was alone with MG.

6    She will identify MG's bedding, the purple polka dot comforter,

7    and the yellow blanket.  And she will tell you how MG had both of

8    these pieces of bedding at both addresses, 122 Laurel Valley

9    Court and 261 Montpelier Court.

10              Finally, she will identify the defendant's laptop, his

11   phone, the orange shirt with holes in it, and his blue pajama

12   pants, the drawstring and, finally, his wedding ring.

13              In sum, ladies and gentlemen, the evidence will show

14   that MG, the victim in this case, is the defendant's adopted

15   daughter.  It will show that the abuse of MG occurred in Abingdon

16   and in Westminster.  It will show the defendant spent time alone

17   with MG.  It will show the defendant's orange shirt, blue pants

18   and wedding ring are visible in certain of the images and videos.

19   It will show that he possessed images of child pornography that

20   were not MG.  It will show that he repeatedly used the Internet

21   to seek out child pornography, with a particular interest in

22   father/daughter sex.

23              And it will show that all of the images and videos were

24   found on devices that belonged to the defendant:  Laptop, Samsung

25   phone.

28

1          Finally, it will show that after he was charged

2     federally, the defendant tried to get MG to say that she took the

3     images, not him.

4          In the end, ladies and gentlemen, when you've heard all

5     of the evidence, when you've heard from the witnesses and applied

6     your common sense and logic, you will have no doubt the defendant

7     is guilty on all nine charges in the superseding, in the third

8     superseding indictment.  And that is why, at the end of the case,

9     the government will return to you and ask you to find the

10    defendant guilty on all counts.  Thank you.

11          THE COURT:  Thank you, Mr. Riley.  Ms. Oyer.

12          MS. OYER:  Thank you, Your Honor.  Good afternoon,

13    ladies and gentlemen.  My name is Liz Oyer and, along with my

14    colleague, Kirsten Hopkins, who's seated at counsel table, I

15    represent the defendant in this case, Eric Grinder.  Mr. Grinder

16    is the gentlemen seated at our table in blue.

17          I want to start by thanking you for your service in

18    this case as jurors.  This is an extremely difficult case.  And

19    you're going to see and hear a lot of very painful things over

20    the next few days.  It is your job as jurors to watch and listen

21    to the evidence, and in this case that is not an easy job.  So we

22    thank you for it.

23          The government has talked to you at some length about

24    the evidence they plan to present.  And I am here to tell you, on

25    behalf of Mr. Grinder, that he is not disputing the government's

29

1    evidence in this case.  Mr. Grinder will not be contesting the

2    things that the government's witnesses tell you.  He's not going

3    to be challenging the things that the government's witnesses show

4    you.  And I expect that there will be no surprises from our

5    table.

6            What this means is that you won't be hearing very much

7    more from me or Ms. Hopkins during the course of this trial.  We

8    are going to be sitting here alongside you, observing the

9    government's presentation.  You may hear us raise legal

10   objections from time to time but, for the most part, we are going

11   to be sitting and watching and listening just like you.

12           We'll have one more opportunity to address you briefly

13   at the conclusion of the government's evidence when they've

14   finished their presentation, and until that time we thank you for

15   your service as jurors.

16           THE COURT:  Would you like to call your first witness?

17           MR. RILEY:  Yes, Your Honor.  The government calls

18   Agent Rick Federico.

19           THE CLERK:  Mr. Riley, if you would be so kind, please.

20           MR. RILEY:  Yes.

21           THE CLERK:  Thank you.  Please raise your right hand.

22         AGENT RICHARD FEDERICO, GOVERNMENT'S WITNESS, SWORN

23           THE WITNESS:  Yes.

24           THE CLERK:  Please be seated.  Please speak directly

25   into the microphone.  State and spell your full name for the

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          30

1    record, please.

2              THE WITNESS:  Richard Federico.  That's R-I-C-H-A-R-D.

3    F-E-D-E-R-I-C-O.

4              THE CLERK:  Thank you.

5              DIRECT EXAMINATION

6    BY MR. RILEY:

7    Q    Good morning, sir.

8    A    Good morning.

9    Q    Or good afternoon, I should say.  Are you employed?

10   A    Yes, I am.

11   Q    Where do you work?

12   A    For Homeland Security, Homeland Security Investigations.

13   Q    What's your title there, sir?

14   A    Special Agent.

15   Q    Okay.  And how long have you been employed by the Department

16   of Homeland Security?

17   A    Since the inception.  Inception, 2013, or 2003.

18   Q    And what's your current assignment at Homeland Security

19   Investigations?

20   A    I investigate cases involving child exploitation in

21   Frederick, Maryland.

22   Q    And how long have you been investigating child exploitation

23   cases?

24   A    Roughly about four to five years.

25   Q    And is there a particular type of case or cases that you

1   worked on before you started investigating child exploitation

2   cases?

3   A    Yes.  I used to do narcotic investigations, fraud cases,

4   immigration cases, stuff of that nature.

5   Q    Did there come a point in time where you opened a federal

6   investigation into someone named Eric Wayne Grinder?

7   A    Yes.

8   Q    When did that occur?

9   A    March 17th, 2017.

10  Q    Okay.  And generally speaking, what was the nature of your

11  investigations?

12  A    It was discovered child, child pornography on some

13  electronic equipment.

14  Q    So fair to say that your investigation involved potential

15  allegations of production of child pornography?

16  A    Yes.

17  Q    Now, now, what entity was, was HSI -- did you initiate the

18  investigation --

19  A    No.

20  Q    -- into the defendant?  Okay.  Who did?

21  A    Carroll County Advocacy Center.

22  Q    Okay.  And without getting into, without getting into

23  specifics, what was the first step in connection with that, or

24  one of the early steps in connection with that local

25  investigation?

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          32

1    A    The first step was an investigation.  It was a search

2    warrant in Carroll County at 2611 Montpelier Court, Westminster,

3    Maryland.  That was a state warrant.

4    Q    And when was that?

5    A    That was March -- November 29, 2016.

6    Q    Okay.  And at the time you opened the federal case, had you

7    seen any images of suspected child pornography that formed the

8    basis of your federal investigation?

9    A    Yes.

10   Q    Okay.  And generally speaking, can you tell the members of

11   the jury what you saw?

12   A    A prepubescent female engaged in several sex acts.

13   Q    Okay.  And were you able -- was the female alone?

14   A    No.

15   Q    Okay.  There was another individual in the room?

16   A    In the pictures, yes.

17   Q    Okay.  And can you describe, in the images that you saw, was

18   that individual wearing any clothing?

19   A    Yes, he was.

20   Q    Okay.  Generally speaking, can you describe what you saw him

21   wearing?

22   A    He was wearing an orange shirt, dark colored what I

23   considered pajama pants, with a wide drawstring, which is

24   orange-reddish color.

25   Q    Okay.  And did you notice anything else that was unique

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          33

1   about those image or images that you saw?

2   A    Yes.  In the background it was some type of marbling effect

3   on the back wall, on the back side of the photos.

4   Q    So you were just referring to an image or images of

5   suspected child pornography, right?

6   A    Correct.

7   Q    Did you view, in connection with your review of items from a

8   laptop, any items that were not child pornography?

9   A    Yes.

10  Q    Okay.  Can you tell the members of the jury what, generally

11  speaking, you saw?

12  A    It was an adult male, you can't see his face, but he was

13  wearing a dark colored T-shirt that said, had a logo GHB or

14  GBH -- GHB, and dark colored pajama pants, with an orange

15  drawstring.  And another one had a collared shirt with, it was

16  light in color, horizontal stripes, dark in color, and MG in the

17  video.

18  Q    Okay.  So you just referenced a video.  Were these two, were

19  there one item or two items?

20  A    Two items.

21  Q    Okay.  And were they images or videos?

22  A    Videos.

23  Q    So very generally speaking, when you open a federal child,

24  production of child pornography investigation, what are the

25  investigative steps that you take?

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY                34

1    A    I try to identify the victim or the child in the images or

2    videos.  I look at any identifying marks, clothing, background,

3    as maybe furniture, maybe lighting, curtains, that nature.  And,

4    also, I look at the other person in the video, if he's, what type

5    of clothing is he wearing, identifying marks, tattoos, scars,

6    moles, whatever, that can help me identify maybe location as

7    well.

8    Q    Now shifting your attention back to this matter in

9    particular.  Did there come a point in time when you obtained,

10   when you applied for a search warrant from a federal magistrate

11   judge here in the District of Maryland?

12   A    Yes.

13   Q    And was that warrant authorized by the federal magistrate

14   judge?

15   A    Yes.

16   Q    Okay.  And when was that?

17   A    March 17th, 2017.

18   Q    So same day you opened the investigation?

19   A    Correct.

20   Q    And were any devices covered by this warrant?

21   A    Yes.

22   Q    Okay.  What?

23   A    The Toshiba laptop and a Samsung cell phone.

24   Q    Okay.  Same devices that were seized on November 29, 2016?

25   A    Correct.

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          35

1    Q    Anything else covered by that federal warrant?

2    A    Yes, the house located at 261 Montpelier Court in

3    Westminster, Maryland.

4    Q    Okay.  I want to come to the house in a minute.  Before I do

5    that I want to show you, mark this government exhibit -- may I

6    approach the witness, Your Honor?

7              THE COURT:  Certainly.

8    Q    Exhibit 1-A.  You recognize this?

9    A    Yes.

10   Q    What is it?

11   A    This is a Samsung cell phone that was sized on the state

12   warrant on November 29, 2016.

13   Q    Is it the same one you got a federal warrant for on March

14   17th?

15   A    Correct.

16   Q    Now, I'm going to show you now what's marked as Government's

17   Exhibit 1-B.  Quite small.  Do you recognize this?

18   A    Yes.

19   Q    Okay.  And what is it?

20   A    That's a SIM card that, it's associated with the Samsung

21   cell phone.

22   Q    Okay.

23   A    SD card.

24   Q    Sorry?

25   A    SD card.

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          36

1    Q    It's an SD card?

2    A    Yes.

3    Q    And very generally speaking, what is an SD card?

4    A    Just a storage, just holds storage for the phone.

5    Q    A memory device?

6    A    Correct.

7    Q    Okay.  Showing you what's been marked as Government's

8    Exhibit 2.  Recognize this?

9    A    Yes.

10   Q    Okay.  And what is it?

11   A    That's the Samsung cell phone.

12   Q    That's the one we were just looking at a moment ago?

13   A    Yes.

14   Q    Okay.  That was first page.  Showing you the second page of

15   Government's Exhibit 2.  Recognize this?

16   A    Yes.

17   Q    Okay.  And what is it?

18   A    That's the back side of the cell phone with the cover off.

19   Q    Okay.  I want to direct your attention here, on the

20   left-hand side of the page.  I'm making it somewhat larger now.

21   What's the model number of this phone?

22   A    SM-G900V.

23   Q    Okay.  And where was this SM-G900V phone manufactured?

24   A    China.

25   Q    Okay.  Now, directing your attention to where it says IMEI.

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          37

1    First off, very generally, what is an IMEI?

2    A    It's a unique number associated with that cell phone.

3    Q    Okay.  Now, can you read for the members of the jury the

4    IMEI associated with this cell phone?

5    A    The first letter -- let's see.  I can't see that first, the

6    first.

7    Q    Let me stop you right there if I could.  Would it help if I

8    actually gave you the --

9    A    Yes.

10   Q    -- actual phone?  All right.  Showing you Government's

11   Exhibit 1-A.  Can you read the IMEI number to the jury?

12   A    990004495000428.

13   Q    Now, directing your attention to the right-hand side of this

14   photograph and specifically this, this little gray slot here.  Do

15   you see that?

16   A    Yes.

17   Q    Okay.  What is that gray slot?

18   A    That's where the SIM card is placed in the phone.

19   Q    Showing you the third page of Government's Exhibit 2.  You

20   recognize this?

21   A    Yes.

22   Q    Okay.  And what is it?

23   A    That's a SIM card.

24   Q    That's the SD card?

25   A    SD card.  Correct.

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          38

1   Q    Okay.  And this is the, it's, it looks like it says Micro S.

2   Is that a particular model of SD card?

3   A    Yes.

4   Q    Okay.  Now, where was this Micro SD card manufactured?

5   A    China.

6   Q    Okay.  And looks like there's a series of numbers above

7   "made in China."  Do you see that?

8   A    Yes.

9   Q    Okay.  1000903482DUU.  Is that what it says?

10  A    Correct.

11  Q    All right.  Showing you what's been marked as Government's

12  Exhibit 3.  Do you recognize this?

13  A    Yes.

14  Q    Okay.  What is it?

15  A    The Toshiba Satellite laptop.

16  Q    Okay.  Is this the same laptop you obtained a search warrant

17  for on March 2017?

18  A    Yes.

19  Q    Showing you Government's Exhibit 4, first page.  This is the

20  same laptop you were just looking at a moment ago, right?

21  A    Yes.

22  Q    Photograph of it?

23  A    Yes.

24  Q    Okay.  Showing you the second page.  Recognize this?

25  A    Yes.

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY        39

1    Q    Okay.  And what is it?

2    A    The back side of the laptop.

3    Q    Okay.  Now, directing your attention to the gray area on the

4    back side of the laptop.  Fair to say that there's a serial

5    number associated with this laptop, am I right?

6    A    Yes.

7    Q    This right here in the middle of where I've zoomed in a

8    little bit?

9    A    Yes.

10   Q    Okay.  And the serial number is 1A112898Q, is that right?

11   A    Correct.

12   Q    And where was this laptop manufactured?

13   A    China.

14   Q    Okay.  Now, you said, testified earlier that in addition to

15   the devices just talked about to the members of the jury, the

16   federal search warrant you obtained authorized a search of

17   premises, is that right?

18   A    Yes.

19   Q    Okay.  And that was 261 Montpelier Court in Westminster?

20   A    Correct.

21   Q    Okay.  And who, if anybody, was living there at that time?

22   A    Eric Grinder.

23   Q    Okay.  Anyone else?

24   A    No.

25   Q    And were there any items in particular that you were looking

1   at, looking for at 261 Montpelier Court?

2   A    Yes.

3   Q    Okay.  What?

4   A    I was looking for the orange T-shirt with the holes in it; a

5   dark-colored pajama pants with an orange drawstring; a collared

6   shirt, light in color with horizontal stripes; and a dark-colored

7   T-shirt, GHB logo to the left; and any other electronic devices.

8   Q    Okay.  So with respect to the clothing, those are the same

9   pieces, or those were pieces of clothing that you thought you may

10  have earlier observed and suspected images of child pornography,

11  is that fair?

12  A    Yes.

13  Q    Okay.  Now, did there come a point in time where you

14  executed that federal search and seizure warrant at 261

15  Montpelier Court?

16  A    Yes.

17  Q    Okay.  When was that?

18  A    That was March 21st, 2017.

19  Q    Okay.  Very generally speaking, what does it mean to execute

20  a warrant?

21  A    When we entered the house to search the house.

22  Q    Okay.  And were you present on March 21, 2017?

23  A    Yes.

24  Q    Okay.  Were you the lead investigator in connection with

25  that warrant?

1    A    Yes.

2    Q    Okay.  Showing you Government's Exhibit 5, first page.

3    Recognize this?

4    A    Yes.

5    Q    Okay.  What is it?

6    A    That's the house located on 261 Montpelier Court,

7    Westminster, Maryland.

8    Q    This is a photograph of the house?

9    A    Yes.

10   Q    Okay.  And does this photograph reflect the way the house

11   looked on March, March 21, 2017?

12   A    Yes.

13   Q    Okay.  Showing you the second and third page of Government's

14   Exhibit 5.  Just two additional views of 261 Montpelier Court, is

15   that right?

16   A    Yes.

17   Q    Okay.  Now, fair to say that the defendant was arrested on

18   March 21, 2017?

19   A    Yes.

20   Q    Okay.  And so when you executed the search warrant, there

21   was no one in the house, is that right?

22   A    That's correct.

23   Q    Okay.  Now, during your search of 261 Montpelier Court, did

24   law enforcement seize any items of particular evidentiary value?

25   A    Yes.

1    Q    Okay.  What?

2    A    Orange T-shirt.

3    Q    Okay.  Showing you the fourth page of Government's Exhibit

4    5.  You recognize this?

5    A    Yes.

6    Q    Okay.  And what is it?

7    A    That's the orange T-shirt that we seized on that day.

8    Q    Okay.  And let's, I'm going to back up and ask you to just

9    describe for the members of the jury what they are seeing in this

10   photograph more generally.

11   A    This is the master bedroom.  To the left is a dresser.  And

12   in the middle of this photo you see a bed.  And on top of the bed

13   is the orange shirt.

14   Q    Okay.  And you're referring to basically the orange shirt in

15   the middle of the page; is that fair?

16   A    Correct.

17   Q    Okay.  Now, can you describe in general terms sort of the

18   state of the house?

19   A    It appeared that somebody, it was, that they were moving

20   out.

21   Q    Okay.

22   A    It was very little clothing in the closet.  The drawers

23   were, didn't have very many clothing in it.  And the personal

24   effects, it was very limited.

25   Q    All right.  Showing you the fifth page of Government's

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          43

1  Exhibit 5.  You recognize this?

2  A    Yes.

3  Q    Okay.  What is it?

4  A    That's the dresser drawer to the dresser.

5  Q    Okay.  And this is in the master bedroom, right?

6  A    That's correct.

7  Q    Okay.  Directing your attention down to the lower right-hand

8  side of this picture.  Do you see that?

9  A    Yes.

10  Q    Okay.  What do we see in this picture?

11  A    It's a KY lubricant.

12  Q    Okay.  Showing you the sixth page of Government's Exhibit 5.

13  Now, this is the orange shirt that you seized on March 21, 2017,

14  right?

15  A    That's correct.

16  Q    A photograph of it?

17  A    Yes.

18  Q    Okay.  Going to direct your attention down to the bottom of

19  the photograph.  See that?  What do we see here in this

20  photograph?

21  A    Holes.

22  Q    Can you circle them for the members of the jury, by touching

23  the screen?

24       That's quite all right.  I think it's not working.  All

25  right.  But I'll just use my cursor.  You're referring to this

1   right here, right?

2   A    Correct.

3   Q    Hole?  Okay.  And there's another one right, basically right

4   in the center of, the lower center of the photograph.  Is that

5   fair?

6   A    Yes.

7   Q    It's another hole?  Okay.  Showing you the seventh page of

8   Government's Exhibit 5.  This is another angle of the orange

9   shirt you seized on March 21, 2017?

10  A    That's correct.

11  Q    Okay.  Showing you what's been marked as Government's

12  Exhibit 6.  Recognize this?

13  A    Yes.

14  Q    Okay.  What is it?

15  A    That's the shirt that was seized from the 261 Montpelier

16  Court on 3/21/2017.

17  Q    Going to go back to the sixth page of Government's Exhibit

18  5.  Fair to say there's a logo on the top left-hand side of this

19  shirt, right?

20  A    That's correct.

21  Q    Can you read to the members of the jury what that logo says?

22  A    DL Collins and Son.

23  Q    Okay.  And with respect to the shirt you seized on March 21,

24  2017, how did it compare to the orange shirt that you had earlier

25  seen in the images of suspected child pornography?

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          45

1    A    Identical.

2    Q    In what respect?

3    A    The color, the holes at the bottom of the shirt.

4    Q    In connection with your search warrant on March 21, 2017,

5    did law enforcement locate any electronics in the house?

6    A    Yes.

7    Q    Generally speaking, what?

8    A    Cell phones, cameras, that type of stuff.

9    Q    Fair to say that you were, in addition to this orange shirt,

10   you were also looking for a blue pair of pajama pants, right?

11   A    That's correct.

12   Q    Okay.  Did you find those blue pajama pants at 261

13   Montpelier Court?

14   A    No.

15   Q    Okay.  And I think you testified earlier that you were also

16   looking for two other shirts, right?

17   A    That's correct.

18   Q    Okay.  Did you find those two other shirts at 261 Montpelier

19   Court?

20   A    No.

21   Q    Okay.  Now, the morning of March 21, 2017, without getting

22   into specifics of the conversation, did you have a conversation

23   with anyone concerning the location of the defendant's

24   belongings?

25   A    Yes.

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          46

1    Q     Okay.  Who?

2    A     Kayla Martin and Leann Martin.

3    Q     Okay.  Now, as a result of that conversation, what was the

4    next investigative step that you -- who are they?  Let me ask

5    that question again.  Who is LeAnn Martin and Kayla Martin?

6    A     LeAnn Martin is Eric Grinder's mother.  Kayla Martin is Eric

7    Grinder's sister.

8    Q     As a result of that conversation, what was the next

9    investigative step that you took?

10   A     A search warrant was obtained for the garage/outbuilding

11   associated with ███████████████, Union Bridge.

12   Q     Okay.  Who lived at ████████████, Union Bridge?

13   A     LeAnn Martin.

14   Q     Okay.  I think you said there was a garage associated with

15   ████████████, is that right?

16   A     That's correct.

17   Q     And where was this, this garage vis-a-vis the building, ████

18   ████████████, itself?

19   A     The garage is to the left of the house.  It sits further

20   back.

21   Q     Showing you the first page of Government's Exhibit 7.

22   Recognize this?

23   A     Yes.

24   Q     Okay.  And not sure I covered this earlier.  You executed

25   the second search warrant on March 21, 2017, too, right?

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          47

1    A    That's correct.

2    Q    Okay.  So this is the second search warrant you're doing on

3    March 21, 2017?

4    A    That's correct.

5    Q    Okay.  So looks like this is a large building, is that

6    right?

7    A    That's correct.

8    Q    Okay.  And where, where did, where did Ms. Martin live in

9    this building?

10   A    It's ████████.  It's on the second story.  The door to

11   the left in the center, between the two doors, she's on the left.

12   Q    Okay.  All right.  Showing you the second page of

13   Government's Exhibit 7.  Recognize this?

14   A    Yes.  It's another picture of the house on ████████

15   ████████, Union Bridge.

16   Q    This is another angle, basically, taken from the right-hand

17   side of ████████████, is that right?

18   A    Correct.

19   Q    Showing you the third page of Government's Exhibit 7.

20   Recognize this?

21   A    Yes.

22   Q    Okay.  What's this?

23   A    That's the right side of the house.

24   Q    Okay.  Showing you the fourth page of Government's Exhibit

25   7.  Recognize this?

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          48

1    A    Yes.  That's the garage/outbuilding associated with the ███████

2    ███████████    address.

3    Q    Okay.  This right here, this is a photograph of that

4    garage/outbuilding, right?

5    A    Correct.

6    Q    So it's this, this building right here that you obtained the

7    search warrant for, right?

8    A    That's correct.

9    Q    Looks like there was a lock on the door.  Is that fair?

10   A    Yes.

11   Q    Okay.  Did you break that lock to get in?

12   A    No.

13   Q    Approximately what time did law enforcement execute the

14   search and seizure warrant for this garage?

15   A    Approximately 2:22 in the afternoon.

16   Q    Showing you the fifth page of Government Exhibit 7.

17   Recognize this?

18   A    Yes.

19   Q    Okay.  What's this?

20   A    That's the inside of the garage.

21   Q    Okay.  Very generally, can you describe, describe this

22   photograph to the members of the jury?

23   A    It has personal belongings, you know, in the center.

24   There's a tarp covering some items.  And there's items to the

25   left, items to the right, all the way in the back.  So it's full

1    of items, personal items.

2    Q    During the search of this outbuilding, did law enforcement

3    discover any items of evidentiary value?

4    A    Yes.

5    Q    What did you find?

6    A    The dark-colored pajama pants with the orange drawstring,

7    orange-reddish drawstring, and a striped, collared shirt, light

8    in color with, with dark horizontal stripes.

9    Q    So two of the pieces of clothing that law enforcement was

10   searching for; is that fair?

11   A    That's correct.

12   Q    All right.  Showing you the sixth page of Government's

13   Exhibit 7.  You recognize this?

14   A    Yes.

15   Q    Okay.  What is it?

16   A    Those are the dark colored pajama pants with the orange

17   drawstring.

18   Q    Okay.  Can you describe to the members of the jury what's

19   happening in this photograph?

20   A    In this photograph, we're taking the bags of clothing out of

21   the garage and going through them.

22   Q    Okay.

23   A    That's why you see bags, like garbage bags and duffel bags

24   and that type.

25   Q    Okay.  Showing you the seventh page of Government's Exhibit

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY                50

1    7.  This is another angle of the dark blue pajama pants, is that

2    right?

3    A    Correct.

4    Q    Okay.  What's, what's happening in this photograph?

5    A    They're just holding them up so I could take a picture of

6    the full length of the pajama pants.

7    Q    Okay.  Now, what, what, if anything, did you do with the

8    pajama pants after you discovered them?

9    A    I seized them.

10   Q    Okay.  I want to, before I do this, I want to direct your

11   attention to close to the middle of this photograph.  What do we

12   see here in this photograph?

13   A    It's the name of the clothing, Reebok.

14   Q    Showing you what's been marked as Government's Exhibit 8.

15   Recognize this?

16   A    Yes.

17   Q    Okay.  What is it?

18   A    Those are the, those are the pajama pants I seized on March

19   21st, 2017 from the ██████████████ address.

20   Q    And how did these pajama pants compare to the pajama pants

21   you had earlier seen in images of suspected child pornography?

22   A    Identical.

23   Q    Now, you made reference earlier to another piece of clothing

24   that you seized during the execution of the search warrant, is

25   that right?

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          51

1    A    Yes.

2    Q    Okay.  Showing you the eighth page of Government's Exhibit

3    7.  Can you tell the members of the jury what they're seeing in

4    this photograph?

5    A    A light-colored collared shirt with dark horizontal stripes.

6    Q    Okay.  Showing you the ninth page of Government's Exhibit 7.

7    Recognize this?

8    A    Yes.

9    Q    Okay.  It's another angle of the shirt that we saw on Page

10   8; is that fair?

11   A    Correct.

12   Q    Okay.  Showing you what's been marked as Government's

13   Exhibit 9.  Do you recognize this?

14   A    Yes.

15   Q    Okay.  What is it?

16   A    That's the shirt I seized on March 21st, 2017 from the ███

17   ██████████████  address.

18   Q    Same shirt that the jury had been looking at in the

19   photograph, is that right?

20   A    Yes.

21   Q    Okay.  And how did this shirt compare to the shirt you saw

22   in one of the videos that you referenced earlier?

23   A    Identical.

24        THE COURT:  Mr. Riley, just let me know when you're at

25   a good breaking point.

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY                52

1              MR. RILEY:  Happy to take a break right now, Your

2      Honor.

3              THE COURT:  Ladies and gentlemen, we'll take the

4      mid-afternoon recess.  We'll be recessed for between 10, 15

5      minutes.

6              (Recess at 3:28 p.m. Resume at 3:40 p.m.)

7              THE COURT:  Are we ready to bring the jury back in?

8              MR. BUDLOW:  Yes, Your Honor.

9              (Jury enters the courtroom at 3:47 p.m.)

10             THE COURT:  All right.  You can all be seated.  Would

11     you like to continue, Mr. Riley?

12     BY MR. RILEY:

13     Q    Yes, Your Honor.  Agent Federico, I want to show you

14     Government's Exhibit 1-A again.  I'm going to ask you to

15     describe, describe it, that, for the jury?

16     A    It's a white Samsung cell phone with a cover.  The cover's

17     kind of worn.  It just flips over the phone with the window

18     visible so you can still see the, I guess the time or whatever is

19     displayed on the phone.  But it's covered.

20     Q    You referred to a window, is that right?

21     A    Correct.

22     Q    Is this what you're referring to here in the upper, the top,

23     the top one-third of the cover?  Is that fair?

24     A    Yes.

25     Q    That's the window?

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          53

1    A    Yes.

2    Q    It's translucent?

3    A    Yes.

4    Q    Agent Federico, you testified earlier that the defendant was

5    arrested the morning of three, of March 21, 2017, is that right?

6    A    Correct.

7    Q    Okay.  Generally speaking, what process is there, if any,

8    after someone is arrested?

9    A    Generally, the individual is booked into the county

10   Detention Center.  They're photographed.  All markings, tattoos,

11   are logged.  All the property that they have on their, is secured

12   in a safe place.

13   Q    Okay.  Showing you what's been marked as Government's

14   Exhibit 10.  First page.  Recognize this?

15   A    Yes.

16   Q    What is it?

17   A    That's a photo of Eric Grinder.

18   Q    Is this a booking photo of Mr. Grinder?

19   A    Correct.

20   Q    Okay.  Showing you the second page of Government's Exhibit

21   10.  Recognize this?

22   A    Yes.

23   Q    What is it?

24   A    That's a side profile, mug shot of Eric Grinder.

25   Q    Showing you the third page of Government's Exhibit 10.  You

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          54

1    recognize this?

2    A    Yes.

3    Q    Okay.  What is it?

4    A    It's a tattoo on Eric Grinder's back, above his, between his

5    shoulder blades, right below his neck.  It's a cross.  It's light

6    blue, maybe purplish in color, two rings in the center.  The

7    outer ring is like a reddish-orange the inner ring is like a

8    greenish color.

9    Q    Okay.  Showing you the fourth page of Government's Exhibit

10   10.  Recognize this?

11   A    Yes.

12   Q    What is it?

13   A    It's a tattoo, Asian writing, Scripture, on his right arm.

14   Q    Where were these photographs taken?

15   A    The Carroll County Detention Center.

16   Q    You referred to -- generally speaking, you referred to

17   property potentially being checked in during the booking process.

18   Is that fair?

19   A    Yes.

20   Q    Okay.  To your knowledge, did the defendant check any items

21   into the Carroll County Detention Center Property Department?

22   A    Yes.

23   Q    Your Honor, at this time I'm going to read a stipulation

24   between the parties.

25           THE COURT:  And I'll just remind the jury, a

1   stipulation is an agreement about some thing between the parties,

2   and you may consider it as evidence in the case.

3           MR. RILEY:  It's hereby stipulated and agreed by and

4   between the United States of America, by its attorneys, and the

5   defendant, Eric Wayne Grinder, as follows:  On or about March 21,

6   2017, during the booking process at the Carroll County Detention

7   Center after his arrest, the defendant's wedding ring was checked

8   into the Property Department of the Carroll County Detention

9   Center.

10          On or about April 12, 2017, LeAnn Martin, the

11  defendant's mother, retrieved the wedding ring from the Property

12  Department of the Carroll County Detention Center.

13  BY MR. RILEY:

14  Q    Agent Federico, after his booking, did the defendant remain

15  at the Carroll County Detention Center?

16  A    Yes.

17  Q    I want to shift gears a little bit and direct your attention

18  back to one of the investigative steps you took in connection

19  with your investigation.  Did there come a point in time when you

20  identified an earlier address that the defendant lived?

21  A    Yes.

22  Q    Okay.  And what address was that?

23  A    122 Laurel Valley Court, Abingdon, Maryland.

24  Q    Okay.  Now, in connection with your investigation, did you

25  visit that address on April 13, 2017?

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY                56

1    A    Yes.

2    Q    Okay.  For what purpose did you visit that address?

3    A    I was looking for the, possibly the background marbling

4    effect that I had seen in the photos.

5    Q    And you said that you had seen in the photos.  Are you

6    referring to suspected images of child pornography that you had

7    earlier observed?

8    A    Yes.

9    Q    Okay.  Now, did you go inside 122 Laurel Valley Court?

10   A    Yes.

11   Q    Okay.  And what, if anything, did you discover when you went

12   inside that house?

13   A    I discovered that the marbling effect in the master bedroom

14   was caused by the light housing on a cell, on a cellular, a fan,

15   ceiling fan, that the housing around the light fixture was

16   etched.  So when the light was turned on, it created a marbling

17   effect on the wall.

18   Q    Let's unpack that a little bit.  I want to show you

19   Government's Exhibit 25, first page.  Recognize this?

20   A    Yes.

21   Q    And what is it?

22   A    That's the townhouse, picture of the townhouse at 122 Laurel

23   Valley Court, Abingdon, Maryland.

24   Q    The outside of the house; is that fair?

25   A    Yes.

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          57

1   Q    Okay.  Showing you the second page of Government's Exhibit

2   25.  Do you recognize this?

3   A    Yes.

4   Q    What is it?

5   A    That's the entrance to the master bedroom from the hallway.

6   Q    Okay.  Showing you the third page of Government's Exhibit

7   25.  Recognize this?

8   A    Yes.

9   Q    Okay.  And what do we see here?

10  A    That's a picture as you're looking into the master bedroom.

11  Q    Showing you the fourth page of Government's Exhibit 25.  Do

12  you recognize this?

13  A    Yes.

14  Q    Okay.  What is it?

15  A    That's the marbling lighting effect.

16  Q    Okay.  And fair to say that the effect is sort of splashed

17  up against the wall of the bedroom, is that right?

18  A    Correct.

19  Q    Showing you the fifth page of Government's Exhibit 25.  This

20  is another view of that effect, is that fair?

21  A    Correct.

22  Q    Showing you the sixth page of Government's Exhibit 25.

23  Recognize this?

24  A    Yes.

25  Q    Okay.  What is it?

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY                58

1    A    That's the ceiling fan with the light housing that glass is

2    etched.  So when it's turned on, it gives that effect on the

3    wall.

4    Q    Okay.  So you're using the term "housing."  Is that the

5    glass that we're seeing around the light bulb; is that fair?

6    A    Yes.

7    Q    Okay.  Did you go through all of the rooms in 122 Laurel

8    Valley Court?

9    A    Yes.

10   Q    Were there any other fans in those rooms?

11   A    Yes.

12   Q    Okay.  Any other fans that had housing around light bulbs

13   like in this, like in the bedroom?

14   A    No.

15   Q    Okay.  And with respect to the marbling effect that you saw

16   when you visited 122 Laurel Valley Court, how did it compare to

17   the effect you saw in the earlier images of suspected child

18   pornography that you had viewed?

19   A    Very similar.

20   Q    I want to shift gears a little bit and direct your attention

21   to April 26, 2017.  As a result of your investigation, what, if

22   anything, happened that day?

23   A    Obtained a grand jury indictment for Eric Grinder for the

24   production of child pornography.

25   Q    So in other words, there were federal charges that were

1    returned by a federal grand jury?

2    A    Correct.

3    Q    I want to now direct your attention to May 4, 2017.  What

4    steps, if any, did you take with respect to the federal case that

5    day?

6    A    I picked up Eric Grinder from Carroll County Detention

7    Center and brought him to the US Courthouse in Baltimore,

8    Maryland, for his initial appearance on federal charges of

9    production of child pornography.

10   Q    And did, did that appearance happen that day?

11   A    Yes.

12   Q    Okay.  And after the court appearance, what did you do next?

13   A    I took him back to Carroll County Detention Center.

14   Q    Okay.  So after there were federal charges, did your

15   investigation of the defendant continue?

16   A    Yes.

17   Q    Okay.  Now, as part of your investigation, did you maintain

18   contact with the Carroll County Detention Center?

19   A    Yes.

20   Q    Okay.  In connection with your investigation, what, if

21   anything, did the Detention Center provide to you upon request?

22   A    Phone calls conducted by Eric Grinder, mail correspondence,

23   outgoing mail, emails, any visitations, that kind of stuff.

24   Q    You referred to, you referred to visitations.  Are

25   visitations with inmates at the Carroll County Detention Center

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          60

1    recorded?

2    A    Yes.

3    Q    Okay.  Did the Detention Center ever provide you property

4    that was confiscated from the defendant's cell?

5    A    Yes.

6    Q    Now, have you reviewed all of the items provided to you by

7    the Carroll County Detention Center?

8    A    Yes.

9    Q    Your Honor, at this time I would like to read another

10   stipulation into the record.

11             THE COURT:  All right.

12             MR. RILEY:  It is hereby stipulated and agreed by and

13   between the United States of America, by its attorneys, and the

14   defendant, Eric Wayne Grinder, as follows:  The defendant engaged

15   in visitations at the Carroll County Detention Center with the,

16   with visitors that were recorded.  The defendant engaged in the

17   visitation conversation listed below, and the recordings are

18   accurate and unaltered.

19             With respect to Exhibit 13-A, the date was March 24,

20   2017.  The identity of the visitor was LeAnn Martin.  With

21   respect to Exhibit 18-A, the date was July 8, 2017.  The identity

22   of the visitor was LeAnn Martin.

23             Officials at the Carroll County Detention Center

24   intercept and copy outgoing mail and the original is then placed

25   bag in the mail stream.  The following item of intercepted mail

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY                61

1    was written by the defendant and obtained on or about the date

2    indicated.  The copied mail has not been altered.

3            Exhibit 17-A, date, July 2017.

4            On or about July 25, 2017, law enforcement officials at

5    the Carroll County Detention Center seized Government's Exhibit

6    19 from the defendant's cell.  Government's Exhibit 19 has not

7    been altered.

8    BY MR. RILEY:

9    Q    Agent Federico, I'm going to show you Government's Exhibits

10   18-A and 13-A.  And it's fair to say that Government's Exhibits

11   18-A and 13-A contain excerpts of conversations that the

12   defendant had while detained at the Carroll County Detention

13   Center?

14   A    Yes.

15   Q    You reviewed these excerpts?

16   A    Yes.

17   Q    And they're accurate?

18   A    Yes.

19   Q    Have you, have you also reviewed transcripts of these

20   recordings, which are marked for identification only as

21   Government's Exhibit 13-B and 18-B, and checked them for

22   accuracy?

23   A    Yes.

24   Q    Your Honor, at this time I would request permission to hand

25   out copies of the transcripts of these exhibits.

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          62

1          THE COURT:  Yes.  As that's being done, you're also

2     planning to play these conversations?

3          MR. RILEY:  Yes, Your Honor.

4          THE COURT:  Okay.  Ladies and gentlemen, first of all,

5     please don't start looking at the transcripts right now.  The

6     transcripts themselves are not the evidence.  The evidence that

7     you're going to have is the actual recorded calls.  The

8     transcripts are just to assist you as you're listening to the

9     calls.  So please keep in mind that if you hear something

10    different in the recording, what you hear controls.  The

11    transcript is not evidence.

12         MR. RILEY:  I'm going to play Exhibit 13-A.

13         THE COURT:  And is that the 13-B transcript?

14         MR. RILEY:  Yes, Your Honor.

15         THE COURT:  Like to look at it.

16         (Call playing.)

17    BY MR. RILEY:

18    Q    Agent Federico, whose voice is that reflected on that call?

19    A    That's Eric Grinder's and LeAnn Martin.

20    Q    When was this conversation recorded?

21    A    This conversation was recorded on March 24, 2017.

22    Q    When did you execute the federal search warrant at Ms.

23    Martin's garage?

24    A    March 21st, 2017.

25    Q    You testified earlier that you received copies of certain

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY      63

1    pieces of outgoing mail from the Carroll County Detention Center.

2    Is that right?

3    A    Correct.

4    Q    I want to direct your attention to the time period of July

5    2017.  Did there come a point in time when you received a copy of

6    a piece of outgoing mail that appeared to be unusual?

7    A    Yes.

8    Q    Okay.  Can you tell the members of the jury about that?

9    A    I obtained a copy of a letter from Eric Grinder, it was

10   outgoing mail.  And in the letter it had regular writing, like

11   you were writing somebody.  And then the pages that followed

12   that, it was all numbers.

13   Q    Okay.  So I want to show you what's been marked as

14   Government Exhibit 17-A.  Do you recognize this?

15   A    Yes.

16   Q    Okay.  And what is it?

17   A    That's a copy of a letter, envelope from Eric Grinder to

18   Kayla Martin.

19   Q    As a reminder, who is Kayla Martin, again?

20   A    Kayla Martin is Eric Grinder's sister.

21   Q    Showing you the second page of Government's Exhibit 17-A.  I

22   want to direct your attention to the top of this page.  Can you

23   read to the members of the jury this salutation and then the

24   first sentence?

25   A    It says:  B, I am really sorry you got in trouble.  I am

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          64

1   already super stressed here as it is.  I worry all the time about

2   my kids.

3   Q    Okay.  Who's B?

4   A    B is Kayla Martin.

5   Q    Okay.  How do you know that?

6   A    In some of the phone calls, Eric Grinder addresses his

7   sister as B.

8   Q    Okay.  So I want to direct your attention to the last

9   sentence of the second page of Government's Exhibit 17-A, where

10  it starts with "I."

11  A    I found out something about MG that really worries me and I

12  am worried about the boys not having a father.

13  Q    Okay.  And the letter go on to enclose anything?

14  A    Excuse me?

15  Q    Does the letter go on to enclose anything?

16  A    Yes.

17  Q    Show, showing you the third page of Government's Exhibit

18  17-A.  You recognize this?  Sorry.  Showing the third page of

19  Government's Exhibit 17-A.  Do you recognize this?

20  A    Yes.

21  Q    Okay.  Is this the series of numbers that you were referring

22  to earlier?

23  A    Yes.

24  Q    Okay.  And showing you the fourth page and the fifth page of

25  Government's Exhibit 17-A.  So it looks like a three-page series

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY            65

1    of numbers.  Is that fair?

2    A    Yes.

3    Q    Okay.  I want to direct your attention to the top of the

4    third page of Government's Exhibit 17-A.  Do you see that?

5    A    Yes.

6    Q    Okay.  What, first off, can you describe what we're seeing

7    here?

8    A    Looks like it has a dot at the top, and then, motion down,

9    like a shape of the letter C with arrows.

10   Q    Okay.  What was your understanding of this symbol when you

11   saw it?

12   A    My understanding was the alphabet was, the numbers are

13   associated with letters of the alphabet.  And instead of starting

14   with A as in 1, it started at Z as in 1 and A as in the number

15   26.  So it went backwards.

16   Q    Okay.  Did there come a point in time when you decoded this

17   series of numbers?

18   A    Yes.

19   Q    Okay.  Showing you what's been marked as Government's

20   Exhibit 17-B.  Is this the document you prepared that decoded the

21   series of numbers?

22   A    Yes.

23   Q    Okay.  Could you please read slowly Government's Exhibit

24   17-B to the members of the jury.

25   A    Kayla, I know you got in trouble cause of me.  Please do not

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY        66

1    tell anyone anything in this letter and burn it.  After you read

2    it.  I am sorry but you are the only person I can turn to that I

3    trust and I need you.

4    Q    Okay.  I'm showing you the second page of 17-B.  Continue.

5    A    I need you to mail that letter and contact MG if you can.

6    Talk to MG and just gain her ear.  I really need her to say I

7    didn't do anything and any --

8    Q    Third page.

9    A    -- pictures she used my phone while I was asleep.  It is the

10   only way I get to see my kids again.  Let her know she will not

11   be in trouble.  It seems whatever they have there is no proof I

12   took them.  I need her to understand that I will be in jail

13   forever.

14   Q    Showing you the fourth page.

15   A    And I'll never be able to see the boys.  This does not get

16   readed (sic) Kayla.  Please, if I have to spend the rest of my

17   life in jail, I probably will end up seriously taking my own

18   life.  I can't --

19   Q    Fifth page.

20   A    -- live not seeing my kids.  This is serious, Kayla.  My

21   life could be over.  I am super depressed.  I love you, B, and

22   thank you very much.  Tell MG I love her, please.

23   Q    Okay.  Did there come a point in time when you received a

24   recording from the Carroll County Detention Center, when you

25   understood that a coded letter was being discussed potentially?

1    A    Yes.

2    Q    I'm going to now play Government's Exhibit 18-A.  The

3    transcript is Government's Exhibit 18-B.

4            (Call playing.)

5    Q    Whose voices are we hearing on that call?

6    A    Eric Grinder and LeAnn Martin.

7    Q    And when was this, this conversation recorded?

8    A    July 8th, 2017.

9    Q    What step, if any, did you take after you learned of this

10   coded letter?

11   A    I contacted LeAnn Martin, Kayla Martin, and law enforcement.

12   Q    Okay.  Detective Federico, I want to direct your attention

13   now to July 25, 2017.  Without getting into what may have been

14   said, did you have contact with officials at the Carroll County

15   Detention Center that day?

16   A    Yes.

17   Q    Okay.  I want to show you what's been marked as Government's

18   Exhibit 19.  Recognize this?

19   A    Yes.

20   Q    Okay.  And what is it?

21   A    That is the key code to the coded letters.

22   Q    Where was this found?

23   A    In Eric Grinder's cell.

24   Q    Okay.  And looks like there's a series of numbers and then a

25   series of parentheses next to the numbers.  Can you explain to

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          68

1   the members of the jury what, what the numbers in the parentheses
2   are?
3   A    The numbers in the parentheses are associated with that
4   letter.  So the Z would be 1, and A would be number 26.
5   Q    I want to -- want to switch gears a little bit and direct
6   your attention to November 7 of 2018.  What, what investigative
7   steps, if any, did you take that day?
8   A    I obtained the federal search warrant for the address of
9   ███████████, ██████████, Union Bridge, Maryland.
10  Q    Okay.  Can you tell the members of the jury who lives at
11  that address?
12  A    LeAnn Martin.
13  Q    What did that warrant authorize law enforcement to seize?
14  A    Eric Grinder's wedding ring.
15  Q    And why were you seeking out Eric Grinder's wedding ring in
16  connection with the federal search warrant?
17  A    To compare it to the video that was, that we had seen
18  depicting an adult male with a wedding ring on.
19  Q    And you used a term, said "a video that we had seen."  When
20  you saw that video, were you concerned at all about its contents?
21  A    Yes.
22  Q    Video's contents?
23  A    Yes.
24  Q    Okay.  And had that, that video been somewhat recently
25  discovered by law enforcement?

DIRECT EXAMINATION OF AGENT FEDERICO BY MR. RILEY          69

1    A    Correct.

2    Q    Okay.  And where was that video found?

3    A    I believe that video was found on the SIM card, or the SD

4    card.

5    Q    Okay.  Okay.  I want to direct you to November 9, 2018.

6    What was the investigative step, if any, that you took that day?

7    A    We executed the search warrant on ███████████████

8    ██████████, in Union Bridge.

9    Q    Okay.  And did you obtain the ring that you were searching

10   for when you executed that warrant?

11   A    Yes.

12   Q    Okay.  Showing you, showing you what's been marked as

13   Government's Exhibit 11.  Do you recognize this?

14   A    Yes.

15   Q    What is it?

16   A    That's the wedding ring or wedding band that I seized on

17   November 9th and placed into evidence.

18   Q    Placed into evidence afterwards?

19   A    Yes.

20   Q    And now show you what's been marked as Government's Exhibit

21   12.  These are photographs of Government's Exhibit 11, 11, is

22   that right?

23   A    Yes.

24   Q    Okay.  Can you describe what the jurors are seeing in the

25   first page of Government's Exhibit 12?

1    A    It's a silverish color wedding ring or band with grooves on

2    the outer edges.

3    Q    Showing you the second page of Government's Exhibit 12.

4    Just another angle of the band, is that fair?

5    A    Correct.

6    Q    Showing you the third page of Government's Exhibit 12.

7    Another angle of that wedding band; is that fair?

8    A    Yes.

9    Q    Okay.  Now, how did this seized wedding band compare to the

10   wedding band that you had observed on the video found on the SD

11   card?  How did it compare?

12   A    Very similar.

13   Q    One moment, Your Honor.  No further questions at this time,

14   Your Honor.

15           THE COURT:  All right.  Thank you.  Ms. Oyer.

16           MS. OYER:  No questions of this witness.

17           THE COURT:  I'm sorry.  No questions?

18           MS. OYER:  No questions.

19           THE COURT:  Okay.  All right.  I thank you.  You can

20   step down, Special Agent.  Perhaps I can see counsel at the bench

21   for just a minute.

22           (Bench conference on the record.)

23           THE COURT:  So maybe we got here a little faster than I

24   thought we were going to, but I assume you don't have another

25   witness.

71

1          MR. RILEY:  Correct, Your Honor.

2          THE COURT:  Right.  Okay.  I will -- that's all right.

3     We can stick around and see if there's anything else we need to

4     talk about, the search warrant or anything.  And I'll excuse the

5     jury until 10 tomorrow, if, if they have to come.  Otherwise, 10

6     on Thursday.  Okay?

7              (End of bench conference.)

8          THE COURT:  All right, ladies and gentlemen.  It's

9     always a little difficult to predict exactly how long

10    everything's going to take.  But it appears that we've come to

11    the end of the available evidence for today.  I have some matters

12    to discuss with counsel, which I can do in a minute or two.

13         But we're going to, we're going to excuse you for

14    today.  Usual instructions.  Please leave your notes here.  Don't

15    talk about the case.  Keep an open mind.

16         Weather permitting, you should be back here a little

17    before 10 tomorrow for the case.  If the forecast is what it

18    sounds like, as I'm sure Ms. Moye told you, we will able to find

19    out if we're not able to be in court tomorrow because of the

20    driving and the distance, there will be a notice about that.

21    Certainly, we do not want any of you taking unnecessary risks in

22    your travel.  If for any reason there is court and you have some

23    genuine concern, you will let Ms. Moye know.  But I think we will

24    have a reasonable answer one way or the other tomorrow morning

25    when we see, when we see what happens.

72

1          So thank you all for your patience and attention so

2     far.  We'll see you either tomorrow or, if not, then Thursday by

3     10:00 to continue the case.  Thank you.

4               (Jury exits the courtroom at 4:26 p.m.)

5               THE COURT:  All right.  You can be seated.  I'll start

6     with the motion for reconsideration.  I have, obviously, a

7     motion, the government's response, and the defense reply.  But

8     I'm happy to hear if there's anything else that either side would

9     like to say about it.  Ms. Oyer or Ms. Hopkins?

10              MS. OYER:  Your Honor, with respect to the motion for

11    reconsideration, we will rest on the arguments that are set forth

12    in the legal briefing that we filed.

13              THE COURT:  Okay.  Mr. Riley.

14              MR. RILEY:  Same for the government, Your Honor.

15              THE COURT:  Okay.  All right.  Let me ask one, a

16    factual question.  There is a reference in the government's

17    response to Rule 41(g) and requesting return of property.  I

18    think the defense reply was that the federal rule, 41(g), doesn't

19    necessarily apply in a state situation.

20              Is there any evidence in the record of a request by Mr.

21    Grinder to have any of his electronic devices, phone and/or

22    laptop and/or SD cards, returned?

23              MR. RILEY:  Government's not aware of any, Your Honor.

24              MS. OYER:  Your Honor, there was no evidence presented

25    either way on that topic at the motions hearing.

73

1          THE COURT:  Okay.  Okay.  And, again, remind me of

2     which count.  The evidence that is about to be presented on all

3     but one of Counts 1 through 8 are the images of the minor victim

4     allegedly produced by Mr. Grinder, as opposed to separate, other

5     child pornography?  I'm trying to distinguish between pictures

6     that are in themselves evidence of the sexual abuse of a minor.

7          MR. RILEY:  Yes, Your Honor.

8          THE COURT:  Which I gather to be almost all of the

9     images that you're planning to present, as opposed to one of

10    these counts is three non-produced images from the laptop.

11         MR. RILEY:  Correct, Your Honor.  So those non-produced

12    images are part of Count 7.

13         THE COURT:  Count 7.

14         MR. RILEY:  The government's view is that the defendant

15    both possessed, with respect to the laptop, he possessed both the

16    produced images, as well as the non-produced images, that were on

17    that laptop.

18         THE COURT:  Okay.  Okay.  Well, I'm going to deny the

19    motion for reconsideration, obviously, resting on everything that

20    I said in my original opinion.  I will -- additionally, I think

21    there are distinctions between this and Mitchell, not the least

22    of which, of course, is that there was a warrant within, within

23    20 minutes.

24         I find that there is no evidence of Mr. Grinder having

25    requested these items back in any fashion that would influence

74

1    the length of the possession of the items, any electronic

2    devices.

3        The very first warrant it appears is sufficient to

4    cover everything that was, that is going to be introduced against

5    Mr. Grinder, other than Count 7, and it is itself child

6    pornography.  It is also evidence of the abuse of a minor victim,

7    which I believe was clearly covered by the first warrant.

8        And if it were necessary to get there -- again, I'm not

9    finding that there was such a delay in getting the federal

10   warrant that would interfere with any possessory interest -- but

11   if there is any problem, I would note that the, which I didn't

12   address the first time, I believe the first warrant is sufficient

13   to cover the three, even the three non-produced images of child

14   pornography.  Clearly, they were uncovered in the course of

15   looking for evidence of sexual abuse of a minor.

16       That, as I also said, I will just rest on everything

17   else that was in my initial memorandum.

18       Any other legal issues that we should be discussing

19   right now?

20       MR. RILEY:  Not from the government's perspective, Your

21   Honor.

22       THE COURT:  Ms. Oyer?

23       MS. OYER:  No, Your Honor.

24       THE COURT:  All right.  Well, you also will obviously

25   be able to find out whether we are going to be in court tomorrow

75

1    or not.  So I will see you either tomorrow or Thursday.

2              MS. OYER:  Your Honor, could I ask just a logistical

3    question about the circumstances of a court closure?

4              THE COURT:  Sure.

5              MS. OYER:  If it is not snowing first thing in the

6    morning but is likely to or forecasted to start snowing in the

7    morning, is it likely that the Court would close or would bring

8    in jurors?  I'm asking partly for self-interested reasons because

9    I also have a long commute, like many of the jurors probably, and

10   just wanted to understand if the Court will be likely to close if

11   it's going to start snowing mid-morning or something like that.

12             THE COURT:  Yeah.  I don't any longer make the decision

13   for the entire court.  But, certainly, I think it is the normal

14   practice of those who consult that, yes, if it's anticipated that

15   there will be a problem, even if it's not going to begin by

16   mid-morning but it's something sufficient that likely the Court

17   will be closed perhaps -- Ms. Moye, if there's a way you can find

18   that out, make sure you find that out as soon as possible, also.

19   Certainly can try to call chambers.

20             I will tell you that my thought is that if the weather

21   looks sufficiently bad, given where all our jurors come from,

22   that even if the court does not close, I may very well decide not

23   to call in the jury.  I will be trying to make that decision

24   along with the Clerk and the Chief Judge very early tomorrow

25   morning.

76

1          MS. OYER:  Thank you, Your Honor.

2          THE COURT:  Okay?  Anything else?

3          MR. RILEY:  No, Your Honor.

4          THE COURT:  Okay.  Thank you.

5          (Conclusion of Proceedings at 4:34 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

77

1                                  INDEX

2

3                                                         PAGE

4     GOVERNMENT WITNESS

5     WITNESS: AGENT RICHARD FEDERICO

6     DIRECT EXAMINATION BY MR. RILEY                       30

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

78

1

2

3                          REPORTER'S CERTIFICATE

4

5          I, Mary M. Zajac, do hereby certify that I recorded

6    stenographically the proceedings in the matter of USA v. Eric

7    Wayne Grinder, Case Number(s) CCB-17-226, on February 19, 2019.

8          I further certify that the foregoing pages constitute

9    the official transcript of proceedings as transcribed by me to

10   the within matter in a complete and accurate manner.

11         In Witness Whereof, I have hereunto affixed my

12   signature this _____ day of _____, 2019.

13

14

15

16                         _____/S/_____
                           Mary M. Zajac,
17                         Official Court Reporter

18

19

20

21

22

23

24

25

## /

**/S** [1] - 78:16

## 1

**1** [6] - 9:5, 14:16, 65:14, 68:4, 73:3
**1-A** [1] - 35:8, 37:11, 52:14
**1-B** [1] - 35:17
**10** [8] - 52:4, 53:14, 53:21, 53:25, 54:10, 71:5, 71:17
**1000903482DUU** [1] - 38:9
**101** [1] - 1:24
**10:00** [1] - 72:3
**11** [3] - 69:13, 69:21
**12** [5] - 55:10, 69:21, 69:25, 70:3, 70:6
**13** [1] - 55:25
**13-A** [4] - 60:19, 61:10, 61:11, 62:12
**13-B** [2] - 61:21, 62:13
**15** [1] - 52:4
**17** [1] - 6:14
**17-A** [8] - 61:3, 63:14, 63:21, 64:9, 64:18, 64:19, 64:25, 65:4
**17-B** [3] - 65:20, 65:24, 66:4
**17th** [4] - 7:4, 31:9, 34:17, 35:14
**18** [1] - 14:20
**18-A** [4] - 60:21, 61:10, 61:11, 67:2
**18-B** [2] - 61:21, 67:3
**18th** [1] - 3:24
**19** [5] - 1:10, 61:6, 67:18, 78:7
**1981** [1] - 2:13
**1A112898Q** [1] - 39:10

## 2

**2** [6] - 14:17, 15:17, 15:24, 36:8, 36:15, 37:19
**20** [1] - 73:23
**2003** [1] - 30:17
**2006** [1] - 23:17
**2012** [1] - 19:4
**2013** [3] - 19:7, 19:8, 30:17
**2016** [6] - 19:25, 21:3, 26:3, 32:5, 34:24, 35:12
**2017** [32] - 25:6, 31:9, 34:17, 38:17, 40:18,

40:22, 41:11, 41:18, 43:13, 44:9, 44:24, 45:4, 45:21, 46:25, 47:3, 50:19, 51:16, 53:5, 55:6, 55:10, 55:25, 58:21, 59:3, 60:20, 60:21, 61:3, 61:4, 62:21, 62:24, 63:5, 67:8, 67:13
**2018** [2] - 68:6, 69:5
**2019** [5] - 1:10, 3:24, 6:14, 78:7, 78:12
**21** [12] - 40:22, 41:11, 41:18, 43:13, 44:9, 44:23, 45:4, 45:21, 46:25, 47:3, 53:5, 55:5
**21201** [1] - 1:24
**21st** [4] - 40:18, 50:19, 51:16, 62:24
**24** [2] - 60:19, 62:21
**25** [8] - 56:19, 57:2, 57:7, 57:11, 57:19, 57:22, 61:4, 67:13
**26** [3] - 58:21, 65:15, 68:4
**28** [1] - 19:25
**29** [4] - 21:3, 32:5, 34:24, 35:12
**29th** [1] - 26:3
**2:00** [1] - 2:2
**2:20** [1] - 10:14
**2:22** [1] - 48:15

## 3

**3** [2] - 14:16, 38:12
**3/21/2017** [1] - 44:16
**30** [1] - 77:6
**30-A** [1] - 7:8
**30-B** [1] - 7:8
**30-C** [1] - 7:8
**30-D** [1] - 7:8
**30-E** [1] - 7:8
**30-F** [1] - 7:8
**30-G** [1] - 7:8
**33-F** [1] - 7:9
**33-G** [1] - 7:9
**33-H** [1] - 7:9
**37** [1] - 2:11
**3:28** [1] - 52:6
**3:40** [1] - 52:6
**3:47** [1] - 52:9

## 4

**4** [3] - 14:16, 38:19, 59:3
**41(g** [2] - 72:17, 72:18
**46** [1] - 9:17

**49** [1] - 9:17
**4:26** [1] - 72:4
**4:34** [1] - 76:5

## 5

**5** [9] - 9:4, 14:16, 41:2, 41:14, 42:4, 43:1, 43:12, 44:8, 44:18
**51** [1] - 9:19

## 6

**6** [2] - 14:16, 44:12
**60** [1] - 9:20
**615** [1] - 3:6

## 7

**7** [16] - 15:25, 24:15, 24:16, 46:21, 47:13, 47:19, 47:25, 48:16, 49:13, 50:1, 51:3, 51:6, 68:6, 73:12, 73:13, 74:5

## 8

**8** [7] - 15:25, 24:15, 24:19, 50:14, 51:10, 60:21, 73:3
**89** [1] - 9:5
**8th** [1] - 67:8

## 9

**9** [8] - 8:8, 8:9, 8:12, 16:13, 16:14, 25:5, 51:13, 69:5
**93** [1] - 9:6
**990004495000428** [1] - 37:12
**9th** [1] - 69:17

## A

**Abingdon** [4] - 19:11, 27:15, 55:23, 56:23
**able** [9] - 6:18, 18:7, 22:20, 23:16, 32:13, 66:15, 71:18, 71:19, 74:25
**absolutely** [1] - 6:12
**abuse** [13] - 19:25, 20:3, 20:5, 20:6, 21:14, 21:23, 22:8, 22:15, 22:20, 27:15, 73:6, 74:6,

74:15
**abused** [4] - 19:14, 20:3, 20:19, 21:10
**abuser** [1] - 22:5
**abuser's** [1] - 21:16
**abusing** [1] - 25:1
**accept** [3] - 5:19, 12:13, 13:19
**accepted** [1] - 5:5
**accessed** [2] - 16:3, 24:18, 24:20
**accomplish** [3] - 15:22, 15:23, 24:7
**accuracy** [1] - 61:22
**accurate** [3] - 60:18, 61:17, 78:10
**accusation** [1] - 14:2
**Act** [2] - 2:21, 3:15
**act** [2] - 15:21, 24:6
**acted** [1] - 16:18
**acts** [2] - 23:19, 32:12
**actual** [5] - 5:6, 15:7, 16:11, 37:10, 62:7
**add** [2] - 6:24, 7:21
**addition** [2] - 39:14, 45:9
**additional** [3] - 8:20, 21:11, 41:14
**additionally** [1] - 73:20
**address** [13] - 8:25, 21:4, 29:12, 48:2, 50:19, 51:17, 55:20, 55:22, 55:25, 56:2, 68:8, 68:11, 74:12
**addresses** [2] - 27:8, 64:6
**admission** [1] - 8:24
**admit** [1] - 8:13
**admitted** [2] - 11:12, 12:2
**admitting** [2] - 8:8, 8:14
**adopted** [3] - 19:9, 20:3, 27:14
**adoption** [1] - 27:2
**adult** [3] - 25:1, 33:12, 68:18
**adults** [1] - 15:8
**Advocacy** [1] - 31:21
**affecting** [2] - 16:5, 16:6
**affirmatively** [1] - 6:19
**affixed** [1] - 78:11
**Afternoon** [1] - 2:2
**afternoon** [5] - 19:3, 28:12, 30:9, 48:15, 52:4
**afterwards** [1] - 69:18
**age** [2] - 2:10, 14:20
**Agent** [10] - 22:10, 22:19, 23:1, 25:15, 29:18, 30:14, 55:14,

61:9, 62:18, 70:20
**agent** [3] - 25:19, 52:13, 53:4
**AGENT** [2] - 29:22, 77:5
**ago** [4] - 4:24, 25:25, 36:12, 38:20
**agree** [2] - 11:5, 11:13
**agreed** [3] - 6:7, 55:3, 60:12
**agreement** [1] - 55:1
**Alisha** [9] - 19:5, 19:6, 19:12, 19:19, 20:1, 21:2, 25:18, 26:25
**allegations** [1] - 31:15
**allegedly** [1] - 73:4
**allow** [1] - 5:15
**allowing** [1] - 6:21
**almost** [1] - 73:8
**alone** [3] - 27:5, 27:16, 32:13
**alongside** [1] - 29:8
**alphabet** [2] - 65:12, 65:13
**altered** [3] - 4:9, 61:2, 61:7
**Amendment** [1] - 5:16
**America** [2] - 55:4, 60:13
**AMERICA** [1] - 1:4
**Analyst** [1] - 25:17
**analyst** [1] - 26:9
**angle** [6] - 44:8, 47:16, 50:1, 51:9, 70:4, 70:7
**answer** [3] - 11:24, 17:16, 71:24
**answered** [1] - 17:15
**anticipated** [1] - 75:14
**apartment** [1] - 23:2
**appearance** [4] - 25:7, 59:8, 59:10, 59:12
**Appearances** [1] - 1:15
**appeared** [2] - 42:19, 63:6
**appellate** [1] - 5:16
**applied** [2] - 28:5, 34:10
**apply** [2] - 11:4, 72:19
**applying** [1] - 13:21
**appointed** [1] - 4:3
**approach** [1] - 35:6
**appropriate** [3] - 3:6, 4:15, 6:16
**April** [3] - 55:10, 55:25, 58:21
**area** [3] - 15:11, 15:13, 39:3
**argument** [2] - 7:14, 18:15
**arguments** [2] - 11:16, 72:11

**arm** [1] - 54:13
**arraignment** [1] - 2:5
**arrest** [1] - 55:7
**arrested** [3] - 41:17, 53:5, 53:8
**arriving** [1] - 14:8
**arrows** [1] - 65:9
**Asian** [1] - 54:13
**asleep** [2] - 25:13, 66:9
**assignment** [1] - 30:18
**assist** [1] - 62:8
**associated** [9] - 35:20, 37:2, 37:4, 39:5, 46:11, 46:14, 48:1, 65:13, 68:3
**assume** [2] - 4:2, 70:24
**assumption** [1] - 8:10
**attempt** [4] - 9:19, 15:17, 15:18, 15:24
**attempted** [3] - 16:17, 23:7, 24:2
**attention** [21] - 17:14, 18:9, 34:8, 36:19, 36:25, 37:13, 39:3, 43:7, 43:18, 50:11, 55:17, 58:20, 59:3, 63:4, 63:22, 64:8, 65:3, 67:12, 68:6, 72:1
**attorneys** [3] - 18:21, 55:4, 60:13
**attract** [1] - 15:11
**authorize** [1] - 68:13
**authorized** [2] - 34:13, 39:16
**available** [1] - 71:11
**aware** [1] - 72:23

**B**

**background** [7] - 12:8, 21:21, 22:20, 27:4, 33:2, 34:2, 56:3
**backwards** [1] - 65:15
**bad** [1] - 75:21
**bag** [1] - 60:25
**bags** [4] - 49:20, 49:23
**Baltimore** [3] - 1:11, 1:24, 59:7
**band** [2] - 23:3, 24:13, 69:16, 70:1, 70:4, 70:7, 70:9, 70:10
**bare** [1] - 22:13
**based** [8] - 3:7, 3:11, 11:2, 13:2, 13:9, 17:4, 20:24
**basic** [2] - 13:24, 16:21
**basis** [4] - 3:15, 3:21, 8:7, 32:8
**bathroom** [1] - 20:13
**became** [2] - 19:9, 19:21

**become** [1] - 19:13
**bed** [2] - 42:12
**bedding** [6] - 21:6, 22:2, 26:5, 27:6, 27:8
**bedroom** [10] - 22:22, 25:23, 27:4, 42:11, 43:5, 56:13, 57:5, 57:10, 57:17, 58:13
**begin** [2] - 18:10, 75:15
**Behalf** [1] - 1:16, 1:18
**behalf** [1] - 28:25
**belonged** [1] - 27:24
**belongings** [2] - 45:24, 48:23
**below** [2] - 54:5, 60:17
**bench** [3] - 70:20, 70:22, 71:7
**between** [11] - 15:8, 16:25, 47:11, 52:4, 54:4, 54:24, 55:1, 55:4, 60:13, 73:5, 73:21
**beyond** [4] - 14:11, 14:18, 20:15, 23:11
**bit** [6] - 18:13, 39:8, 55:17, 56:18, 58:20, 68:5
**blades** [1] - 54:5
**Blake** [4] - 1:12, 20:9, 23:5, 24:3
**blanket** [4] - 22:3, 22:4, 26:5, 27:7
**blue** [11] - 21:20, 22:6, 22:18, 25:21, 27:11, 27:17, 28:16, 45:10, 45:12, 50:1, 54:6
**booked** [1] - 53:9
**booking** [4] - 53:18, 54:17, 55:6, 55:14
**born** [2] - 2:12, 23:17
**bottom** [5] - 21:19, 22:14, 25:21, 43:18, 45:3
**box** [1] - 18:1
**boys** [2] - 64:12, 66:15
**break** [2] - 48:11, 52:1
**breaking** [1] - 51:25
**Bridge** [6] - 22:17, 46:11, 46:12, 47:15, 68:9, 69:8
**brief** [6] - 9:15, 9:16, 9:23, 10:23, 24:3, 26:2
**briefing** [1] - 72:12
**briefly** [2] - 14:13, 29:12
**bright** [1] - 13:5
**bring** [6] - 9:14, 10:6, 15:22, 24:7, 52:7, 75:7
**brings** [1] - 15:10
**brought** [3] - 14:1, 25:7, 59:7
**BUDLOW** [2] - 2:23, 52:8
**budlow** [1] - 1:17

**building** [4] - 46:17, 47:5, 47:9, 48:6
**bulb** [2] - 22:25, 58:5
**bulbs** [1] - 58:12
**burden** [2] - 7:16, 14:4
**burn** [1] - 66:1
**BY** [6] - 30:6, 52:12, 55:13, 61:8, 62:17, 77:6

**C**

**camera** [1] - 24:10
**cameras** [1] - 45:8
**capture** [1] - 24:10
**card** [17] - 21:11, 23:25, 26:11, 35:20, 35:23, 35:25, 36:1, 36:3, 37:18, 37:23, 37:24, 37:25, 38:2, 38:4, 69:3, 69:4, 70:11
**cards** [1] - 72:22
**carefully** [2] - 23:19, 23:21
**Carroll** [20] - 31:21, 32:2, 54:15, 54:21, 55:6, 55:8, 55:12, 55:15, 59:6, 59:13, 59:18, 59:25, 60:7, 60:15, 60:23, 61:5, 61:12, 63:1, 66:24, 67:14
**Case** [1] - 78:7
**CASE** [1] - 1:5
**case** [49] - 3:5, 4:14, 4:20, 4:21, 5:1, 5:3, 6:3, 6:16, 7:24, 8:21, 9:22, 9:23, 10:19, 10:25, 11:3, 13:15, 13:20, 13:22, 14:5, 14:12, 14:14, 16:23, 17:1, 17:4, 17:6, 18:13, 18:18, 20:2, 20:4, 20:10, 20:22, 23:6, 26:12, 27:14, 28:8, 28:15, 28:18, 28:21, 29:1, 30:25, 32:6, 55:2, 59:4, 71:15, 71:17, 72:3
**cases** [9] - 3:23, 4:14, 6:13, 30:20, 30:23, 30:25, 31:2, 31:3, 31:4
**Catherine** [1] - 1:12
**caused** [1] - 56:14
**CCB-17-226** [2] - 1:6, 78:7
**ceiling** [2] - 56:15, 58:1
**cell** [13] - 34:23, 35:11, 35:21, 36:11, 36:18, 37:2, 37:4, 45:8, 52:16, 56:14, 60:4, 61:6, 67:23
**cellular** [1] - 56:14
**center** [5] - 44:4, 47:11, 48:23, 54:6

**Center** [22] - 31:21, 53:10, 54:15, 54:21, 55:7, 55:9, 55:12, 55:15, 59:7, 59:13, 59:18, 59:21, 59:25, 60:3, 60:7, 60:15, 60:23, 61:5, 61:13, 63:1, 66:24, 67:15
**certain** [7] - 4:13, 11:15, 12:3, 13:2, 13:13, 27:18, 62:25
**certainly** [6] - 4:10, 6:14, 35:7, 71:21, 75:13, 75:19
**CERTIFICATE** [1] - 78:3
**certify** [2] - 78:5, 78:8
**challenging** [1] - 29:3
**chambers** [2] - 5:25, 75:19
**chance** [1] - 18:22
**change** [1] - 2:23
**changes** [1] - 8:5
**charge** [4] - 8:8, 14:17, 23:13, 24:4
**charged** [4] - 16:15, 24:14, 25:6, 28:1
**charges** [9] - 14:1, 14:12, 14:15, 23:5, 23:11, 28:7, 58:25, 59:8, 59:14
**check** [1] - 54:20
**checked** [3] - 54:17, 55:7, 61:21
**Chief** [2] - 6:17, 75:24
**child** [55] - 4:2, 5:22, 6:3, 14:17, 15:17, 15:20, 16:1, 16:2, 16:8, 20:6, 20:8, 20:13, 20:18, 23:7, 23:8, 23:9, 23:12, 24:2, 24:5, 24:14, 24:17, 24:19, 24:23, 25:3, 26:6, 26:12, 26:13, 26:19, 26:20, 26:23, 27:19, 27:21, 30:20, 30:22, 31:1, 31:12, 31:15, 32:7, 33:5, 33:8, 33:23, 33:24, 34:1, 40:10, 44:25, 50:21, 56:6, 58:17, 58:24, 59:9, 73:5, 74:5, 74:13
**child's** [1] - 15:13
**children** [3] - 15:8, 15:11, 20:19
**China** [7] - 23:24, 23:25, 24:1, 36:24, 38:5, 38:7, 39:13
**choice** [1] - 14:9
**choose** [1] - 18:17
**chose** [2] - 3:16, 5:18
**circle** [1] - 43:22
**circumstances** [2] -

3:17, 75:3
**circumstantial** [5] - 7:21, 12:22, 13:1, 13:12, 13:14
**cited** [1] - 6:13
**City** [1] - 25:17
**clear** [9] - 3:3, 4:7, 4:11, 5:6, 7:6, 8:24, 9:3, 12:19, 16:24
**clearly** [3] - 4:4, 74:7, 74:14
**Clerk** [1] - 75:24
**CLERK** [11] - 2:7, 2:10, 2:12, 2:14, 2:17, 10:18, 10:21, 29:19, 29:21, 29:24, 30:4
**clients** [1] - 11:19
**close** [5] - 23:21, 50:11, 75:7, 75:10, 75:22
**close-up** [1] - 23:21
**closed** [1] - 75:17
**closet** [1] - 42:22
**closing** [1] - 21:18
**closure** [1] - 75:3
**clothes** [1] - 22:12
**clothing** [21] - 21:17, 32:18, 34:2, 34:5, 40:8, 40:9, 42:22, 42:23, 49:9, 49:20, 50:13, 50:23
**code** [1] - 67:21
**coded** [8] - 8:7, 8:9, 25:9, 25:10, 25:25, 66:25, 67:10, 67:21
**coerced** [1] - 14:22
**collared** [4] - 33:15, 40:5, 49:7, 51:5
**colleague** [1] - 28:14
**Collins** [1] - 44:22
**color** [9] - 32:24, 33:16, 40:6, 45:3, 49:8, 54:6, 54:8, 70:1
**colored** [8] - 32:22, 33:13, 33:14, 40:5, 40:6, 49:6, 49:16, 51:5
**comforter** [3] - 21:7, 22:3, 27:6
**commences** [1] - 2:2
**commerce** [3] - 15:2, 16:5, 16:7
**commit** [3] - 15:17, 15:19, 24:4
**common** [3] - 13:21, 20:25, 28:6
**commute** [1] - 75:9
**compare** [7] - 44:24, 50:20, 51:21, 58:16, 68:17, 70:9, 70:11
**complete** [1] - 78:10
**computer** [4] - 7:19, 21:8, 24:18, 26:9

**Computer** [1] - 25:17
**concern** [2] - 6:1, 71:23
**concerned** [1] - 68:20
**concerning** [1] - 45:23
**conclude** [3] - 13:3, 13:10, 13:13
**conclusion** [4] - 12:11, 16:23, 29:13, 76:5
**conditional** [1] - 5:15
**conduct** [8] - 9:18, 14:23, 14:24, 15:3, 15:7, 16:12, 17:3, 20:10
**conducted** [1] - 59:22
**conference** [3] - 4:25, 70:22, 71:7
**confiscated** [1] - 60:4
**connect** [1] - 3:10
**connection** [11] - 8:21, 25:20, 31:23, 31:24, 33:7, 40:24, 45:4, 55:18, 55:24, 59:20, 68:16
**consider** [7] - 11:14, 12:14, 13:14, 14:8, 15:15, 23:6, 55:2
**considered** [2] - 17:20, 32:23
**constitute** [1] - 78:8
**constitutes** [1] - 15:13
**consult** [1] - 75:14
**contact** [3] - 59:18, 66:5, 67:14
**contacted** [1] - 67:11
**contain** [1] - 61:11
**contents** [2] - 68:20, 68:22
**contesting** [1] - 29:1
**continue** [4] - 52:11, 59:15, 66:4, 72:3
**continued** [1] - 22:19
**control** [2] - 17:2, 17:19
**controls** [1] - 62:10
**conversation** [11] - 8:16, 8:22, 45:22, 46:3, 46:8, 60:17, 62:20, 62:21, 67:7
**conversations** [3] - 6:1, 61:11, 62:2
**convincing** [1] - 4:8
**copied** [1] - 61:2
**copies** [2] - 61:25, 62:25
**copy** [4] - 60:24, 63:5, 63:9, 63:17
**correct** [41] - 5:23, 6:14, 33:6, 34:19, 34:25, 35:15, 36:6, 37:25, 38:10, 39:11, 39:20, 41:22, 42:16, 43:6, 43:15, 44:2, 44:10, 44:20, 45:11, 45:17,

46:16, 47:1, 47:4, 47:7, 47:18, 48:5, 48:8, 49:11, 50:3, 51:11, 52:21, 53:6, 53:19, 57:18, 57:21, 59:2, 63:3, 69:1, 70:5, 71:1, 73:11
**correspondence** [1] - 59:22
**corruptly** [1] - 16:16
**counsel** [11] - 5:23, 14:13, 16:22, 17:10, 17:15, 18:12, 18:17, 18:25, 28:14, 70:20, 71:12
**Count** [13] - 8:8, 8:9, 8:12, 14:17, 15:17, 15:24, 16:13, 16:14, 25:5, 73:12, 73:13, 74:5
**count** [6] - 16:14, 23:7, 23:9, 24:16, 24:19, 73:2
**Counts** [3] - 2:15, 24:14, 73:3
**counts** [9] - 14:14, 14:15, 14:16, 15:25, 23:6, 23:8, 28:10, 73:10
**County** [20] - 31:21, 32:2, 54:15, 54:21, 55:6, 55:8, 55:12, 55:15, 59:6, 59:13, 59:18, 59:25, 60:7, 60:15, 60:23, 61:5, 61:12, 63:1, 66:24, 67:14
**county** [1] - 53:9
**couple** [2] - 13:6, 17:25
**course** [9] - 6:8, 6:10, 6:16, 8:5, 11:6, 17:17, 29:7, 73:22, 74:14
**court** [11] - 12:5, 18:4, 18:6, 25:7, 59:12, 71:19, 71:22, 74:25, 75:3, 75:13, 75:22
**COURT** [53] - 1:1, 2:3, 2:18, 3:1, 3:22, 5:6, 5:10, 5:18, 5:21, 7:1, 7:12, 9:10, 9:13, 10:2, 10:4, 10:6, 10:10, 10:13, 10:15, 10:22, 20:16, 28:11, 29:16, 35:7, 51:24, 52:3, 52:7, 52:10, 54:25, 60:11, 62:1, 62:4, 62:13, 62:15, 70:15, 70:17, 70:19, 70:23, 71:2, 71:8, 72:5, 72:13, 72:15, 73:1, 73:8, 73:13, 73:18, 74:22, 74:24, 75:4, 75:12, 76:2, 76:4
**Court** [5] - 4:25, 75:7, 75:10, 75:16, 78:17
**courthouse** [2] - 17:22, 25:8
**Courthouse** [2] - 1:23,

59:7
**courtroom** [10] - 2:25, 3:13, 3:19, 10:14, 12:18, 17:5, 17:23, 52:9, 72:4
**cover** [5] - 36:18, 52:16, 52:23, 74:4, 74:13
**cover's** [1] - 52:16
**covered** [5] - 34:20, 35:1, 46:24, 52:19, 74:7
**covering** [1] - 48:24
**coworkers** [1] - 13:7
**created** [4] - 20:5, 22:24, 26:15, 56:16
**credibility** [1] - 13:20
**crime** [5] - 15:19, 15:23, 15:24, 24:5, 24:7
**Crime** [2] - 2:21, 3:14
**criminal** [1] - 13:22
**CRIMINAL** [1] - 1:5
**cross** [2] - 18:17, 54:5
**cumulative** [1] - 9:8
**current** [1] - 30:18
**cursor** [1] - 43:25
**curtains** [1] - 34:3

# D

**dark** [12] - 21:20, 32:22, 33:13, 33:14, 33:16, 40:5, 40:6, 49:6, 49:8, 49:16, 50:1, 51:5
**dark-colored** [3] - 40:5, 40:6, 49:6
**date** [5] - 16:15, 60:19, 60:21, 61:1, 61:3
**dated** [1] - 3:24
**dates** [1] - 26:15
**dating** [1] - 19:5
**daughter** [4] - 19:5, 19:9, 20:3, 27:15
**days** [2] - 17:25, 28:20
**December** [1] - 19:8
**decide** [7] - 11:2, 11:9, 12:13, 13:3, 13:17, 17:4, 75:22
**decision** [2] - 75:12, 75:23
**decoded** [2] - 65:16, 65:20
**DEFENDANT** [4] - 2:9, 2:11, 2:13, 2:16
**defendant** [56] - 7:2, 7:18, 8:11, 13:25, 14:2, 14:5, 14:7, 14:21, 15:19, 15:21, 16:3, 16:9, 16:16, 16:18, 18:18, 19:4, 19:8, 19:14, 19:15, 19:16, 19:17, 19:19, 19:22, 20:24, 23:15, 23:18,

23:20, 24:4, 24:6, 24:8, 24:22, 25:2, 25:6, 26:18, 27:1, 27:5, 27:16, 27:24, 28:2, 28:6, 28:10, 28:15, 31:20, 41:17, 53:4, 54:20, 55:5, 55:14, 55:20, 59:15, 60:14, 60:16, 61:1, 61:12, 73:14
**Defendant** [2] - 1:7, 1:18
**defendant's** [22] - 7:2, 14:11, 19:7, 22:11, 22:17, 23:2, 23:3, 23:21, 24:12, 24:18, 25:18, 25:24, 26:3, 27:2, 27:10, 27:14, 27:17, 45:23, 55:7, 55:11, 60:4, 61:6
**defense** [11] - 3:1, 4:7, 4:10, 6:4, 6:5, 7:4, 18:11, 18:16, 72:7, 72:18
**defined** [1] - 16:9
**definition** [2] - 9:17, 15:16
**delay** [1] - 74:9
**delete** [1] - 24:24
**deliberate** [3] - 17:21, 17:24, 18:23
**deliberating** [1] - 17:19
**deliberations** [1] - 18:3
**deny** [2] - 8:2, 73:18
**Department** [5] - 25:17, 30:15, 54:21, 55:8, 55:12
**depicting** [1] - 68:18
**depiction** [9] - 14:24, 14:25, 15:10, 16:3, 16:4, 16:8, 16:11, 24:17, 24:19
**depressed** [1] - 66:21
**describe** [11] - 32:17, 32:20, 42:9, 42:17, 48:21, 49:18, 52:15, 65:6, 69:24
**described** [1] - 15:20
**description** [1] - 15:4
**deserves** [1] - 12:16
**detained** [2] - 25:8, 61:12
**Detective** [2] - 25:16, 67:12
**detective** [1] - 26:1
**Detention** [21] - 53:10, 54:15, 54:21, 55:6, 55:8, 55:12, 55:15, 59:6, 59:13, 59:18, 59:21, 59:25, 60:3, 60:7, 60:15, 60:23, 61:5, 61:12, 63:1, 66:24, 67:15
**device** [1] - 36:5
**devices** [8] - 26:10, 27:24, 34:20, 34:24, 39:15, 40:7, 72:21, 74:2

**difference** [1] - 16:25
**different** [5] - 2:1, 7:25, 9:21, 14:15, 62:10
**difficult** [2] - 28:18, 71:9
**Dire** [1] - 2:1
**DIRECT** [2] - 30:5, 77:6
**direct** [16] - 12:22, 13:14, 36:19, 43:18, 50:10, 55:17, 58:20, 59:3, 63:4, 63:22, 64:8, 65:3, 67:12, 68:5, 69:5
**directing** [4] - 36:25, 37:13, 39:3, 43:7
**directly** [1] - 29:24
**disagree** [1] - 20:16
**discover** [2] - 49:3, 56:11
**discovered** [5] - 21:9, 31:12, 50:8, 56:13, 68:25
**discovery** [2] - 25:22, 26:11
**discuss** [4] - 5:11, 17:6, 17:12, 71:12
**discussed** [4] - 2:21, 4:25, 5:24, 66:25
**discusses** [1] - 8:15
**discussing** [1] - 74:18
**discussion** [1] - 9:4
**discussions** [3] - 4:18, 4:21, 5:2
**dispassionately** [1] - 20:24
**displayed** [1] - 52:19
**displays** [1] - 15:10
**disposition** [1] - 5:2
**disputing** [1] - 28:25
**disregarded** [2] - 12:4, 12:20
**distance** [1] - 71:20
**distinct** [6] - 21:18, 21:21, 22:8, 22:22, 25:23, 27:3
**distinctions** [1] - 73:21
**distinguish** [1] - 73:5
**DISTRICT** [2] - 1:1, 1:1
**District** [2] - 23:24, 34:11
**DIVISION** [1] - 1:2
**DL** [1] - 44:22
**document** [1] - 65:20
**documents** [1] - 11:11
**Doe** [4] - 14:20, 14:22, 16:17, 16:19
**done** [2] - 18:18, 62:1
**door** [2] - 47:10, 48:9
**doors** [1] - 47:11
**dot** [5] - 21:7, 22:3, 26:5, 27:6, 65:8
**dots** [1] - 3:10

**doubt** [4] - 14:11, 14:19, 23:11, 28:6
**down** [5] - 17:13, 43:7, 43:18, 65:8, 70:20
**drawer** [1] - 43:4
**drawers** [1] - 42:22
**drawstring** [11] - 21:20, 22:7, 22:18, 25:22, 27:12, 32:23, 33:15, 40:5, 49:6, 49:7, 49:17
**dresser** [2] - 42:11, 43:4
**dressers** [1] - 22:12
**dripping** [2] - 13:7, 13:8
**driving** [1] - 71:20
**duffel** [1] - 49:23
**during** [16] - 2:25, 3:13, 8:22, 11:6, 17:17, 20:22, 23:2, 23:10, 25:8, 26:16, 29:7, 41:23, 49:2, 50:24, 54:17, 55:6

**E**

**ear** [1] - 66:6
**early** [3] - 4:21, 31:24, 75:24
**easy** [1] - 28:21
**ECF** [2] - 9:5, 9:6
**edges** [1] - 70:2
**effect** [14] - 21:22, 22:9, 22:23, 25:23, 33:2, 56:4, 56:13, 56:17, 57:15, 57:16, 57:20, 58:2, 58:15, 58:17
**effects** [1] - 42:24
**effort** [2] - 15:22, 24:6
**eighth** [1] - 51:2
**either** [5] - 5:9, 9:18, 72:2, 72:8, 72:25, 75:1
**elect** [1] - 17:25
**electronic** [4] - 31:13, 40:7, 72:21, 74:1
**electronics** [1] - 45:5
**elements** [7] - 7:17, 9:16, 9:20, 16:21, 23:11, 23:13, 24:15
**Elizabeth** [1] - 1:18
**emails** [1] - 59:23
**Emminizer** [1] - 25:16
**Emminizer's** [1] - 26:1
**emotion** [1] - 20:24
**employed** [3] - 14:21, 30:9, 30:15
**enclose** [2] - 64:13, 64:15
**end** [16] - 9:22, 13:20, 14:5, 14:14, 15:4, 15:5, 17:1, 18:8, 20:9, 28:4,

28:8, 66:17, 71:7, 71:11
**enforcement** [11] - 21:3, 22:6, 41:24, 45:5, 48:13, 49:2, 49:9, 61:4, 67:11, 68:13, 68:25
**engaged** [6] - 16:11, 20:10, 23:19, 32:12, 60:14, 60:16
**engines** [1] - 26:23
**entered** [2] - 26:22, 40:21
**enters** [2] - 10:14, 52:9
**enticed** [1] - 14:21
**entire** [1] - 75:13
**entitled** [1] - 4:7
**entity** [1] - 31:17
**entrance** [1] - 57:5
**envelope** [1] - 63:17
**equally** [1] - 3:18
**equipment** [1] - 31:13
**Eric** [25] - 2:9, 19:4, 28:15, 31:6, 39:22, 46:6, 53:17, 53:24, 54:4, 55:5, 58:23, 59:6, 59:22, 60:14, 62:19, 63:9, 63:17, 63:20, 64:6, 67:6, 67:23, 68:14, 68:15, 78:6
**ERIC** [1] - 1:6
**Esquire** [4] - 1:16, 1:17, 1:18, 1:19
**essentially** [6] - 3:10, 6:5, 8:10, 9:8, 13:20, 15:3
**establish** [1] - 23:10
**etched** [2] - 56:16, 58:2
**evaluate** [1] - 20:23
**event** [1] - 12:24
**eventually** [1] - 21:10
**evidence** [61] - 4:8, 4:17, 6:11, 7:16, 7:21, 8:6, 9:9, 11:2, 11:9, 11:14, 11:15, 11:20, 11:21, 12:1, 12:19, 12:21, 12:22, 13:1, 13:12, 13:15, 14:6, 17:4, 17:8, 17:9, 18:12, 18:14, 18:15, 18:20, 18:21, 18:23, 20:15, 20:23, 20:25, 23:10, 23:14, 23:18, 23:20, 23:22, 24:8, 25:10, 26:3, 27:13, 28:5, 28:21, 28:24, 29:1, 29:13, 55:2, 62:6, 62:11, 69:17, 69:18, 71:11, 72:20, 72:24, 73:2, 73:6, 73:24, 74:6, 74:15
**Evidence** [1] - 3:7
**evidentiary** [2] - 41:24, 49:3
**ex** [1] - 25:18

**ex-wife** [1] - 25:18
**exact** [1] - 24:25
**exactly** [2] - 7:24, 71:9
**EXAMINATION** [2] - 30:5, 77:6
**examination** [1] - 26:10
**examine** [2] - 18:17, 21:10
**examined** [1] - 21:8
**examiner** [2] - 21:9
**example** [2] - 7:18, 13:4
**excellent** [1] - 18:6
**except** [1] - 14:17
**exceptions** [1] - 12:7
**excerpts** [2] - 61:11, 61:15
**excite** [1] - 15:12
**exclude** [2] - 3:7, 3:20
**excluding** [1] - 8:20
**excuse** [4] - 6:18, 64:14, 71:4, 71:13
**execute** [3] - 40:19, 48:13, 62:22
**executed** [7] - 21:3, 22:16, 40:14, 41:20, 46:24, 69:7, 69:10
**execution** [2] - 23:2, 50:24
**exhibit** [2] - 35:5, 61:3
**Exhibit** [64] - 9:4, 9:5, 35:8, 35:17, 36:8, 36:15, 37:11, 37:19, 38:12, 38:19, 41:2, 41:14, 42:3, 43:1, 43:12, 44:8, 44:12, 44:17, 46:21, 47:13, 47:19, 47:24, 48:16, 49:13, 49:25, 50:14, 51:2, 51:6, 51:13, 52:14, 53:14, 53:20, 53:25, 54:9, 56:19, 57:1, 57:6, 57:11, 57:19, 57:22, 60:19, 60:21, 61:5, 61:6, 61:21, 62:12, 63:14, 63:21, 64:9, 64:17, 64:19, 64:25, 65:4, 65:20, 65:23, 67:2, 67:3, 67:18, 69:13, 69:20, 69:21, 69:25, 70:3, 70:6
**exhibition** [2] - 15:9, 15:14
**exhibits** [4] - 7:7, 9:3, 11:12, 61:25
**Exhibits** [2] - 61:9, 61:10
**exist** [2] - 13:3, 13:14
**exits** [1] - 72:4
**expect** [4] - 9:24, 18:13, 18:14, 29:4
**expected** [1] - 3:10
**experience** [2] - 12:9,

12:15
**expert** [2] - 12:12, 12:15
**expertise** [1] - 12:9
**experts** [1] - 13:16
**explain** [1] - 67:25
**explicit** [7] - 9:18, 14:22, 15:3, 15:7, 16:10, 16:12, 20:10
**explicitly** [1] - 25:3
**exploitation** [4] - 26:24, 30:20, 30:22, 31:1
**exposed** [1] - 6:2
**exposure** [1] - 15:13
**express** [2] - 12:6, 12:10
**extended** [1] - 4:22
**extra** [1] - 18:2
**extremely** [2] - 9:15, 28:18
**eyewitness** [1] - 12:23

**F**

**F-E-D-E-R-I-C-O** [1] - 30:3
**face** [3] - 21:16, 22:2, 33:12
**fact** [3] - 7:20, 7:22, 8:18
**facts** [9] - 11:3, 11:5, 11:10, 13:2, 13:3, 13:13, 13:14
**factual** [1] - 72:16
**failed** [2] - 24:9
**fair** [21] - 31:14, 39:4, 40:11, 41:17, 42:15, 44:5, 44:18, 45:9, 48:9, 49:10, 51:10, 52:23, 54:18, 56:24, 57:16, 57:20, 58:5, 61:10, 65:1, 70:4, 70:7
**fairly** [1] - 9:23
**family** [2] - 19:10, 20:12
**fan** [4] - 22:24, 56:14, 56:15, 58:1
**fans** [2] - 58:10, 58:12
**far** [1] - 72:2
**fashion** [2] - 5:23, 73:25
**faster** [1] - 70:23
**father** [1] - 64:12
**father/daughter** [2] - 26:21, 27:22
**FCRR** [1] - 1:23
**February** [5] - 1:10, 3:24, 6:14, 7:4, 78:7
**Federal** [1] - 3:7
**federal** [22] - 5:3, 16:19, 31:5, 32:6, 32:8, 33:23, 34:10, 34:13, 35:1,

35:13, 39:16, 40:14, 58:25, 59:1, 59:4, 59:8, 59:14, 62:22, 68:8, 68:16, 72:18, 74:9
**federally** [2] - 25:6, 28:2
**FEDERICO** [2] - 29:22, 77:5
**Federico** [13] - 22:10, 22:19, 23:1, 25:15, 25:19, 29:18, 30:2, 52:13, 53:4, 55:14, 61:9, 62:18, 67:12
**fellow** [1] - 17:13
**felony** [1] - 6:17
**felt** [1] - 6:10
**female** [2] - 32:12, 32:13
**few** [4] - 2:3, 13:23, 28:20
**field** [1] - 19:16
**fifth** [5] - 42:25, 48:16, 57:19, 64:24, 66:19
**figure** [2] - 22:5, 22:7
**figured** [1] - 22:1
**file** [1] - 26:19
**file-sharing** [1] - 26:19
**filed** [2] - 2:1, 72:12
**files** [1] - 25:3
**film** [2] - 24:8, 24:10
**filmed** [7] - 19:14, 19:16, 19:17, 19:18, 19:23, 20:3, 23:20
**finally** [7] - 16:13, 23:22, 26:18, 26:25, 27:10, 27:12, 28:1
**finger** [1] - 19:16
**finished** [1] - 29:14
**first** [32] - 8:15, 9:4, 10:16, 14:16, 14:19, 15:19, 16:15, 21:24, 24:4, 25:7, 29:16, 31:23, 32:1, 36:14, 37:1, 37:5, 37:6, 38:19, 41:2, 46:21, 53:14, 56:19, 62:4, 63:24, 65:6, 69:25, 74:3, 74:7, 74:12, 75:5
**five** [4] - 10:5, 19:6, 23:6, 30:24
**fixture** [1] - 56:15
**flicked** [1] - 22:22
**flips** [1] - 52:17
**Floor** [1] - 1:23
**focus** [1] - 26:21
**focused** [2] - 21:24, 26:23
**follow** [4] - 9:22, 11:5, 12:2, 12:4
**followed** [1] - 63:11
**following** [1] - 60:25
**follows** [2] - 55:5, 60:14

**FOR** [1] - 1:1
**forecast** [1] - 71:17
**forecasted** [1] - 75:6
**foregoing** [1] - 78:8
**foreign** [3] - 15:2, 16:5, 16:7
**Forensic** [1] - 25:17
**forensic** [3] - 21:8, 26:9, 26:10
**foreperson** [2] - 17:25, 18:2
**forever** [1] - 66:13
**form** [1] - 17:9
**formal** [2] - 4:20, 5:9
**formed** [1] - 32:7
**forms** [1] - 8:7
**forth** [2] - 3:10, 72:11
**forward** [1] - 6:19
**four** [2] - 25:15, 30:24
**fourth** [7] - 16:9, 42:3, 47:24, 54:9, 57:11, 64:24, 66:14
**Fourth** [2] - 1:23, 5:16
**frame** [1] - 24:13
**framed** [1] - 24:11
**fraud** [1] - 31:3
**Frederick** [1] - 30:21
**Frye** [1] - 4:15
**full** [4] - 15:4, 29:25, 48:25, 50:6
**function** [1] - 4:4
**furniture** [1] - 34:3

**G**

**G900V** [2] - 36:22, 36:23
**gain** [1] - 66:6
**game** [1] - 8:23
**garage** [9] - 8:18, 22:17, 46:14, 46:17, 46:19, 48:14, 48:20, 49:21, 62:23
**garage/outbuilding** [3] - 46:10, 48:1, 48:4
**garbage** [1] - 49:23
**gather** [1] - 73:8
**GBH** [1] - 33:14
**gears** [3] - 55:17, 58:20, 68:5
**general** [3] - 6:15, 15:16, 42:17
**generally** [15] - 13:4, 31:10, 32:10, 32:20, 33:10, 33:23, 36:3, 37:1, 40:19, 42:10, 45:7, 48:21, 53:7, 53:9, 54:16
**genitals** [5] - 15:11, 15:13, 23:22, 24:10,

24:11
**gentlemen** [10] - 10:23, 20:2, 23:14, 27:13, 28:4, 28:13, 28:16, 52:3, 62:4, 71:8
**genuine** [1] - 71:23
**GHB** [3] - 33:13, 33:14, 40:7
**Gibson** [2] - 25:17, 26:8
**girl** [1] - 23:14
**girls** [1] - 25:1
**given** [2] - 2:22, 75:21
**glass** [2] - 22:24, 58:1, 58:5
**Government** [3] - 1:16, 48:16, 63:14
**government** [31] - 2:21, 3:15, 3:20, 3:24, 4:13, 4:16, 4:21, 5:13, 5:18, 6:7, 6:11, 6:13, 6:15, 6:22, 7:15, 9:24, 14:2, 14:4, 14:10, 14:18, 15:15, 15:18, 16:2, 16:14, 18:10, 18:16, 28:9, 28:23, 29:17, 35:5, 72:14
**GOVERNMENT** [1] - 77:4
**government's** [19] - 2:24, 3:5, 5:4, 7:4, 7:7, 7:14, 9:11, 9:16, 18:18, 28:25, 29:2, 29:3, 29:9, 29:13, 72:7, 72:16, 72:23, 73:14, 74:20
**GOVERNMENT'S** [1] - 29:22
**Government's** [58] - 35:16, 36:7, 36:15, 37:10, 37:19, 38:11, 38:19, 41:2, 41:13, 42:3, 42:25, 43:12, 44:8, 44:11, 44:17, 46:21, 47:13, 47:19, 47:24, 49:12, 49:25, 50:14, 51:2, 51:6, 51:12, 52:14, 53:13, 53:20, 53:25, 54:9, 56:19, 57:1, 57:6, 57:11, 57:19, 57:22, 61:5, 61:6, 61:9, 61:10, 61:21, 63:21, 64:9, 64:17, 64:19, 64:25, 65:4, 65:19, 65:23, 67:2, 67:3, 67:17, 69:13, 69:20, 69:21, 69:25, 70:3, 70:6
**grand** [2] - 58:23, 59:1
**gratification** [1] - 19:23
**gray** [3] - 37:14, 37:17, 39:3
**greenish** [1] - 54:8

**GRINDER** [1] - 1:6
**Grinder** [34] - 2:9, 2:14, 3:4, 3:19, 3:25, 5:14, 8:23, 9:6, 19:4, 25:18, 26:25, 28:15, 28:25, 29:1, 31:6, 39:22, 53:17, 53:18, 53:24, 55:5, 58:23, 59:6, 59:22, 60:14, 63:9, 63:17, 64:6, 67:6, 72:21, 73:4, 73:24, 74:5, 78:7
**Grinder's** [12] - 2:24, 8:15, 8:17, 8:19, 46:6, 46:7, 54:4, 62:19, 63:20, 67:23, 68:14, 68:15
**grooves** [1] - 70:1
**guardian** [1] - 4:5
**guess** [1] - 52:18
**guidelines** [1] - 13:19
**guilt** [1] - 14:3, 14:11
**guilty** [5] - 2:16, 5:14, 14:1, 28:7, 28:10

**H**

**hallway** [1] - 57:5
**hand** [9] - 10:19, 24:12, 29:21, 36:20, 37:13, 43:7, 44:18, 47:16, 61:24
**happy** [2] - 52:1, 72:8
**hear** [20] - 9:22, 12:18, 14:13, 16:16, 16:22, 20:9, 23:10, 23:17, 24:22, 25:2, 25:5, 26:8, 26:18, 26:22, 26:25, 28:19, 29:9, 62:9, 62:10, 72:8
**heard** [8] - 7:5, 12:7, 12:17, 12:25, 17:8, 20:8, 28:4, 28:5
**hearing** [6] - 4:16, 20:21, 25:14, 29:6, 67:5, 72:25
**hears** [1] - 4:9
**help** [2] - 34:6, 37:7
**helpful** [1] - 12:10
**hereby** [3] - 55:3, 60:12, 78:5
**hereunto** [1] - 78:11
**herself** [1] - 3:16
**himself** [1] - 24:9
**holding** [2] - 13:7, 50:5
**holds** [1] - 36:4
**hole** [3] - 21:19, 44:3, 44:7
**holes** [6] - 22:14, 25:21, 27:11, 40:4, 43:21, 45:3
**Homeland** [7] - 21:15, 25:15, 26:8, 30:12,

30:16, 30:18
**Honor** [44] - 2:23, 3:3, 4:19, 4:24, 5:2, 5:8, 5:12, 5:20, 6:25, 7:6, 9:2, 9:12, 10:1, 10:3, 10:5, 10:9, 10:11, 19:2, 20:14, 28:12, 29:17, 35:6, 52:2, 52:8, 52:13, 54:23, 60:9, 61:24, 62:3, 62:14, 70:13, 70:14, 71:1, 72:10, 72:14, 72:23, 72:24, 73:7, 73:11, 74:21, 74:23, 75:2, 76:1, 76:3
**Honorable** [1] - 1:12
**HOPKINS** [2] - 7:6, 9:2
**Hopkins** [5] - 1:19, 10:4, 28:14, 29:7, 72:9
**horizontal** [4] - 33:16, 40:6, 49:8, 51:5
**horrors** [2] - 19:13, 19:22
**hours** [1] - 13:6
**house** [29] - 19:13, 19:14, 19:15, 19:16, 19:17, 19:20, 19:21, 19:22, 22:11, 22:12, 27:4, 35:2, 35:4, 40:21, 41:6, 41:8, 41:10, 41:21, 42:18, 45:5, 46:19, 47:14, 47:23, 56:12, 56:24
**housing** [6] - 22:24, 56:14, 56:15, 58:1, 58:4, 58:12
**HSI** [1] - 31:17

**I**

**identical** [5] - 22:14, 23:4, 45:1, 50:22, 51:23
**identification** [1] - 61:20
**identified** [1] - 55:20
**identify** [5] - 22:20, 27:6, 27:10, 34:1, 34:6
**identifying** [2] - 34:2, 34:5
**identity** [3] - 22:5, 60:20, 60:21
**ignore** [1] - 11:23
**image** [4] - 14:24, 14:25, 33:1, 33:4
**images** [43] - 6:6, 6:9, 6:20, 6:22, 7:18, 7:22, 20:18, 20:22, 20:23, 21:12, 21:14, 21:16, 21:21, 22:2, 22:15, 22:23, 24:23, 26:6,

26:13, 26:15, 26:16, 27:18, 27:19, 27:23, 28:3, 32:7, 32:17, 33:1, 33:4, 33:21, 34:1, 40:10, 44:25, 50:21, 56:6, 58:17, 73:3, 73:9, 73:10, 73:12, 73:16, 74:13
**IMEI** [4] - 36:25, 37:1, 37:4, 37:11
**immigration** [1] - 31:4
**important** [2] - 17:7, 18:8
**improper** [1] - 11:21
**IN** [1] - 1:1
**inception** [2] - 30:17
**incest** [1] - 26:21
**included** [2] - 5:3, 21:21
**includes** [4] - 8:15, 11:16, 15:7, 15:9
**including** [3] - 7:18, 9:15, 21:6
**incorrect** [1] - 5:11
**independent** [1] - 17:5
**INDEX** [1] - 77:1
**indicate** [1] - 11:7
**indicated** [4] - 6:19, 13:16, 14:10, 61:2
**indictment** [5] - 2:15, 14:1, 14:16, 28:8, 58:23
**individual** [6] - 8:23, 17:20, 32:15, 32:18, 53:9
**induced** [1] - 14:21
**infer** [1] - 13:2
**influence** [2] - 16:19, 73:25
**influenced** [2] - 3:8, 11:22
**informal** [4] - 4:20, 4:22, 5:1
**information** [1] - 26:14
**initial** [2] - 59:8, 74:17
**initiate** [1] - 31:17
**inmates** [1] - 59:25
**inner** [2] - 24:11, 54:7
**innocent** [2] - 13:25, 14:6
**inside** [4] - 19:15, 48:20, 56:9, 56:12
**instantaneous** [1] - 18:6
**instead** [1] - 65:13
**Instruction** [1] - 9:17
**instruction** [4] - 9:21, 12:3, 12:4, 24:3
**instructions** [5] - 9:15, 10:24, 15:5, 17:1, 71:14
**intend** [1] - 15:19
**intended** [3] - 11:7, 24:4, 24:8

**intent** [1] - 16:18
**intercept** [1] - 60:24
**intercepted** [1] - 60:25
**intercourse** [1] - 15:7
**interest** [2] - 27:21, 74:10
**interested** [1] - 75:8
**interests** [1] - 3:18
**interfere** [1] - 74:10
**internet** [1] - 26:22
**Internet** [1] - 27:20
**interpret** [1] - 18:22
**interstate** [3] - 15:2, 16:5, 16:7
**introduced** [1] - 74:4
**investigate** [1] - 30:20
**investigating** [2] - 30:22, 31:1
**investigation** [18] - 21:15, 21:24, 22:19, 25:20, 31:6, 31:14, 31:18, 31:25, 32:1, 32:8, 33:24, 34:18, 55:19, 55:24, 58:21, 59:15, 59:17, 59:20
**investigations** [3] - 25:16, 31:3, 31:11
**Investigations** [3] - 26:9, 30:12, 30:19
**investigative** [6] - 33:25, 46:4, 46:9, 55:18, 68:6, 69:6
**investigator** [1] - 40:24
**investigators** [1] - 22:1
**invoke** [1] - 3:6
**invoked** [1] - 3:15
**involved** [1] - 31:14
**involving** [2] - 8:14, 30:20
**issue** [4] - 2:19, 5:16, 5:22, 7:1
**issues** [2] - 2:3, 74:18
**item** [3] - 12:1, 33:19, 60:25
**items** [16] - 33:7, 33:8, 33:19, 33:20, 39:25, 41:24, 48:24, 48:25, 49:1, 49:3, 54:20, 60:6, 73:25, 74:1
**itself** [3] - 8:1, 46:18, 74:5

## J

**jail** [4] - 8:13, 8:14, 66:12, 66:17
**Jane** [4] - 14:20, 14:22, 16:17, 16:19
**job** [3] - 11:2, 28:20,

28:21
**John** [1] - 25:16
**joined** [1] - 21:15
**Judge** [5] - 1:12, 20:9, 23:5, 24:2, 75:24
**judge** [4] - 23:12, 24:15, 34:11, 34:14
**judges** [1] - 11:3
**July** [7] - 25:6, 60:21, 61:3, 61:4, 63:4, 67:8, 67:13
**jurors** [9] - 17:3, 17:13, 28:18, 28:20, 29:15, 69:24, 75:8, 75:9, 75:21
**jury** [44] - 2:25, 5:23, 6:2, 6:8, 6:18, 9:14, 9:21, 10:7, 10:14, 10:18, 10:20, 10:21, 12:11, 15:5, 15:6, 17:21, 17:23, 32:11, 33:10, 37:3, 37:11, 39:15, 42:9, 43:22, 44:21, 48:22, 49:18, 51:3, 51:18, 52:7, 52:9, 52:15, 54:25, 58:23, 59:1, 63:8, 63:23, 65:24, 68:1, 68:10, 71:5, 72:4, 75:23
**Jury** [2] - 1:13, 9:17

## K

**Kayla** [12] - 25:9, 46:2, 46:5, 46:6, 63:18, 63:19, 63:20, 64:4, 65:25, 66:16, 66:20, 67:11
**keep** [4] - 13:24, 17:8, 62:9, 71:15
**key** [3] - 3:5, 3:19, 67:21
**kiddie** [1] - 20:12
**kids** [4] - 20:11, 64:2, 66:10, 66:20
**kind** [3] - 29:19, 52:17, 59:23
**kinds** [2] - 7:20, 15:8
**Kirsten** [1] - 28:14
**Kirstin** [1] - 1:19
**knowingly** [7] - 16:3, 16:16, 16:18, 24:17, 24:20
**knowledge** [1] - 54:20
**known** [1] - 19:12
**KY** [1] - 43:11

## L

**lacrosse** [1] - 8:22
**ladies** [9] - 10:22, 20:2, 23:13, 27:13, 28:4,

28:13, 52:3, 62:4, 71:8
**Lafler** [1] - 4:14
**laid** [1] - 7:3
**language** [2] - 4:11, 7:13
**laptop** [24] - 21:5, 21:8, 21:14, 21:16, 23:24, 24:18, 24:24, 26:4, 26:11, 27:10, 27:24, 33:8, 34:23, 38:15, 38:16, 38:20, 39:2, 39:4, 39:5, 39:12, 72:22, 73:10, 73:15, 73:17
**large** [1] - 47:5
**larger** [1] - 36:20
**lascivious** [2] - 15:9, 15:14
**last** [1] - 64:8
**law** [13] - 11:4, 11:5, 21:3, 22:5, 41:24, 45:5, 48:13, 49:2, 49:9, 61:4, 67:11, 68:13, 68:25
**lawyers** [2] - 11:17, 11:19
**lead** [2] - 13:13, 40:24
**leading** [1] - 6:2
**Leann** [11] - 46:2, 46:5, 46:6, 46:13, 55:10, 60:20, 60:22, 62:19, 67:6, 67:11, 68:12
**learned** [1] - 67:9
**learning** [1] - 21:14
**least** [6] - 6:10, 6:18, 21:19, 24:16, 24:19, 73:21
**leave** [1] - 71:14
**left** [10] - 8:25, 21:2, 36:20, 40:7, 42:11, 44:18, 46:19, 47:11, 48:25
**left-hand** [2] - 36:20, 44:18
**legal** [3] - 29:9, 72:12, 74:18
**legally** [1] - 19:9
**length** [3] - 28:23, 50:6, 74:1
**less** [1] - 10:5
**letter** [25] - 2:22, 3:24, 6:14, 7:4, 8:7, 8:9, 8:11, 8:13, 8:15, 9:4, 25:9, 25:10, 25:25, 37:5, 63:9, 63:10, 63:17, 64:13, 64:15, 65:9, 66:1, 66:5, 66:25, 67:10, 68:4
**letters** [2] - 65:13, 67:21
**letting** [1] - 8:6
**life** [3] - 66:17, 66:18, 66:21
**light** [16] - 4:11, 5:12,

6:3, 22:22, 22:25, 33:16, 40:6, 49:7, 51:5, 54:5, 56:14, 56:15, 56:16, 58:1, 58:5, 58:12
**light-colored** [1] - 51:5
**lighting** [2] - 34:3, 57:15
**likelihood** [1] - 3:7
**likely** [5] - 17:14, 75:6, 75:7, 75:10, 75:16
**limine** [5] - 7:3, 7:10, 8:2, 8:4, 9:8
**limit** [1] - 6:7
**limited** [4] - 5:23, 6:23, 12:2, 42:24
**list** [1] - 18:2
**listed** [1] - 60:17
**listen** [1] - 28:20
**listening** [3] - 13:21, 29:11, 62:8
**litigated** [1] - 5:17
**live** [2] - 47:8, 66:20
**lived** [2] - 46:12, 55:20
**lives** [1] - 68:10
**living** [1] - 39:21
**Liz** [1] - 28:13
**local** [1] - 31:24
**locate** [1] - 45:5
**located** [4] - 21:11, 26:15, 35:2, 41:6
**location** [2] - 34:6, 45:23
**lock** [2] - 48:9, 48:11
**logged** [1] - 53:11
**logic** [2] - 20:25, 28:6
**logical** [1] - 4:5
**logistical** [1] - 75:2
**logo** [4] - 33:13, 40:7, 44:18, 44:21
**Lombard** [1] - 1:24
**look** [5] - 6:9, 20:7, 34:2, 34:4, 62:15
**looked** [3] - 3:23, 7:13, 41:11
**looking** [15] - 6:20, 12:21, 22:12, 36:12, 38:20, 39:25, 40:1, 40:4, 45:10, 45:16, 51:18, 56:3, 57:10, 62:5, 74:15
**looks** [8] - 38:1, 38:6, 47:5, 48:9, 64:25, 65:8, 67:24, 75:21
**love** [2] - 66:21, 66:22
**lower** [2] - 43:7, 44:4
**lubricant** [1] - 43:11
**lustfulness** [1] - 15:12

## M

**magistrate** [2] - 34:10, 34:13
**mail** [10] - 59:22, 59:23, 60:24, 60:25, 61:2, 63:1, 63:6, 63:10, 66:5
**mailed** [1] - 15:1
**maintain** [1] - 59:17
**male** [2] - 33:12, 68:18
**males** [1] - 25:1
**man** [3] - 20:2, 21:17, 21:25
**manner** [2] - 6:16, 78:10
**manufactured** [4] - 23:23, 36:23, 38:4, 39:12
**marbling** [1] - 21:22, 22:9, 22:23, 25:23, 33:2, 56:3, 56:13, 56:16, 57:15, 58:15
**March** [25] - 19:4, 31:9, 32:5, 34:17, 35:13, 38:17, 40:18, 40:22, 41:11, 41:18, 43:13, 44:9, 44:23, 45:4, 45:21, 46:25, 47:3, 50:18, 51:16, 53:5, 55:5, 60:19, 62:21, 62:24
**mark** [1] - 35:5
**marked** [13] - 35:16, 36:7, 38:11, 44:11, 50:14, 51:12, 53:13, 61:20, 63:13, 65:19, 67:17, 69:12, 69:20
**markings** [1] - 53:10
**marks** [2] - 34:2, 34:5
**marriage** [1] - 27:1
**married** [2] - 19:8, 19:10
**Martin** [21] - 25:9, 46:2, 46:5, 46:6, 46:13, 47:8, 55:10, 60:20, 60:22, 62:19, 63:18, 63:19, 63:20, 64:4, 67:6, 67:11, 68:12
**Martin's** [1] - 62:23
**Mary** [3] - 1:23, 78:5, 78:16
**MARYLAND** [1] - 1:1
**Maryland** [15] - 1:11, 1:24, 19:12, 19:20, 22:17, 23:24, 30:21, 32:3, 34:11, 35:3, 41:7, 55:23, 56:23, 59:8, 68:9
**master** [22] - 22:22, 25:23, 27:4, 42:11, 43:5, 56:13, 57:5, 57:10
**material** [1] - 16:10

**materially** [1] - 4:9
**materials** [3] - 15:1, 16:6, 23:23
**matter** [4] - 13:21, 34:8, 78:6, 78:10
**matters** [1] - 71:11
**mean** [4] - 12:22, 13:1, 13:12, 40:19
**meaning** [1] - 15:10
**means** [2] - 20:12, 29:6
**members** [16] - 10:18, 32:10, 33:10, 37:3, 39:15, 42:9, 43:22, 44:21, 48:22, 49:18, 51:3, 63:8, 63:23, 65:24, 68:1, 68:10
**memorandum** [1] - 74:17
**memorializations** [1] - 20:4
**memory** [2] - 21:11, 36:5
**met** [1] - 15:15
**MG** [34] - 19:6, 19:9, 19:12, 19:14, 19:16, 19:18, 19:19, 19:22, 20:1, 21:2, 22:2, 23:14, 23:17, 23:19, 24:23, 25:1, 25:11, 25:18, 26:13, 27:2, 27:5, 27:7, 27:14, 27:15, 27:17, 27:20, 28:2, 33:16, 64:11, 66:5, 66:6, 66:22
**MG's** [9] - 19:15, 21:5, 21:6, 23:17, 24:9, 24:11, 26:5, 26:25, 27:6
**Micro** [2] - 38:1, 38:4
**microphone** [2] - 10:12, 29:25
**mid** [3] - 52:4, 75:11, 75:16
**mid-afternoon** [1] - 52:4
**mid-morning** [2] - 75:11, 75:16
**middle** [4] - 39:7, 42:12, 42:15, 50:11
**might** [2] - 4:3, 5:24
**mind** [4] - 13:24, 17:8, 62:9, 71:15
**minor** [9] - 3:16, 4:1, 4:2, 16:11, 21:9, 73:3, 73:6, 74:6, 74:19
**minors** [1] - 20:10
**minute** [4] - 18:10, 35:4, 70:21, 71:12
**minutes** [4] - 10:3, 10:5, 52:5, 73:23
**Mitchell** [1] - 73:21
**model** [2] - 36:21, 38:2

**modeling** [1] - 20:13
**moles** [1] - 34:6
**molested** [1] - 20:19
**moment** [7] - 2:4, 2:20, 10:16, 25:25, 36:12, 38:20, 70:13
**monitor** [1] - 6:23
**month** [1] - 19:8
**morning** [13] - 2:25, 13:5, 13:23, 30:7, 30:8, 45:21, 53:5, 71:24, 75:6, 75:7, 75:11, 75:16, 75:25
**most** [3] - 4:5, 6:22, 29:10
**mother** [11] - 2:20, 4:1, 4:5, 8:15, 8:18, 9:7, 23:17, 25:18, 27:1, 46:6, 55:11
**mother's** [2] - 22:17, 23:2
**motion** [8] - 7:2, 8:2, 8:3, 65:8, 72:6, 72:7, 72:10, 73:19
**motions** [4] - 7:10, 8:4, 9:8, 72:25
**mouth** [1] - 19:15
**move** [1] - 27:2
**moved** [3] - 19:10, 19:19, 20:1
**moving** [3] - 3:20, 24:12, 42:19
**Moye** [5] - 10:12, 10:16, 71:18, 71:23, 75:17
**Moye's** [1] - 17:14
**MR** [35] - 2:23, 4:19, 5:8, 5:20, 6:25, 9:11, 10:1, 10:3, 10:9, 10:11, 19:2, 20:18, 29:17, 29:20, 30:6, 52:1, 52:8, 52:12, 55:3, 55:13, 60:12, 61:8, 62:3, 62:12, 62:14, 62:17, 71:1, 72:14, 72:23, 73:7, 73:11, 73:14, 74:20, 76:3, 77:6
**MS** [15] - 3:3, 5:12, 7:6, 9:2, 10:5, 20:14, 28:12, 70:16, 70:18, 72:10, 72:24, 74:23, 75:2, 75:5, 76:1
**mug** [1] - 53:24
**must** [3] - 12:2, 12:19, 13:11

---

## N

**name** [5] - 2:7, 19:6, 28:13, 29:25, 50:13
**named** [2] - 19:5, 31:6

**narcotic** [1] - 31:3
**nature** [6] - 3:12, 16:10, 24:25, 31:4, 31:10, 34:3
**necessarily** [1] - 72:19
**necessary** [4] - 4:4, 6:10, 6:12, 74:8
**neck** [1] - 54:5
**need** [16] - 8:25, 9:24, 10:2, 10:11, 10:17, 17:4, 17:11, 17:21, 17:22, 18:3, 18:5, 66:3, 66:5, 66:6, 66:12, 71:3
**needed** [1] - 22:6
**needs** [1] - 6:24
**never** [3] - 5:9, 14:5, 66:15
**new** [1] - 19:20
**next** [7] - 9:13, 26:8, 28:20, 46:4, 46:8, 59:12, 67:25
**nine** [5] - 14:15, 23:5, 23:15, 28:7
**Nine** [1] - 2:15
**ninth** [1] - 51:6
**NO** [1] - 1:5
**non** [4] - 73:10, 73:11, 73:16, 74:13
**non-produced** [4] - 73:10, 73:11, 73:16, 74:13
**normal** [1] - 75:13
**NORTHERN** [1] - 1:2
**note** [1] - 74:11
**notes** [6] - 17:17, 17:18, 17:19, 17:21, 18:9, 71:14
**nothing** [3] - 9:11, 11:6, 14:2
**notice** [3] - 15:11, 32:25, 71:20
**noticed** [1] - 22:11
**November** [10] - 19:7, 19:25, 21:3, 26:3, 32:5, 34:24, 35:12, 68:6, 69:5, 69:17
**number** [7] - 36:21, 37:2, 37:11, 39:5, 39:10, 65:14, 68:4
**Number** [6] - 9:4, 9:5, 9:6, 9:17, 9:19, 9:20
**Number(s** [1] - 78:7
**numbers** [9] - 38:6, 63:12, 64:21, 65:1, 65:12, 65:17, 65:21, 67:24, 67:25, 68:1, 68:3
**numerous** [1] - 26:20

---

## O

**O'Neil** [1] - 19:5

**oath** [1] - 11:11
**objected** [1] - 8:6
**objecting** [7] - 3:4, 7:7, 7:9, 7:10, 9:3, 9:5, 9:7
**objection** [7] - 3:25, 4:10, 7:12, 9:19, 11:22, 11:23, 20:14
**objections** [3] - 11:17, 11:20, 29:10
**obligation** [2] - 11:19, 18:19
**observed** [3] - 40:10, 56:7, 70:10
**observing** [1] - 29:8
**obtain** [2] - 23:1, 69:9
**obtained** [9] - 34:9, 38:16, 39:16, 46:10, 48:6, 58:23, 61:1, 63:9, 68:8
**obviously** [8] - 7:13, 7:24, 9:20, 12:1, 18:8, 72:6, 73:19, 74:24
**occasions** [1] - 27:5
**occur** [1] - 31:8
**occurred** [2] - 8:22, 27:15
**October** [1] - 23:17
**OF** [2] - 1:1, 1:4
**offense** [2] - 7:17, 9:16
**offer** [4] - 4:20, 4:22, 5:4, 5:7, 5:9
**offered** [3] - 5:14, 11:20, 12:15
**offering** [3] - 6:5, 6:11, 20:15
**office** [1] - 13:6
**official** [2] - 16:19, 78:9
**Official** [1] - 78:17
**officials** [2] - 60:23, 61:4, 67:14
**old** [2] - 19:6, 23:15
**Old** [1] - 6:17
**once** [3] - 18:18, 18:21, 19:22
**One** [1] - 2:15
**one** [28] - 4:1, 13:6, 17:24, 18:1, 19:8, 21:12, 21:19, 22:13, 23:7, 23:9, 24:16, 24:19, 29:12, 31:24, 33:15, 33:19, 35:13, 36:12, 41:21, 44:3, 51:22, 52:23, 55:18, 70:13, 71:24, 72:15, 73:3, 73:9
**one-third** [1] - 52:23
**ones** [3] - 7:19, 22:14, 23:4
**open** [3] - 17:8, 33:23, 71:15
**opened** [3] - 31:5, 32:6,

34:18
**opening** [5] - 9:25, 10:2, 10:8, 18:11, 19:1
**opinion** [2] - 17:9, 73:20
**opinions** [2] - 12:6, 12:10
**opportunity** [1] - 29:12
**opposed** [3] - 15:25, 73:4, 73:9
**orange** [27] - 21:18, 21:20, 22:6, 22:7, 22:13, 22:18, 25:20, 25:22, 27:11, 27:17, 32:22, 32:24, 33:14, 40:4, 40:5, 42:2, 42:7, 42:13, 42:14, 43:13, 44:8, 44:24, 45:9, 49:6, 49:7, 49:16, 54:7
**orange-reddish** [2] - 32:24, 49:7
**order** [2] - 15:11, 18:1
**ordinarily** [1] - 12:5
**original** [2] - 60:24, 73:20
**otherwise** [1] - 71:5
**ought** [1] - 11:7
**outbuilding** [1] - 49:2
**outer** [2] - 54:7, 70:2
**outgoing** [5] - 59:23, 60:24, 63:1, 63:6, 63:10
**outline** [1] - 16:21
**outside** [5] - 12:17, 12:18, 13:11, 23:24, 56:24
**overhead** [1] - 22:24
**overrule** [1] - 3:25
**overruled** [3] - 11:24, 20:16, 20:17
**overview** [1] - 20:15
**own** [3] - 19:23, 66:17
**Oyer** [8] - 1:18, 5:10, 10:4, 28:11, 28:13, 70:15, 72:9, 74:22
**OYER** [13] - 3:3, 5:12, 10:5, 20:14, 28:12, 70:16, 70:18, 72:10, 72:24, 74:23, 75:2, 75:5, 76:1

---

## P

**p.m** [7] - 2:2, 10:14, 52:6, 52:9, 72:4, 76:5
**page** [49] - 36:14, 36:20, 37:19, 38:19, 38:24, 41:2, 41:13, 42:3, 42:15, 42:25, 43:12, 44:7, 44:17, 46:21, 47:12, 47:19, 47:24,

48:16, 49:12, 49:25, 51:2, 51:6, 53:14, 53:20, 53:25, 54:9, 56:19, 57:1, 57:6, 57:11, 57:19, 57:22, 63:21, 63:22, 64:9, 64:17, 64:18, 64:24, 64:25, 65:4, 66:4, 66:8, 66:14, 66:19, 69:25, 70:3, 70:6
**Page** [1] - 51:9
**PAGE** [1] - 77:3
**pages** [2] - 63:11, 78:8
**painful** [1] - 28:19
**pair** [1] - 45:10
**pajama** [15] - 21:20, 27:11, 32:23, 33:14, 40:5, 45:10, 45:12, 49:6, 49:16, 50:1, 50:6, 50:8, 50:18, 50:20
**panel** [1] - 10:18
**pants** [19] - 21:20, 22:7, 22:18, 25:22, 27:12, 27:17, 32:23, 33:14, 40:5, 45:10, 45:12, 49:6, 49:16, 50:1, 50:6, 50:8, 50:18, 50:20
**paper** [1] - 17:13
**parentheses** [3] - 67:25, 68:1, 68:3
**part** [6] - 11:24, 14:22, 15:15, 29:10, 59:17, 73:12
**particular** [11] - 8:21, 12:9, 13:18, 15:15, 26:21, 27:21, 30:25, 34:9, 38:2, 39:25, 41:24
**parties** [4] - 4:20, 4:24, 4:25, 11:13, 54:24, 55:1
**partly** [1] - 75:8
**patience** [1] - 72:1
**Paul** [2] - 1:16, 1:17
**pay** [1] - 18:9
**peer** [2] - 26:19
**peer-to-peer** [1] - 26:19
**penis** [1] - 19:15
**people** [1] - 4:3
**perhaps** [7] - 2:5, 3:16, 9:17, 17:14, 18:13, 70:20, 75:17
**period** [2] - 25:8, 63:4
**permission** [1] - 61:24
**permit** [2] - 4:16, 7:15
**permitted** [1] - 12:10
**permitting** [1] - 71:16
**person** [6] - 8:21, 12:23, 14:19, 15:8, 34:4, 66:2
**personal** [3] - 42:23, 48:23, 49:1
**perspective** [3] - 2:24,

9:12, 74:20
**persuaded** [2] - 14:21, 16:17
**pertains** [2] - 24:16, 24:19
**phone** [29] - 21:5, 21:10, 23:25, 24:21, 25:13, 26:4, 26:11, 27:11, 27:25, 34:23, 35:11, 35:21, 36:4, 36:11, 36:18, 36:21, 36:23, 37:2, 37:4, 37:10, 37:18, 52:16, 52:17, 52:19, 59:22, 64:6, 66:9, 72:21
**phones** [1] - 45:8
**photo** [3] - 42:12, 53:17, 53:18
**photograph** [18] - 37:14, 38:22, 41:8, 41:10, 42:10, 43:16, 43:19, 43:20, 44:4, 48:3, 48:22, 49:19, 49:20, 50:4, 50:11, 50:12, 51:4, 51:19
**photographed** [1] - 53:10
**photographs** [5] - 6:22, 21:9, 26:12, 54:14, 69:21
**photos** [5] - 20:13, 23:22, 33:3, 56:4, 56:5
**picked** [1] - 59:6
**picture** [12] - 14:24, 14:25, 15:10, 16:4, 16:11, 23:21, 43:8, 43:10, 47:14, 50:5, 56:22, 57:10
**pictures** [6] - 6:3, 20:4, 23:15, 23:16, 25:12, 32:16, 66:9, 73:5
**piece** [3] - 17:13, 50:23, 63:6
**pieces** [6] - 26:2, 27:8, 40:9, 49:9, 63:1
**place** [4] - 21:23, 22:8, 22:21, 53:12
**placed** [4] - 37:18, 60:24, 69:17, 69:18
**plan** [1] - 28:24
**planning** [2] - 62:2, 73:9
**play** [3] - 62:2, 62:12, 67:2
**playing** [2] - 62:16, 67:4
**plea** [6] - 4:17, 4:20, 4:21, 4:22, 5:15
**plead** [2] - 2:14, 5:14
**point** [10] - 8:8, 8:17, 31:5, 34:9, 40:13, 51:25, 55:19, 63:5, 65:16, 66:23

**Police** [1] - 25:17
**polka** [4] - 21:7, 22:3, 26:5, 27:6
**porn** [1] - 20:12
**pornography** [46] - 5:22, 6:3, 8:1, 14:17, 15:18, 15:20, 16:1, 16:2, 16:8, 20:6, 20:8, 20:18, 23:7, 23:8, 23:9, 23:12, 24:2, 24:5, 24:14, 24:17, 24:20, 24:24, 25:3, 26:7, 26:12, 26:14, 26:20, 27:19, 27:21, 31:12, 31:15, 32:7, 33:5, 33:8, 33:24, 40:10, 44:25, 50:21, 56:6, 58:18, 58:24, 59:9, 73:5, 74:6, 74:14
**poses** [1] - 20:11
**position** [1] - 14:24
**possessed** [7] - 16:3, 24:17, 24:20, 24:22, 27:19, 73:15
**possession** [6] - 15:25, 16:1, 23:8, 24:14, 74:1
**possessory** [1] - 74:10
**possible** [2] - 6:23, 75:18
**possibly** [1] - 56:3
**potential** [2] - 5:1, 31:14
**potentially** [2] - 54:17, 66:25
**practice** [1] - 75:14
**precede** [2] - 3:9, 3:11
**predict** [1] - 71:9
**prejudice** [2] - 7:23, 9:8
**prejudicial** [2] - 3:12, 7:25
**preliminary** [2] - 9:15, 10:24
**premises** [1] - 39:17
**prepared** [1] - 65:20
**prepubescent** [1] - 32:12
**presence** [2] - 2:20, 3:4
**present** [11] - 2:24, 3:13, 3:16, 7:14, 10:19, 12:24, 14:6, 18:20, 28:24, 40:22, 73:9
**presentation** [2] - 29:9, 29:14
**presented** [3] - 4:7, 72:24, 73:2
**preserved** [1] - 7:13
**preside** [1] - 18:3
**presumed** [1] - 13:25
**pretrial** [2] - 4:25, 25:9
**pretty** [1] - 22:13
**prevails** [1] - 4:11

**previously** [1] - 22:23
**problem** [2] - 74:11, 75:15
**problems** [1] - 6:20
**proceeding** [1] - 16:20
**Proceedings** [1] - 76:5
**proceedings** [2] - 78:6, 78:9
**process** [3] - 53:7, 54:17, 55:6
**produced** [11] - 7:19, 7:22, 15:1, 16:5, 23:23, 73:4, 73:10, 73:11, 73:16, 74:13
**producing** [1] - 14:23
**production** [13] - 14:17, 15:17, 15:20, 16:1, 23:7, 23:8, 23:12, 24:2, 24:5, 31:15, 33:24, 58:24, 59:9
**profile** [1] - 53:24
**program** [1] - 26:19
**progressed** [1] - 19:7
**proof** [6] - 13:2, 13:13, 14:3, 14:4, 15:16, 66:11
**property** [4] - 53:11, 54:17, 60:3, 72:17
**Property** [3] - 54:21, 55:8, 55:11
**proposed** [1] - 5:2
**prove** [10] - 6:15, 7:17, 14:5, 14:11, 14:18, 15:19, 16:2, 16:7, 16:15, 18:13
**proven** [1] - 14:1
**provide** [2] - 26:14, 59:21, 60:3
**provided** [2] - 3:24, 60:6
**provides** [1] - 4:3
**pubic** [2] - 15:11, 15:13
**public** [1] - 6:23
**publication** [1] - 6:6
**publish** [2] - 6:11, 6:22
**publishes** [1] - 6:8
**publishing** [1] - 5:22
**purple** [4] - 21:6, 22:3, 26:5, 27:6
**purplish** [1] - 54:6
**purpose** [3] - 12:2, 14:23, 56:2
**purposes** [2] - 19:23, 20:20
**pursuant** [1] - 5:15
**put** [7] - 4:13, 4:16, 7:15, 18:1, 19:15, 19:16, 19:17

## Q

**questions** [7] - 11:16, 11:17, 17:10, 70:13, 70:16, 70:17, 70:18
**quickly** [1] - 22:1
**quite** [2] - 35:17, 43:24
**quote** [1] - 25:12

## R

**R-I-C-H-A-R-D** [1] - 30:2
**rain** [1] - 13:9
**raincoat** [1] - 13:8
**raining** [1] - 13:11
**raise** [3] - 10:19, 29:9, 29:21
**raped** [1] - 20:19
**rather** [1] - 12:6
**reaching** [1] - 12:11
**read** [9] - 18:8, 37:3, 37:11, 44:21, 54:23, 60:9, 63:23, 65:23, 66:1
**readed** [1] - 66:16
**ready** [2] - 10:7, 52:7
**realized** [1] - 11:1
**really** [3] - 63:25, 64:11, 66:6
**reason** [3] - 11:21, 17:7, 71:22
**reasonable** [5] - 13:10, 14:11, 14:19, 23:11, 71:24
**reasons** [4] - 7:10, 9:7, 12:14, 75:8
**received** [3] - 62:25, 63:5, 66:23
**recently** [1] - 68:24
**recess** [2] - 52:4, 52:6
**recessed** [1] - 52:4
**recitation** [1] - 9:16
**recognize** [34] - 35:8, 35:17, 36:8, 36:15, 37:20, 38:12, 38:24, 41:3, 42:4, 43:1, 44:12, 46:22, 47:13, 47:20, 47:25, 48:17, 49:13, 50:15, 51:7, 51:13, 53:14, 53:21, 54:1, 54:10, 56:19, 57:2, 57:7, 57:12, 57:23, 63:14, 64:18, 64:19, 67:18, 69:13
**recollection** [1] - 17:20
**reconsideration** [4] - 8:3, 72:6, 72:11, 73:19
**record** [14] - 2:4, 2:8, 3:3, 4:14, 4:17, 5:13,

7:7, 9:3, 11:12, 30:1, 60:10, 70:22, 72:20

**recorded** [8] - 8:14, 60:1, 60:16, 62:7, 62:20, 62:21, 67:7, 78:5

**recording** [2] - 62:10, 66:24

**recordings** [2] - 60:17, 61:20

**red** [4] - 21:20, 22:7, 22:18, 25:22

**reddish** [3] - 32:24, 49:7, 54:7

**reddish-orange** [1] - 54:7

**Reebok** [1] - 50:13

**refer** [2] - 4:15, 14:12

**reference** [2] - 50:23, 72:16

**referenced** [2] - 33:18, 51:22

**referred** [8] - 14:19, 25:25, 26:5, 52:20, 54:16, 59:24

**referring** [6] - 33:4, 42:14, 43:25, 52:22, 56:6, 64:21

**reflect** [2] - 5:14, 41:10

**reflected** [1] - 62:18

**regard** [1] - 13:16

**regarding** [4] - 4:14, 4:17, 25:12

**regular** [1] - 63:10

**reject** [2] - 12:13, 13:19

**rejected** [1] - 4:23

**related** [1] - 7:11

**relationship** [1] - 19:7

**relatively** [1] - 26:1

**relevance** [1] - 9:8

**remain** [2] - 14:7, 55:14

**remind** [2] - 54:25, 73:1

**reminder** [1] - 63:19

**repeat** [1] - 13:23

**repeatedly** [4] - 5:14, 23:19, 23:21, 27:20

**reply** [2] - 72:7, 72:18

**reporter** [1] - 18:6

**Reporter** [1] - 78:17

**REPORTER'S** [1] - 78:3

**represent** [2] - 3:18, 28:15

**representative** [1] - 3:18

**request** [3] - 59:21, 61:24, 72:20

**requested** [2] - 4:13, 73:25

**requesting** [1] - 72:17

**research** [1] - 17:5

**reserve** [1] - 5:15

**resolution** [1] - 5:1

**respect** [11] - 21:15, 24:3, 40:8, 44:23, 45:2, 58:15, 59:4, 60:19, 60:21, 72:10, 73:15

**response** [2] - 72:7, 72:17

**responsible** [1] - 8:11

**rest** [3] - 66:16, 72:11, 74:16

**resting** [1] - 73:19

**result** [3] - 46:3, 46:8, 58:21

**Resume** [1] - 52:6

**retrieved** [1] - 55:11

**return** [2] - 28:9, 72:17

**returned** [2] - 59:1, 72:22

**review** [1] - 33:7

**reviewed** [4] - 6:13, 60:6, 61:15, 61:19

**RICHARD** [2] - 29:22, 77:5

**Richard** [1] - 30:2

**Rick** [1] - 29:18

**right-hand** [2] - 37:13, 43:7, 47:16

**rights** [3] - 4:2, 4:6, 5:16

**Rights** [2] - 2:21, 3:14

**Riley** [7] - 10:8, 18:25, 28:11, 29:19, 51:24, 52:11, 72:13

**riley** [1] - 1:16

**RILEY** [33] - 4:19, 5:8, 5:20, 6:25, 9:11, 10:1, 10:3, 10:9, 10:11, 19:2, 20:18, 29:17, 29:20, 30:6, 52:1, 52:12, 55:3, 55:13, 60:12, 61:8, 62:3, 62:12, 62:14, 62:17, 71:1, 72:14, 72:23, 73:7, 73:11, 73:14, 74:20, 76:3, 77:6

**ring** [14] - 21:13, 25:24, 27:12, 27:18, 54:7, 55:7, 55:11, 68:14, 68:15, 68:18, 69:9, 69:16, 70:1

**rings** [1] - 54:6

**risks** [1] - 71:21

**room** [6] - 15:6, 17:21, 17:23, 21:22, 22:8, 32:15

**rooms** [2] - 58:7, 58:10

**roughly** [1] - 30:24

**RPR** [1] - 1:23

**Rule** [2] - 3:6, 72:17

**rule** [1] - 72:18

**rules** [2] - 11:21, 13:24

**Rules** [1] - 3:7

**ruling** [1] - 11:22

**S**

**safe** [1] - 53:12

**salutation** [1] - 63:23

**Samsung** [11] - 21:5, 21:10, 23:25, 24:21, 26:4, 27:24, 34:23, 35:11, 35:20, 36:11, 52:16

**Satellite** [1] - 38:15

**saw** [14] - 12:7, 12:24, 22:22, 32:11, 32:17, 32:20, 33:1, 33:11, 51:9, 51:21, 58:15, 58:17, 65:11, 68:20

**scars** [1] - 34:5

**scope** [1] - 20:15

**screen** [1] - 43:23

**Scripture** [1] - 54:13

**SD** [14] - 21:11, 23:25, 26:11, 35:23, 35:25, 36:1, 36:3, 37:24, 37:25, 38:2, 38:4, 69:3, 70:10, 72:22

**search** [32] - 7:2, 7:3, 8:17, 21:3, 22:10, 22:16, 23:1, 26:19, 26:22, 26:23, 32:1, 34:10, 38:16, 39:16, 40:14, 40:21, 41:20, 41:23, 45:4, 46:10, 46:25, 47:2, 48:7, 48:14, 49:2, 50:24, 62:22, 68:8, 68:16, 69:7, 71:4

**searching** [4] - 7:20, 25:3, 49:10, 69:9

**seated** [8] - 2:18, 10:16, 10:21, 28:14, 28:16, 29:24, 52:10, 72:5

**second** [18] - 8:8, 14:20, 15:21, 21:25, 24:5, 36:14, 38:24, 41:13, 46:25, 47:2, 47:10, 47:12, 53:20, 57:1, 63:21, 64:9, 66:4, 70:3

**secured** [1] - 53:11

**Security** [7] - 21:15, 25:15, 26:9, 30:12, 30:16, 30:18

**see** [42] - 2:4, 7:23, 8:12, 9:18, 12:18, 13:8, 13:9, 13:10, 20:23, 23:16, 24:10, 24:12, 24:23, 24:25, 25:2, 26:6, 26:16, 28:19, 33:12, 37:5, 37:15, 38:7, 42:12, 43:8, 43:10, 43:19, 49:23, 50:12, 52:18,

57:9, 65:4, 66:10, 66:15, 70:20, 71:3, 71:25, 72:2, 75:1

**seeing** [7] - 20:22, 42:9, 51:3, 58:5, 65:6, 66:20, 69:24

**seek** [1] - 27:21

**seeking** [1] - 68:15

**seize** [2] - 41:24, 68:13

**seized** [17] - 21:5, 21:6, 23:3, 34:24, 42:7, 43:13, 44:9, 44:15, 44:23, 50:9, 50:18, 50:24, 51:16, 61:5, 69:16, 70:9

**seizure** [10] - 21:4, 25:20, 25:21, 25:24, 26:2, 26:3, 26:4, 40:14, 48:14

**selected** [1] - 10:18

**selection** [1] - 2:25

**self** [1] - 75:8

**self-interested** [1] - 75:8

**sense** [3] - 13:21, 20:25, 28:6

**sentence** [2] - 63:24, 64:9

**separate** [1] - 73:4

**serial** [2] - 39:4, 39:10

**series** [7] - 38:6, 64:21, 64:25, 65:17, 65:21, 67:24, 67:25

**serious** [1] - 66:20

**seriously** [1] - 66:17

**service** [2] - 28:17, 29:15

**Session** [1] - 2:2

**set** [2] - 3:10, 72:11

**seventh** [2] - 44:7, 49:25

**several** [2] - 14:15, 32:12

**sex** [5] - 20:6, 23:19, 26:21, 27:22, 32:12

**sexual** [6] - 15:7, 15:12, 19:23, 20:20, 73:6, 74:15

**sexually** [11] - 9:18, 14:22, 15:3, 15:6, 16:10, 16:12, 19:14, 20:3, 20:10, 20:19, 25:1

**sexy** [1] - 20:11

**shape** [1] - 65:9

**sharing** [1] - 26:19

**shift** [2] - 55:17, 58:20

**shifting** [1] - 34:8

**shirt** [32] - 21:18, 21:19, 22:6, 22:13, 25:21, 27:11, 27:17, 32:22, 33:13, 33:15, 40:4, 40:6, 40:7, 42:2, 42:7, 42:13,

42:14, 43:13, 44:9, 44:15, 44:19, 44:23, 44:24, 45:3, 45:9, 49:7, 51:5, 51:9, 51:16, 51:18, 51:21

**shirts** [2] - 45:16, 45:18

**shortly** [1] - 19:10

**shot** [1] - 53:24

**shoulder** [1] - 54:5

**show** [24] - 23:14, 23:18, 23:20, 23:22, 24:8, 25:10, 27:13, 27:15, 27:16, 27:17, 27:19, 27:20, 27:23, 28:1, 29:3, 35:5, 35:16, 52:13, 56:18, 61:9, 63:13, 64:17, 67:17, 69:20

**showing** [45] - 36:7, 36:14, 37:10, 37:19, 38:11, 38:19, 38:24, 41:2, 41:13, 42:3, 42:25, 43:12, 44:7, 44:11, 46:21, 47:12, 47:19, 47:24, 48:16, 49:12, 49:25, 50:14, 51:2, 51:6, 51:12, 53:13, 53:20, 53:25, 54:9, 57:1, 57:6, 57:11, 57:19, 57:22, 63:21, 64:17, 64:18, 64:24, 65:19, 66:4, 66:14, 69:12, 70:3, 70:6

**sic** [1] - 66:16

**side** [12] - 33:3, 36:18, 36:20, 37:13, 39:2, 39:4, 43:8, 44:18, 47:17, 47:23, 53:24, 72:8

**sight** [1] - 24:12

**signature** [1] - 78:12

**silent** [1] - 14:7

**silverish** [1] - 70:1

**SIM** [4] - 35:20, 37:18, 37:23, 69:3

**similar** [2] - 58:19, 70:12

**similarly** [1] - 23:20

**simple** [1] - 13:4

**simulated** [1] - 15:7

**sister** [5] - 25:9, 25:11, 46:7, 63:20, 64:7

**sites** [1] - 7:21

**sits** [1] - 46:19

**sitting** [3] - 17:11, 29:8, 29:11

**situation** [1] - 72:19

**six** [1] - 14:16

**sixth** [4] - 43:12, 44:17, 49:12, 57:22

**sized** [1] - 35:11

**slot** [2] - 37:14, 37:17

**slowly** [1] - 65:23
**SM** [2] - 36:22, 36:23
**SM-G900V** [2] - 36:22, 36:23
**small** [1] - 35:17
**snowing** [3] - 75:5, 75:6, 75:11
**someone** [2] - 31:6, 53:8
**somewhat** [2] - 36:20, 68:24
**Son** [1] - 44:22
**soon** [1] - 75:18
**sorry** [6] - 10:1, 35:24, 63:25, 64:18, 66:2, 70:17
**sort** [3] - 4:16, 42:17, 57:16
**sought** [1] - 25:2
**sounds** [1] - 71:18
**speaking** [10] - 31:10, 32:10, 32:20, 33:11, 33:23, 36:3, 40:19, 45:7, 53:7, 54:16
**special** [1] - 12:9
**Special** [2] - 30:14, 70:20
**specifically** [2] - 26:23, 37:14
**specifics** [2] - 31:23, 45:22
**spell** [1] - 29:25
**spend** [1] - 66:16
**spent** [1] - 27:16
**splashed** [1] - 57:16
**spokesperson** [1] - 18:4
**stand** [4] - 2:7, 2:19, 2:22, 10:19
**start** [6] - 2:5, 28:17, 62:5, 72:5, 75:6, 75:11
**started** [4] - 10:24, 19:4, 31:1, 65:14
**starting** [1] - 65:13
**starts** [1] - 64:10
**state** [7] - 2:7, 5:3, 29:25, 32:3, 35:11, 42:18, 72:19
**statement** [3] - 8:24, 18:11, 19:1
**statements** [1] - 11:16
**States** [2] - 55:4, 60:13
**STATES** [2] - 1:1, 1:4
**stating** [1] - 5:24
**statute** [4] - 3:23, 4:3, 4:6, 4:12
**stay** [1] - 17:22
**stenographically** [1] - 78:6
**step** [11] - 9:13, 15:22, 15:23, 24:6, 31:23, 32:1,

46:4, 46:9, 67:9, 69:6, 70:20
**steps** [6] - 25:19, 31:24, 33:25, 55:18, 59:4, 68:7
**Steven** [2] - 25:17, 26:8
**stick** [1] - 71:3
**still** [2] - 24:25, 52:18
**stimulation** [2] - 15:12, 20:20
**stipulate** [1] - 11:14
**stipulated** [2] - 55:3, 60:12
**stipulation** [4] - 6:17, 54:23, 55:1, 60:10
**stipulations** [3] - 6:4, 6:5, 11:13
**stop** [2] - 19:25, 37:7
**storage** [2] - 36:4
**story** [1] - 47:10
**straightforward** [1] - 24:15
**stream** [1] - 60:25
**Street** [1] - 1:24
**stressed** [1] - 64:1
**stricken** [1] - 12:3
**striped** [1] - 49:7
**stripes** [4] - 33:16, 40:6, 49:8, 51:5
**stuff** [3] - 31:4, 45:8, 59:23
**subject** [4] - 6:20, 7:24, 8:9, 8:11
**substantial** [3] - 15:22, 15:23, 24:6
**substantially** [2] - 6:7, 14:14
**succeeds** [1] - 4:5
**sufficient** [2] - 74:3, 74:12, 75:16
**sufficiently** [1] - 75:21
**sum** [1] - 27:13
**summarize** [1] - 18:22
**sunny** [1] - 13:5
**super** [2] - 64:1, 66:21
**superseding** [4] - 2:6, 2:15, 28:7, 28:8
**supposed** [1] - 18:12
**suppress** [1] - 8:3
**surprises** [1] - 29:4
**surprisingly** [1] - 21:16
**suspected** [7] - 32:7, 33:5, 40:10, 44:25, 50:21, 56:6, 58:17
**sustained** [1] - 11:23
**sweatpants** [1] - 8:19
**switch** [1] - 68:5
**SWORN** [1] - 29:22
**sworn** [6] - 9:14, 10:7, 10:17, 10:20, 10:21,

11:10
**symbol** [1] - 65:10

## T

**T-shirt** [5] - 33:13, 40:4, 40:7, 42:2, 42:7
**table** [3] - 28:14, 28:16, 29:5
**tampering** [5] - 8:7, 9:20, 16:14, 23:9, 25:5
**tarp** [1] - 48:24
**tattoo** [2] - 54:4, 54:13
**tattoos** [2] - 34:5, 53:10
**tentatively** [1] - 8:5
**term** [2] - 58:4, 68:19
**terms** [9] - 6:15, 7:2, 7:3, 7:19, 8:4, 17:3, 25:14, 26:22, 42:17
**testified** [5] - 11:10, 39:14, 45:15, 53:4, 62:25
**testify** [2] - 12:5, 14:6
**testimony** [20] - 3:8, 3:11, 3:12, 3:13, 3:21, 4:8, 4:9, 7:11, 11:10, 11:25, 12:3, 12:12, 12:16, 12:23, 13:18, 16:19, 26:1, 26:16
**thanking** [1] - 28:17
**THE** [71] - 1:1, 1:1, 2:3, 2:7, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:16, 2:17, 2:18, 3:1, 3:22, 5:6, 5:10, 5:18, 5:21, 7:1, 7:12, 9:10, 9:13, 10:2, 10:4, 10:6, 10:10, 10:13, 10:15, 10:18, 10:21, 10:22, 20:16, 28:11, 29:16, 29:19, 29:21, 29:23, 29:24, 30:2, 30:4, 35:7, 51:24, 52:3, 52:7, 52:10, 54:25, 60:11, 62:1, 62:4, 62:13, 62:15, 70:15, 70:17, 70:19, 70:23, 71:2, 71:8, 72:5, 72:13, 72:15, 73:1, 73:8, 73:13, 73:18, 74:22, 74:24, 75:4, 75:12, 76:2, 76:4
**themselves** [2] - 62:6, 73:6
**therefore** [3] - 3:6, 4:6, 8:12
**they've** [1] - 29:13
**thigh** [1] - 24:11
**thinks** [1] - 6:12
**third** [16] - 2:6, 2:15, 14:25, 16:7, 28:7, 37:19, 41:13, 47:19, 52:23,

53:25, 57:6, 64:17, 64:18, 65:4, 66:8, 70:6
**three** [6] - 19:19, 53:5, 64:25, 73:10, 74:13
**three-page** [1] - 64:25
**throughout** [1] - 6:1
**Thursday** [3] - 71:6, 72:2, 75:1
**title** [1] - 30:13
**today** [3] - 6:2, 71:11, 71:14
**tomorrow** [8] - 71:5, 71:17, 71:19, 71:24, 72:2, 74:25, 75:1, 75:24
**took** [13] - 8:18, 21:23, 22:8, 22:20, 23:15, 23:21, 25:19, 28:2, 46:9, 55:18, 59:13, 66:12, 69:6
**top** [7] - 42:12, 44:18, 52:22, 52:23, 63:22, 65:3, 65:8
**topic** [2] - 20:7, 72:25
**Toshiba** [5] - 21:5, 21:8, 23:24, 24:18, 34:23, 38:15
**touching** [2] - 24:9, 43:22
**tough** [4] - 20:7, 20:8
**towards** [1] - 15:23
**townhouse** [2] - 19:11, 56:22
**training** [2] - 12:8, 12:15
**transcribed** [1] - 78:9
**transcript** [6] - 2:1, 18:7, 62:11, 62:13, 67:3, 78:9
**transcripts** [6] - 18:7, 61:19, 61:25, 62:5, 62:6, 62:8
**translucent** [1] - 53:2
**transmitting** [1] - 14:23
**transported** [2] - 15:1, 16:4, 16:6
**travel** [1] - 71:22
**treat** [1] - 11:24
**trial** [7] - 3:21, 7:17, 11:7, 17:18, 18:10, 23:10, 29:7
**tried** [2] - 12:19, 24:24, 28:2
**trouble** [1] - 63:25, 65:25, 66:11
**trust** [1] - 66:3
**try** [4] - 17:16, 25:11, 34:1, 75:19
**trying** [3] - 15:23, 73:5, 75:23
**Tuesday** [1] - 1:10
**turn** [3] - 5:22, 18:25,

66:2
**turned** [3] - 6:23, 56:16, 58:2
**twenty** [1] - 10:3
**two** [12] - 4:14, 21:24, 23:8, 33:18, 33:19, 33:20, 41:14, 45:16, 45:18, 47:11, 49:9, 54:6, 71:12
**type** [5] - 30:25, 33:2, 34:4, 45:8, 49:24

## U

**U.S** [1] - 1:23
**umbrella** [1] - 13:8
**unaltered** [1] - 60:18
**uncovered** [1] - 74:14
**under** [7] - 2:20, 3:17, 4:6, 5:16, 11:11, 11:21, 14:20
**understood** [1] - 66:25
**undisputed** [1] - 8:10
**undue** [1] - 7:23
**unfair** [1] - 7:23
**Union** [5] - 22:17, 46:11, 46:12, 47:15, 68:9, 69:8
**United** [2] - 55:4, 60:13
**UNITED** [2] - 1:1, 1:4
**unless** [3] - 4:7, 8:5, 13:25
**unnecessarily** [1] - 6:2
**unnecessary** [1] - 71:21
**unpack** [1] - 56:18
**unrelated** [1] - 8:21
**unusual** [1] - 63:6
**up** [11] - 6:2, 11:8, 12:13, 13:7, 13:17, 23:21, 42:8, 50:5, 57:17, 59:6, 66:17
**upper** [1] - 52:22
**upstairs** [1] - 22:21
**US** [1] - 59:7
**USA** [1] - 78:6
**usual** [2] - 9:21, 71:14

## V

**vagina** [1] - 24:9
**value** [2] - 41:24, 49:3
**various** [5] - 7:3, 15:8, 15:14, 26:2, 26:22
**verdict** [3] - 11:7, 14:8, 18:24

**vibrator** [1] - 19:17
**victim** [12] - 3:15, 3:16, 4:1, 14:20, 14:22, 16:17, 21:25, 22:1, 27:14, 34:1, 73:3, 74:6
  **victim's** [2] - 2:20, 4:6
  **victims** [1] - 3:14
  **Victims'** [2] - 2:21, 3:14
  **video** [12] - 14:24, 23:4, 33:17, 33:18, 34:4, 68:17, 68:19, 68:20, 68:24, 69:2, 69:3, 70:10
  **video's** [1] - 68:22
  **videos** [20] - 6:9, 7:22, 20:4, 20:18, 20:22, 21:12, 23:15, 23:23, 26:6, 26:12, 26:13, 26:15, 26:17, 27:18, 27:23, 33:21, 33:22, 34:2, 51:22
  **view** [5] - 8:18, 15:10, 33:7, 57:20, 73:14
  **viewed** [1] - 58:18
  **viewer** [1] - 15:12
  **viewing** [1] - 20:20
  **views** [1] - 41:14
  **vis** [2] - 46:17
  **vis-a-vis** [1] - 46:17
  **visible** [6] - 21:17, 22:2, 22:4, 24:13, 27:18, 52:18
  **visit** [2] - 55:25, 56:2
  **visitation** [1] - 60:17
  **visitations** [4] - 59:23, 59:24, 59:25, 60:15
  **visited** [3] - 22:21, 26:20, 58:16
  **visitor** [2] - 60:20, 60:22
  **visitors** [1] - 60:16
  **visual** [6] - 14:23, 14:25, 16:3, 16:4, 16:8, 16:11
  **voice** [1] - 62:18
  **voices** [1] - 67:5
  **Voir** [1] - 2:1
  **VOLUME** [1] - 1:10
  **vote** [1] - 18:2

**W**

  **waiting** [1] - 10:16
  **walked** [1] - 22:21
  **wall** [7] - 21:22, 22:9, 25:23, 33:3, 56:17, 57:17, 58:3
  **wants** [3] - 3:1, 6:21, 7:14
  **warrant** [39] - 8:17, 21:4, 22:10, 22:16, 23:1, 23:3, 32:2, 32:3, 34:10,

34:13, 34:20, 35:1, 35:12, 35:13, 38:16, 39:16, 40:14, 40:20, 40:25, 41:20, 45:4, 46:10, 46:25, 47:2, 48:7, 48:14, 50:24, 62:22, 68:8, 68:13, 68:16, 69:7, 69:10, 71:4, 73:22, 74:3, 74:7, 74:10, 74:12
  **waste** [1] - 9:9
  **watch** [1] - 28:20
  **watching** [1] - 29:11
  **WAYNE** [1] - 1:6
  **Wayne** [4] - 31:6, 55:5, 60:14, 78:7
  **wearing** [8] - 21:17, 21:18, 21:19, 32:18, 32:21, 32:22, 33:13, 34:5
  **weather** [2] - 71:16, 75:20
  **websites** [1] - 26:20
  **wedding** [17] - 21:13, 23:3, 24:13, 25:24, 27:12, 27:18, 55:7, 55:11, 68:14, 68:15, 68:18, 69:16, 70:1, 70:7, 70:9, 70:10
  **weight** [1] - 12:16
  **welcome** [1] - 10:15
  **West** [1] - 1:24
  **Westminster** [7] - 19:20, 25:16, 27:16, 32:2, 35:3, 39:19, 41:7
  **wet** [2] - 13:7, 13:8
  **whatsoever** [1] - 18:19
  **Whereof** [1] - 78:11
  **white** [1] - 52:16
  **wide** [1] - 32:23
  **wife** [1] - 25:18
  **window** [4] - 13:9, 52:17, 52:20, 52:25
  **windows** [1] - 13:6
  **wish** [1] - 2:14
  **WITNESS** [5] - 29:22, 29:23, 30:2, 77:4, 77:5
  **witness** [15] - 3:5, 3:20, 8:7, 9:20, 12:8, 13:17, 13:19, 16:13, 23:9, 25:5, 29:16, 35:6, 70:16, 70:25
  **Witness** [1] - 78:11
  **witness's** [1] - 13:18
  **witnesses** [12] - 3:9, 3:11, 3:13, 11:10, 12:5, 18:16, 18:19, 25:14, 25:15, 28:5, 29:2, 29:3
  **woman** [1] - 19:5
  **words** [1] - 58:25
  **worn** [1] - 52:17
  **worried** [1] - 64:12
  **worries** [1] - 64:11

  **worry** [1] - 64:1
  **write** [1] - 17:13
  **writing** [3] - 54:13, 63:10, 63:11
  **written** [2] - 15:5, 61:1
  **wrote** [1] - 25:9

**Y**

  **year** [1] - 2:12
  **years** [4] - 19:6, 19:19, 23:15, 30:24
  **yellow** [2] - 22:3, 27:7
  **yourself** [1] - 23:16
  **yourselves** [1] - 17:7

**Z**

  **Zajac** [3] - 1:23, 78:5, 78:16
  **zoomed** [1] - 39:7

1

1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
2                        NORTHERN DIVISION

3

4

   UNITED STATES OF AMERICA
5
          v.                        CRIMINAL CASE NO.
6                                   CCB-17-226
   ERIC WAYNE GRINDER,
7
          Defendant
8   _____/

9

10                      VOLUME II
                Thursday, February 21, 2019
11              Baltimore, Maryland

12
   Before:  Honorable Catherine C. Blake, Judge
13                    And a Jury

14

15   Appearances:

16        On Behalf of the Government:
           Paul A. Riley, Esquire
17         Paul E. Budlow, Esquire

18        On Behalf of the Defendant:
           Elizabeth G. Oyer, Esquire
19         Kirstin M. Hopkins, Esquire

20

21

22   ----------------------------------------------------------------

23              Mary M. Zajac, RPR, FCRR
              Fourth Floor, U.S. Courthouse
24             101 West Lombard Street
              Baltimore, Maryland 21201
25

2

1                    (Proceedings at 10:26 a.m.)

2              THE COURT:  I gather we had a technology problem?

3              MR. RILEY:  Apologies, Your Honor.  We tested it last

4     week and thought everything was functional.  It was not this

5     morning.  We have a work-around in place.  Apologies.

6              THE COURT:  Okay.  What's the schedule for this

7     morning?

8              MR. BUDLOW:  Your Honor, the first witness is Detective

9     John Emminizer, who's in the courtroom.  He's going to be a

10    relatively short witness.  And then Forensic Examiner Steven

11    Gibson, who will be a more lengthy witness.  I doubt if we'll

12    finish him this morning.

13             Then Alisha Grinder is set to testify this afternoon.

14    Hopefully, the government will rest at that point.

15             THE COURT:  Okay.  All right.  And I'm thinking that,

16    because we haven't even talked about, got to get the instructions

17    done.  We may do instructions and argument tomorrow, I think.

18    But we'll see how far we get.

19             I wanted to alert you all to, you may have seen the

20    Fourth Circuit issued an opinion yesterday in United States v.

21    Gregory Seerden, S-E-E-R-D-E-N, in which the Fourth Circuit,

22    under somewhat different circumstances, but the Fourth Circuit

23    applied the good faith exception to a couple of military

24    warrants, and then a following federal warrant in the child

25    pornography case.  I note, incidentally, in that case the

3

1    government did allow a conditional guilty plea.  There was a
2    stipulated statement of facts.  The Fourth Circuit dealt with it
3    afterwards.
4              Okay.  We'll get the jury.
5              MR. BUDLOW:  Your Honor, while we're getting the jury,
6    I just want to let you know the work-around we have in place is
7    switching between the two laptops when Mr. Gibson testifies,
8    while we're playing some of the explicit materials.  It's a
9    little bit more cumbersome than it otherwise would have been.
10   We'll do our best if it keeps things moving.
11             THE COURT:  Okay.
12             (Jury enters the courtroom at 10:29 a.m.)
13             THE COURT:  You all can be seated.  All right.  Good
14   morning, and welcome back, ladies and gentlemen.  I hope you're
15   all shoveled out, snowplowed, whatever.  I appreciate your coming
16   back.  Apologize for the delay.  There was apparently some
17   technological issues that had to be, that had to be resolved, but
18   I think we're ready.
19             The government call another witness?
20             MR. BUDLOW:  Yes, Your Honor.  Thank you.  The
21   government calls Detective John Emminizer.
22             THE COURT:  All right.
23             THE CLERK:  Please raise your right hand.
24        DETECTIVE JOHN EMMINIZER, GOVERNMENT'S WITNESS, SWORN
25             THE WITNESS:  I do.

1          THE CLERK:  Please be seated.  Please speak directly

2     into the microphone.  State and spell your full name for the

3     record, please.

4          THE WITNESS:  First name, John, last name Emminizer.

5     It's E-M-M-I-N-I-Z-E-R.

6          THE CLERK:  Thank you.

7          DIRECT EXAMINATION

8     BY MR. BUDLOW:

9     Q    Good morning, Detective.

10    A    Good morning.

11    Q    Can you tell us how you're employed?

12    A    I am employed with Westminster Police Department, located in

13    Carroll County, Maryland.

14    Q    And how long have you been in law enforcement?

15    A    38 years.

16    Q    Could you, just as an overview, tell us where you started

17    originally, how long you were there, and what kind of cases you

18    handled?

19    A    I started my career in law enforcement in 1981.  I was hired

20    by Baltimore City Police, where I stayed there until 2006.

21    During my career, I did about 14 years in patrol in the Central

22    District, which is the Downtown Baltimore area around here.  From

23    there, I went to a specialized unit where I investigated

24    robberies and burglaries, auto thefts, things of that nature.

25          I then transferred out of there.  I spent a year in

DIRECT EXAMINATION OF DETECTIVE JOHN EMMINIZER BY MR. BUDLOW          5

1    Internal Affairs.  From there, I left Internal Affairs and I went

2    to the Auto Theft RAT Unit, which, in other words, it's a

3    specialized unit that goes out and looks for stolen, and recover

4    autos.  And I also did the administrative side of that.  Then I

5    left in '06 and went to Westminster.

6    Q    Just so it's clear, "RAT" is the Regional Auto Theft Task

7    Force?

8    A    Correct.

9    Q    And you left Baltimore City in 2006, is that right?

10   A    Yes, February 2006, kind a week of break of law enforcement.

11   And a week later I was back in it.

12   Q    And that was when you went to the Westminster City Police,

13   is that right?

14   A    So in 2006 of February, I spent about a year on the street.

15   I was offered a job within the police department in the Child

16   Advocacy.  The Child Advocacy investigates physical and sexual

17   abuse to children. I also worked on child pornography cases.  I

18   spent 12 years in there and just recently, in December, I asked

19   to come out of there.  And I have now been assigned to

20   investigating like crimes of theft, fraud, and burglaries, things

21   of that nature, for Westminster City Police in their CID unit,

22   Criminal Investigation Division.

23   Q    In the 12 years that you did, you said the Child Advocacy,

24   that's the Carroll County Child Advocacy Center?

25   A    Yes, it is.  It's a combined task force, which is made up of

DIRECT EXAMINATION OF DETECTIVE JOHN EMMINIZER BY MR. BUDLOW    6

1    three different police departments:  The Carroll County Sheriff's

2    Department, Maryland State Police, and then my department,

3    Westminster Police.

4    Q    And is that where you were working and assigned on November

5    the 28th of 2016?

6    A    Yes, it is.

7    Q    Court's indulgence.  And when you were working that day, do

8    you recall receiving a call from a Deputy Ruben Gill?

9    A    Yes, I do.

10    Q    And who is Deputy Gill?

11    A    He's a deputy who works for the Carroll County Sheriff's

12    Department.

13    Q    He's more akin to a patrol officer, not assigned to the

14    Carroll County --

15    A    Correct.

16    Q    -- Child Advocacy?  All right.  And did Deputy Gill inform

17    you that he had been, he was out on a call at the time of his

18    call to you?

19    A    Yes, he did.

20    Q    And without telling us what he told you, did he tell you

21    what he had learned?

22    A    Yes, he did.

23    Q    And what did you advise him?

24    A    I advised him to take the initial report, document

25    everything that he had, and fax that report over to the Child

DIRECT EXAMINATION OF DETECTIVE JOHN EMMINIZER BY MR. BUDLOW          7

1    Advocacy.

2    Q    And then did that conclude your call with Deputy Gill?

3    A    With him, yes.

4    Q    What happened next?

5    A    I asked if he was still at the house and he said he was.  I

6    asked him if he could put one of the parents on the phone that he

7    was taking a report from.

8    Q    And did you speak to the parent?

9    A    Yes, I did.

10   Q    It was the mother?

11   A    Yes, it was.

12   Q    What was her name?

13   A    I think Alissa, Alisha Grinder.

14   Q    And you spoke to her, you think, on Deputy Gill's phone, is

15   that right?

16   A    Correct.

17   Q    And did you make any arrangements for a future meeting with

18   Ms. Grinder?

19   A    Yes, I did.  I asked if she was available to come in to the

20   Child Advocacy with her daughter in reference to an interview

21   being conducted.

22   Q    And did you set up -- during that call, did you set up that

23   interview?

24   A    Yes, I did.  I believe it was scheduled the very next day

25   for around 10 in the morning.

DIRECT EXAMINATION OF DETECTIVE JOHN EMMINIZER BY MR. BUDLOW        8

1    Q    So on Tuesday, November the 29th, in the morning, did Ms.

2    Grinder and her daughter come to the Carroll County Child

3    Advocacy Center?

4    A    Yes, they did.

5    Q    And were they interviewed, or was the daughter interviewed?

6    A    They were interviewed.  I was not involved in the interview.

7    I believe the interview was conducted by Trooper Barry and a CPS

8    worker.

9    Q    And was that interview audio and video recorded?

10   A    Yes.

11   Q    Now, later that day, Detective, roughly 6 or 6:30 p.m., did

12   you participate in obtaining a search warrant for the residence

13   at 261 Montpelier Court?

14   A    Yes, I did.

15   Q    And while you were getting the warrant, do you know what

16   directions had been given in terms of securing the house that was

17   the subject of the warrant?

18   A    It was requested by -- yes.  It was, a deputy was requested

19   to go to the house and secure the residence until a warrant had

20   been signed so we could execute it.

21   Q    And who was that officer that was assigned to secure the

22   house?

23   A    Actually, I'm not -- I left my folder back at the -- I can't

24   remember, actually, who the deputy was.

25   Q    And the purpose of that was to preserve evidence?

1   A     Correct.

2   Q     Your Honor, at this time we have another stipulation that I

3   would like to read.

4          THE COURT:  All right.

5          MR. BUDLOW:  It is hereby and agreed -- it is hereby

6   stipulated and agreed by and between the United States of

7   America, by its attorneys, and the defendant, Eric Wayne Grinder,

8   as follows:  On November 29th, 2016 at approximately 5:05 p.m.,

9   Corporal Michael Lare of the Carroll County Sheriff's Office

10  responded to the residence of the defendant at 261 Montpelier

11  Court in Westminster, Maryland, to assist in the execution of a

12  search and seizure warrant at the residence.

13          At approximately 5:56 p.m., the defendant arrived in

14  his car and parked in the driveway of his home.  The defendant

15  got out of his car.  Corporal Lare then approached him, and while

16  he and the defendant were still in the driveway of the residence,

17  Corporal Lare seized the defendant's Samsung SMG900V Smartphone

18  IMEI990004495000428.

19          At approximately 6:05 p.m., Deputy David Roys of the

20  Carroll County Sheriff's Office responded to 261 Montpelier Court

21  in Westminster, Maryland, and Corporal Lare provided the

22  defendant's Samsung SMG900V smartphone to him.

23          At approximately 6:31 p.m., Detective John Emminizer of

24  the Westminster City Police Department responded to 261

25  Montpelier Court in Westminster, Maryland, and Deputy Roys

1    provided defendant's SMG900V smartphone to him.

2         Your Honor, that stipulation is signed by the parties.

3         THE COURT:  All right.

4    BY MR. BUDLOW:

5    Q    Detective Emminizer, if you remember, approximately what

6    time did you arrive at the house?

7    A    I believe it was around like 6:55, somewhere around there.

8    Q    And what happened, what did you observe when you arrived at

9    the house?

10   A    I observed the Deputy Lare there, Detective Roys.  And I

11   observed Mr. Grinder there, sitting in his personal car on the

12   driveway.

13   Q    And did you have a conversation with Deputy Roys?

14   A    Briefly.  Just that he had secured the residence and

15   obtained the keys, so when we did the search warrant, we could

16   enter the house.

17   Q    Your Honor, may I approach the witness?  Did Deputy Roys

18   give you anything?

19   A    Yes.  He gave me a cell phone belonging to Mr. Grinder.

20   Q    And in preparation for your testimony here today, did you

21   review evidence and evidence submission forms and evidence

22   packaging?

23   A    Yes.

24   Q    And, also, did you review in that packaging Government's

25   Exhibit 1-A?

DIRECT EXAMINATION OF DETECTIVE JOHN EMMINIZER BY MR. BUDLOW    11

1    A    That is the phone that I was given that belonged to Mr.

2    Grinder.

3    Q    And what happened to this phone following the execution of

4    the search warrant?

5    A    It was submitted in Property at the sheriff's office.

6    Q    If you could -- showing you Government's Exhibit 26, Page 3.

7    Is that a photograph of the phone that was taken that evening?

8    A    Yes, it is.

9    Q    And Page 4, is that another picture of the phone with the

10   case open?

11   A    Yes, it is.

12   Q    Did you participate in the search warrant?

13   A    Yes, I did.

14   Q    I'm looking at the exhibit in front of you, which is 26,

15   Page 1.  Is that the home at 261 Montpelier Court?

16   A    Yes, it is.

17   Q    And can you describe it for the record, please?

18   A    It's a single family home residence, with a garage, vehicle

19   parked on the driveway.  It's tan-colored siding.

20   Q    And Page 2, is that another picture of the front porch?

21   A    Yes, it is.

22   Q    In both of those pictures there's a vehicle in the driveway.

23   Was that vehicle there when you arrived?

24   A    Excuse me.  Yes, it was.

25   Q    Looking at Page 5 of Exhibit 26.  Can you tell us what that

DIRECT EXAMINATION OF DETECTIVE JOHN EMMINIZER BY MR. BUDLOW        12

1   is?

2   A    That is the first floor near the main entrance of the

3   residence.

4   Q    Could you give a general overview of the interior of the

5   home?  How many floors it was, basement, whether or not it was

6   finished, that kind of thing.

7   A    Finished basement with like an entertaining/sitting area.

8   First floor, like a family room, kitchen, very neat, well kept

9   house.  Second floor, three bedrooms.  I believe it had a master

10  bathroom and a hall bathroom.

11  Q    And in the top floor, were you able to identify what

12  appeared to be a girl's bedroom?

13  A    Yes, I did.

14  Q    And do you remember where that was in the layout?

15  A    Yeah.  It was at the very top.  As soon as you go up the top

16  of the steps, walk a few feet, and then you enter the bedroom.

17  Q    And was any evidence seized from the bedroom?

18  A    Yes, it was.

19  Q    Did that include a purple blanket?

20  A    Yes, it did.

21  Q    Starting with, again, on the same exhibit, Page 6, shortly.

22  What are we looking at on Page 6?

23  A    That is the bedroom, a girl's bedroom.

24  Q    Page 7?

25  A    Same thing.  Girl's bedroom.

1  Q    Page 8?

2  A    Picture of the girl's bedroom with some bedding articles

3  laying on the floor to the left side of the bed.

4  Q    And Page 9, close-up of the same area with the bedding?

5  A    Correct.

6  Q    I'm going to zoom in for you the bottom.  Do you see a

7  bedding and a pillow?

8  A    Yes.

9  Q    Under the black pillow, can you describe what's there?

10  A    It is a purple/white polka-dotted like comforter.  And then

11  on the other side it's like a quilted pattern with butterflies.

12  Q    And is that, the purple polka-dot blanket that you see

13  there, is that the comforter or the bedding that was seized that

14  day and submitted in evidence?

15  A    It's the comforter that was on the floor by the bed that was

16  seized.

17  Q    Showing you what should be Government's Exhibit 27-A.

18  Again, you reviewed this in preparation for your testimony, is

19  that correct?

20  A    Correct.

21  Q    Is this that blanket?

22  A    Yes, it is.

23  Q    Describe one side as what?

24  A    Purple with white polka dots.  Other side, quilted pattern

25  with butterflies and flowers.

DIRECT EXAMINATION OF DETECTIVE JOHN EMMINIZER BY MR. BUDLOW    14

1    Q    Page 10, another close-up of the same area?

2    A    Correct.

3    Q    The blanket was 27-A.  Not sure if I said that right.  Now

4    I'm going to show you 27-B.  Maybe.  These photographs of the

5    same blanket?

6    A    Yes, it is.

7    Q    Page 1 is which side?

8    A    This is the quilted pattern with the butterflies and

9    flowers.

10   Q    Page 2?

11   A    Is the picture of the purple and white polka-dotted side of

12   the blanket.

13   Q    Page 3?

14   A    The other side, the quilted side, butterflies and flowers.

15   Q    And then Page 4?

16   A    Same thing.  The butterflies, and then a purple polka

17   dotted, purple with the white polka dots.

18   Q    You can see both sides in that exhibit, right?

19   A    Correct.

20   Q    Now I've done it.  Ms. Moye, any way to get rid of

21   whatever -- thank you.  If only our problems earlier were solved

22   so easily.

23            Going back to 26.  While I'm getting to the next

24   picture, was the basement searched, also?

25   A    Yes, it was.

DIRECT EXAMINATION OF DETECTIVE JOHN EMMINIZER BY MR. BUDLOW        15

1    Q    And what was seized from the basement?

2    A    A computer.

3    Q    Showing you Page 11 of Government's Exhibit 26.  What is

4    this photograph of?

5    A    It's a picture of the table where the computer was located.

6    And on top the computer was two game control, for gaming and

7    playing games.

8    Q    And was that the laptop that was seized?

9    A    Yes, it is.

10   Q    Showing you Government's Exhibit 3.  Did you have a chance

11   to review this in the packaging?

12   A    Yes, I did.

13   Q    What is Government's Exhibit 3?

14   A    It is the computer that was recovered from the basement,

15   from this table in this picture.

16   Q    Detective Emminizer, thank you.  Your Honor, that's all I

17   have.

18              THE COURT:  Thank you very much.  Ms. Oyer?

19              MS. OYER:  No questions, Your Honor.

20              THE COURT:  Thank you, Detective.  You're excused.

21              THE WITNESS:  Thank you.

22              MR. BUDLOW:  Your Honor, the government's next witness

23   is Forensic Examiner Steven Gibson.

24              THE COURT:  All right.

25              THE CLERK:  Please raise your right hand.

1              STEVEN GIBSON, GOVERNMENT'S WITNESS, SWORN

2              THE WITNESS:  I do.

3              THE CLERK:  Please be seated.  Please speak directly

4    into the microphone.  State and spell your full name for the

5    record, please.

6              THE WITNESS:  Steven O. Gibson.

7              THE CLERK:  Spell your full name, please.

8              THE WITNESS:  S-T-E-V-E-N.  O.  G-I-B-S-O-N.

9              THE CLERK:  Thank you.

10             DIRECT EXAMINATION

11   BY MR. BUDLOW:

12   Q    Good morning, Mr. Gibson.

13   A    Good morning.

14   Q    Could you tell the members of the jury your title and where

15   you work?

16   A    I'm a computer forensic analyst for the Department of

17   Homeland Security Investigations.

18   Q    And how long have you been a computer forensic analyst?

19   A    Four years paid, one year as a non-paid intern.

20   Q    Can you give is an overview of your duties as a computer

21   forensic analyst with DHS Homeland Security?

22   A    Yes.  I attend search warrants.  I look at evidence.  And

23   what I mean by that is I gather data.  I go through digital

24   electronics.  I image those items, which we'll get into.  I

25   collect it, analyze it, make reports, and give it to the case

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          17

1    agents for their review and analysis.

2    Q    And we'll get into it later, but does that include what you

3    refer to as data recovery?

4    A    Yes, it does.

5    Q    Do you use various forensic tools in your everyday work as a

6    forensic analyst?

7    A    Yes.

8    Q    Could you give us just an overview of what some of the names

9    of those tools are?

10   A    There's many forensic tools out there that assist us in our

11   job.  Some of those are what's called AXIOM by magnet forensics.

12   Also, Magnet Forensics Internet Evidence Finder.  Cellebrite

13   Mobile Forensics for using on mobile phones and mobile devices.

14   EnCase Forensic.  There is Final Forensics.  So that's just some

15   of the tools that we use.

16   Q    I mentioned this briefly.  Data recovery, can you explain

17   what that term refers to or what data recovery is?

18   A    Yes.  Data recovery is when we get an evidence drive, such

19   as a hard drive or something, we are able to go in and create

20   what's known as a forensically sound backup copy of that device,

21   which does not allow any changes to be made to that original

22   evidence item.  So it gives us a forensically sound copy that we

23   can now utilize and run with our forensic tools.

24   Q    And does data recovery also include sometimes cracking

25   passwords, getting into encrypted devices?

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW        18

1   A    Yes.

2   Q    Does it include getting files that are either hidden or

3   deleted that a normal user might not be able to find?

4   A    Correct.

5   Q    And before you became a computer forensic analyst with HSI,

6   did you have another role in the agency?

7   A    Yes.  I was what's known as a HERO, a Human Exploitation

8   Rescue Operative, which was a program designed between United

9   States Army Special Operations Command, the National Association

10  to Protect Children, and Homeland Security, to get wounded and

11  disabled vets back into a fight, that being against child

12  exploitation.

13  Q    As part of your work in that HERO Corps, did you conduct

14  forensic examinations?

15  A    I did.

16  Q    And did you work with various forensic tools, include some

17  of the ones that you still work with today?

18  A    Absolutely.

19  Q    How long was that internship?

20  A    One year.

21  Q    And what did you do before you were part of the HERO Corps?

22  A    I was an independent contractor to the Wounded Warrior

23  Project, teaching computer maintenance and repair, network plus,

24  and intro to computers to wounded and disabled vets.

25  Q    And how long did you do that?

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          19

1    A    Approximately 24 months.

2    Q    Can you give the ladies and gentlemen of the jury a little

3    background about any specialized training that you've had

4    regarding computer and digital forensics?

5    A    I've had an extensive amount.  I've had EnCase, which is

6    another forensic tool, EnCase Forensics I and II prior to coming

7    into the HERO program.  And then once in the HERO program, they

8    sent us for training.  So I had basic evidence recovery

9    techniques, advanced evidence recovery techniques, Forensic

10   Toolkit, which is another tool, as well as EnCase once again.

11          I've had Cellebrite training, which is for mobile

12   devices.  I've had Griffeye, which is a specialized image and

13   video tool for child exploitation.  I've also gone and attended

14   Project Victim Identification training, just to name some.

15   Q    And some of these trainings are multi-day trainings and

16   conferences that you've attended?

17   A    Yes, most of them are anywhere from 48 to 72 hours.  So two

18   to three-day trainings.

19   Q    So the tools that you use everyday, you have specific

20   training with respect to using those tools?

21   A    Yes.

22   Q    And can you tell the jury approximately how many cases

23   you've performed forensic examinations through the course of your

24   career?

25   A    Over the five years, approximately a hundred, maybe a little

1  more.

2  Q    As an overview, what are the types of cases that you've

3  worked on?

4  A    The majority of them are child exploitation, is what I

5  specialize in.  And then a view document frauds, a couple of

6  violent crimes.  But the majority, once again, is child

7  exploitation.

8  Q    Have you ever been qualified as an expert in computer

9  forensics in a court of law?

10  A    Yes.  Numerous times.

11  Q    Do you know approximately how many or can you give a

12  minimum?

13  A    Four state and one federal.

14  Q    And were all the state in Maryland?

15  A    Yes.

16  Q    Do you know which jurisdictions?

17  A    Washington County, Frederick County, Caroline County,

18  Worcester County, and here in this courtroom.

19  Q    The District Court of Maryland as well?

20  A    Yes.

21  Q    And the state testifying, the state testimony, were they in

22  circuit court or district court?

23  A    I can't answer that.

24  Q    Your Honor, at this time the government moves to have Mr.

25  Gibson qualified as an expert in the field of forensic analysis

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW        21

1    of computers.

2            THE COURT: Any objections or questions?

3            MS. HOPKINS:  No objection.

4            THE COURT:  All right.  Well, based on the witness's

5    experience and training and education, I will find him qualified

6    to give opinion testimony in the field of forensic analysis of

7    computers.  You may proceed.

8    BY MR. BUDLOW:

9    Q    Thank you, Your Honor.  Mr. Gibson, generally speaking, can

10   you describe the steps that are involved in the forensic review

11   of digital devices, starting first with the sort of less moving

12   parts?  So not cell phones, but laptops and storage devices.

13   A    They all, regardless of what device it is, it always begins

14   with a search warrant or the consent, which I then ensure that I

15   have the legal authority to go through those devices, or the

16   consent signed by the owner to go through them.

17           Once I've gotten that and gone through it and make sure

18   everything is okay, the first thing I do is look at the item, in

19   this case the laptop or computer, and I ensure to log the make,

20   model, serial number of it, look at it, make sure there's nothing

21   detrimental to it.  Then I remove the hard drive out of it and,

22   once again, log the make and model, serial number of that actual

23   hard drive, the size of it, whether it's one terabyte, two

24   terabyte, or however big it is.

25           Then I have a program, which is called Forensic

1   Toolkit.  I'll get that up and running.  But I also have what's

2   called a tableau write-blocker because, once again, we do not

3   want to change one single item of data or bit on that evidence,

4   evidentiary hard drive.

5           So I will plug it up to this thing, which is the

6   tableau, which allows it to read the hard drive, but not write

7   anything to it, doesn't allow anything like that.

8           I then connect that to my forensic machine.  And I will

9   create a bit-for-bit backup forensic copy of that hard drive, or

10  whatever that device is.  Once I'm finished with that, it

11  verifies by hash value, hash, the value of it, so I ensure those

12  numbers match.  If the hash is at the beginning and a hash at the

13  end is identical, then I know I have a bit-for-bit copy of that

14  hard drive.

15          And from there, I then disconnect it.  It goes back

16  into the evidence and it goes back in my evidence locker.  And

17  then from there I can run any number of my forensic tools on my

18  copy, that forensic copy that I just created.

19  Q    So you run the testing on the copy, not on the original

20  evidence?

21  A    Correct.

22  Q    Why is that?

23  A    Data integrity, and also because if something happens, you

24  want that clean, pristine piece of evidence.  You don't want

25  anything to happen with it.

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          23

1    Q    And you could go back and run the same tests and find the

2    same results again, is that correct?

3    A    Yes.

4    Q    And when you do your analysis of what the, of the image or

5    the copy, what do you do with evidence or files or data that you

6    find relevant?

7    A    I go through and I bookmark those things that I find that

8    are, I believe are relative to the case, and I bookmark them.

9    Eventually, they go into a report for the case agent to review.

10   Q    So that's the, what you've described is the general process,

11   but specifically as it applies to non-moving data, computers and

12   storage devices.  Can you explain how, if at all, it's different

13   with a cell phone?

14   A    Yes.  Where a computer and stuff, it's got a hard drive in

15   it.  It's, no power is going to it or anything else.  It's not

16   going to be, anything happen to it.  With a cell phone or a

17   mobile device, the tool that I use in most tools, the phone has

18   to be completely charged up, which means I have to plug it in,

19   which means now it's up and running.  Sometimes it's in airplane

20   mode, sometimes it's not.  We have to make sure.

21        And with the program that we use, a lot of the programs

22   that we use, they're what's called push-button forensics.  So

23   this is -- remember when I talked about a hash.  A hash is an

24   algorithm, as I said.  In the beginning you hash it and at the

25   end that number is going to be the same.  With cell phones and

1   stuff, it's only a snapshot in time.  So because I have to turn

2   the phone on, power's going, things are changing, the registries

3   within it are changing, when I do my image, it is only that

4   moment in that space of life of the phone or whatever device it

5   is.  So, therefore, if I take that phone today and plug it back

6   in, that value is not going to be the same as the day when I did

7   it.

8           So once I plug this in, I followed the prompts, it,

9   actually, my program will tell me what kind of device it is.  Is

10  this the one you want?  Yes.  And then I can go through and pick

11  what I want to do and what kind of extraction, in which case I

12  always, you always, in forensics, want to get as much data as you

13  can.  So we go for the whole, the whole kit and caboodle.

14          Once I have that, it then opens it up into a reader

15  view.  And just like with any other device, I can go through and

16  bookmark images, videos, or whatever is relevant.  And then, once

17  again, I create a report and give it to the case agent for their

18  review.

19  Q    So the difference really is the extraction process?

20  A    Yes.

21  Q    And if you were to go back to examine an item like a phone

22  that you've already done an extraction, you would be able to see

23  evidence that you'd been there once before and extracted data?

24  A    Yes.

25  Q    But do you make any other changes to the device other than

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          25

1    that?

2    A    No.

3    Q    Let's, now we have the big picture, let's sort of move to

4    the questions that relate to your forensic examinations in this

5    case, starting with what evidence it is that you examined.  I

6    want to show you -- you've reviewed these items in our office

7    recently in preparation for trial, is that right?

8    A    Yes.

9    Q    Showing you Government's Exhibit 3.  Let's do this all at

10   once.  1-A.  I don't have it.  Did you examine -- let me ask you

11   this.  As to 1-A and 3, did you perform a forensic examination of

12   both of those?

13   A    Yes.

14   Q    Here we go.  And it's very small.  1-B as well?

15   A    Yes.

16   Q    These are three of the items that you performed forensic

17   examinations on in this case?

18   A    Correct.

19   Q    And just to go through.  The 1-A was a Samsung phone?

20   A    Yes.

21   Q    1-B was the SD card?

22   A    Yes.

23   Q    And 3 was a Toshiba laptop computer, is that right?

24   A    Yes.

25   Q    Where did you get the phone and the SD card from, or who did

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          26

1    you get it from?

2    A    From Special Agent Federico.

3    Q    And what about the, the other device, the laptop?

4    A    That was from Trooper Barry from -- when that came, it came

5    as a different case.

6    Q    Earlier?

7    A    Yes.

8    Q    And what did you do with the items, as all of them, when you

9    got them?

10   A    Logged them in and put them in the evidence locker.

11   Q    And who has access to that area?

12   A    Just myself and Maryland State Police forensic guy.

13   Q    Is that locked?

14   A    Oh, absolutely.

15   Q    It's a locker.  I'll ask it now.

16   A    Yes.

17   Q    And did it remain there until the time that you examined it

18   and after you examined it?

19   A    Yes.

20   Q    Showing you Government's Exhibit 4, Page 1.  Can you tell us

21   what that photograph is?

22   A    That is a photo of the Toshiba laptop.

23   Q    Page 2.  Wait a minute.  Yes, Page 2 of 3 of Government's

24   Exhibit 4.

25   A    That is an image of the back of the laptop, the Toshiba

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          27

1    laptop computer.

2    Q     And Page 3?

3    A     That is an image of the hard drive that resided within it.

4    Q     You're a computer expert, right?  Do you know if water is

5    good for laptops?  May I get a moment, Your Honor?

6          THE COURT:  Yes.

7    Q     Maybe Ms. Moye has some tissues.  You would never have water

8    that close to a laptop when you are doing to a forensic

9    examination, is that correct?

10   A     That is correct.

11         THE COURT:  Is it still working?

12   Q     So far.  Yes.  Didn't break it yet.  All right.

13   Government's Exhibit 2, Page 1.  Do you recognize that?

14   A     Yes.  That's the, an image of the Samsung phone.

15   Q     Is that the front of the phone?

16   A     Yes.

17   Q     Page 2?

18   A     That is the back of the phone.

19   Q     Page 3?

20   A     That is the SD card that was within the phone.

21   Q     Where was the SD card when you first got the phone?

22   A     Inside it.

23   Q     That area right there?

24   A     Yes.

25   Q     Your Honor, at this time I have another stipulation I'd like

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW        28

1    to read.

2           THE COURT:  All right.

3           MR. BUDLOW:  It is hereby stipulated and agreed by and

4    between the United States of America, by its attorneys, and the

5    defendant, Eric Wayne Grinder, as follows:  The Toshiba Satellite

6    model laptop computer Serial Number 1A112898Q, the Toshiba laptop

7    referenced in Counts 1 and 7 of third superseding indictment, was

8    manufactured in China.

9           The Hitachi hard drive, Serial Number

10   091209PBN303QTKYKSYR, contained within the Toshiba laptop, was

11   manufactured in Thailand.

12          The Samsung SMG900V smartphone, IMEI990004495000428,

13   referenced in Counts 5, 6, and 8 of the third superseding

14   indictment was manufactured in China.

15          The SanDisk SD card, Serial Number 10009033482DUUU,

16   referenced in Counts 2, 3 and 4 of the third superseding

17   indictment, was manufactured in China.

18          I may have said an extra "three" in the serial number

19   of the SanDisk, is that right?  It is one -- thank you.  I was

20   hoping to read this twice.  1000903482DUUU.  Did I get it right?

21          Lastly, by virtue of the presence of the Toshiba

22   laptop, the Hitachi hard drive, and the Samsung smartphone, and

23   the SanDisk SD card in the State of Maryland, those items had

24   traveled in interstate and/or foreign commerce.  That is the

25   stipulation that's signed by the parties.

1              THE COURT:  Thank you.

2    BY MR. BUDLOW:

3    Q    Mr. Gibson, can you describe generally the steps taken to

4    preserve the integrity of this evidence that you've just

5    discussed, the Toshiba laptop, the SD card, and the phone?

6    A    I'm sorry.  Can you repeat that?

7    Q    What steps did you take to protect the integrity?  In other

8    words, did they remain locked --

9    A    Yes.

10   Q    -- in your evidence locker when you did not have them in

11   your possession?

12   A    Correct.  That is correct.  Once I bring them out of the

13   locker, I typically will begin my analysis.  Plus my office also

14   remains locked, which is also behind another locked door, which

15   is behind another locked door, at the Frederick Law Enforcement

16   Center.

17              So once they're brought out, I begin the process.  Once

18   it's finished, it immediately goes right back into the evidence

19   locker.

20   Q    So starting with the laptop, can you describe the steps that

21   you took, the initial steps for the forensic examination of the

22   laptop?  And knowing that you've already told us your general

23   steps, you can hopefully review them quickly.

24   A    Yes.  Once again, I review the search warrant.  I have a

25   tableau write-blocker.  I then log everything, as I said before,

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          30

1   make, model, serial number of the computer.  Pulled the hard

2   drive.  Once again, log the make, model, serial number of the

3   hard drive.  Take my tableau, hook it to the drive, which then

4   goes into my forensic machine.  I then use a forensic software

5   tool, FTK Imager, which then creates my forensic image, my copy

6   of the drive.  Once that is complete, I verify the hashes are the

7   same.

8           I then turn everything back off, disconnect, goes back

9   into its device, goes back into the evidence locker.

10  Q    I want to ask you just a couple more questions about what

11  you said, making sure the hash is the same.  When you compare the

12  hash of the device that you've used, your subject device, to the

13  image or the copy that you've made, that's, those are the two

14  hashes that you're talking about comparison, is that right?

15  A    Yes.

16  Q    Comparing.  And those were the same in this case?

17  A    Absolutely.

18  Q    What is the significance of the hash of the copy device

19  being the same as the hash of the subject device?

20  A    When it comes to electronic media, even photos in your

21  phone, on your computer, anything, when a person has these, you

22  can, a hash is generated and can be hashed.  And what that is is

23  a numeric algorithm.  And there's various types of hashes.  But a

24  picture or an image that an individual has on their phone, say

25  you took one this morning, it can be hashed.  If nothing changes,

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW       31

1   20 years from now, you can send it all the way around the world

2   and millions of people could get it.  As long as they change not

3   one pixel of that, that value will be exactly the same.

4           So you can hash a computer, a file, a folder.  You can

5   hash pretty much anything out there in the digital world and the

6   chances of them having a duplicate now is almost zero.

7   Absolutely zero.

8   Q   Is it a fair comparison to say that a hash value is similar

9   to a digital fingerprint?

10  A   Absolutely.  And that's where I was going.  It is, it's a

11  digital fingerprint of that image, video, whatever you have.  And

12  as long as nothing changes, it will always remain the same.

13  Q   Now, after you confirmed that the imaged drive or the copy

14  drive matched the hard drive that came out of the laptop, what

15  was the next step in your forensic examination of that device?

16  A   Once that happens, then I begin using my forensic tools.

17  And I will load that image, I will open up one of my forensic

18  tools.  In this case, normally I will run multiple forensic tools

19  on any drive because some of them do things better than others.

20  Such as Magnet Forensics Internet Evidence Finder is great for

21  finding Internet artifacts.  My Griffeye Analyze is designed for

22  law enforcement, especially those of is working in child

23  exploitation, for images and videos.

24          So I load these, I load that forensic copy into my

25  tools and then I go and select where I needed to go, the path,

1   and what I'm looking for.  And it starts running.  And it will

2   analyze the entire drive, or my forensic copy of it.  And then it

3   parses out those things into a nice column.

4   Q    So the programs allow you, or the programs separate the data

5   into different categories?

6   A    Oh, absolutely.

7   Q    And do the programs also find data in what's referred to as

8   unallocated space?

9   A    Yes.

10  Q    And can you explain what unallocated space is?

11  A    Unallocated space, or deleted space, as many of you probably

12  know it, is, on a computer a person has a picture, video,

13  something they don't want any more.  So you click it, drop it

14  over and drop it in your trash can, or right click and hit

15  delete.  Well, what happens is that is still there.  You can't

16  see it any more.

17          So with every file, every video, there's what's called

18  a header.  And it has a certain designator that says on the video

19  I reside and I live here.  When you delete it, what happens is it

20  changes some of those characters.  Say with your video, your

21  image, let's say AB is what it's known as.  So when it changes

22  it, for example, it changes them all to AA when you hit delete.

23  What that tells the computer is, hey, I'm here, I'm available to

24  be overwritten.  But until it is overwritten, that file, that

25  image, that video, is still there.

1          So let's say a person has a video that's two gigs.

2   Well, you delete it, it's still there.  It just changed that

3   coding at the very beginning.  It says, hey, I got two gigs that

4   can be overwritten.  Now, how long and when does it get

5   overwritten?  Who's to say?  It's when the computer gets around

6   and says, hey, I got free space right here and then it overwrites

7   on to that.  But until then, it's recoverable, especially by

8   those of us in forensics because our tools do great jobs at

9   finding those things.

10  Q    Now, in this case when you ran your tools to look for

11  categories and various Internet artifacts and unallocated space,

12  things like that, did you then review the results of that

13  examination or the report or the data that the programs kick out?

14  A    Yes.

15  Q    And what do you generally do with that?  What did you do

16  with it in this case?

17  A    As I was saying, it breaks it down into columns.  So there's

18  searches for web histories.  It breaks it into images, videos.

19  And it also will tell us if it's in allocated space, which is

20  what you can see.  And it shows the file path in most instances.

21  But it also shows me the unallocated space.  And with those, same

22  as I do everything else, if I think it is relevant to the case, I

23  will bookmark it, and then it goes into my report for the case

24  agent to review.

25  Q    Now, moving to the phone, what steps did you take to extract

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          34

1    data from the phone, and to examine that?  Can you give us the

2    overview of that?

3    A    Yes.  As I said before, the phone has to be fully charged.

4    I open up my Cellebrite mobile device, plug it in.  And it

5    actually shows me the phone.  I push the button.  And then it

6    says what kind of extraction do you want to do?  In this case, I

7    was given the option to do a full physical extraction.

8              What a physical extraction is, it grabs all the data

9    file systems, images, videos, everything about that phone.  It's

10   able to capture that data and put into a reader view.  And then

11   it opens it up into a different program where I can go through

12   and bookmark all of these things as well.

13   Q    Now, as to all the devices, were they, while they were being

14   copied, so those devices that were being copied, as well as the

15   tools that you were using to copy them, were any of those

16   connected to the Internet --

17   A    No.

18   Q    -- or to wifi?

19   A    No.

20   Q    Did you confirm, were you able to confirm that all of the

21   data in your reports and in the data that was created or copied

22   by your programs, were you able to confirm that all of that data

23   came from the devices that you examined?

24   A    Yes.

25   Q    Before we get into what you found on the devices, I want to

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          35

1    review a couple other terms that you may discuss.  You've already

2    talked about unallocated space.  You said that's essentially the

3    same as what people commonly refer to as deleted space, is that

4    right?

5    A    Yes.

6    Q    Another term you may discuss is thumbnails.  Can you discuss

7    what thumbnails are and how they're created?

8    A    Thumbnails is individuals, is they're looking at images.

9    Your computer, in order to speed up everything, will create

10   what's known as a thumbnail.  So you have your original image.

11   You put it into a folder.  But when an individual wants to look

12   at it, it has to go a long way around.  So the system says, well,

13   they might want to look at this.  So it creates a copy of your

14   original image, reduces it in size, and puts it into -- which

15   we'll talk about here in a few -- is a cache folder.  What that

16   does is it allows your computer to quickly bring up those images

17   so you can view them without having to go the long way around to

18   find your, the image of what you're looking for.

19          So by being able to do that, it also decreases the

20   amount of time the computer takes processing, trying to find your

21   original.  So, therefore, it caches it with that information.

22   You click on it, boom, it comes right up.  And you can look at

23   multiple and more photos at one time.

24          So if someone, let's say someone downloads a folder of

25   family reunion photos.  And you click on it and you see all of

1    those photos that come in -- you're looking through them very

2    quickly because you're looking for the one of Aunt Martha --

3    those are thumbnails.  It's created by the system to allow you to

4    sort very quickly and go through those images.

5    Q    So you've just given like an everyday example of looking at,

6    let's say, image files in a Microsoft Windows folder --

7    A    Yes.

8    Q    -- in an icon view.  And when people look at the icon, they

9    see the image, right?

10   A    Yes.

11   Q    They're not actually seeing the whole file, are they?

12   A    No.  They're looking, you're looking at a copy of the

13   original.  It's not the original.

14   Q    And the computer makes that automatically and puts it on top

15   of the icon?

16   A    Yes.

17   Q    Let me ask you first sort of another everyday example.  What

18   if that file, instead of an image file, was a video?  Would a

19   thumbnail be created of a video?

20   A    Yes, typically of the first frame, especially with AVI

21   format, it will create the first frame of that video so you have

22   your reference when you're looking through your stuff.  You will

23   see the first frame of that picture and you go, oh, that's the

24   video of the family reunion.

25   Q    One other everyday example.  If someone is looking at

1    folders in the icon view, sometimes they might see an image or

2    something on the folder other than just that yellow file folder.

3    What is that?

4    A    Correct.  That's showing some of the pictures.  But once

5    again, it's a copy.  And if you clicked on it, then you would see

6    those, those images, those thumbnails within that folder.

7    Q    And that smaller copy of the file, that thumbnail, is saved

8    somewhere on the computer?

9    A    Yes, in the cache files.

10   Q    What happens if the file, let's say you've looked at the

11   family photos like you discussed and you delete three of the ten

12   photos, so the file is gone.  Where is the, what has happened, if

13   anything, to the three thumbnails that were created when the user

14   looked at that folder in the icon view?

15   A    They would still be remaining in the cache folder.

16   Q    Mr. Gibson, if you were to do a forensic examination and you

17   found a thumbnail file, but you did not find the associated

18   original or larger file, what would you conclude?

19   A    That the original had been deleted.

20   Q    And would you also conclude that the original had been on

21   that computer at one time?

22   A    Yes.

23   Q    You said "deleted."  Could it also have been moved?

24   A    Yes.

25   Q    Within the computer?

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          38

1    A    Or to another, to another drive.

2    Q    Another term I'd like you to describe is EXIF data.  Can you

3    describe what EXIF data is and what type of data it usually

4    consists of?

5    A    EXIF stands for Exchangeable Interface Format.  And

6    basically within images it has data that can be embedded into the

7    photographs, especially now that we have digital cameras.  A lot

8    of times, based on the program which wrote the EXIF or metadata,

9    you will end up with dates that it was created, sometimes how

10   many pixels, you know, the settings that were on the camera.  If

11   any of you are into photography, you'll know that you can go in

12   and look and it will tell you the settings of your camera.  In

13   some instances it will give you GPS location.  Typically, it will

14   give you dates of when it was created.  And a lot of times these

15   cannot be changed.

16   Q    And that EXIF data, does it necessarily -- let me go back to

17   your earlier, we talked about unallocated space.  If you take a

18   file and you delete it, or you think you delete it, and it goes

19   to unallocated space, when the file is in unallocated space, does

20   it necessarily have any or all of that EXIF data still with it?

21   A    No.

22   Q    Might it have some and not others?

23   A    Correct.

24   Q    Your Honor, I'm happy to continue but I'm also at a natural

25   breaking point.  If you were thinking about a mid-morning break,

1    this would be a good time.

2          THE COURT:  All right. I'll ask counsel to stick around

3    for a moment.  Ladies and gentlemen, we'll excuse you for a short

4    break.

5          (Jury exits the courtroom at 11:20 a.m.)

6          THE COURT:  You can step down.  You can be seated.

7          (Witness exits the courtroom.)

8          THE COURT: I understood there might be an issue before

9    the remainder of his testimony?

10         MR. BUDLOW:  Yes, Your Honor.  Not quite there yet, but

11   close, so I'm happy to address it now.  I think that makes the

12   most sense because we might get there before the lunch break.

13   We're obviously a little behind based on our technical

14   difficulties.

15         THE COURT:  Sure.

16         MR. BUDLOW:  Your Honor, we are prepared to display to

17   the jury very briefly, probably a second to a second and a half

18   each, some images in the videos as we've described, which have

19   been narrowed down as much as we can.  In preparing Mr. Gibson

20   and in reviewing my notes for this, it occurred to me to address

21   this with Your Honor again.  I know the defense has objected to

22   the descriptions and I just wanted to get clarification.  Also, I

23   ask the Court to rule on that and ask that they be admissible.

24         What I had found is that there's portions of these

25   exhibits that we've discussed that, first of all, describe

1    whether or not they're sexually explicit conduct.  They go into

2    background information.  I'm sorry.  A couple ways to read that

3    term.  The background of the file that's particularly relevant.

4    Some of the files are, a couple are hard to see what images, what

5    portion of the image is sexually explicit.  To be clear, there's

6    only one or two like that.  Most of these are painfully clear.

7    But there are a couple that need little special, more special

8    attention.

9            I'm also concerned with the record sort of supporting

10   what the files are without having to look at the images.  And so

11   to me, Your Honor, it would, given how quickly we're going to

12   take these images on and off the screen, if the jury's not given

13   a guide as to what they're about to see or what to look for -- I

14   have looked at these images many times.  I know exactly where the

15   things are.  I just don't think they're going to have enough

16   direction to process what they need to process.

17           I believe that in terms of the descriptions that we

18   have provided -- and I'll let the defense speak to this -- I

19   don't think there's any dispute as to the content.  I certainly

20   understand their objection that they be read.  And there might be

21   one or two, there is a little back and forth on these issues.

22   And I think that we have made the corrections suggested by the

23   defense with respect to the descriptions.

24           THE COURT:  Okay.  This is the three-page document,

25   you've given me a copy of as well, possessed known images.  I

1    thought the defense objection was just that it was sort of

2    duplicative to have the description and the picture.  But if

3    there's something else.

4            MR. BUDLOW:  That's my understanding.

5            THE COURT: Ms. Oyer?

6            MS. OYER:  That's all, Your Honor.

7            THE COURT:  Okay.  Then in that case I'll overrule it.

8    I agree because part of the point of this is to be able to show

9    the picture for the very shortest time possible.  And I do think

10   having a description that is accurate in content read before the

11   image is shown would make sense and be helpful to the jury.

12           MR. RILEY:  Your Honor, if I may, with respect to the

13   description.  I gave Ms. Moye a copy of the updated version, a

14   corrected typo.  We were missing the word "female" in one of the

15   descriptions.  And we also put them in order, Your Honor.  So if

16   I could give the updated copy.

17           THE COURT:  Sure.

18           MR. RILEY:  Apologize, Your Honor.  We're going to give

19   you a marked version.

20           MR. BUDLOW:  We're discussing this.  There's an

21   objection to it.  I'm going to mark, the one that we're providing

22   is Government Exhibit 51 for identification purposes only.

23           THE COURT:  Is that what you just handed me or what

24   you've given Ms. Moye?

25           MR. RILEY:  It's the same document, Your Honor.  Ms.

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          42

1    Moye has the same document that you're looking at.

2             THE COURT:  Does she have one with an exhibit?

3             MR. BUDLOW:  No.  That's the only one with the exhibit

4    number.  They're identical otherwise.

5             THE COURT:  Then let's trade.

6             MR. RILEY:  Thank you, Your Honor.

7             THE COURT:  I'm looking at two copies of a document.

8    I've given the 51 for identification to Ms. Moye, so that's

9    clear.  I'm looking at something that has 29-A, Count Seven.

10            MR. RILEY:  Correct, Your Honor.  That's the exact same

11   document that I handed Your Honor.

12            THE COURT:  Okay.

13            MR. RILEY:  Just one is marked and one is not.

14            THE COURT:  That's what's going to be used for purposes

15   of the testimony?

16            MR. RILEY:  Yes, Your Honor.

17            THE COURT:  All right.

18            MR. BUDLOW:  Your honor, from the government's

19   perspective, there's no other -- that was the only issue we

20   needed to raise.

21            THE COURT:  Okay.  Anything else at this point?

22            MS. OYER:  No, Your Honor.

23            THE COURT:  Okay.  All right.  I'll see you after the

24   break.

25            (Recess at 11:26 a.m.  Resume at 11:37 a.m.)

1          THE COURT:  Bring in the jury.

2          (Jury enters the courtroom at 11:37 a.m.)

3          THE COURT:  You can all be seated, please.  All right.

4    If you'd like to continue.

5    BY MR. BUDLOW:

6    Q    Yes.  Thank you, Your Honor.  Mr. Gibson, let's talk about

7    your examination of the devices.  Is one of the tasks that you

8    perform when examining the results of the forensic exam is to

9    look for files and other data to indicate who the user of the

10   device or devices is?

11   A    That is correct.

12   Q    And did you do that with respect to the phone, Government's

13   Exhibit 1-A?

14   A    Yes.

15   Q    And 1-B, the SD card?

16   A    Yes.

17   Q    Generally speaking, what types of files did you find that

18   are indicative of the user?

19   A    I found image files, as well as PDF documents.

20   Q    Did you also find data files relating to the calendar items?

21   A    Yes.

22   Q    And did you assist in making exhibits for trial using those

23   files that you found?

24   A    I did.

25   Q    And do these files that we're going to review in these

1    exhibits account for all of the photos or documents or other data

2    that you found --

3    A    No.

4    Q    -- on the devices?

5    A    It's just a small sampling.

6    Q    I want to start with Government's Exhibit 33-A.  Are these

7    the image files that you found on the Samsung phone?

8    A    It is.

9    Q    All right.  We'll review the six image files that are part

10   of Government's Exhibit 33-A, starting with Page 1. Can you

11   describe what that file is?

12   A    It's a check from Heritage Mazda Bel Air to an Eric Wayne

13   Grinder.

14   Q    And what's the date of the check?

15   A    July 28th, 2016.

16   Q    Page 2.

17   A    This is an image of a screenshot, it's an image of a

18   computer screen, basically dealing with --

19   Q    Without getting into the content, is it a picture of an

20   email?

21   A    Yes.

22   Q    And whose name is at the bottom of the email?

23   A    Eric Wayne Grinder.

24   Q    Page 3?

25   A    This was an image of a court document between Eric Wayne

1    Grinder and Heidi Jo Grinder.

2    Q    Page 4?  There you go.

3    A    This was an image file or image of a computer screen for

4    Grinder monthly finances.

5    Q    And what name is on the far right top side?

6    A    Eric take home.

7    Q    Page 5.

8    A    This was a, something to do with children and the parents,

9    guardians, with the names of Heidi Grinder and Eric Grinder.

10   Q    Page 6?

11   A    This is a cross tattoo, color cross tattoo, which appears to

12   be on the males, shirtless.

13   Q    Now, moving on to the documents that you found on the

14   Samsung phone.  Government's Exhibit 33-B is on the screen.

15   That's a five-page document.  Was that a PDF?

16   A    Yes, it is.

17   Q    And what kind of document was that?

18   A    It's a Navy Federal Credit Union bank statement.

19   Q    In whose name?

20   A    Eric W. Grinder.

21   Q    Another document from the phone, 33-C.  Can you tell us what

22   that is?  That is a three-page document that was on the phone?

23   A    Yes.  It's a Comcast bill in the name of Eric Grinder.

24   Q    And what's the date for the payment due, according to the

25   bill?

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          46

1    A     July 22nd, 2016.

2    Q     33-D.  This, again, is another document from the phone,

3    correct?

4    A     Correct.  It's a State Farm Insurance homeowner's rate quote

5    to Grinder, Eric and Alisha.

6    Q     And the effective date of the quote?

7    A     June 7th, 2016.

8    Q     33-E?

9    A     This was for a request for repairs, inspection addendum to

10   Eric and Alisha Grinder.

11   Q     And this is a 33-page document, right?

12   A     Correct.  With the date of May 28th, 2016.

13   Q     All right.  33-F.  This is not a photo or a document that

14   you found on the phone, correct?

15   A     Correct.  This is, if you remember telling you my tools,

16   this is from my Cellebrite mobile forensics tool.  And it parses,

17   once again, different things.  And if an individual has written

18   on the calendar, it will actually separate that data out, which

19   is what you're seeing here, is a screenshot from my actual

20   forensic tool.

21   Q     And can you review line one, the subject and the start and

22   end date, please?

23   A     45 days for house.  September 7th of 2015.

24   Q     And do you know what the start date column references in

25   this exhibit?

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW   47

1   A    That's the timestamp of when it was entered.

2   Q    So the entry, 45 days for house, was entered on September

3   the 7th, 2015?

4   A    Correct.

5   Q    How about Line 2?

6   A    MG glasses.

7   Q    And what's the entry date of that item?

8   A    February 5th, 2016.

9   Q    Let's move to the SD card.  Did you also look for evidence

10   on the SD card, one, which is Government's Exhibit 1-B, of who

11   used that?

12   A    Yes.

13   Q    What types of files did you find about who used it?

14   A    Images.

15   Q    And did you prepare an exhibit?

16   A    I did.

17   Q    Showing you Government's Exhibit 49-A.  This is a 13-page

18   exhibit.  Were these all, this 13 different image files?

19   A    Yes.

20   Q    Starting with Page 1.  This looks familiar.  This is not

21   from the phone, though.  This is from the SD card, correct?

22   A    Correct.

23   Q    What is this an image of?

24   A    It's the Heritage Mazda Bel Air check to Eric Wayne Grinder

25   with the date of July 28th, 2016.

1    Q     Page 2?

2    A     This is a check from Eric W. Grinder to RE/MAX Advantage

3    Realty.

4    Q     Dated May 18th, 2016?

5    A     Correct.

6    Q     Page 3?

7    A     This is an image of a Blue Cross/Blue Shield card in the

8    name of Eric W. Grinder.

9    Q     Page 4?

10   A     This is an image of a computer screen where someone is

11   ordering a, looks like for a birth certificate.

12   Q     Let me ask you a question about that.  The birth

13   certificate's in the name, last name Grinder?

14   A     Yes.

15   Q     And the first name on the screen, is that you know to be one

16   of Mr. Eric Grinder's children?

17   A     Yes.

18   Q     Government's Exhibit 5.  I'm sorry.  Government's Exhibit

19   49-A, Page 5.

20   A     This is a birth certificate.

21   Q     It's an image file of that birth certificate?

22   A     Yes.

23   Q     It's kind of blurry, would you say?

24   A     Yes, it is.

25   Q     Were you able to make out the last name on the exhibit?

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          49

1    A    Yes.  Grinder.

2    Q    Page 6.

3    A    This is an image of a, looks like a dental bill for services

4    that were rendered to, in the last name of Grinder.

5    Q    Again, one of the defendant's children?

6    A    Yes.

7    Q    And what's the date range on this exhibit?

8    A    August 20th of 2015.

9    Q    Page 8?

10   A    This is a Maryland vehicle emissions.

11   Q    Is that for a 2008 Chevy?

12   A    Yes.

13   Q    Page 9?

14   A    This is a selfie or appears to be a selfie of an individual

15   who was seen throughout the device.  So I took some of these.

16   Q    Page, let me get to Page 10.

17   A    This is another, appears to be another selfie of the same

18   individual noted throughout the device.

19   Q    Different picture, different shirt?

20   A    Yes.

21   Q    Page 11.

22   A    The same individual without a shirt.

23   Q    Page 12?

24   A    A colorful cross tattoo on, on the back of a shirtless

25   individual.

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          50

1    Q    And, lastly, Page 13.

2    A    Appears to be tattoo of a forearm with Asian lettering.

3    Q    Just to find a similar video to one of these images on the

4    SD card.  Did you find a video related to that tattoo?

5    A    Yes.

6    Q    And is it Government's Exhibit 49-B, that video?

7    A    Yes.

8             (Video playing.)

9    Q    Let me just play that video.  That was about eight seconds.

10   Can you describe what it was, what it depicted?

11   A    Appears to be a male, shirtless, with a colorful cross

12   tattoo in the center of their back.

13   Q    Same tattoo, appear to be the same tattoo from that picture

14   that you showed us moments ago?

15   A    Yes.

16   Q    And did you also look for evidence of who used the laptop?

17   A    Yes.

18   Q    And did you again find images and documents relating to the

19   user of the laptop?

20   A    Yes, I did.

21   Q    And you helped prepare exhibits of those?

22   A    Yes.

23   Q    Showing you Government's Exhibit 28-A, Page 1.  Is this one

24   of those images that you found on the laptop?

25   A    Yes, it is.  Appears to be a shirtless male once again that

1    I found numerous images of throughout the device.

2    Q    And Page 2?

3    A    This is a tattoo, appears to have Asian lettering, that was

4    also discovered.

5    Q    And these were both image files that were found on the

6    laptop?

7    A    Yes.

8    Q    28-B.  This a single-page PDF that you found on the laptop?

9    A    Yes, it is.

10   Q    And this is the first page of that RE/MAX inspection request

11   for repairs in the name of Eric and Alisha Grinder at 261

12   Montpelier Court?

13   A    Correct.

14   Q    28-C.  Is that a resume?

15   A    It is.  In the name of Eric Grinder.

16   Q    What was the file format?  You talked about documents in

17   PDF.  Was this a PDF?

18   A    No.  This was a Microsoft Word document on the desktop.

19   Q    28-D?

20   A    The Blue Cross/Blue Shield card in the name of Eric Grinder.

21   Q    This was an image file on the laptop?

22   A    Yes.

23   Q    And 28-E?

24   A    Image file of the CVS prescription card in the name of Eric

25   Grinder.

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          52

1    Q    All right.  Does the computer forensic program that you use

2    produce results relating to how a computer is used?

3    A    Yes.

4    Q    And can you give some examples?  What types of categories or

5    reports do you get about the use of the computer?

6    A    As I said before, my forensic tools are pretty

7    comprehensive.  So they will break down computer searches such as

8    Google searches, search terms, different browser histories.  If

9    he's going to using different browsers, it will identify those,

10   Explorer versus Firefox, Google search engine.  Pornography URLs.

11   It will parse out all of these different things so that I can go

12   through them and look at them very easily.

13   Q    And you checking off boxes when you run the program to

14   determine different things that you might want the program to

15   look for that aren't standard?

16   A    Yes.

17   Q    And does that include -- and we'll discuss more about this

18   later -- peer-to-peer file sharing programs?

19   A    Yes.

20   Q    Does it include link files?

21   A    Yes.

22   Q    You mentioned browsers.  Can you very briefly tell us what

23   the primary browser is that everybody knows about and then what a

24   browser is?

25   A    Internet Explorer is a browser.  And then Google Search, as

1    we do it, people use Google Search, or they will use Firefox web

2    browser and then Google within it.

3    Q     Is Chrome also another browser?

4    A     Yes.  Different browsers have different security.  That's

5    why they're different companies.  And they all tout different

6    things that they can do better than the other.

7    Q     What is a link file?

8    A     A link file is a shortcut to another file.  If a person has

9    an icon and you'll see a little arrow on your windows, and you

10   click on it and it opens up a program.  Well, the program is not

11   running from there or that image or video is not residing there;

12   it's residing somewhere else in your computer.  But clicking on

13   that little shortcut is actually a link file.  It links it to the

14   real file that you're wanting to watch or view.

15   Q     And the link files we're going to talk about in this case

16   are those that were made automatically by the computer?

17   A     Yes.

18   Q     Let's start with peer-to-peer.  Are you familiar generally

19   with peer-to-peer file sharing programs?

20   A     Yes.

21   Q     Can you briefly provide an overview to the members of the

22   jury of what a peer-to-peer file sharing program is?

23   A     A peer-to-peer file sharing program is, basically allows one

24   individual to share resources with another individual without

25   anything in between.  So this, this individual is considered a

1    node and this person is considered a node.  And there can be

2    hundreds, if not thousands, of individuals all part of it.  The

3    thing of it is is it doesn't require anything in the middle.  In

4    other words, you don't have to have a server to go between, you

5    don't need a host, because each one of you is sharing directly

6    with the other.  So that's the beauty of the peer-to-peer file

7    sharing is you can get images, videos, and resources from a

8    number of individuals, but while you're downloading your image or

9    video, you're also uploading it and sharing with other

10   individuals.  But you don't need Google.  You don't need an

11   internet browser to assist you.

12   Q    It's just connecting computer users directly to each other?

13   A    Yes.  If an individual shares a computer, shares computers

14   in their house, they're basically creating a peer-to-peer

15   network.

16   Q    Now, did you find any evidence of peer-to-peer file sharing

17   programs on the laptop?

18   A    Yes.

19   Q    And was it something that was installed at the time of your

20   analysis on the laptop or was it something that appeared to have

21   been removed?

22   A    It appeared to have been removed.  It was on there at one

23   time.

24   Q    What was the last thing you said?  It was what?

25   A    It had been on there at one time.

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          55

1    Q    And what was the name of the peer-to-peer file sharing

2    program that you found?

3    A    EMule.

4    Q    EMule.  That's E capital M-U-L-E?

5    A    Correct.

6    Q    You're not an EMule expert, are you?

7    A    No.

8    Q    Are you generally familiar with it?  Have you testified

9    about it in other cases?

10   A    Yes.

11   Q    Have you seen it in other cases?

12   A    Yes.

13   Q    Have you located it -- well, strike that.  Does EMule have a

14   search function?  Does the EMule program on someone's computer

15   have a search function?

16   A    Yes.

17   Q    And is that how users find files from other peers?

18   A    Yes.

19   Q    Did you find the search key words "EMule log" on the Toshiba

20   laptop hard drive?

21   A    Yes.

22   Q    Did you find any other EMule logs that you sometimes find in

23   these examinations?

24   A    No.

25   Q    Just the one log?

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW     56

1   A    Just the one.

2   Q    And did it have search terms in it?

3   A    Yes.

4   Q    How many search terms in that log?

5   A    One.

6   Q    Did you direct the forensic program to look specifically for

7   peer-to-peer programs and associated logs, whether they were

8   deleted or not?

9   A    Yes.

10  Q    Did you create an exhibit of this log using your forensic

11  program?

12  A    Yes.

13  Q    Showing you Government's Exhibit 30-A.  Is that the exhibit?

14  A    Yes, it is.

15  Q    And what is that?

16  A    That is the EMule search keyword that my forensic tool was

17  able to pull.

18  Q    And as you stated, it only reflects one search?

19  A    Correct.

20  Q    There's no date and time associated with that search?

21  A    No.

22  Q    Where was the file, this EMule found on the computer?

23  A    Well, my forensic tool pulls it up as search terms, and

24  peer-to-peer search terms.  And, therefore, it was the EMule

25  search term.

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW   57

1   Q   And you mentioned that this program had been deleted.  So

2   was this somewhere in unallocated space?

3   A   Yes.

4   Q   And so the search term, could you read it, please?

5   A   PTHC.

6   Q   Are you familiar with that combination of letters?

7   A   Yes.

8   Q   And how is it that you're familiar with that combination of

9   letters?

10   A   Through my experience and training and utilizing it in other

11   cases.

12   Q   Is that an acronym?

13   A   It is.

14   Q   What does it stand for?

15   A   Pre-teen hard core.

16   Q   And in your experience in investigating and working on these

17   kind of cases, when you see "pre-teen hard core" as a search

18   term, what types of files specifically is that looking for?

19   A   Typically prepubescent sexual, sexual intercourse.

20   Q   Did you prepare other exhibits relating to the computer's

21   internet and search histories?

22   A   Yes.

23   Q   Showing you Government's Exhibit 30-B.  What is this?

24   A   These are the link files that were, that I selected that

25   were from my, one of my forensic tools.

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          58

1    Q    And there's only four, is that correct?

2    A    Four that I marked, yes.

3    Q    So this isn't the only four link files on the computer;

4    these are the four that you chose in preparation for trial that

5    you found relevant, correct?

6    A    Correct.

7    Q    Could you give us the date range of these four files?

8    A    2011 and -- are you wanting the full date range or just the

9    years?

10   Q    Just -- they're all from 2011, is that correct?

11   A    The top one is from 2013, with the last access date of 2014.

12   Q    And can you, starting with, actually, Line 2, can you tell

13   us what the linked file path is?  You can begin after the

14   numbers, number 57.

15   A    Saint Petersburg Russian Lolita 9YO blow hand mpg niece PTHC

16   comma dot QT.

17   Q    During your experience and training investigating child

18   exploitation cases, you're familiar with the term "Lolita?"

19   A    Yes.

20   Q    And what is that?  Is that a common search term in child

21   pornography, in child exploitation cases?

22   A    Yes, it is.

23   Q    All right.  Now, Line 3.  Starting again after the numbers.

24   Reading after the number 68 dash.  Could you read that?

25   A    13-year-old fucks her dad must see (girl sex porn pussy ass

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          59

1    tit r@y PTHC sister incest incest girl fuck hard core Vicki Leela

2    swan com nude naked PRI 54 CE, or priceless, mature 13 YO, 14 YO,

3    15Y.mpg.

4    Q    What's .mpg?  What kind of file is that?

5    A    I'm sorry?

6    Q    What kind of file is MPG?

7    A    It's a media file, it's a movie.

8    Q    And then we see the letters -- it's a little bit cut off

9    here -- R@Y.  You already said what PTHC is.  What's that R@Y?

10   A    It stands for Roy Gold.

11   Q    And is that a term that you see commonly in child

12   exploitation investigations?

13   A    Yes.

14   Q    And does that term refer to child pornography?

15   A    Yes.  Roy Gold was one of the, considered one the

16   forefathers of pre-teen sex.

17   Q    And here we see 13 YO and 14 YO.  Is that something you

18   typically see in these investigations?

19   A    Yes.

20   Q    And what does the YO stand for?

21   A    Year old.

22   Q    At the beginning of the bottom three, we see C:/ and then

23   user/Eric.  My first question is with respect to the laptop

24   computer, was there only one user?

25   A    Yes.

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW                60

1    Q    And the name of that user was Eric?

2    A    Yes.

3    Q    What is the significance of the C:/ with respect to these

4    link files?

5    A    It shows the drive letter, that's the drive letter of where

6    the file was linked, the target to it.

7    Q    And where's the C drive in most Microsoft computers?

8    A    It's the main, it's the main drive where you program files

9    and everything else.  Your downloads and everything will be on

10   the C drive.

11   Q    And then the top line, what about the E drive?

12   A    That could have been a USB or another external drive that

13   was connected to it.

14   Q    Some sort of memory device or drive that was connected to

15   the laptop?

16   A    Yes.

17   Q    Can you read the top line?

18   A    Nine YO Vicki-sucker.AVI.

19   Q    All right.  Moving to 30-C maybe.  This Exhibit 30-C is

20   titled Google Searches.  Can you explain what this is?

21   A    Once again, my forensic tool is able to parse out the

22   various things.  One of the things it does is it parses out the

23   Google searches.  These are actually what the individual typed

24   in.  You know, when you bring up Google and you type in what

25   you're looking for, it records it.

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          61

1   Q    And in terms of the date range of these searches, is this

2   from early as February 2012 and as late as September 2012?

3   A    Yes.

4   Q    And is this all the Google searches that your forensic

5   program showed or just the ones that you selected for use at

6   trial?

7   A    Just the ones I selected.

8   Q    And where -- actually, strike that.  In terms of the search

9   terms that we see in this exhibit, there's other exhibits that

10  are prepared, such as Firefox web history and Firefox artifacts.

11  Might they contain potentially repetitive entries because the

12  user was using a different browser to search Google?

13  A    Yes.

14  Q    So these Google searches could show up in a couple different

15  places?

16  A    Correct.

17  Q    All right.  I'd like you to read a couple lines.  Let's

18  start with one, three, and six.

19  A    Number one.

20  Q    If you can give us the number when you read it.  Thank you.

21  A    Number one, daughter rape movies.  Number three, PTHC

22  movies.  And number six, incest rape movies.

23  Q    Nine, ten and eleven?

24  A    Number 9, virgin rape movies.  Number 10, underage rape

25  movies.  And 11, pre-teen rape movies.

1   Q     And lastly for now, 15.

2   A     Daddy daughter rape movies.

3   Q     Showing you now Government's Exhibit 30-D.  Explain, this is

4   called Firefox web history.  What is this?

5   A     Firefox is a web browser, much like Chrome or Internet

6   Explorer.  And Firefox has a little bit more security so people

7   think it's a little more anonymous.

8   Q     But the computer programs that you use, the forensic

9   programs, were able to find some history from the Firefox web

10  activity, correct?

11  A     Yes.

12  Q     Again, this is not all of that history, just what was

13  selected for use at trial?

14  A     Correct.

15  Q     And the date range on these, again, is from February 2012

16  through September 2012, is that right?

17  A     Correct.

18  Q     I just want you to read -- again, this entire exhibit, we'll

19  have some lines that were duplicative of the earlier exhibit,

20  right?

21  A     Yes.

22  Q     I'd like you to read the third and the fourth lines.  Hold

23  on.

24  A     So number three will be --

25  Q     I'm sorry.  The last, of the three bottom lines, I want you

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          63

1    to read all but the second to last.

2    A    Incest family orgies.  Dad fucking daughter incest family.

3    All rape videos, virgin daughters, incest family rape movies,

4    search.

5    Q    Showing you now Government's Exhibit 30-E.  Firefox session

6    store artifacts.  Can you explain what that is and how it

7    compares to Firefox web history?

8    A    Yes.  The Firefox session store artifacts is the last active

9    session he was running when he was in Firefox.  So it recorded

10   his very last active session that he was doing.

11   Q    And did not provide any dates associated with those, is that

12   correct?

13   A    No, it does not.

14   Q    But you can conclude that they were -- can you conclude that

15   they were at least as late as the last date in the Firefox web

16   history?

17   A    Yes.

18   Q    All right.  And again, there's some repeat in here?

19   A    Yes.

20   Q    And there is -- you selected these.  This is not all of the

21   results?

22   A    Correct.

23   Q    If you could read the first and the third lines.

24   A    The first is dad rape porn video archive, Mom and Daddy, Dad

25   rape sex movies parental collection.  And the third is Dad and

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          64

1    uncle rape stepdaughter search X videos.com.

2    Q    Showing you now Government Exhibit 30-F.  This is called

3    internet main history.  These are names that your computer, your

4    forensic program names the categories, is that right?

5    A    Correct.

6    Q    What's the internet main history?

7    A    This is from the Internet Explorer browser because it breaks

8    them down to the different browsers.

9    Q    And then you selected the three?

10   A    Yes.

11   Q    You selected the lines here.  There's just three, right?

12   And what are the dates associated with these three lines, if you

13   could just -- I'll just read it.  Line one's December 5th, 2011.

14   Line 2, February 10th, 2012.  Line 3 is December 26, 2011.  Is

15   that right?

16   A    Yes.

17   Q    These were the only three in internet main history or the

18   only three you selected?

19   A    The only three I selected.

20   Q    Can you read the first line?

21   A    Incestmovies.org.

22   Q    And then the second line starting from with the cursor is?

23   A    It would stand for Ray Gold or the R@Y Gold, PTHC.

24   Q    Oh, I'm sorry.

25   A    Sup slave.  And that's it.  And then the third one is --

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          65

1    Q    That's all right.  You don't need to move read the third

2    one.  Moving on to 30-G.  This is called Internet Explorer

3    privacy record.  Can you explain how this is different from

4    Internet Explorer main history?

5    A    Yes.  This one, with these he just turned on the privacy

6    settings within Internet Explorer.  Once again, a lot of times

7    they believe they get, the individual believes they get more

8    anonymity from being tracked.

9    Q    So this is in some kind of privacy browsing mode, correct?

10   A    Yes.

11   Q    Is this all of the results from that privacy mode?

12   A    No.  It was not.

13   Q    And the date range of these results is all from December

14   15th, 2013?

15   A    Correct.

16   Q    And all of these, with a few, with the exception of a few,

17   are images that end in JPEG, JPG?

18   A    Yes.

19   Q    Those are image files?

20   A    Yes.

21   Q    And can you read the line after the 927 underscore, where

22   the cursor is?

23   A    Hello underscore Daddy.

24   Q    So that, you just described some of the activity you found

25   on the laptop computer.  Let's go back to the Samsung phone.  Did

1   you also find evidence of various applications that were used by

2   the phone?

3   A    Yes.

4   Q    And was one of those applications called DuckDuckGo?

5   A    Yes.

6   Q    And do you know what the, what is the DuckDuckGo

7   application?

8   A    DuckDuckGo is a search engine which prides itself on not

9   tracking users and not allowing cookies to be downloaded on to

10  your device, which people utilize to track or send you

11  advertisements and that kind of stuff.  So the website will send

12  cookies.  DuckDuckGo prevents that, or at least they claim.

13        And then they also claim to be able to, you won't be

14  able to, no one will be able to track your web history and that

15  kind of stuff.  But one of the things that it doesn't tell you is

16  that you have to have your settings done correctly for it not to

17  record that.

18        So DuckDuckGo is a search engine for, that prides

19  itself on privacy.

20  Q    And were you able to determine or was the forensic program

21  able to determine on what date the DuckDuckGo application was

22  installed on the phone, Government Exhibit 1-A?

23  A    Yes.

24  Q    And when was that?

25  A    December 15th.

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          67

1    Q     What year?

2    A     I believe -- excuse me one second while I look at my notes.

3    2000 -- one second -- 2015.

4    Q     And did you create an exhibit relating to the data on the

5    phone from the DuckDuckGo application?

6    A     Yes, I did.

7    Q     I'm showing you first Government's Exhibit 33-G.  This is

8    referenced, it's titled Databases Visited.  24 entries.  Are

9    these the only 24 entries that were on the phone or in the data

10   or just the 24 that you selected?

11   A     Just the 24 that I selected.  There were actually hundreds.

12   Q     It's titled Databases Visited, but is it fair to say it

13   lists web sites that were visited by the DuckDuckGo application

14   on the phone?

15   A     Yes.

16   Q     And were there roughly 500 or so entries, at least?

17   A     Yes.

18   Q     And the date range for those entries goes from December

19   17th, 2015 to April 21st, 2016, is that right?

20   A     Correct.

21   Q     I'd like you to read just a few selected lines.  Let's start

22   with 3, 6 and 7.  They all have HTTP underscore at the beginning.

23   So if you could just pick up from there, up until the last

24   underscore.

25   A     Number three is Lolataboo.com.  Number six,

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          68

1    incesttabootube.org.  I'm sorry.  What was the last one?

2    Q    Seven.

3    A    And seven is realincesttube.org.

4    Q    Ten?

5    A    Number 10 is Daddyfucksdaughter.net.

6    Q    16?

7    A    Daddaughtertaboo.cc.

8    Q    17?

9    A    Cumindaughter.org.

10   Q    And 22 and 24?

11   A    Actualincesttube.org.  And 24, dadscamera.com.

12   Q    In addition to the websites visited from that exhibit, 33-G,

13   were you able to locate a search history, in other words,

14   searches that were entered into the DuckDuckGo application from

15   the phone?

16   A    Yes.

17   Q    And did you create an exhibit relating to the search

18   history?

19   A    I did.

20   Q    Showing you Government's Exhibit 33-H.  This is a Page 1 of

21   8, is that correct?

22   A    Yes.

23   Q    And is this exhibit the entire search history?

24   A    Yes.

25   Q    And even though I've sort of said it already, could you

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW                69

1    explain what this document represents?

2    A    Within, as I've said, within the DuckDuckGo, if your browser

3    is set up correctly, then this would never be recorded, the

4    history, because DuckDuckGo says the history doesn't get logged.

5    But if your browser is not set correctly and you use, say,

6    another search engine within DuckDuckGo, that search gets logged.

7    Like if you go to DuckDuckGo and then use Google within it or you

8    go somewhere else, it's going to log your browsing and your

9    history.  And within DuckDuckGo databases, there are other

10   databases created.  One of them is the history.

11            So this is the DuckDuckGo history of his searching.

12   Q    And, Mr. Gibson, does the column under Data represent the

13   actual words or letters that were entered into the search bar of

14   the DuckDuckGo phone application?

15   A    Yes.

16   Q    Now, I notice there's no dates on this chart, is that

17   correct?

18   A    Correct.

19   Q    Do you know if all of these searches were performed after a

20   particular date?

21   A    After December 15th.

22   Q    All right.  And the black bars that you see on some of these

23   pages, but certainly on Page 1 of that exhibit were not on the

24   exhibit.  Those have been added, is that right?

25   A    I'm sorry.  Say that again.

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW       70

1    Q    The black bars, the redactions, have been added --

2    A    Correct.

3    Q    -- after you made the exhibit?

4    A    Yes.

5    Q    I want to have you read a number of these lines, starting

6    with Line 53.

7    A    Incest daughter petite.

8    Q    Line 102.

9    A    102, pushing dick in tight vagina.

10   Q    Line 116.

11   A    Daddy daughter sex.

12   Q    Line 118.

13   A    Daddy incest movies.

14   Q    Lines 145 and 146.

15   A    Can a girl have, can a girl have am (sic) orgasm when passed

16   out.  And can a girl have an orgasm while passed out.

17   Q    Line 188.

18   A    Daddy daughter porn.

19   Q    287?

20   A    287, pre-teen sex.

21   Q    376?

22   A    Can deleted pictures be retrieved from a cell phone?

23   Q    399?

24   A    Super small tiny girl movies.

25   Q    401?

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          71

1    A    How to stretch a vagina.

2    Q    409?

3    A    10-year-old have sex.

4    Q    410?

5    A    Will a penis fit in a 10-year-old girl.

6    Q    417?

7    A    Very young sex.

8    Q    428, 429 and 430?

9    A    How to orgasm with vibrator.  How to make a girl orgasm with

10   vibrator.

11   Q    And 430?

12   A    Can a passed-out girl orgasm.

13   Q    449, 450, and 451?

14   A    Can 10-year-old have sex?  Age girls start to get horny.

15   Jump start puberty girl.

16   Q    472 and 3.

17   A    Make daughter want sex.  Dad daughter sex.

18   Q    478?

19   A    How to get rid of the wife for a weekend.

20   Q    488?

21   A    Daddy camera.

22   Q    493?

23   A    Best lubricant for virgins.

24   Q    497?

25   A    Dads camera.

1   Q    501?

2   A    Are 10-year-old girls horny.

3   Q    Mr. Gibson, in addition to looking for attribution and use

4   of the computer devices, did you also do a visual search of

5   images and videos and other files looking for child exploitation

6   materials on those devices?

7   A    Yes.

8   Q    How did you do that?

9   A    Once again, once my software has finished, it parses out the

10  images and the videos into separate names, as well as some

11  YouTube stuff, kind of artifacts it can identify with video or

12  image.  And once it does that, I will then start going through it

13  manually, looking.  I can put it into what's called thumbnail

14  view, as we've discussed earlier the thumbnails.  So I can set

15  however many I want and I can go through thousands of images

16  pretty quickly.  Doing it within my experience, I've gotten very

17  quick at detecting flesh-colored tones and that kind of stuff.

18       But I also have another thing which is called a hash

19  set.  Remember, we talked about hashing earlier.  Every picture,

20  every image you can have a hash on.

21       The National Center For Missing and Exploited Children

22  have millions upon millions of these over the years as people

23  have sent those in to them.  We have sets that I can load into my

24  forensic program because even those things I can't see, that hash

25  value may be there of that known child exploitation image.  So I

1    load that in and it's also another tool which then I run the

2    entire thing, my entire drive against that known hash set of all

3    those known victims that are out there.

4    Q    Mr. Gibson, let me ask you, in terms of running the hash,

5    the known hashes against all devices in this case, you didn't

6    actually find any hashes matches of known child pornography, is

7    that right?

8    A    No, I did not.

9    Q    In doing your visual searches, did you find items of

10   interest that you believed were child exploitation materials?

11   A    Yes.

12   Q    And that included both images and videos?

13   A    Yes.

14   Q    And did you make exhibits for trial based on those?

15   A    Yes.

16   Q    Let's start with the laptop.  As to the laptop, did you find

17   three specific files that you had seen in prior child

18   exploitation investigations and through your training?

19   A    Yes.

20   Q    And did you assist in preparing an exhibit using those three

21   image files?

22   A    Yes.

23   Q    Hold on one second.  In preparation for your testimony, were

24   those three exhibits represented in Government's Exhibits 29-A,

25   29-B and 29-C?

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW            74

1    A    Yes.

2    Q    And can you explain where you found those three photographs?

3    A    Those were found in the thumb cache.

4    Q    And on the laptop, correct?

5    A    Yes.

6    Q    Can you explain what the thumb cache or thumbnail cache is?

7    A    Yes.  As, as we discussed earlier, when you, when there are

8    image files, thumbnails, it stores them into a, what's called a

9    cache file.  And so as you look at images, videos, as we said

10   before, it will take a picture of the first one.  And the images,

11   it will reduce the size and it will put it into what's known as

12   this cache file.  And within the Windows Explorer system, what it

13   does is allows you to very quickly bring those images and videos

14   back up without having to go the long way around.

15   Q    Let me ask you, Mr. Gibson.  The cache folder, is that where

16   the thumbnail files go?

17   A    Yes.

18   Q    And so the files that you found are the smaller versions of

19   the original or the other file that was on the computer at one

20   time?

21   A    Correct.

22   Q    With respect to the three thumbnails that we're going to

23   discuss, was there any metadata relating to the date, the device

24   used to take it, the date deleted, anything like that?

25   A    No.

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          75

1    Q    And is that expected with respect to a thumbnail file?

2    A    Yes.

3    Q    Remnants of our technical difficulties from earlier, Your

4    Honor.   Success.   I would like you to describe the image that

5    we're about to see.   Your Honor, for the record, I would like to

6    advice the Court and the jury that we're about to show explicit

7    images.   These are the three known images that relate to Count

8    Seven.

9              Mr. Gibson, could you describe the image we're about to

10   see that's labeled Government's Exhibit 29-A?

11             THE COURT:   Perhaps the witness could explain just a

12   little more.   What do you mean by "known images?"

13   Q    Yes.  I'm sorry.  Thank you.  I used that term.  You've seen

14   these files in the past, is that correct?

15   A    Yes.

16   Q    And these all are images of child pornography that are in

17   the database that you reference so that the originals have hash

18   values, can be compared?

19   A    Correct.

20   Q    And the individuals that are depicted in the images have

21   been identified as minors?

22   A    Yes.

23   Q    And there's a stipulation that we're going to read in a

24   little bit, Your Honor, relating to that.  With respect to 29-A,

25   can you describe that exhibit, that picture?

1   A    Yes.  29-A is an image file depicting a prepubescent female

2   in a pink shirt, holding an adult male penis.

3   Q    We can show that quickly and then move to the next, to a

4   blank screen.  Thank you.

5            Now, 29-B.  Could you describe Exhibit 29-B, please?

6   A    29-B is an image file depicting a prepubescent female nude

7   from the waist up, next to a nude adult male.  The nude adult

8   male is holding his penis with his right hand.  His other hand is

9   placed behind the female.

10  Q    Mr. Riley, if you can show that and then remove it quickly.

11           Can you describe the next exhibit, 29-C?

12  A    29-C is an image file depicting a topless prepubescent

13  female engaged in oral sex on an adult male penis.

14  Q    Your Honor, at this time I have a stipulation relating to

15  these three images that I'd like to read.

16           THE COURT:  All right.

17  Q    It is hereby stipulated and agreed by and between the United

18  States of America, by its attorneys, and the defendant, Eric

19  Wayne Grinder, as follows:  The individuals depicted in the

20  exhibits listed below are real persons under the age of 18 and

21  were under 18 at the time of the depiction.  And if called to

22  testify at trial, investigating agents would establish that the

23  individuals depicted in the exhibits listed below were the ages

24  listed and the production occurred in the locations listed:

25  Exhibit 29-A, age five to nine, location, Manchester, United

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          77

1    Kingdom; Exhibit 29-B, age five to eight, location of production

2    Arkhangelsk, Russia; and Exhibit 29-C, age 10 to 11, State of

3    Washington in the United States.

4             Mr. Gibson, with respect to 29-C, the last one, have

5    you seen that image in prior investigations?

6    A    Yes.

7    Q    And is that part of a series with more images and videos?

8    A    Yes.

9    Q    Does the series have a name that the files are typically

10   associated with?

11   A    Yes.

12   Q    And that's not the name of the actual victim depicted in

13   that image, correct?

14   A    Correct.

15   Q    What is the series name that those files in that series are

16   referred to?

17   A    Vicki.

18   Q    Now, I'm going to go back to 30-B.  We would be able to

19   quickly toggle, but we're having problems.  So I think we'll skip

20   it.  Referencing 30-B, do you remember that link file exhibit?

21   A    Yes.

22   Q    And do you remember the path of the link file, at least part

23   of it?

24   A    Vicki 9YO-sucker, I believe ABI.

25   Q    Now referencing back 29-C, the image that was just shown.

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          78

1    Have you seen the files in that series with the name "Vicki" in

2    the file?

3    A    Yes.

4    Q    Is it a common way to refer to that particular victim series

5    as an age followed by YO and then Vicki?

6    A    Yes.

7    Q    We're going to switch back to this one.  Staying with the

8    laptop computer.  Did you find videos of MG and an adult male on

9    the couch in the living room clothed?

10   A    Yes.

11   Q    And are those videos marked as Government's Exhibits 32-A

12   and 32-B?

13   A    Yes.

14   Q    All right.  With respect to 32-B, can you tell us where the,

15   where that video file was found and tell us what kind of file it

16   is and any information you have about metadata.

17   A    That file was, it's a video file.  And it was found at the

18   users/home/video or videos/video.  Do you want the file name?

19   Q    It ends in one, right?

20   A    Correct.

21   Q    And what kind of file is it?

22   A    It's a video file.

23   Q    And did it have metadata that provided the date created?

24   A    Yes.

25   Q    And what was the date?

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          79

1    A    The date of creation on that was May 27th of 2014.

2    Q    Was there any other metadata other than creation date

3    associated with that file?

4    A    Yes, it was 10 minutes and 14 seconds in length.

5    Q    And was this file deleted from the device or not deleted?

6    A    It was not deleted.

7    Q    And you said it's 10 minutes and 14 seconds.  Were you

8    involved in making an exhibit for trial that's a condensed

9    version of that?

10   A    Yes.

11   Q    And how long is the condensed version?

12   A    43 seconds.

13   Q    Can you generally just describe the video?  Actually, let me

14   see if I can play it now.  It's 32-B.  I'll withdraw that.

15           Your Honor, at this time I'm going to play Government's

16   Exhibit 32-B.

17           THE COURT:  All right.

18           (Video playing.)

19   BY MR. BUDLOW:

20   Q    Did you make still, did you assist in making still

21   photographs from that video?

22   A    Yes.

23   Q    Showing you Government's Exhibit 32-D. Is that one of the

24   still photographs?

25   A    Yes.

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          80

1    Q    And fair to say that at least on the screen it comes out

2    kind of dark?

3    A    Yes.

4    Q    All right.  Were you able to make or at least help to make

5    an exhibit that's a little bit lighter and easier to see?

6    A    Yes.

7    Q    Your Honor, may I publish this lighter version to the jury?

8    I can just pass one down on each row, if that's okay.

9              THE COURT:  Fine.  Sure.

10   Q    Mr. Gibson, what part of the screen were you trying to make

11   lighter so it's a little easier to see?

12   A    The forearm.

13   Q    May I approach, Your Honor?

14             THE COURT:  Yes. Thank you.

15   Q    Was there a second video with MG on the couch, also clothed,

16   found on the laptop?

17   A    Yes.

18   Q    And is that 32-A?

19   A    Yes.

20   Q    Can you describe where that was found and the metadata and

21   the date?

22   A    That was also found at users/home/videos/video, and with the

23   file name ending in one.  And it's also a video file.

24   Q    You said the file ending in one.  The other one was one.

25   Was this one ending in three?

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          81

1    A    Yes.

2    Q    And what was the date that it was created?

3    A    Also May 27th, 2014.

4    Q    Did it indicate that it was after the one that we just saw?

5    A    Yes.

6    Q    So 32-B was first; 32-A was later?

7    A    Correct.

8    Q    Was that file deleted or not deleted?

9    A    It was not deleted.  And it was 25 minutes 32 seconds.  And

10   it was edited down to 6 minutes and 2 seconds.

11   Q    And is there talking on this one?

12   A    Yes.

13   Q    Your Honor, at this time I'm going to play the 6 minutes and

14   2 seconds of Government's Exhibit 32-A.  And Madam Clerk, can we

15   just have the sound as loud as it will go, which it may already

16   be?  Thank you.

17        (Video playing.)

18        Mr. Gibson, did you make exhibit, still photos from

19   that video?

20   A    Yes.

21   Q    Government's Exhibit 32-C.  Page 1 of 32-C, what is that?

22   A    I'm assuming it's the draw -- I can't see it.

23   Q    You can tilt your screen towards you.

24   A    Well, I'm not sure I helped there.  It's the --

25   Q    If you can tell.  If not -- it might be the angle of the

1    screen.  You can try standing.  If not, I'll just move to the

2    next picture.

3    A    It's the shirt with the lettering of a G.B.

4    Q    All right.  Now Page 2 of Government's Exhibit 32-C.

5    A    That's the drawstring is what, the image.

6    Q    Somebody standing?

7    A    Yes.

8    Q    Stance?  And what do you see off the front of the pants?

9    A    A reddish-orange or orange drawstring.

10   Q    In addition to those videos, did you find other images and

11   videos of MG on the three devices you examined?

12   A    Yes.

13   Q    And some of those were normal clothed images?

14   A    Correct.

15   Q    And some of those were not, correct?

16   A    Correct.

17   Q    Let's talk about those that were not first.  Did you find --

18            MS. OYER:  Your Honor, could we approach briefly?

19            THE COURT:  Sure.

20            (Bench conference on the record.)

21            MS. OYER:  Your Honor, we conveyed to the government

22   before trial an objection to this witness making an

23   identification of MG as the victim in the images of child

24   pornography.  We have a stipulation to that.  But we don't think

25   it's appropriate for this victim to be, for this witness to be

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          83

1    making that identification.  It sort of carries an expert nature

2    or suggests that he's got, using some expertise to identify a

3    victim who cannot be identified. Her face is not in many of these

4    images.

5         So we would ask that the witness describe the pictures

6    generally, without making the identification of the victim.  It

7    was our understanding, based on conversations prior to the trial,

8    that the government was not going to have this witness do what

9    he's now doing.

10        THE COURT:  Okay.  The description does not use the

11   name, so I think that's the point.

12        MR. BUDLOW:  Right.  That was my understanding of the

13   discussions that we had, asking the witness, using the victim's

14   name.  There's a stipulation to the victim being in there.  I

15   don't see the prejudice.  It just makes the evidence more

16   understandable.

17        THE COURT:  All right.  And you've done that generally.

18   Is there any need to do it picture by picture?

19        MR. BUDLOW:  No.

20        THE COURT:  You're not going to?

21        MR. BUDLOW:  We're not changing the descriptions at

22   all.  We actually went to change the descriptions to be more

23   neutral.  It was just the way I was phrasing the question because

24   I thought it was more understandable.  I think it's appropriate

25   but I can attempt to avoid it if the Court thinks that it's

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          84

1    inappropriate.

2            THE COURT:  What is the stipulation?  I mean, I agree,

3    sort of, there is no debate that the girl in the picture is MG.

4    That is a stipulation to that effect, is that right?

5            MR. BUDLOW:  There is.  I haven't read it yet, but

6    there is.

7            MS. OYER:  That's correct, Your Honor.  My concern is

8    that the jury will feel that they're missing something when they

9    see these images and he's saying this is MG and all they're

10   seeing are the genitals of a little girl.  That maybe they'll

11   self-conclude that there's something more to the images or the

12   videos than what they're seeing.  I think it potentially is

13   confusing.

14           You know, I would have raised this earlier but my

15   understanding is the government did not intend to have this

16   witness identify the images as being a specific person.

17           THE COURT:  Okay.  Do you want to go ahead and read the

18   stipulation now?

19           MR. BUDLOW:  Sure.

20           THE COURT:  That will make it clear.

21           MS. OYER:  Your Honor, could I raise one other issue?

22   I've observed that this witness is referring repeatedly to notes

23   during his testimony.  Those notes haven't been provided to the

24   defense.  So before the witness is excused, I would like to have

25   a copy of the notes that the witness is referring to, and the

1    opportunity to review them before the witness is excused.

2              THE COURT:  Okay.  How voluminous are these notes?

3              MR. BUDLOW:  It's the page that you have in front of

4    you, with handwriting on it.  Maybe another three pages like

5    that, I believe.  I don't know.  I think he made notes during

6    trial prep so he wouldn't have to read from his reports.  It's

7    fairly standard.  I've never provided those kind of notes in

8    advance.  I have no problem with the defense seeing whatever it

9    is he's looking at.

10              THE COURT:  All right.  You can copy them over the

11   break, then, the lunch break.

12              MS. OYER:  Thank you, Your Honor.

13              THE COURT:  Okay.

14              (End of bench conference.)

15              MR. BUDLOW:  Your Honor, at this time the government

16   will read another stipulation.

17              It is hereby stipulated and agreed by and between the

18   United States of America, by its attorneys, and the defendant,

19   Eric Wayne Grinder, as follows:  The defendant's adopted

20   daughter, MG, who was born in October of 2006, MG is depicted in

21   the exhibits in counts of the third superseding indictment as

22   indicated below.  With respect to exhibits, Exhibit Numbers 31-A,

23   31-B, C, D, E, F, G, H and I, which relate to Count 1 and Count

24   7; also in 34-A, which relates to Count 2; and 36-A, which

25   relates to Count 3; and 37-A, which relates to Count 4; and 38-A,

1    which relates to Counts 5 and 8; and in 39-A and 39-B, which

2    relates to Counts 6 and 8.

3              That is the stipulation as signed by the parties.

4              THE COURT:  Could I see counsel at the bench just a

5    minute, then?

6              (Bench conference on the record.)

7              THE COURT:  Unless I missed it, you didn't read 35-A,

8    which is not charged?

9              MR. BUDLOW:  That's correct.

10             THE COURT: Is that in the stipulation?

11             MR. BUDLOW: It's not.

12             THE COURT:  Okay.  So that's going to be dealt with

13   separately?

14             MR. BUDLOW:  There's just no stipulation with respect

15   to that.  I don't believe the defendant's contesting it.  I think

16   probably it was an oversight on the part of the government not to

17   include it.  But the circumstantial evidence that will come in

18   otherwise I think will make it clear that it's the same person.

19             THE COURT:  Okay.

20             (End of bench conference.)

21   BY MR. BUDLOW:

22   Q    All right.  Just trying to find where I was, Mr. Gibson.  I

23   think I had asked you about the series of nine images that you

24   found on the laptop computer.  Where were they located?

25   A    The nine images were found in the thumb cache, 256.

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW                87

1    Q    Did you prepare an exhibit of those nine images?

2    A    I did.

3    Q    Before we display those images to the members of the jury,

4    was there any EXIF data for any of those images?

5    A    No, because they were in the cache.

6    Q    Would the metadata have been in the original files,

7    potentially?

8    A    Yes.

9    Q    You did not -- did you find the original file or files that

10   related to these nine thumb cache images?

11   A    No, I did not.

12   Q    Were you able to determine the date that these images were

13   made or produced?

14   A    No.

15   Q    What about the device that was used to produce them?

16   A    No.

17   Q    Can you say whether these thumbs, these nine images, were

18   from image files or were from video files?

19   A    Image files.

20   Q    Mr. Riley, do we have the switch over?  While we're setting

21   that up, could you provide a description of Government's Exhibit

22   31-A, the first of the nine?

23   A    31-A is an image file that depicts an adult male wearing

24   blue pajama pants with an orange/red drawstring, with his penis

25   exposed.  The adult male is also wearing an orange shirt with at

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          88

1    least one hole visible at the bottom of the shirt.  The

2    prepubescent female's right arm and hand is visible with her hair

3    ties, or bracelets, on her wrist.  Her hand is reaching to grab

4    the adult male's penis.  A marbled lighting effect is visible on

5    the back wall of the room, along with dark-in-color blackout

6    shade covering the window.

7    Q    Court's indulgence, Your Honor.  More technical

8    difficulties.  All right.  So is the first exhibit identified in

9    this exhibit you helped prepare as 31-A?

10   A    Yes.

11   Q    Mr. Riley, if we could see it briefly and then move to the

12   black screen.

13            With respect to 31-B, could you provide the

14   description?

15   A    31-B is an image file that depicts an adult male wearing

16   blue pajama pants with an orange/red drawstring.  A prepubescent

17   female is visible in the image.  She is topless, wearing only

18   glasses or hair ties, or bracelets, on her wrist.  The

19   prepubescent female is reaching to touch the adult male's penis.

20   A marbled lighting effect is visible on the back wall of the

21   room.

22   Q    31-C.  Could you describe 31-C?

23   A    31-C is an image file that depicts an adult male wearing

24   blue pajama pants, with his penis exposed.  A prepubescent

25   female's right arm and hand is visible, with hair ties, or

1    bracelets, on her wrist.  She is touching the adult male's penis.

2    A marbled lighting effect is visible on the back wall of the

3    room, along with a dark-in-color blackout shade covering the

4    window.

5                If we could display 31-C.  Good.

6                Can you describe 31-D?

7    A    31-D is an image file that depicts an adult male wearing

8    blue pajama pants, with his penis exposed.  The adult male is

9    also wearing an orange shirt, with at least one hole visible at

10   the bottom of the shirt.  A prepubescent female is visible and

11   wearing glasses.  She is holding the male's penis and her open

12   mouth is approaching the top of the penis.  A marbled lighting

13   effect is visible on the back wall of the room.

14   Q    Mr. Riley, 31-D.

15               Mr. Gibson, could you describe 31-E?

16   A    31-E is an image file that depicts an adult male wearing

17   blue pajama pants, with his penis exposed and being held by his

18   left hand.  The adult male is also wearing an orange shirt.  A

19   prepubescent female is visible and wearing glasses.  The man's

20   penis is in the prepubescent female's mouth.  A marbled light

21   effect is visible on the back wall of the room.

22   Q    Display 31-E.  Okay.

23               31-F.  Could you describe that?

24   A    31-F is an image file that depicts an adult male wearing

25   blue pajama pants, with his penis exposed.  The adult male is

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          90

1    also wearing an orange shirt, with at least one hole visible at

2    the bottom of the shirt.  The prepubescent female's right arm and

3    hand is visible, with hair ties, or bracelet, on her wrist.  She

4    is touching the adult male's penis with her right hand.  A

5    marbled lighting effect is visible on the back wall of the room.

6    Q    Display 31-F.

7         Mr. Gibson, could you read or describe 31-G?

8    A    31-G is an image file that depicts an adult male wearing

9    blue pajama pants, with his penis exposed.  The adult male is

10   also wearing an orange shirt.  A prepubescent female is visible,

11   and she has hair ties, or bracelets, on her wrist.  She is

12   touching the adult male's penis with her right hand.  A marbled

13   lighting effect is visible on the back wall of the room.

14   Q    31-G.  Display quickly.  Thank you.

15        31-H?

16   A    31-H is an image file that depicts an adult male wearing

17   blue pajama pants with an orange/red drawstring, with his penis

18   exposed.  A prepubescent female is visible and wearing glasses.

19   Her face is in the area of the adult male's penis.  Her tongue is

20   sticking out, and she is making an L sign with her right hand.  A

21   marbled lighting effect is visible on the back wall of the room.

22   Q    Before we show this, Mr. Gibson, do you know from having

23   seen this image in the past, in relation to the hand, where's the

24   penis?

25   A    It's right below the hand.

417

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          91

1    Q    31-H, please.  All right.  And lastly for this series, sir,

2    Mr. Gibson, if you could describe 31-I.

3    A    31-I is an image file that depicts an adult male wearing

4    blue pajama pants with an orange/red drawstring, with his penis

5    exposed.  A prepubescent female is visible and she has hair ties,

6    or bracelets, on her wrist.  She is touching the man's penis with

7    her right hand.  A marbled lighting effect is visible on the back

8    wall of the room.

9    Q    Display 31-I, please.

10         Your Honor, may I approach the witness?

11         THE COURT:  Yes.

12   Q    Mr. Gibson, showing you Government's Exhibit 50.  This is

13   the nine pages -- if you could just flip through them -- each

14   representing one of the images you just described.  This

15   Government's 50, is it fair to say it's each of the images

16   printed out and redacted so that only the background and the

17   clothing is still visible?

18   A    Correct.

19   Q    And to be clear, it's the same nine images referenced in

20   Count One in the series 31-A through I, is that right?

21   A    Yes.

22         THE COURT:  Mr. Budlow, led me know if you're in a

23   good place to take a break.

24         MR. BUDLOW:  Perfect.

25         THE COURT:  All right.  Ladies and gentlemen, we're

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW        92

1    going to break until 2:00.  I will see everybody back here at

2    2:00.  Thank you.

3            (Luncheon recess at 12:54 p.m.  Resume at 2:03 p.m.)

4            THE COURT:  Mr. Riley, I have two copies of a draft of

5    the jury instructions, if you don't mind, one for you and one for

6    Ms. Oyer.  Counsel, I'm not sure about a proposed verdict sheet.

7    Did I --

8            MR. RILEY:  You have not received one, Your Honor.

9    I'll have it to you after we're done today.

10           THE COURT:  Okay.

11           MR. RILEY:  Or perhaps during a break.

12           THE COURT:  All right.  That would be fine.

13           (Jury enters the courtroom at 2:05 p.m.)

14           THE COURT:  Welcome back.  You can be seated.

15           THE CLERK:  You are still under oath.

16           THE WITNESS:  Yes, ma'am.

17   BY MR. BUDLOW:

18   Q    Mr. Gibson -- I'm sorry, Your Honor.

19           THE COURT:  No.  Go ahead.

20   Q    Thank you.  I want to pick up, we left off from the images

21   from the laptop.  I want to now move to the SD card.  Did you

22   also find a video on the SD card which is identified as

23   government, the SD card as Exhibit 1-B?  Did you find a video on

24   that device?

25   A    Yes.

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          93

1    Q    And did you prepare an exhibit of that video that's

2    Government's Exhibit 34-A?

3    A    Yes.

4    Q    Can you tell the members of the jury about that file in

5    terms of where it was found and any metadata on the file?

6    A    This file, this file was found in unallocated clusters.  And

7    it was created on 4:30, or April 30th, of 2016.  And it's two

8    minutes and four seconds in length.

9    Q    Remind us.  What does it mean that the file was found in

10   unallocated clusters?

11   A    That it had been deleted.

12   Q    Can you describe -- I'm sorry.  Two minutes and four

13   seconds?

14   A    Yes.

15   Q    Describe what we're going to see in the video.

16   A    It's, it begins with a prepubescent female skin visible on

17   what appears to be a white sheet, an adult male hand with a

18   silver-in-color ring on the left ring finger appears.  And the

19   hand is visible moving in and out of the left, of the left-hand

20   side of the frame.  A purple polka dot blanket is visible at the

21   end of the video.

22   Q    Your Honor, for the record, this is the video that's

23   referenced in Count Two of the third superseding indictment.

24        THE COURT:  All right.

25   Q    We can now play Exhibit 34-A.

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          94

1          (Video playing.)

2    Q    Mr. Gibson, during the entirety of the video, does the

3    subject of the video appear to move at all?

4    A    No.

5    Q    Did you make an exhibit of still photographs from

6    Government's Exhibit 34-A?

7    A    Yes, I did.

8    Q    Showing you on the screen Government's Exhibit 34-B, Page 1.

9    Can you describe what for the members of the jury?

10   A    It looks like a --

11   Q    Let me back you up.  Is this the exhibit, are these three

12   photographs made from the video, 34-A?

13   A    Yes.

14   Q    All right.  And what does 34-B, Page 1, depict?

15   A    A ring, metallic, looks like with indentations, or raised

16   edges, on each side.

17   Q    Page 2.

18   A    It's a hand.  And you can see the blur, the polka dot

19   blanket down towards the bottom in the midel.

20   Q    What color?

21   A    Purple, with a white dot.

22   Q    Page 3.

23   A    This is also a still image created from the video.  Shows

24   the, shows a purple polka dot blanket.

25   Q    Did you also search, during your forensic exam of this case,

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          95

1    a desktop computer, a Dell Inspiron?

2    A    Yes.

3    Q    And were you asked to look for wedding pictures on that

4    computer?

5    A    Yes.

6    Q    Did you find any?

7    A    Yes.

8    Q    Showing you Government's Exhibit 40.  Is this, are these

9    four pages the exhibit you helped create from those pictures?

10   A    Yes.

11   Q    And were there two pictures that you found, and this exhibit

12   is each of those pictures followed by a close-up that you made

13   from looking at the original file?

14   A    Yes.

15   Q    Can you describe Government's Exhibit 40, Page 1?

16   A    This appears to be a male in a suit, on his knee, it looks

17   like at a celebratory event.

18   Q    In front of him is a woman in a white dress?

19   A    Correct.

20   Q    All right.  Page 2 of that exhibit, is that the close-up

21   that you made?

22   A    Yes.

23   Q    And what does that depict?

24   A    The wedding ring or the ring on the left hand.

25   Q    And what color is it?

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW    96

1    A    Metallic with looks like indentations or depression in the

2    center.

3    Q    And is it a silver platinum color or is it a gold color, or

4    something else?

5    A    It's kind of a silver platinum color.

6    Q    Page 3.  Is this another one of the images that you found on

7    the Dell desktop?

8    A    Yes.

9    Q    And generally what does it depict?

10    A    A male in a suit.  It looks like he either has a garter in

11    his hand and potentially about to throw it over his shoulder.

12    Q    It looks like the same male and female from the earlier

13    picture?

14    A    Yes.

15    Q    Page 4, is that a close-up that you made?

16    A    Yes.

17    Q    And what is that?

18    A    This, once again, is the wedding band on the left hand of

19    the male.  Appears to be a white or silver-looking metallic ring.

20    Q    All right.  So the last video you played was 34-A from, you

21    said, April the 30th of 2016.  Did you find another video on the

22    SD card with metadata that indicated a creation date of May the

23    12th, 2016?

24    A    Yes.

25    Q    And is that Government's Exhibit 35-A?

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          97

1    A    Yes.

2    Q    Can you again tell the ladies and gentlemen of the jury

3    about that exhibit in terms of where it was found, what type of

4    metadata, if any, that was on that, in that file?

5    A    This one was created on May 12th of 2016.  It was 13

6    seconds.  It's been reduced to 7 seconds.

7    Q    And where in the device was it found?  This is the SD card,

8    right?

9    A    Yes.

10   Q    Where in the SD card was this video found?

11   A    That is in unallocated space, also.  Or deleted space.

12   Q    Can you provide a description of what we're about to see in

13   Government's Exhibit 35-A?

14   A    Yes.  This is a, 35-A is a video file.  It was 13 seconds.

15   And it's been reduced.  Begins with a child on her side with her

16   buttocks exposed.  A blanket is lifted, exposing more of the

17   child's buttocks.  The camera zooms in, revealing a clear liquid

18   between the cheeks of the child's buttocks.  A purple blanket

19   with white polka dots is visible in the frame, along with light

20   blue colored fabric underneath the child.

21   Q    Your Honor, at this time we would play Government's Exhibit

22   35-A, the seven seconds of that video.

23            THE COURT:  All right.

24            (Video playing.)

25   BY MR. BUDLOW:

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          98

1   Q     Did you make an exhibit of still photographs from

2   Government's Exhibit 35-A?

3   A     Yes, I did.

4   Q     Showing you Government's Exhibit 35-B.  Maybe.  Is that that

5   exhibit?

6   A     Yes, it is.

7   Q     And can you describe the blanket that we see at the top left

8   and top right, please?

9   A     It's the purple polka dot blanket.

10  Q     Drawing your attention back to the video again.  During the

11  entirety of that video, not just the seven seconds that we

12  played, but the entire 13 seconds, did the subject of the video

13  appear to move at all?

14  A     No.

15  Q     All right.  Moving chronologically, did you find another

16  video on the SD card with the creation date of May the 29th,

17  2016?

18  A     Yes, I did.

19  Q     And is that Government's Exhibit 36-A?

20  A     Yes.

21  Q     Your Honor, for the record, these are the exhibits

22  referenced in Count Three of the third superseding indictment.

23          THE COURT:  All right.

24  BY MR. BUDLOW:

25  Q     Mr. Gibson, again, can you tell the ladies and gentlemen

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW                99

1    about that file in terms of where it was found and metadata?

2    A    This was found on the SD card in the unallocated, or

3    deleted, space.  It was created on May 29th, 2016, and was 4

4    minutes and 28 seconds.  And it's been cut to approximately six

5    seconds.

6    Q    Can you describe the video, please?  And I'm referencing the

7    4 minutes and 28 seconds video.

8    A    Yes.  This one is a, begins with a prepubescent female whose

9    legs are apart.  Her genitals are exposed.  An adult male hand

10   appears and touches the prepubescent female's genitals.  Moments

11   later, a black vibrator is placed on the prepubescent female's

12   exposed vagina.  The vibrator remains in the position for the

13   duration of the video.  A purple blanket with white polka dots is

14   visible in the frame, along with a light blue colored fabric

15   underneath the prepubescent female.

16        At the end of the video, a patterned blanket including

17   white polka dots and butterflies is visible in the frame.

18   Q    Your Honor, at this time the government will play

19   Government's Exhibit 36-A, the seven seconds of that video.

20        (Video playing.)

21   BY MR. BUDLOW:

22   Q    Mr. Gibson, have you watched all four minutes of that video?

23   A    Yes.

24   Q    During the entirety of the video, does the subject of the

25   video appear to move at all?

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          100

1   A    No.

2   Q    Did you create -- let me show you Government's Exhibit 36-B.

3   Is this a still photograph from that video?

4   A    Yes.

5   Q    In referencing the top portion in between the blue

6   redactions and the light blue blanket, can you describe what you

7   see there?

8   A    It's the purple polka dot blanket.

9   Q    Moving from May 29th, 2016 in the SD card to June 19th,

10  2016, did you find another similar video?

11  A    Yes, I did.

12  Q    And has that been identified as Government's Exhibit 37-A?

13  A    Yes.

14  Q    Your Honor, for the record, these exhibits are referenced in

15  Count 4 of the superseding indictment.  Mr. Gibson, can you tell

16  the ladies and gentlemen about that file in terms of where it was

17  found, creation date, and any other metadata?

18  A    This video also was found on the SD card in the unallocated,

19  or deleted, space.  It was created on June 19th, 2016.  It was

20  20.5 seconds and reduced to 5 seconds for brevity.

21  Q    And can you describe that file?

22  A    Yes.  This one begins with a nude prepubescent female with

23  her vagina and inner thighs exposed.  An adult hand appears and

24  the hand penetrates the prepubescent female's vagina with a

25  finger.  A purple polka dot blanket is visible in the frame.  At

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW        101

1   the end of the video, a light-colored rectangular-shaped object

2   with a clear rectangular window appears in the frame.

3   Q    At this time the government will play 37-A, the five seconds

4   of that video.

5        (Video playing.)

6   Q    Mr. Gibson, during the entirety of that video, does the

7   subject of the video appear to move at all?

8   A    No.

9   Q    Did you make, make an exhibit of redacted stills from

10  Government's Exhibit 37-A?

11  A    Yes, I did.

12  Q    Showing you Page 1 of 2 of Government Exhibit 37A-R.  Is

13  this that two-page exhibit?

14  A    It is.

15  Q    The portion that's not redacted is in the top left corner,

16  is that right?

17  A    Yes.

18  Q    Can you describe what we see there?

19  A    The polka dot blanket.

20  Q    Now moving to Page 2 of 37A-R.  Is this from the -- this is

21  one of the screen shots from towards the end of the video?

22  A    Yes.  It's within the last few frames.

23  Q    And can you describe what you're looking at there?

24  A    This is a, is the cell -- well, it appears to be a cell

25  phone case being held in the hand at the end of the video.

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW          102

1   Q    And when you saw that, did it remind you of a cell phone

2   case that you examined in this case?

3   A    Yes.

4   Q    Is that Government's Exhibit 1-A, the Samsung cell phone?

5   A    Yes, it is.

6   Q    And can you describe the flap part of the cover?

7   A    It's dirty, worn, and you can see the voice hole over here.

8   Q    And that's a little slot towards the top, above the clear

9   window?

10  A    Yes.

11  Q    Moving now from June 19th, 2016 to July 10th, 2016, and also

12  switching devices now to the phone.  Did you find a single image

13  on the Samsung phone, Government's Exhibit 1-A, that was created

14  on that date?

15  A    Yes.

16  Q    And is that Government's Exhibit 38-A?

17  A    Yes, it is.

18  Q    Your Honor, for the record, this is the image referenced in

19  Count 5 of the third superseding indictment.

20       THE COURT:  All right.

21  Q    Can you tell the ladies and gentlemen of the jury about

22  Government's Exhibit 38-A.  And, again, what I mean is where it

23  was found and any metadata.

24  A    This one was on the Samsung phone.  It was created on July

25  10th of 2016.  And it was stored in the Android Gallery cache.

1    Q    Stored in the Android Gallery cache?

2    A    Yes.

3    Q    Is that what you said?  And what does that mean with respect

4    to -- well, first of all, let me back up.  This is a thumbnail --

5    A    Yes.

6    Q    -- type image?

7    A    Yes.

8    Q    Okay.  And the fact that the thumbnail was found in the

9    Android Gallery cache, what does that tell you about the

10   original, larger file that this thumbnail is from?

11   A    It was gone.  Deleted.

12   Q    And where was it when, at one time?

13   A    In one of the folders somewhere, or on his desktop.  The

14   original file is not there.

15   Q    This is the Samsung phone that this device, that this image

16   came from?

17   A    Yes.

18   Q    So the Android Gallery cache, is the Android Gallery an app

19   that's on the phone?

20   A    It's built in, it's built in by the manufacturer.  It's to

21   allow you to, just like caches on computers, it's designed to

22   bring up your photos quicker, documents and that stuff, so you

23   can peruse it very quickly.  That's what the cache is for.

24   Q    Does the existence of the cache file in the Android Gallery

25   cache folder indicate that the original file was in the Android

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW    104

1    Gallery?

2    A    At one time.

3    Q    Any other metadata associated with that image other than

4    that it was created on July the 10th of 2016?

5    A    July 10th, Android Gallery cache.  From the Samsung phone.

6    Are you wanting the file name or --

7    Q    Is the file name one that your forensic program generated or

8    is the file name the original file?

9    A    One that my program would have created.

10   Q    I want to know if there's any of the original metadata.

11   A    No, other than July 10th.

12   Q    Can you, can you describe the image, 38-A?

13   A    Yes.  This image file depicts a prepubescent female's legs

14   open, with her vagina exposed.  Beneath her body is a purple

15   fabric or cloth.  A blanket with purple, pink and blue flowers on

16   it is visible just above the prepubescent female's vagina.

17   Q    I'm going to display briefly 38-A.  Did you make an exhibit

18   of a redacted still photo of Government's Exhibit 38-A?

19   A    Yes, I did.

20   Q    And showing in front of you -- can we switch to the --

21   Government Exhibit 38A-R, is that that redacted exhibit?

22   A    Yes.

23   Q    Which portion of the image is visible?

24   A    The blanket.

25   Q    And that was on the top of the original image?

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW         105

1    A    Correct.

2    Q    All right.  Now moving from July 10th to August the 27th of

3    2016.  Did you find two more images on the Samsung phone created

4    on the same date, August 27th, 2016?

5    A    Yes, I did.

6    Q    And those images in the exhibit you helped create,

7    Government's Exhibit 39-A and 39-B?

8    A    Yes.

9    Q    Your Honor, for the record, these are the images referenced

10   in Count 6 of the third superseding indictment.

11        THE COURT:  All right.

12   Q    Mr. Gibson, again, same drill.  Tell the ladies and

13   gentlemen of the jury about where those images were found and

14   what, if any, metadata was associated with them.

15   A    These were found on the Samsung cell phone as well.  They

16   were both created on August 27th of 2016, actually three minutes

17   apart.  And they were found in the Android Gallery cache.

18   Q    The same as the prior exhibit, correct?

19   A    Correct, yes.

20   Q    And do you have the same opinion as with respect to the

21   prior exhibit, meaning that the images, these two images were

22   once in the Android Gallery of the phone?

23   A    Yes.

24   Q    Can you describe both images, starting with 39-A and then

25   39-B?

432

DIRECT EXAMINATION OF STEVEN GIBSON BY MR. BUDLOW        106

1    A    Yes.  39-A is an image file that depicts a prepubescent

2    female's legs open, with her vagina exposed.  Part of a yellow

3    blanket is visible just above her vagina, along with a white

4    sheet or blanket.

5           And Exhibit 39-B is an image file that depicts a

6    prepubescent female's legs open, with her vagina exposed.  Part

7    of a yellow blanket is visible just above her vagina.  Along with

8    a white sheet or blanket, blue cloth is visible beneath her legs.

9    Q    Your Honor, at this time we'll briefly display 39-A and

10   39-B.

11          THE COURT:  All right.

12   Q    Mr. Gibson, did you make and assist in making a redacted

13   image of 39-A?

14   A    Yes.

15   Q    Showing you 39A-R.  Is this that redacted image?

16   A    Yes.  These are the blankets that would have been above her.

17   Q    And this is just the top portion of the photo, showing the

18   yellow and the white blanket?

19   A    Yes.

20   Q     That's all I have, Your Honor, for Mr. Gibson.

21          THE COURT:  All right.  Thank you.

22          MR. RILEY:  Your Honor, the government calls Alisha

23   Grinder.

24          THE COURT:  Hold on just a second.

25          MR. RILEY:  Sorry.

1          THE COURT: Any questions?

2          MS. OYER:  No, Your Honor.

3          THE COURT:  Thank you.  Let this witness get off the

4    stand.  You can call the next witness.

5          THE CLERK:  Please raise your right hand.

6           ALISHA GRINDER, GOVERNMENT'S WITNESS, SWORN

7          THE WITNESS:  I do.

8          THE CLERK:  Please be seated.  Please speak directly

9    into the microphone.  State and spell your full name for the

10   record, please.

11         THE WITNESS:  Alisha Grinder.  A-L-I-S-H-A.

12   G-R-I-N-D-E-R.

13         THE CLERK:  Thank you.

14         DIRECT EXAMINATION

15   BY MR. RILEY:

16   Q    Good afternoon, Ms. Grinder.

17   A    Okay.

18   Q    Without getting into specifics, where do you live?

19   A    I live in Abingdon, Maryland.

20   Q    Okay.  How long have you lived in Maryland?

21   A    My whole life.

22   Q    Born and raised here?

23   A    Yes.

24   Q    Again, without getting into the specifics, you have a job?

25   A    Yes.

1    Q    Okay.  What do you do for work?

2    A    I'm a pharmacy technician.

3    Q    Okay.  Do you have any children?

4    A    Yes.

5    Q    Okay.  What's her name?

6    A    MG.

7    Q    What's MG's birthday?

8    A    ███████2006.

9    Q    I understand that you know the defendant in this case, Eric

10   Grinder?

11   A    I do.

12   Q    Okay.  And how do you know him?

13   A    We were married.

14   Q    And before you got married, you were dating, is that right?

15   A    Correct.

16   Q    When did you first start dating the defendant?

17   A    In March of 2012.

18   Q    And when did you marry him?

19   A    November 7th, 2013.

20   Q    And, obviously, your last name is "Grinder" now so you took

21   the defendant's name, is that right?

22   A    Yes.

23   Q    What was your maiden name?

24   A    O'Neil.

25   Q    Do you know if the defendant had been married before?

1    A    He had.

2    Q    Do you know his ex-wife's name?

3    A    I do.

4    Q    Okay.  What is it?

5    A    Heidi Grinder.

6    Q    Now, was the defendant MG's birth father?

7    A    No.

8    Q    Did there come a point in time when the defendant legally

9    adopted MG?

10   A    Yes.

11   Q    When was that?

12   A    That was December 23rd of 2013.

13   Q    Okay.  And early in your relationship, you and the defendant

14   had a good relationship?

15   A    Yes.

16   Q    Okay.  And generally speaking, did MG and the defendant have

17   a good relationship?

18   A    Yes.

19   Q    Now, after you started dating the defendant, did there come

20   a point in time when you, him and MG moved in together?

21   A    Yes.

22   Q    Okay.  And where was that?

23   A    That was in Abingdon.

24   Q    Okay.  What was the address?

25   A    122 Laurel Valley Court.

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY          110

1    Q    And that's in Harford County?

2    A    Correct.

3    Q    And approximately how long did you, MG and the defendant

4    live at that address in Abingdon?

5    A    Three years.

6    Q    Do you know when you moved in, approximately?

7    A    Around June 15th of 2013.

8    Q    Okay.  Do you know when you moved out?

9    A    About June 25th of 2016.

10   Q    All right.  Showing you what's been marked as Government's

11   Exhibit 25.  Recognize this?

12   A    Yes.

13   Q    Can you tell the members of the jury what it is?

14   A    That is the house that we rented from June 2013 to June of

15   2016.

16   Q    Showing you -- this is the outside of the house, right?

17   A    Correct.

18   Q    Showing you the third page of Government's Exhibit 25.

19   Recognize this?

20   A    That is the master bedroom in that house.

21   Q    And to be clear, there's furniture in this photograph, is

22   that right?

23   A    Correct.

24   Q    Is this your furniture, the furniture you had when you lived

25   there with MG and the defendant?

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY                111

1    A    No.

2    Q    Okay.  When you did have furniture in that bedroom, can you

3    tell the members of the jury where the, in what direction the bed

4    was faced?

5    A    The bed faced the wall with the windows, the window that you

6    see.

7    Q    Okay.  And directing your attention to the middle of the

8    photograph here.  It looks like there's a light covering.  Is

9    that fair?

10   A    Yes.

11   Q    Okay.  Is this the same light covering -- I'm sorry --

12   window covering that you had when you and the defendant and MG

13   lived at this address?

14   A    There were blinds, but there were also blackout curtains

15   when we were there.

16   Q    Blackout curtains?

17   A    Yes.

18   Q    Okay.  Directing your attention to the top of the photograph

19   here.  Let me show you, actually, Page 6 of Government's Exhibit

20   25.  What do we see in this photograph?

21   A    That's a ceiling fan with light fixture.

22   Q    Okay.  And did you have other ceiling fans in the house?

23   A    Yes.

24   Q    Okay.  Directing your attention specifically to the, the

25   lighting fixture.  Can you describe for the members of the jury

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY          112

1    the glass around the light bulb, right here where I'm circling

2    right now?

3    A    Yeah.  Those globes were specific to that light fixture in

4    that master bedroom.

5    Q    Okay.  Any other globes like that in the house?

6    A    No.

7    Q    Okay.  Now, showing you the fifth page of Government's

8    Exhibit 25.  Directing your attention right to the middle of the

9    photograph here.  Can you describe to the members of the jury

10   what we're seeing here?

11   A    When the light was on, that reflection from the light bulb,

12   a design would go on the wall and partial of the ceiling, too.

13   Q    Okay.  You testified earlier that you, the defendant, and MG

14   lived at 122 Laurel Valley Court for about three years, is that

15   right?

16   A    Yes.

17   Q    During that period of time, would the defendant have ever

18   been home, to your knowledge, with MG alone?

19   A    Yes.

20   Q    Okay.  Under what circumstances?

21   A    If I was at work or occasional, if I went out.

22   Q    Okay.  Generally, what was your work schedule during the

23   time period you lived at 122 Laurel Valley Court?

24   A    So I worked 2 to 10:30 typically every Sunday night.  And I

25   worked Tuesday, Wednesday, Thursday, 9 to 5.

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY          113

1   Q    Okay.  And generally speaking, what was the defendant's work
2   schedule during that time?
3   A    He worked, I believe it was 6 to 3:30 Monday through Friday,
4   except for every other Friday he had off.
5   Q    Okay.  Was MG in school during the period of time when the
6   family lived at 122 Laurel Valley Court?
7   A    Yes.
8   Q    Who was responsible for dropping MG off at school?
9   A    I dropped her off typically.
10  Q    Okay.  Who picked her up?
11  A    Eric did.
12  Q    Okay.  Besides the defendant, was MG ever left alone at 122
13  Laurel Valley Court with any other men?
14  A    No.
15  Q    No friends?
16  A    No.
17  Q    No relatives?
18  A    No.
19  Q    Showing you Government's Exhibit 32 -- 32-D. You recognize
20  the location of this photograph?
21  A    That is the living room in Laurel Valley Court.
22  Q    Okay.  And you recognize the furniture?
23  A    Yes.
24  Q    Okay.  Do you recognize the people in this photograph?
25  A    Yes.

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY          114

1    Q    Okay.  Who do you see?

2    A    MG and Eric.

3    Q    And how do you recognize the defendant?

4    A    I know the shirt and I can recognize his tattoo.

5    Q    Okay.  Now, directing your attention, you referred to a

6    tattoo.  I'm directing your attention to roughly the center of

7    this exhibit.  You know what?  I'm going to work from paper.

8    Showing you a printout of Government's Exhibit 32.  May I

9    approach the witness, Your Honor?

10           This is the exhibit we were just looking at a moment

11   ago, is that right?

12   A    Yes.

13   Q    You referred to a tattoo.  Directing your attention down to

14   the bottom of the photograph.  Is that the tattoo you were

15   referring to here?

16   A    Yes.

17   Q    And may I publish to the jury, Your Honor?  You know what

18   that -- can you describe to the members of the jury what that

19   tattoo was, generally speaking?

20   A    It was a Chinese symbol.  I was told it meant "karma."

21   Q    Karma?

22   A    Yes.

23   Q    All right.  You also testified earlier that you said you

24   recognized the shirt in that exhibit.  Is that fair?

25   A    Yes.

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY          115

1   Q    Okay.  How do you recognize that shirt?

2   A    I just know that that's Eric's shirt.  A light green shirt

3   with stripes.

4   Q    Okay.  How frequently did the defendant wear it?

5   A    Probably once a week.

6   Q    Do you know where, where or when he got it?

7   A    I don't, no.

8   Q    Okay.  Showing you what's been marked as Government's

9   Exhibit 9.  Recognize this?

10  A    Yes.

11  Q    Okay.  What is it?

12  A    It's Eric's shirt, polo shirt.

13  Q    That's the same shirt we were just looking at in the

14  photograph?

15  A    Correct.

16  Q    Now showing you -- work on paper again -- what's been marked

17  as Government's Exhibit 32-C.  I'll pull it up on the screen as

18  well.  Do you recognize the location of this photograph?

19  A    Can't really see it, to be honest.

20  Q    Okay.  I'm handing you what's been marked as Government's

21  Exhibit 32-C.  Is that better?

22  A    Yes.

23  Q    Do you recognize the location of this photograph?

24  A    Yes.

25  Q    Okay.  Where is it?

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY          116

1    A    That's also the living room in Laurel Valley Court.

2    Q    Do you recognize the individual in this photograph?

3    A    Yes.  That's Eric.  I recognize the shirt.

4    Q    Okay.  And tell the members of the jury what do you -- it

5    looks like there's markings on the shirt; is that fair?

6    A    Yeah, GBH.

7    Q    GBH.  How frequently did the defendant wear that GBH shirt?

8    A    Frequently.

9    Q    Frequently?  Show you the second page of Government's

10   Exhibit 32-C.  Do you recognize the photograph?

11   A    Yeah.  That's our couch.  That's Eric.  I can recognize the

12   pants.  And I believe that's MG laying there.

13   Q    Can you describe the pants that you recognize?

14   A    Yeah.  They're blue pajama pants, with Reebok, and the

15   drawstring, red drawstring.

16   Q    Okay.  How frequently would the defendant wear those blue

17   pajama pants, blue Reebok pajama pants with the red drawstring?

18   A    Frequently.  They were lounge pants that he would put on

19   after work.

20   Q    Okay.  Let me show you what's been marked as Government's

21   Exhibit 8.  Do you recognize this?

22   A    Yes.

23   Q    Okay.  What is it?

24   A    That's the pajama pants.

25   Q    The same ones you were looking at just a moment ago?

1    A    Correct.

2    Q    Are these, touching right in the middle of the exhibit, are

3    these the drawstrings you were just referring to?

4    A    Yes.

5    Q    During the period of time when you, the defendant, and MG

6    lived at 122 Laurel Valley Court, where did MG sleep?

7    A    She had her own bedroom.  It was across the hall, to the

8    left of our bedroom.

9    Q    Okay.  And what, what, if anything, did she have in her

10   bedroom in terms of bedding?

11   A    She had several small blankets.  She had a purple comforter

12   with polka dots on it and butterflies on the other side.

13        She has a yellow blanket that she's had since birth.

14   Q    Okay.  All right.  Your Honor, may we approach briefly?

15        THE COURT:  All right.

16        MR. RILEY:  There's no need for it.

17        THE COURT:  Okay.

18   BY MR. RILEY:

19   Q    Showing you what's been marked as Government Exhibit 41-A.

20   All right.  Who -- first off, do you recognize this?

21   A    Yes.

22   Q    Okay.  What is it?

23   A    It's a picture of MG on her bed.

24   Q    Okay.  Now, I want you to focus on the lower half or lower

25   third of this photograph.  Can you describe for the members of

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY          118

1    the jury what we're seeing here?

2    A    That's MG's comforter.  It's a purple comforter with

3    flowers.

4    Q    Okay.  Are these the polka dots you were referring to

5    earlier, too, right where I'm circling?

6    A    Yes.  That's the other side of the blanket.

7    Q    Like it's folded over, is that fair?

8    A    Correct.

9    Q    Bring your attention to the right arm of MG, specifically

10   near her wrist.  Do you rec -- was it common for MG to wear

11   anything on her wrist during this period?

12   A    Yeah, hair ties.  They also made like the loom band

13   bracelets.

14   Q    Okay.  When did MG start wearing hair ties on her wrist?

15   A    Four, five years old.

16   Q    Okay.  And did she stop wearing the hair ties on her wrist

17   at some point?

18   A    She still does it.

19   Q    Okay.  I'm now going to show you what's been marked as

20   Government Exhibit 27-A.  Do you recognize this?

21   A    Yes.

22   Q    Okay.  What is it?

23   A    MG's comforter.

24   Q    The purple polka dot comforter you were just referring to a

25   moment ago?

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY          119

1    A    Yes.

2    Q    Showing you Government's Exhibit 27-B.  Fair to say that

3    first page, this is a photograph of one of the sides of the

4    comforter, is that right?

5    A    Correct.

6    Q    Okay.  Second page.  This is detail, the purple polka dots?

7    A    Correct.

8    Q    Third page.  This is a detailed shot of the comforter as

9    well?

10   A    Correct.

11   Q    This is another focus shot.  I'm on the fourth page.  And we

12   can see the purple polka dots and the butterflies you mentioned

13   earlier; is that fair?

14   A    Yes.

15   Q    You referred to a yellow blanket earlier.  Is that right?

16   A    Yes.

17   Q    Said MG still has it today?

18   A    Yes.

19   Q    Showing you Government's Exhibit 27-C.  First page.  Do you

20   recognize this?

21   A    Yes.

22   Q    Okay.  What is it?

23   A    That's MG's blanket.

24   Q    All right.  Showing you the second page, 27-C.  This is a

25   close-up shot of the yellow blanket, is that right?

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY                120

1    A    Yes.

2    Q    All right.  Third page.  This is the back side of that

3    blanket; is that fair?

4    A    Yes.

5    Q    Okay.  You said earlier that MG has had that blanket since

6    she was a baby.  Obviously, she had it at 122 Laurel Valley

7    Court, is that right?

8    A    Yes.

9    Q    Come a point in time, did there come a point in time when

10   you, MG and the defendant left 122 Laurel Valley Court?

11   A    Yes.

12   Q    Okay.  And I think you may have answered this earlier, but

13   when was that?

14   A    It was June 25th of 2016.

15   Q    Okay.  And where did you move?

16   A    We moved to 261 Montpelier Court in Westminster.

17   Q    Carroll County?

18   A    Correct.

19   Q    And when you, the defendant and MG left 122 Laurel Valley

20   Court and moved to 261 Montpelier, did MG's bedding go with you?

21   A    Yes.

22   Q    When you -- mark as Government's Exhibit 5.  Recognize this?

23   A    Yes.

24   Q    Okay.  What is it?

25   A    That is our house that we bought in Carroll County, 261

447

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY          121

1    Montpelier Court.

2    Q    Okay.  A photograph of the outside?

3    A    Correct.

4    Q    All right.  Showing you the fourth page.  Do you recognize

5    this?

6    A    That is the bedroom, master bedroom.

7    Q    Okay.  And there's a piece of furniture on the left-hand

8    side of the photograph, is that right?

9    A    Yes.

10   Q    Okay.  What's that?

11   A    That's our dresser.

12   Q    And in the center of the photograph looks like there's a

13   orange shirt, is that right?

14   A    Yes.

15   Q    Is the -- and I'm zoomed in a little bit.  Let me actually

16   go to a different shot.  Page 6 of Government's Exhibit 5.  This

17   is the orange shirt you were referring to just a moment ago, is

18   that right?

19   A    Yes.

20   Q    Okay.  Directing your attention down to the bottom of the

21   photograph, what do you see here?

22   A    Holes.

23   Q    How frequently did the defendant wear this shirt?

24   A    All the time.

25   Q    Okay.  Did you and he ever have a conversation about this

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY          122

1    shirt?

2    A    Yes.  I wanted to throw it away.

3    Q    You wanted to throw it away?

4    A    Yes, I did.

5    Q    All right.  And how long, to your knowledge, how long did he

6    have the shirt?

7    A    Before we met.

8    Q    Showing you what's been marked as Government's Exhibit 7.

9    Sorry.  Government's Exhibit 6.  Do you recognize this?  What is

10   is?  You have to say yes or no.

11   A    I'm sorry.  Yes.

12   Q    What is it?

13   A    Eric's shirt.

14   Q    Same shirt we were looking at just a moment ago?

15   A    Yes.

16   Q    All right.  I want to go back to Government's Exhibit 5 for

17   just a moment, specifically the fifth page.  Can you -- first

18   off, what are we seeing in this photograph?

19   A    That is the top drawer.  That would have been Eric's

20   underwear drawer.

21   Q    Okay.  Directing your attention to the lower right-hand

22   corner of the photograph.  What do we see here?

23   A    Lubricant.

24   Q    During the period of time when you were together with the

25   defendant, was it common for him to have lubricant?

1   A    We did.

2   Q    Relatedly, did you ever know the defendant to have a

3   vibrator?

4   A    Yes.

5   Q    And did you know him to have a vibrator at Laurel Valley

6   Court as well as 261 Montpelier Court?

7   A    Yes.

8   Q    All right.  Shift gears a little bit to the period of time

9   when you, the defendant and MG were living at, 261 Montpelier

10  Court, and ask you where MG slept in that house?

11  A    She had a bedroom that was across the hall, also to the left

12  from our master bedroom.

13  Q    Okay.  Showing you Government's Exhibit 26, seventh page.

14  You recognize this?

15  A    Yes.

16  Q    What is it?

17  A    That's MG's bedroom.

18  Q    Okay.  Eighth page.  This is another photograph of MG's

19  bedroom?

20  A    Correct.

21  Q    Directing your attention to the lower left of this

22  photograph, what do we see here?

23  A    That's MG's blankets, her comforter, pillow, stuffed

24  animals.

25  Q    Okay.  And forgive me if you said this earlier.  But where

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY   124

1   was MG's bedroom in relation to your bedroom, the master bedroom?

2   A   It was kind of like cater-cornered to the left, across the

3   hall.

4   Q   Okay.  All right.  Now, was there a particular area of the

5   home where the defendant spent a good bit of time?

6   A   Yes.

7   Q   Okay.  Where was that?

8   A   The basement.

9   Q   And what, if anything, was located in the basement of the

10   home?

11   A   There was the couch, entertainment center, TV, electronics,

12   Play Station.

13   Q   Okay.  And to your knowledge, what did the defendant do when

14   he was spending time in the basement?

15   A   Play video games.

16   Q   Showing you Government's Exhibit 26, eleventh page.  Do you

17   recognize this?

18   A   Yes.

19   Q   Okay.  What is it?

20   A   That's a laptop, Eric's laptop.  Underneath that tarp is a

21   monitor.

22   Q   Okay.  So this was Eric's laptop I'm circling, is that

23   right?

24   A   Correct.

25   Q   What's on top of it?

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY          125

1    A    Play Station controller.

2    Q    Okay.  And to the right I think you said is a monitor, is

3    that right?

4    A    Yes.

5    Q    Okay.  Just a cover over it, is that right?

6    A    Correct.

7    Q    With respect to the laptop, did you ever use it?

8    A    Once.

9    Q    Okay.  And what did you use it for that one time?

10   A    To look up honeymoon locations.

11   Q    Okay.  So relatively early in your relationship, then?

12   A    Correct.

13   Q    And generally speaking, during your relationship with the

14   defendant, was the laptop available for you to use?

15   A    No.

16   Q    Okay.  And why not?

17   A    I don't know.  I never saw it.

18   Q    Okay.  You said you never saw it.  Where --

19   A    I rarely saw it.

20   Q    Do you know where it was kept, generally?

21   A    I do not.

22   Q    Okay.  You have your own computer?

23   A    I do.

24   Q    When you lived at 261 Montpelier?

25   A    I did.

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY          126

1    Q    Okay.  What kind?

2    A    It was a Dell, just regular computer, desktop computer.

3    Q    All right.  Did you know the defendant to have an email

4    address?

5    A    Yes.

6    Q    Okay.  What was it?

7    A    Egric109@Yahoo.com.

8    Q    Aware of any others?

9    A    Not that I'm aware of.

10   Q    Okay.  With respect to the Toshiba laptop, did you ever know

11   MG to use it?

12   A    Not that I'm aware of.

13   Q    Okay.  Anybody else that you're aware of using that Toshiba

14   laptop?

15   A    No.

16   Q    I'm going to show you Government's Exhibit 49-A, the tenth

17   page.  You recognize the individual in this photograph?

18   A    Yes.

19   Q    Who is it?

20   A    Eric Grinder.

21   Q    Eleventh page.  Do you recognize this individual?

22   A    Yes.

23   Q    Who is it?

24   A    Eric Grinder.

25   Q    Twelfth page.  You recognize this?

1    A    Eric's tattoo.

2    Q    Okay.  Can you describe the tattoo for the members of the

3    jury?

4    A    It is a cross on his upper back.  And it's colored in with

5    the birthstones of his children.

6    Q    Okay.  Showing you the thirteenth page of Government's

7    Exhibit 49-A.

8    A    Eric's tattoo.

9    Q    Is this the, I think you said Chinese symbol tattoo that we

10   saw earlier, is that right?

11   A    Correct.

12   Q    All right.  All right.  Showing you what's been marked as

13   Government's Exhibit 1-A.  Do you recognize this?

14   A    Yes.

15   Q    Okay.  What is it?

16   A    It's Eric's phone.

17   Q    How long did you know Eric to, or the defendant to have this

18   phone?

19   A    I think he had it about two and a half years.

20   Q    Do you know when he got it?

21   A    Yeah.  We got ours at around the same time, so I believe it

22   was May of 2014.

23   Q    And do you know, so he had it from May 2014 to November

24   2016; is that fair?

25   A    Yes.

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY          128

1    Q     All right.  I want to ask you a couple questions about the

2    defendant's interactions with MG at Montpelier Court, okay?  Now,

3    during the period of time when you, the defendant, and MG lived

4    at 261 Montpelier Court, under what circumstances would the

5    defendant have been alone with MG?

6    A     Same as the other address.  If I was at work, or had gone

7    out with friends or family.

8    Q     Okay.  Now, besides the defendant, was MG ever left alone

9    with any other men?

10   A     No.

11   Q     -- at that address?

12   A     No.

13   Q     Okay.  I'm going to now direct your attention to a specific

14   evening during the periods of time when the family lived at that

15   address.  Okay?  And specifically November 27, 2016.  First off,

16   you taken drugs that night?

17   A     I had.

18   Q     Okay.  What had you taken?

19   A     I had taken an opioid and a benzodiazepine.

20   Q     Generally speaking, how did it make you feel?

21   A     I was drowsy, a little out of it.

22   Q     Now, focusing your attention on the period of time that

23   evening after you had gone to bed, did there come a point in time

24   when you woke up and noticed that the defendant was not in bed

25   with you?

1    A    Yes.

2    Q    Okay.  And did that strike you as unusual?

3    A    Not at that moment.  It was still early on so I wasn't

4    expecting him to be in bed yet.

5    Q    Okay.  But did anything unusual happen at that time?

6    A    Yeah.  I heard just like noise in the hallway, shuffling.

7    And I yelled, called out to ask what was going on.  And I was

8    coming around to go out of the bedroom to find out what was going

9    on.

10   Q    Okay.  So you said you heard shuffling outside, is that

11   right?

12   A    Yeah.  Movement outside of the room.

13   Q    And you got out of bed?

14   A    Yes.

15   Q    Okay.  And did you see the defendant?

16   A    I did.

17   Q    All right.  And did you have a conversation with him?

18   A    I asked him what was going on.

19   Q    And what did he say?

20   A    He said that MG was coughing and he was giving her cough

21   syrup.

22   Q    Okay.  Was MG, to your knowledge, coughing that night?

23   A    No.  I had actually said I didn't hear her coughing.  And he

24   just walked past me and down the stairs.

25   Q    During the period of time around that night, was MG sick?

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY                130

1    A    No.

2    Q    I think you just said the defendant walked downstairs after

3    that interaction, is that right?

4    A    Yes.

5    Q    Can you describe his demeanor when you had that interaction

6    with him?

7    A    Like emotionless.  He didn't want to, he didn't look at me.

8    He just kept walking.

9    Q    Now, without getting into the specifics of what was said, as

10   a result of the interaction that you had with the defendant that

11   you just described, did you have a conversation with MG?

12   A    I did.

13   Q    And it's fair to say that after that conversation, both you

14   and MG went back to bed?

15   A    Yes.

16   Q    All right.  And do you know where the defendant slept that

17   night?

18   A    He slept in our, on our second floor, on a futon.

19   Q    Now, despite the fact that you had taken a drug earlier in

20   that night, is your memory of that event clear?

21   A    Yes.

22   Q    When you woke up the following morning, was the defendant

23   still in the house?

24   A    Yes.

25   Q    Did there come a point in time where you spoke with law

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY          131

1   enforcement concerning your conversation with MG?

2   A    Yes.

3   Q    Okay.  When was that?

4   A    That was that next day, on November 28th.

5   Q    Okay.  So the interaction you had with the defendant was the

6   27th of November and you spoke to law enforcement the next day?

7   A    Correct.

8   Q    All right.  And did there come a point in time when you and

9   MG left 261 Montpelier Court and began staying some place else?

10  A    Yes.  We left that same day, the 28th.

11  Q    And where did you begin staying?

12  A    We, we went to my parent's house in Abingdon.

13  Q    Okay.  Now, without getting into what, if anything, she may

14  have said, was MG interviewed by law enforcement after the events

15  of November 27, 2016?

16  A    Yes.

17  Q    Okay.  And without getting into what happened there, did

18  there come a point in time when MG was taken to the hospital for

19  a medical examination?

20  A    Yes.

21  Q    And come a point in time when law enforcement executed a

22  search warrant at 261 Montpelier Court?

23  A    Yes.

24  Q    Okay.  Was that November 29th; is that fair?

25  A    Correct.

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY          132

1    Q    So you just said that you left ███████████ with MG

2    on the 28th of November and were staying with your parents,

3    right?

4    A    Yes.

5    Q    Approximately how long did you and MG stay with your

6    parents?

7    A    About a year.

8    Q    And so you eventually got your own place?

9    A    Yes.

10   Q    Did you ever move back to Montpelier Court?

11   A    No.

12   Q    Now, after November 29th, 2016, did you have any sort of

13   contact with the defendant?

14   A    Yes.

15   Q    Okay.  Now, first off, what sort of contact did you have?

16   A    Mainly text messaging.  We did meet in person a couple of

17   times.

18   Q    With respect to text messaging, how did you exchange text

19   messages with him?  In other words, by what means?

20   A    There were some Facebook messaging, Messenger.  Regular

21   texting.  And an app called Confide.

22   Q    Confide?

23   A    Yes.

24   Q    Okay.  What is Confide, generally?

25   A    It's an app that you can text, and when the person reads the

1   text, it erases it afterwards.  You can no longer read it again.

2   Q    Okay.  Whose idea was it to use Confide?

3   A    Eric's.

4   Q    All right.  Now, during the course of any text message

5   conversations with the defendant, did he say anything, using

6   Confide in particular, okay, did he say anything to you that you

7   viewed as particularly noteworthy concerning MG?

8   A    Yes.

9   Q    Okay.  What?

10  A    He wanted me tell her that it wasn't her fault and he didn't

11  know why he did those disgusting things.

12  Q    Okay.  Now, during the course of text messages, text message

13  conversations between you and the defendant when you weren't

14  using the Confide app, did the defendant ever send you pictures

15  of himself?

16  A    Yes.

17  Q    Okay.  Showing you Government's Exhibit 43.  Recognize this?

18  A    Yes.

19  Q    What is it?

20  A    That's a picture of Eric.

21  Q    Can you describe to the members of the jury what he is

22  wearing?

23  A    The orange shirt.

24  Q    This is the same orange shirt that you saw just a moment

25  ago, Government's Exhibit 6?

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY          134

1    A    Yes.

2    Q    Says DL Collins on the upper left-hand side.  Is that fair?

3    A    Yes.

4    Q    DL Collins & Son.  Excuse me.  Is that right?

5    A    Yes.

6    Q    I want to shift gears a little bit now and quickly show you

7    some images.  All right?

8    A    Yes.

9    Q    Showing you Government's Exhibit 31B-R.  Do you recognize

10   anything or anyone in this photograph?

11   A    That's MG, and looks to be in the master bedroom.

12   Q    The master bedroom of what house?

13   A    Laurel Valley Court.

14   Q    Okay.  Showing you Government's Exhibit 31C-R.  Do you

15   recognize anything in this photograph?

16   A    Yes.  That's the master bedroom.  That's the wall and the

17   window with the blackout curtains.

18   Q    Showing you Government's Exhibit 31H-R.  Recognize anyone in

19   this photograph?

20   A    Yes.  That's MG.

21   Q    Okay. Do you recognize the background?

22   A    Yes.

23   Q    What is it?

24   A    That's the wall in Laurel Valley Court in the master

25   bedroom.

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY          135

1    Q    Showing you 38A-R.  Do you recognize this?

2    A    Yes.

3    Q    Okay.  What is it?

4    A    MG's comforter.

5    Q    Purple polka dot comforter?

6    A    Correct.

7    Q    This is the other side?

8    A    Correct.

9    Q    Showing you Government's Exhibit 39A-R.  Recognize anything

10   in this photograph?

11   A    That's MG's yellow blanket.

12   Q    All right.  Going to show you what's been marked as

13   Government's Exhibit 11.  Do you recognize this?

14   A    Yes.

15   Q    What is it?

16   A    That's Eric's wedding band.

17   Q    Generally speaking, would the defendant wear his wedding

18   band?

19   A    Yes.

20   Q    Showing you Government's Exhibit 34-B.  Recognize this?

21   A    That's Eric's wedding band.

22   Q    Second page.  Recognize this?

23   A    Yeah.  That's Eric's wedding band.

24   Q    Do you recognize anything in this photograph, third page?

25   A    Purple blanket, MG's purple blanket.

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY          136

1    Q    Court's indulgence, Your Honor.

2         Just want to -- a couple more questions.  All right?  I

3    want to take you back to the night of November 27, 2018, okay,

4    and your interaction with the defendant.  Can you describe where

5    the defendant was standing when you had that interaction with

6    him?

7    A    He was coming out of MG's bedroom.  And as I was coming out

8    of my bedroom, he was kind of crossing me in the hallway.

9    Q    Okay.

10        THE COURT:  I think you said 2018.  Did you mean --

11   Q    Thank you, Your Honor.  November 27, 2016.  That's the year

12   it happened, right?

13   A    Yes.

14   Q    Okay.  Thank you.  Now, thinking about that interaction that

15   you had on November 27th, 2016, within the month surrounding that

16   night, did you have any other notable or, notable interactions or

17   odd interactions with the defendant?

18   A    Yes.

19   Q    Okay.  Can you tell the members of the jury about any of

20   them?

21   A    About a month prior, I had a night of unrest.  I was tossing

22   and turning.  And Eric wasn't in bed.  And I could hear moving

23   around in the house, shuffling up and down the stairs, in the

24   hallway.  I got up at one point and went into the master bathroom

25   and had flipped on a light.  As I did that, he came rushing in

DIRECT EXAMINATION OF ALISHA GRINDER BY MR. RILEY          137

1   and asked me what was going on.  And I said I'm going to the
2   bathroom.  I'm like, what are you doing, why aren't you in bed?
3   He said he can't sleep, he's laying on the floor in one of the
4   other bedrooms, playing on his phone.
5   Q    Okay.  And what bedroom did -- do you know what bedroom he
6   was in?  Did he say?
7   A    It was one of the other children's bedrooms.
8   Q    Okay.  Where was that other child's bedroom in relation --
9   A    Across, across the hall from, from our bedroom and next to
10  MG's bedroom.
11  Q    Okay.  November 20 -- so you said, when did you say this --
12  A    That was probably about a month prior to November 27th.
13  Q    Okay.  And how old was MG on November 27, 2016?
14  A    Ten.
15  Q    No further questions at this time, Your Honor.
16             THE COURT:  All right.  Any questions?
17             MS. OYER:  No questions, Your Honor.
18             THE COURT:  Okay.  Thank you very much, Ms. Grinder.
19             MR. RILEY:  Your Honor, may we approach briefly?
20             THE COURT:  Yes.
21             (Bench conference on the record.)
22             MR. RILEY:  Your Honor, I believe the government is
23  ready to rest.  If we could just have a few minute to review
24  everything, just to confirm, confirm that, maybe a brief break,
25  we would appreciate it.

138

1          THE COURT:  Sure.

2          MR. RILEY:  Five minutes.

3          THE COURT:  Well, I can go ahead and take that, but

4    just to anticipate.  Assuming the government rests, will you want

5    to be heard on any issue?

6          MS. OYER:  No, Your Honor.  Not -- certainly make a

7    very brief motion and will not intend to argue it.

8          THE COURT:  Okay.  All right.  What I'm thinking

9    tentatively -- I'll go ahead and take the break now, I can always

10   bring you back up to the bench, is that we, when you are done, we

11   adjourn for today.  I do have the draft instructions.  I'm

12   thinking maybe we could even meet in chambers in, you know, a

13   half hour or so to look at them.  I don't think there's anything

14   much that you haven't seen.  So we can try to nail that down

15   tonight.

16          Then I would probably start tomorrow morning at 10:30

17   just because we did run into Friday.  I've got a sentencing and a

18   guilty plea that I'm still trying to squish in.  Does that work?

19          MR. RILEY:  Yes, Your Honor.

20          THE COURT:  Okay.  Thank you.

21          (End of bench conference.)

22          THE COURT:  All right, ladies and gentlemen.  We're

23   going to take just a short break.  I'll see you in about 10

24   minutes.

25          (Recess at 3:13 p.m. Resume at 3:23 p.m.)

139

1          THE COURT:  The government going to be ready to rest or

2      did you find something else?

3          MR. RILEY:  Yes, Your Honor.  The government rests.

4          THE COURT:  I don't know if there's any technical

5      requirement about doing that in front of a jury.  On the other

6      hand, we might be able to save a little time if you want to --

7      unless there's any objection -- we'll just move to the, hearing

8      from the, hearing from the defense.  And then I can bring the

9      jury back in and tell them that we're done.

10         MS. OYER:  Your Honor, so would the Court like me to

11     make our motion for the record at this time?  I'm happy to do

12     that.

13         MR. RILEY:  Your Honor, I'm happy to rest in front of

14     the jury if that's -- actually, Your Honor, maybe I got ahead of

15     myself.  If the government could rest in front of the jury, I'd

16     prefer to do it that way.

17         THE COURT:  All right.  I'll bring you, bring you up to

18     the bench, unless you think you would need a recess.

19         MS. OYER:  No, Your Honor.  And I think that for the

20     purposes of the record, I can make the motion right now on the

21     understanding that the government is about to rest in front of

22     the jury --

23         THE COURT:  Okay.

24         MS. OYER:  -- and presented all the evidence.  And I'll

25     make a motion pursuant to Rule 29 of the Federal Rules of

140

1  Criminal Procedure.  And I don't need to be heard further on that

2  motion.

3          THE COURT:  Okay.  Thank you.  And I will in advance

4  deny the motion.

5          We'll get the jury back in.  The government can rest.

6  I will advise them, unless you prefer to have me turn to you and

7  just say that you're not calling any witnesses or, you know, that

8  you're not presenting evidence at this time.

9          MS. OYER:  Fine with the Court doing it, Your Honor.

10  However the Court prefers.

11          THE COURT:  Okay.  All right.  Get the jury back in.

12          (Jury enters the courtroom at 3:26 p.m.)

13          THE COURT: Thank you.  You could all be seated.

14          All right.  Is the government presenting any more

15  evidence?

16          MR. RILEY:  No, Your Honor.  The government rests.

17          THE COURT:  Okay.  All right.  The government has

18  rested, ladies and gentlemen.  And I'm advised that the defendant

19  does not intend to call any witnesses at this time.  Is that

20  correct?

21          MS. OYER:  That's correct, Your Honor.

22          THE COURT:  All right.  So ladies and gentlemen, we are

23  at the end of the evidence in the case.  And I'm going to, I'll

24  tell you what's going to happen.  I'm going to excuse you for

25  today.

141

1          There are some legal issues, things I need to discuss

2    with counsel.  You will still need to hear my instructions on the

3    law and have a chance to review the various counts in the third

4    superseding indictment.  Also, counsel have an opportunity to

5    argue to you now that the case is over, if they choose to do

6    that.  But you will have the case for deliberation tomorrow.  You

7    will certainly have it tomorrow.

8          So I'm going to excuse you at this point since there's

9    no more evidence for today.  We'll ask you to come back tomorrow

10   morning at, at 10:30.  And that is simply, since we lost a day, I

11   have some other proceedings that I'm going to try to squeeze in

12   first thing in the morning.

13         But once you're here and we get started, you will hear

14   instructions from me.  I'll read them to you.  You will also get

15   them later in written form in the jury room.  As I've said,

16   counsel have the chance to argue to you, if they choose.  And

17   then we will ask you to go out and deliberate on your verdict.

18         So until then, please keep an open mind.  Don't talk

19   about the case.  Leave your notes here.

20         Thank you very much and we'll see you tomorrow morning

21   at 10:30.

22              (Jury exits the courtroom at 3:28 p.m.)

23         THE COURT:  All right.  So you've got the draft jury

24   instructions.  Would you be ready to -- sorry, Ms. Moye -- ready

25   to come back to chambers about 4:00 and go over the instructions?

468

142

1                MS. OYER:  Yes, Your Honor.

2                MR. RILEY:  Yes, Your Honor.

3                THE COURT:  Okay.  I'll see you then.

4                (Conclusion of Proceedings at 3:29 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

143

1                                  INDEX

2

3                                                           PAGE

4     GOVERNMENT WITNESSES

5     WITNESS: DETECTIVE JOHN EMMINIZER
      DIRECT EXAMINATION BY MR. BUDLOW                        4
6
      WITNESS: STEVEN GIBSON
7     DIRECT EXAMINATION BY MR. BUDLOW                       16

8     WITNESS: ALISHA GRINDER
      DIRECT EXAMINATION BY MR. RILEY                       107
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

144

REPORTER'S CERTIFICATE

I, Mary M. Zajac, do hereby certify that I recorded stenographically the proceedings in the matter of USA v. Eric Grinder, Case Number(s) CCB-17-226, on February 21, 2019.

I further certify that the foregoing pages constitute the official transcript of proceedings as transcribed by me to the within matter in a complete and accurate manner.

In Witness Whereof, I have hereunto affixed my signature this _____ day of _____, 2019.

_____/S/_____
Mary M. Zajac,
Official Court Reporter

**'**

**'06** [1] - 5:5

**/**

**/S** [1] - 144:16

**0**

**091209PBN303 QTKYKSYR** [1] - 28:10

**1**

**1** [16] - 11:15, 14:7, 26:20, 27:13, 28:7, 44:10, 47:20, 50:23, 68:20, 69:23, 81:21, 85:23, 94:8, 94:14, 95:15, 101:12
**1-A** [9] - 10:25, 25:10, 25:11, 25:19, 43:13, 66:22, 102:4, 102:13, 127:13
**1-B** [5] - 25:14, 25:21, 43:15, 47:10, 92:23
**10** [9] - 7:25, 14:1, 49:16, 61:24, 68:5, 77:2, 79:4, 79:7, 138:23
**10-year-old** [4] - 71:3, 71:5, 71:14, 72:2
**10009033482DUUU** [1] - 28:15
**1000903482DUUU** [1] - 28:20
**101** [1] - 1:24
**102** [2] - 70:8, 70:9
**107** [1] - 143:8
**10:26** [1] - 2:1
**10:29** [1] - 3:12
**10:30** [4] - 112:24, 138:16, 141:10, 141:21
**10th** [7] - 64:14, 102:11, 102:25, 104:4, 104:5, 104:11, 105:2
**11** [5] - 15:3, 49:21, 61:25, 77:2, 135:13
**116** [1] - 70:10
**118** [1] - 70:12
**11:20** [1] - 39:5
**11:26** [1] - 42:25
**11:37** [2] - 42:25, 43:2
**12** [3] - 5:18, 5:23, 49:23
**122** [9] - 109:25, 112:14, 112:23, 113:6,

113:12, 117:6, 120:6, 120:10, 120:19
**12:54** [1] - 92:3
**12th** [2] - 96:23, 97:5
**13** [7] - 47:18, 50:1, 59:2, 59:17, 97:5, 97:14, 98:12
**13-page** [1] - 47:17
**13-year-old** [1] - 58:25
**14** [5] - 4:21, 59:2, 59:17, 79:4, 79:7
**145** [1] - 70:14
**146** [1] - 70:14
**15** [1] - 62:1
**15th** [4] - 65:14, 66:25, 69:21, 110:7
**15Y.mpg** [1] - 59:3
**16** [2] - 68:6, 143:7
**17** [1] - 68:8
**17th** [1] - 67:19
**18** [2] - 76:20, 76:21
**188** [1] - 70:17
**18th** [1] - 48:4
**1981** [1] - 4:19
**19th** [3] - 100:9, 100:19, 102:11
**1A112898Q** [1] - 28:6

**2**

**2** [22] - 11:20, 14:10, 26:23, 27:13, 27:17, 28:16, 44:16, 47:5, 48:1, 51:2, 58:12, 64:14, 81:10, 81:14, 82:4, 85:24, 94:17, 95:20, 101:12, 101:20, 112:24
**20** [2] - 31:1, 137:11
**20.5** [1] - 100:20
**2000** [1] - 67:3
**2006** [6] - 4:20, 5:9, 5:10, 5:14, 85:20, 108:8
**2008** [1] - 49:11
**2011** [4] - 58:8, 58:10, 64:13, 64:14
**2012** [6] - 61:2, 62:15, 62:16, 64:14, 108:17
**2013** [6] - 58:11, 65:14, 108:19, 109:12, 110:7, 110:14
**2014** [5] - 58:11, 79:1, 81:3, 127:22, 127:23
**2015** [5] - 46:23, 47:3, 49:8, 67:3, 67:19
**2016** [36] - 6:5, 9:8, 44:15, 46:1, 46:7, 46:12, 47:8, 47:25, 48:4, 67:19, 93:7, 96:21, 96:23, 97:5, 98:17, 99:3, 100:9,

100:10, 100:19, 102:11, 102:25, 104:4, 105:3, 105:4, 105:16, 110:9, 110:15, 120:14, 127:24, 128:15, 131:15, 132:12, 136:11, 136:15, 137:13
**2018** [2] - 136:3, 136:10
**2019** [3] - 1:10, 144:7, 144:12
**20th** [1] - 49:8
**21** [1] - 1:10
**21201** [1] - 1:24
**21st** [1] - 67:19
**22** [2] - 68:10, 144:7
**22nd** [1] - 46:1
**23rd** [1] - 109:12
**24** [7] - 19:1, 67:8, 67:9, 67:10, 67:11, 68:10, 68:11
**25** [5] - 81:9, 110:11, 110:18, 111:20, 112:8
**256** [1] - 86:25
**25th** [2] - 110:9, 120:14
**26** [8] - 11:6, 11:14, 11:25, 14:23, 15:3, 64:14, 123:13, 124:16
**261** [15] - 8:13, 9:10, 9:20, 9:24, 11:15, 51:11, 120:16, 120:20, 120:25, 123:6, 123:9, 125:24, 128:4, 131:9, 131:22
**27** [5] - 128:15, 131:15, 136:3, 136:11, 137:13
**27-A** [3] - 13:17, 14:3, 118:20
**27-B** [2] - 14:4, 119:2
**27-C** [2] - 119:19, 119:24
**27th** [6] - 79:1, 81:3, 105:2, 105:4, 105:16, 131:6, 136:15, 137:12
**28** [2] - 99:4, 99:7
**28-A** [1] - 50:23
**28-B** [1] - 51:8
**28-C** [1] - 51:14
**28-D** [1] - 51:19
**28-E** [1] - 51:23
**287** [2] - 70:19, 70:20
**28th** [7] - 6:5, 44:15, 46:12, 47:25, 131:4, 131:10, 132:2
**29** [1] - 139:25
**29-A** [6] - 42:9, 73:24, 75:10, 75:24, 76:1, 76:25
**29-B** [5] - 73:25, 76:5, 76:6, 77:1
**29-C** [6] - 73:25, 76:11, 76:12, 77:2, 77:4, 77:25
**29th** [7] - 8:1, 9:8, 98:16, 99:3, 100:9,

131:24, 132:12
**2:00** [2] - 92:1, 92:2
**2:03** [1] - 92:3
**2:05** [1] - 92:13

**3**

**3** [20] - 11:6, 14:13, 15:10, 15:13, 25:9, 25:11, 25:23, 26:23, 27:2, 27:19, 28:16, 44:24, 48:6, 58:23, 64:14, 67:22, 71:16, 85:25, 94:22, 96:6
**30-A** [1] - 56:13
**30-B** [3] - 57:23, 77:18, 77:20
**30-C** [2] - 60:19
**30-D** [1] - 62:3
**30-E** [1] - 63:5
**30-F** [1] - 64:2
**30-G** [1] - 65:2
**30th** [2] - 93:7, 96:21
**31-A** [5] - 85:22, 87:22, 87:23, 88:9, 91:20
**31-B** [3] - 85:23, 88:13, 88:15
**31-C** [4] - 88:22, 88:23, 89:5
**31-D** [3] - 89:6, 89:7, 89:14
**31-E** [3] - 89:15, 89:16, 89:22
**31-F** [3] - 89:23, 89:24, 90:6
**31-G** [3] - 90:7, 90:8, 90:14
**31-H** [3] - 90:15, 90:16, 91:1
**31-I** [3] - 91:2, 91:3, 91:9
**31B** [1] - 134:9
**31B-R** [1] - 134:9
**31C** [1] - 134:14
**31C-R** [1] - 134:14
**31H** [1] - 134:18
**31H-R** [1] - 134:18
**32** [3] - 81:9, 113:19, 114:8
**32-A** [4] - 78:11, 80:18, 81:6, 81:14
**32-B** [5] - 78:12, 78:14, 79:14, 79:16, 81:6
**32-C** [6] - 81:21, 82:4, 115:17, 115:21, 116:10
**32-D** [2] - 79:23, 113:19
**33-A** [2] - 44:6, 44:10
**33-B** [1] - 45:14
**33-C** [1] - 45:21

**33-D** [1] - 46:2
**33-E** [1] - 46:8
**33-F** [1] - 46:13
**33-G** [2] - 67:7, 68:12
**33-H** [1] - 68:20
**33-page** [1] - 46:11
**34-A** [6] - 85:24, 93:2, 93:25, 94:6, 94:12, 96:20
**34-B** [2] - 94:8, 94:14, 135:20
**35-A** [6] - 86:7, 96:25, 97:13, 97:14, 97:22, 98:2
**35-B** [1] - 98:4
**36-A** [3] - 85:24, 98:19, 99:19
**36-B** [1] - 100:2
**37-A** [4] - 85:25, 100:12, 101:3, 101:10
**376** [1] - 70:21
**37A** [2] - 101:12, 101:20
**37A-R** [2] - 101:12, 101:20
**38** [1] - 4:15
**38-A** [5] - 85:25, 102:16, 102:22, 104:12, 104:17, 104:18
**38A** [2] - 104:21, 135:1
**38A-R** [2] - 104:21, 135:1
**39-A** [6] - 86:1, 105:7, 105:24, 106:1, 106:9, 106:13
**39-B** [5] - 86:1, 105:7, 105:25, 106:5, 106:10
**399** [1] - 70:23
**39A** [2] - 106:15, 135:9
**39A-R** [2] - 106:15, 135:9
**3:13** [1] - 138:25
**3:23** [1] - 138:25
**3:26** [1] - 140:12
**3:28** [1] - 141:22
**3:29** [1] - 142:4
**3:30** [1] - 113:3

**4**

**4** [13] - 11:9, 14:15, 26:20, 26:24, 28:16, 45:2, 48:9, 85:25, 96:15, 99:3, 99:7, 100:15, 143:5
**40** [2] - 95:8, 95:15
**401** [1] - 70:25
**409** [1] - 71:2
**41-A** [1] - 117:19
**410** [1] - 71:4
**417** [1] - 71:6
**428** [1] - 71:8
**429** [1] - 71:8

**43** [2] - 79:12, 133:17
**430** [2] - 71:8, 71:11
**449** [1] - 71:13
**45** [2] - 46:23, 47:2
**450** [1] - 71:13
**451** [1] - 71:13
**472** [1] - 71:16
**478** [1] - 71:18
**48** [1] - 19:17
**488** [1] - 71:20
**49-A** [4] - 47:17, 48:19, 126:16, 127:7
**49-B** [1] - 50:6
**493** [1] - 71:22
**497** [1] - 71:24
**4:00** [1] - 141:25
**4:30** [1] - 93:7

**5**

**5** [12] - 11:25, 28:13, 45:7, 48:18, 48:19, 86:1, 100:20, 102:19, 112:25, 120:22, 121:16, 122:16
**50** [2] - 91:12, 91:15
**500** [1] - 67:16
**501** [1] - 72:1
**51** [2] - 41:22, 42:8
**53** [1] - 70:6
**54** [1] - 59:2
**57** [1] - 58:14
**5:05** [1] - 9:8
**5:56** [1] - 9:13
**5th** [2] - 47:8, 64:13

**6**

**6** [16] - 8:11, 12:21, 12:22, 28:13, 45:10, 49:2, 67:22, 81:10, 81:13, 86:2, 105:10, 111:19, 113:3, 121:16, 122:9, 133:25
**68** [1] - 58:24
**6:05** [1] - 9:19
**6:30** [1] - 8:11
**6:31** [1] - 9:23
**6:55** [1] - 10:7

**7**

**7** [6] - 12:24, 28:7, 67:22, 85:24, 97:6, 122:8
**72** [1] - 19:17
**7th** [4] - 46:7, 46:23, 47:3, 108:19

**8**

**8** [7] - 13:1, 28:13, 49:9, 68:21, 86:1, 86:2, 116:21

**9**

**9** [5] - 13:4, 49:13, 61:24, 112:25, 115:9
**927** [1] - 65:21
**9YO** [2] - 58:15, 77:24
**9YO-sucker** [1] - 77:24

**A**

**A-L-I-S-H-A** [1] - 107:11
**a.m** [6] - 2:1, 3:12, 39:5, 42:25, 43:2
**AA** [1] - 32:22
**AB** [1] - 32:21
**ABI** [1] - 77:24
**Abingdon** [4] - 107:19, 109:23, 110:4, 131:12
**able** [23] - 12:11, 17:19, 18:3, 24:22, 34:10, 34:20, 34:22, 35:19, 41:8, 48:25, 56:17, 60:21, 62:9, 66:13, 66:14, 66:20, 66:21, 68:13, 77:18, 80:4, 87:12, 139:6
**absolutely** [6] - 18:18, 26:14, 30:17, 31:7, 31:10, 32:6
**abuse** [1] - 5:17
**access** [2] - 26:11, 58:11
**according** [1] - 45:24
**account** [1] - 44:1
**accurate** [2] - 41:10, 144:10
**acronym** [1] - 57:12
**active** [2] - 63:8, 63:10
**activity** [2] - 62:10, 65:24
**actual** [4] - 21:22, 46:19, 69:13, 77:12
**actualincesttube.org** [1] - 68:11
**added** [2] - 69:24, 70:1
**addendum** [1] - 46:9
**addition** [3] - 68:12, 72:3, 82:10
**address** [9] - 39:11, 39:20, 109:24, 110:4, 111:13, 126:4, 128:6, 128:11, 128:15
**adjourn** [1] - 138:11

**administrative** [1] - 5:4
**admissible** [1] - 39:23
**adopted** [2] - 85:19, 109:9
**adult** [28] - 76:2, 76:7, 76:13, 78:8, 87:23, 87:25, 88:4, 88:15, 88:19, 88:23, 89:1, 89:7, 89:8, 89:16, 89:18, 89:24, 89:25, 90:4, 90:8, 90:9, 90:12, 90:16, 90:19, 91:3, 93:17, 99:9, 100:23
**advance** [2] - 85:8, 140:3
**advanced** [1] - 19:9
**Advantage** [1] - 48:2
**advertisements** [1] - 66:11
**advice** [1] - 75:6
**advise** [2] - 6:23, 140:6
**advised** [2] - 6:24, 140:18
**Advocacy** [8] - 5:16, 5:23, 5:24, 6:16, 7:1, 7:20, 8:3
**Affairs** [2] - 5:1
**affixed** [1] - 144:11
**afternoon** [2] - 2:13, 107:16
**afterwards** [2] - 3:3, 133:1
**age** [6] - 71:14, 76:20, 76:25, 77:1, 77:2, 78:5
**agency** [1] - 18:6
**agent** [3] - 23:9, 24:17, 33:24
**Agent** [1] - 26:2
**agents** [2] - 17:1, 76:22
**ages** [1] - 76:23
**ago** [7] - 50:14, 114:11, 116:25, 118:25, 121:17, 122:14, 133:25
**agree** [2] - 41:8, 84:2
**agreed** [5] - 9:5, 9:6, 28:3, 76:17, 85:17
**ahead** [5] - 84:17, 92:19, 138:3, 138:9, 139:14
**Air** [2] - 44:12, 47:24
**airplane** [1] - 23:19
**akin** [1] - 6:13
**alert** [1] - 2:19
**algorithm** [2] - 23:24, 30:23
**ALISHA** [2] - 107:6, 143:8
**Alisha** [7] - 2:13, 7:13, 46:5, 46:10, 51:11, 106:22, 107:11

**Alissa** [1] - 7:13
**allocated** [1] - 33:19
**allow** [6] - 3:1, 17:21, 22:7, 32:4, 36:3, 103:21
**allowing** [1] - 66:9
**allows** [4] - 22:6, 35:16, 53:23, 74:13
**almost** [1] - 31:6
**alone** [4] - 112:18, 113:12, 128:5, 128:8
**AMERICA** [1] - 1:4
**America** [4] - 9:7, 28:4, 76:18, 85:18
**amount** [2] - 19:5, 35:20
**analysis** [6] - 17:1, 20:25, 21:6, 23:4, 29:13, 54:20
**analyst** [5] - 16:16, 16:18, 16:21, 17:6, 18:5
**Analyze** [1] - 31:21
**analyze** [2] - 16:25, 32:2
**Android** [10] - 102:25, 103:1, 103:9, 103:18, 103:24, 103:25, 104:5, 105:17, 105:22
**angle** [1] - 81:25
**animals** [1] - 123:24
**anonymity** [1] - 65:8
**anonymous** [1] - 62:7
**answer** [1] - 20:23
**answered** [1] - 120:12
**anticipate** [1] - 138:4
**apart** [2] - 99:9, 105:19
**apologies** [2] - 2:3, 2:5
**apologize** [2] - 3:16, 41:18
**app** [4] - 103:18, 132:21, 132:25, 133:14
**appear** [5] - 50:13, 94:3, 98:13, 99:25, 101:7
**Appearances** [1] - 1:15
**appeared** [3] - 12:12, 54:20, 54:22
**application** [6] - 66:7, 66:21, 67:5, 67:13, 68:14, 69:14
**applications** [2] - 66:1, 66:4
**applied** [1] - 2:23
**applies** [1] - 23:11
**appreciate** [2] - 3:15, 137:25
**approach** [7] - 10:17, 80:13, 82:18, 91:10, 114:9, 117:14, 137:19
**approached** [1] - 9:15
**approaching** [1] - 89:12
**appropriate** [2] - 82:25,

83:24
**April** [3] - 67:19, 93:7, 96:21
**archive** [1] - 63:24
**area** [8] - 4:22, 12:7, 13:4, 14:1, 26:11, 27:23, 90:19, 124:4
**argue** [2] - 138:7, 141:5, 141:16
**argument** [1] - 2:17
**Arkhangelsk** [1] - 77:2
**arm** [4] - 88:2, 88:25, 90:2, 118:9
**Army** [1] - 18:9
**arrangements** [1] - 7:17
**arrive** [1] - 10:6
**arrived** [3] - 9:13, 10:8, 11:23
**arrow** [1] - 53:9
**articles** [1] - 13:2
**artifacts** [6] - 31:21, 33:11, 61:10, 63:6, 63:8, 72:11
**Asian** [2] - 50:2, 51:3
**ass** [1] - 58:25
**assigned** [4] - 5:19, 6:4, 6:13, 8:21
**assist** [7] - 9:11, 17:10, 43:22, 54:11, 73:20, 79:20, 106:12
**associated** [9] - 37:17, 56:7, 56:20, 63:11, 64:12, 77:10, 79:3, 104:3, 105:14
**Association** [1] - 18:9
**assuming** [2] - 81:22, 138:4
**attempt** [1] - 83:25
**attend** [1] - 16:22
**attended** [2] - 19:13, 19:16
**attention** [15] - 40:8, 98:10, 111:7, 111:18, 111:24, 112:8, 114:5, 114:6, 114:13, 118:9, 121:20, 122:21, 123:21, 128:13, 128:22
**attorneys** [4] - 9:7, 28:4, 76:18, 85:18
**attribution** [1] - 72:3
**audio** [1] - 8:9
**August** [4] - 49:8, 105:2, 105:4, 105:16
**Aunt** [1] - 36:2
**authority** [1] - 21:15
**auto** [1] - 4:24
**Auto** [2] - 5:2, 5:6
**automatically** [2] - 36:14, 53:16
**autos** [1] - 5:4

**available** [3] - 7:19, 32:23, 125:14
**AVI** [1] - 36:20
**avoid** [1] - 83:25
**aware** [4] - 126:8, 126:9, 126:12, 126:13
**AXIOM** [1] - 17:11

**B**

**baby** [1] - 120:6
**background** [5] - 19:3, 40:2, 40:3, 91:16, 134:21
**backup** [2] - 17:20, 22:9
**Baltimore** [5] - 1:11, 1:24, 4:20, 4:22, 5:9
**band** [1] - 96:18, 118:12, 135:16, 135:18, 135:21, 135:23
**bank** [1] - 45:18
**bar** [1] - 69:13
**Barry** [2] - 8:7, 26:4
**bars** [2] - 69:22, 70:1
**based** [5] - 21:4, 38:8, 39:13, 73:14, 83:7
**basement** [8] - 12:5, 12:7, 14:24, 15:1, 15:14, 124:8, 124:9, 124:14
**basic** [1] - 19:8
**bathroom** [4] - 12:10, 136:24, 137:2
**beauty** [1] - 54:6
**became** [1] - 18:5
**bed** [12] - 13:3, 13:15, 111:3, 111:5, 117:23, 128:23, 128:24, 129:4, 129:13, 130:14, 136:22, 137:2
**bedding** [6] - 13:2, 13:4, 13:7, 13:13, 117:10, 120:20
**bedroom** [34] - 12:12, 12:16, 12:17, 12:23, 12:25, 13:2, 110:20, 111:2, 112:4, 117:7, 117:8, 117:10, 121:6, 123:11, 123:12, 123:17, 123:19, 124:1, 129:8, 134:11, 134:12, 134:16, 134:25, 136:7, 136:8, 137:5, 137:8, 137:9, 137:10
**bedrooms** [3] - 12:9, 137:4, 137:7
**began** [1] - 131:9
**begin** [5] - 29:13, 29:17, 31:16, 58:13, 131:11
**beginning** [5] - 22:12, 23:24, 33:3, 59:22, 67:22

**begins** [5] - 21:13, 93:16, 97:15, 99:8, 100:22
**Behalf** [2] - 1:16, 1:18
**behind** [4] - 29:14, 29:15, 39:13, 76:9
**Bel** [2] - 44:12, 47:24
**believes** [1] - 65:7
**belonged** [1] - 11:1
**belonging** [1] - 10:19
**below** [4] - 76:20, 76:23, 85:22, 90:25
**bench** [9] - 82:20, 85:14, 86:4, 86:6, 86:20, 137:21, 138:10, 138:21, 139:18
**beneath** [2] - 104:14, 106:8
**benzodiazepine** [1] - 128:19
**best** [2] - 3:10, 71:23
**better** [3] - 31:19, 53:6, 115:21
**between** [12] - 3:7, 9:6, 18:8, 28:4, 44:25, 53:25, 54:4, 76:17, 85:17, 97:18, 100:5, 133:13
**big** [2] - 21:24, 25:3
**bill** [3] - 45:23, 45:25, 49:3
**birth** [6] - 48:11, 48:12, 48:20, 48:21, 109:6, 117:13
**birthday** [1] - 108:7
**birthstones** [1] - 127:5
**bit** [14] - 3:9, 22:3, 22:9, 22:13, 59:8, 62:6, 75:24, 80:5, 121:15, 123:8, 124:5, 134:6
**bit-for-bit** [2] - 22:9, 22:13
**black** [5] - 13:9, 69:22, 70:1, 88:12, 99:11
**blackout** [5] - 88:5, 89:3, 111:14, 111:16, 134:17
**Blake** [1] - 1:12
**blank** [1] - 76:4
**blanket** [36] - 12:19, 13:12, 13:21, 14:3, 14:5, 14:12, 93:20, 94:19, 94:24, 97:16, 97:18, 98:7, 98:9, 99:13, 99:16, 100:6, 100:8, 100:25, 101:19, 104:15, 104:24, 106:3, 106:4, 106:7, 106:8, 106:18, 117:13, 118:6, 119:15, 119:23, 119:25, 120:3, 120:5, 135:11, 135:25

**blankets** [3] - 106:16, 117:11, 123:23
**blinds** [1] - 111:14
**blocker** [2] - 22:2, 29:25
**blow** [1] - 58:15
**blue** [18] - 87:24, 88:16, 88:24, 89:8, 89:17, 89:25, 90:9, 90:17, 91:4, 97:20, 99:14, 100:5, 100:6, 104:15, 106:8, 116:14, 116:16, 116:17
**Blue** [2] - 48:7, 51:20
**blur** [1] - 94:18
**blurry** [1] - 48:23
**body** [1] - 104:14
**bookmark** [5] - 23:7, 23:8, 24:16, 33:23, 34:12
**boom** [1] - 35:22
**born** [2] - 85:20, 107:22
**bottom** [10] - 11:6, 44:22, 59:22, 62:25, 88:1, 89:10, 90:2, 94:19, 114:14, 121:20
**bought** [1] - 120:25
**boxes** [1] - 52:13
**bracelet** [1] - 90:3
**bracelets** [6] - 88:3, 88:18, 89:1, 90:11, 91:6, 118:13
**break** [15] - 5:10, 27:12, 38:25, 39:4, 39:12, 42:24, 52:7, 85:11, 91:23, 92:1, 92:11, 137:24, 138:9, 138:23
**breaking** [1] - 38:25
**breaks** [3] - 33:17, 33:18, 64:7
**brevity** [1] - 100:20
**brief** [2] - 137:24, 138:7
**briefly** [11] - 10:14, 17:16, 39:17, 52:22, 53:21, 82:18, 88:11, 104:17, 106:9, 117:14, 137:19
**bring** [11] - 29:12, 35:16, 43:1, 60:24, 74:13, 103:22, 118:9, 138:10, 139:8, 139:17
**brought** [1] - 29:17
**browser** [12] - 52:8, 52:23, 52:24, 52:25, 53:2, 53:3, 54:11, 61:12, 62:5, 64:7, 69:2, 69:5
**browsers** [4] - 52:9, 52:22, 53:4, 64:8
**browsing** [2] - 65:9, 69:8
**BUDLOW** [37] - 2:8, 3:5, 3:20, 4:8, 9:5, 10:4, 15:22, 16:11, 21:8, 28:3,

29:2, 39:10, 39:16, 41:4, 41:20, 42:3, 42:18, 43:5, 79:19, 83:12, 83:19, 83:21, 84:5, 84:19, 85:3, 85:15, 86:9, 86:11, 86:14, 86:21, 91:24, 92:17, 97:25, 98:24, 99:21, 143:5, 143:7
**Budlow** [1] - 91:22
**budlow** [1] - 1:17
**built** [2] - 103:20
**bulb** [2] - 112:1, 112:11
**burglaries** [2] - 4:24, 5:20
**butterflies** [8] - 13:11, 13:25, 14:8, 14:14, 14:16, 99:17, 117:12, 119:12
**buttocks** [3] - 97:16, 97:17, 97:18
**button** [2] - 23:22, 34:5
**BY** [17] - 4:8, 10:4, 16:11, 21:8, 29:2, 43:5, 79:19, 86:21, 92:17, 97:25, 98:24, 99:21, 107:15, 117:18, 143:5, 143:7, 143:8

**C**

**caboodle** [1] - 24:13
**cache** [21] - 35:15, 37:9, 37:15, 74:3, 74:6, 74:9, 74:12, 74:15, 86:25, 87:5, 87:10, 102:25, 103:1, 103:9, 103:18, 103:23, 103:24, 103:25, 104:5, 105:17
**caches** [2] - 35:21, 103:21
**calendar** [2] - 43:20, 46:18
**camera** [5] - 38:10, 38:12, 71:21, 71:25, 97:17
**cameras** [1] - 38:7
**cannot** [2] - 38:15, 83:3
**capital** [1] - 55:4
**capture** [1] - 34:10
**car** [3] - 9:14, 9:15, 10:11
**card** [25] - 25:21, 25:25, 27:20, 27:21, 28:15, 28:23, 29:5, 43:15, 47:9, 47:10, 47:21, 48:7, 50:4, 51:20, 51:24, 92:21, 92:22, 92:23, 96:22, 97:7, 97:10, 98:16, 99:2, 100:9, 100:18

**career** [3] - 4:19, 4:21, 19:24
**Caroline** [1] - 20:17
**carries** [1] - 83:1
**Carroll** [10] - 4:13, 5:24, 6:1, 6:11, 6:14, 8:2, 9:9, 9:20, 120:17, 120:25
**Case** [1] - 144:7
**case** [31] - 2:25, 11:10, 16:25, 21:19, 23:8, 23:9, 24:11, 24:17, 25:5, 25:17, 26:5, 30:16, 31:18, 33:10, 33:16, 33:22, 33:23, 34:6, 41:7, 53:15, 73:5, 94:25, 101:25, 102:2, 108:9, 140:23, 141:5, 141:6, 141:19
**CASE** [1] - 1:5
**cases** [14] - 4:17, 5:17, 19:22, 20:2, 55:9, 55:11, 57:11, 57:17, 58:18, 58:21
**categories** [4] - 32:5, 33:11, 52:4, 64:4
**cater** [1] - 124:2
**cater-cornered** [1] - 124:2
**Catherine** [1] - 1:12
**CCB-17-226** [2] - 1:6, 144:7
**CE** [1] - 59:2
**ceiling** [3] - 111:21, 111:22, 112:12
**celebratory** [1] - 95:17
**cell** [11] - 10:19, 21:12, 23:13, 23:16, 23:25, 70:22, 101:24, 102:1, 102:4, 105:15
**Cellebrite** [4] - 17:12, 19:11, 34:4, 46:16
**Center** [4] - 5:24, 8:3, 29:16, 72:21
**center** [5] - 50:12, 96:2, 114:6, 121:12, 124:11
**Central** [1] - 4:21
**certain** [1] - 32:18
**certainly** [4] - 40:19, 69:23, 138:6, 141:7
**CERTIFICATE** [1] - 144:3
**certificate** [3] - 48:11, 48:20, 48:21
**certificate's** [1] - 48:13
**certify** [2] - 144:5, 144:8
**chambers** [2] - 138:12, 141:25
**chance** [3] - 15:10, 141:3, 141:16
**chances** [1] - 31:6

**change** [3] - 22:3, 31:2, 83:22

**changed** [2] - 33:2, 38:15

**changes** [7] - 17:21, 24:25, 30:25, 31:12, 32:20, 32:21, 32:22

**changing** [3] - 24:2, 24:3, 83:21

**characters** [1] - 32:20

**charged** [3] - 23:18, 34:3, 86:8

**chart** [1] - 69:16

**check** [4] - 44:12, 44:14, 47:24, 48:2

**checking** [1] - 52:13

**cheeks** [1] - 97:18

**Chevy** [1] - 49:11

**child** [21] - 2:24, 5:17, 18:11, 19:13, 20:4, 20:6, 31:22, 58:17, 58:20, 58:21, 59:11, 59:14, 72:5, 72:25, 73:6, 73:10, 73:17, 75:16, 82:23, 97:15, 97:20

**Child** [6] - 5:15, 5:16, 5:23, 5:24, 6:16, 6:25, 7:20, 8:2

**child's** [3] - 97:17, 97:18, 137:8

**Children** [2] - 18:10, 72:21

**children** [6] - 5:17, 45:8, 48:16, 49:5, 108:3, 127:5

**children's** [1] - 137:7

**China** [3] - 28:8, 28:14, 28:17

**Chinese** [2] - 114:20, 127:9

**choose** [2] - 141:5, 141:16

**chose** [1] - 58:4

**Chrome** [2] - 53:3, 62:5

**chronologically** [1] - 98:15

**CID** [1] - 5:21

**circling** [3] - 112:1, 118:5, 124:22

**Circuit** [4] - 2:20, 2:21, 2:22, 3:2

**circuit** [1] - 20:22

**circumstances** [3] - 2:22, 112:20, 128:4

**circumstantial** [1] - 86:17

**City** [5] - 4:20, 5:9, 5:12, 5:21, 9:24

**claim** [2] - 66:12, 66:13

**clarification** [1] - 39:22

**clean** [1] - 22:24

**clear** [12] - 5:6, 40:5, 40:6, 42:9, 84:20, 86:18, 91:19, 97:17, 101:2, 102:8, 110:21, 130:20

**CLERK** [11] - 3:23, 4:1, 4:6, 15:25, 16:3, 16:7, 16:9, 92:15, 107:5, 107:8, 107:13

**Clerk** [1] - 81:14

**click** [5] - 32:13, 32:14, 35:22, 35:25, 53:10

**clicked** [1] - 37:5

**clicking** [1] - 53:12

**close** [8] - 13:4, 14:1, 27:8, 39:11, 95:12, 95:20, 96:15, 119:25

**close-up** [2] - 13:4, 14:1, 95:12, 95:20, 96:15, 119:25

**cloth** [2] - 104:15, 106:8

**clothed** [3] - 78:9, 80:15, 82:13

**clothing** [1] - 91:17

**clusters** [2] - 93:6, 93:10

**coding** [1] - 33:3

**collect** [1] - 16:25

**collection** [1] - 63:25

**Collins** [2] - 134:2, 134:4

**color** [9] - 45:11, 88:5, 89:3, 93:18, 94:20, 95:25, 96:3, 96:5

**colored** [6] - 11:19, 72:17, 97:20, 99:14, 101:1, 127:4

**colorful** [2] - 49:24, 50:11

**column** [3] - 32:3, 46:24, 69:12

**columns** [1] - 33:17

**com** [1] - 59:2

**combination** [2] - 57:6, 57:8

**combined** [1] - 5:25

**Comcast** [1] - 45:23

**comforter** [13] - 13:10, 13:13, 13:15, 117:11, 118:2, 118:23, 118:24, 119:4, 119:8, 123:23, 135:4, 135:5

**coming** [3] - 3:15, 19:6, 129:8, 136:7

**comma** [1] - 58:16

**Command** [1] - 18:9

**commerce** [1] - 28:24

**common** [4] - 58:20, 78:4, 118:10, 122:25

**commonly** [2] - 35:3,

59:11

**companies** [1] - 53:5

**compare** [1] - 30:11

**compared** [1] - 75:18

**compares** [1] - 63:7

**comparing** [1] - 30:16

**comparison** [2] - 30:14, 31:8

**complete** [2] - 30:6, 144:10

**completely** [1] - 23:18

**comprehensive** [1] - 52:7

**computer** [57] - 15:2, 15:5, 15:6, 15:14, 16:16, 16:18, 16:20, 18:5, 18:23, 19:4, 20:8, 21:19, 23:14, 25:23, 27:1, 27:4, 28:6, 30:1, 30:21, 31:4, 32:12, 32:23, 33:5, 35:9, 35:16, 35:20, 36:14, 37:8, 37:21, 37:25, 44:18, 45:3, 48:10, 52:1, 52:2, 52:5, 52:7, 53:12, 53:16, 54:12, 54:13, 55:14, 56:22, 58:3, 59:24, 62:8, 64:3, 65:25, 72:4, 74:19, 78:8, 86:24, 95:1, 95:4, 125:22, 126:2

**computer's** [1] - 57:20

**computers** [7] - 18:24, 21:1, 21:7, 23:11, 54:13, 60:7, 103:21

**concern** [1] - 84:7

**concerned** [1] - 40:9

**concerning** [2] - 131:1, 133:7

**conclude** [1] - 7:2, 37:18, 37:20, 63:14, 84:11

**conclusion** [1] - 142:4

**condensed** [2] - 79:8, 79:11

**conditional** [1] - 3:1

**conduct** [2] - 18:13, 40:1

**conducted** [2] - 7:21, 8:7

**conference** [6] - 82:20, 85:14, 86:6, 86:20, 137:21, 138:21

**conferences** [1] - 19:16

**Confide** [5] - 132:21, 132:24, 133:2, 133:6, 133:14

**confide** [1] - 132:22

**confirm** [5] - 34:20, 34:22, 137:24

**confirmed** [1] - 31:13

**confusing** [1] - 84:13

**connect** [1] - 22:8

**connected** [3] - 34:16, 60:13, 60:14

**connecting** [1] - 54:12

**consent** [2] - 21:14, 21:16

**considered** [3] - 53:25, 54:1, 59:15

**consists** [1] - 38:4

**constitute** [1] - 144:8

**contact** [2] - 132:13, 132:15

**contain** [1] - 61:11

**contained** [1] - 28:10

**content** [3] - 40:19, 41:10, 44:19

**contesting** [1] - 86:15

**continue** [2] - 38:24, 43:4

**contractor** [1] - 18:22

**control** [1] - 15:6

**controller** [1] - 125:1

**conversation** [6] - 10:13, 121:25, 129:17, 130:11, 130:13, 131:1

**conversations** [3] - 83:7, 133:5, 133:13

**conveyed** [1] - 82:21

**cookies** [2] - 66:9, 66:12

**copied** [1] - 34:14, 34:21

**copies** [2] - 42:7, 92:4

**copy** [24] - 17:20, 17:22, 22:9, 22:13, 22:18, 22:19, 23:5, 30:5, 30:13, 30:18, 31:13, 31:24, 32:2, 34:15, 35:13, 36:12, 37:5, 37:7, 40:25, 41:13, 41:16, 84:25, 85:10

**core** [3] - 57:15, 57:17, 59:1

**corner** [2] - 101:15, 122:22

**cornered** [1] - 124:2

**Corporal** [4] - 9:9, 9:15, 9:17, 9:21

**Corps** [2] - 18:13, 18:21

**correct** [92] - 5:8, 6:15, 7:16, 9:1, 13:5, 13:19, 13:20, 14:2, 14:19, 18:4, 22:21, 23:2, 25:18, 27:9, 27:10, 29:12, 37:4, 38:23, 42:10, 43:11, 46:3, 46:4, 46:12, 46:14, 46:15, 47:4, 47:21, 47:22, 48:5, 51:13, 55:5, 56:19, 58:1, 58:5, 58:6, 58:10, 61:16, 62:10,

62:14, 62:17, 63:12, 63:22, 64:5, 65:9, 65:15, 67:20, 68:21, 69:17, 69:18, 70:2, 74:4, 74:21, 75:14, 75:19, 77:13, 77:14, 78:20, 81:7, 82:14, 82:15, 82:16, 84:7, 86:9, 91:18, 95:19, 105:1, 105:18, 105:19, 108:15, 110:2, 110:17, 110:23, 115:15, 117:1, 118:8, 119:5, 119:7, 119:10, 120:18, 121:3, 123:20, 124:24, 125:6, 125:12, 127:11, 131:7, 131:25, 135:6, 135:8, 140:20, 140:21

**corrected** [1] - 41:14

**corrections** [1] - 40:22

**correctly** [3] - 66:16, 69:3, 69:5

**couch** [4] - 78:9, 80:15, 116:11, 124:11

**cough** [1] - 129:20

**coughing** [3] - 129:20, 129:22, 129:23

**counsel** [6] - 39:2, 86:4, 92:6, 141:2, 141:4, 141:16

**Count** [13] - 42:9, 75:7, 85:23, 85:24, 85:25, 91:20, 93:23, 98:22, 100:15, 102:19, 105:10

**counts** [2] - 85:21, 141:3

**Counts** [5] - 28:7, 28:13, 28:16, 86:1, 86:2

**County** [15] - 4:13, 5:24, 6:1, 6:11, 6:14, 8:2, 9:9, 9:20, 20:17, 20:18, 110:1, 120:17, 120:25

**couple** [12] - 2:23, 20:5, 30:10, 35:1, 40:2, 40:4, 40:7, 61:14, 61:17, 128:1, 132:16, 136:2

**course** [3] - 19:23, 133:4, 133:12

**COURT** [97] - 1:1, 2:2, 2:6, 2:15, 3:11, 3:13, 3:22, 9:4, 10:3, 15:18, 15:20, 15:24, 21:2, 21:4, 27:6, 27:11, 28:2, 29:1, 39:2, 39:6, 39:8, 39:15, 40:24, 41:5, 41:7, 41:17, 41:23, 42:2, 42:5, 42:7, 42:12, 42:14, 42:17, 42:21, 42:23, 43:1, 43:3, 75:11, 76:16, 79:17, 80:9, 80:14, 82:19,

83:10, 83:17, 83:20,
84:2, 84:17, 84:20, 85:2,
85:10, 85:13, 86:4, 86:7,
86:10, 86:12, 86:19,
91:11, 91:22, 91:25,
92:4, 92:10, 92:12,
92:14, 92:19, 93:24,
97:23, 98:23, 102:20,
105:11, 106:11, 106:21,
106:24, 107:1, 107:3,
117:15, 117:17, 136:10,
137:16, 137:18, 137:20,
138:1, 138:3, 138:8,
138:20, 138:22, 139:1,
139:4, 139:17, 139:23,
140:3, 140:11, 140:13,
140:17, 140:22, 141:23,
142:3

**Court** [37] - 8:13, 9:11,
9:20, 9:25, 11:15, 20:19,
39:23, 51:12, 75:6,
83:25, 109:25, 112:14,
112:23, 113:6, 113:13,
113:21, 116:1, 117:6,
120:7, 120:10, 120:16,
120:20, 121:1, 123:6,
123:10, 128:2, 128:4,
131:9, 131:22, 132:10,
134:13, 134:24, 139:10,
140:9, 140:10, 144:17

**court** [4] - 20:9, 20:22,
44:25

**Court's** [5] - 6:7, 88:7,
136:1

**Courthouse** [1] - 1:23

**courtroom** [9] - 2:9,
3:12, 20:18, 39:5, 39:7,
43:2, 92:13, 140:12,
141:22

**cover** [2] - 102:6, 125:5

**covering** [5] - 88:6,
89:3, 111:8, 111:11,
111:12

**CPS** [1] - 8:7

**cracking** [1] - 17:24

**create** [11] - 17:19,
22:9, 24:17, 35:9, 36:21,
56:10, 67:4, 68:17, 95:9,
100:2, 105:6

**created** [22] - 22:18,
34:21, 35:7, 36:3, 36:19,
37:13, 38:9, 38:14,
69:10, 78:23, 81:2, 93:7,
94:23, 97:5, 99:3,
100:19, 102:13, 102:24,
104:4, 104:9, 105:3,
105:16

**creates** [2] - 30:5, 35:13

**creating** [1] - 54:14

**creation** [5] - 79:1,

79:2, 96:22, 98:16,
100:17

**Credit** [1] - 45:18

**crimes** [2] - 5:20, 20:6

**CRIMINAL** [1] - 1:5

**Criminal** [2] - 5:22,
140:1

**cross** [5] - 45:11, 49:24,
50:11, 127:4

**Cross/Blue** [2] - 48:7,
51:20

**crossing** [1] - 136:8

**cumbersome** [1] - 3:9

**cumindaughter.org** [1]
- 68:9

**cursor** [2] - 64:22,
65:22

**curtains** [3] - 111:14,
111:16, 134:17

**cut** [2] - 59:8, 99:4

**CVS** [1] - 51:24

# D

**Dad** [2] - 63:24, 63:25

**dad** [4] - 58:25, 63:2,
63:24, 71:17

**daddaughtertaboo.cc**
[1] - 68:7

**daddy** [1] - 62:2

**Daddy** [6] - 63:24,
65:23, 70:11, 70:13,
70:18, 71:21

**Daddyfucksdaughter.
net** [1] - 68:5

**dads** [1] - 71:25

**dadscamera.com** [1] -
68:11

**dark** [3] - 80:2, 88:5,
89:3

**dark-in-color** [2] - 88:5,
89:3

**dash** [1] - 58:24

**data** [34] - 16:23, 17:3,
17:16, 17:17, 17:18,
17:24, 22:3, 22:23, 23:5,
23:11, 24:12, 24:23,
32:4, 32:7, 33:13, 34:1,
34:8, 34:10, 34:21,
34:22, 38:2, 38:3, 38:6,
38:16, 38:20, 43:9,
43:20, 44:1, 46:18, 67:4,
67:9, 87:4

**Data** [1] - 69:12

**database** [1] - 75:17

**Databases** [2] - 67:8,
67:12

**databases** [2] - 69:9,
69:10

**date** [34] - 44:14, 45:24,
46:6, 46:12, 46:22,
46:24, 47:7, 47:25, 49:7,
56:20, 58:7, 58:8, 58:11,
61:1, 62:15, 63:15,
65:13, 66:21, 67:18,
69:20, 74:23, 74:24,
78:23, 78:25, 79:1, 79:2,
80:21, 81:2, 87:12,
96:22, 98:16, 100:17,
102:14, 105:4

**dated** [1] - 48:4

**dates** [5] - 38:9, 38:14,
63:11, 64:12, 69:16

**dating** [3] - 108:14,
108:16, 109:19

**daughter** [12] - 7:20,
8:2, 8:5, 61:21, 62:2,
63:2, 70:7, 70:11, 70:18,
71:17, 85:20

**daughters** [1] - 63:3

**David** [1] - 9:19

**days** [2] - 46:23, 47:2

**dealing** [1] - 44:18

**dealt** [2] - 3:2, 86:12

**debate** [1] - 84:3

**December** [8] - 5:18,
64:13, 64:14, 65:13,
66:25, 67:18, 69:21,
109:12

**decreases** [1] - 35:19

**Defendant** [2] - 1:7,
1:18

**defendant** [57] - 9:7,
9:10, 9:13, 9:14, 9:16,
28:5, 76:18, 85:18,
108:9, 108:16, 108:25,
109:6, 109:8, 109:13,
109:16, 109:19, 110:3,
110:25, 111:12, 112:13,
112:17, 113:12, 114:3,
115:4, 116:7, 116:16,
117:5, 120:10, 120:19,
121:23, 122:25, 123:2,
123:9, 124:5, 124:13,
125:14, 126:3, 127:17,
128:3, 128:5, 128:8,
128:24, 129:15, 130:2,
130:10, 130:16, 130:22,
131:5, 132:13, 133:5,
133:13, 133:14, 135:17,
136:4, 136:5, 136:17,
140:18

**defendant's** [9] - 9:17,
9:22, 10:1, 49:5, 85:19,
86:15, 108:21, 113:1,
128:2

**defense** [7] - 39:21,
40:18, 40:23, 41:1,
84:24, 85:8, 139:8

**delay** [1] - 3:16

**delete** [7] - 32:15,
32:19, 32:22, 33:2,
37:11, 38:18

**deleted** [20] - 18:3,
32:11, 35:3, 37:19,
37:23, 56:8, 57:1, 70:22,
74:24, 79:5, 79:6, 81:8,
81:9, 93:11, 97:11, 99:3,
100:19, 103:11

**deliberate** [1] - 141:17

**deliberation** [1] - 141:6

**Dell** [3] - 95:1, 96:7,
126:2

**demeanor** [1] - 130:5

**dental** [1] - 49:3

**deny** [1] - 140:4

**department** [2] - 5:15,
6:2

**Department** [5] - 4:12,
6:2, 6:12, 9:24, 16:16

**departments** [1] - 6:1

**depict** [3] - 94:14,
95:23, 96:9

**depicted** [6] - 50:10,
75:20, 76:19, 76:23,
77:12, 85:20

**depicting** [3] - 76:1,
76:6, 76:12

**depiction** [1] - 76:21

**depicts** [12] - 87:23,
88:15, 88:23, 89:7,
89:16, 89:24, 90:8,
90:16, 91:3, 104:13,
106:1, 106:5

**depression** [1] - 96:1

**Deputy** [10] - 6:8, 6:10,
6:16, 7:2, 7:14, 9:19,
9:25, 10:10, 10:13, 10:17

**deputy** [3] - 6:11, 8:18,
8:24

**describe** [47] - 11:17,
13:9, 13:23, 21:10, 29:3,
29:20, 38:2, 38:3, 39:25,
44:11, 50:10, 75:4, 75:9,
75:25, 76:5, 76:11,
79:13, 80:20, 83:5,
88:22, 89:6, 89:15,
89:23, 90:7, 91:2, 93:12,
93:15, 94:9, 95:15, 98:7,
99:6, 100:6, 100:21,
101:18, 101:23, 102:6,
104:12, 105:24, 111:25,
112:9, 114:18, 116:13,
117:25, 127:2, 130:5,
133:21, 136:4

**described** [5] - 23:10,
39:18, 65:24, 91:14,
130:11

**description** [7] - 41:2,

41:10, 41:13, 83:10,
87:21, 88:14, 97:12

**descriptions** [6] -
39:22, 40:17, 40:23,
41:15, 83:21, 83:22

**design** [1] - 112:12

**designator** [1] - 32:18

**designed** [3] - 18:8,
31:21, 103:21

**desktop** [5] - 51:18,
95:1, 96:7, 103:13, 126:2

**despite** [1] - 130:19

**detail** [1] - 119:6

**detailed** [1] - 119:8

**detecting** [1] - 72:17

**detective** [2] - 10:5,
15:16

**DETECTIVE** [2] - 3:24,
143:5

**Detective** [7] - 2:8,
3:21, 4:9, 8:11, 9:23,
10:10, 15:20

**determine** [4] - 52:14,
66:20, 66:21, 87:12

**detrimental** [1] - 21:21

**device** [28] - 17:20,
21:13, 22:10, 23:17,
24:4, 24:9, 24:15, 24:25,
26:3, 30:9, 30:12, 30:18,
30:19, 31:15, 34:4,
43:10, 49:15, 49:18,
51:1, 60:14, 66:10,
74:23, 79:5, 87:15,
92:24, 97:7, 103:15

**devices** [19] - 17:13,
17:25, 19:12, 21:11,
21:12, 21:15, 23:12,
34:13, 34:14, 34:23,
34:25, 43:7, 43:10, 44:4,
72:4, 72:6, 73:5, 82:11,
102:12

**DHS** [1] - 16:21

**dick** [1] - 70:9

**difference** [1] - 24:19

**different** [23] - 2:22,
6:1, 23:12, 26:5, 32:5,
34:11, 46:17, 47:18,
49:19, 52:8, 52:9, 52:11,
52:14, 53:4, 53:5, 61:12,
61:14, 64:8, 65:3, 121:16

**difficulties** [3] - 39:14,
75:3, 88:8

**digital** [7] - 16:23, 19:4,
21:11, 31:5, 31:9, 31:11,
38:7

**direct** [2] - 56:6, 128:13

**DIRECT** [6] - 4:7, 16:10,
107:14, 143:5, 143:7,
143:8

**directing** [10] - 111:7,

111:18, 111:24, 112:8, 114:5, 114:6, 114:13, 121:20, 122:21, 123:21
**direction** [2] - 40:16, 111:3
**directions** [1] - 8:16
**directly** [5] - 4:1, 16:3, 54:5, 54:12, 107:8
**dirty** [1] - 102:7
**disabled** [2] - 18:11, 18:24
**disconnect** [2] - 22:15, 30:8
**discovered** [1] - 51:4
**discuss** [6] - 35:1, 35:6, 52:17, 74:23, 141:1
**discussed** [5] - 29:5, 37:11, 39:25, 72:14, 74:7
**discussing** [1] - 41:20
**discussions** [1] - 83:13
**disgusting** [1] - 133:11
**display** [9] - 39:16, 87:3, 89:5, 89:22, 90:6, 90:14, 91:9, 104:17, 106:9
**dispute** [1] - 40:19
**district** [1] - 20:22
**District** [2] - 4:22, 20:19
**DISTRICT** [2] - 1:1, 1:1
**Division** [1] - 5:22
**DIVISION** [1] - 1:2
**DL** [2] - 134:2, 134:4
**document** [17] - 6:24, 20:5, 40:24, 41:25, 42:1, 42:7, 42:11, 44:25, 45:15, 45:17, 45:21, 45:22, 46:2, 46:11, 46:13, 51:18, 69:1
**documents** [6] - 43:19, 44:1, 45:13, 50:18, 51:16, 103:22
**done** [8] - 2:17, 14:20, 24:22, 66:16, 83:17, 92:9, 138:10, 139:9
**door** [2] - 29:14, 29:15
**dot** [12] - 13:12, 58:16, 93:20, 94:18, 94:21, 94:24, 98:9, 100:8, 100:25, 101:19, 118:24, 135:5
**dots** [9] - 13:24, 14:17, 97:19, 99:13, 99:17, 117:12, 118:4, 119:6, 119:12
**dotted** [3] - 13:10, 14:11, 14:17
**doubt** [1] - 2:11
**down** [13] - 33:17, 39:6, 39:19, 52:7, 64:8, 80:8, 81:10, 94:19, 114:13,

121:20, 129:24, 136:23, 138:14
**downloaded** [1] - 66:9
**downloading** [1] - 54:8
**downloads** [2] - 35:24, 60:9
**downstairs** [1] - 130:2
**Downtown** [1] - 4:22
**draft** [3] - 92:4, 138:11, 141:23
**draw** [1] - 81:22
**drawer** [2] - 122:19, 122:20
**drawing** [1] - 98:10
**drawstring** [9] - 82:5, 82:9, 87:24, 88:16, 90:17, 91:4, 116:15, 116:17
**drawstrings** [1] - 117:3
**dress** [1] - 95:18
**dresser** [1] - 121:11
**drill** [1] - 105:12
**drive** [32] - 17:18, 17:19, 21:21, 21:23, 22:4, 22:6, 22:9, 22:14, 23:14, 27:3, 28:9, 28:22, 30:2, 30:3, 30:6, 31:13, 31:14, 31:19, 32:2, 38:1, 55:20, 60:5, 60:7, 60:8, 60:10, 60:11, 60:12, 60:14, 73:2
**driveway** [5] - 9:14, 9:16, 10:12, 11:19, 11:22
**drop** [2] - 32:13, 32:14
**dropped** [1] - 113:9
**dropping** [1] - 113:8
**drowsy** [1] - 128:21
**drug** [1] - 130:19
**drugs** [1] - 128:16
**DuckDuckGo** [10] - 66:4, 66:6, 66:8, 66:12, 66:18, 66:21, 67:5, 67:13, 68:14, 69:2, 69:4, 69:6, 69:7, 69:9, 69:11, 69:14
**due** [1] - 45:24
**duplicate** [1] - 31:6
**duplicative** [2] - 41:2, 62:19
**duration** [1] - 99:13
**during** [24] - 4:21, 7:22, 58:17, 84:23, 85:5, 92:11, 94:2, 94:25, 98:10, 99:24, 101:6, 112:17, 112:22, 113:2, 113:5, 117:5, 118:11, 122:24, 125:13, 128:3, 128:14, 129:25, 133:4, 133:12
**duties** [1] - 16:20

**E**

**E-M-M-I-N-I-Z-E-R** [1] - 4:5
**early** [4] - 61:2, 109:13, 125:11, 129:3
**easier** [2] - 80:5, 80:11
**easily** [2] - 14:22, 52:12
**edges** [1] - 94:16
**edited** [1] - 81:10
**education** [1] - 21:5
**effect** [10] - 84:4, 88:4, 88:20, 89:2, 89:13, 89:21, 90:5, 90:13, 90:21, 91:7
**effective** [1] - 46:6
**egric109@Yahoo.com** [1] - 126:7
**eight** [2] - 50:9, 77:1
**eighth** [1] - 123:18
**either** [2] - 18:2, 96:10
**electronic** [1] - 30:20
**electronics** [2] - 16:24, 124:11
**eleven** [1] - 61:23
**eleventh** [2] - 124:16, 126:21
**Elizabeth** [1] - 1:18
**email** [3] - 44:20, 44:22, 126:3
**embedded** [1] - 38:6
**emissions** [1] - 49:10
**EMMINIZER** [2] - 3:24, 143:5
**Emminizer** [6] - 2:9, 3:21, 4:4, 9:23, 10:5, 15:16
**emotionless** [1] - 130:7
**employed** [2] - 4:11, 4:12
**EMule** [10] - 55:3, 55:4, 55:6, 55:13, 55:14, 55:19, 55:22, 56:16, 56:22, 56:24
**EnCase** [2] - 19:5, 19:6, 19:10
**enCase** [1] - 17:14
**encrypted** [1] - 17:25
**end** [14] - 22:13, 23:25, 38:9, 46:22, 65:17, 85:14, 86:20, 93:21, 99:16, 101:1, 101:21, 101:25, 138:21, 140:23
**ending** [1] - 80:23, 80:24, 80:25
**ends** [1] - 78:19
**Enforcement** [1] - 29:15
**enforcement** [8] - 4:14,

4:19, 5:10, 31:22, 131:1, 131:6, 131:14, 131:21
**engaged** [1] - 76:13
**engine** [4] - 52:10, 66:8, 66:18, 69:6
**ensure** [3] - 21:14, 21:19, 22:11
**enter** [2] - 10:16, 12:16
**entered** [4] - 47:1, 47:2, 68:14, 69:13
**enters** [3] - 3:12, 43:2, 92:13, 140:12
**entertaining/sitting** [1] - 12:7
**entertainment** [1] - 124:11
**entire** [6] - 32:2, 62:18, 68:23, 73:2, 98:12
**entirety** [4] - 94:2, 98:11, 99:24, 101:6
**entrance** [1] - 12:2
**entries** [5] - 61:11, 67:8, 67:9, 67:16, 67:18
**entry** [2] - 47:2, 47:7
**erases** [1] - 133:1
**ERIC** [1] - 1:6
**Eric** [33] - 9:7, 28:5, 44:12, 44:23, 44:25, 45:6, 45:9, 45:20, 45:23, 46:5, 46:10, 47:24, 48:2, 48:8, 48:16, 51:11, 51:15, 51:20, 51:24, 60:1, 76:18, 85:19, 108:9, 113:11, 114:2, 116:3, 116:11, 126:20, 126:24, 127:17, 133:20, 136:22, 144:6
**Eric's** [13] - 115:2, 115:12, 122:13, 122:19, 124:20, 124:22, 127:1, 127:8, 127:16, 133:3, 135:16, 135:21, 135:23
**especially** [4] - 31:22, 33:7, 36:20, 38:7
**Esquire** [4] - 1:16, 1:17, 1:18, 1:19
**essentially** [1] - 35:2
**establish** [1] - 76:22
**evening** [3] - 11:7, 128:14, 128:23
**event** [2] - 95:17, 130:20
**events** [1] - 131:14
**eventually** [2] - 23:9, 132:8
**everyday** [5] - 17:5, 19:19, 36:5, 36:17, 36:25
**evidence** [35] - 8:25, 10:21, 12:17, 13:14, 16:22, 17:18, 17:22,

19:8, 19:9, 22:3, 22:16, 22:20, 22:24, 23:5, 24:23, 25:5, 26:10, 29:4, 29:10, 29:18, 30:9, 47:9, 50:16, 54:16, 66:1, 83:15, 86:17, 139:24, 140:8, 140:15, 140:23, 141:9
**Evidence** [2] - 17:12, 31:20
**evidentiary** [1] - 22:4
**ex** [1] - 109:2
**ex-wife's** [1] - 109:2
**exact** [1] - 42:10
**exactly** [2] - 31:3, 40:14
**exam** [2] - 43:8, 94:25
**examination** [8] - 25:11, 27:9, 29:21, 31:15, 33:13, 37:16, 43:7, 131:19
**EXAMINATION** [6] - 4:7, 16:10, 107:14, 143:5, 143:7, 143:8
**examinations** [5] - 18:14, 19:23, 25:4, 25:17, 55:23
**examine** [3] - 24:21, 25:10, 34:1
**examined** [6] - 25:5, 26:17, 26:18, 34:23, 82:11, 102:2
**Examiner** [2] - 2:10, 15:23
**examining** [1] - 43:8
**example** [4] - 32:22, 36:5, 36:17, 36:25
**examples** [1] - 52:4
**except** [1] - 113:4
**exception** [2] - 2:23, 65:16
**exchange** [1] - 132:18
**Exchangeable** [1] - 38:5
**excuse** [6] - 11:24, 39:3, 67:2, 134:4, 140:24, 141:8
**excused** [3] - 15:20, 84:24, 85:1
**execute** [1] - 8:20
**executed** [1] - 131:21
**execution** [2] - 9:11, 11:3
**exhibit** [53] - 11:14, 12:21, 14:18, 42:2, 42:3, 46:25, 47:15, 47:18, 48:25, 49:7, 56:10, 56:13, 61:9, 62:18, 66:17, 67:4, 68:12, 68:17, 68:23, 69:23, 69:24, 70:3, 73:20,

75:25, 76:11, 76:25,
77:20, 79:8, 80:5, 81:18,
87:1, 88:8, 88:9, 93:1,
94:5, 94:11, 95:9, 95:11,
95:20, 97:3, 98:1, 98:5,
101:9, 101:13, 104:17,
104:21, 105:6, 105:18,
105:21, 114:7, 114:10,
114:24, 117:2

**Exhibit** [102] - 10:25,
11:6, 11:25, 13:17, 15:3,
15:10, 15:13, 25:9,
26:20, 26:24, 27:13,
41:22, 43:13, 44:6,
44:10, 45:14, 47:10,
47:17, 48:18, 50:6,
50:23, 56:13, 57:23,
60:19, 62:3, 63:5, 64:2,
66:22, 67:7, 68:20,
75:10, 76:5, 77:1, 77:2,
79:16, 79:23, 81:14,
81:21, 82:4, 85:22,
87:21, 91:12, 92:23,
93:2, 93:25, 94:6, 94:8,
95:8, 95:15, 96:25,
97:13, 97:21, 98:2, 98:4,
98:19, 99:19, 100:2,
100:12, 101:10, 101:12,
102:4, 102:13, 102:16,
102:22, 104:18, 104:21,
105:7, 106:5, 110:11,
110:18, 111:19, 112:8,
113:19, 114:8, 115:9,
115:17, 115:21, 116:10,
116:21, 117:19, 118:20,
119:2, 119:19, 120:22,
121:16, 122:8, 122:9,
122:16, 123:13, 124:16,
126:16, 127:7, 127:13,
133:17, 133:25, 134:9,
134:14, 134:18, 135:9,
135:13, 135:20

**exhibits** [14] - 39:25,
43:22, 44:1, 50:21,
57:20, 61:9, 73:14,
73:24, 76:20, 76:23,
85:21, 85:22, 98:21,
100:14

**Exhibits** [2] - 73:24,
78:11

**EXIF** [7] - 38:2, 38:3,
38:5, 38:8, 38:16, 38:20,
87:4

**existence** [1] - 103:24

**exits** [3] - 39:5, 39:7,
141:22

**expected** [1] - 75:1

**expecting** [1] - 129:4

**experience** [5] - 21:5,
57:10, 57:16, 58:17,

72:16

**expert** [5] - 20:8, 20:25,
27:4, 55:6, 83:1

**expertise** [1] - 83:2

**explain** [11] - 17:16,
23:12, 32:10, 60:20,
62:3, 63:6, 65:3, 69:1,
74:2, 74:6, 75:11

**explicit** [4] - 3:8, 40:1,
40:5, 75:6

**Exploitation** [1] - 18:7

**exploitation** [12] -
18:12, 19:13, 20:4, 20:7,
31:23, 58:18, 58:21,
59:12, 72:5, 72:25,
73:10, 73:18

**Exploited** [1] - 72:21

**Explorer** [8] - 52:10,
52:25, 62:6, 64:7, 65:2,
65:4, 65:6, 74:12

**exposed** [15] - 87:25,
88:24, 89:8, 89:17,
89:25, 90:9, 90:18, 91:5,
97:16, 99:9, 99:12,
100:23, 104:14, 106:2,
106:6

**exposing** [1] - 97:16

**extensive** [1] - 19:5

**external** [1] - 60:12

**extra** [1] - 28:18

**extract** [1] - 33:25

**extracted** [1] - 24:23

**extraction** [6] - 24:11,
24:19, 24:22, 34:6, 34:7,
34:8

**F**

**fabric** [3] - 97:20, 99:14,
104:15

**face** [2] - 83:3, 90:19

**Facebook** [1] - 132:20

**faced** [2] - 111:4, 111:5

**fact** [2] - 103:8, 130:19

**facts** [1] - 3:2

**fair** [15] - 31:8, 67:12,
80:1, 91:15, 111:9,
114:24, 116:5, 118:7,
119:2, 119:13, 120:3,
127:24, 130:13, 131:24,
134:2

**fairly** [1] - 85:7

**faith** [1] - 2:23

**familiar** [6] - 47:20,
53:18, 55:8, 57:6, 57:8,
58:18

**family** [11] - 11:18, 12:8,
35:25, 36:24, 37:11,
63:2, 63:3, 113:6, 128:7,

128:14

**fan** [1] - 111:21

**fans** [1] - 111:22

**far** [3] - 2:18, 27:12,
45:5

**Farm** [1] - 46:4

**father** [1] - 109:6

**fault** [1] - 133:10

**fax** [1] - 6:25

**FCRR** [1] - 1:23

**February** [8] - 1:10,
5:10, 5:14, 47:8, 61:2,
62:15, 64:14, 144:7

**federal** [2] - 2:24, 20:13

**Federal** [2] - 45:18,
139:25

**Federico** [1] - 26:2

**feet** [1] - 12:16

**female** [17] - 41:14,
76:1, 76:6, 76:9, 76:13,
88:17, 88:19, 89:10,
89:19, 90:10, 90:18,
91:5, 93:16, 96:12, 99:8,
99:15, 100:22

**female's** [11] - 88:2,
88:25, 89:20, 90:2,
99:10, 99:11, 100:24,
104:13, 104:16, 106:2,
106:6

**few** [7] - 12:16, 35:15,
65:16, 67:21, 101:22,
137:23

**field** [2] - 20:25, 21:6

**fifth** [2] - 112:7, 122:17

**fight** [1] - 18:11

**file** [96] - 31:4, 32:17,
32:24, 33:20, 34:9,
36:11, 36:18, 37:2, 37:7,
37:10, 37:12, 37:17,
37:18, 38:18, 38:19,
40:3, 44:11, 45:3, 48:21,
51:16, 51:21, 51:24,
52:18, 53:7, 53:8, 53:13,
53:14, 53:19, 53:22,
52:23, 54:6, 54:16, 55:1,
56:22, 58:13, 59:4, 59:6,
59:7, 60:6, 74:9, 74:12,
74:19, 75:1, 76:1, 76:6,
76:12, 77:20, 77:22,
78:2, 78:15, 78:17,
78:18, 78:21, 78:22,
79:3, 79:5, 80:23, 80:24,
81:8, 87:9, 87:23, 88:15,
88:23, 89:7, 89:16,
89:24, 90:8, 90:16, 91:3,
93:4, 93:5, 93:6, 93:9,
95:13, 97:4, 97:14, 99:1,
100:16, 100:21, 103:10,
103:14, 103:24, 103:25,
104:6, 104:7, 104:8,

104:13, 106:1, 106:5

**files** [42] - 18:2, 23:5,
36:6, 37:9, 40:4, 40:10,
43:9, 43:17, 43:19,
43:20, 43:23, 43:25,
44:7, 44:9, 47:13, 47:18,
51:5, 52:20, 53:15,
55:17, 57:18, 57:24,
58:3, 58:7, 60:4, 60:8,
65:19, 72:5, 73:17,
73:21, 74:8, 74:16,
74:18, 75:14, 77:9,
77:15, 78:1, 87:6, 87:9,
87:18, 87:19

**Final** [1] - 17:14

**finances** [1] - 45:4

**Finder** [2] - 17:12,
31:20

**fine** [3] - 80:9, 92:12,
140:9

**finger** [2] - 93:18,
100:25

**fingerprint** [2] - 31:9,
31:11

**finish** [1] - 2:12

**finished** [5] - 12:6,
12:7, 22:10, 29:18, 72:9

**Firefox** [13] - 52:10,
53:1, 61:10, 62:4, 62:5,
62:6, 62:9, 63:5, 63:7,
63:8, 63:9, 63:15

**first** [33] - 2:8, 4:4, 12:2,
12:8, 21:11, 21:18,
27:21, 36:17, 36:20,
36:21, 36:23, 39:25,
48:15, 51:10, 59:23,
63:23, 63:24, 64:20,
67:7, 74:10, 81:6, 82:17,
87:22, 88:8, 103:4,
108:16, 117:20, 119:3,
119:19, 122:17, 128:15,
132:15, 141:12

**fit** [1] - 71:5

**five** [7] - 19:25, 45:15,
76:25, 77:1, 101:3,
118:15, 138:2

**five-page** [1] - 45:15

**fixture** [3] - 111:21,
111:25, 112:3

**flap** [1] - 102:6

**flesh** [1] - 72:17

**flesh-colored** [1] -
72:17

**flip** [1] - 91:13

**flipped** [1] - 136:25

**Floor** [1] - 1:23

**floor** [8] - 12:2, 12:8,
12:9, 12:11, 13:3, 13:15,
130:18, 137:3

**floors** [1] - 12:5

**flowers** [5] - 13:25,
14:9, 14:14, 104:15,
118:3

**focus** [2] - 117:24,
119:11

**focusing** [1] - 128:22

**folded** [1] - 118:7

**folder** [13] - 8:23, 31:4,
35:11, 35:15, 35:24,
36:6, 37:2, 37:6, 37:14,
37:15, 74:15, 103:25

**folders** [2] - 37:1,
103:13

**followed** [3] - 24:8,
78:5, 95:12

**following** [3] - 2:24,
11:3, 130:22

**follows** [4] - 9:8, 28:5,
76:19, 85:19

**FOR** [1] - 1:1

**force** [1] - 5:25

**Force** [1] - 5:7

**forearm** [1] - 50:2,
80:12

**forefathers** [1] - 59:16

**foregoing** [1] - 144:8

**foreign** [1] - 28:24

**Forensic** [5] - 2:10,
15:23, 17:14, 19:9, 21:25

**forensic** [52] - 16:16,
16:18, 16:21, 17:5, 17:6,
17:10, 17:23, 18:5,
18:14, 18:16, 19:6,
19:23, 20:25, 21:6,
21:10, 22:8, 22:9, 22:17,
22:18, 25:4, 25:11,
25:16, 26:12, 27:8,
29:21, 30:4, 30:5, 31:15,
31:16, 31:17, 31:18,
31:24, 32:2, 37:16, 43:8,
46:20, 52:1, 52:6, 56:6,
56:10, 56:16, 56:23,
57:25, 60:21, 61:4, 62:8,
64:4, 66:20, 72:24,
94:25, 104:7

**forensically** [2] - 17:20,
17:22

**forensics** [7] - 17:11,
19:4, 20:9, 23:22, 24:12,
33:8, 46:16

**Forensics** [5] - 17:12,
17:13, 17:14, 19:6, 31:20

**forgive** [1] - 123:25

**form** [1] - 141:15

**format** [2] - 36:21,
51:16

**Format** [1] - 38:5

**forms** [1] - 10:21

**forth** [1] - 40:21

**four** [12] - 16:19, 20:13,

58:1, 58:2, 58:3, 58:4, 58:7, 93:8, 93:12, 95:9, 99:22, 118:15
  **fourth** [3] - 62:22, 119:11, 121:4
  **Fourth** [5] - 1:23, 2:20, 2:21, 2:22, 3:2
  **frame** [9] - 36:20, 36:21, 36:23, 93:20, 97:19, 99:14, 99:17, 100:25, 101:2
  **frames** [1] - 101:22
  **fraud** [1] - 5:20
  **frauds** [1] - 20:5
  **Frederick** [2] - 20:17, 29:15
  **free** [1] - 33:6
  **frequently** [7] - 115:4, 116:7, 116:8, 116:9, 116:16, 116:18, 121:23
  **Friday** [3] - 113:3, 113:4, 138:17
  **friends** [2] - 113:15, 128:7
  **front** [11] - 11:14, 11:20, 27:15, 82:8, 85:3, 95:18, 104:20, 139:5, 139:13, 139:15, 139:21
  **FTK** [1] - 30:5
  **fuck** [1] - 59:1
  **fucking** [1] - 63:2
  **fucks** [1] - 58:25
  **full** [6] - 4:2, 16:4, 16:7, 34:7, 58:8, 107:9
  **fully** [1] - 34:3
  **function** [2] - 55:14, 55:15
  **functional** [1] - 2:4
  **furniture** [6] - 110:21, 110:24, 111:2, 113:22, 121:7
  **futon** [1] - 130:18
  **future** [1] - 7:17

**G**

  **G-I-B-S-O-N** [1] - 16:8
  **G-R-I-N-D-E-R** [1] - 107:12
  **G.B** [1] - 82:3
  **Gallery** [10] - 102:25, 103:1, 103:9, 103:18, 103:24, 104:1, 104:5, 105:17, 105:22
  **game** [1] - 15:6
  **games** [2] - 15:7, 124:15
  **gaming** [1] - 15:6
  **garage** [1] - 11:18

  **garter** [1] - 96:10
  **gather** [2] - 2:2, 16:23
  **GBH** [3] - 116:6, 116:7
  **gears** [2] - 123:8, 134:6
  **general** [3] - 12:4, 23:10, 29:22
  **generally** [19] - 21:9, 29:3, 33:15, 43:17, 53:18, 55:8, 79:13, 83:6, 83:17, 96:9, 109:16, 112:22, 113:1, 114:19, 125:13, 125:20, 128:20, 132:24, 135:17
  **generated** [2] - 30:22, 104:7
  **genitals** [3] - 84:10, 99:9, 99:10
  **gentlemen** [12] - 3:14, 19:2, 39:3, 91:25, 97:2, 98:25, 100:16, 102:21, 105:13, 138:22, 140:18, 140:22
  **Gibson** [34] - 2:11, 3:7, 15:23, 16:6, 16:12, 20:25, 21:9, 29:3, 37:16, 39:19, 43:6, 69:12, 72:3, 73:4, 74:15, 75:9, 77:4, 80:10, 81:18, 86:22, 89:15, 90:7, 90:22, 91:2, 91:12, 92:18, 94:2, 98:25, 99:22, 100:15, 101:6, 105:12, 106:12, 106:20
  **GIBSON** [2] - 16:1, 143:6
  **gigs** [2] - 33:1, 33:3
  **Gill** [4] - 6:8, 6:10, 6:16, 7:2
  **Gill's** [1] - 7:14
  **girl** [12] - 58:25, 59:1, 70:15, 70:16, 70:24, 71:5, 71:9, 71:12, 71:15, 84:3, 84:10
  **girl's** [4] - 12:12, 12:23, 12:25, 13:2
  **girls** [2] - 71:14, 72:2
  **given** [9] - 8:16, 11:1, 34:7, 36:5, 40:11, 40:12, 40:25, 41:24, 42:8
  **glass** [1] - 112:1
  **glasses** [5] - 47:6, 88:18, 89:11, 89:19, 90:18
  **globes** [2] - 112:3, 112:5
  **gold** [1] - 96:3
  **Gold** [4] - 59:10, 59:15, 64:23
  **Google** [13] - 52:8, 52:10, 52:25, 53:1, 53:2,

54:10, 60:20, 60:23, 60:24, 61:4, 61:12, 61:14, 69:7
  **GOVERNMENT** [1] - 143:4
  **government** [24] - 2:14, 3:1, 3:19, 3:21, 20:24, 82:21, 83:8, 84:15, 85:15, 86:16, 92:23, 99:18, 101:3, 106:22, 137:22, 138:4, 139:1, 139:3, 139:15, 139:21, 140:5, 140:14, 140:16, 140:17
  **Government** [8] - 1:16, 41:22, 64:2, 66:22, 101:12, 104:21, 117:19, 118:20
  **government's** [4] - 15:22, 42:18, 45:14, 81:21
  **GOVERNMENT'S** [3] - 3:24, 16:1, 107:6
  **Government's** [87] - 10:24, 11:6, 13:17, 15:3, 15:10, 15:13, 25:9, 26:20, 26:23, 27:13, 43:12, 44:6, 44:10, 47:10, 47:17, 48:18, 50:6, 50:23, 56:13, 57:23, 62:3, 63:5, 67:7, 68:20, 73:24, 75:10, 78:11, 79:15, 79:23, 91:12, 91:15, 93:2, 94:6, 94:8, 95:8, 95:15, 96:25, 97:13, 97:21, 98:2, 98:4, 98:19, 99:19, 100:2, 100:12, 101:10, 102:4, 102:13, 102:16, 102:22, 104:18, 105:7, 110:10, 110:18, 111:19, 112:7, 113:19, 114:8, 115:8, 115:17, 115:20, 116:9, 116:20, 119:2, 119:19, 120:22, 121:16, 122:8, 122:9, 122:16, 123:13, 124:16, 126:16, 127:6, 127:13, 133:17, 133:25, 134:9, 134:14, 134:18, 135:9, 135:13, 135:20
  **GPS** [1] - 38:13
  **grab** [1] - 88:3
  **grabs** [1] - 34:8
  **great** [2] - 31:20, 33:8
  **green** [1] - 115:2
  **Gregory** [1] - 2:21
  **Griffeye** [2] - 19:12, 31:21
  **GRINDER** [3] - 1:6,

107:6, 143:8
  **Grinder** [42] - 2:13, 7:13, 7:18, 8:2, 9:7, 10:11, 10:19, 11:2, 28:5, 44:13, 44:23, 45:1, 45:4, 45:9, 45:20, 45:23, 46:5, 46:10, 47:24, 48:2, 48:8, 48:13, 49:1, 49:4, 51:11, 51:15, 51:20, 51:25, 76:19, 85:19, 106:23, 107:11, 107:16, 108:10, 108:20, 109:5, 126:20, 126:24, 137:18, 144:7
  **Grinder's** [1] - 48:16
  **guardians** [1] - 45:9
  **guide** [1] - 40:13
  **guilty** [2] - 3:1, 138:18
  **guy** [1] - 26:12

**H**

  **hair** [9] - 88:2, 88:18, 88:25, 90:3, 90:11, 91:5, 118:12, 118:14, 118:16
  **half** [4] - 39:17, 117:24, 127:19, 138:13
  **hall** [5] - 12:10, 117:7, 123:11, 124:3, 137:9
  **hallway** [3] - 129:6, 136:8, 136:24
  **hand** [32] - 3:23, 15:25, 58:15, 76:8, 88:2, 88:3, 88:25, 89:18, 90:3, 90:4, 90:12, 90:20, 90:23, 90:25, 91:7, 93:17, 93:19, 94:18, 95:24, 96:11, 96:18, 99:9, 100:23, 100:24, 101:25, 107:5, 121:7, 122:21, 134:2, 139:6
  **handed** [2] - 41:23, 42:11
  **handing** [1] - 115:20
  **handled** [1] - 4:18
  **handwriting** [1] - 85:4
  **happy** [4] - 38:24, 39:11, 139:11, 139:13
  **hard** [19] - 17:19, 21:21, 21:23, 22:4, 22:6, 22:9, 22:14, 23:14, 27:3, 28:9, 28:22, 30:1, 30:3, 31:14, 40:4, 55:20, 57:15, 57:17, 59:1
  **Harford** [1] - 110:1
  **hash** [21] - 22:11, 22:12, 23:23, 23:24, 30:11, 30:12, 30:18, 30:19, 30:22, 31:4, 31:5, 31:8, 72:18, 72:20,

72:24, 73:2, 73:4, 75:17
  **hashed** [1] - 30:22, 30:25
  **hashes** [3] - 30:6, 30:14, 30:23, 73:5, 73:6
  **hashing** [1] - 72:19
  **header** [1] - 32:18
  **hear** [4] - 129:23, 136:22, 141:2, 141:13
  **heard** [4] - 129:6, 129:10, 138:5, 140:1
  **hearing** [2] - 139:7, 139:8
  **Heidi** [3] - 45:1, 45:9, 109:5
  **held** [2] - 89:17, 101:25
  **hello** [1] - 65:23
  **help** [1] - 80:4
  **helped** [5] - 50:21, 81:24, 88:9, 95:9, 105:6
  **helpful** [1] - 41:11
  **hereby** [6] - 9:5, 28:3, 76:17, 85:17, 144:5
  **hereunto** [1] - 144:11
  **Heritage** [2] - 44:12, 47:24
  **HERO** [5] - 18:7, 18:13, 18:21, 19:7
  **hidden** [1] - 18:2
  **himself** [1] - 133:15
  **hired** [1] - 4:19
  **histories** [3] - 33:18, 52:8, 57:21
  **history** [19] - 61:10, 62:4, 62:9, 62:12, 63:7, 63:16, 64:3, 64:6, 64:17, 65:4, 66:14, 68:13, 68:18, 68:23, 69:4, 69:9, 69:10, 69:11
  **hit** [2] - 32:14, 32:22
  **Hitachi** [3] - 28:9, 28:22
  **hold** [3] - 62:22, 73:23, 106:24
  **holding** [3] - 76:2, 76:8, 89:11
  **hole** [4] - 88:1, 89:9, 90:1, 102:7
  **holes** [1] - 121:22
  **home** [8] - 9:14, 11:15, 11:18, 12:5, 45:6, 112:18, 124:5, 124:10
  **Homeland** [3] - 16:17, 16:21, 18:10
  **homeowner's** [1] - 46:4
  **honest** [1] - 115:19
  **honeymoon** [1] - 125:10
  **honor** [1] - 42:18
  **Honor** [80] - 2:3, 2:8, 3:5, 3:20, 9:2, 10:2,

10:17, 15:16, 15:19, 15:22, 20:24, 21:9, 27:5, 27:25, 38:24, 39:10, 39:16, 39:21, 40:11, 41:6, 41:12, 41:15, 41:18, 41:25, 42:6, 42:10, 42:11, 42:16, 42:22, 43:6, 75:4, 75:5, 75:24, 76:14, 79:15, 80:7, 80:13, 81:13, 82:18, 82:21, 84:7, 84:21, 85:12, 85:15, 88:7, 91:10, 92:8, 92:18, 93:22, 97:21, 98:21, 99:18, 100:14, 102:18, 105:9, 106:9, 106:20, 106:22, 107:2, 114:9, 114:17, 117:14, 136:1, 136:11, 137:15, 137:17, 137:19, 137:22, 138:6, 138:19, 139:3, 139:10, 139:13, 139:14, 139:19, 140:9, 140:16, 140:21, 142:1, 142:2

**Honorable** [1] - 1:12
**hook** [1] - 30:3
**hope** [1] - 3:14
**hopefully** [2] - 2:14, 29:23
**hoping** [1] - 28:20
**HOPKINS** [1] - 21:3
**Hopkins** [1] - 1:19
**horny** [2] - 71:14, 72:2
**hospital** [1] - 131:18
**host** [1] - 54:5
**hour** [1] - 138:13
**hours** [1] - 19:17
**house** [22] - 7:5, 8:16, 8:19, 8:22, 10:6, 10:9, 10:16, 12:9, 46:23, 47:2, 54:14, 110:14, 110:16, 110:20, 111:22, 112:5, 120:25, 123:10, 130:23, 131:12, 134:12, 136:23
**HSI** [1] - 18:5
**HTTP** [1] - 67:22
**Human** [1] - 18:7
**hundred** [1] - 19:25
**hundreds** [2] - 54:2, 67:11

**I**

**icon** [6] - 36:8, 36:15, 37:1, 37:14, 53:9
**idea** [1] - 133:2
**identical** [2] - 22:13, 42:4
**identification** [5] -

41:22, 42:8, 82:23, 83:1, 83:6
**Identification** [1] - 19:14
**identified** [5] - 75:21, 83:3, 88:8, 92:22, 100:12
**identify** [5] - 12:11, 52:9, 72:11, 83:2, 84:16
**II** [2] - 1:10, 19:6
**image** [84] - 16:24, 19:12, 23:4, 24:3, 26:25, 27:3, 27:14, 30:5, 30:13, 30:24, 31:11, 31:17, 32:21, 32:25, 35:10, 35:14, 35:18, 36:6, 36:9, 36:18, 37:1, 40:5, 41:11, 43:19, 44:7, 44:9, 44:17, 44:25, 45:3, 47:18, 47:23, 48:7, 48:10, 48:21, 49:3, 51:5, 51:21, 51:24, 53:11, 54:8, 65:19, 72:12, 72:20, 72:25, 73:21, 74:8, 75:4, 75:9, 76:1, 76:6, 76:12, 77:5, 77:13, 77:25, 82:5, 87:18, 87:19, 87:23, 88:15, 88:17, 88:23, 89:7, 89:16, 89:24, 90:8, 90:16, 90:23, 91:3, 94:23, 102:12, 102:18, 103:6, 103:15, 104:3, 104:12, 104:13, 104:23, 104:25, 106:1, 106:5, 106:13, 106:15
**imaged** [1] - 31:13
**Imager** [1] - 30:5
**images** [84] - 24:16, 31:23, 33:18, 34:9, 35:8, 35:16, 36:4, 37:6, 38:6, 39:18, 40:4, 40:10, 40:12, 40:14, 40:25, 47:14, 50:3, 50:18, 50:24, 51:1, 54:7, 65:17, 72:5, 72:10, 72:15, 73:12, 74:9, 74:10, 74:13, 75:7, 75:12, 75:16, 75:20, 76:15, 77:7, 82:10, 82:13, 82:23, 83:4, 84:9, 84:11, 84:16, 86:23, 86:25, 87:1, 87:3, 87:4, 87:10, 87:12, 87:17, 91:14, 91:15, 91:19, 92:20, 96:6, 105:3, 105:6, 105:9, 105:13, 105:21, 105:24, 134:7
**IMEI990004495000428**
[2] - 9:18, 28:12
**immediately** [1] - 29:18
**IN** [1] - 1:1

**inappropriate** [1] - 84:1
**incest** [8] - 59:1, 61:22, 63:2, 63:3, 70:7, 70:13
**incestmovies.org** [1] - 64:21
**incesttabootube.org** [1] - 68:1
**incidentally** [1] - 2:25
**include** [8] - 12:19, 17:2, 17:24, 18:2, 18:16, 52:17, 52:20, 86:17
**included** [1] - 73:12
**including** [1] - 99:16
**indentations** [2] - 94:15, 96:1
**independent** [1] - 18:22
**INDEX** [1] - 143:1
**indicate** [3] - 43:9, 81:4, 103:25
**indicated** [2] - 85:22, 96:22
**indicative** [1] - 43:18
**indictment** [10] - 28:7, 28:14, 28:17, 85:21, 93:23, 98:22, 100:15, 102:19, 105:10, 141:4
**individual** [16] - 30:24, 35:11, 46:17, 49:14, 49:18, 49:22, 49:25, 53:24, 53:25, 54:13, 60:23, 65:7, 116:2, 126:17, 126:21
**individuals** [7] - 35:8, 54:2, 54:8, 54:10, 75:20, 76:19, 76:23
**indulgence** [3] - 6:7, 88:7, 136:1
**inform** [1] - 6:16
**information** [3] - 35:21, 40:2, 78:16
**initial** [2] - 6:24, 29:21
**inner** [1] - 100:23
**inside** [1] - 27:22
**inspection** [2] - 46:9, 51:10
**Inspiron** [1] - 95:1
**installed** [2] - 54:19, 66:22
**instances** [2] - 33:20, 38:13
**instead** [1] - 36:18
**instructions** [8] - 2:16, 2:17, 92:5, 138:11, 141:2, 141:14, 141:24, 141:25
**Insurance** [1] - 46:4
**integrity** [3] - 22:23, 29:4, 29:7
**intend** [3] - 84:15, 138:7, 140:19

**interaction** [7] - 130:3, 130:5, 130:10, 131:5, 136:4, 136:5, 136:14
**interactions** [3] - 128:2, 136:16, 136:17
**intercourse** [1] - 57:19
**interest** [1] - 73:10
**Interface** [1] - 38:5
**interior** [1] - 12:4
**intern** [1] - 16:19
**Internal** [1] - 5:1
**Internet** [11] - 17:12, 31:20, 31:21, 33:11, 34:16, 52:25, 62:5, 64:7, 65:2, 65:4, 65:6
**internet** [6] - 54:11, 57:21, 64:3, 64:6, 64:17
**internship** [1] - 18:19
**interstate** [1] - 28:24
**interview** [7] - 7:20, 7:23, 8:6, 8:7, 8:9
**interviewed** [4] - 8:5, 8:6, 131:14
**intro** [1] - 18:24
**investigated** [1] - 4:23
**investigates** [1] - 5:16
**investigating** [4] - 5:20, 57:16, 58:17, 76:22
**Investigation** [1] - 5:22
**Investigations** [1] - 16:17
**investigations** [4] - 59:12, 59:18, 73:18, 77:5
**involved** [3] - 8:6, 21:10, 79:8
**issue** [4] - 39:8, 42:19, 84:21, 138:5
**issued** [1] - 2:20
**issues** [3] - 3:17, 40:21, 141:1
**item** [5] - 17:22, 21:18, 22:3, 24:21, 47:7
**items** [7] - 16:24, 25:6, 25:16, 26:8, 28:23, 43:20, 73:9
**itself** [2] - 66:8, 66:19

**J**

**Jo** [1] - 45:1
**job** [3] - 5:15, 17:11, 107:24
**jobs** [1] - 33:8
**John** [4] - 2:9, 3:21, 4:4, 9:23
**JOHN** [2] - 3:24, 143:5
**JPEG** [1] - 65:17
**JPG** [1] - 65:17
**Judge** [1] - 1:12

**July** [9] - 44:15, 46:1, 47:25, 102:11, 102:24, 104:4, 104:5, 104:11, 105:2
**jump** [1] - 71:15
**June** [9] - 46:7, 100:9, 100:19, 102:11, 110:7, 110:9, 110:14, 120:14
**jurisdictions** [1] - 20:16
**jury** [45] - 3:4, 3:5, 3:12, 16:14, 19:2, 19:22, 39:5, 39:17, 41:11, 43:1, 43:2, 53:22, 75:6, 80:7, 84:8, 87:3, 92:5, 92:13, 93:4, 94:9, 97:2, 102:21, 105:13, 110:13, 111:3, 111:25, 112:9, 114:17, 114:18, 116:4, 118:1, 127:3, 133:21, 136:19, 139:5, 139:9, 139:14, 139:15, 139:22, 140:5, 140:11, 140:12, 141:15, 141:22, 141:23
**Jury** [1] - 1:13
**jury's** [1] - 40:12

**K**

**karma** [2] - 114:20, 114:21
**keep** [1] - 141:18
**keeps** [1] - 3:10
**kept** [3] - 12:8, 125:20, 130:8
**key** [1] - 55:19
**keys** [1] - 10:15
**keyword** [1] - 56:16
**kick** [1] - 33:13
**kind** [24] - 4:17, 5:10, 12:6, 24:9, 24:11, 34:6, 45:17, 48:23, 57:17, 59:4, 59:6, 65:9, 66:11, 66:15, 72:11, 72:17, 78:15, 78:21, 80:2, 85:7, 96:5, 124:2, 126:1, 136:8
**Kingdom** [1] - 77:1
**Kirstin** [1] - 1:19
**kit** [1] - 24:13
**kitchen** [1] - 12:8
**knee** [1] - 95:16
**knowing** [1] - 29:22
**knowledge** [4] - 112:18, 122:5, 124:13, 129:22
**known** [13] - 17:20, 18:7, 32:21, 35:10, 40:25, 72:25, 73:2, 73:3, 73:5, 73:6, 74:11, 75:7, 75:12
**knows** [1] - 52:23

## L

**labeled** [1] - 75:10
**ladies** [12] - 3:14, 19:2, 39:3, 91:25, 97:2, 98:25, 100:16, 102:21, 105:12, 138:22, 140:18, 140:22
**laptop** [42] - 15:8, 21:19, 25:23, 26:3, 26:22, 26:25, 27:1, 27:8, 28:6, 28:10, 28:22, 29:5, 29:20, 29:22, 31:14, 50:16, 50:19, 50:24, 51:6, 51:8, 51:21, 54:17, 54:20, 55:20, 59:23, 60:15, 65:25, 73:16, 74:4, 78:8, 80:16, 86:24, 92:21, 124:20, 124:22, 125:7, 125:14, 126:10, 126:14
**laptops** [3] - 3:7, 21:12, 27:5
**Lare** [5] - 9:9, 9:15, 9:17, 9:21, 10:10
**larger** [2] - 37:18, 103:10
**last** [18] - 2:3, 4:4, 48:13, 48:25, 49:4, 54:24, 58:11, 62:25, 63:1, 63:8, 63:10, 63:15, 67:23, 68:1, 77:4, 96:20, 101:22, 108:20
**lastly** [4] - 28:21, 50:1, 62:1, 91:1
**late** [2] - 61:2, 63:15
**Laurel** [14] - 109:25, 112:14, 112:23, 113:6, 113:13, 113:21, 116:1, 117:6, 120:6, 120:10, 120:19, 123:5, 134:13, 134:24
**Law** [1] - 29:15
**law** [10] - 4:14, 4:19, 5:10, 20:9, 31:22, 130:25, 131:6, 131:14, 131:21, 141:3
**laying** [1] - 13:3, 116:12, 137:3
**layout** [1] - 12:14
**learned** [1] - 6:21
**least** [9] - 63:15, 66:12, 67:16, 77:22, 80:1, 80:4, 88:1, 89:9, 90:1
**leave** [1] - 141:19
**led** [1] - 91:22
**Leela** [1] - 59:1
**left** [27] - 5:1, 5:5, 5:9, 8:23, 13:3, 89:18, 92:20, 93:18, 93:19, 95:24,

96:18, 98:7, 101:15, 113:12, 117:8, 120:10, 120:19, 121:7, 123:11, 123:21, 124:2, 128:8, 131:9, 131:10, 132:1, 134:2
**left-hand** [3] - 93:19, 121:7, 134:2
**legal** [2] - 21:15, 141:1
**legally** [1] - 109:8
**legs** [5] - 99:9, 104:13, 106:2, 106:6, 106:8
**length** [2] - 79:4, 93:8
**lengthy** [1] - 2:11
**less** [1] - 21:11
**letter** [1] - 60:5
**lettering** [3] - 50:2, 51:3, 82:3
**letters** [4] - 57:6, 57:9, 59:8, 69:13
**life** [2] - 24:4, 107:21
**lifted** [1] - 97:16
**light** [14] - 89:20, 97:19, 99:14, 100:6, 101:1, 111:8, 111:11, 111:21, 112:1, 112:3, 112:11, 115:2, 136:25
**light-colored** [1] - 101:1
**lighter** [3] - 80:5, 80:7, 80:11
**lighting** [9] - 88:4, 88:20, 89:2, 89:12, 90:5, 90:13, 90:21, 91:7, 111:25
**line** [11] - 46:21, 60:11, 60:17, 64:13, 64:20, 64:22, 65:21, 70:8, 70:10, 70:12, 70:17
**Line** [4] - 57:5, 58:12, 58:23, 64:14, 70:6
**lines** [10] - 61:17, 62:19, 62:22, 62:25, 63:23, 64:11, 64:12, 67:21, 70:5, 70:14
**link** [10] - 52:20, 53:7, 53:8, 53:13, 53:15, 57:24, 58:3, 60:4, 77:20, 77:22
**linked** [2] - 58:13, 60:6
**links** [1] - 53:13
**liquid** [1] - 97:17
**listed** [4] - 76:20, 76:23, 76:24
**lists** [1] - 67:13
**live** [4] - 32:19, 107:18, 107:19, 110:4
**lived** [10] - 107:20, 110:24, 111:13, 112:14, 112:23, 113:6, 117:6,

125:24, 128:3, 128:14
**living** [4] - 78:9, 113:21, 116:1, 123:9
**load** [5] - 31:17, 31:24, 72:23, 73:1
**locate** [1] - 68:13
**located** [5] - 4:12, 15:5, 55:13, 86:24, 124:9
**location** [6] - 38:13, 76:25, 77:1, 113:20, 115:18, 115:23
**locations** [2] - 76:24, 125:10
**locked** [5] - 26:13, 29:8, 29:14, 29:15
**locker** [7] - 22:16, 26:10, 26:15, 29:10, 29:13, 29:19, 30:9
**log** [9] - 21:19, 21:22, 29:25, 30:2, 55:19, 55:25, 56:4, 56:10, 69:8
**logged** [3] - 26:10, 69:4, 69:6
**logs** [2] - 55:22, 56:7
**Lolataboo.com** [1] - 67:25
**Lolita** [2] - 58:15, 58:18
**Lombard** [1] - 1:24
**look** [23] - 16:22, 21:18, 21:20, 33:10, 35:11, 35:13, 35:22, 36:8, 38:12, 40:10, 40:13, 43:9, 47:9, 50:16, 52:12, 52:15, 56:6, 67:2, 74:9, 95:3, 125:10, 130:7, 138:13
**looked** [3] - 37:10, 37:14, 40:14
**looking** [29] - 11:14, 11:25, 12:22, 32:1, 35:8, 35:18, 36:1, 36:2, 36:5, 36:12, 36:22, 36:25, 42:1, 42:7, 42:9, 57:18, 60:25, 72:3, 72:5, 72:13, 85:9, 95:13, 96:19, 101:23, 114:10, 115:13, 116:25, 122:14
**looks** [14] - 5:3, 47:20, 48:11, 49:3, 94:10, 94:15, 95:16, 96:1, 96:10, 96:12, 111:8, 116:5, 121:12, 134:11
**loom** [1] - 118:12
**lost** [1] - 141:10
**loud** [1] - 81:15
**lounge** [1] - 116:18
**lower** [4] - 117:24, 122:21, 123:21
**lubricant** [3] - 71:23, 122:23, 122:25

**lunch** [2] - 39:12, 85:11
**luncheon** [1] - 92:3

## M

**ma'am** [1] - 92:16
**machine** [2] - 22:8, 30:4
**Madam** [1] - 81:14
**magnet** [1] - 17:11
**Magnet** [2] - 17:12, 31:20
**maiden** [1] - 108:23
**main** [7] - 12:2, 60:8, 64:3, 64:6, 64:17, 65:4
**maintenance** [1] - 18:23
**majority** [2] - 20:4, 20:6
**male** [27] - 50:11, 50:25, 76:2, 76:7, 76:8, 76:13, 78:8, 87:23, 87:25, 88:15, 88:23, 89:7, 89:8, 89:16, 89:18, 89:24, 89:25, 90:8, 90:9, 90:16, 91:3, 93:17, 95:16, 96:10, 96:12, 96:19, 99:9
**male's** [7] - 88:4, 88:19, 89:1, 89:11, 90:4, 90:12, 90:19
**males** [1] - 45:12
**man's** [2] - 89:19, 91:6
**Manchester** [1] - 76:25
**manner** [1] - 144:10
**manually** [1] - 72:13
**manufactured** [4] - 28:8, 28:11, 28:14, 28:17
**manufacturer** [1] - 103:20
**marbled** [9] - 88:4, 88:20, 89:2, 89:12, 89:20, 90:5, 90:12, 90:21, 91:7
**March** [1] - 108:17
**mark** [2] - 41:21, 120:22
**marked** [14] - 41:19, 42:13, 58:2, 78:11, 110:10, 115:8, 115:16, 115:20, 116:20, 117:19, 118:19, 122:8, 127:12, 135:12
**markings** [1] - 116:5
**married** [2] - 108:13, 108:14, 108:25
**marry** [1] - 108:18
**Martha** [1] - 36:2
**Mary** [3] - 1:23, 144:5, 144:16
**MARYLAND** [1] - 1:1
**Maryland** [14] - 1:11, 1:24, 4:13, 6:2, 9:11,

9:21, 9:25, 20:14, 20:19, 26:12, 28:23, 49:10, 107:19, 107:20
**master** [11] - 12:9, 110:20, 112:4, 121:6, 123:12, 124:1, 134:11, 134:12, 134:16, 134:24, 136:24
**match** [1] - 22:12
**matched** [1] - 31:14
**matches** [1] - 73:6
**materials** [3] - 3:8, 72:6, 73:10
**matter** [2] - 144:6, 144:10
**mature** [1] - 59:2
**Mazda** [2] - 44:12, 47:24
**mean** [7] - 16:23, 75:12, 84:2, 93:9, 102:22, 103:3, 136:10
**meaning** [1] - 105:21
**means** [2] - 23:18, 23:19, 132:19
**meant** [1] - 114:20
**media** [2] - 30:20, 59:7
**medical** [1] - 131:19
**meet** [2] - 132:16, 138:12
**meeting** [1] - 7:17
**members** [15] - 16:14, 53:21, 87:3, 93:4, 94:9, 110:13, 111:3, 111:25, 112:9, 114:18, 116:4, 117:25, 127:2, 133:21, 136:19
**memory** [2] - 60:14, 130:20
**men** [2] - 113:13, 128:9
**mentioned** [4] - 17:16, 52:22, 57:1, 119:12
**message** [2] - 133:4, 133:12
**messages** [2] - 132:19, 133:12
**messaging** [3] - 132:16, 132:18, 132:20
**Messenger** [1] - 132:20
**met** [1] - 122:7
**metadata** [14] - 38:8, 74:23, 78:16, 78:23, 79:2, 80:20, 87:6, 93:5, 96:22, 97:4, 99:1, 100:17, 102:23, 104:3, 104:10, 105:14
**metallic** [3] - 94:15, 96:1, 96:19
**MG** [15] - 47:6, 78:8, 80:15, 82:11, 82:23, 84:3, 84:9, 85:20, 108:6,

109:9, 109:16, 109:20, 110:3, 110:25, 111:12, 112:13, 112:18, 113:5, 113:8, 113:12, 114:2, 116:12, 117:5, 117:6, 117:23, 118:9, 118:10, 118:14, 119:17, 120:5, 120:10, 120:19, 123:9, 123:10, 126:11, 128:2, 128:3, 128:5, 128:8, 129:20, 129:22, 129:25, 130:11, 130:14, 131:1, 131:9, 131:14, 131:18, 132:1, 132:5, 133:7, 134:11, 134:20, 137:13

**MG's** [15] - 108:7, 109:6, 118:2, 118:23, 119:23, 120:20, 123:17, 123:18, 123:23, 124:1, 135:4, 135:11, 135:25, 136:7, 137:10

**Michael** [1] - 9:9

**microphone** [3] - 4:2, 16:4, 107:9

**Microsoft** [1] - 36:6, 51:18, 60:7

**mid** [1] - 38:25

**mid-morning** [1] - 38:25

**middle** [4] - 54:3, 111:7, 112:8, 117:2

**midel** [1] - 94:19

**might** [11] - 18:3, 35:13, 37:1, 38:22, 39:8, 39:12, 40:20, 52:14, 61:11, 81:25, 139:6

**military** [1] - 2:23

**millions** [3] - 31:2, 72:22

**mind** [2] - 92:5, 141:18

**minimum** [1] - 20:12

**minors** [1] - 75:21

**minute** [3] - 26:23, 86:5, 137:23

**minutes** [13] - 79:4, 79:7, 81:9, 81:10, 81:13, 93:8, 93:12, 99:4, 99:7, 99:22, 105:16, 138:2, 138:24

**missed** [1] - 86:7

**Missing** [1] - 72:21

**missing** [2] - 41:14, 84:8

**Mobile** [1] - 17:13

**mobile** [6] - 17:13, 19:11, 23:17, 34:4, 46:16

**mode** [3] - 23:20, 65:9, 65:11

**model** [5] - 21:20, 21:22, 28:6, 30:1, 30:2

**Mom** [1] - 63:24

**moment** [11] - 24:4, 27:5, 39:3, 114:10, 116:25, 118:25, 121:17, 122:14, 122:17, 129:3, 133:24

**moments** [2] - 50:14, 99:10

**Monday** [1] - 113:3

**monitor** [2] - 124:21, 125:2

**month** [3] - 136:15, 136:21, 137:12

**monthly** [1] - 45:4

**months** [1] - 19:1

**Montpelier** [17] - 8:13, 9:10, 9:20, 9:25, 11:15, 51:12, 120:16, 120:20, 121:1, 123:6, 123:9, 125:24, 128:2, 128:4, 131:9, 131:22, 132:10

**morning** [17] - 2:5, 2:7, 2:12, 3:14, 4:9, 4:10, 7:25, 8:1, 16:12, 16:13, 30:25, 38:25, 130:22, 138:16, 141:10, 141:12, 141:20

**most** [6] - 19:17, 23:17, 33:20, 39:12, 40:6, 60:7

**mother** [1] - 7:10

**motion** [6] - 138:7, 139:11, 139:20, 139:25, 140:2, 140:4

**mouth** [2] - 89:12, 89:20

**move** [14] - 25:3, 47:9, 65:1, 76:3, 82:1, 88:11, 92:21, 94:3, 98:13, 99:25, 101:7, 120:15, 132:10, 139:7

**moved** [6] - 37:23, 109:20, 110:6, 110:8, 120:16, 120:20

**movement** [1] - 129:12

**moves** [1] - 20:24

**movie** [1] - 59:7

**movies** [11] - 61:21, 61:22, 61:24, 61:25, 62:2, 63:3, 63:25, 70:13, 70:24

**moving** [14] - 3:10, 21:11, 23:11, 33:25, 45:13, 60:19, 65:2, 93:19, 98:15, 100:9, 101:20, 102:11, 105:2, 136:22

**Moye** [2] - 14:20, 27:7, 41:13, 41:24, 42:1, 42:8, 141:24

**mpg** [2] - 58:15, 59:4

**MPG** [1] - 59:6

**MR** [61] - 2:3, 2:8, 3:5, 3:20, 4:8, 9:5, 10:4, 15:22, 16:11, 21:8, 28:3, 29:2, 39:10, 39:16, 41:4, 41:12, 41:18, 41:20, 41:25, 42:3, 42:6, 42:10, 42:13, 42:16, 42:18, 43:5, 79:19, 83:12, 83:19, 83:21, 84:5, 84:19, 85:3, 85:15, 86:9, 86:11, 86:14, 86:21, 91:24, 92:8, 92:11, 92:17, 97:25, 98:24, 99:21, 106:22, 106:25, 107:15, 117:16, 117:18, 137:19, 137:22, 138:2, 138:19, 139:3, 139:13, 140:16, 142:2, 143:5, 143:7, 143:8

**MS** [18] - 15:19, 21:3, 41:6, 42:22, 82:18, 82:21, 84:7, 84:21, 85:12, 107:2, 137:17, 138:6, 139:10, 139:19, 139:24, 140:9, 140:21, 142:1

**MULE** [1] - 55:4

**multi** [1] - 19:15

**multi-day** [1] - 19:15

**multiple** [2] - 31:18, 35:23

**must** [1] - 58:25

**N**

**nail** [1] - 138:14

**naked** [1] - 59:2

**name** [40] - 4:2, 4:4, 7:12, 16:4, 16:7, 19:14, 44:22, 45:5, 45:19, 45:23, 48:8, 48:13, 48:15, 48:25, 49:4, 51:11, 51:15, 51:20, 51:24, 55:1, 60:1, 77:9, 77:12, 77:15, 78:1, 78:18, 80:23, 83:11, 83:14, 104:6, 104:7, 104:8, 107:9, 108:5, 108:20, 108:21, 108:23, 109:2

**names** [5] - 17:8, 45:9, 64:3, 64:4, 72:10

**narrowed** [1] - 39:19

**National** [2] - 18:9, 72:21

**natural** [1] - 38:24

**nature** [3] - 4:24, 5:21, 83:1

**Navy** [1] - 45:18

**near** [2] - 12:2, 118:10

**neat** [1] - 12:8

**necessarily** [2] - 38:16, 38:20

**need** [12] - 40:7, 40:16, 54:5, 54:10, 65:1, 83:18, 117:16, 139:18, 140:1, 141:1, 141:2

**needed** [2] - 31:25, 42:20

**network** [2] - 18:23, 54:15

**neutral** [1] - 83:23

**never** [5] - 27:7, 69:3, 85:7, 125:17, 125:18

**next** [13] - 7:4, 7:24, 14:23, 15:22, 31:15, 76:3, 76:7, 76:11, 82:2, 107:4, 131:4, 131:6, 137:9

**nice** [1] - 32:3

**niece** [1] - 58:15

**night** [9] - 112:24, 128:16, 129:22, 129:25, 130:17, 130:20, 136:3, 136:16, 136:21

**nine** [11] - 60:18, 61:23, 76:25, 86:23, 86:25, 87:1, 87:10, 87:17, 87:22, 91:13, 91:19

**NO** [1] - 1:5

**node** [2] - 54:1

**noise** [1] - 129:6

**non** [2] - 16:19, 23:11

**non-moving** [1] - 23:11

**non-paid** [1] - 16:19

**normal** [2] - 18:3, 82:13

**normally** [1] - 31:18

**NORTHERN** [1] - 1:2

**notable** [1] - 136:16

**note** [1] - 2:25

**noted** [1] - 49:18

**notes** [9] - 39:20, 67:2, 84:22, 84:23, 84:25, 85:2, 85:5, 85:7, 141:19

**noteworthy** [1] - 133:7

**nothing** [3] - 21:20, 30:25, 31:12

**notice** [1] - 69:16

**noticed** [1] - 128:24

**November** [18] - 6:4, 8:1, 9:8, 108:19, 127:23, 128:15, 131:4, 131:6, 131:15, 131:24, 132:2, 132:12, 136:3, 136:11, 136:15, 137:11, 137:12, 137:13

**nude** [5] - 59:2, 76:6, 76:7, 100:22

**Number** [3] - 28:6, 28:9, 28:15

**number** [23] - 21:20, 21:22, 22:17, 23:25, 28:18, 30:1, 30:2, 42:4, 54:8, 58:14, 58:24, 61:19, 61:20, 61:21, 61:22, 62:4, 62:24, 67:25, 68:5, 70:5

**Number(s** [1] - 144:7

**Numbers** [1] - 85:22

**numbers** [3] - 22:12, 58:14, 58:23

**numeric** [1] - 30:23

**numerous** [2] - 20:10, 51:1

**O**

**O'Neil** [1] - 108:24

**oath** [1] - 92:15

**object** [1] - 101:1

**objected** [1] - 39:21

**objection** [6] - 21:3, 40:20, 41:1, 41:21, 82:22, 139:7

**objections** [1] - 21:2

**observe** [1] - 10:8

**observed** [3] - 10:10, 10:11, 84:22

**obtained** [1] - 10:15

**obtaining** [1] - 8:12

**obviously** [3] - 39:13, 108:20, 120:6

**occasional** [1] - 112:21

**occurred** [2] - 39:20, 76:24

**October** [1] - 85:20

**odd** [1] - 136:17

**OF** [2] - 1:1, 1:4

**offered** [1] - 5:15

**Office** [2] - 9:9, 9:20

**office** [3] - 11:5, 25:6, 29:13

**officer** [2] - 6:13, 8:21

**official** [1] - 144:9

**Official** [1] - 144:17

**old** [3] - 59:21, 118:15, 137:13

**once** [32] - 19:7, 19:10, 20:6, 21:17, 21:22, 22:2, 22:10, 24:8, 24:14, 24:16, 24:23, 25:10, 29:12, 29:17, 29:24, 30:2, 30:6, 31:16, 37:4, 46:17, 50:25, 60:21, 65:6, 72:9, 72:12, 96:18, 105:22, 115:5, 125:8, 141:13

**one** [97] - 7:6, 13:23, 16:19, 18:20, 20:13, 21:23, 22:3, 24:10, 28:19, 30:25, 31:3, 31:17, 35:23, 36:2, 36:25, 37:21, 40:6, 40:21, 41:14, 41:21, 42:2, 42:3, 42:13, 43:7, 46:21, 47:10, 48:15, 49:5, 50:3, 50:23, 53:23, 54:5, 54:22, 54:25, 55:25, 56:1, 56:5, 56:18, 57:25, 58:11, 59:15, 59:24, 60:22, 61:18, 61:19, 61:21, 64:25, 65:2, 65:5, 66:4, 66:14, 66:15, 67:2, 67:3, 68:1, 69:10, 73:23, 74:10, 74:19, 77:4, 78:7, 78:19, 79:23, 80:8, 80:23, 80:24, 80:25, 81:4, 81:11, 84:21, 88:1, 89:9, 90:1, 91:14, 92:5, 92:8, 96:6, 97:5, 99:8, 100:22, 101:21, 102:24, 103:12, 103:13, 104:2, 104:7, 104:9, 119:3, 125:9, 136:24, 137:3, 137:7
**One** [1] - 91:20
**one's** [1] - 64:13
**ones** [4] - 18:17, 61:5, 61:7, 116:25
**open** [8] - 11:10, 31:17, 34:4, 89:11, 104:14, 106:2, 106:6, 141:18
**opens** [3] - 24:14, 34:11, 53:10
**Operations** [1] - 18:9
**Operative** [1] - 18:8
**opinion** [3] - 2:20, 21:6, 105:20
**opioid** [1] - 128:19
**opportunity** [2] - 85:1, 141:4
**option** [1] - 34:7
**oral** [1] - 76:13
**orange** [1] - 82:9, 87:25, 89:9, 89:18, 90:1, 90:10, 121:13, 121:17, 133:23, 133:24
**orange/red** [4] - 87:24, 88:16, 90:17, 91:4
**order** [2] - 35:9, 41:15
**ordering** [1] - 48:11
**orgasm** [5] - 70:15, 70:16, 71:9, 71:12
**orgies** [1] - 63:2
**original** [20] - 17:21, 22:19, 35:10, 35:14, 35:21, 36:13, 37:18,

37:19, 37:20, 74:19, 87:6, 87:9, 95:13, 103:10, 103:14, 103:25, 104:8, 104:10, 104:25
**originally** [1] - 4:17
**originals** [1] - 75:17
**otherwise** [3] - 3:9, 42:4, 86:18
**outside** [4] - 110:16, 121:2, 129:10, 129:12
**overrule** [1] - 41:7
**oversight** [1] - 86:16
**overview** [7] - 4:16, 12:4, 16:20, 17:8, 20:2, 34:2, 53:21
**overwrites** [1] - 33:6
**overwritten** [4] - 32:24, 33:4, 33:5
**own** [3] - 117:7, 125:22, 132:8
**owner** [1] - 21:16
**oyer** [1] - 15:18
**Oyer** [3] - 1:18, 41:5, 92:6
**OYER** [7] - 15:19, 41:6, 42:22, 82:18, 82:21, 84:7, 84:21, 85:12, 107:2, 137:17, 138:6, 139:10, 139:19, 139:24, 140:9, 140:21, 142:1

**P**

**p.m** [13] - 8:11, 9:8, 9:13, 9:19, 9:23, 92:3, 92:13, 138:25, 140:12, 141:22, 142:4
**packaging** [3] - 10:22, 12:04, 15:11
**PAGE** [1] - 143:3
**page** [43] - 13:1, 14:1, 14:7, 14:10, 26:23, 27:19, 40:24, 45:7, 45:10, 45:15, 45:22, 49:2, 49:9, 49:16, 49:23, 51:8, 51:10, 81:21, 85:3, 96:6, 101:13, 110:18, 112:7, 116:9, 119:3, 119:6, 119:8, 119:11, 119:19, 119:24, 120:2, 121:4, 121:16, 122:17, 123:13, 123:18, 124:16, 126:17, 126:21, 126:25, 127:6, 135:22, 135:24
**Page** [45] - 11:6, 11:9, 11:15, 11:20, 11:25, 12:21, 12:22, 12:24, 13:4, 14:13, 14:15, 15:3, 26:20, 26:23, 27:2,

27:13, 27:17, 44:10, 44:16, 44:24, 45:2, 47:20, 48:1, 48:6, 48:9, 48:19, 49:13, 49:16, 49:21, 50:1, 50:23, 51:2, 68:20, 69:23, 82:4, 94:8, 94:14, 94:17, 94:22, 95:15, 95:20, 96:15, 101:12, 101:20, 111:19
**pages** [5] - 69:23, 85:4, 91:13, 95:9, 144:8
**paid** [2] - 16:19
**painfully** [1] - 40:6
**pajama** [13] - 87:24, 88:16, 88:24, 89:8, 89:17, 89:25, 90:9, 90:17, 91:4, 116:14, 116:17, 116:24
**pants** [17] - 82:8, 87:24, 88:16, 88:24, 89:8, 89:17, 89:25, 90:9, 90:17, 91:4, 116:12, 116:13, 116:14, 116:17, 116:18, 116:24
**paper** [2] - 114:7, 115:16
**parent** [1] - 7:8
**parent's** [1] - 131:12
**parental** [1] - 63:25
**parents** [4] - 7:6, 45:8, 132:2, 132:6
**parked** [2] - 9:14, 11:19
**parse** [2] - 52:11, 60:21
**parses** [4] - 32:3, 46:16, 60:22, 72:9
**part** [12] - 18:13, 18:21, 41:8, 44:9, 54:2, 77:7, 77:22, 80:10, 86:16, 102:6, 106:2, 106:6
**partial** [1] - 112:12
**participate** [2] - 8:12, 11:12
**particular** [4] - 69:20, 78:4, 124:4, 133:6
**particularly** [2] - 40:3, 133:7
**parties** [3] - 10:2, 28:25, 86:3
**parts** [1] - 21:12
**pass** [1] - 80:8
**passed** [2] - 70:15, 70:16, 71:12
**passed-out** [1] - 71:12
**passwords** [1] - 17:25
**past** [3] - 75:14, 90:23, 129:24
**path** [4] - 31:25, 33:20, 58:13, 77:22
**patrol** [2] - 4:21, 6:13
**pattern** [3] - 13:11,

13:24, 14:8
**patterned** [1] - 99:16
**Paul** [2] - 1:16, 1:17
**payment** [1] - 45:24
**PDF** [5] - 43:19, 45:15, 51:8, 51:17
**peer** [22] - 52:18, 53:18, 53:19, 53:22, 53:23, 54:6, 54:14, 54:16, 55:1, 56:7, 56:24
**peer-to-peer** [11] - 52:18, 53:18, 53:19, 53:22, 53:23, 54:6, 54:14, 54:16, 55:1, 56:7, 56:24
**peers** [1] - 55:17
**penetrates** [1] - 100:24
**penis** [23] - 71:5, 76:2, 76:8, 76:13, 87:24, 88:4, 88:19, 88:24, 89:1, 89:8, 89:11, 89:12, 89:17, 89:20, 89:25, 90:4, 90:9, 90:12, 90:17, 90:19, 90:24, 91:4, 91:6
**people** [8] - 31:2, 35:3, 36:8, 53:1, 62:6, 66:10, 72:22, 113:24
**perfect** [1] - 91:24
**perform** [2] - 25:11, 43:8
**performed** [3] - 19:23, 25:16, 69:19
**perhaps** [2] - 75:11, 92:11
**period** [10] - 112:17, 112:23, 113:5, 117:5, 118:11, 122:24, 123:8, 128:3, 128:22, 129:25
**periods** [1] - 128:14
**person** [9] - 30:21, 32:12, 33:1, 53:8, 54:1, 84:16, 86:18, 132:16, 132:25
**personal** [1] - 10:11
**persons** [1] - 76:20
**perspective** [1] - 42:19
**peruse** [1] - 103:23
**Petersburg** [1] - 58:15
**petite** [1] - 70:7
**pharmacy** [1] - 108:2
**phone** [61] - 7:6, 7:14, 10:19, 11:1, 11:3, 11:7, 11:9, 23:13, 23:16, 23:17, 24:2, 24:4, 24:5, 24:21, 25:19, 25:25, 27:14, 27:15, 27:18, 27:20, 27:21, 29:5, 30:21, 30:24, 33:25, 34:1, 34:3, 34:5, 34:9, 43:12, 44:7, 45:14,

45:21, 45:22, 46:2, 46:14, 47:21, 65:25, 66:2, 66:22, 67:5, 67:9, 67:14, 68:15, 69:14, 70:22, 101:25, 102:1, 102:4, 102:12, 102:13, 102:24, 103:15, 103:19, 104:5, 105:3, 105:15, 105:22, 127:16, 127:18, 137:4
**phones** [3] - 17:13, 21:12, 23:25
**photo** [4] - 26:22, 46:13, 104:18, 106:17
**photograph** [33] - 11:7, 15:4, 26:21, 100:3, 110:21, 111:8, 111:18, 111:20, 112:9, 113:20, 113:24, 114:14, 115:14, 115:18, 115:23, 116:2, 116:10, 117:25, 119:3, 121:2, 121:8, 121:12, 121:21, 122:18, 122:22, 123:18, 123:22, 126:17, 134:10, 134:15, 134:19, 135:10, 135:24
**photographs** [8] - 14:4, 38:7, 74:2, 79:21, 79:24, 94:5, 94:12, 98:1
**photography** [1] - 38:11
**photos** [9] - 30:20, 35:23, 35:25, 36:1, 37:11, 37:12, 44:1, 81:18, 103:22
**phrasing** [1] - 83:23
**physical** [3] - 5:16, 34:7, 34:8
**pick** [3] - 24:10, 67:23, 92:20
**picked** [1] - 113:10
**picture** [26] - 11:9, 11:20, 13:2, 14:11, 14:24, 15:5, 15:15, 25:3, 30:24, 32:12, 36:23, 41:2, 41:9, 44:19, 49:19, 50:13, 72:19, 74:10, 75:25, 82:2, 83:18, 84:3, 96:13, 117:23, 133:20
**pictures** [11] - 11:22, 37:4, 70:22, 83:5, 95:3, 95:9, 95:11, 95:12, 133:14
**piece** [2] - 22:24, 121:7
**pillow** [3] - 13:7, 13:9, 123:23
**pink** [2] - 76:2, 104:15
**pixel** [1] - 31:3
**pixels** [1] - 38:10
**place** [5] - 2:5, 3:6,

91:23, 131:9, 132:8
**placed** [2] - 76:9, 99:11
**places** [1] - 61:15
**platinum** [2] - 96:3, 96:5
**Play** [1] - 124:12
**play** [10] - 50:9, 79:14, 79:15, 81:13, 93:25, 97:21, 99:18, 101:3, 124:15, 125:1
**played** [2] - 96:20, 98:12
**playing** [10] - 3:8, 15:7, 50:8, 79:18, 81:17, 94:1, 97:24, 99:20, 101:5, 137:4
**plea** [2] - 3:1, 138:18
**plug** [5] - 22:5, 23:18, 24:5, 24:8, 34:4
**plus** [2] - 18:23, 29:13
**point** [17] - 2:14, 38:25, 41:8, 42:21, 83:11, 109:8, 109:20, 118:17, 120:9, 128:23, 130:25, 131:8, 131:18, 131:21, 136:24, 141:8
**Police** [8] - 4:12, 4:20, 5:12, 5:21, 6:2, 6:3, 9:24, 26:12
**police** [2] - 5:15, 6:1
**polka** [22] - 13:10, 13:12, 13:24, 14:11, 14:16, 14:17, 93:20, 94:18, 94:24, 97:19, 98:9, 99:13, 99:17, 100:8, 100:25, 101:19, 117:12, 118:4, 118:24, 119:6, 119:12, 135:5
**polka-dot** [1] - 13:12
**polka-dotted** [2] - 13:10, 14:11
**polo** [1] - 115:12
**porch** [1] - 11:20
**porn** [3] - 58:25, 63:24, 70:18
**pornography** [8] - 2:25, 5:17, 52:10, 58:21, 59:14, 73:6, 75:16, 82:24
**portion** [5] - 40:5, 100:5, 101:15, 104:23, 106:17
**portions** [1] - 39:24
**position** [1] - 99:12
**possessed** [1] - 40:25
**possession** [1] - 29:11
**possible** [1] - 41:9
**potentially** [4] - 61:11, 84:12, 87:7, 96:11
**power** [1] - 23:15
**power's** [1] - 24:2

**pre** [5] - 57:15, 57:17, 59:16, 61:25, 70:20
**pre-teen** [1] - 57:15, 57:17, 59:16, 61:25, 70:20
**prefer** [2] - 139:16, 140:6
**prefers** [1] - 140:10
**prejudice** [1] - 83:15
**prep** [1] - 85:6
**preparation** [5] - 10:20, 13:18, 25:7, 58:4, 73:23
**prepare** [6] - 47:15, 50:21, 57:20, 87:1, 88:9, 93:1
**prepared** [2] - 39:16, 61:10
**preparing** [2] - 39:19, 73:20
**prepubescent** [26] - 57:19, 76:1, 76:6, 76:12, 88:2, 88:16, 88:19, 88:24, 89:10, 89:19, 89:20, 90:2, 90:10, 90:18, 91:5, 93:16, 99:8, 99:10, 99:11, 99:15, 100:22, 100:24, 104:13, 104:16, 106:1, 106:6
**prescription** [1] - 51:24
**presence** [1] - 28:21
**presented** [1] - 139:24
**presenting** [2] - 140:8, 140:14
**preserve** [2] - 8:25, 29:4
**pretty** [3] - 31:5, 52:6, 72:16
**prevents** [1] - 66:12
**PRI** [1] - 59:2
**priceless** [1] - 59:2
**prides** [2] - 66:8, 66:18
**primary** [1] - 52:23
**printed** [1] - 91:16
**printout** [1] - 114:8
**pristine** [1] - 82:9
**privacy** [5] - 65:3, 65:5, 65:9, 65:11, 66:19
**problem** [2] - 2:2, 85:8
**problems** [2] - 14:21, 77:19
**Procedure** [1] - 140:1
**proceed** [1] - 21:7
**proceedings** [4] - 2:1, 141:11, 144:6, 144:9
**Proceedings** [1] - 142:4
**process** [5] - 23:10, 24:19, 29:17, 40:16
**processing** [1] - 35:20
**produce** [2] - 52:2, 87:15

**produced** [1] - 87:13
**production** [2] - 76:24, 77:1
**program** [27] - 18:8, 19:7, 21:25, 23:21, 24:9, 34:11, 38:8, 52:1, 52:13, 52:14, 53:10, 53:22, 53:23, 55:2, 55:14, 56:6, 56:11, 57:1, 60:8, 61:5, 64:4, 66:20, 72:24, 104:7, 104:9
**programs** [12] - 23:21, 32:4, 32:7, 33:13, 34:22, 52:18, 53:19, 54:17, 56:7, 62:8, 62:9
**Project** [2] - 18:23, 19:14
**prompts** [1] - 24:8
**Property** [1] - 11:5
**proposed** [1] - 92:6
**Protect** [1] - 18:10
**protect** [1] - 29:7
**provide** [5] - 53:21, 63:11, 87:21, 88:13, 97:12
**provided** [6] - 9:21, 10:1, 40:18, 78:23, 84:23, 85:7
**providing** [1] - 41:21
**PTHC** [6] - 57:5, 58:15, 59:1, 59:9, 61:21, 64:23
**puberty** [1] - 71:15
**publish** [2] - 80:7, 114:17
**pull** [2] - 56:17, 115:17
**pulled** [1] - 30:1
**pulls** [1] - 56:23
**purple** [24] - 12:19, 13:12, 13:24, 14:11, 14:16, 14:17, 93:20, 94:21, 94:24, 97:18, 98:9, 99:13, 100:8, 100:25, 104:14, 104:15, 117:11, 118:2, 118:24, 119:6, 119:12, 135:5, 135:25
**purple/white** [1] - 13:10
**purpose** [1] - 8:25
**purposes** [3] - 41:22, 42:14, 139:20
**pursuant** [1] - 139:25
**push** [2] - 23:22, 34:5
**push-button** [1] - 23:22
**pushing** [1] - 70:9
**pussy** [1] - 58:25
**put** [8] - 7:6, 26:10, 34:10, 35:11, 41:15, 72:13, 74:11, 116:18
**puts** [2] - 35:14, 36:14

**Q**

**QT** [1] - 58:16
**qualified** [3] - 20:8, 20:25, 21:5
**questions** [10] - 15:19, 21:2, 25:4, 30:10, 107:1, 128:1, 136:2, 137:15, 137:16, 137:17
**quick** [1] - 72:17
**quicker** [1] - 103:22
**quickly** [13] - 29:23, 35:16, 36:2, 36:4, 40:11, 72:16, 74:13, 76:3, 76:10, 77:19, 90:14, 103:23, 134:6
**quilted** [4] - 13:11, 13:24, 14:8, 14:14
**quite** [1] - 39:10
**quote** [2] - 46:4, 46:6

**R**

**r@y** [1] - 59:1
**R@Y** [3] - 59:9, 64:23
**raise** [5] - 3:23, 15:25, 42:20, 84:21, 107:5
**raised** [3] - 84:14, 94:15, 107:22
**ran** [1] - 33:10
**range** [7] - 49:7, 58:7, 58:8, 61:1, 62:15, 65:13, 67:18
**rape** [11] - 61:21, 61:22, 61:24, 61:25, 62:2, 63:3, 63:24, 63:25, 64:1
**rarely** [1] - 125:19
**RAT** [2] - 5:2, 5:6
**rate** [1] - 46:4
**Ray** [1] - 64:23
**RE/MAX** [2] - 48:2, 51:10
**reaching** [2] - 88:3, 88:19
**read** [32] - 9:3, 22:6, 28:1, 28:20, 40:2, 40:20, 41:10, 57:4, 58:24, 60:17, 61:17, 61:20, 62:18, 62:22, 63:1, 63:23, 64:13, 64:20, 65:1, 65:21, 67:21, 70:5, 75:23, 76:15, 84:5, 84:17, 85:6, 85:16, 86:7, 90:7, 133:1, 141:14
**reader** [2] - 24:14, 34:10
**reading** [1] - 58:24
**reads** [1] - 132:25

**ready** [5] - 3:18, 137:23, 139:1, 141:24
**real** [2] - 53:14, 76:20
**realincesttube.org** [1] - 68:3
**really** [2] - 24:19, 115:19
**Realty** [1] - 48:3
**rec** [1] - 118:10
**received** [1] - 92:8
**receiving** [1] - 6:8
**recently** [2] - 5:18, 25:7
**recess** [4] - 42:25, 92:3, 138:25, 139:18
**recognize** [41] - 27:13, 110:11, 110:19, 113:19, 113:22, 113:24, 114:3, 114:4, 115:1, 115:9, 115:18, 115:23, 116:2, 116:3, 116:10, 116:11, 116:13, 116:21, 117:20, 118:20, 119:20, 120:22, 121:4, 122:9, 123:14, 124:17, 126:17, 126:21, 126:25, 127:13, 133:17, 134:9, 134:15, 134:18, 134:21, 135:1, 135:9, 135:13, 135:20, 135:22, 135:24
**recognized** [1] - 114:24
**record** [18] - 4:3, 11:17, 16:5, 40:9, 65:3, 66:17, 75:5, 82:20, 86:6, 93:22, 98:21, 100:14, 102:18, 105:9, 107:10, 137:21, 139:11, 139:20
**recorded** [4] - 8:9, 63:9, 69:3, 144:5
**records** [1] - 60:25
**recover** [1] - 5:3
**recoverable** [1] - 33:7
**recovered** [1] - 15:14
**recovery** [7] - 17:3, 17:16, 17:17, 17:18, 17:24, 19:8, 19:9
**rectangular** [2] - 101:1, 101:2
**rectangular-shaped** [1] - 101:1
**red** [2] - 116:15, 116:17
**redacted** [7] - 91:16, 101:9, 101:15, 104:18, 104:21, 106:12, 106:15
**redactions** [2] - 70:1, 100:6
**reddish** [1] - 82:9
**reddish-orange** [1] - 82:9
**reduce** [1] - 74:11
**reduced** [3] - 97:6,

97:15, 100:20

**reduces** [1] - 35:14

**Reebok** [2] - 116:14, 116:17

**refer** [4] - 17:3, 35:3, 59:14, 78:4

**reference** [3] - 7:20, 36:22, 75:17

**referenced** [10] - 28:7, 28:13, 28:16, 67:8, 91:19, 93:23, 98:22, 100:14, 102:18, 105:9

**references** [1] - 46:24

**referencing** [4] - 77:20, 77:25, 99:6, 100:5

**referred** [5] - 32:7, 77:16, 114:5, 114:13, 119:15

**referring** [7] - 84:22, 84:25, 114:15, 117:3, 118:4, 118:24, 121:17

**refers** [1] - 17:17

**reflection** [1] - 112:11

**reflects** [1] - 56:18

**regarding** [1] - 19:4

**regardless** [1] - 21:13

**Regional** [1] - 5:6

**registries** [1] - 24:2

**regular** [2] - 126:2, 132:20

**relate** [3] - 25:4, 75:7, 85:23

**related** [2] - 50:4, 87:10

**relatedly** [1] - 123:2

**relates** [5] - 85:24, 85:25, 86:1, 86:2

**relating** [9] - 43:20, 50:18, 52:2, 57:20, 67:4, 68:17, 74:23, 75:24, 76:14

**relation** [3] - 90:23, 124:1, 137:8

**relationship** [5] - 109:13, 109:14, 109:17, 125:11, 125:13

**relative** [1] - 23:8

**relatively** [2] - 2:10, 125:11

**relatives** [1] - 113:17

**relevant** [5] - 23:6, 24:16, 33:22, 40:3, 58:5

**remain** [3] - 26:17, 29:8, 31:12

**remainder** [1] - 39:9

**remaining** [1] - 37:15

**remains** [2] - 29:14, 99:12

**remember** [8] - 8:24, 10:5, 12:14, 23:23, 46:15, 72:19, 77:20,

77:22

**remind** [2] - 93:9, 102:1

**remnants** [1] - 75:3

**remove** [2] - 21:21, 76:10

**removed** [2] - 54:21, 54:22

**rendered** [1] - 49:4

**rented** [1] - 110:14

**repair** [1] - 18:23

**repairs** [2] - 46:9, 51:11

**repeat** [2] - 29:6, 63:18

**repeatedly** [1] - 84:22

**repetitive** [1] - 61:11

**report** [7] - 6:24, 6:25, 7:7, 23:9, 24:17, 33:13, 33:23

**Reporter** [1] - 144:17

**REPORTER'S** [1] - 144:3

**reports** [4] - 16:25, 34:21, 52:5, 85:6

**represent** [1] - 69:12

**represented** [1] - 73:24

**representing** [1] - 91:14

**represents** [1] - 69:1

**request** [2] - 46:9, 51:10

**requested** [1] - 8:18

**require** [1] - 54:3

**requirement** [1] - 139:5

**Rescue** [1] - 18:8

**reside** [1] - 32:19

**resided** [1] - 27:3

**residence** [8] - 8:12, 8:19, 9:10, 9:12, 9:16, 10:14, 11:18, 12:3

**residing** [2] - 53:11, 53:12

**resolved** [1] - 3:17

**resources** [2] - 53:24, 54:7

**respect** [19] - 19:20, 40:23, 41:12, 43:12, 59:23, 60:3, 74:22, 75:1, 75:24, 77:4, 78:14, 85:22, 86:14, 88:13, 103:3, 105:20, 125:7, 126:10, 132:18

**responded** [3] - 9:10, 9:20, 9:24

**responsible** [1] - 113:8

**rest** [7] - 2:14, 137:23, 139:1, 139:13, 139:15, 139:21, 140:5

**rested** [1] - 140:18

**rests** [3] - 138:4, 139:3, 140:16

**result** [1] - 130:10

**results** [7] - 23:2, 33:12,

43:8, 52:2, 63:21, 65:11, 65:13

**Resume** [3] - 42:25, 92:3, 138:25

**resume** [1] - 51:14

**retrieved** [1] - 70:22

**reunion** [2] - 35:25, 36:24

**revealing** [1] - 97:17

**review** [18] - 10:21, 10:24, 15:11, 17:1, 21:10, 23:9, 24:18, 29:23, 29:24, 33:12, 33:24, 35:1, 43:25, 44:9, 46:21, 85:1, 137:23, 141:3

**reviewed** [2] - 13:18, 25:6

**reviewing** [1] - 39:20

**rid** [2] - 14:20, 71:19

**right-hand** [1] - 122:21

**riley** [1] - 1:16

**Riley** [5] - 76:10, 87:20, 88:11, 89:14, 92:4

**RILEY** [24] - 2:3, 41:12, 41:18, 41:25, 42:6, 42:10, 42:13, 42:16, 92:8, 92:11, 106:22, 106:25, 107:15, 117:16, 117:18, 137:19, 137:22, 138:2, 138:19, 139:3, 139:13, 140:16, 142:2, 143:8

**ring** [6] - 93:18, 94:15, 95:24, 96:19

**robberies** [1] - 4:24

**role** [1] - 18:6

**room** [15] - 12:8, 78:9, 88:5, 88:21, 89:3, 89:13, 89:21, 90:5, 90:13, 90:21, 91:8, 113:21, 116:1, 129:12, 141:15

**roughly** [3] - 8:11, 67:16, 114:6

**row** [1] - 80:8

**Roy** [2] - 59:10, 59:15

**Roys** [5] - 9:19, 9:25, 10:10, 10:13, 10:17

**RPR** [1] - 1:23

**Ruben** [1] - 6:8

**Rule** [1] - 139:25

**rule** [1] - 39:23

**Rules** [1] - 139:25

**run** [8] - 17:23, 22:17, 22:19, 23:1, 31:18, 52:13, 73:1, 138:17

**running** [6] - 22:1, 23:19, 32:1, 53:11, 63:9, 73:4

**rushing** [1] - 136:25

**Russia** [1] - 77:2

**Russian** [1] - 58:15

**S**

**S-T-E-V-E-N** [1] - 16:8

**saint** [1] - 58:15

**sampling** [1] - 44:5

**Samsung** [16] - 9:17, 9:22, 25:19, 27:14, 28:12, 28:22, 44:7, 45:14, 65:25, 102:4, 102:13, 102:24, 103:15, 104:5, 105:3, 105:15

**SanDisk** [3] - 28:15, 28:19, 28:23

**Satellite** [1] - 28:5

**save** [1] - 139:6

**saved** [1] - 37:7

**saw** [7] - 81:4, 102:1, 125:17, 125:18, 125:19, 127:10, 133:24

**schedule** [3] - 2:6, 112:22, 113:2

**scheduled** [1] - 7:24

**school** [2] - 113:5, 113:8

**screen** [15] - 40:12, 44:18, 45:3, 45:14, 48:10, 48:15, 76:4, 80:1, 80:10, 81:23, 82:1, 88:12, 94:8, 101:21, 115:17

**screenshot** [2] - 44:17, 46:19

**SD** [22] - 25:21, 25:25, 27:20, 27:21, 28:15, 28:23, 29:5, 43:15, 47:9, 47:10, 47:21, 50:4, 92:21, 92:22, 92:23, 96:22, 97:7, 97:10, 98:16, 99:2, 100:9, 100:18

**Search** [2] - 52:25, 53:1

**search** [40] - 8:12, 9:12, 10:15, 11:4, 11:12, 16:22, 21:14, 29:24, 52:8, 52:10, 55:14, 55:15, 55:19, 56:2, 56:4, 56:16, 56:18, 56:20, 56:23, 56:24, 56:25, 57:4, 57:17, 57:21, 58:20, 61:8, 61:12, 63:4, 64:1, 66:8, 66:18, 68:13, 68:17, 68:23, 69:6, 69:13, 72:4, 94:25, 131:22

**searched** [1] - 14:24

**searches** [10] - 33:18,

52:7, 52:8, 60:23, 61:1, 61:4, 61:14, 68:14, 69:19, 73:9

**Searches** [1] - 60:20

**searching** [1] - 69:11

**seated** [3] - 3:13, 4:1, 16:3, 39:6, 43:3, 92:14, 107:8, 140:13

**second** [15] - 12:9, 39:17, 63:1, 64:22, 67:2, 67:3, 73:23, 80:15, 106:24, 116:9, 119:6, 119:24, 130:18, 135:22

**seconds** [22] - 50:9, 79:4, 79:7, 79:12, 81:9, 81:10, 81:14, 93:8, 93:13, 97:6, 97:14, 97:22, 98:11, 98:12, 99:4, 99:5, 99:7, 99:19, 100:20, 101:3

**secure** [2] - 8:19, 8:21

**secured** [1] - 10:14

**securing** [1] - 8:16

**Security** [3] - 16:17, 16:21, 18:10

**security** [2] - 53:4, 62:6

**see** [57] - 2:18, 13:6, 13:12, 14:18, 24:22, 32:16, 33:20, 35:25, 36:9, 36:23, 37:1, 37:5, 40:4, 40:13, 42:23, 53:9, 57:17, 58:25, 59:8, 59:11, 59:17, 59:18, 59:22, 61:9, 69:22, 72:24, 75:5, 75:10, 79:14, 80:5, 80:11, 81:22, 82:8, 83:15, 84:9, 86:4, 88:11, 92:1, 93:15, 94:18, 97:12, 98:7, 100:7, 101:18, 102:7, 111:6, 111:20, 114:1, 115:19, 119:12, 121:21, 122:22, 123:22, 129:15, 138:23, 141:20, 142:3

**seeing** [8] - 36:11, 46:19, 84:10, 84:12, 85:8, 112:10, 118:1, 122:18

**Seerden** [1] - 2:21

**SEERDEN** [1] - 2:21

**seized** [6] - 9:17, 12:17, 13:13, 13:16, 15:1, 15:8

**seizure** [1] - 9:12

**select** [1] - 31:25

**selected** [12] - 57:24, 61:5, 61:7, 62:13, 63:20, 64:9, 64:11, 64:18, 64:19, 67:10, 67:11, 67:21

**self** [1] - 84:11

159

**self-conclude** [1] - 84:11

**selfie** [3] - 49:14, 49:17

**send** [4] - 31:1, 66:10, 66:11, 133:14

**sense** [2] - 39:12, 41:11

**sent** [2] - 19:8, 72:23

**sentencing** [1] - 138:17

**separate** [3] - 32:4, 46:18, 72:10

**separately** [1] - 86:13

**September** [4] - 46:23, 47:2, 61:2, 62:16

**Serial** [3] - 28:6, 28:9, 28:15

**serial** [5] - 21:20, 21:22, 28:18, 30:1, 30:2

**series** [9] - 77:7, 77:9, 77:15, 78:1, 78:4, 86:23, 91:1, 91:20

**server** [1] - 54:4

**services** [1] - 49:3

**session** [4] - 63:5, 63:8, 63:9, 63:10

**set** [8] - 2:13, 7:22, 69:3, 69:5, 72:14, 72:19, 73:2

**sets** [1] - 72:23

**setting** [1] - 87:20

**settings** [4] - 38:10, 38:12, 65:6, 66:16

**Seven** [2] - 42:9, 75:8

**seven** [5] - 68:2, 68:3, 97:22, 98:11, 99:19

**seventh** [1] - 123:13

**several** [1] - 117:11

**sex** [11] - 58:25, 59:16, 63:25, 70:11, 70:20, 71:3, 71:7, 71:14, 71:17, 76:13

**sexual** [3] - 5:16, 57:19

**sexually** [2] - 40:1, 40:5

**shade** [2] - 88:6, 89:3

**shaped** [1] - 101:1

**share** [1] - 53:24

**shares** [2] - 54:13

**sharing** [9] - 52:18, 53:19, 53:22, 53:23, 54:5, 54:7, 54:9, 54:16, 55:1

**sheet** [4] - 92:6, 93:17, 106:4, 106:8

**sheriff's** [1] - 11:5

**Sheriff's** [4] - 6:1, 6:11, 9:9, 9:20

**Shield** [2] - 48:7, 51:20

**shift** [2] - 123:8, 134:6

**shirt** [32] - 49:19, 49:22, 76:2, 82:3, 87:25, 88:1, 89:9, 89:10, 89:18, 90:1,

90:2, 90:10, 114:4, 114:24, 115:1, 115:2, 115:12, 115:13, 116:3, 116:5, 116:7, 121:13, 121:17, 121:23, 122:1, 122:6, 122:13, 122:14, 133:23, 133:24

**shirtless** [4] - 45:12, 49:24, 50:11, 50:25

**short** [3] - 2:10, 39:3, 138:23

**shortcut** [2] - 53:8, 53:13

**shortest** [1] - 41:9

**shortly** [1] - 12:21

**shot** [4] - 119:8, 119:11, 119:25, 121:16

**shots** [1] - 101:21

**shoulder** [1] - 96:11

**shoveled** [1] - 3:15

**show** [16] - 14:4, 25:6, 41:8, 61:14, 75:6, 76:3, 76:10, 90:22, 100:2, 111:19, 116:9, 116:20, 118:19, 126:16, 134:6, 135:12

**showed** [2] - 50:14, 61:5

**showing** [50] - 11:6, 13:17, 15:3, 15:10, 25:9, 26:20, 37:4, 47:17, 50:23, 56:13, 57:23, 62:3, 63:5, 64:2, 67:7, 68:20, 79:23, 91:12, 94:8, 95:8, 98:4, 101:12, 104:20, 106:15, 106:17, 110:10, 110:16, 110:18, 112:7, 113:19, 114:8, 115:8, 115:16, 117:19, 119:2, 119:19, 119:24, 121:4, 122:8, 123:13, 124:16, 127:6, 127:12, 133:17, 134:9, 134:14, 134:18, 135:1, 135:9, 135:20

**shown** [2] - 41:11, 77:25

**shows** [6] - 33:20, 33:21, 34:5, 60:5, 94:23, 94:24

**shuffling** [1] - 129:6, 129:10, 136:23

**sic** [1] - 70:15

**sick** [1] - 129:25

**side** [19] - 5:4, 13:3, 13:11, 13:23, 13:24, 14:7, 14:11, 14:14, 45:5, 93:20, 94:16, 97:15, 117:12, 118:6, 120:2, 121:8, 134:2, 135:7

**sides** [2] - 14:18, 119:3

**siding** [1] - 11:19

**sign** [1] - 90:20

**signature** [1] - 144:12

**signed** [5] - 8:20, 10:2, 21:16, 28:25, 86:3

**significance** [2] - 30:18, 60:3

**silver** [4] - 93:18, 96:3, 96:5, 96:19

**silver-in-color** [1] - 93:18

**silver-looking** [1] - 96:19

**similar** [3] - 31:8, 50:3, 100:10

**simply** [1] - 141:10

**single** [4] - 11:18, 22:3, 51:8, 102:12

**single-page** [1] - 51:8

**sister** [1] - 59:1

**sites** [1] - 67:13

**sitting** [1] - 10:11

**six** [5] - 44:9, 61:18, 61:22, 67:25, 99:4

**size** [3] - 21:23, 35:14, 74:11

**skin** [1] - 93:16

**skip** [1] - 77:19

**slave** [1] - 64:25

**sleep** [2] - 117:6, 137:3

**slept** [3] - 123:10, 130:16, 130:18

**slot** [1] - 102:8

**small** [4] - 25:14, 44:5, 70:24, 117:11

**smaller** [2] - 37:7, 74:18

**Smartphone** [1] - 9:17

**smartphone** [4] - 9:22, 10:1, 28:12, 28:22

**SMG900V** [4] - 9:17, 9:22, 10:1, 28:12

**snapshot** [1] - 24:1

**snowplowed** [1] - 3:15

**software** [2] - 30:4, 72:9

**solved** [1] - 14:21

**someone** [4] - 35:24, 36:25, 48:10

**sometimes** [6] - 17:24, 23:19, 23:20, 37:1, 38:9, 55:22

**somewhat** [1] - 2:22

**somewhere** [6] - 10:7, 37:8, 53:12, 57:2, 69:8, 103:13

**Son** [1] - 134:4

**soon** [1] - 12:15

**sorry** [16] - 29:6, 40:2, 48:18, 59:5, 62:25, 64:24, 68:1, 69:25,

75:13, 92:18, 93:12, 106:25, 111:11, 122:9, 122:11, 141:24

**sort** [12] - 21:11, 25:3, 36:4, 36:17, 40:9, 41:1, 60:14, 68:25, 83:1, 84:3, 132:12, 132:15

**sound** [3] - 17:20, 17:22, 81:15

**space** [19] - 24:4, 32:8, 32:10, 32:11, 33:6, 33:11, 33:19, 33:21, 35:2, 35:3, 38:17, 38:19, 57:2, 97:11, 99:3, 100:19

**speaking** [8] - 21:9, 43:17, 109:16, 113:1, 114:19, 125:13, 128:20, 135:17

**Special** [2] - 18:9, 26:2

**special** [2] - 40:7

**specialize** [1] - 20:5

**specialized** [4] - 4:23, 5:3, 19:3, 19:12

**specific** [5] - 19:19, 73:17, 84:16, 112:3, 128:13

**specifically** [7] - 23:11, 56:6, 57:18, 111:24, 118:9, 122:17, 128:15

**specifics** [2] - 107:18, 107:24, 130:9

**speed** [1] - 35:9

**spell** [4] - 4:2, 16:4, 16:7, 107:9

**spending** [1] - 124:14

**spent** [4] - 4:25, 5:14, 5:18, 124:5

**squeeze** [1] - 141:11

**squish** [1] - 138:18

**stairs** [2] - 129:24, 136:23

**stance** [1] - 82:8

**stand** [4] - 57:14, 59:20, 64:23, 107:4

**standard** [2] - 52:15, 85:7

**standing** [3] - 82:1, 82:6, 136:5

**stands** [2] - 38:5, 59:10

**start** [13] - 44:6, 46:21, 46:24, 53:18, 61:18, 67:21, 71:14, 71:15, 72:12, 73:16, 108:16, 118:14, 138:16

**started** [4] - 4:16, 4:19, 109:19, 141:13

**starting** [11] - 12:21, 21:11, 25:5, 29:20, 44:10, 47:20, 58:12, 58:23, 64:22, 70:5,

105:24

**starts** [1] - 32:1

**state** [7] - 4:2, 16:4, 20:13, 20:14, 20:21, 107:9

**State** [5] - 6:2, 26:12, 28:23, 46:4, 77:2

**statement** [2] - 3:2, 45:18

**STATES** [2] - 1:1, 1:4

**States** [7] - 2:20, 9:6, 18:9, 28:4, 76:18, 77:3, 85:18

**Station** [2] - 124:12, 125:1

**stay** [1] - 132:5

**stayed** [1] - 4:20

**staying** [4] - 78:7, 131:9, 131:11, 132:2

**stenographically** [1] - 144:6

**step** [2] - 31:15, 39:6

**stepdaughter** [1] - 64:1

**steps** [5] - 12:16, 21:10, 29:3, 29:7, 29:20, 29:21, 29:23, 33:25

**STEVEN** [2] - 16:1, 143:6

**Steven** [3] - 2:10, 15:23, 16:6

**stick** [1] - 39:2

**sticking** [1] - 90:20

**still** [26] - 7:5, 9:16, 18:17, 27:11, 32:15, 32:25, 33:2, 37:15, 38:20, 79:20, 79:24, 81:18, 91:17, 92:15, 94:5, 94:23, 98:1, 100:3, 104:18, 118:18, 119:17, 129:3, 130:23, 138:18, 141:2

**stills** [1] - 101:9

**stipulated** [5] - 3:2, 9:6, 28:3, 76:17, 85:17

**stipulation** [15] - 9:2, 10:2, 27:25, 28:25, 75:23, 76:14, 82:24, 83:14, 84:2, 84:4, 84:18, 85:16, 86:3, 86:10, 86:14

**stolen** [1] - 5:3

**stop** [1] - 118:16

**storage** [2] - 21:12, 23:12

**store** [2] - 63:6, 63:8

**stored** [2] - 102:25, 103:1

**stores** [1] - 74:8

**street** [1] - 5:14

**Street** [1] - 1:24

**stretch** [1] - 71:1

**strike** [3] - 55:13, 61:8, 129:2
**stripes** [1] - 115:3
**stuff** [8] - 23:14, 24:1, 36:22, 66:11, 66:15, 72:11, 72:17, 103:22
**stuffed** [1] - 123:23
**subject** - 8:17, 30:12, 30:19, 46:21, 94:3, 98:12, 99:24, 101:7
**submission** - 10:21
**submitted** [2] - 11:5, 13:14
**success** [1] - 75:4
**sucker** [1] - 77:24
**sucker.AVI** [1] - 60:18
**suggested** [1] - 40:22
**suggests** [1] - 83:2
**suit** [2] - 95:16, 96:10
**Sunday** [1] - 112:24
**sup** [1] - 64:25
**super** [1] - 70:24
**superseding** [10] - 28:7, 28:13, 28:16, 85:21, 93:23, 98:22, 100:15, 102:19, 105:10, 141:4
**supporting** [1] - 40:9
**surrounding** [1] - 136:15
**swan** [1] - 59:2
**switch** [3] - 78:7, 87:20, 104:20
**switching** [2] - 3:7, 102:12
**SWORN** [3] - 3:24, 16:1, 107:6
**symbol** [2] - 114:20, 127:9
**syrup** [1] - 129:21
**system** [3] - 35:12, 36:3, 74:12
**systems** [1] - 34:9

## T

**table** [2] - 15:5, 15:15
**tableau** [4] - 22:2, 22:6, 29:25, 30:3
**tan** [1] - 11:19
**tan-colored** [1] - 11:19
**target** [1] - 60:6
**tarp** [1] - 124:20
**Task** [1] - 5:6
**task** [1] - 5:25
**tasks** [1] - 43:7
**tattoo** [18] - 45:11, 49:24, 50:2, 50:4, 50:12, 50:13, 51:3, 114:4,

114:6, 114:13, 114:14, 114:19, 127:1, 127:2, 127:8, 127:9
**teaching** [1] - 18:23
**technical** [4] - 39:13, 75:3, 88:7, 139:4
**technician** [1] - 108:2
**techniques** [2] - 19:9
**technological** [1] - 3:17
**technology** [1] - 2:2
**teen** [5] - 57:15, 57:17, 59:16, 61:25, 70:20
**ten** [4] - 37:11, 61:23, 68:4, 137:14
**tentatively** [1] - 138:9
**tenth** [1] - 126:16
**terabyte** [2] - 21:23, 21:24
**term** [12] - 17:17, 35:6, 38:2, 40:3, 56:25, 57:4, 57:18, 58:18, 58:20, 59:11, 59:14, 75:13
**terms** [17] - 8:16, 35:1, 40:17, 52:8, 56:2, 56:4, 56:23, 56:24, 61:1, 61:8, 61:9, 73:4, 93:5, 97:3, 99:1, 100:16, 117:10
**tested** [1] - 2:3
**testified** [3] - 55:8, 112:13, 114:23
**testifies** [1] - 3:7
**testify** [2] - 2:13, 76:22
**testifying** [1] - 20:21
**testimony** [8] - 10:20, 13:18, 20:21, 21:6, 39:9, 42:15, 73:23, 84:23
**testing** [1] - 22:19
**tests** [1] - 23:1
**text** [8] - 132:16, 132:18, 132:25, 133:1, 133:4, 133:12
**texting** [1] - 132:21
**Thailand** [1] - 28:11
**THE** [118] - 1:1, 1:1, 2:2, 2:6, 2:15, 3:11, 3:13, 3:22, 3:23, 3:25, 4:1, 4:4, 4:6, 9:4, 10:3, 15:18, 15:20, 15:21, 15:24, 15:25, 16:2, 16:3, 16:6, 16:7, 16:8, 16:9, 21:2, 21:4, 27:6, 27:11, 28:2, 29:1, 39:2, 39:6, 39:8, 39:15, 40:24, 41:5, 41:7, 41:17, 41:23, 42:2, 42:5, 42:7, 42:12, 42:14, 42:17, 42:21, 42:23, 43:1, 43:3, 75:11, 76:16, 79:17, 80:9, 80:14, 82:19, 83:10, 83:17, 83:20, 84:2, 84:17,

84:20, 85:2, 85:10, 85:13, 86:4, 86:7, 86:10, 86:12, 86:19, 91:11, 91:22, 91:25, 92:4, 92:10, 92:12, 92:14, 92:15, 92:16, 92:19, 93:24, 97:23, 98:23, 102:20, 105:11, 106:11, 106:21, 106:24, 107:1, 107:3, 107:5, 107:7, 107:8, 107:11, 107:13, 117:15, 117:17, 136:10, 137:16, 137:18, 137:20, 138:1, 138:3, 138:8, 138:20, 138:22, 139:1, 139:4, 139:17, 139:23, 140:3, 140:11, 140:13, 140:17, 140:22, 141:23, 142:3
**Theft** [2] - 5:2, 5:6
**theft** [1] - 5:20
**thefts** [1] - 4:24
**therefore** [3] - 24:5, 35:21, 56:24
**thighs** [1] - 100:23
**thinking** [5] - 2:15, 38:25, 136:14, 138:8, 138:12
**thinks** [1] - 83:25
**third** [19] - 28:7, 28:13, 28:16, 62:22, 63:23, 63:25, 64:25, 65:1, 85:21, 93:23, 98:22, 102:19, 105:10, 110:18, 117:25, 119:8, 120:2, 135:24, 141:3
**thirteenth** [1] - 127:6
**thousands** [2] - 54:2, 72:15
**three** [35] - 6:1, 12:9, 19:18, 25:16, 28:18, 37:11, 37:13, 40:24, 45:22, 59:22, 61:18, 61:21, 62:24, 62:25, 64:9, 64:11, 64:12, 64:17, 64:18, 64:19, 67:25, 73:17, 73:20, 73:24, 74:2, 74:22, 75:7, 76:15, 80:25, 82:11, 85:4, 94:11, 105:16, 110:5, 112:14
**Three** [1] - 98:22
**three-day** [1] - 19:18
**three-page** [2] - 40:24, 45:22
**throughout** [3] - 49:15, 49:18, 51:1
**throw** [3] - 96:11, 122:2, 122:3
**thumb** [4] - 74:3, 74:6,

86:25, 87:10
**thumbnail** [11] - 35:10, 36:19, 37:7, 37:17, 72:13, 74:6, 74:16, 75:1, 103:4, 103:8, 103:10
**thumbnails** [5] - 35:6, 35:7, 35:8, 36:3, 37:6, 37:13, 72:14, 74:8, 74:22
**thumbs** [1] - 87:17
**Thursday** [2] - 1:10, 112:25
**ties** [9] - 88:3, 88:18, 88:25, 90:3, 90:11, 91:5, 118:12, 118:14, 118:16
**tight** [1] - 70:9
**tilt** [1] - 81:23
**timestamp** [1] - 47:1
**tiny** [1] - 70:24
**tissues** [1] - 27:7
**tit** [1] - 59:1
**title** [1] - 16:14
**titled** [3] - 60:20, 67:8, 67:12
**today** [8] - 10:20, 18:17, 24:5, 92:9, 119:17, 138:11, 140:25, 141:9
**together** [2] - 109:20, 122:24
**toggle** [1] - 77:19
**tomorrow** [6] - 2:17, 138:16, 141:6, 141:7, 141:9, 141:20
**tones** [1] - 72:17
**tongue** [1] - 90:19
**tonight** [1] - 138:15
**took** [4] - 29:21, 30:25, 49:15, 108:20
**tool** [11] - 19:6, 19:10, 19:13, 23:17, 30:5, 46:16, 46:20, 56:16, 56:23, 60:21, 73:1
**Toolkit** [2] - 19:10, 22:1
**tools** [20] - 17:5, 17:9, 17:10, 17:15, 17:23, 18:16, 19:19, 19:20, 22:17, 23:17, 31:16, 31:18, 31:25, 33:8, 33:10, 34:15, 46:15, 52:6, 57:25
**top** [12] - 12:11, 12:15, 15:6, 36:14, 45:5, 58:11, 60:11, 60:17, 89:12, 98:7, 98:8, 100:5, 101:15, 102:8, 104:25, 106:17, 111:18, 122:19, 124:25
**topless** [2] - 76:12, 88:17
**Toshiba** [11] - 25:23, 26:22, 26:25, 28:5, 28:6,

28:10, 28:21, 29:5, 55:19, 126:10, 126:13
**tossing** [1] - 136:21
**touch** [1] - 88:19
**touches** [1] - 99:10
**touching** [5] - 89:1, 90:4, 90:12, 91:6, 117:2
**tout** [1] - 53:5
**towards** [4] - 81:23, 94:19, 101:21, 102:8
**track** [2] - 66:10, 66:14
**tracked** [1] - 65:8
**tracking** [1] - 66:9
**trade** [1] - 42:5
**training** [9] - 19:3, 19:8, 19:11, 19:14, 19:20, 21:5, 57:10, 58:17, 73:18
**trainings** [2] - 19:15, 19:18
**transcribed** [1] - 144:9
**transcript** [1] - 144:9
**transferred** [1] - 4:25
**trash** [1] - 32:14
**traveled** [1] - 28:24
**trial** [11] - 25:7, 43:22, 58:4, 61:6, 62:13, 73:14, 76:22, 79:8, 82:22, 83:7, 85:6
**Trooper** [2] - 8:7, 26:4
**try** [3] - 82:1, 138:14, 141:11
**trying** [4] - 35:20, 80:10, 86:22, 138:18
**Tuesday** [2] - 8:1, 112:25
**turn** [3] - 24:1, 30:8, 140:6
**turned** [1] - 65:5
**turning** [1] - 136:22
**TV** [1] - 124:11
**twelfth** [1] - 126:25
**twice** [1] - 28:20
**Two** [1] - 93:23
**two** [18] - 3:7, 15:6, 19:17, 21:23, 30:13, 33:1, 33:3, 40:6, 40:21, 42:7, 92:4, 93:7, 93:12, 95:11, 101:13, 105:3, 105:21, 127:19
**two-page** [1] - 101:13
**type** [4] - 38:3, 60:24, 97:3, 103:6
**typed** [1] - 60:23
**types** [6] - 20:2, 30:23, 43:17, 47:13, 52:4, 57:18
**typically** [8] - 29:13, 36:20, 38:13, 57:19, 59:18, 77:9, 112:24, 113:9
**typo** [1] - 41:14

## U

**U.S** [1] - 1:23
**unallocated** [15] - 32:8, 32:10, 32:11, 33:11, 33:21, 35:2, 38:17, 38:19, 57:2, 93:6, 93:10, 97:11, 99:2, 100:18
**uncle** [1] - 64:1
**under** [8] - 2:22, 13:9, 69:12, 76:20, 76:21, 92:15, 112:20, 128:4
**underage** [1] - 61:24
**underneath** [3] - 97:20, 99:15, 124:20
**underscore** [4] - 65:21, 65:23, 67:22, 67:24
**understandable** [2] - 83:16, 83:24
**understood** [1] - 39:8
**underwear** [1] - 122:20
**Union** [1] - 45:18
**unit** [3] - 4:23, 5:3, 5:21
**Unit** [1] - 5:2
**UNITED** [2] - 1:1, 1:4
**United** [8] - 2:20, 9:6, 18:8, 28:4, 76:17, 76:25, 77:3, 85:18
**unless** [4] - 86:7, 139:7, 139:18, 140:6
**unrest** [1] - 136:21
**unusual** [2] - 129:2, 129:5
**up** [45] - 5:25, 7:22, 12:15, 13:4, 14:1, 22:1, 22:5, 23:18, 23:19, 24:14, 31:17, 34:4, 34:11, 35:9, 35:16, 35:22, 38:9, 53:10, 56:23, 60:24, 61:14, 67:23, 69:3, 74:14, 76:7, 87:21, 92:20, 94:11, 95:12, 95:20, 96:15, 103:4, 103:22, 113:10, 115:17, 119:25, 125:10, 128:24, 130:22, 136:23, 136:24, 138:10, 139:17
**updated** [2] - 41:13, 41:16
**uploading** [1] - 54:9
**upper** [2] - 127:4, 134:2
**URLs** [1] - 52:10
**USA** [1] - 144:6
**USB** [1] - 60:12
**user** [8] - 18:3, 37:13, 43:9, 43:18, 50:19, 59:24, 60:1, 61:12
**user/Eric** [1] - 59:23
**users** [3] - 54:12, 55:17, 66:9
**users/home/video** [1] - 78:18
**users/home/videos/ video** [1] - 80:22
**utilize** [2] - 17:23, 66:10
**utilizing** [1] - 57:10

## V

**vagina** [11] - 70:9, 71:1, 99:12, 100:23, 100:24, 104:14, 104:16, 106:2, 106:3, 106:6, 106:7
**Valley** [14] - 109:25, 112:14, 112:23, 113:6, 113:13, 113:21, 116:1, 117:6, 120:6, 120:10, 120:19, 123:5, 134:13, 134:24
**value** [4] - 22:11, 24:6, 31:3, 31:8, 72:25
**values** [1] - 75:18
**various** [7] - 17:5, 18:16, 30:23, 33:11, 60:22, 66:1, 141:3
**vehicle** [4] - 11:18, 11:22, 11:23, 49:10
**verdict** [2] - 92:6, 141:17
**verifies** [1] - 22:11
**verify** [1] - 30:6
**version** [5] - 41:13, 41:19, 79:9, 79:11, 80:7
**versions** [1] - 74:18
**versus** [1] - 52:10
**vets** [2] - 18:11, 18:24
**vibrator** [6] - 71:9, 71:10, 99:11, 99:12, 123:3, 123:5
**Vicki** [6] - 59:1, 60:18, 77:17, 77:24, 78:1, 78:5
**Vicki-sucker.AVI** [1] - 60:18
**victim** [7] - 77:12, 78:4, 82:23, 82:25, 83:3, 83:6, 83:14
**Victim** [1] - 19:14
**victim's** [1] - 83:13
**victims** [1] - 73:3
**Video** [2] - 97:24, 99:20
**video** [52] - 8:9, 19:13, 31:11, 32:12, 32:17, 32:18, 32:20, 32:25, 33:1, 36:18, 36:19, 36:21, 36:24, 50:3, 50:4, 50:6, 50:8, 50:9, 53:11, 54:9, 63:24, 72:11, 78:15, 78:17, 78:22, 79:13, 79:18, 79:21, 80:15, 80:23, 81:17, 81:19, 87:18, 92:22, 92:23, 93:1, 93:15, 93:21, 93:22, 94:1, 94:2, 94:3, 94:12, 94:23, 96:20, 96:21, 97:10, 97:14, 97:22, 98:10, 98:11, 98:12, 98:16, 99:6, 99:7, 99:13, 99:16, 99:19, 99:22, 99:24, 99:25, 100:3, 100:10, 100:18, 101:1, 101:4, 101:5, 101:6, 101:7, 101:21, 101:25, 124:15
**videos** [18] - 24:16, 31:23, 33:18, 34:9, 39:18, 54:7, 63:3, 72:5, 72:10, 73:12, 74:9, 74:13, 77:7, 78:8, 78:11, 82:10, 82:11, 84:12
**videos.com** [1] - 64:1
**videos/video** [1] - 78:18
**view** [9] - 20:5, 24:15, 34:10, 35:17, 36:8, 37:1, 37:14, 53:14, 72:14
**viewed** [1] - 133:7
**violent** [1] - 20:6
**virgin** [2] - 61:24, 63:3
**virgins** [1] - 71:23
**virtue** [1] - 28:21
**visible** [34] - 88:1, 88:2, 88:4, 88:17, 88:20, 88:25, 89:2, 89:9, 89:10, 89:13, 89:19, 89:21, 90:1, 90:3, 90:5, 90:10, 90:13, 90:18, 91:3, 91:5, 91:7, 91:17, 93:16, 93:19, 93:20, 97:19, 99:14, 99:17, 100:25, 104:16, 104:23, 106:3, 106:7, 106:8
**Visited** [2] - 67:8, 67:12
**visited** [2] - 67:13, 68:12
**visual** [2] - 72:4, 73:9
**voice** [1] - 102:7
**VOLUME** [1] - 1:10
**voluminous** [1] - 85:2

## W

**waist** [1] - 76:7
**wait** [1] - 26:23
**walk** [1] - 12:16
**walked** [2] - 129:24, 130:2
**walking** [1] - 130:8
**wall** [13] - 88:5, 88:20, 89:2, 89:13, 89:21, 90:5, 90:13, 90:21, 91:8, 111:5, 112:12, 134:16, 134:24
**wants** [1] - 35:11
**warrant** [12] - 2:24, 8:12, 8:15, 8:17, 8:19, 9:12, 10:15, 11:4, 11:12, 21:14, 29:24, 131:22
**warrants** [2] - 2:24, 16:22
**Warrior** [1] - 18:22
**Washington** [2] - 20:17, 77:3
**watch** [1] - 53:14
**watched** [1] - 99:22
**water** [2] - 27:4, 27:7
**Wayne** [8] - 9:7, 28:5, 44:12, 44:23, 44:25, 47:24, 76:19, 85:19
**WAYNE** [1] - 1:6
**ways** [1] - 40:2
**wear** [6] - 115:4, 116:7, 116:16, 118:10, 121:23, 135:17
**wearing** [21] - 87:23, 87:25, 88:15, 88:17, 88:23, 89:7, 89:9, 89:11, 89:16, 89:18, 89:19, 89:24, 90:1, 90:8, 90:10, 90:16, 90:18, 91:3, 118:14, 118:16, 133:22
**web** [10] - 33:18, 53:1, 61:10, 62:4, 62:5, 62:9, 63:7, 63:15, 66:14, 67:13
**website** [1] - 66:11
**websites** [1] - 68:12
**wedding** [7] - 95:3, 95:24, 96:18, 135:16, 135:17, 135:21, 135:23
**Wednesday** [1] - 112:25
**week** [4] - 2:4, 5:10, 5:11, 115:5
**weekend** [1] - 71:19
**welcome** [2] - 3:14, 92:14
**West** [1] - 1:24
**Westminster** [10] - 4:12, 5:5, 5:12, 5:21, 6:3, 9:11, 9:21, 9:24, 9:25, 120:16
**Whereof** [1] - 144:11
**white** [13] - 13:24, 14:11, 14:17, 93:17, 94:21, 95:18, 96:19, 97:19, 99:13, 99:17, 106:3, 106:8, 106:18
**whole** [4] - 24:13, 36:11, 107:21
**wife** [1] - 71:19
**wife's** [1] - 109:2
**wifi** [1] - 34:18
**window** [7] - 88:6, 89:4, 101:2, 102:9, 111:5, 111:12, 134:17
**Windows** [2] - 36:6, 74:12
**windows** [2] - 53:9, 111:5
**withdraw** [1] - 79:14
**WITNESS** [13] - 3:24, 3:25, 4:4, 15:21, 16:1, 16:2, 16:6, 16:8, 92:16, 107:6, 107:7, 107:11, 143:6
**witness** [23] - 2:8, 2:10, 2:11, 3:19, 10:17, 15:22, 75:11, 82:22, 82:25, 83:5, 83:8, 83:13, 84:16, 84:22, 84:24, 84:25, 85:1, 91:10, 107:3, 107:4, 114:9, 143:5, 143:8
**Witness** [2] - 39:7, 144:11
**witness's** [1] - 21:4
**witnesses** [2] - 140:7, 140:19
**WITNESSES** [1] - 143:4
**woke** [2] - 128:24, 130:22
**woman** [1] - 95:18
**Worcester** [1] - 20:18
**word** [1] - 41:14
**Word** [1] - 51:18
**words** [7] - 5:2, 29:8, 54:4, 55:19, 68:13, 69:13, 132:19
**work-around** [2] - 2:5, 3:6
**worker** [1] - 8:8
**works** [1] - 6:11
**world** [2] - 31:1, 31:5
**worn** [1] - 102:7
**wounded** [2] - 18:10, 18:24
**Wounded** [1] - 18:22
**wrist** [10] - 88:3, 88:18, 89:1, 90:3, 90:11, 91:6, 118:10, 118:11, 118:14, 118:16
**write** [3] - 22:2, 22:6, 29:25
**write-blocker** [2] - 22:2, 29:25
**written** [2] - 46:17, 141:15
**wrote** [1] - 38:8

## Y

**year** [8] - 4:25, 5:14, 16:19, 18:20, 59:21, 67:1, 132:7, 136:11
**years** [13] - 4:15, 4:21, 5:18, 5:23, 16:19, 19:25, 31:1, 58:9, 72:22, 110:5, 112:14, 118:15, 127:19
**yelled** [1] - 129:7
**yellow** [8] - 37:2, 106:2, 106:7, 106:18, 117:13, 119:15, 119:25, 135:11
**yesterday** [1] - 2:20
**YO** [7] - 59:2, 59:17, 59:20, 60:18, 78:5
**young** [1] - 71:7
**YouTube** [1] - 72:11

## Z

**Zajac** [3] - 1:23, 144:5, 144:16
**zero** [2] - 31:6, 31:7
**zoom** [1] - 13:6
**zoomed** [1] - 121:15
**zooms** [1] - 97:17